IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. _____ |
| | § | |
| **BASELINE OIL & GAS CORP.,** | § | |
| | § | |
| **The Debtor** | § | (Chapter 11) |
| | § | |
| | § | |

---

### DISCLOSURE STATEMENT WITH RESPECT TO PREPACKAGED
### PLAN OF REORGANIZATION OF BASELINE OIL & GAS CORP.

RHETT G. CAMPBELL
Texas State Bar No.03714500
MILLIE A. SALL
Texas State Bar No. 01278050
**THOMPSON & KNIGHT LLP**
333 Clay Street, Suite 3300
Houston, Texas  77002
Telephone:  713.654.8111
*and*
MATTHEW S. COHEN
IRA L. HERMAN
Texas State Bar No. 24063314
**THOMPSON & KNIGHT LLP**
919 Third Avenue, 39th Floor
New York, New York  10022-3915
Telephone:  212.751.3001
ATTORNEYS FOR BASELINE OIL & GAS CORP.

DATED:  July 21, 2009.

## **TABLE OF CONTENTS**

PAGE

ARTICLE I PLAN OVERVIEW ...................................................................................................... 4

    1.1    Post-Confirmation Funding:  Exit Facility. ............................................... 4

    1.2    Classes 1, 2, 3, 5, 6 and 7 ........................................................................ 4

    1.3    Class 4 Prepetition Notes. .......................................................................... 4

    1.4    Class 8 ........................................................................................................ 5

ARTICLE II INTRODUCTION ...................................................................................................... 5

    2.1    Purpose of Disclosure Statement. .............................................................. 5

    2.2    Explanation of Chapter 11. ........................................................................ 5

    2.3    Procedure for Filing Proofs of Claim and Proofs of Interest. .................... 7

    2.4    Voting Procedures and Requirements ......................................................... 8

ARTICLE III HISTORY OF THE DEBTOR ............................................................................ 11

    3.1    Overview of Business Operations ............................................................. 11

    3.2    Ownership. ................................................................................................ 12

ARTICLE IV THE REORGANIZATION CASE ...................................................................... 13

    4.1    The Debtor and the Reorganization Case. ............................................... 13

    4.2    Sources of Information. ............................................................................ 23

    4.3    Liquidation Analysis. ............................................................................... 24

    4.4    Other Financial Information. .................................................................... 24

    4.5    Insurance Policies and Indemnification. .................................................. 26

    4.6    Preference Analysis. ................................................................................. 26

ARTICLE V DESCRIPTION OF THE PLAN ......................................................................... 26

    5.1    Overall Structure of the Plan .................................................................... 26

    5.2    Classification and Treatment of Claims and Interests. ............................ 27

    5.3    Means for Implementation of the Plan ..................................................... 30

    5.4    Treatment of Executory Contracts and Unexpired Leases. ..................... 51

    5.5    Conditions Precedent to the Plan's Confirmation and
            Consummation. ........................................................................................ 52

    5.6    Modification; Withdrawal ......................................................................... 53

    5.7    Retention of Jurisdiction. ......................................................................... 53

    5.8    Binding Effect and Discharge of the Debtor ............................................ 54

| 5.9 | Vesting. | 55 |
|---|---|---|
| 5.10 | Exculpation And Limitation Of Liability. | 55 |
| 5.11 | Good Faith. | 55 |
| 5.12 | Injunction. | 56 |
| 5.13 | Payment of Statutory Fees. | 56 |
| 5.14 | Severability of Plan Provision. | 56 |
| 5.15 | Successors and Assigns. | 56 |
| 5.16 | Term of Injunctions or Stays. | 56 |
| 5.17 | Governing Law. | 57 |

ARTICLE VI CERTAIN RISK FACTORS TO BE CONSIDERED ........................................ 57

| 6.1 | Risks Related to the Bankruptcy Proceedings. | 57 |
|---|---|---|
| 6.2 | Risks Related to Financial Condition of Reorganized Debtor. | 58 |
| 6.3 | Risks Related to the Reorganized Debtor's Assets and Projected Operations. | 60 |
| 6.4 | Risks Related to the New Notes. | 67 |
| 6.5 | Risks Related to the New Stock. | 71 |

ARTICLE VII FINANCIAL INFORMATION AND FEASIBILITY ........................................ 73

| 7.1 | Financial Information. | 73 |
|---|---|---|
| 7.2 | Feasibility of the Plan. | 73 |

ARTICLE VIII LIQUIDATION ANALYSIS ........................................ 74

| 8.1 | Liquidation Analysis. | 74 |
|---|---|---|

ARTICLE IX POST CONFIRMATION MANAGEMENT ........................................ 75

ARTICLE X DISTRIBUTIONS AND CLAIMS RESOLUTION ........................................ 76

| 10.1 | Delivery of Distributions; Undeliverable or Unclaimed Distributions. | 76 |
|---|---|---|
| 10.2 | Allocation of Plan Distributions Between Principal and Interest. | 76 |
| 10.3 | Fractional Amounts. | 76 |
| 10.4 | Withholding and Reporting Requirements. | 76 |
| 10.5 | Setoffs. | 77 |

ARTICLE XI FEDERAL INCOME TAX CONSEQUENCES ........................................ 77

| 11.1 | General. | 77 |
|---|---|---|
| 11.2 | Tax Consequences to the Debtor. | 79 |

11.3    Tax Consequences to Holders of Allowed Prepetition Notes Claims. ................................................................................................ 84

11.4    Tax Consequences of Holding New Notes. ............................................. 88

11.5    Tax Consequences of Holding New Stock. ............................................. 91

11.6    Information Reporting and Backup Withholding. .................................... 94

11.7    Importance of Obtaining Professional Tax Assistance. ........................... 95

ARTICLE XII REQUIREMENTS FOR CONFIRMATION ...................................................... 95

12.1    Solicitation and Voting Requirements. .................................................... 95

12.2    Best Interests Test. .................................................................................. 96

12.3    Confirmation Without Acceptance of All Impaired Classes - "Cramdown". ........................................................................................... 97

ARTICLE XIII ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ................................................................................................ 98

ARTICLE XIV OTHER MATTERS .......................................................................................... 99

ARTICLE XV RECOMMENDATION AND CONCLUSION ................................................. 100

Exhibits:

| | |
|---|---|
| Exhibit A | Plan of Reorganization dated [August __, 2009] of Baseline Oil & Gas Corp. |
| Exhibit B | Evaluation Summary for Baseline Oil & Gas Corp. of Cawley Gillespie & Associates, Inc., Petroleum Consultants, Reserve Report dated February 13, 2009 (proved and probable reserves only) |
| Exhibit C | Glossary of Oil and Gas Terminology |
| Exhibit D | Debtor Beneficial Ownership Chart, as of May 14, 2009 |
| Exhibit E | Baseline Oil & Gas Valuation prepared by Grant Thornton LLP, Corporate Advisory & Restructuring Services |
| Exhibit F | Reorganized Debtor Securities Allocation Table |
| Exhibit G | *pro forma* Financial Projections and Budget |
| Exhibit H | Financial Statements and Financial Statement Schedules of Baseline Oil & Gas Corp. for the fiscal year ended December 31, 2008, as filed with the Securities and Exchange Commission on Form 10-K |
| Exhibit I | Quarterly Report of Baseline Oil & Gas Corp., for the period ending March 31, 2009, as filed with the Securities and Exchange Commission on Form 10-Q |
| Exhibit J | Schedule of Insurance Policies |
| Exhibit K | List of Executory Contracts |
| Exhibit L | Form of Series A Senior Notes Indenture between Baseline Oil & Gas Corp. and The Bank of New York Mellon Trust Company, N.A., as trustee, dated as of [_____, 2009] |
| Exhibit M | Form of Series B Senior Notes Indenture between Baseline Oil & Gas Corp. and The Bank of New York Mellon Trust Company, N.A., as trustee, dated as of [_____, 2009] |
| Exhibit N | Form of Subordinated Notes Indenture between Baseline Oil & Gas Corp. and The Bank of New York Mellon Trust Company, N.A., as trustee, dated as of [_____, 2009] |
| Exhibit O | Form of First Lien Security Agreement between Baseline Oil & Gas Corp. and The Bank of New York Mellon Trust Company, N.A., as collateral agent, dated as of [_____, 2009] |

Exhibit P     Form of Second Lien Security Agreement between Baseline Oil & Gas Corp. and
              The Bank of New York Mellon Trust Company, N.A., as collateral agent, dated as
              of [_____, 2009]

Exhibit Q     Form of Third Lien Security Agreement between Baseline Oil & Gas Corp. and
              The Bank of New York Mellon Trust Company, N.A., as collateral agent, dated as
              of [_____, 2009]

Exhibit R     Form of Intercreditor Agreement between Baseline Oil & Gas Corp. and The
              Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent,
              dated as of [_____, 2009]

Exhibit S     Form of Stockholders Agreement among Baseline Oil & Gas Corp., Jefferies and
              Third Point, dated as of [_____, 2009]

Exhibit T     Form of Certificate of Designations, Preferences and Rights of Senior and Junior
              Redeemable Preferred Stock of Baseline Oil & Gas Corp., dated as of [_____,
              2009]

Exhibit U     Form of Certificate of Incorporation of Baseline Oil & Gas Corp., dated as of
              [_____, 2009]

Exhibit V     Form of Amended and Restated Bylaws of Baseline Oil & Gas Corp., dated as of
              [_____, 2009]

Exhibit W     Form of Purchase Agreement among Baseline Oil & Gas Corp. and the
              Purchasers named therein  dated as of  [_____, 2009]

Exhibit X     Plan Support and Lock-Up Agreement Regarding Baseline Oil & Gas Corp.,
              among Baseline Oil & Gas Corp., Jefferies and Third Point dated as of  July  17,
              2009*

_____

(*) Available for review only on a confidential basis unless and until the commencement of the
Chapter 11 Case.

THE BOARD OF DIRECTORS OF BASELINE OIL & GAS CORP. ("BASELINE" OR THE "DEBTOR") BELIEVES THAT ITS PREPACKAGED PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE DATED [AUGUST ___, 2009] (THE "PLAN") IS IN THE BEST INTERESTS OF CREDITORS.  HOLDERS OF PREPETITION NOTES CLAIMS ARE IMPAIRED UNDER THE PLAN AND ARE URGED TO VOTE IN FAVOR OF THE PLAN.

THE SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE PLAN *BEFORE* THE FILING OF THE VOLUNTARY REORGANIZATION CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE.  BECAUSE THE CHAPTER 11 CASE HAS NOT COMMENCED, THIS DISCLOSURE STATEMENT AND THE ACCOMPANYING BALLOT HAVE NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.  FOLLOWING THE COMMENCEMENT OF ITS CHAPTER 11 CASE, THE DEBTOR EXPECTS TO SEEK PROMPTLY AN ORDER OF THE BANKRUPTCY COURT (i) APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, (ii) APPROVING THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE, AND (iii) CONFIRMING THE PLAN.

THE SECURITIES TO BE ISSUED UNDER THE PLAN AND DESCRIBED HEREIN HAVE NOT BEEN REGISTERED WITH, RECOMMENDED BY OR APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY OTHER U.S. OR NON-U.S. FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY.  NEITHER THE SEC NOR ANY SUCH STATE SECURITIES COMMISSION OR AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES ISSUABLE UNDER THE PLAN ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND OTHER PROVISIONS SET FORTH IN THE NEW NOTES INDENTURES, THE CERTIFICATE OF DESIGNATIONS AND A STOCKHOLDERS AGREEMENT REGARDING THE NEW COMMON STOCK, AS APPLICABLE, AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SUCH RESTRICTIONS AND CONDITIONS AND EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.  PREPETITION NOTEHOLDERS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS INDEFINITELY OF ANY DEEMED INVESTMENT IN THE SECURITIES BY REASON OF THEIR ACCEPTANCE OF THE PLAN AND/OR ELECTION TO PARTICIPATE IN THE EXIT FACILITY.

The summary of Baseline's Plan and other documents described in this Disclosure Statement are qualified by reference to documents themselves and the exhibits thereto. **Capitalized terms not otherwise defined in this Disclosure Statement shall have the**

**meanings ascribed to them in the Plan. In the event of any conflict between the provisions of this Disclosure Statement and the Plan, the provisions of the Plan shall control.**

## PRELIMINARY STATEMENT

On or about August 25, 2009 Baseline intends to commence a case by filing a petition for relief under chapter 11 of title 11 of the United States Code, as amended, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, subject to receiving in advance requisite acceptances of the Debtor's Plan from holders of Prepetition Notes Claims. If the petition is filed, the Debtor will seek immediate confirmation of the Plan on or about September 25, 2009.

Baseline hereby transmits this Disclosure Statement for use in the solicitation of votes to accept its Plan. This Disclosure Statement has been prepared in accordance with Section 1125 of the Bankruptcy Code and Bankruptcy Rules 3016(c) and 3018. A copy of the Plan is attached to this Disclosure Statement as Exhibit A. This Disclosure Statement, among other things, (i) contains certain information regarding the Debtor's prepetition history, (ii) describes the Plan, the effects of confirmation of the Plan, the treatment of claims and interests and distributions under the Plan, and (iii) discusses the confirmation process and voting procedures that Prepetition Notes Claims in Class 4 must follow for their votes to be counted. The holders of Class 4 Claims are the only Claims Impaired under the Plan and entitled to vote to accept or reject the Plan. Class 8 Claims are Impaired but are deemed to have rejected the Plan because they will not receive distributions under the Plan.

Holders of Prepetition Notes Claims in Class 4 are urged to read the Disclosure Statement and the Plan in full. **The board of directors of Baseline believe that the Plan is in the best interests of creditors and urges holders of Prepetition Notes Claims in Class 4 to vote in favor of the Plan.**

The statements in this Disclosure Statement are made as of the date hereof. Neither the Disclosure Statement's distribution nor the Plan's consummation will, under any circumstance, create any implication that the information herein is correct at any time after the date hereof. All summaries herein are qualified by reference to the Plan as a whole. In any contested matter or adversary proceeding, this Disclosure Statement shall not constitute an admission of any fact or liability but shall be deemed a statement made in settlement negotiations. Unless otherwise indicated, the Debtor's management has provided the factual information in this Disclosure Statement. The Debtor believes that the information herein is accurate but is unable to warrant that it is without any inaccuracy or omission.

In making a decision in connection with the Plan, holders of Prepetition Notes Claims in Class 4 must rely on their own examination of the Debtor and the terms of the Plan, including the merits and risks involved. They should not construe the contents of this Disclosure Statement as providing any legal, business, financial, or tax advice, and members of this Class should consult their own advisors with respect to those matters and related aspects of their acceptance or rejection of the Plan, their participation or non-participation in the Exit Facility, and any deemed investment in the New Stock or New Notes or any other securities issued by the Reorganized Debtor under the Plan by reason thereof.

No person has been authorized to give any information or to make any representations other than those contained in the Solicitation Package (as defined herein), and, if given or made, such information and representations must not be relied upon as having been authorized. Neither the delivery of this Solicitation Package nor any deemed offer of the New Stock and New Notes or any other securities to be issued by the Reorganized Debtor under the Plan as a result thereof shall, under any circumstances, create the implication that there has been no change in the Debtor's affairs since the date of this Disclosure Statement or that the information contained therein is correct as of any time subsequent to its date.

This Disclosure Statement contains summaries, believed to be accurate, of some of the terms of specific documents incorporated herein by reference. All summaries are qualified in their entirety by such reference and holders of Prepetition Notes Claims should read the actual documents, copies of which are attached as exhibits to this Disclosure Statement or which will be made available by the Debtor and its Counsel on request, for the complete information contained in such documents.

## U.S. FEDERAL SECURITIES LAW MATTERS

The Debtor is relying on Section 1145(a)(1) of the Bankruptcy Code to exempt the exchange, issuance and distribution of the New Stock and the New Notes, or any other securities to be issued by the Reorganized Debtor under the Plan from the provisions of the Securities Act of 1933, as amended (the "Securities Act"), and other U.S. and non-U.S. state securities and "blue sky" laws insofar as: (i) the securities will be issued by a debtor, an affiliate of a debtor, or a successor to a debtor under a plan approved by a Bankruptcy Court; (ii) the recipients of the securities hold a claim against, an interest in, or a claim for an administrative expense in a case concerning the debtor or such affiliate; and (iii) the securities are issued entirely in exchange for the recipient's claim against or interest in the debtor, or are issued "principally" in such exchange and "partly" in exchange for cash or property.

The solicitation of Prepetition Noteholders' votes and the deemed offer of the New Stock and New Notes, as well as any other securities issued by the Reorganized Debtor under the Plan, as a result thereof are being made on the basis of the Solicitation Package and in reliance upon one or more exemptions from the registration requirements of the Securities Act and any U.S. and non-U.S. state or local laws requiring registration, including Section 4(2) of the Securities Act and/or Regulation D, Rule 144A or Regulation S thereof, as applicable, with respect to transactions not involving a public offering and with accredited investors, qualified institutional buyers or non-U.S. persons, and also, in part, upon the truth and accuracy of the certifications made by the Prepetition Noteholders in the Ballot.

## FORWARD-LOOKING STATEMENTS

The information presented in this Disclosure Statement includes forward-looking statements in addition to historical information. These statements involve known and unknown risks and relate to future events, the Debtor's and the Reorganized Debtor's future financial performance or the Debtor's and the Reorganized Debtor's projected business results. In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "targets,"

"potential" or "continue" or the negative of these terms or other comparable terminology. Forward-looking statements are only predictions. Actual events or results may differ materially from any forward-looking statement as a result of various factors, including those contained in the section entitled "Risk Factors" and other sections of this Disclosure Statement, including the documents incorporated by reference herein. Although the Debtor believes that the expectations reflected in the forward-looking statements are reasonable, the Debtor cannot guarantee future results, events, levels of activity, performance or achievements. The Debtor expressly disclaims a duty to update any of the forward-looking statements.

## ARTICLE I

## PLAN OVERVIEW

The following summarizes the classification and treatment under the Plan of the Claims against and Interests in the Debtor. The summary contained herein is qualified in its entirety by reference to the provisions of the Plan, a copy of which is attached hereto as Exhibit A, and by this Disclosure Statement. The Plan places all Claims and Interests into Classes. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion thereof qualifies within the description of a different Class. Claims against or Interests in the Debtor are grouped in accordance with Section 1122(a) of the Bankruptcy Code. The classification and treatment for all Classes of Claims and Interests are described in more detail elsewhere in this Disclosure Statement. *See* Section 5.2 "Classification and Treatment of Claims and Interests."

### 1.1     Post-Confirmation Funding:  Exit Facility.

The Debtor has negotiated an Exit Facility which will provide $5 million in Cash to use for operations and to make payments to holders of Claims, as set forth in the Plan. The Exit Facility is described in more detail in Section 5.3(A) "Exit Facility" below.

### 1.2     Classes 1, 2, 3, 5, 6 and 7.

The Reorganized Debtor proposes to pay the holders of Allowed Claims in Classes 1, 2, 3, 6 and 7 out of its operating funds or the Exit Facility in full in Cash as soon as practicable on the later of (a) the Effective Date and (b) the date on which such Claims become Allowed Claims payable under applicable law or any agreement relating thereto. In the case of Class 5 (Royalty Claims), each holder of a Class 5 Claim shall be paid in full, in Cash, from a segregated account and, to the extent necessary, from the Exit Facility on the later of (i) the Effective Date and (ii) the date when such Royalty Claim (A) becomes an Allowed Claim payable under applicable law or any agreement relating thereto and (B) is in Pay Status. Claims in Classes 1, 2, 3, 5, 6 and 7 are not Impaired, are deemed to have accepted the Plan and therefore are not entitled to vote to accept or reject the Plan.

### 1.3     Class 4 Prepetition Notes.

The Reorganized Debtor proposes to issue as soon as practicable on the later of (i) the Effective Date and (ii) the date on which such Prepetition Notes Claim becomes an Allowed

Claim payable under applicable law or any agreement relating thereto: (a) New 10%
Subordinated Secured Notes, (b) Junior Preferred Stock and (c) New Common Stock, to satisfy
Allowed Prepetition Notes Claims in Class 4.

In addition, any Prepetition Noteholder who participates in the Exit Facility shall receive
New Series A 20% Senior Secured Notes, New Series B 20% Senior Secured Notes and Senior
Preferred Stock. The security interests and liens securing repayment of the Prepetition Notes
shall be released and re-granted on the Effective Date (i) on a first priority basis to secure the
New Series A 20% Senior Secured Notes, (ii) on a second priority basis to secure the New Series
B 20% Senior Secured Notes, and (iii) on a third priority basis to secure the New 10% Senior
Subordinated Secured Notes, in each case pursuant to the Security Agreements, the Collateral
Agreements and the Intercreditor Agreement (each, as defined herein).

For a more detailed description of the above securities to be issued to holders of Class 4
Prepetition Notes and the Exit Facility Lenders, *see* subsections (A) "- Exit Facility", (B) "-
Class 4 Prepetition Notes Claims" and (C) "- Description of Securities to be Issued in Plan" of
Section 5.3 "Means for Implementation of Plan" below.

Class 4 is Impaired and entitled to vote to accept or reject the Plan.

### 1.4    Class 8.

All Interests of the Debtor held by members of Class 8 shall be cancelled and annulled on
the Effective Date. Interests in Class 8 are Impaired. However, since holders of Class 8 will not
receive any distributions under the Plan, they are deemed to have rejected the Plan and are not
entitled to vote.

## ARTICLE II

## INTRODUCTION

### 2.1    Purpose of Disclosure Statement.

The purpose of this Disclosure Statement is to provide sufficient information about the
Debtor and about the treatment of Claims and Interests under the Plan, including a description of
the securities to be issued under the Plan in satisfaction of certain Claims, to enable the holders
of Impaired Claims against the Debtor to make an informed decision with respect to acceptance
or rejection of the Plan. Each holder of a Claim or Interest or other party in interest is urged to
carefully consider the Plan and this Disclosure Statement in their entirety and, to consult with
legal or other available counsel, if necessary, to understand the Plan and its effects, including
possible tax consequences, before voting.

### 2.2    Explanation of Chapter 11.

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Upon the
commencement of a chapter 11 case, Section 362 of the Bankruptcy Code provides for an
automatic stay of all attempts to collect upon claims against a debtor that arose prior to the

bankruptcy filing. Generally speaking, the automatic stay prohibits interference with a debtor's property or business.

Under chapter 11, a debtor attempts to reorganize its business for the benefit of the debtor, its creditors, and its shareholders. Confirmation of a plan of reorganization is the primary goal of a reorganization case under chapter 11 of the Bankruptcy Code. A plan of reorganization sets forth the means for satisfying all claims against, and interests in, a debtor. Generally, a claim against a debtor arises from a debtor/creditor transaction, such as a promissory note or a trade credit relationship, but may also arise from other contractual agreements or from alleged torts. An interest in a debtor is held by a party that owns the debtor, such as a shareholder.

A chapter 11 case is a "prepackaged chapter 11 case" when a debtor transmits all solicitation materials to holders of claims or interests whose vote is sought *before* it commences a chapter 11 case. Section 1126(b) of the Bankruptcy Code governs acceptances and rejections of plans obtained by parties entitled to vote, before the commencement of a chapter 11 case. Section 1126(b) counts a prepetition acceptance or rejection toward the required amounts and number of acceptances only if solicitation was in compliance with any applicable non-bankruptcy law or rule or such acceptance was solicited after disclosure of adequate information as defined in Section 1125(a) of the Bankruptcy Code.

Section 1125 of the Bankruptcy Code requires that a plan proponent fully disclose adequate information about the debtor, its assets, liabilities, claims and the plan of reorganization to creditors and shareholders before acceptances of that plan may be solicited. This Disclosure Statement is being provided to the Prepetition Noteholders to satisfy the requirements of Section 1125 of the Bankruptcy Code.

The Bankruptcy Code provides that creditors and shareholders are to be grouped into "classes" under a plan and that they are to vote to accept or reject a plan by class. As a general matter, creditors with similar legal rights are placed together in the same class and shareholders with similar legal rights are placed together in the same class. For example, creditors entitled to similar priority under the Bankruptcy Code should commonly be grouped together.

The Bankruptcy Code does not require that each claimant or shareholder vote in favor of a plan in order for the court to confirm the plan. Rather, the plan must be accepted by each class of claimants and shareholders (subject to the "cramdown" exception discussed below). A class of claimants accepts the plan if, of the claimants in the class who actually vote on the Plan, such claimants holding at least two-thirds in dollar amount and more than one-half in number of allowed claims vote to accept the plan. For example, if a hypothetical class has ten creditors that vote and the total dollar amount of those ten creditors' claim is $1,000,000, then for such class to have accepted the plan, six or more of those creditors must have voted to accept the plan (a simple majority) *and* the claims of the creditors voting to accept the plan must total at least $666,667 (a two-thirds majority).

The Bankruptcy Court may confirm the Plan even though fewer than all classes of Claims and Interests vote to accept the Plan. In this instance, the Plan must be accepted by at least one "Impaired" class of Claims, without including any acceptance of the Plan by an "insider" (as such term is defined in the Bankruptcy Code). Section 1124 of the Bankruptcy Code defines

"impairment" and generally provides that a claim as to which legal, equitable or contractual rights are altered under a plan is deemed to be "impaired." Under the Plan, Classes 4 and 8 are Impaired.

The Debtor has been advised that Third Point and Jefferies, which together hold the requisite majority in number and amount of Claims in Class 4, intend to vote to accept the Plan subject to the terms and conditions of the Plan Support and Lock-Up Agreement Regarding Baseline Oil & Gas Corp. dated as of July 17, 2009, by and among the Debtor, Third Point and Jefferies (the "Plan Support Agreement"). If Class 4 accepts the Plan, the Debtor will have at least one Impaired Class of Claims voting to accept the Plan and will seek confirmation of the Plan under the "cramdown" provisions, over the dissenting votes of holders of Class 8 Interests. Class 8 is deemed to have rejected the Plan by operation of law.

Independent of the acceptance of the Plan by holders of Claims as described above, in order to confirm the Plan, the Bankruptcy Court must determine that the requirements of Section 1129(a) of the Bankruptcy Code have been satisfied. *See* Section 12.3 "Confirmation Without Acceptance of All Impaired Classes – 'Cramdown'" below, for a discussion of the Section 1129(a) requirements for confirmation of a plan of reorganization.

The Debtor believes that the Plan satisfies the confirmation requirements of the Bankruptcy Code. Confirmation of the Plan makes the Plan binding upon the Debtor, the Reorganized Debtor, all holders of Claims and Interests, and other parties in interest, irrespective of whether they have filed proofs of claim or voted to accept the Plan.

## 2.3    Procedure for Filing Proofs of Claim and Proofs of Interest.

### A.    Bar Date for Filing of All Proofs of Claim (Other Than Administrative Claims) and Proofs of Interest.

In order to participate in the payments and other distributions under the Plan, a holder of a Claim or Interest must have such Claim or Interest Allowed. The first step in the allowance process is generally to file a proof of claim or proof of interest.

A proof of claim or proof of interest is deemed filed for any Claim or Interest that appears in the schedules of assets and liabilities, except a Claim or Interest that is scheduled as disputed, contingent, unliquidated or in an unknown amount. If the holder of a Claim or Interest agrees with the amount of the Claim or Interest as scheduled by the Debtor, and that Claim or Interest is not listed in the schedules as being disputed, contingent, or unliquidated, it is not necessary that a separate proof of claim or proof of interest be filed. Claims or Interests that are unscheduled, or that are scheduled as disputed, contingent, or unliquidated will be recognized and allowed only if a proof of claim or proof of interest is timely filed.

If your Claim or Interest is scheduled in a finite amount and you believe it was understated, you are required to file a proof of claim or interest for the larger amount or be forced to accept the amount for which it is scheduled.

The Debtor and the Reorganized Debtor reserves the right, consistent with Article XI Section A of the Plan, to object to Claims and Interests.

**B.      Effect of Amendments to Schedules.**

If, prior to the Confirmation Date, the Debtor reduces the amount of any Claim or Interest shown on the schedules, the affected holder of such Claim or Interest will be notified and will be given 30 calendar days from the date of the mailing of the notice in which to file a proof of claim or proof of interest.

**C.      Executory Contracts and Unexpired Leases.**

Unless otherwise ordered by the Bankruptcy Court, a party to an executory contract or lease that is rejected by the Debtor under the Plan must file any Claim for damages resulting from such rejection within the later of (a) thirty (30) calendar days after the Effective Date and (b) thirty (30) calendar days from the deadline for filing a proof of claim with respect to such Claim. The Debtor does not anticipate any material liability to result from the rejection of executory contracts under the Plan.

**2.4      Voting Procedures and Requirements.**

**A.      Persons Entitled to Vote.**

Only the holders of Claims in Class 4 which are Impaired under the Plan are entitled to vote on the Plan in accordance with the provisions of the Bankruptcy Code. The holders of Claims classified in Classes 1, 2, 3, 5, 6, and 7 are not entitled to vote under the Plan, as such holders are either receiving their statutory treatment under the Bankruptcy Code or are not Impaired under the Plan. Interests in Class 8 are not receiving distributions under the Plan, are therefore deemed to reject the Plan, and are not entitled to vote.

Any Claim as to which an objection is filed before voting has commenced is not entitled to vote unless the Bankruptcy Court, upon motion of the holder whose Claim has been objected to or the motion of another party in interest, temporarily allows the Claim in an amount the Bankruptcy Court deems proper for the purpose of voting to accept or reject the Plan.

Prior to commencing the Chapter 11 Case, the Debtor will transmit on a confidential basis this Disclosure Statement, all exhibits hereto (including, without limitation, the Plan) and the Ballot to holders of Prepetition Notes Claims in Class 4 for informational purposes and for the purpose of soliciting votes on the Plan.

You must be the holder of record on July 20, 2009 of a Claim in Class 4 in order for your vote to be counted.

**B.      Notice to Holders of Claims and Interests.**

The primary purpose of this Disclosure Statement is to provide adequate information to enable members of Class 4 to make a reasonably informed decision with respect to (i) the Plan prior to exercising their right to vote to accept or to reject the Plan and (ii) whether or not to participate in the Exit Facility. Upon commencing the Chapter 11 Case, the Debtor will request that the Bankruptcy Court approve this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable the holders Class 4 Claims to make an informed

judgment about the Plan. The Debtor simultaneously will request that the Bankruptcy Court confirm the Plan.

**WHEN AND IF CONFIRMED BY THE COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR, WHETHER OR NOT THEY ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. IN PARTICULAR, HOLDERS OF CLASS 4 CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS TO THE PLAN AND DISCLOSURE STATEMENT CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR TO REJECT THE PLAN.**

**THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. NO SOLICITATION OF VOTES MAY BE MADE UNTIL DISTRIBUTION OF THIS DISCLOSURE STATEMENT, AND NO PERSON HAS BEEN AUTHORIZED TO DISTRIBUTE ANY INFORMATION CONCERNING THE DEBTOR OTHER THAN THE INFORMATION CONTAINED HEREIN.**

**C.      Voting Instructions, Ballots and Voting Deadline.**

Accompanying this Disclosure Statement and forming a part of the solicitation package are copies of (i) the Plan (Exhibit A to this Disclosure Statement), (ii) information concerning the Debtor (*see* Exhibits B, D, E, H, I and J of this Disclosure Statement), (iii) information concerning the Reorganized Debtor and its securities issuable under the Plan (*see* Exhibits F, G, K and L through V of this Disclosure Statement), and (iv) for holders of Class 4 Claims who are entitled to vote on the Plan, one or more voting ballots (the "Ballot" or "Ballots") (together, the Plan, the Disclosure Statement and all other exhibits thereto and the Ballots shall be referred to as the "Solicitation Package"). If you did not receive a Ballot in your Solicitation Package and believe that you are entitled to vote on the Plan, please contact the Debtor's counsel at the addresses and telephone numbers set forth on the cover of this Disclosure Statement and below, or alternatively, contact the Debtor's counsel through Demetra L. Liggins, Thompson & Knight, LLP, (Tel.) 713.654.8111 or demetra.liggins@tklaw.com.

After carefully reviewing the Plan, this Disclosure Statement, and the instructions on the enclosed Ballot, each holder of Class 4 Impaired Claims shall indicate (a) its acceptance or rejection of the Plan and (b) its election to participate in the Exit Facility, and if making such election, the maximum amount of Cash that it is willing to contribute in connection with the New Cash Advance, which election shall be its binding commitment to provide such Cash contribution, subject to confirmation of the Plan. As part of the Ballot, each holder shall make those certifications contained in Items 1, 4 and 5 thereof with respect to its Prepetition Note holdings and the applicable U.S. federal and state securities laws. Moreover, each holder of Class 4 Claims must complete and sign its Ballot and return it so that it is RECEIVED by the Voting Deadline (as defined below).

IF YOU ARE A HOLDER OF A CLASS 4 CLAIM, FOR YOUR VOTE TO BE COUNTED, YOU MUST PROPERLY COMPLETE AND DELIVER YOUR BALLOT SO THAT YOUR VOTE IS **RECEIVED** BY THE VOTING AGENT NO LATER THAN **THE VOTING DEADLINE.** IN ORDER TO PROMPTLY TRANSMIT YOUR BALLOT, YOU MUST **SEND IT VIA FAX OR EMAIL, TOGETHER WITH AN ORIGINAL SIGNED COPY OF THE BALLOT SENT BY OVERNIGHT DELIVERY,** TO THE FOLLOWING PERSON:

> Demetra L. Liggins, Esq.
> Thompson & Knight LLP
> 333 Clay Street, Suite 3300
> Houston, Texas 77002
> Fax:  713.654.1871
> Email:  demetra.liggins@tklaw.com

**Ballots that are not executed, untimely delivered or otherwise deficient will not be counted.  The Debtor reserves the right to challenge the validity of all Ballots submitted.**

You may obtain additional copies of the Plan, Disclosure Statement, or other material in this Solicitation Package from the Debtor's attorneys as indicated above.

**D.     Confirmation Hearing and Deadline for Objections.**

As noted above, the Debtor will ask the Bankruptcy Court to consider the adequacy of this Disclosure Statement and to confirm the Plan on or before **September 25, 2009 at 5:00p.m. prevailing Central Time,** subject to the Bankruptcy Court's calendar.  At the Confirmation Hearing, the Debtor will request Confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) of the Bankruptcy Code.  *See* Section 12.3 "Confirmation Without Acceptance of All Impaired Classes – 'Cramdown'" below.

The Debtor may modify the Plan, to the extent acceptable to the Exit Facility Lenders and in accordance with the Plan Support Agreement and permitted by Section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, as necessary to confirm the Plan.

Notice of the anticipated Confirmation Hearing and the time to present objections will be provided to holders of Claims and Interests.  **Objections, if any, to Confirmation of the Plan must be presented to the Bankruptcy Court at the Confirmation Hearing.  Any written objections must also be served so that they are RECEIVED not less than ten (10) calendar days before the Confirmation Hearing by:**

> **Counsel to the Debtor:**
> Rhett G. Campbell, Esq.
> Thompson & Knight LLP
> 333 Clay Street, Suite 3300
> Houston, Texas 77002
> Fax:  713.654.1871
> Email:  Rhett.Campbell@tklaw.com

After filing of the Chapter 11 Case, the Bankruptcy Court will schedule a Confirmation Hearing, together with a date by which objections, if any, must be presented. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## ARTICLE III

## HISTORY OF THE DEBTOR

### 3.1    Overview of Business Operations.

Baseline is a Houston, Texas-based independent oil and natural gas company engaged in the exploration, production, development, acquisition and exploitation of natural gas and crude oil properties, with interests in the following three core properties: (i) the Eliasville Field located in Stephens County in North Texas (the "Eliasville Field Properties"); (ii) the Blessing Field in Matagorda County located onshore along the Texas Gulf Coast (the "Blessing Field Properties"); and (iii) the New Albany Shale play located in Southern Indiana (the "New Albany Shale Play"), each as more particularly described in Section 4.1(C)(i) "- Core Properties" below.

The Debtor was incorporated as a Nevada corporation in February 2004 under the name College Oak Investments, Inc., and changed its name to Baseline Oil & Gas Corp. on January 17, 2006. It is the surviving corporation of a merger transaction with Coastal Energy Services, Inc., a closely-held Delaware corporation ("Coastal"), that was effective on April 6, 2005. As a result of the merger, Coastal was treated as the "acquiring" company, and the historical financial statements of the Debtor were restated to be those of Coastal for financial accounting and reporting purposes. Coastal had been formed to engage in the energy business, and following the merger, the Debtor began pursuing opportunities in the energy industry and more particularly, the oil and gas industries, which efforts culminated with the acquisitions during 2007 of its above referenced core properties.

The Debtor's core properties cover approximately 39,945 net acres across the areas identified above. As of December 31, 2008, based on the reserve report prepared by Cawley, Gillespie & Associates, Inc., independent petroleum engineers ("CG&A" and the "CG&A Reserve Report"), the Debtor's proved reserves were 60.2 Bcfe, of which 46.5% were natural gas and 68.2% were proved developed. The SEC PV-10 of these proved reserves as of that date was $69.5 million. The CG&A Reserve Report assumes the Debtor will perform additional operations that require capital; however, the Debtor's liquidity problems have forced the Debtor to defer many of these operations. The Debtor's lack of liquidity and its resulting financial inability to sustain the level of capital expenditures assumed by the CG&A Report are important factors that should be kept in mind when reviewing that report. During 2008, the Debtor produced 2.8 Bcfe and had a proved reserve reduction of 6.7 Bcfe as a result of reserve revisions. The Debtor produced an additional 62.4 thousand barrels of oil and 257.8 million cubic feet of natural gas during the first quarter of 2009, and received an average price of $38.37 per barrel and $4.58 per thousand cubic feet, respectively, resulting in total oil and gas sales revenue for the quarter of $3.6 million, before the effects of hedging. Further information concerning estimates of the Debtor's proved reserves as of December 31, 2008 is set forth in Section 4.1 (C) "- Description of the Debtor's Assets and

Their Value" below, and in the CG&A Reserve Report attached as Exhibit B hereto. Attached hereto as Exhibit C is a glossary of "oil and gas" industry-specific terms.

As of December 31, 2008, 44.7% of the Debtor's proved reserves were located in the Eliasville Field Properties and 55.3% in the Blessing Field Properties. The Debtor acquired all of its current proved reserves during 2007, including (i) the Blessing Field Properties on October 1, 2007, consisting of those wells and properties located on 2,374 net acres located onshore along the Texas Gulf Coast and (ii) the Eliasville Field Properties on May 12, 2007, consisting of those wells and properties located on 5,231 net acres in North Texas. On March 16, 2007, the Debtor converted a prior membership interest in a joint venture into a direct working interest in approximately 171,000 gross acres (32,340 net acres) in the Illinois Basin located in Southern Indiana known to contain the New Albany Shale formation. The Debtor's proved reserves are primarily long-life crude oil located in the Eliasville Field and natural gas and condensate located in the Blessing Field. These two fields are characterized by over 50 years of development drilling and production history along with active participation by several industry leading companies in and around these fields. The New Albany Shale Play assets, which currently do not have any booked proved reserves, represent upside potential that the Debtor is currently evaluating and developing with its operating partners, Atlas Energy Resources, LLC and El Paso Corporation, each of which brings significant regional expertise and financial and operational resources. The Debtor participated in the drilling of 17 (gross) wells during 2008 and performed 19 workovers on existing wells. Of the 17 wells drilled, 15 were development wells located in the Debtor's two operated Texas fields and 2 were non-operated exploratory wells drilled in the Southern Indiana acreage. All of the workovers were performed on wells in the two Texas fields.

## 3.2    Ownership.

The Debtor is a publicly-traded company incorporated on February 3, 2004, under the laws of the State of Nevada, whose common stock is presently quoted on the OTC Bulletin Board under the symbol "BOGA."

On June 30, 2009, the Debtor had 300 million shares of common stock authorized under its charter documents, of which 151,497,530 shares of common stock are issued and outstanding and an additional 12,527,500 shares of common stock are issuable, pending vesting schedules in some instances, upon the exercise or conversion, as applicable, of outstanding warrants, options and other derivative securities. Although authorized under the charter documents, no shares of preferred stock are currently designated or outstanding. There were approximately 132 holders of record of the Debtor's common stock as of June 30, 2009. The largest shareholder is Third Point with beneficial ownership of 58.3% of the issued and outstanding common stock as of June 30, 2009. Exhibit D sets forth the name, number and percentage of shares held by each person who, to the Debtor's knowledge, beneficially owns more than 5% of outstanding shares of common stock.

On July 1, 2009, the Debtor had outstanding indebtedness of $133.5 million, consisting chiefly of the outstanding 15% Prepetition Notes and the 12½% Prepetition Notes in the approximate aggregate principal amounts of $108.7 million and $15 million, respectively, and

accrued interest thereon in the approximate aggregate amounts of $6.7 million and $937,500, respectively.

Joshua Targoff, a current director of the Debtor, is also General Counsel of Third Point LLC, the registered investment advisor that manages funds of Third Point. As of June 30, 2009, Third Point held approximately $19.29 million in outstanding principal amount of the Debtor's 15% Prepetition Notes and, as a holder of Class 4 Claims, expects, subject to the terms and conditions of the Plan Support Agreement, to participate in the Exit Facility proposed in the Plan in exchange for the senior securities in the Reorganized Debtor described in <u>Section 5.3(A)</u> "- Exit Facility". If the Plan is confirmed as currently proposed, Third Point will also receive its *pro rata* portion of New 10% Subordinated Secured Notes, Junior Preferred Stock and New Common Stock in the Reorganized Debtor, as described in <u>Section 5.3(B)</u> "-Class 4 Prepetition Notes Claims

## ARTICLE IV

## THE REORGANIZATION CASE

### 4.1    The Debtor and the Reorganization Case.

#### A.    Timing of the Chapter 11 Case.

Subject to receiving the requisite acceptances on the Plan from the Class 4 claimants, the Debtor intends to commence its Chapter 11 Case on or about **August 25, 2009.**

Because the Debtor has received a commitment for the Exit Facility from Third Point and Jefferies, the holders of the 15% Prepetition Notes, subject to the terms and conditions of the Plan Support Agreement, the Debtor does not expect the Chapter 11 Case to be protracted. In fact, the Debtor will request confirmation of the Plan at the earliest possible opportunity. Specifically, the Debtor will request that the hearing to consider the adequacy of the Disclosure Statement and Confirmation of the Plan occur as early as September 25, 2009. The Plan provides that the Effective Date will be the Business Day on which all conditions precedent to the Plan's Confirmation and Effective Date have been satisfied or waived (as provided in Article VII of the Plan). *See also* <u>Section 5.5</u> "Conditions Precedent to the Plan's Confirmation and Consummation". The Effective Date could be the same day as the Confirmation Hearing. In fact, the Debtor will endeavor to cause the Plan to become effective immediately after the Confirmation of the Plan. There is a possibility, however, that this projected timetable cannot be achieved due to factors beyond the Debtor's control.

The Debtor believes that the length of its stay in Chapter 11 must be as short as possible to preserve the value of its assets and to avoid the unnecessary costs that could be associated with obtaining debtor-in-possession financing that may be needed to finance a protracted Chapter 11 Case.

**B.**     **Events Leading to the Chapter 11 Filing and the Plan.**

    **(i)**     **The Debtor's business is heavily dependent on the availability of capital.**

Despite a number of identified opportunities for the Debtor to increase production and develop its reserve base through infill and step-out drilling of new wells, workovers on existing wells, stimulation of existing wells and the expansion of enhanced oil recovery projects such as waterflood operations, such efforts are heavily dependent on the availability of sufficient capital. A number of events set forth below have significantly adversely affected the Debtor's liquidity. As a result, the Debtor's production and attendant cash flow declined in the first quarter of 2009.

    **(ii)**     **The Debtor's repayment obligation under the Prepetition Notes has affected its liquidity.**

The Debtor is facing significant repayment obligations with respect to outstanding Prepetition Notes, the majority of which were restructured during the fourth quarter of 2008. The 15% Prepetition Notes matured on June 15, 2009, and the 12 ½% Prepetition Notes that were not converted into 15% Prepetition Notes became due on October 6, 2008.

During July 2008, Third Point purchased and converted into equity all of the Debtor's $53.5 million in outstanding 14% Senior Subordinated Convertible Notes due 2013. The Debtor ultimately issued to Third Point a total of 117,035,248 shares of common stock, resulting in such investors holding approximately 77.25% of the Debtor's outstanding shares of common stock as of July 30, 2008. The purchase of these 14% Senior Subordinated Convertible Notes resulted in a "change of control," and as a result, the Debtor was required to offer to purchase all $115 million in aggregate principal amount of its 12 ½% Prepetition Notes at a price of 101% of par. On August 8, 2008, the Debtor commenced a change of control offer in accordance with the provisions of the indenture governing the 12 ½% Prepetition Notes, which offer was accepted by all of the then 12 ½% Noteholders. However, because of the turmoil and slowdown in transaction activity that occurred in the U.S. and global credit markets during September and October 2008, the Debtor was unable to obtain the loan and equity commitments required to complete the change of control purchase transaction for the 12 ½% Prepetition Notes and defaulted on such obligation on October 6, 2008.

After subsequent negotiations, the Debtor arrived at an agreement on October 29, 2008, with the holders of $100 million in principal amount of the 12 ½% Prepetition Notes, Jefferies and Third Point, to convert those notes to $106.7 million of 15% Prepetition Notes. The 15% Prepetition Notes provide for an interest rate of 15% per annum, paid quarterly, commencing January 1, 2009, with 12.5% required to be paid in Cash and the remaining 2.5% required to be paid in kind in the form of additional principal amount of 15% Prepetition Notes. The 15% Prepetition Notes (and any issued PIK notes) matured on June 15, 2009. The Debtor has no current means of re-paying the holders of the 15% Prepetition Notes.

The remaining $15 million in principal amount of the 12 ½% Prepetition Notes, which amount was not converted to 15% Prepetition Notes in October 2008, became due in full on October 6, 2008, upon the Debtor's failure to finance the purchase offer that was commenced on

August 6, 2008. This remaining principal amount continues to carry a cash interest rate of 12.5% per annum, payable semi-annually on October 1st and April 1st.

### (iii)   The current economic climate and the price of oil and gas have affected the Debtor's business operations.

In addition to the global credit crisis, since the Debtor issued the 15% Prepetition Notes in October 2008, oil and natural gas prices have declined to the lowest levels since 2001 and, though prices have recovered somewhat in recent months, the increase is not sufficient to solve the Debtor's continuing liquidity problem. As a result, the operating revenues and stock prices of many publicly traded oil and gas exploration and production companies have fallen sharply. It has become extremely difficult for below-investment grade companies such as the Debtor to raise debt or equity capital in the U.S. markets. As a result of these factors, the Debtor defaulted on its obligation to make the $4.29 million of cash interest payments due April 1, 2009, on the Prepetition Notes, its obligation to issue any PIK notes with respect to the 15% Prepetition Notes, and its obligation to pay the entire outstanding principal, together with accrued and unpaid interest, on the 15% Prepetition Notes at their June 15, 2009 maturity. The principal amount of the 15% Prepetition Notes, together with any accrued and unpaid interest thereon, has become due and payable. The remaining principal amount of the 12 ½% Prepetition Notes, together with any accrued and unpaid interest thereon, on which the Debtor has defaulted (as discussed above), is also due and payable.

### (iv)   The performance of the Blessing Field Properties has been significantly below original expectations.

The Debtor acquired the Blessing Field Properties on October 1, 2007, for an adjusted purchase price of $96.6 million. This acquisition occurred during a period when it was common for companies acquiring oil and gas properties to assign value to proved, probable and even possible reserve categories, and at a time when prices paid for oil and natural gas properties in general were relatively high by historic standards. Such practices reflected the then widely held belief of industry observers and participants that oil and natural gas prices were likely to remain at high levels relative to historic standards and that the use of new technologies had mitigated some of the risks traditionally associated with drilling successful oil and natural gas wells, regardless of the classification of the associated reserves as proved, probable or possible.

Production from the existing producing wells located on the Blessing Field Properties began to decline significantly during the months leading up to the Debtor's October 2007 acquisition closing. Upon assuming ownership and operations of this field in October 2007, the Debtor also experienced a variety of operational problems on existing producing wells, which required costly (and in some cases, unsuccessful) remediation.

The Debtor drilled five new wells on the Blessing Field Properties starting in the fourth quarter of 2007 and lasting throughout 2008. The drilling and completion costs of these five new wells were higher than anticipated, and the overall production rates and reserves were significantly lower than originally anticipated. As a result, the Debtor was not able to significantly increase its overall daily oil and natural gas production and cash flow generation to the degree originally expected during 2008. The Debtor was correspondingly unable to take

advantage of the extremely high prices that prevailed during much of the first three quarters of 2008, as newly drilled wells generally failed to result in significant incremental volumes that could be hedged at high oil and natural gas prices. Combined with the steep decline in oil and natural gas prices that occurred during the last months of 2008, the disappointing performance of the Blessing Field Properties led to reductions in the Debtor's ability to service its debt and its ability to meet the terms of its credit agreements and indenture.

## C.    Description of the Debtor's Assets and their Value.

### (i)    Core Properties.

The Debtor's assets consist chiefly of oil and natural gas properties covering approximately 39,945 net acres across the following three core areas: (i) the Eliasville Field Properties; (ii) the Blessing Field Properties; and (iii) the New Albany Shale Play.

#### (a)    Eliasville Field Properties.

On April 12, 2007, the Debtor acquired, effective February 1, 2007, a 100% working interest in 5,231 net acres in the Eliasville Field located in Stephens County in North Texas, roughly 90 miles west of Fort Worth, Texas for an adjusted purchase price of $27.05 million. The Eliasville Field was discovered in the 1920's and produces primarily from the Caddo Lime oil formation at a depth of 3,300 feet. During December 2008, this field produced at rates of 541 bopd and 71 mcfpd net to the Debtor's interest, for an equivalent net rate of approximately 553 boepd of production. There are 92 oil wells producing in the field, and a portion of it is operated as an active waterflood with 57 injection wells. There are 8 leases, 2 central operating facilities and 3 tank batteries.

Proved net reserves have been estimated in the CG&A Reserve Report to be 4.5 MMBoe with a pre-tax PV-10 value of $22.3 million, based on year-end SEC pricing. Of the proved reserves, 67.6% are proved developed producing, or PDP, 11.5% are proved developed non-producing, or PDNP and 20.9% are proved undeveloped, or PUD, reserves.

The Debtor successfully drilled 11 proved undeveloped wells to the Caddo formation at 3,350 feet during 2008. All of the wells were on production by the end of December. The average initial daily rate for each new well has been approximately 32 bopd (8/8ths). In addition to drilling new wells, the Debtor also performed workovers on 12 low-rate or idle wells during 2008. These workovers were on oil wells, which were either returned to production, or on which perforations were added and/or stimulation was performed. One of the workovers involved the conversion of previously idle oil wells to waterflood injection service.

The Debtor has identified 20 proved undeveloped locations to drill in the field and 27 additional workovers to be done as capital becomes available and oil prices improve.

#### (b)    Blessing Field Properties.

On October 1, 2007, the Debtor acquired, effective as of June 1, 2007, a working interest of over 95% in the Blessing Field Properties located onshore along the Texas Gulf Coast for an adjusted purchase price of $96.6 million. The Debtor operates 100% of the wells on these

DISCLOSURE STATEMENT                    16

properties. During December 2008, this field produced at rates of 172 bopd and 2,642 mcfd net to the Debtor's interest, for an equivalent net rate of approximately 3,674 mcfepd. Proved net reserves on the Blessing Field Properties have been estimated in the CG&A Reserve Report to be 33.3 Bcfe with a pre-tax PV-10 value of $ 47.2 million based on year-end SEC pricing. Of the proved reserves, 12.5% are PDP, 47.0% are PDNP, and 40.5% are PUD reserves.

The Blessing Field Properties are situated within the Blessing Field area, located in Matagorda County, Texas, on trend with several prolific Frio fields. Most of these fields were structural traps along down-to-the-coast growth faults containing normally pressured Frio sand reservoirs. A proprietary 3-D seismic survey was acquired over the area in 1996. As a result, a series of buried faults were identified that set up traps in the deeper, geopressured Frio section basinward of Blessing Field. With the aid of this proprietary 3D seismic survey, 17 wells have been drilled and completed to date. Production in 5 separate fault blocks has been established, with proved and probable reserves identified in 21 different sands.

The Debtor drilled four new wells in this field in 2008 and also performed seven workovers. All four new wells were drilled to an approximate depth of 12,000 feet and all four were completed and are producing natural gas and condensate. The seven workovers were done to re-complete existing wells in new zones or add perforations to existing zones. Neither the new wells nor the workovers are performing as well as was anticipated.

### (c) New Albany Shale Play.

The Debtor owns a direct working non-operating interest in leasehold interests covering approximately 171,000 gross (32,340 net) surface acres in the Illinois Basin located in Southern Indiana and known to overlay the New Albany Shale formation. The Debtor's total average working interest is approximately 18.5%, and its acreage is grouped into three separate areas of mutual interest, or AMI's, where the Debtor has varying working interests as follows:

a. 19.7% working interest in approximately 122,000 gross acres (approximately 24,400 net acres) located primarily in Greene County and operated by Atlas Energy Resources, LLC ("Wabash AMI");

b. 18.2% working interest in approximately 41,000 gross acres (approximately 7,380 net acres) located in Knox and Sullivan Counties and operated by Atlas Energy Resources, LLC ("Knox AMI"); and

c. 6.9% working interest in approximately 8,000 gross acres (560 net acres) located in Greene County, operated by El Paso Corporation.

The name "New Albany Shale" refers to a brownish-black shale exposed along the Ohio River at New Albany in Floyd County, Indiana, and present in the subsurface throughout much of the Illinois Basin. The Illinois Basin covers approximately 60,000 square miles in parts of Illinois, Southwestern Indiana and Western Kentucky. The New Albany Shale has produced natural gas since 1858, mostly from wells located in Southwestern Indiana and Western Kentucky.

Although the industry has reported a range of natural gas production rates and reserve potential in the New Albany Shale, there is not extensive production history from horizontal

wells completed in the New Albany Shale and the Debtor has no active production or proved reserves booked to its acreage position. The Debtor presently considers the acreage contained in its Knox AMI to be highly prospective, as it lies between active producing projects owned by Noble Energy to the north (southern Sullivan County) and El Paso to the southeast (Knox and Davies Counties).

During 2008, the Debtor participated with its partners in the drilling of two vertical wells located in the Wabash AMI of Greene County, Indiana. Both wells had gas shows in the New Albany Shale but insufficient gas in the Devonian formation. The wells will be used in the development of the New Albany Shale formation. The Debtor also participated in the extension of certain oil and gas leases on its acreage. Currently, the Debtor's partner Atlas Energy Resources, LLC is planning to install gas gathering compression and treating facilities in 2009, as well as to drill up to 25 wells. The Debtor is evaluating its participation on a well by well basis, depending on drilling results, natural gas prices and available capital. The steep drop in natural gas prices that has occurred since mid-2008 is expected to slow the evaluation and development of the New Albany Shale Play, as the economics of this area require a relatively robust price environment in order to generate attractive rates of return.

### (ii)   Natural Gas and Oil Reserves.

The following table sets forth the Debtor's estimated net proved oil and natural gas reserves and the PV-10 value of such reserves as of December 31, 2008, as contained in the CG&A Reserve Report. These calculations were prepared using standard geological and engineering methods generally accepted by the oil and natural gas industry and in accordance with the financial accounting and reporting standards of the SEC.

|  | Oil | Natural Gas | Undiscounted Future Net Revenue | Present Value of Proved Reserves Discounted at 10% (1) (2) |
|---|---|---|---|---|
|  | (Mbbl) | (MMcf) | ($ thousands) | ($ thousands) |
| Developed Producing | 3,106.8 | 3,716.9 | 43,954 | 27,270 |
| Developed Nonproducing | 889.9 | 13,410.1 | 63,871 | 23,495 |
| Proved Undeveloped | 1,370.5 | 10,897.5 | 49,721 | 18,719 |
| Total Proved | 5,367.2 | 28,024.5 | 157,546 | 69,484 |

(1)   The estimated present value of proved reserves does not include indirect expenses such as general and administrative expenses, debt service and future income tax expense or depletion, depreciation, and amortization.

(2)   The PV-10 value is not a measure of financial or operating performance under GAAP, nor is it intended to represent the current market value of the estimated oil and natural gas reserves owned by the Debtor. PV-10 should not be considered in isolation or as a substitute for the standardized measure of discounted future net cash flows as defined under GAAP. The Debtor believes that the presentation of PV-10 value provides useful information to investors because it is widely used by professional analysts and sophisticated investors in evaluating oil and gas companies. Because many factors that are unique to each individual company may impact the amount of future income taxes to be paid, the use of the pre-tax measure provides greater comparability when evaluating companies. It is relevant and useful to investors for evaluating the relative monetary significance of the Debtor's natural gas and oil properties. Further, investors may utilize the measure as a basis for comparison of the relative size and value of the Debtor's reserves to other companies. As stated above, the CG&A Reserve Report assumes the Debtor will perform additional operations that require capital; however, the

Debtor's liquidity problems have forced the Debtor to defer many of these operations. The Debtor's lack of liquidity and its resulting financial inability to sustain the level of capital expenditures assumed by the CG&A Report are important factors that should be kept in mind when reviewing that report.

The Debtor believes that the above presentation of PV-10 may be considered a non-GAAP financial measure as defined in Item 10(e) of Regulation S-K promulgated by the SEC. Accordingly, the table below provides a reconciliation of the PV-10 measure to the most directly comparable GAAP financial measure (standardized measure of discounted future net cash flows).

|  | As of December 31, 2008 |
| --- | --- |
|  | (dollars in thousands) |
| PV-10 | $ 69,484 |
| Future income taxes, discounted at 10% | (4,607) |
| Standardized measure of discounted future net cash flows | $ 64,877 |

Due to the inherent uncertainties and the limited nature of reservoir data, proved reserves are subject to change as additional information becomes available. The above estimates of reserves, future cash flows and present value are based on various assumptions, including those prescribed by the SEC, and are inherently imprecise. Although the Debtor believes these estimates are reasonable, actual future production, cash flows, taxes, development expenditures, operating expenses and quantities of recoverable oil and natural gas reserves may vary substantially from these estimates. Also, the use of a 10% discount factor for reporting purposes may not necessarily represent the most appropriate discount factor, given actual interest rates and risks to which the Debtor's business or the oil and natural gas industry in general are subject.

In accordance with applicable financial accounting and reporting standards of the SEC, the estimates of the Debtor's proved reserves and the present value of proved reserves set forth herein are made using oil and natural gas sales prices estimated to be in effect as of the date of such reserve estimates and are held constant throughout the life of the properties. Estimated quantities of proved reserves and their present value are affected by changes in oil and natural gas prices. The prices utilized for the purpose of estimating the Debtor's proved reserves and the present value of proved reserves as of December 31, 2008, were a WTI Cushing spot price of $44.60 per Bbl and a Henry Hub spot natural gas price of $5.620 per MMBtu, adjusted by property for energy content, quality, transportation fees, and regional price differentials. The PV-10 value is not intended to represent the current market value of the estimated oil and natural gas reserves owned by the Debtor.

### (iii)    Oil and Natural Gas Volumes, Prices and Operating Expense.

The table below sets forth certain information regarding the production volumes, revenue, average prices received and average production costs associated with the Debtor's sale of oil and natural gas for the years ended December 31, 2007 and 2008. Prior to 2007, the Debtor had no operating assets other than an indirect interest in the New Albany Shale Play by virtue of its membership interest in a joint venture acquiring and holding working leasehold interests in leasehold acreage located in Southern Indiana. As indicated elsewhere in this Disclosure Statement, the Debtor redeemed its membership interest for a direct assignment of a

working interest in certain oil and gas properties, rights and assets of the joint venture on March 16, 2007, and acquired its additional operating assets located in north Texas and the Texas Gulf Coast in April and October 2007, respectively.

| | Year Ended December 31, 2008 | Year Ended December 31, 2007 |
|---|---|---|
| **Net Production:** | | |
| Oil (Bbl)............................................................... | 252,350 | 149,318.9 |
| Natural Gas (Mcf)................................................ | 1,245,911 | 335,533.2 |
| Natural Gas Equivalent (Mcfe) ........................... | 2,760,009 | 1,231,446.8 |
| **Oil and Natural Gas Sales (dollars in thousands):** | | |
| Oil........................................................................ $ | 24,716. $ | 11,511.. |
| Natural Gas ......................................................... | 12,645.1 | 2,459.1 |
| Total ................................................................... | 37,361.2 | 13,970.6 |
| **Average Sales Price:** | | |
| Oil ($ per Bbl)..................................................... $ | 97.9 $ | 77.0 |
| Natural Gas ($ per Mcf)...................................... | 10.15 | 7.33 |
| Natural Gas Equivalent ($ per Mcfe) .................. $ | 13.5 $ | 11.3. |
| **Oil and Natural Gas Costs (dollars in thousands):** | | |
| Lease operating expenses..................................... $ | 7,869. $ | 4,190. |
| Production taxes................................................... | 2,637.5 | 958.4 |
| Total .................................................................... | 10,506.8 | 5,148.4 |
| **Average production cost per Mcfe** | $ 3.8 $ | 4.1 |

### (iv)    Exploration, Development and Acquisition Capital Expenditures.

The following table sets forth certain information regarding the gross costs incurred in the Debtor's purchase of proved and unproved properties and in development and exploration activities:

| | Year Ended December 31, 2008 | Year Ended December 31, 2007 |
|---|---|---|
| Property acquisition costs............................................................... $ | — $ | 123,153,383 |
| Unproved prospects......................................................................... | 34,460 | 665,531 |
| Exploration costs............................................................................ | — | 0 |
| Development costs .......................................................................... | 21,865,577 | 5,228,246 |
| Total operations ....................................................................... $ | 21,900,037 $ | 129,047,160 |
| Asset retirement obligation (non-cash)........................................... | — | 240,959 |

### (v)    Drilling Activity.

The following table sets forth the Debtor's drilling activity during the twelve month period ended December 31, 2008 (excluding wells in progress at the end of the period) and since the Debtor acquired its operating assets in 2007.  In the table, "gross" refers to the total number of wells in which the Debtor has a working interest, and "net" refers to gross wells multiplied by the Debtor's working interest therein.

| | Year Ended December 31, | | | |
| | 2008 | | 2007 | |
| | Gross | Net | Gross | Net |
|---|---|---|---|---|
| Development Wells | | | | |
| Productive | 15 | 15 | 6 | 6 |
| Non-Productive | 0 | 0 | 0 | 0 |
| Exploratory Wells | | | | |
| Productive | 0 | 0 | 8 | 1.6 |
| Non-Productive | 2 | 0.4 | 0 | 0 |

### (vi)    Productive Wells.

The following table sets forth the number of productive oil and natural gas wells in which the Debtor owned an interest as of December 31, 2008.  Productive wells are wells that are capable of producing natural gas or oil.

| | Company Operated | | Non-operated | | Total | |
| | Gross | Net | Gross | Net | Gross | Net |
|---|---|---|---|---|---|---|
| Oil | 93 | 93 | 0 | 0 | 93 | 93 |
| Natural Gas | 16 | 16 | 22 | 4.4 | 38 | 20.4 |
| Total | 109 | 109 | 22 | 4.4 | 131 | 113.4 |

### (vii)    Lease Acreage Data.

The following table summarizes the Debtor's gross and net developed and undeveloped oil and natural gas acreage under lease as of December 31, 2008.

| | Developed acres | | Undeveloped acres | |
| | Gross | Net | Gross | Net |
|---|---|---|---|---|
| Blessing Field Properties (1) | 1,334 | 1,334 | 1,040 | 1,040 |
| Eliasville Field Properties (1) | 3,991 | 3,991 | 1,240 | 1,240 |
| New Albany Shale Play (2) | 0 | 0 | 171,000 | 32,340 |
| Total | 5,325 | 5,325 | 173,280 | 34,620 |

(1)    Properties held by production, or HBP.
(2)    Primary term expires in 2009.

As is customary in the oil and natural gas industry, the Debtor can generally retain its interest in undeveloped acreage by drilling activity that establishes commercial production sufficient to maintain the leases or by paying delay rentals during the remaining primary term of leases. The oil and natural gas leases in which the Debtor has an interest are for varying primary terms, and if production under a lease continues from the Debtor's developed lease acreage beyond the primary term, the Debtor is entitled to hold the lease for as long as oil or natural gas is produced.

The Debtor's oil and natural gas properties consist primarily of oil and natural gas wells and its interests in leasehold acreage, both developed and undeveloped.

### (viii)   Valuation of Assets by Independent Advisor.

In June 2009, the Debtor engaged the corporate advisory and restructuring services of Grant Thornton LLP ("Grant Thornton") to perform various services, including a valuation of the Debtor's assets. Attached as Exhibit E is the Valuation Report prepared by Grant Thornton dated June 16, 2009, with respect to the Debtor's assets (the "Valuation Report"), assigning an approximate value of $82 million. Such valuation was based upon Grant Thornton's analysis of (i) oil and gas companies with similar characteristics, (ii) the average market trading multiples of members of the Debtor's peer group, and (iii) the Debtor's discounted cash flow, based upon a discount rate that incorporated the Debtor's inherent riskiness. In performing this analysis, it is the Debtor's understanding that Grant Thornton utilized the CG&A Report, adjusted to take into account the operations that Debtor could not perform due to lack of liquidity and also adjusted for somewhat higher prices in recent months.

### (ix)   Other.

On March 31, 2009, the Debtor had support equipment and other property and equipment valued at $364,339 (net of accumulated depreciation of $121,236). Such equipment and other property consist of land, vehicles, office furniture and equipment and computer software and, in accordance with GAAP, are valued at cost and depreciated over their estimated useful lives, using the straight-line method over estimated useful lives of 3 to 5 years. Additions are capitalized, and maintenance and repairs are charged to expense as incurred. Gains and losses on dispositions of equipment are reflected in income or loss from operations.

### D.   Anticipated Future of the Debtor.

The Debtor's assets will continue to be operated after the Confirmation of the Plan with new ownership. After Confirmation, the Prepetition Noteholders will own all of the outstanding capital stock of the Reorganized Debtor. The Reorganized Debtor shall emerge from Chapter 11 as a privately-held company, reincorporated under the laws of the State of Delaware.

The initial capitalization of the Reorganized Debtor shall be $80 million, consisting of (i) equity interests in the form of the Senior Preferred Stock, Junior Preferred Stock and the New Common Stock, with aggregate values of $25 million, $5 million and $10 million, respectively, and (ii) $40 million in debt represented by (A) the Exit Facility, evidenced by $5 million in aggregate principal amount of the New Series A 20% Senior Secured Notes and $25 million in

aggregate principal amount of the New Series B 20% Senior Secured Notes, and (B) the New 10% Subordinated Secured Notes in the aggregate principal amount of $10 million.

Exhibit F hereto describes the initial capitalization of the Reorganized Debtor on the Effective Date, upon giving effect to the Plan, under two alternative scenarios. Table 1A in Exhibit F assumes that all of the Prepetition Noteholders participate in the Exit Facility, and that the Plan, as described in this Disclosure Statement and related exhibits, is confirmed. Table 1B assumes that only the 15% Noteholders participate in the Exit Facility and that the Plan is confirmed as described. *See also* subsections (A) "- Exit Facility" and (B) "-Class 4 Prepetition Notes Claims" of Section 5.3 "Means for Implementation of the Plan" (tables and accompanying notes) for a discussion of how the initial capitalization is calculated.

Under current operating assumptions and following Confirmation, the Reorganized Debtor plans to continue in business as an active oil and natural gas exploration and production company. Attached as Exhibit G is a *pro forma* set of financial projections of the intended business operations of the Reorganized Debtor (the "Projections"). The Projections reflect the Debtor's reasonable judgments as to the cash flow of the Reorganized Debtor; however, there can be no assurance that any of the various assumptions on which the Projections are based will prove to be accurate, that any of the forecasted expenses will not exceed assumptions or that the projected results will be realized any time in the future or at all. Actual results will be impacted by a number of factors, including, without limitation, general economic and business conditions, successful implementation of business plans, third-party contractual relationships, sufficient working capital and available sources of funding, as well as other conditions which affect the capital markets and the oil and natural gas industry, all of which can be materially adverse to the Reorganized Debtor.

## 4.2   Sources of Information.

The descriptions contained in this Disclosure Statement of the Debtor's history, capitalization, business assets and operations, and financial condition are primarily based upon the public reports filed by the Debtor pursuant to the Securities Exchange Act of 1934, as amended (the "Exchange Act"), in the form of current reports on Forms 8-K and periodic reports on Forms 10-K and 10-Q, including (i) the Debtor's audited financial statements for the year ended December 31, 2008, contained in its annual report on Form 10-K filed with the SEC on March 31, 2009, and (ii) the Debtor's quarterly report for the quarter ended March 31, 2009, on Form 10-Q filed with the SEC on May 15, 2009, attached hereto as Exhibits H and I, respectively. Reports and any other documents filed by the Debtor with the SEC are available for reading and copying at the SEC's public reference room at 100 F Street N.E., Washington, D.C. 20549 (tel. 1-800-SEC-0330 for further information), as well as available for retrieval on the SEC's website at www.sec.gov.

The asset valuation prepared by Grant Thornton with the assistance of the Debtor is attached as Exhibit E. Information pertaining to the Debtor's assets was also provided from the CG&A Reserve Report as of December 31, 2008, attached as Exhibit B.

The liquidation analysis summary contained in the report attached as Exhibit E was prepared by Grant Thornton with the assistance of the Debtor. The Projections attached as Exhibit G were compiled by the Debtor's management.

Some of the ownership information concerning the greater than 5% beneficial owners of the Debtor was obtained from third-party reports on Schedules 13D and 13G and Forms 3 and 4 filed with the SEC by such parties in accordance with Section 13 of the Exchange Act.

## 4.3    Liquidation Analysis.

As indicated in the liquidation analysis contained in the Valuation Report prepared by Grant Thornton and attached as Exhibit E hereto, the assets of the Debtor would generate between $39.3 million and $51.8 million of net cash proceeds for distribution to creditors in the event of liquidation (the "Liquidation Analysis"). The Liquidation Analysis, accompanied by assumptions prepared by Grant Thornton is discussed in more detail in Article VIII "Liquidation Analysis" below. The liquidation values demonstrate that Class 4 and Class 5 would be the only two classes that would benefit from liquidation, with estimated recoveries ranging from 30% to 39% with respect to Class 4 and 14% with respect to Class 5. The remaining Classes would not receive a distribution on account of their Allowed Claims if the Debtor were to be liquidated.

## 4.4    Other Financial Information.

The most recent unaudited financial statements of the Debtor for the quarter ended March 31, 2009, are contained in the Debtor's quarterly report on Form 10-Q filed with the SEC on May 15, 2009, and attached hereto as Exhibit I. Audited financial statements of the Debtor for the year ended December 31, 2008, are contained in the Debtor's annual report on Form 10-K filed with the SEC on March 31, 2009, which financial statements are attached hereto as Exhibit H.

Set forth below is the balance sheet of the Debtor for the quarter ended March 31, 2009, and the year ended December 31, 2009, which balance sheet should be read in conjunction with the notes accompanying such financial information in the Debtor's Form 10-Q attached as Exhibit I hereto:

## BASELINE OIL & GAS CORP.
## BALANCE SHEETS
### (Unaudited)

| | | March 31, 2009 | | December 31, 2008 |
|---|---|---:|---|---:|
| **ASSETS** | | | | |
| CURRENT ASSETS | | | | |
| Cash and cash equivalents | $ | 1,477,069 | $ | 6,350,520 |
| Accounts receivable | | 1,450,683 | | 2,137,204 |
| Derivative asset | | — | | 4,432,079 |
| Deferred loan Costs, net of accumulated amortization of $22,538,236 and $22,197,084, respectively | | — | | 341,152 |
| Prepaid and other current assets | | 116,948 | | 157,210 |
| **Total current assets** | | 3,044,700 | | 13,418,165 |
| OIL AND NATURAL GAS PROPERTIES – using successful efforts method of accounting | | | | |
| Proved properties | | 151,643,608 | | 149,699,206 |
| Unproved properties | | 8,591,580 | | 8,510,126 |
| Less accumulated depletion, depreciation and amortization | | (35,478,327) | | (34,119,869) |
| **Oil and natural gas properties, net** | | 124,756,861 | | 124,089,463 |
| Other assets | | 31,939 | | 37,939 |
| Other property and equipment, net of accumulated depreciation of $121,236 and $98,129, respectively | | 364,339 | | 371,151 |
| **TOTAL ASSETS** | $ | 128,197,839 | | 137,916,718 |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | | |
| CURRENT LIABILITIES | | | | |
| Accounts payable | $ | 1,632,028 | $ | 2,718,303 |
| Accrued interest | | 4,991,175 | | 4,483,359 |
| Accrued expenses | | 1,441,227 | | 1,303,056 |
| Royalties payable | | 3,451,510 | | 4,164,955 |
| Short term debt and current portion of long-term debt, net of discount of $1,141,558 and $2,444,967, respectively | | 121,656,450 | | 123,693,783 |
| **Total current liabilities** | | 133,172,390 | | 136,363,456 |
| Asset retirement obligations | | 324,283 | | 314,532 |
| **Total liabilities** | | 133,496,673 | | 136,677,988 |
| COMMITMENTS AND CONTINGENCIES | | — | | — |
| STOCKHOLDERS' EQUITY (DEFICIT) | | | | |
| Common stock, $0.001 par value per share; 300,000,000 shares authorized; 151,497,530 shares issued and outstanding | | 151,498 | | 151,498 |
| Additional paid-in capital | | 111,894,217 | | 111,703,204 |
| Accumulated other comprehensive income | | 4,419,554 | | 4,955,580 |
| Accumulated deficit | | (121,764,103) | | (115,571,552) |
| **Total stockholders' equity (deficit)** | | (5,298,834) | | 1,238,730 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | $ | 128,197,839 | $ | 137,916,718 |

**4.5     Insurance Policies and Indemnification.**

        The Debtor maintains insurance coverage with respect to its employees and its assets. The insurance policies include coverage for workers' compensation, general liability, commercial auto, umbrella claims, operator's extra expenses, equipment, and property claims. In addition, the Debtor carries directors and officers liability, as well as excess directors and officers liability insurance. A schedule of the Debtor's insurance policies is attached hereto as Exhibit J. In addition, the Debtor entered into an indemnification with each of its officers and directors (the "Indemnification Agreement") in February 2009, pursuant to which it agreed to indemnify its officers and directors to the fullest extent permitted under Nevada law.

**4.6     Preference Analysis.**

        The Debtor will be disclosing payments to third parties made within 90 calendar days and within one year of the Petition Date in its Statement of Financial Affairs, which the Debtor will file within 15 calendar days of the Petition Date, unless an extension is necessary. The Debtor has not made any determination as to whether payments made to third parties within this period constitute a preference or fraudulent conveyance under applicable law.

## ARTICLE V

## DESCRIPTION OF THE PLAN

        THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. IT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A.

        THE SUMMARY OF THE PLAN AND OF OTHER DOCUMENTS REFERRED TO HEREIN DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THOSE DOCUMENTS, AND REFERENCE IS MADE TO THE PLAN AND THE OTHER DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF THEIR TERMS AND PROVISIONS.

        THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN OR THE OTHER OPERATIVE DOCUMENT WILL CONTROL.

**5.1     Overall Structure of the Plan.**

        Under the Plan, Claims against and Interests in the Debtor are divided into Classes according to the payment priority set forth in the Bankruptcy Code. If the Plan is confirmed by

the Bankruptcy Court and consummated, every Class of Claims will receive distributions on the Effective Date or on the date the Claim becomes an Allowed Claim.

## 5.2    Classification and Treatment of Claims and Interests.

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify the claims of a debtor's creditors and the claims of its interest holders. In accordance with Section 1123, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class. The Debtor is required under Section 1122 of the Bankruptcy Code to classify Claims against and Interests in the Debtor into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtor believes the Plan has classified all Claims and Interests in compliance with the provisions of Section 1122; however, a holder of a Claim or Interest may challenge the Debtor's classification of Claims and Interests, and the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Debtor intends, to the extent permitted by the Bankruptcy Code, the Plan and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received in this solicitation for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan. Furthermore, a reclassification of a Claim or Interest after approval of the Plan could necessitate a redistribution of the Disclosure Statement and re-solicitations of acceptances under the Plan.

Class 1.    Administrative Claims. Class 1 Claims are not Impaired. Each holder of an Allowed Administrative Claim shall be paid in full, in Cash, as soon as practicable on the later of (a) the Effective Date, and (b) the date on which such Claim becomes an Allowed Claim payable under applicable law or any agreement relating thereto. As of June 30, 2009, the number of Administrative Claims is estimated to be 3 and the amount of Administrative Claims is estimated to be $530,000. See the Projections attached hereto as Exhibit G. Class 1 is deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

Class 2.    Priority Tax Claims. Class 2 Claims are not Impaired. Each holder of an Allowed Priority Tax Claim shall be paid in full, in Cash, as soon as practicable on the later of (a) the Effective Date, and (b) the date on which such Priority Tax Claim becomes an Allowed Claim payable under applicable law or any agreement relating thereto. As of June 30, 2009, the number of holders of Class 2 Claims is estimated to be 4 and the amount of Priority Tax Claims is estimated to be $1,665,914. Estimated recovery is 100%. Class 2 is deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

Class 3.    Other Priority Claims. Class 3 Claims are not Impaired. Class 3 shall include all Priority Claims not included in Class 1, 2, 4, 5 or 6. Each holder of an Allowed Class 3 Claim shall be paid in full, in Cash, as soon as practicable, on the later

of (a) the Effective Date, and (b) on the date on which such Other Priority Claim becomes an Allowed Claim payable under applicable law or any agreement relating thereto. As of June 30, 2009, there are no estimated Class 3 Claims. Class 3 is deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

Class 4.       Prepetition Notes Claims. Class 4 Claims are Impaired. Each holder of an Allowed Prepetition Notes Claim shall be entitled to receive the securities listed below, as soon as practicable, on the later of (a) the Effective Date, and (b) the date on which such Prepetition Notes Claim becomes an Allowed Claim payable under applicable law or any agreement relating thereto. *See* Section 5.3 (B) "- Class 4 Prepetition Notes Claims" and Section 5.3(C) "- Description of Securities to be Issued in the Plan" below. Class 4 is entitled to vote to accept or reject the Plan.

A.   New 10% Subordinated Secured Notes. These notes will be allocated among the Prepetition Noteholders in proportion to the aggregate principal amount of Prepetition Notes held by the Prepetition Noteholders; *provided, however*, that for purposes of this allocation calculation, the principal amount of Prepetition Notes rolled forward pursuant to the Exit Facility shall be excluded.

B.   Junior Preferred Stock. These shares will be allocated among the Prepetition Noteholders in proportion to the aggregate principal amount of Prepetition Notes held by the Prepetition Noteholders. For the avoidance of doubt, this allocation calculation will include the principal amount of Prepetition Notes rolled forward pursuant to the Exit Facility.

C.   New Common Stock. A total of 1 million shares of New Common Stock will be issued to the holders of Allowed Prepetition Notes Claims. These shares will be allocated as follows:

(i)   Any holder of Allowed Prepetition Notes Claims who does not elect to participate in the Exit Facility described in Section 5.3 below will receive, in addition to the shares described in clause (ii) below, a number of shares of New Common Stock equal to (x) the aggregate liquidation preference of the Senior Preferred Stock that such holder would have received if it had participated in the Exit Facility, divided by (y) $10.00 per share (all such shares issued to holders of Allowed Prepetition Notes Claims, the "Make-Up Common Shares"); and

(ii)   All remaining shares of New Common Stock (*i.e.*, after giving effect to the issuance of the Make-Up Common Shares pursuant to subsection (i) above) will be issued to all holders of Allowed Prepetition Notes Claims in proportion to their respective aggregate principal amount of Prepetition Notes held by them including, for purposes of this allocation calculation, the aggregate amount of Prepetition Notes rolled forward; *provided, however*,

that any Prepetition Noteholders that do not participate in the Exit
Facility will be entitled to additional shares of New Common
Stock equal in the aggregate to 2.22% of the total number of shares
of New Common Stock to be issued pursuant to this subsection
(ii), which shares will be allocated in proportion to the principal
amount of Prepetition Notes held by such Prepetition Noteholders;
*provided further*, that holders who participate in the Exit Facility
will share in the dilution caused by this additional allocation *pro
rata* based upon the respective principal amounts of Prepetition
Notes held by them.

As of June 30, 2009, the number of holders of Class 4 Claims is estimated to be 5 and the
amount of Class 4 Claims is estimated to be $ 132,297,546. Class 4 is entitled to vote to
accept or reject the Plan.

In addition to the above-described securities, the Prepetition Noteholders in Class
4 who participate in the Exit Facility in accordance with Article III of the Plan, as further
consideration, shall roll forward their *pro rata* share, based on the amount of New Cash
Advance contributed by such Prepetition Noteholder, of the $25 million in aggregate
principal amount of Prepetition Notes being rolled forward pursuant to the Plan, which
roll forward shall be allocated as set forth in Article III of the Plan. *See also* Section
5.3(A) "- Exit Facility" below.

Class 5.    Royalty Claims. Class 5 Claims are not Impaired. Each holder of
an Allowed Class 5 Claim shall be paid in full, in Cash, as soon as practicable on the later
of (a) the Effective Date and (b) the date on which such Royalty Claim (i) becomes an
Allowed Claim payable under applicable law or any agreement relating thereto and (ii) is
in Pay Status. As of June 30, 2009, the number of holders of Class 5 Claims is estimated
to be 309 and the amount of Class 5 Claims is estimated to be approximately $ 3,288,490.
Estimated Recovery is 100%. Class 5 is deemed to have accepted the Plan and therefore
is not entitled to vote to accept or reject the Plan.

Class 6.    Other Secured Claims. Class 6 Claims are not Impaired. Class 6
shall include all Secured Claims other than Class 4 and Class 5 Claims. Each holder of
an Allowed Class 6 Claim shall be paid in full, in Cash, as soon as practicable on the later
of (a) the Effective Date and (b) the date on which such Other Secured Claim becomes an
Allowed Claim payable under applicable law or any agreement relating thereto. As of
June 30, 2009, there are no estimated Class 6 Claims. Class 6 is deemed to have accepted
the Plan and therefore is not entitled to vote.

Class 7.    General Unsecured Claims. Class 7 Claims are not Impaired.
Each holder of an Allowed Class 7 Claim shall be paid in full, in Cash, as soon as
practicable on the later of (a) the Effective Date and (b) the date on which such General
Unsecured Claim becomes an Allowed Claim payable under applicable law or any
agreement relating thereto. As of June 30, 2009, the number of holders of Class 7 Claims
is estimated to be 84 and the amount of Class 7 Claims is estimated to be approximately

$937,000. Estimated Recovery is 100%. Class 7 is deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

Class 8.        Interests. Class 8 holders are Impaired. Interests in the Debtor shall be cancelled and annulled on the Effective Date. As the Interest holders shall not receive distributions under the Plan, Class 8 is deemed to have rejected the Plan by operation of law and is not entitled to vote to accept or reject the Plan.

## 5.3    Means for Implementation of the Plan.

### A.    Exit Facility.

All Prepetition Noteholders will have the option, but not the obligation, to participate in the Exit Facility. The election to participate in the Exit Facility shall be exercised by the Prepetition Noteholders prior to the Petition Date in connection with the solicitation of acceptances or rejection of this Plan. The election to participate in the Exit Facility shall be made on the Ballot provided, shall be signed by the Prepetition Noteholder and shall be submitted in accordance with the instructions provided in the Ballot. Each written election by a Prepetition Noteholder to participate in the Exit Facility (i) shall set forth the maximum amount of Cash that such Prepetition Noteholder is willing to contribute in connection with the New Cash Advance, and (ii) shall be the binding commitment of such Prepetition Noteholder to provide such Cash contribution.

Notwithstanding anything in a Ballot to the contrary, if two affiliates (as defined in Section 101(2) of the Bankruptcy Code) are Prepetition Noteholders and one affiliate fails to, or chooses not to, participate in the Exit Facility, the other affiliate will have the right, before any other Prepetition Noteholders, to increase such other affiliate's participation in the Exit Facility in an amount up to such non-participating affiliate's pro rata share of the Exit Facility, based on the aggregate principal amount of Prepetition Notes held by such non-participating affiliate.

The Debtor has commitments under the Plan Support Agreement from Third Point and Jefferies, as holders of the 15% Prepetition Notes, to participate in the Exit Facility, subject to the terms and conditions of the Plan Support Agreement, in order to enable the Debtor to consummate the Plan and emerge from Chapter 11 as a reorganized entity.

The Exit Facility Lenders will (a) provide the New Cash Advance in exchange for $5 million in aggregate principal amount of the New Series A 20% Senior Secured Notes and (b) roll forward $25 million in aggregate principal amount of Prepetition Notes in exchange for $25 million of New Series B 20% Senior Secured Notes. Allocation of the Exit Facility among the Exit Facility Lenders shall be as follows:

(i)    New Cash Advance. If the aggregate amount of Cash that the Exit Facility Lenders have committed to contribute is greater than the amount of the New Cash Advance, the Cash to be contributed to the New Cash Advance will be allocated among such Exit Facility Lenders in proportion to their respective *pro rata* share of outstanding principal of Prepetition Notes; *provided, however*, that if any such Exit Facility Lender commits to contribute less than its *pro rata* share of the New Cash Advance, all other

Exit Facility Lenders shall have the right to contribute additional amounts of Cash to make up the shortfall, which additional Cash contribution shall be allocated among such other Exit Facility Lenders in proportion to their respective *pro rata* share of outstanding principal of Prepetition Notes. If any portion of the New Cash Advance remains unallocated after the allocation described in the immediately preceding sentence, then the remaining portion will be allocated in proportion to the unallocated portion of the commitments made by the Exit Facility Lenders.

(ii)     Roll Forward of Prepetition Notes. As part of the aggregate $25 million in Prepetition Notes to be rolled forward in the Exit Facility (which will be accomplished by exchanging such Prepetition Notes for the securities described in subsections (b) and (c) below of this Section 5.3(A)), the Exit Facility Lenders shall be entitled to roll forward a portion of the outstanding principal amount of their respective Prepetition Notes equal to product of (i) $25 million multiplied by (ii) their respective *pro rata* share of the New Cash Advance.

In exchange for participation in the Exit Facility, each Exit Facility Lender shall receive:

(a)     New Series A 20% Senior Secured Notes with a principal amount equal to the amount of Cash contributed by such Exit Facility Lender as part of the New Cash Advance;

(b)     New Series B 20% Senior Secured Notes with a principal amount equal to the aggregate principal amount of the Prepetition Notes that such Exit Facility Lender rolls forward; and

(c)     shares of Senior Preferred Stock with a liquidation preference equal to the aggregate principal amount of the Prepetition Notes that such Exit Facility Lender rolls forward.

The security interests and liens securing repayment of the Prepetition Notes shall be released and re-granted on the Effective Date (i) on a first priority basis to secure the New Series A 20% Senior Secured Notes, (ii) on a second priority basis to secure the New Series B 20% Senior Secured Notes, and (iii) on a third priority basis to secure the New 10% Subordinated Secured Notes, in each case pursuant to the Security Agreements, the Collateral Agreements and the Intercreditor Agreement.

Descriptions of the New Series A 20% Senior Secured Notes, the New Series B 20% Senior Secured Notes and the Senior Preferred Stock are set forth in subsections (i) "- New Series A 20% Senior Secured Notes and New Series B 20% Senior Secured Notes" and (iii) "- Senior Preferred Stock," respectively, of Section 5.3(C) "- Description of Securities to be issued under the Plan" below.

Distribution of the New Series A 20% Senior Secured Notes, the New Series B 20% Senior Secured Notes and the Senior Preferred Stock to the Exit Facility Lenders shall be in addition to the other securities in the Reorganized Debtor received by the Prepetition

Noteholders in exchange for their Allowed Prepetition Notes Claims. *See* Section 5.3(B) "- Class 4 Prepetition Notes Claims" below.

The following tables show the securities issued to the Exit Facility Lenders under the Plan under two possible scenarios. Scenario #1 sets forth the allocation of the New Series A 20% Senior Secured Notes, the New Series B 20% Senior Secured Notes and the Senior Preferred Stock, after giving effect to the Plan and assuming the *pro rata* participation by only the 15% Noteholders in the Exit Facility:

### Scenario #1 –Exit Facility (15% Noteholder Participation Only)

|  | Jefferies (1) | | Third Point (2) | | Total |
|---|---|---|---|---|---|
|  |  | | (in $ millions) | | |
| New Series A 20% Senior Secured Notes | $ | 4.096 | $ | 0.904 | $ | 5.00 |
| New Series B 20% Senior Secured Notes | $ | 20.480 | $ | 4.520 | $ | 25.00 |
| Senior Preferred Stock | $ | 20.480 | $ | 4.520 | $ | 25.00 (3) |

(1) Allocated based upon Jefferies' 81.92% share of the outstanding 15% Prepetition Notes

(2) Allocated based upon Third Point's 18.08% share of the outstanding 15% Prepetition Notes

(3) Senior Preferred Stock has a liquidation preference of $1,000 per share, resulting in 25,000 shares to be issued under the Plan.

Scenario #2 below sets forth the allocation of the New Series A 20% Senior Secured Notes, the New Series B 20% Senior Secured Notes and the Senior Preferred Stock, after giving effect to the Plan and assuming the *pro rata* participation by all of the Prepetition Noteholders in the Exit Facility:

### Scenario #2 –Exit Facility (Prepetition Noteholder Participation)

|  | Jefferies (1) | | Third Point (2) | | Other Noteholders (3) | | Total |
|---|---|---|---|---|---|---|---|
|  |  | | (in $ millions) | | | | |
| New Series A 20% Senior Secured Notes | $ | 3.572 | $ | 0.788 | $ | 0.640 | $ | 5.00 |
| New Series B 20% Senior Secured Notes | $ | 17.862 | $ | 3.942 | $ | 3.196 | $ | 25.00 |
| Senior Preferred Stock | $ | 17.862 | $ | 3.942 | $ | 3.196 | $ | 25.00 (4) |

(1) Allocated based upon Jefferies' 71.45% share of the outstanding Prepetition Notes

(2) Allocated based upon Third Point's 15.77% share of the outstanding Prepetition Notes

(3) Allocated based upon Other Noteholders' 12.78% share of the outstanding Prepetition Notes

(4) Senior Preferred Stock has a liquidation preference of $1,000 per share, resulting in 25,000 shares to be issued under the Plan.

### B.    Class 4 Prepetition Notes Claims.

In exchange for the Allowed Prepetition Notes Claims, each Prepetition Noteholder shall receive:

> (i)    the New 10% Subordinated Secured Notes, in an aggregate principal amount equal to its Prepetition Notes Claims, excluding, for purposes of this allocation calculation, the aggregate principal amount of Prepetition Notes rolled forward in the Exit Facility;

(ii)    shares of the Junior Preferred Stock, having an aggregate liquidation preference equal to the aggregate principal amount of the Prepetition Notes held by the Prepetition Noteholder, including for purposes of this allocation calculation, any principal amount of Prepetition Notes rolled forward pursuant to the Exit Facility; and

(iii)   a number of shares of New Common Stock equal to:

    (a)    if such Prepetition Noteholder does not participate in the Exit Facility:

        (1)    such Prepetition Noteholder's Make-Up Common Shares, plus

        (2)    the product of (x) the 1 million aggregate shares of the New Common Stock reserved for issuance under the Plan, as reduced by the aggregate amount of all Make-Up Common Shares, and (y) the percentage of the aggregate principal amount of all outstanding Prepetition Notes held by such Prepetition Noteholders, plus

        (3)    such Prepetition Noteholders pro rata share, based on the aggregate principal amount of the Prepetition Notes held by all Prepetition Noteholders not participating in the Exit Facility, of an additional number of shares equal to the product of (x) the 1 million aggregate shares of the New Common Stock reserved for issuance under the Plan, as reduced by the aggregate amount of all Make-Up Common Shares, and (y) 2.22% (the "Dilutive Common Shares"); and

    (b)    if such Prepetition Noteholder does participate in the Exit Facility:

        (1)    the product of (x) the 1 million aggregate shares of the New Common Stock reserved for issuance under the Plan, as reduced by the aggregate amount of all Make-Up Common Shares, and (y) the percentage of the aggregate principal amount of all outstanding Prepetition Notes held by such Prepetition Noteholders, *minus*

        (2)    such Prepetition Noteholder's pro rata share, based on its holdings of Prepetition Notes relative to the holdings of Prepetition Notes by all Prepetition Noteholders who participate in the Exit Facility, of the aggregate amount of all Dilutive Common Shares.

A description of the New 10% Subordinated Secured Notes, the Junior Preferred Stock and the New Common Stock (inclusive of the Make-Up Common Shares and the Dilutive Common Shares) is set forth in subsections (ii) "- New 10% Subordinated Secured Notes", (iv)

"- Junior Preferred Stock" and (v) "New Common Stock", respectively, of <u>Section 5.3(C)</u>
"- Description of Securities to be Issued in the Plan" below.

  The following table sets forth the allocation of the New 10% Subordinated Secured Notes, the Junior Preferred Stock and the New Common Stock, after giving effect to the Plan and assuming the *pro rata* participation of only the 15% Prepetition Noteholders in the Exit Facility:

| | Jefferies | | Third Point | | Other Noteholders | | Total | |
|---|---|---|---|---|---|---|---|---|
| | | | Value in $ millions | | | | | |
| **New 10% Subordinated Secured Notes (1)** | $ | 6.876 (1a) | $ | 1.517 (1b) | $ | 1.607 (1c) | $ 10.00 | |
| **Junior Preferred Stock (2)** | $ | 3.572 (2a) | $ | 0.788 (2b) | $ | 0.640 (2c) | $ | 5.00 (3) |
| **New Common Stock: (4)** | | | | | | | | |
|  **Make-Up Common Shares (5)** | n/a | | n/a | | $ | 3.196 (6) | | |
|  **Dilutive Common Shares (7)** | n/a | | n/a | | $ | 0.151 (8) | | |
|  **Balance of Shares:** | $ | 4.738 (9) | $ | 1.045 (10) | $ | 0.870 (11) | | |
| **Total:** | $ | 4.738 | $ | 1.045 | $ | 4.217 | $ 10.00 (12) | |

(1) Allocated based upon the respective holdings of the outstanding $122.319 million aggregate principal amount of the Prepetition Notes, as adjusted for the $25 million aggregate principal amount rolled forward by the 15% Prepetition Noteholders participating in the Exit Facility:

  a. 68.76% held by Jefferies, or $66.915 million of the 15% Prepetition Notes (adjusted for roll up)

  b. 15.17% held by Third Point, or $14.766 million of the 15% Prepetition Notes (adjusted for roll up)

  c. 16.07% held by Other Noteholders, or $15.638 million of the 12½% Prepetition Notes

(2) Allocated based upon the initial respective holdings of the outstanding $122.319 million aggregate principal amount of the Prepetition Notes (without regard to any principal amount rolled forward):

  a. 71.45% held by Jefferies, or $87.395 million of the 15% Prepetition Notes

  b. 15.77% held by Third Point, $19.286 million of the 15% Prepetition Notes

  c. 12.78% held by Other Noteholders, or 15.638 million of the 12½% Prepetition Notes

(3) Junior Preferred Stock has a liquidation preference of $1,000 per share, for 5,000 total shares issuable under the Plan.

(4) Subject to adjustments, if any, in (i) the number of shares of New Common Stock available and (ii) the *pro rata* share of the New Common Stock to which the Prepetition Noteholders are entitled, each as more particularly set forth in notes (5) and (7) below, allocated based upon the initial respective holdings of the outstanding $122.319 million aggregate principal amount of the Prepetition Notes (see note (2) above). For purposes of the calculation, a total of 1 million shares of the New Common Stock have been authorized for issuance under the Plan.

(5) Represents share value of New Common Stock equivalent to the *pro rata* share of the $25 million aggregate principal amount rolled forward in the Exit Facility which Prepetition Holder forewent by not electing to participate in the Exit Facility. For purposes of the calculation, the *pro rata* amount is based upon the percentage of the Prepetition Noteholder's initial respective holding in the outstanding principal amount of the Prepetition Notes (see note (2) above) and shares of New Common Stock are deemed to have a value of $10.00 per share under the Plan.

(6) Calculated by multiplying $25 million (amount rolled forward in Exit Facility) by 12.78% (Other Noteholders' holdings of the outstanding Prepetition Notes - see note (2) above).

(7) Represents share value of New Common Stock equivalent to 2.22% of the outstanding shares of New Common Stock issuable under the Plan, after giving effect to issuance of the Make-Up Common Shares (see note (5) above), which shares are issuable under the Plan to each of the Prepetition Noteholders who does not elect to participate in the Exit Facility. All Exit Facility Lenders shall share in the dilution caused thereby.

(8) Calculated by multiplying $6.804 million (value of New Common Stock available for issuance under the Plan after deducting the Make-Up Common Shares) by 2.22% (see note (7) above).

(9) Calculated by multiplying $6.804 million (value of New Common Stock available for issuance under the Plan after deducting the Make-Up Common Shares) by 69.63% (Jefferies holdings of the outstanding Prepetition Notes, as diluted by the issuance of the Dilutive Common Shares - see notes (7) and (8) above).

(10) Calculated by multiplying $6.804 million (value of New Common Stock available for issuance under the Plan after deducting the Make-Up Common Shares) by 15.37% (Third Point holdings of the outstanding Prepetition Notes, as diluted by the issuance of the Dilutive Common Shares - see notes (7) and (8) above).

(11) Calculated by multiplying $6.804 million (value of New Common Stock available for issuance under the Plan after deducting the Make-Up Common Shares) by 12.78% (Other Noteholders' holdings of the outstanding Prepetition Notes).

(12) New Common Stock has a deemed value of $10.00 per share, resulting in 1 million shares to be issued under the Plan.

The following table sets forth the allocation of the New 10% Subordinated Secured Notes, the Junior Preferred Stock and the New Common Stock, after giving effect to the Plan and assuming the *pro rata* participation of all of the Prepetition Noteholders in the Exit Facility:

| | **Jefferies** | | **Third Point** | | **Other Noteholders** | | **Total** | |
|---|---|---|---|---|---|---|---|---|
| | | | | Value in $ millions | | | | |
| **New 10% Subordinated Secured Notes (1)** | $ | 6.876 (1a) | $ | 1.517 (1b) | $ | 1.607 (1c) | $ | 10.00 |
| **Junior Preferred Stock (2)** | $ | 3.572 (2a) | $ | 0.788 (2b) | $ | 0.640 (2c) | $ | 5.00 (3) |
| **New Common Stock: (4)** | $ | 6.876 | $ | 1.517 | $ | 1.607 | $ | 10.00 (5) |
|     **Make-Up Common Shares** | | n/a | | n/a | | n/a | | |
|     **Dilutive Common Shares** | | n/a | | n/a | | n/a | | |

(1) Allocated based upon the respective holdings of the outstanding $122.319 million aggregate principal amount of the Prepetition Notes, as adjusted for the $25 million aggregate principal amount rolled forward by the Prepetition Noteholders participating in the Exit Facility:

    a.  71.45% held by Jefferies, or $69.533 million of the 15% Prepetition Notes (adjusted for roll up)

    b.  15.77% held by Third Point, or $15.344 million of the 15% Prepetition Notes (adjusted for roll up)

    c.  12.78% held by Other Noteholders, or $12.442 million of the 12½% Prepetition Notes (adjusted for roll up)

(2) Allocated based upon the initial respective holdings of the outstanding $122.319 million aggregate principal amount of the Prepetition Notes (without regard to any principal amount rolled forward):

    a.  71.45% held by Jefferies, or $87.395 million of the 15% Prepetition Notes

    b.  15.77% held by Third Point, $19.286 million of the 15% Prepetition Notes

    c.  12.78% held by Other Noteholders, or 15.638 million of the 12½% Prepetition Notes

(3) Junior Preferred Stock has a liquidation preference of $1,000 per share, for 5,000 shares issuable under the Plan.

(4) Allocated based upon the respective holdings of the outstanding $122.319 million aggregate principal amount of the Prepetition Notes (see note (2) above). For purposes of the calculation, a total of 1 million shares of New Common Stock are reserved for issuance under the Plan. Because this scenario #2 assumes participation by all of the Prepetition Noteholders in the Exit Facility, no adjustments are required with respect to either the number of shares of New Common Stock available (e.g. no Make-Up Common Shares issuable) or the initial *pro rata* share of the New Common Stock to which the Prepetition Noteholders are entitled (e.g. no Dilutive Common Shares issuable).

(5) New Common Stock has a deemed value of $10.00 per share, resulting in 1 million shares to be issued under the Plan.

## C. Description of Securities to be Issued in the Plan.

### (i) New Series A 20% Senior Secured Notes and New Series B 20% Senior Secured Notes.

The New Series A 20% Senior Secured Notes shall be issued pursuant to that certain Series A Senior Notes Indenture, and the New Series B 20% Senior Secured Notes shall be issued pursuant to that Series B Senior Notes Indenture, in each case between the Reorganized Debtor and The Bank of New York Mellon Trust Company, NA, as Indenture Trustee and Collateral Agent with respect to the applicable New 20% Senior Secured Notes (as defined below), substantially in the forms attached hereto as, respectively, Exhibit L (the "Series A

Senior Notes Indenture") and Exhibit M (the "Series B Senior Notes Indenture" and together with the Series A Senior Notes Indenture, the "Senior Notes Indentures"), which Senior Notes Indentures will govern the rights and obligations of the Reorganized Debtor and the holders of the notes issued thereunder. The Senior Notes Indentures will be subject to the laws of the State of New York. Each of the New Series A 20% Senior Secured Notes and the New Series B 20% Senior Secured Notes will be subject to restrictions on transferability and resale under the Securities Act, applicable state securities laws and the Senior Notes Indentures.

Repayment of the New Series A 20% Senior Secured Notes shall be secured by a first priority lien on substantially all assets of the Reorganized Debtor (and substantially all assets of the Reorganized Debtor's future domestic subsidiaries) except for specified excluded assets. Repayment of the New Series B 20% Senior Secured Notes shall be secured by a second priority lien on substantially all assets of the Reorganized Debtor (and substantially all assets of the Reorganized Debtor's future domestic subsidiaries) except for specified excluded assets. The collateral securing the New Series A 20% Senior Secured Notes and the New Series B 20% Senior Secured Notes will be granted and governed by the Series A Senior Notes Indenture and the First Lien Security Agreement, substantially in the form attached hereto as Exhibit O, in the case of the New Series A 20% Senior Secured Notes, and the Series B Senior Notes Indenture and the Second Lien Security Agreement, substantially in the form attached hereto as Exhibit P, in the case of the New Series B 20% Senior Secured Notes, in each case to be entered into between the Reorganized Debtor and The Bank of New York Mellon, as collateral agent with respect to the applicable New 20% Senior Secured Notes (collectively, with the Third Lien Security Agreement (as defined below), the "Security Agreements"), and the other agreements, documents and filings related thereto (the "Collateral Documents"). The respective lien priorities of the New Notes shall be set forth in and governed by the Senior Notes Indentures, the applicable regulatory filings, and the Intercreditor Agreement to be entered into between the Reorganized Debtor and The Bank of New York Mellon, as trustee and collateral agent, substantially in the form attached hereto as Exhibit R (the "Intercreditor Agreement").

By way of summary only, and qualified in its entirety to the form of the Senior Notes Indentures, Security Agreements and Intercreditor Agreement attached as Exhibits L, M, N, O, P and Q to this Disclosure Statement, the Senior Notes Indentures, Security Agreements and Intercreditor Agreement shall provide for the following with respect to the New Series A 20% Senior Secured Notes and the New Series B 20% Senior Secured Notes (collectively, the "New 20% Senior Secured Notes"):

| | |
|---|---|
| **Principal Amount** ............ ▪ | $5 million aggregate principal amount of New Series A 20% Senior Secured Notes |
| ▪ | $25 million aggregate principal amount of New Series B 20% Senior Secured Notes |
| **Interest** ............................. | Rate of 20% per annum, payable quarterly in arrears on each January 1, April 1, July 1 and October 1 of each year, commencing [_____, 20 ___], in cash or, at the option of the Reorganized Debtor, as payment-in-kind in the form of additional principal amount of the New Series A 20% Senior Secured Notes or New Series B 20% Senior Secured Notes, as applicable. For all purposes of the Senior Notes Indentures, any such PIK notes will constitute additional principal amount of the New Series A 20% Senior Secured Notes or New Series B 20% Senior Secured Notes, as the case may be. |

|  | Interest may not be paid on the New Series B 20% Senior Secured Notes in cash while any of the New Series A 20% Senior Secured Notes remain outstanding unless the New Series A 20% Senior Secured Notes are paid in cash in the same percentage. |
|---|---|
| **Maturity Date** | 2014, on the fifth anniversary of the initial issuance of the New 20% Senior Secured Notes. |
| **Guarantees** | To be unconditionally guaranteed on a senior secured basis by the Reorganized Debtor's existing and future domestic subsidiaries.  At the origination date, the Reorganized Debtor will not have any subsidiaries. |
| **Ranking** | New Series A 20% Senior Secured Notes and New Series B 20% Senior Secured Notes will be the senior secured obligations of the Reorganized Debtor, ranking (i) equal in right of payment with all of the Reorganized Debtor's existing and future senior indebtedness, (ii) effectively senior to all of the Reorganized Debtor's existing and future senior and senior subordinated unsecured indebtedness to the extent of the value of the assets securing the New Series A 20% Senior Secured Notes and New Series B 20% Senior Secured Notes, respectively, and (iii) senior in right of payment to all of the Reorganized Debtor's existing and future senior subordinated indebtedness. |
| **Collateral** | The New Series A 20% Senior Secured Notes will be secured, together with the related guarantees, if any, by a first priority lien on substantially all of the Reorganized Debtor's assets except for specified excluded assets.  The New Series B 20% Senior Secured Notes will be secured, together with the related guarantees, if any, by a second priority lien on substantially all of the assets of the Reorganized Debtor except for specified excluded assets.  Pursuant to the terms of the Intercreditor Agreement, the second priority lien of the New Series B 20% Senior Secured Notes and the guarantees, if any, will be subordinated to the New Series A 20% Senior Secured Notes. |
|  | All or substantially all of the Collateral may be released with respect to either of the New 20% Senior Secured Notes by holders of at least 85% in aggregate principal amount of the applicable series of notes. |
| **Redemption** | ▪ Prior to the third anniversary of issuance in 2012, redeemable at the option of the Reorganized Debtor at a make-whole redemption price equal to (i) 100% of the then outstanding principal amount plus (ii) the excess of (a) 1% of the principal amount then outstanding or (b) the excess of (1) the present value on such redemption date of the redemption price of the New 20% Senior Secured Notes at the third anniversary of the issuance date plus all required interest payments due through the third anniversary of the issuance date, computed using a discount rate equal to the comparable Treasury security plus 50 basis points; over (2) the principal amount of the New 20% Senior Secured Notes, if greater, plus (iii) accrued and unpaid interest through the date of redemption. |
|  | ▪ Thereafter, redeemable at the option of the Reorganized Debtor at a redemption price equal to 100% of the then outstanding principal amount plus accrued and unpaid interest to such redemption date. |
|  | ▪ The New Series B 20% Senior Secured Notes will not be able to be redeemed if there are any New Series A 20% Senior Secured Notes outstanding on the redemption date. |
| **Change of Control** | Upon a change of control, the Reorganized Debtor shall be obligated to offer to purchase the outstanding New Series A 20% Senior Secured Notes and the New Series B 20% Senior Secured Notes at a change of control purchase price of 101% of the respective principal amount tendered, plus accrued and unpaid |

interest, if any, to the date of such purchase.

Any payments with respect to a change of control must first be made to holders of the New Series A 20% Senior Secured Notes before any such payments are made to holders of the New Series B 20% Senior Secured Notes, and any failure to make any such payment to holders of the New Series A 20% Senior Secured Notes shall constitute a breach or default of this covenant.

**Information Rights**......... The Reorganized Debtor shall provide (i) audited annual and unaudited quarterly financial statements and (ii) management discussion and analysis and current information consistent with the reporting requirements under Item 301 of Regulation S-K and Form 8-K, respectively, promulgated under the Exchange Act.

**Covenants**......................... The Senior Notes Indentures include affirmative and negative covenants which, among other things, require the Reorganized Debtor to make timely payment of its obligations under the New Series A 20% Senior Secured Notes and the New Series B 20% Senior Secured Notes, maintain its corporate existence and properties (including the Collateral), conduct its business in compliance with applicable laws, as well as restrict the Reorganized Debtor's ability to:

- pay dividends, redeem subordinated debt or make other restricted payments, in cash or in-kind, junior to the applicable series of notes, meaning with respect to (x) the New Series A 20% Senior Secured Notes, any security ranking junior to the New Series A 20% Senior Secured Notes including, but not limited to, the New Series B 20% Senior Secured Notes, the New 10% Subordinated Secured Notes, the Senior Preferred Stock, the Junior Preferred Stock, and the New Common Stock and (y) the New Series B 20% Senior Secured Notes, any security ranking junior to the New Series B 20% Senior Secured Notes including, but not limited to, the New 10% Subordinated Secured Notes, the Senior Preferred Stock, the Junior Preferred Stock, and the New Common Stock; *provided, however*, that the payment of PIK notes on the New Notes or PIK dividends on the Senior Preferred Stock or the Junior Preferred Stock are permitted;

- enter into certain transactions with affiliates (exclusive of employment agreements entered into in the ordinary course and payment of reasonable director's fees, among others);

- incur or guarantee certain additional indebtedness or issue certain preferred stock;

- incur dividend or other payment restrictions affecting certain subsidiaries;

- grant liens on assets;

- issue capital stock of subsidiaries;

- merge, consolidate or transfer substantially all assets;

- consummate certain asset sales; and

- impair security interests granted with respect to the Collateral securing the obligations under the New 20% Senior Secured Notes.

**Events of Default** ............. An event of default shall occur if, among other things, the Reorganized Debtor fails to timely pay its obligations under the New 20% Senior Secured Notes or otherwise breaches in any material respect any of its covenants or obligations to the holders of such notes, which failure is not cured after notice and a specified opportunity to cure as provided in the Senior Notes Indentures, or the Reorganized Debtor files for bankruptcy, or there is an assignment for the benefit of creditors. While an event of default is continuing, the Indenture Trustee or holders of 25% of more in principal amount of the then outstanding applicable series of New 20% Senior Secured Notes may declare the principal,

interest and any premium under the affected notes immediately due and payable. Subject to certain limitations, at any time after the Indenture Trustee or such holders have declared an acceleration with respect to a series of New 20% Senior Secured Notes, the holders of 85% in principal amount of the applicable series of New 20% Senior Secured Notes may rescind and cancel such declaration and its consequences. Notwithstanding anything to the contrary contained in the Senior Notes Indentures, the holders of 85% in principal amount of the applicable series of New 20% Senior Secured Notes have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the applicable trustee or collateral agent.

Amendments ...................

Amendments modifying, among other things, the principal, interest rate or maturity of the New 20% Senior Secured Notes or the right of the noteholders to receive payment of principal, interest or premium, if any, require consent of each holder of the notes issued under the applicable New Notes Indenture. Subject to the foregoing and certain other exceptions regarding amendments that do not require the consent of any noteholders, (i) holders of at least 85% in aggregate principal amount of the then outstanding New Series A 20% Senior Notes, may amend, modify or supplement the Series A Senior Notes Indenture, the New Series A 20% Senior Notes, the related guarantees, and the related collateral agreements and (ii) holders of at least 85% in aggregate principal amount of the then outstanding New Series B 20% Senior Notes, may amend, modify or supplement the Series B Senior Notes Indenture, the New Series B 20% Senior Notes, the related guarantees, and the related collateral agreements.

### (ii)    New 10% Subordinated Secured Notes.

The New 10% Subordinated Secured Notes shall be issued pursuant to that certain Subordinated Notes Indenture between the Reorganized Debtor and The Bank of New York Mellon Trust Company, NA, as Indenture Trustee and Collateral Agent, substantially in the form attached hereto as Exhibit N (the "Subordinated Notes Indenture"). Repayment of the New 10% Subordinated Secured Notes shall be secured by a third priority lien on substantially all of the assets of the Reorganized Debtor (and substantially all assets of the Reorganized Debtor's future domestic subsidiaries) except for specified excluded assets, that will be contractually subordinated to the liens securing the New 20% Senior Secured Notes. Repayment of the New 10% Subordinated Secured Notes shall be contractually subordinated to the New Series A 20% Senior Secured Notes and the New Series B 20% Senior Secured Notes, as provided in the Subordinated Notes Indenture. The New 10% Subordinated Secured Notes will be subject to restrictions on transferability and resale under the Securities Act, applicable state securities laws and the Subordinated Notes Indenture. The collateral securing the New 10% Subordinated Secured Notes will be granted and governed by the Subordinated Notes Indenture, the Third Lien Security Agreement to be entered into between the Reorganized Debtor and The Bank of New York Mellon, as collateral agent with respect to the New 10% Subordinated Secured Notes (the "Third Lien Security Agreement"), substantially in the form attached hereto as Exhibit Q, and the Collateral Agreements. The respective lien priorities of the New 10% Subordinated Secured Notes shall be set forth in and governed by the Subordinated Notes Indenture, applicable regulatory filings and the Intercreditor Agreement.

By way of summary only, and qualified in its entirety to the form of the Subordinated Notes Indenture, Security Agreements and Intercreditor Agreement attached as <u>Exhibits L, M, N, O, P and Q</u> to this Disclosure Statement, the Subordinated Notes Indenture, Security Agreements and Intercreditor Agreement shall provide for the following with respect to the New 10% Subordinated Secured Notes:

| | |
|---|---|
| **Principal Amount** | $10.0 million aggregate principal amount of New 10% Subordinated Secured Notes |
| **Interest** | Rate of 10% per annum, payable quarterly in arrears on each January 1, April 1, July 1 and October 1 of each year, commencing [_____, 20 ___], in cash or, at the option of the Reorganized Debtor, in the form of additional principal amount of the New 10% Subordinated Secured Notes. For all purposes of the Subordinated Notes Indenture, any such PIK notes will constitute additional principal amount of the New 10% Subordinated Secured Notes. |
| | Interest may not be paid on the New 10% Subordinated Secured Notes in cash while any of the New 20% Senior Secured Notes remain outstanding unless the New 20% Senior Secured Notes are paid in cash in the same percentage. |
| **Maturity Date** | 2016, on the seventh anniversary of the initial issuance of the New 10% Subordinated Secured Notes. |
| **Guarantees** | To be unconditionally guaranteed on a senior subordinated secured basis by the Reorganized Debtor's existing and future domestic subsidiaries. At the origination date, the Reorganized Debtor will not have any subsidiaries. |
| **Ranking** | New 10% Subordinated Secured Notes will be the senior subordinated secured obligations of the Reorganized Debtor, ranking (i) junior in right of payment to all of the Reorganized Debtor's existing and future senior indebtedness, including indebtedness outstanding under the New Series A 20% Senior Secured Notes and the New Series B 20% Senior Secured Notes, (ii) senior in right of payment to any existing and future subordinated or unsecured indebtedness of the Reorganized Debtor or guarantors, and (iii) equally in right of payment to any future senior subordinated indebtedness of the Reorganized Debtor or guarantors. |
| **Subordination** | Whether or not in a liquidation, dissolution or bankruptcy of the Reorganized Debtor, the New Series A 20% Senior Secured Notes and the New Series B 20% Senior Secured Notes are entitled to be paid in full before payment is made to a holder of the New 10% Subordinated Secured Notes, and holders of the New 10% Subordinated Secured Notes will contractually agree to forego any distribution to which they would otherwise be entitled until such senior notes are paid in full. In addition, no payments or distributions shall be payable under the New 10% Subordinated Secured Notes in the event of a default in payment under the New Series A 20% Senior Secured Notes or the New Series B 20% Senior Secured Notes, as the case may be, or other default thereunder (which is continuing and permits the applicable senior note to be accelerated) unless and until such default is cured or waived. In the event the Reorganized Debtor receives a "payment blockage notice" from holders of the New 20% Senior Secured Notes, no subsequent blockage notice shall be effective unless and until at least 360 days have elapsed since the effectiveness of such prior blockage notice and all scheduled payments of principal, premium, if any, and interest on the New 20% Senior Secured Notes that have come due have been paid in full in cash. The foregoing subordination provisions may not be amended absent consent of all holders of the then outstanding New 20% Senior Secured Notes. |

| | |
|---|---|
| **Collateral**............................ | New 10% Subordinated Secured Notes will be secured, together with the related guarantees, if any, by a third priority lien on substantially all of the Reorganized Debtor's assets except for specified excluded assets.  Pursuant to the terms of the Intercreditor Agreement, such lien will be contractually subordinated to the first and second priority liens thereon that will secure the New 20% Senior Secured Notes and certain other permitted indebtedness, making the New 10% Subordinated Secured Notes subordinated to the indebtedness of such senior notes. |
| | All or substantially all of the Collateral securing the New 10% Subordinated Secured Notes may be released by holders of at least 85% in aggregate principal amount of such notes. |
| **Redemption**...................... | Redeemable at any time at the option of the Reorganized Debtor at a redemption price equal to 100% of the then outstanding principal amount, plus accrued and unpaid interest, if any, to the date of such redemption; *provided, however*, that the New 10% Subordinated Secured Notes will not be able to be redeemed so long as the New Series A 20% Senior Secured Notes and New Series B 20% Senior Secured Notes remain outstanding. |
| **Change of Control**........... | Upon a change of control, the Reorganized Debtor shall be obligated to offer to purchase the outstanding New 10% Subordinated Secured Notes at a change of control purchase price of 101% of their principal amount, plus accrued and unpaid interest, if any, to the date of such purchase.  Any payments with respect to a change of control must first be made to holders of the New 20% Senior Secured Notes before any such payments are made to holders of the New 10% Subordinated Secured Notes, and any failure to make any such payment to holders of the New 20% Senior Secured Notes shall constitute a breach or default of this covenant. |
| **No Layering of Debt**........ | The Reorganized Debtor will not incur, create, issue, assume, guarantee or otherwise become liable for any indebtedness that is contractually subordinate or junior in right of payment to the New 20% Senior Secured Notes or other permitted senior indebtedness and that is senior in right of payment to the New 10% Subordinated Secured Notes. |
| **Information Rights**.......... | The Reorganized Debtor shall provide (i) audited annual and unaudited quarterly financial statements and (ii) management discussion and analysis and current information consistent with the reporting requirements under Item 301 of Regulation S-K and Form 8-K, respectively, under the Exchange Act. |
| **Covenants**......................... | The Subordinated Notes Indenture includes affirmative and negative covenants which, among other things, require the Reorganized Debtor to make timely payment of its obligations New 10% Subordinated Secured Notes, maintain its corporate existence and properties (including the Collateral), conduct its business in compliance with applicable laws, as well as restrict the Reorganized Debtor's ability to: |

- pay dividends, redeem subordinated debt or make other restricted payments, in cash or in-kind, junior to the New 10% Subordinated Secured Notes, including, but not limited to, the Senior Preferred Stock, the Junior Preferred Stock, and the New Common Stock; *provided, however*, that the payment of PIK notes on the New 10% Subordinated Secured Notes or PIK dividends of the Senior Preferred Stock or the Junior Preferred Stock are permitted;

- enter into certain transactions with affiliates (exclusive of employment agreements entered into the ordinary case and payment of reasonable director's fees, among others);

- incur or guarantee additional indebtedness or issue certain preferred stock;

- incur dividend or other payment restrictions affecting certain subsidiaries;
- grant liens on assets;
- issue capital stock of subsidiaries; and
- merge, consolidate or transfer substantially all assets.
- consummation of asset sales; and
- impair security interests granted with respect to the Collateral securing the obligations under the New 10% Subordinated Secured Notes.

**Events of Default** ............. An event of default shall occur if, among other things, the Reorganized Debtor fails to timely pay its obligations under the New 20% Senior Secured Notes or the New 10% Subordinated Secured Notes or otherwise breaches in any material respect any of its covenants or obligations to the holders of such notes, which failure is not cured after notice and a specified opportunity to cure as provided in the Subordinated Notes Indenture, or the Reorganized Debtor files for bankruptcy, or there is an assignment for the benefit of creditors. Upon an event of default that is continuing, the Indenture Trustee or holders of 25% of more in principal amount of the New 10% Subordinated Secured Notes may declare the principal, interest and any premium under such notes immediately due and payable. Subject to certain limitations, at any time after the Indenture Trustee or such holders have declared an acceleration with respect to the New 10% Subordinated Secured Notes, the holders of 85% in principal amount of the New 10% Subordinated Secured Notes may rescind and cancel such declaration and its consequences.

**Amendments** ..................... Amendments modifying, among other things, the principal, interest rate or maturity of the New 10% Subordinated Secured Notes or the right of the noteholders to receive payment of principal, interest or premium, if any, require consent of each holder of the notes issued under the applicable New Notes Indenture. Subject to the foregoing and certain other exceptions regarding amendments that do not require the consent of any noteholders, holders of at least 85% in aggregate principal amount of the then outstanding New 10% Subordinated Notes, may amend, modify or supplement the Subordinated Notes Indenture, the New 10% Subordinated Notes, the related guarantees, and the related collateral agreements.

### (iii)    Senior Preferred Stock.

The Senior Preferred Stock shall be issued pursuant to a series designation by the Board of Directors of the Reorganized Debtor (the "Board") set forth in a Certificate of Designations, Preferences and Rights, substantially in the form attached as Exhibit T hereto (the "Certificate of Designations"), to be filed by the Reorganized Debtor. The series designation for the Senior Preferred Stock in the Certificate of Designations shall govern the terms of the Senior Preferred Stock and provide the rights of the holders thereof. Shares of the Senior Preferred Stock will be subject to restrictions on transferability and resale under the Securities Act, applicable state securities laws and a Stockholders Agreement, in substantially the form attached as Exhibit S (the "Stockholders Agreement") to be entered into by the Debtor, Third Point and Jefferies. *See* subsection (vi) "- Transfer Restrictions and Certain Rights Related to the New Stock" below of this Section 5.3(C) "- Description of Securities to be Issued in the Plan" for a description of the transfer restrictions and other rights and obligations related to the New Stock under the Stockholders Agreement.

By way of summary only, qualified in its entirety to the form of the Certificate of Designations attached as <u>Exhibit T</u> to this Disclosure Statement, the Certificate of Designations provides for the following with respect to the Senior Preferred Stock:

| | |
|---|---|
| **Face Amount** | $25,000,000, liquidation value at $1,000 per share |
| **Dividends** | Rate of 18% per annum, on a cumulative basis, in preference to any dividends on any junior securities, including the Junior Preferred Stock and New Common Stock, payable in cash whenever funds are legally available when, as and if declared by the board of directors. Dividends shall be payable quarterly on each January 1, April 1, July 1 and October 1 of each year, commencing October 1, 2009, in cash or, at the option of the Reorganized Debtor, in kind with additional shares of the Senior Preferred Stock. Any such PIK dividends issued shall constitute Senior Preferred Stock for all purposes of the Certificate of Designations. |
| **Ranking** | With respect to dividend rights, rights upon liquidation, winding up and dissolution, ranking (i) senior to all existing common stock, the Junior Preferred Stock and each other class of capital stock or series of preferred stock established after the original issue date, the terms of which do not expressly provide that it ranks senior to or on parity with the Senior Preferred Stock, and (ii) junior to or on parity with any other class of capital stock or series of preferred stock established after the original issue date, the terms of which expressly provide that such class or series ranks senior to or on parity with the Senior Preferred Stock |
| **Optional Redemption** | Prior to the third anniversary of issuance in 2012, redeemable at the option of the Reorganized Debtor to the extent that funds are legally available under applicable corporate law for such payment, at a make-whole redemption price equal to (i) 100% of the then applicable liquidation preference plus (ii) the excess of (a) 1% of $1,000 for each share of the Senior Preferred Stock or (b) the excess of  (1) the present value on such redemption date of  the redemption price of each share of Senior Preferred Stock at the third anniversary of the issuance date plus all required dividend and other payments due on each such Share of Senior Preferred Stock through the third anniversary of the issuance date, computed using a discount rate equal to the comparable Treasury security plus 50 basis points, over (2) 1% of $1,000 for each share of the Senior Preferred Stock, if greater, plus (iii) any accrued and unpaid dividends per Share of Senior Preferred Stock as of the date of redemption. |
| | Thereafter, redeemable at the option of the Reorganized Debtor to the extent that funds are legally available under applicable corporate law for such payment at a redemption price equal to 100% of the then applicable liquidation preference plus cumulative and unpaid dividends to the redemption date. |
| **Mandatory Redemption** | To the extent funds are legally available under applicable corporate law, the Reorganized Debtor shall redeem all outstanding Senior Preferred Stock on the earlier to occur of (i) the tenth year anniversary of the issuance date in 2019, and (ii) an event of default under the New Notes Indentures, liquidation or, absent consent from the holders of the Senior Preferred Stock, the redemption or repurchase of any security junior in right of payment to the Senior Preferred Stock. The redemption price shall be equal to the then applicable liquidation preference, plus all accrued and unpaid dividends through the redemption date. So long as unredeemed shares of the preferred stock remain outstanding, the Reorganized Debtor shall not (x) acquire any preferred stock on parity with the Senior Preferred stock or the Junior |

|  | Preferred Stock, as applicable, or (y) declare or distribute any dividends on account of any class or series or equity securities junior to the Senior Preferred Stock or the Junior Preferred Stock, as applicable. |
|---|---|
| **Change of Control** | Upon a change of control, the Reorganized Debtor shall be obligated to offer to purchase the outstanding Senior Preferred Stock and the Junior Preferred Stock and, to the extent lawful, shall purchase the Senior Preferred Stock tendered at a purchase price equal to 100% of the then applicable liquidation preference plus cumulative and unpaid dividends to the date of such purchase; *provided, however* the Reorganized Debtor shall pay the purchase price on the Senior Preferred Stock prior to making any payment with respect to the Junior Preferred Stock. |
| **Protective Provisions and Voting Rights** | Approval by holders owning at least 85% of outstanding Junior Preferred Stock required to: (i) authorize or issue shares of capital stock, or any instrument convertible or exchangeable into capital stock, that ranks on par with or senior to the Senior Preferred Stock; (ii) amend, alter or repeal the charter of Baseline or the Certificate of Designations if such amendment, alteration or repeal would adversely affect any power, preference or special right of the Senior Preferred Stock or the holders thereof; and (iii) redeem or repurchase securities junior to the Senior Preferred Stock. |
| **Information Rights** | The Reorganized Debtor shall deliver to the holders of the Senior Preferred Stock (i) audited annual and unaudited quarterly financial statements and (ii) management discussion and analysis and such current information consistent with the reporting requirements under Item 301 of Regulation S-K and Form 8-K, respectively, promulgated under the Exchange Act. |
| **Events of Non-Compliance and Remedies** | An event of non-compliance shall occur if (i) the Reorganized Debtor breaches in any material respect any of its covenants or obligations to the holders of the Senior Preferred Stock and fails to cure such breach after notice and a specified opportunity to cure, (ii) a judgment in an aggregate amount in excess of $5.0 million has been rendered against the Debtor or any of its subsidiaries and such judgment remains undischarged, unpaid or unstayed for a period of 60 days after such judgment becomes final and non-appealable, or (iii) the Reorganized Debtor files for bankruptcy, a custodian is appointed, or there is an assignment for the benefit of creditors, among other things.  If any event of non-compliance occurs and continues for 90 days, the holders of the Senior Preferred Stock shall have the right to elect an additional director to the Reorganized Debtor's Board until such event of non-compliance is cured. |

### (iv)    Junior Preferred Stock.

The Junior Preferred Stock shall be issued pursuant to a series designation by the Board set forth in the Certificate of Designations.  The Certificate of Designations shall govern the terms of the Junior Preferred Stock and provide the rights of the holders thereof.  Shares of the Junior Preferred Stock will be subject to restrictions on transferability and resale under the Securities Act, applicable state securities laws and the Stockholders Agreement, as described in subsection (vi) "- Transfer Restrictions and Certain Rights Related to the New Stock" below of this Section 5.3(C) "- Description of Securities to be Issued in the Plan."

By way of summary only, qualified in its entirety to the Certificate of Designations, the Certificate of Designations attached as Exhibit T to this Disclosure Statement provides for the following with respect to the Junior Preferred Stock:

| | |
|---|---|
| **Face Amount** | $5,000,000, liquidation value $1,000 per share |
| **Dividends** | Rate of 18% per annum, on a cumulative basis, payable in cash whenever funds are legally available when, as and if declared by the board of directors. Dividends shall be payable quarterly on each January 1, April 1, July 1 and October 1 of each year, commencing October 1, 2009, in cash or, at the option of the Reorganized Debtor, in kind with PIK Shares. Any PIK Shares issued shall constitute Junior Preferred Stock for all purposes of the Certificate of Designations. The Reorganized Debtor shall not declare or pay any dividends in cash on the Junior Preferred Stock while any Senior Preferred Stock remain outstanding unless cash dividends are also declared and paid on the Senior Preferred Stock. |
| **Ranking** | With respect to dividend rights, rights upon liquidation, winding up and dissolution, ranking (i) senior to all existing common stock and each other class of capital stock or series of preferred stock established after the original issue date, the terms of which do not expressly provide that it ranks senior to or on parity with the Junior Preferred Stock and (ii) junior to the Senior Preferred Stock and junior to or on parity with any other class of capital stock or series of preferred stock established after the original issue date, the terms of which expressly provide that such class or series ranks senior to or on parity with the Junior Preferred Stock |
| **Optional Redemption** | Redeemable at any time to the extent that funds are legally available under applicable corporate law for such payment at a redemption price equal to 100% of the then applicable liquidation preference, plus cumulative and unpaid dividends to the redemption date; *provided, however,* that no Junior Preferred Stock may be redeemed if any Senior Preferred Stock remains outstanding. |
| **Mandatory Redemption** | Except as otherwise prohibited under the New Notes Indentures, to the extent funds are legally available under applicable corporate law, the Reorganized Debtor shall redeem all outstanding Junior Preferred Stock on the earlier to occur of (i) the twelve-year anniversary of the issuance date in 2021, and (ii) an event of default under the New Notes Indentures, liquidation or, absent consent from the holders of the Senior Preferred Stock and the Junior Preferred Stock, the redemption or repurchase of any security junior in right of payment to the Junior Preferred Stock; *provided, however* to the extent of funds legally available, the Reorganized Debtor shall redeem all of the outstanding Senior Preferred Stock prior to its redemption of the Junior Preferred Stock. The redemption price shall be equal to the then applicable liquidation. |
| | In addition, so long as unredeemed shares of any preferred stock remain outstanding, the Reorganized Debtor shall not (i) acquire any preferred stock on parity with the Senior Preferred Stock or the Junior Preferred Stock, as applicable, or (ii) declare or distribute any dividends on account of any class or series of equity securities junior to the Senior Preferred Stock or the Junior Preferred Stock, as applicable. |
| **Change of Control** | Upon a change of control, the Reorganized Debtor shall be obligated to offer to purchase the outstanding Senior Preferred Stock and the Junior Preferred Stock and, to the extent lawful, shall purchase the Junior Preferred Stock tendered at a purchase price equal to 100% of the then applicable liquidation preference, plus cumulative and unpaid dividends to the date of such purchase; *provided, however* the Reorganized Debtor shall pay the purchase price on the Senior Preferred Stock prior to making any payment with respect to the Junior Preferred Stock. |