| | |
|---|---|
| **Protective Provisions and Voting Rights**............ | Approval by holders owning at least 85% of outstanding Junior Preferred Stock required to: (i) authorize or issue shares of capital stock, or any instrument convertible or exchangeable into capital stock, that ranks on par with or senior to the Junior Preferred Stock; (ii) amend, alter or repeal the charter of Baseline or the Certificate of Designations if such amendment, alteration or repeal would adversely affect any power, preference or special right of the Junior Preferred Stock or the holders thereof; and (iii) redeem or repurchase securities junior to the Junior Preferred Stock. |
| **Information Rights**.......... | The Reorganized Debtor shall deliver to the holders of the Junior Preferred Stock (i) audited annual and unaudited quarterly financial statements and (ii) management discussion and analysis and such current information consistent with the reporting requirements under Item 301 of Regulation S-K and Form 8-K, respectively, promulgated under the Exchange Act. |
| **Events of Non-Compliance and Remedies** ........................... | An event of non-compliance shall occur if (i) the Reorganized Debtor breaches in any material respect any of its covenants or obligations to the holders of the Junior Preferred Stock and fails to cure such breach after notice and a reasonable opportunity to cure; (ii) a judgment in an aggregate amount in excess of $5.0 million has been rendered against the Debtor or any of its subsidiaries and such judgment remains undischarged, unpaid or unstayed for a period of 60 days after such judgment becomes final and non-appealable; or (iii) the Reorganized Debtor files for bankruptcy, a custodian is appointed or there is an assignment for the benefit of creditors, among other things. If any event of non-compliance occurs and continues for 90 days, the holders of the Senior Preferred Stock shall have the right to elect an additional director to the Reorganized Debtor's board of directors until such event of non-compliance is cured; *provided, however*, that if no Senior Preferred Stock remains outstanding, then the holders of the Junior Preferred Stock shall exercise such voting rights. |

### (v)     New Common Stock.

The Certificate of Incorporation will authorize the Reorganized Debtor to issue two million (2,000,000) shares of Common Stock, par value $0.001 per share, of which the Reorganized Debtor will issue one million (1,000,000) shares to the Prepetition Noteholders on the Effective Date in the amounts described in subsection (iii) of Section 5.3(B) "- Class 4 Prepetition Notes Claims" above.

Except as provided in the Stockholders Agreement, the holders of New Common Stock will vote as a single class, and each share of the New Common Stock will be entitled to one vote in all matters to be voted on by the holders of the New Common Stock. The Stockholders Agreement provides that as long as Jefferies and Third Point each holds at least 5% of the outstanding shares of the New Common Stock, on a fully-diluted basis, Jefferies and Third Point will each have the right to elect one director to the Board and mutually designate a third director to the Board.

Shares of New Common Stock will be subject to restrictions on transferability and resale under the Securities Act, applicable state securities laws and the Stockholders Agreement (as described below).

(vi)    **Transfer Restrictions and Certain Rights Related to the New Stock.**

The shares of New Stock held by stockholders party to the Stockholders Agreement will be subject to certain rights and obligations, including restrictions regarding transfer, set forth in the Stockholders Agreement.

The Stockholders Agreement provides that:

- No stockholder party thereto may sell, assign, transfer or pledge (subject to customary exceptions) its shares of New Stock except to its majority-owned affiliates without the prior consent of Jefferies and Third Point, if not a party to the transaction and still a stockholder.

- If Jefferies sells a majority of any class or series of its shares of New Stock to a third party, Jefferies will have the right to cause all of the other stockholders party to the Stockholders Agreement to sell, *pro rata*, their shares of New Stock of the same class or series to such third party on substantially the same terms and conditions.

- If one or more stockholders party thereto sell any shares of New Stock to a third party, each other stockholder thereto will have the right to sell, *pro rata*, its shares of New Stock of the same class or series to such third party on substantially the same terms and conditions.

- If any stockholder party thereto wishes to sell any of its shares of New Stock to a third party, such stockholder must first offer to sell such shares of New Stock to the other stockholders.  If the selling stockholder accepts the offer by another stockholder offering the highest price for the selling stockholder's shares of New Stock, such other stockholder will be required to purchase the selling stockholder's shares of New Stock at the price offered by such other stockholder within the next 15 calendar days.  If the selling stockholder does not elect to accept any offers by the other stockholders or fails to accept any such offer within 30 calendar days after notifying the other stockholders of its desire to sell its shares of New Stock, the selling stockholder may sell its shares of New Stock to a third party; *provided, however*, that the sale to the third party must be consummated within 60 calendar days after such 30-calendar day period and at a price not less than 106% of the highest price offered by the other stockholders.

The Stockholders Agreement also provides that:

- Without the prior written consent of Jefferies and Third Point, the Reorganized Debtor may not, among other things:

  - change its charter or bylaws;
  - change its capital structure (e.g., authorize, issue, redeem or modify the terms of any securities of the Reorganized Debtor ) except with respect to PIK notes or PIK dividends;

- except as necessary to accommodate Jefferies' and Third Point's right to designate a Board member, change the composition of the Board;
- change the Reorganized Debtor's line of business;
- incur any debt outside of the ordinary course of business;
- declare or pay any dividends other than PIK dividends;
- sell any material assets outside of the ordinary course of business; or
- enter into any change of control transaction.

- The Reorganized Debtor may not issue any new equity securities without first offering each of Jefferies and Third Point the right to purchase its pro rata share of such new equity securities.

**D.     Continued Corporate Existence; Certificates of Incorporation and By-laws.**

The Reorganized Debtor shall exist as a separate legal entity and shall be reincorporated under the laws of the State of Delaware. The Reorganized Debtor will file the Certificate of Incorporation in substantially the form attached hereto as Exhibit U with the Secretary of State of the State of Delaware and adopt amended and restated bylaws in substantially the form attached hereto as Exhibit V. Such Certificate of Incorporation and amended and restated bylaws shall, among other things, pursuant to Section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities.

**E.     Satisfaction of Allowed Claims.**

The holders of Allowed Claims in Classes 1 through 7 shall be satisfied in accordance with the terms of this Plan.

**F.     Cancellation of Interests; Issuance of New Common Stock.**

All Interests of the Debtor shall be cancelled and annulled on the Effective Date. The Reorganized Debtor shall issue a total of 1 million shares of New Common Stock. These shares of New Common Stock will be distributed to the holders of Allowed Class 4 Claims in the manner described in Section 5.2 "- Classification and Treatment of Claims and Interests" and Section 5.3(B) "- Class 4 Prepetition Notes Claims" above.

**G.     Restructuring Transactions.**

On the Effective Date, and pursuant to the Plan or the applicable Plan Supplement, the Debtor or Reorganized Debtor shall enter into the restructuring transactions contemplated herein (the "Restructuring Transactions"), and shall take any actions as may be reasonably necessary or appropriate to effect a restructuring of its respective businesses or the overall organizational structure of the Reorganized Debtor. The actions to be taken by the Debtor and Reorganized Debtor to effect the Restructuring Transactions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition or transfer and the issuance of the New Notes and the New Stock containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or

delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation or reincorporation, including the Certificate of Incorporation and the Certificate of Designations, limited partnership, or formation, merger or consolidation pursuant to applicable state law; and (d) all other actions determined to be reasonably necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions. The Plan Supplement evidencing the Restructuring Transactions shall be filed with the Bankruptcy Court within five (5) business days before the Confirmation Hearing. The chairman of the board of directors, president, chief executive officer, chief financial officer, any executive vice president or senior vice president, or any other appropriate officer, manager or managing partner of each of Debtor or Reorganized Debtor, as appropriate, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, the New Notes Indentures, the related Collateral Documents, the Security Agreements, the Intercreditor Agreement and the Certificate of Designations, and other agreements or documents, and take such other actions, as may be reasonably necessary or appropriate, to effectuate and further evidence the terms and conditions of this Plan. The secretary or assistant secretary of the Debtor or Reorganized Debtor, as appropriate, shall be authorized to certify or attest to any of the foregoing actions.

**H.     Authority.**

Until the Effective Date, the Bankruptcy Court shall retain jurisdiction of the Debtor, its assets and operations.

**I.     Substantial Consummation.**

On the Effective Date, unless otherwise provided by the Confirmation Order, the following shall occur, be deemed to have occurred simultaneously, and constitute substantial consummation of the Plan: (a) new corporate documents shall be authorized, approved and effective in all respects without further action under applicable law, regulation, order, or rule, including, without express or implied limitation, any action by the stockholders or directors of the Debtor or the Reorganized Debtor; except that the new organizational documents of the Reorganized Debtor shall be filed as may be appropriate with the applicable Secretary of State as soon as practicable on or after the Effective Date; (b) the Debtor's property deemed transferred to the Reorganized Debtor shall automatically vest in the Reorganized Debtor without further action on the part of the Debtor or any other Person; (c) the New Notes and the New Stock shall be authorized and issued to the Exit Facility Lender and the Prepetition Noteholders, and the related Collateral securing the New Notes shall be granted, and the related Intercreditor Agreement will be entered into, in each case as provided in Articles II and III of the Plan.

**J.     Cancellation of Instruments and Agreements.**

Upon the occurrence of the Effective Date, except as otherwise provided herein or in the Confirmation Order, instruments, the notes, warrants, options, share certificates, or other documents (other than any insurance policy of the Debtor) evidencing, giving rise to, or governing any Claim or Interest shall be deemed canceled and annulled without further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the

Debtor under such agreements, instruments, notes, warrants, options, share certificates, or other documents shall be discharged.

## K.    Releases.

On the Effective Date, except for Causes of Action or other obligations arising under the Exit Facility or the Plan, (i) the Exit Facility Lenders and the Prepetition Noteholders shall be deemed to forever waive, release, and discharge any and all Causes of Action against the Debtor based, whether in whole or in part, upon any act, omission, event, condition, or thing in existence or that occurred, whether in whole or in part, prior to the Effective Date of the Plan and (ii) in exchange for the preceding release and the valuable consideration being provided by the Exit Facility Lenders (in the form of new money) and the Prepetition Noteholders (in the form of significant compromise and reduction of their Secured Claims), the Debtor shall be deemed to forever waive, release, and discharge any and all Causes of Action against the Exit Facility Lenders and the Prepetition Noteholders based, whether in whole or in part, upon any act, omission, event, condition, or thing in existence or that occurred, whether in whole or in part, prior to the Effective Date of the Plan. For the purpose of the Releases granted by this provision and by Article III(J) of the Plan, the Exit Facility Lenders, the Prepetition Noteholders and the Debtor shall include those entities' respective officers, directors, employees, agents, partners, subsidiaries, affiliates, advisors, attorneys and successors-in-interest.

## L.    Certain Retained Causes of Action.

Except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, in accordance with Section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall receive by transfer from the Debtor and shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights or causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any Person or that arose before the Effective Date or that relates to a Claim. The Reorganized Debtor may pursue such retained claims, rights or causes of action, suits, or proceedings as appropriate, in accordance with the best interests of the Estate.

## M.    Exemption from Certain Transfer Taxes.

Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers or mortgages from or by the Debtor to the Reorganized Debtor or any other Person or entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**N.      Assignment of Litigation Claims.**

The Debtor will assign any Causes of Action or Claims whether asserted or unasserted, to the Reorganized Debtor, including but not limited to, Claims and Causes of Action against officers and directors.

**5.4      Treatment of Executory Contracts and Unexpired Leases.**

**A.      Assumed Contracts and Leases.**

Except for executory contracts or unexpired leases that are designated for rejection prior to the Confirmation Hearing, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan as of the Effective Date, the Debtor shall be deemed to have assumed each executory contract and unexpired lease and assigned them to the Reorganized Debtor.  The Confirmation Order shall constitute an order of the Bankruptcy Court under Section 365 of the Bankruptcy Code approving the contract and lease assumptions and assignments to the Reorganized Debtor as of the Effective Date.

Although the Debtor has not finalized its evaluation of executory contracts or unexpired leases, the Debtor anticipates rejecting its office lease with 411 NSHP Partners, L.P., which rejection may result in a maximum rejection claim of approximately $141,468.  A list of the Debtor's executory contracts and unexpired leases, and their proposed treatment is attached hereto as Exhibit K.

**B.      Payments Related to Assumption of Contracts and Leases.**

Any monetary amounts by which any executory contract and unexpired lease to be assumed under the Plan is in default shall be satisfied under Section 365(b)(1) of the Bankruptcy Code by Cure in the ordinary course of business.  Such Claims are not impaired.

**C.      Compensation, Benefit, and Pension Programs.**

All employee compensation, benefit and pension plans, and employment agreements or settlements reached thereunder of the Debtors, including benefit plans and programs subject to Sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under the Plan, and the Debtors' respective obligations under each such Retained Plan shall survive Confirmation of this Plan.

**D.      Indemnification Obligations.**

Except as otherwise specifically provided herein or in the Plan, any obligations or rights of the Debtor to indemnify, defend or advance expenses to its present and former directors, officers, employees, agents or representatives under its certificate of incorporation, bylaws, employee-indemnification policy, the Indemnification Agreements or under state law, or any agreement with respect to any claim, demand, suit, cause of action, or proceeding, shall survive confirmation of the Plan.  The employees of the Debtor who become employed by the Reorganized Debtor shall receive indemnification by the Reorganized Debtor in the ordinary

course of its business. Claims against the Debtor for indemnification shall be classified under the Plan as General Unsecured Claims and are payable as Class 7 Claims.

### E.   Treatment of Change of Control Provisions.

The entry of the Confirmation Order, consummation of the Plan, and/or any other acts taken to implement the Plan shall not constitute a "change in control" under any provision of any contract, agreement or other document which provides for the occurrence of any event, the granting of any right, or any other change in then-existing relationship between the parties upon a change in control.

### 5.5   Conditions Precedent to the Plan's Confirmation and Consummation.

### A.   Conditions to Confirmation.

The Plan's Confirmation is subject to the satisfaction or written waiver of each of the following conditions precedent:

(i)     the Bankruptcy Court finding the prepetition solicitation and this Disclosure Statement to have been adequate and not in violation of law;

(ii)    timely and affirmative election by the Exit Facility Lenders that they will provide the New Cash Advance pursuant to the Exit Facility;

(iii)   the assumption and assignment of all executory contracts and unexpired leases that are not expressly rejected that the Debtor may seek to assume and assign under the Plan;

(iv)    approval of the mutual releases as set forth in Article III, Section J of the Plan;

(v)     approval of the release of parties as set forth in Article X, Section C of the Plan and the injunction against prosecution as provided in Article X, Section E of the Plan;

(vi)    the Findings and Conclusions be in form and substance and contain findings and conclusions in support of Confirmation of the Plan that are reasonably satisfactory to the Debtor and the Exit Facility Lenders; and

(vii)   entry of the Confirmation Order on or before September 25, 2009.

### B.   Conditions to Effective Date.

Effectiveness of the Plan is subject to the satisfaction or written waiver of each of the following conditions precedent:

(i)      the Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Debtor and the Exit Facility Lenders, confirming the Plan, as the same may have been modified;

(ii)      the Confirmation Order shall have been entered, no timely appeal shall have been taken from the Confirmation Order, and the Confirmation Order shall have become a Final Order;

(iii)      the Debtor shall have received the New Cash Advance under the Exit Facility;

(iv)      The Debtor and/or Reorganized Debtor shall have executed and delivered all documents necessary to effectuate the issuance of the New Stock and the New Notes as set forth in the Plan;

(v)      all necessary and material consents, authorizations, and approvals shall have been given or waived for the transfers and transactions described in the Plan, including, without limitation, the transfers of property and the payments described in the Plan, as applicable;

(vi)      all conditions to the consummation of the transactions contemplated by the Plan shall have been satisfied or waived.

## C.     Waiver of Conditions.

The conditions set forth above can be waived, in whole or in part, jointly by the Debtor and the Exit Facility Lenders at any time without an order of the Bankruptcy Court. Unless waived, the failure to satisfy any condition to the Effective Date will preclude the Effective Date's occurrence, regardless of the circumstances giving rise thereto (including any action or inaction by the Debtor or the Reorganized Debtor). The waiver of any condition to Confirmation or to the Effective Date shall not constitute or be deemed a waiver of any other condition.

## 5.6     Modification; Withdrawal.

The Debtor reserves the right to modify the Plan in a manner that is acceptable to the Exit Facility Lenders, either before or after Confirmation, to the fullest extent permitted under Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. The Debtor may withdraw the Plan at any time before the Effective Date.

## 5.7     Retention of Jurisdiction.

Under Sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of or related to the Chapter 11 Case and the Plan, to the fullest extent permitted by law, including jurisdiction to:

A.      Enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases,

and other agreements or documents created in connection with the Plan, this Disclosure Statement or the Confirmation Order;

B.    Hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan and all contracts, instruments, and other agreements executed in connection with the Plan;

C.    Hear and determine any request to modify the Plan or to cure any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court;

D.    Issue and enforce injunctions or other orders, or take any other action that may be necessary or appropriate to restrain any interference with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

E.    Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

F.    Hear and determine any matters arising in connection with or relating to the Plan, this Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, this Disclosure Statement or the Confirmation Order;

G.    Enforce all orders, judgments, injunctions, releases, exculpations and rulings entered in connection with the Chapter 11 Case;

H.    Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

I.    To hear and determine matters relating to the allowance, disallowance, estimation and liquidation of Claims against the Debtor and to enter or enforce any order requiring the filing of any such Claim before a particular date;

J.    To determine all applications, Claims, adversary proceedings and contested matters pending on the Effective Date; and

K.    Enter a final decree closing the Chapter 11 Case.

**5.8    Binding Effect and Discharge of the Debtor.**

The Plan shall be binding upon and inure to the benefit of the Debtor, all present and former holders of Claims and Interests, and their respective successors and assigns, and all other parties-in-interest in this Chapter 11 Case.

All consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against, or

Interests in, the Debtor or any of its assets or properties, and, except as otherwise provided herein or in the Confirmation Order, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, upon the Effective Date, the Debtor shall be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims and Interests, including, but not limited to, any conduct of the Debtor and any and all demands and liabilities that arose before the Confirmation Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of the Debtor prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Confirmation Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not the holder of a Claim based upon such debt accepted the Plan. The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtor, subject to the Effective Date occurring.

## 5.9     Vesting.

Except as otherwise provided in the Plan or in the Confirmation Order, on the Effective Date, the Reorganized Debtor shall be vested with all of the property of the Estate free and clear of all Claims, Liens, encumbrances, charges and Interests, and shall thereafter hold, dispose or otherwise deal with such property and operate its business free of any restrictions imposed by the Bankruptcy Code or by the Bankruptcy Court. Prosecution of Causes of Action shall be the exclusive responsibility of the Reorganized Debtor, which shall have sole and absolute discretion over whether to prosecute or settle such Causes of Action.

## 5.10    Exculpation And Limitation Of Liability.

Notwithstanding any other provision of the Plan, no holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, shall have any right of action whether in law or equity, whether for breach of contract, statute, or tort claim, against the Debtor, the Estate, the Reorganized Debtor, the Exit Facility Lenders (including in their capacity as Prepetition Noteholders) the Indenture Trustee or any of their respective affiliates, representatives, present or former members, officers, directors, employees, advisors, attorneys, or agents, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the pursuit of Confirmation of the Plan, consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence.

## 5.11    Good Faith.

As of the Confirmation Date, the Debtor shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtor, the Prepetition Noteholders and the Exit Facility Lenders have participated in good faith and in compliance with Section 1125(e) of the Bankruptcy Code in the offer and issuance of the New Common Stock under the Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for the violation of any applicable law,

rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of the New Stock under the Plan.

### 5.12   Injunction.

Except as otherwise provided in the Plan, from and after the Confirmation Date, all Persons who have held, hold, or may hold Claims against or Interests in the Debtor prior to the Effective Date are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, the Exit Facility Lenders (including in their capacity as Prepetition Noteholders), the Estate and the Indenture Trustee on account of any such Claims or Interests: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided, however,* that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Plan.

### 5.13   Payment of Statutory Fees.

All fees payable under Section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date. All such fees that arise after the Effective Date but before the closing of the Chapter 11 Case shall be paid from funds otherwise available for distribution hereunder.

### 5.14   Severability of Plan Provision.

If, before Confirmation, the Bankruptcy Court holds that any provision of the Plan is invalid, void or unenforceable, the Debtor, at its option and if acceptable to the Exit Facility Lender, may amend or modify the Plan to correct the defect, by amending or deleting the offending provision or otherwise, or may withdraw the Plan. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been amended or modified in accordance with the foregoing, is valid and enforceable.

### 5.15   Successors and Assigns.

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of that Person.

### 5.16   Term of Injunctions or Stays.

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case, either by virtue of Sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, shall remain in full force and effect until all distributions contemplated by the Plan have been made and the Bankruptcy Court has entered an order closing the

Chapter 11 Case. The injunctive provisions of Sections 524 and 1141 of the Bankruptcy Code and those contained in Article X of the Plan are permanent and shall not be affected by this provision.

### 5.17    Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (i) the State of Texas shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan other than the New Notes Indentures, the Purchase Agreement regarding the New Series A 20% Senior Secured Notes in substantially the form attached hereto as Exhibit W, the Security Agreements, the Collateral Documents (except for any deeds of trust, which will be governed by the laws of the State of Texas), and the Intercreditor Agreement, each of which shall be governed by the laws of the State of New York, (ii) the laws of the state of incorporation of the Debtor shall govern corporate governance matters with respect to such Debtor, and (iii) the laws of the state of incorporation of the Reorganized Debtor, shall govern corporate governance matters with respect to such Reorganized Debtor, in each case without giving effect to the principles of conflicts of law thereof.

## ARTICLE VI

## CERTAIN RISK FACTORS TO BE CONSIDERED

Holders of Prepetition Notes Claims in Class 4 should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), including those items discussed in the Projections, before deciding whether to vote to accept or to reject the Plan.

### 6.1    Risks Related to the Bankruptcy Proceedings.

*The Plan may fail to be confirmed or not be submitted, which may result in the Debtor being liquidated inside or outside of Bankruptcy.*

The most likely alternative to confirmation of the Plan is a sale process under § 363 of the Code by which some or all of the assets  of the Debtor would be sold to the highest bidder. The Debtor has no reason to believe that such a process would yield a return to creditors and holders of Interests higher than the Plan and, in fact, based on the liquidation analysis contained in Exhibit E, the Debtor believes there is a high likelihood that the outcome would be dramatically less. For a further discussion, *see* Article VIII "Liquidation Analysis" and Article XIII "Alternatives to Confirmation and Consummation of the Plan."

*The Chapter 11 proceedings may adversely affect the Debtor.*

While the Debtor will seek to make its stay in chapter 11 as brief as possible so as to minimize any potential disruption to their business operations and dealer and customer goodwill, it is possible that despite the belief and intent of the Debtor, the commencement of the Chapter 11 Case could materially adversely affect relationships among the Debtor and its royalty owners, joint interest owners, investors, employees, and suppliers.

***The Plan is based upon the Projections, which are inherently uncertain.***

The Projections set forth in the Disclosure Statement and underlying the Plan are based on numerous assumptions, including the timing, confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtor, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Debtor and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of the Reorganized Debtor's operations. Because the actual results achieved throughout the periods covered by the Projections can be expected to vary from the projected results, the Projections should not be relied upon as a guaranty, representation, or other assurance that the actual results will occur.

**6.2     Risks Related to Financial Condition of Reorganized Debtor.**

***The Reorganized Debtor will continue to have substantial capital requirements that, if not met, may hinder operations and cause it to go out of business.***

The implementation of the Reorganized Debtor's plans will require the Reorganized Debtor to make significant capital expenditures in order to replace current production and find and develop new oil and gas reserves. Substantial capital needs are also required to operate and grow the Reorganized Debtor through exploration and development, as well as acquisition programs.

Under the Plan, if confirmed, the Exit Facility Lenders have committed, subject to the terms and conditions of the Plan Support Agreement, to make a New Cash Advance, in the aggregate sum of $5 million, as part of the Exit Facility. Except for the Exit Facility, operational revenue will initially represent the Reorganized Debtor's only other source of funding for ongoing operations and its capital program. Without adequate capital resources or funding on acceptable terms, the Reorganized Debtor may be forced to limit its oil and natural gas acquisition and development activities and thereby adversely affect the producing rates and ultimate value of its oil and natural gas properties.

***The Reorganized Debtor's leverage and debt service obligations may adversely affect the Reorganized Debtor's cash flow.***

The Reorganized Debtor will have $40 million of secured debt when it emerges from Chapter 11. The Reorganized Debtor's level of indebtedness could have consequences, including the following:

- it may make it difficult for the Reorganized Debtor to satisfy its obligations under its indebtedness and contractual and commercial commitments;

- the Reorganized Debtor's ability to obtain additional debt financing in the future for working capital, capital expenditures, acquisitions or general corporate purposes may be limited;

- the Reorganized Debtor's flexibility in reacting to changes in the industry may be limited and the Reorganized Debtor could be more vulnerable to adverse changes in its business or economic conditions in general; and

- the Reorganized Debtor may be at a competitive disadvantage to those of its competitors who operate on a less leveraged basis.

In addition, the New Notes Indentures governing the New Notes contain restrictive covenants limiting the Reorganized Debtor's ability to engage in activities that may be in its long-term best interests. The Reorganized Debtor's failure to comply with these covenants would result in an event of default which, if not cured or waived, could result in the acceleration of all of its indebtedness and have a material adverse effect on its liquidity, financial condition and results of operations.

### Continuation of recent adverse economic conditions in the credit markets may adversely affect the Reorganized Debtor's financial condition.

The disruption experienced in U.S. and global credit markets since the latter half of 2008 has resulted in actual and projected decreases in demand for oil and natural gas. Commodity prices for oil and gas have dropped dramatically during this period and, though the price of oil has spiked upward somewhat in recent weeks, the volatility of prices has affected the availability and cost of capital. In addition, capital and credit markets have experienced unprecedented volatility and disruption and continue to be unpredictable. Given the current levels of market volatility and disruption, the availability of funds from those markets has diminished substantially. The impact of these difficult conditions on the Reorganized Debtor's ability to obtain, and the cost and terms of, any financing in the future is equally unclear. Any inability to obtain adequate financing under the Reorganized Debtor's commercial arrangements, if any, or to fund them on acceptable terms could deter or prevent the Reorganized Debtor from meeting its future capital needs to finance its development program, adversely affect the satisfaction or replacement of its debt obligations and result in a deterioration of its financial condition.

### Natural gas and oil prices are highly volatile, and lower prices negatively affect the Reorganized Debtor's financial results.

The Reorganized Debtor's revenue, profitability, cash flow, oil and natural gas reserves value, future growth, and ability to borrow funds or obtain additional capital, as well as the carrying value of its properties, are substantially dependent on prevailing prices of natural gas and oil. Historically, the markets for natural gas and oil have been volatile, and those markets are likely to continue to be volatile in the future. Predicting future natural gas and oil price movements with certainty is impossible. Prices for natural gas and oil are subject to wide fluctuations in response to relatively minor changes in the supply of and demand for natural gas and oil, market uncertainty, and a variety of additional factors beyond the Reorganized Debtor's control. These factors include:

- the level of consumer energy product demand;
- the domestic and foreign supply of oil and natural gas;

- overall economic conditions;
- weather conditions;
- domestic and foreign governmental regulations and taxes;
- the price and availability of alternative fuels;
- political conditions in or affecting oil and natural gas producing regions;
- the level and price of foreign imports of oil and liquefied natural gas; and
- the ability of the members of the Organization of Petroleum Exporting Countries and other state controlled oil companies to agree upon and maintain oil price and production controls.

Declines in natural gas and oil prices may materially adversely affect the Reorganized Debtor's financial condition, liquidity, and ability to finance planned capital expenditures and results of operations and may reduce the amount of oil and natural gas that it can produce economically.

***Future hedge transactions may result in the Reorganized Debtor failing to benefit, to the fullest extent possible, from increases in prices for natural gas and oil.***

Because natural gas and oil prices are unstable, from time to time the Reorganized Debtor may enter into price-risk-management transactions such as swaps, collars, futures, and options to reduce its exposure to price declines associated with a portion of its natural gas and oil production and thereby to achieve a more predictable cash flow. Any use of these arrangements may limit the Reorganized Debtor's ability to benefit from increases in the prices of natural gas and oil. Hedging arrangements may also apply to only a portion of the Reorganized Debtor's production, thereby providing only partial protection against declines in natural gas and oil prices. These arrangements could expose the Reorganized Debtor to the risk of financial loss in certain circumstances, including instances in which production is less than expected, customers fail to purchase contracted quantities of natural gas and oil, or a sudden, unexpected event that materially impacts natural gas or oil prices.

### 6.3    Risks Related to the Reorganized Debtor's Assets and Projected Operations.

***A substantial percentage of the Reorganized Debtor's proved reserves consists of undeveloped reserves.***

As of the end of the Debtor's 2008 fiscal year, approximately 21% of the Eliasville Field Properties' proved reserves and 40.5% of the Blessing Field Properties' proved reserves were classified as proved undeveloped reserves. These reserves may not ultimately be developed or produced, or quantities developed and produced may be smaller than expected, which in turn may have a material adverse effect on the Reorganized Debtor's results of operations after the Effective Date.

***Drilling for and producing oil and natural gas are high risk activities with many uncertainties that could adversely affect the Reorganized Debtor's business, financial condition or results of operations.***

The Reorganized Debtor's success largely depends on the success of its exploitation, exploration, development and production activities. The Reorganized Debtor's oil and natural gas exploration and production activities are subject to numerous risks beyond its control,

including the risk that drilling will not result in commercially viable oil or natural gas production. The Reorganized Debtor's decisions to purchase, explore, develop or otherwise exploit prospects or properties will depend in part on the evaluation of data obtained through geophysical and geological analyses, production data and engineering studies, the results of which are often inconclusive or subject to varying interpretations. The Reorganized Debtor's costs of drilling, completing and operating wells are often uncertain before drilling commences. Overruns in budgeted expenditures are a common risk that can make a particular project uneconomical. Further, many factors may curtail, delay or cancel drilling operations, including the following:

- delays imposed by or resulting from compliance with regulatory requirements;
- pressure or irregularities in geological formations;
- shortages of or delays in obtaining equipment and qualified personnel;
- equipment failures or accidents;
- adverse weather conditions;
- reductions in oil and natural gas prices; and
- oil and natural gas property title problems.

***Reserve estimates depend on many assumptions that may turn out to be inaccurate. Any material inaccuracies in these reserve estimates or underlying assumptions will materially affect the quantities and present value of the Reorganized Debtor's reserves.***

The process of estimating oil and natural gas reserves is complex, and it requires interpretations of available technical data and many assumptions, including assumptions relating to economic factors. Any significant inaccuracies in these interpretations or assumptions could materially affect the estimated quantities and present value of the Reorganized Debtor's reported reserves. In order to prepare the Reorganized Debtor's estimates, it must project production rates and the timing of development expenditures. The Reorganized Debtor must also analyze available geological, geophysical, production and engineering data. The extent, quality and reliability of this data can vary. The process also requires that economic assumptions be made about matters such as oil and natural gas prices, drilling and operating expenses, capital expenditures, taxes, and availability of funds. Therefore, estimates of oil and natural gas reserves are inherently imprecise. Actual future production, oil and natural gas prices received, revenues, taxes, development expenditures, operating expenses and quantities of recoverable oil and natural gas reserves most likely will vary from the Reorganized Debtor's estimates. Any significant variance could materially affect the estimated quantities and present value of the Reorganized Debtor's reported reserves. In addition, the Reorganized Debtor may adjust estimates of proved reserves to reflect production history, results of exploration and development, prevailing oil and natural gas prices and other factors, many of which are beyond the Reorganized Debtor's control. In addition, the CG&A Reserve Report dated December 31, 2008, a summary of which is attached hereto as Exhibit B, makes certain assumptions regarding the timing of development expenditures. In fact, many of those assumed development expenditures since December 31, 2008 through the date of filing have not been made, and the results of those development expenditures, which were included in the CG&A Reserve Report as estimates of reserves, have to be backed out of the CG&A Reserve Report conclusion. The Debtor has done this for the purpose of the financial projections attached as Exhibit G to this Disclosure Statement.

*Seismic studies do not guarantee that hydrocarbons are present or if present will be produced in economic quantities.*

The Reorganized Debtor relies on seismic studies to assist it with assessing prospective drilling opportunities on its properties, as well as on properties that it may acquire. Such seismic studies are merely an interpretive tool and do not necessarily guarantee that hydrocarbons are present or if present will be produced in economic quantities.

*The Reorganized Debtor depends on successful exploration, development and acquisitions to maintain revenue in the future.*

Generally, the volume of production from natural gas and oil properties declines as reserves are depleted, with the rate of decline depending on reservoir characteristics. Except to the extent that the Reorganized Debtor conducts successful exploration and development activities or acquires properties containing proved reserves, or both, its proved reserves will decline as reserves are produced. To the extent that the Debtor has insufficient developmental opportunities within its existing acreage positions, the Reorganized Debtor's future natural gas and oil production will therefore be highly dependent on its level of success in finding or acquiring additional reserves.

As explained above, the business of exploring for, developing, or acquiring reserves is capital intensive. Recovery of the Reorganized Debtor's reserves, particularly undeveloped reserves, will require significant additional capital expenditures and successful drilling operations. Except for the Exit Facility, operational revenue of the Reorganized Debtor will initially represent its only source of funding for ongoing operations. To the extent cash flow from operations is lower than anticipated due to low commodity prices, the Reorganized Debtor's ability to make the necessary capital investment to maintain or expand its asset base of natural gas and oil reserves may be impaired unless other external sources of capital become available. In addition, the Reorganized Debtor may be required to find partners for any future exploratory activity. To the extent that others in the industry do not have the financial resources or choose not to participate in the Reorganized Debtor's exploration activities, the Reorganized Debtor could be adversely affected.

*Market conditions or operational impediments may hinder the Reorganized Debtor's access to oil and natural gas markets or delay its production.*

Unexpected and depressed market conditions or the unavailability of satisfactory oil and natural gas transportation arrangements may hinder the Reorganized Debtor's access to oil and natural gas markets or delay its production. The availability of a ready market for the Reorganized Debtor's oil and natural gas production depends on a number of factors, including the demand for and supply of oil and natural gas and the proximity of reserves to pipelines and terminal facilities. The Reorganized Debtor's ability to market its production depends in substantial part on the availability and capacity of gathering systems, pipelines and processing facilities owned and operated by third parties. The Reorganized Debtor's failure to obtain such services on acceptable terms could materially harm its business. Its productive properties may be located in areas with limited or no access to pipelines, thereby necessitating delivery by other means, such as trucking, or requiring compression facilities. Such restrictions on the

Reorganized Debtor's ability to sell its oil or natural gas have several adverse affects, including higher transportation costs, fewer potential purchasers (thereby potentially resulting in a lower selling price) or, in the event it is unable to market and sustain production from a particular lease for an extended time, possibly causing it to lose a lease due to lack of production.

The Reorganized Debtor generally delivers natural gas through gas gathering systems and gas pipelines that it does not own under interruptible or short-term transportation agreements. Under the interruptible transportation agreements, the transportation of the Reorganized Debtor's gas may be interrupted due to capacity constraints on the applicable system, due to maintenance or repair of the system, or for other reasons as dictated by the particular agreements. The Reorganized Debtor's ability to produce and market natural gas on a commercial basis could be harmed by any significant change in the cost or availability of such markets, systems or pipelines.

***The Reorganized Debtor cannot control activities on properties that it does not operate and is unable to ensure their proper operation and profitability.***

The Reorganized Debtor does not operate certain of the properties in which it has an interest. As a result, the Reorganized Debtor has limited ability to exercise influence over and control the risks associated with the operations of these properties. The failure of an operator of its wells to adequately perform operations, an operator's breach of the applicable agreements or an operator's failure to act in ways that are in the Reorganized Debtor's best interests could reduce production and revenues. The success and timing of the Reorganized Debtor's drilling and development activities on non-operated properties therefore depend upon a number of factors outside of its control, including the operator's:

- timing and amount of capital expenditures;
- expertise and financial resources;
- inclusion of other participants in drilling wells; and
- use of technology.

In the event that an operator of its properties experiences financial difficulties, this may negatively impact the Reorganized Debtor's ability to receive payments for its share of production that it is entitled to under its contractual arrangements with such operator. While the Reorganized Debtor seeks to minimize such risk by structuring its contractual arrangements to provide for proceeds of production to be paid directly to it by first purchasers of the hydrocarbons, there can be no assurance that the Reorganized Debtor can do so in all situations covering its non-operated properties.

***The Reorganized Debtor may not be able to keep pace with technological developments in its industry.***

The natural gas and oil industry is characterized by rapid and significant technological advancements and introduction of new products and services which utilize new technologies. As others use or develop new technologies, the Reorganized Debtor may be placed at a competitive disadvantage or competitive pressures may force it to implement those new technologies at substantial costs. In addition, other natural gas and oil companies may have greater financial,

technical, and personnel resources that allow them to enjoy technological advantages and may in the future allow them to implement new technologies before the Reorganized Debtor is able to implement such technologies. The Reorganized Debtor may not be able to respond to these competitive pressures and implement new technologies on a timely basis or at an acceptable cost. If one or more of the technologies the Reorganized Debtor uses now or in the future were to become obsolete or if it were unable to use the most advanced commercially available technology, the Reorganized Debtor's business, financial condition, and results of operations could be materially adversely affected.

### *The Reorganized Debtor faces strong competition from other natural gas and oil companies.*

The Reorganized Debtor encounters competition from other natural gas and oil companies in all areas of its operations, including the acquisition of exploratory prospects and proved properties. The Reorganized Debtor's competitors include major integrated natural gas and oil companies and numerous independent natural gas and oil companies, individuals, and drilling and income programs. Many of these competitors are large, well-established companies that have been engaged in the natural gas and oil business much longer than the Reorganized Debtor has and possess substantially larger operating staffs and greater capital resources than the Reorganized Debtor does. These companies may be able to pay more for exploratory projects and productive natural gas and oil properties and may be able to define, evaluate, bid for, and purchase a greater number of properties and prospects than the Reorganized Debtor's financial or human resources permit. In addition, these companies may be able to expend greater resources on the existing and changing technologies that the Reorganized Debtor believes are and will be increasingly important to attaining success in the industry. The Reorganized Debtor may not be able to conduct its operations, evaluate, and select suitable properties and consummate transactions successfully in this highly competitive environment.

### *The Reorganized Debtor is subject to complex laws that can affect the cost, manner or feasibility of doing business.*

The exploration, development, production and sale of oil and natural gas is subject to extensive federal, state, local and international regulation. The Reorganized Debtor may be required to make large expenditures to comply with such governmental regulations. Matters subject to regulation include:

- permits for operations;
- drilling and plugging bonds;
- reports concerning operations;
- the spacing and density of wells;
- unitization and pooling of properties;
- environmental maintenance and cleanup of drill sites and surface facilities; and
- protection of human health.

From time to time, regulatory agencies have also imposed price controls and limitations on production by restricting the rate of flow of natural gas and oil wells below actual production capacity in order to conserve supplies of natural gas and oil. Under these laws, the Reorganized Debtor could be liable for personal injuries, property damage and other damages. Failure to

comply with these laws also may result in the suspension or termination of the Reorganized Debtor's operations and subject it to administrative, civil and criminal penalties. Moreover, these laws could change in ways that substantially increase the Reorganized Debtor's costs. Any such liabilities, penalties, suspensions, terminations or regulatory changes could materially adversely affect the Reorganized Debtor's financial condition and results of operations.

### *The Reorganized Debtor's operations may cause it to incur substantial liabilities for failure to comply with environmental laws and regulations.*

The Reorganized Debtor's oil and natural gas operations are subject to stringent federal, state and local laws and regulations relating to the release or disposal of materials into the environment or otherwise relating to environmental protection. These laws and regulations may require the acquisition of a permit or other authorizations before drilling commences, restrict the types, quantities and concentration of substances that can be released into the environment in connection with drilling and production activities, require permitting or authorization for release of pollutants into the environment, limit or prohibit drilling activities on certain lands lying within wilderness, wetlands, areas inhabited by endangered or threatened species, and other protected areas, and impose substantial liabilities for pollution resulting from historical and current operations. Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal penalties, incurrence of investigatory or remedial obligations or the imposition of injunctive relief. Changes in environmental laws and regulations occur frequently, and any changes that result in more stringent or costly waste handling, storage, transport, disposal or cleanup requirements could require the Reorganized Debtor to make significant expenditures to maintain compliance, and may otherwise have a material adverse effect on its results of operations, competitive position or financial condition as well as on the industry in general. Under these environmental laws and regulations, the Reorganized Debtor could be held strictly liable for the removal or remediation of previously released materials or property contamination regardless of whether it was responsible for the release or if its operations were standard in the industry at the time they were performed.

### *The Reorganized Debtor may not have enough insurance to cover all of the risks that it faces, and operators of prospects in which it participates may not maintain or may fail to obtain adequate insurance.*

In accordance with customary industry practices, the Reorganized Debtor maintains insurance coverage against some, but not all, potential losses in order to protect against the risks it faces. The Reorganized Debtor does not carry business interruption insurance. The Reorganized Debtor may elect not to carry insurance if its management believes that the cost of available insurance is excessive relative to the risks presented. In addition, the Reorganized Debtor cannot insure fully against pollution and environmental risks. The occurrence of an event not fully covered by insurance could have a material adverse effect on the Reorganized Debtor's financial condition and results of operations. The impact of Hurricanes Katrina and Rita have resulted in escalating insurance costs and less favorable coverage terms.

Oil and natural gas operations are subject to particular hazards incident to the drilling and production of oil and natural gas, such as blowouts, cratering, explosions, uncontrollable flows of oil, natural gas or well fluids, fires and pollution and other environmental risks. These

hazards can cause personal injury and loss of life, severe damage to and destruction of property and equipment, pollution or environmental damage and suspension of operation. The Reorganized Debtor does not operate all of the properties in which it has an interest. In the projects in which the Reorganized Debtor owns a non-operated interest directly or owns an equity interest in a limited partnership which in turn owns a non-operated interest, the operator for the prospect maintains insurance of various types to cover the Reorganized Debtor's share of the cost of operations with policy limits and retention liability customary in the industry. The Reorganized Debtor believes the coverage and types of insurance are adequate. The occurrence of a significant adverse event that is not fully covered by insurance could result in the loss of the Reorganized Debtor's total investment in a particular prospect which could have a material adverse effect on its financial condition and results of operations.

***The Reorganized Debtor's producing properties are located in regions that make the Reorganized Debtor vulnerable to risks associated with operating in a limited number of geographic areas, including the risk of damage or business interruptions from hurricanes.***

The Reorganized Debtor's Blessing Field Properties are geographically located in the Texas Gulf Coast region. As a result, the Reorganized Debtor may be affected by any delays or interruptions in production or transportation in these areas caused by governmental regulation, transportation capacity constraints, natural disasters, regional price fluctuations or other factors. Such disturbances could in the future have any or all of the following adverse effects on the Reorganized Debtor's business:

- interruptions to its operations as it suspends production in advance of an approaching storm;
- damage to its facilities and equipment, including damage that disrupts or delays production;
- disruption to the transportation systems it relies upon to deliver products to purchasers of production; and
- damage to or disruption of the facilities of its purchasers of production that prevents them from taking delivery of the Debtor's products.

***The Reorganized Debtor's business may suffer if it loses its Chief Executive Officer and/or its Chief Financial Officer and is unable to retain experienced management to operate the Reorganized Debtor's business.***

The Reorganized Debtor's success will be dependent on its ability to continue to employ and retain experienced skilled personnel. The employment agreements with Thomas Kaetzer, the Debtor's President and Chief Executive Officer, and Patrick McGarey, the Debtor's Chief Financial Officer, were terminated in October 2008 at which time Messrs. Kaetzer and McGarey agreed to continue to serve in their respective former capacities until June 15, 2009. This subsequent agreement expired on June 15, 2009 and currently Messrs. Kaetzer and McGarey serve as at-will employees of the Debtor. Though the Plan contemplates that Mr. Kaetzer will continue to be President and Mr. McGarey will continue to be Chief Financial Officer and Secretary as of the Effective Date, there is no guarantee that Mr. Kaetzer or Mr. McGarey will remain employees of the Reorganized Debtor after the Effective Date, and the Debtor has not currently identified anyone to replace Mr. Kaetzer or Mr. McGarey if they resign or are terminated. Mr. Kaetzer and Mr. McGarey have experience and expertise in evaluating and analyzing producing oil and natural gas properties and drilling prospects, maximizing production

from oil and natural gas properties and marketing oil and natural gas production. The loss of either one of them could have a material adverse effect on the Reorganized Debtor's operations if it is unable to find qualified management to replace them.

***All of the members of the Board of the Reorganized Debtor will be designated by two significant stockholders.***

Under the terms of the Stockholders Agreement, Jefferies and Third Point will each have the right to elect one director to the Board and mutually designate a third director to the Board, which three directors will constitute all of the members of the Board as of the Effective Date. As long as Jefferies and Third Point continue to own the shares of New Stock issued to them pursuant to the Plan, no other stockholders will be able to designate or elect directors not designated by Jefferies and Third Point to the Board or control the major decisions of the Reorganized Debtor for the foreseeable future.

**6.4     Risks Related to the New Notes.**

***The Reorganized Debtor may not be able to generate sufficient cash flow to meet its financial projections.***

The Reorganized Debtor's ability to generate cash flows from operations and to achieve its financial projections  will depend on its future financial performance.  The Reorganized Debtor's future performance will be affected by a range of economic, competitive, legislative, operating and other business factors, many of which the it cannot control, such as general economic and financial conditions in its industry or the economy at large.  A significant reduction in operating cash flows resulting from changes in economic conditions, increased competition, or other events could increase the need for additional or alternative sources of liquidity and could have a material adverse effect on the Reorganized Debtor's business, financial condition, results of operations and prospects and its ability to meet its financial projections. The inability to meet these projections could result in defaults, cross-defaults and foreclosure under the Reorganized Debtor's New Notes Indentures, Security Agreements, Collateral Agreements and Certificate of Designations.

***The New Notes Indentures governing the New Notes, the Stockholders Agreement and the Certificate of Designations relating to its Senior Preferred Stock and Junior Preferred Stock impose significant operating and financial restrictions on the Reorganized Debtor that may prevent it from pursuing certain business opportunities and restrict its ability to operate its business.***

The New Notes Indentures governing the New Notes, the Stockholders Agreement and the Certificate of Designations relating to the Reorganized Debtor's Senior Preferred Stock and Junior Preferred Stock each contain covenants that restrict its ability to take various actions, such as:

- incurring or generating additional indebtedness or issuing certain preferred stock;
- paying dividends on the Reorganized Debtor's capital stock or redeeming, repurchasing or retiring its capital stock or subordinated indebtedness or making other restricted payments other than PIK notes or PIK dividends;

- entering into certain transactions with affiliates;
- creating or incurring liens on the Reorganized Debtor's assets;
- transferring or selling assets;
- incurring dividend or other payment restrictions affecting certain of the Reorganized Debtor's existing and future subsidiaries; and
- consummating a merger, consolidation or sale of all or substantially all of the Reorganized Debtor's assets.

Accordingly, the restrictions contained in the New Notes Indentures, the Stockholders Agreement and the Certificate of Designations could (i) limit the Reorganized Debtor's ability to plan for or react to market conditions or meet capital needs or otherwise restrict its activities or business plans; and (ii) adversely affect the Reorganized Debtor's ability to meet its financial projections or to engage in other business activities that would be in its interest.

### *The Reorganized Debtor may be unable to finance the repurchase of the New Notes even if required by the holders pursuant to the New Notes Indentures.*

Upon a "change of control," the Reorganized Debtor may be required to repurchase all or a portion of the outstanding New Notes. In some circumstances, a change of control could result from events beyond the Reorganized Debtor's control. The Reorganized Debtor cannot assure you that it will have the financial resources to repurchase the New Notes, particularly if that change of control triggers a similar repurchase requirement for, or results in the acceleration of, other debt. The New Notes Indentures have change of control provisions triggering a repurchase right on the part of the holders of such debt, which could adversely affect the Reorganized Debtor's ability to repurchase the New Notes upon a change of control. Any other agreement relating to any debt or other credit agreement that the Reorganized Debtor may enter into may prevent the Reorganized Debtor from repurchasing the New Notes, may contain provisions that expressly prohibit the repurchase of the New Notes upon a change of control, or may provide that a change of control constitutes an event of default under that agreement. If a change of control occurs at a time when the Reorganized Debtor is prohibited from repurchasing the New Notes, the Reorganized Debtor could seek the consent of the holders of its debt to repurchase the New Notes, or the Reorganized Debtor could attempt to refinance the debt containing such prohibitions. Under these circumstances, if the Reorganized Debtor does not obtain consent to such a repurchase, the Reorganized Debtor would be unable to repurchase the New Notes. The Reorganized Debtor's failure to repurchase tendered New Notes could constitute an event of default under the New Notes Indentures, which could constitute a default under the terms of other debt agreements and the Certificate of Designations.

### *There may not be sufficient Collateral to pay all or any of the New Notes.*

Indebtedness and other obligations under the New Series A 20% Senior Secured Notes, the New Series B 20% Senior Secured Notes and the New 10% Subordinated Secured Notes are, and certain other secured indebtedness that the Reorganized Debtor may incur in the future will be, secured by a lien on substantially all of its tangible and intangible assets (and substantially all tangible and intangible assets of the Reorganized Debtor's future domestic subsidiaries) subject to specified exceptions. Pursuant to the terms of the Intercreditor Agreement, the security interest in those assets that secure the New 10% Subordinated Secured Notes and guarantees will be contractually subordinated to a lien thereon that secures the New Series A 20% Senior

Secured Notes, New Series B 20% Senior Secured Notes and certain other permitted indebtedness. Therefore, in the event of a bankruptcy, liquidation, dissolution, reorganization or similar proceeding against the Reorganized Debtor, or an acceleration of such first priority claims, such assets that secure these senior priority claims and the New Notes must be used first to pay senior priority claims in full before any payments are made therewith on the New 10% Subordinated Secured Notes.

Notwithstanding the fair market value appraisal of Collateral prepared in connection with the reorganization, the value of the Collateral at any time will depend on market and other economic conditions, including the availability of suitable buyers for the Collateral. By its nature, some or all of the Collateral may be illiquid and may have no readily ascertainable market value. The value of the assets pledged as Collateral for the New Notes could be impaired in the future as a result of changing economic conditions, competition or other future trends. In the event of a foreclosure, liquidation, bankruptcy or similar proceeding, no assurance can be given that the proceeds from any sale or liquidation of the Collateral will be sufficient to pay in full the Reorganized Debtor's obligations under the New Notes or the New 10% Subordinated Secured Notes after first satisfying the Reorganized Debtor's obligations in full under senior priority claims, including the New 20% Senior Secured Notes. Accordingly, there may not be sufficient Collateral to pay all or any of the amounts due on any of the New Notes. Any claim for the difference between the amount, if any, realized by holders of the New Notes from the sale of the Collateral securing the New Notes and the obligations under the New Notes will rank equally in right of payment with all of the Reorganized Debtor's unsecured senior indebtedness, in the case of the New 20% Senior Secured Notes, and the Reorganized Debtor's unsecured subordinated indebtedness, in the case of the New 10% Subordinated Secured Notes, and other obligations, including trade payables.

Any PIK notes issued pursuant to the New Notes Indentures will rank *pari passu* with the applicable New Notes and be entitled to the same rights and priority with respect to the Collateral. Thus, the issuance of PIK notes pursuant to the New Notes Indentures may have the effect of diluting the noteholders' ability to recover payment in full from the then existing pool of Collateral.

### *The Collateral is subject to casualty risks.*

The Reorganized Debtor is obligated under the Collateral arrangements to maintain adequate insurance or otherwise insure against hazards as is usually done by corporations operating properties of a similar nature in the same or similar localities. There are, however, certain losses that are either uninsurable or not economically insurable, in whole or in part. As a result, it is possible that the insurance proceeds will not compensate the Reorganized Debtor fully for its losses. If there is a total or partial loss of any of the pledged Collateral, the Reorganized Debtor cannot assure the noteholders that any insurance proceeds received by the Reorganized Debtor will be sufficient to satisfy all of its secured obligations, including the New Notes.

*In the event of a bankruptcy, the ability of the holder of the New Notes to realize upon the Collateral will be subject to certain bankruptcy law limitations.*

The right of the Collateral Agent for the New Notes to repossess and dispose of the Collateral securing the New Notes upon acceleration is likely to be significantly impaired by federal bankruptcy law if bankruptcy proceedings are commenced by or against the Reorganized Debtor prior to or possibly even after the Collateral Agent has repossessed and disposed of the Collateral. Under the Bankruptcy Code, a secured creditor, such as the Collateral Agent for the New Notes, is prohibited from repossessing its security from a debtor in a bankruptcy case, or from disposing of security repossessed from a debtor, without bankruptcy court approval. Moreover, bankruptcy law permits the debtor to continue to retain and to use collateral and the proceeds, products, rents, or profits of the collateral, even though the debtor is in default under the applicable debt instruments, provided that the secured creditor is given "adequate protection". The meaning of the term "adequate protection" may vary according to circumstances, but it is intended in general to protect the value of the secured creditor's interest in the collateral and may include cash payments or the granting of additional security, if and at such time as the court in its discretion determines, for any diminution in the value of the collateral as a result of the stay of repossession or disposition or any use of the collateral by the debtor during the pendency of the bankruptcy case. In view of the broad discretionary powers of a bankruptcy court, it is impossible to predict how long payments under the New Notes could be delayed following commencement of a bankruptcy case, whether or when the Collateral Agent would repossess or dispose of the Collateral, the extent to which Collateral values would decline during any such delay or whether or to what extent holders of the New Notes would be compensated for any delay in payment of loss of value of the Collateral through the requirements of "adequate protection". Furthermore, in the event the bankruptcy court determines that the value of the Collateral is not sufficient to repay all amounts due on the New Notes, the holders of the New Notes would have "undersecured claims" as to the difference. Federal bankruptcy laws do not permit the payment or accrual of interest, costs, and attorneys' fees for "undersecured claims" during the debtor's bankruptcy case.

*Rights of holders of the New Notes in the Collateral may be adversely affected by the failure to perfect security interests in certain Collateral existing or acquired in the future.*

The security interest in the Collateral securing the New Notes includes domestic assets, both tangible and intangible, whether now owned or after-acquired or arising in the future. There can be no assurance that the Indenture Trustee or the Collateral Agent under the New Notes Indentures will monitor, or that the Reorganized Debtor will inform the Indenture Trustee or the Collateral Agent of, the future acquisition of property and rights that constitute Collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired Collateral. The failure to perfect a security interest in respect of such after-acquired Collateral may result in the loss of the security interest therein or the priority of the security interest in favor of the New Notes against third parties.

If the Reorganized Debtor or any guarantor were to become subject to a bankruptcy proceeding after the issue date of the New Notes, any liens recorded or perfected after the issue date of the New Notes would face a greater risk of being invalidated than if they had been recorded or perfected on, or substantially contemporaneously with, the issue date. If a lien is

recorded or perfected after the issue date, it may be treated under bankruptcy law as if it were delivered to secure previously existing debt. In bankruptcy proceedings commenced within 90 days of lien perfection, a lien given to secure previously existing debt is materially more likely to be avoided as a preference by the bankruptcy court than if delivered and promptly recorded on the issue date of the New Notes. Accordingly, if the Reorganized Debtor or a guarantor were to file for bankruptcy after the issue date of the New Notes and the liens had been perfected less than 90 days before commencement of such bankruptcy proceeding, the liens securing the New Notes may be especially subject to challenge as a result of having been delivered after the issue date of the New Notes. To the extent that such challenge succeeded, the note holders would lose the benefit of the security that the Collateral was intended to provide.

### 6.5    Risks Related to the New Stock.

*Right to receive payments on the Junior Preferred Stock is junior to the Senior Preferred Stock and possible future classes of capital stock or series of preferred stock.*

On the Effective Date, the New Common Stock will be subordinated to the shares of preferred stock of the Reorganized Debtor having $30 million in liquidation value and, together with such shares of preferred stock, is subordinated to $40 million in aggregate principal amount of senior debt (consisting of the New Notes), as well as all future indebtedness. The Junior Preferred Stock will rank junior to the Senior Preferred Stock.

As a result, upon any distribution in a bankruptcy, liquidation or reorganization or similar proceeding relating to the property of the Reorganized Debtor, the holders of the Senior Preferred Stock and possibly any future equity interests designated as senior to the Junior Preferred Stock, together with the holders of the Reorganized Debtor's indebtedness and future borrowings, will be entitled to be paid in full and in cash before any payment may be made with respect to the Junior Preferred Stock or the New Common Stock. Accordingly, holders of the New Common Stock and the Junior Preferred Stock may receive less, ratably, than the holders of the Reorganized Debtor's debt and senior equity interests or nothing at all.

*The Reorganized Debtor may issue securities that could dilute ownership of the New Common Stock.*

The Reorganized Debtor may decide to raise additional funds through public or private debt or equity financing to fund its operations. If the Reorganized Debtor raises funds by issuing equity securities (with the consent of the holders of senior equity and debt), the percentage ownership of holders of the New Common Stock at the Effective Date will be reduced, and the new equity securities may have rights prior to those of the New Common Stock.

*Because the New Stock is subject to restrictions on transferability and there is no established trading market for the New Stock, the holders thereof may not be able to sell. The price of any sale may be subject to fluctuations and volatility.*

The shares of New Stock are restricted securities and are not subject to resale absent their registration under the Securities Act or pursuant to an applicable exemption from registration under the Securities Act and applicable state securities laws. The holders of the New Stock are

also subject to the provisions of the Stockholders Agreement, which includes certain restrictions on transfer of the New Stock. Consequently, the holders thereof may not be able to transfer or resell the New Stock at a particular time or at favorable prices.

In addition, there is no established trading market for the New Stock, and the Reorganized Debtor does not intend to apply for the New Stock to be listed on any security exchange or to arrange for quotation on any automated dealer quotation systems.

Regardless, the value of the New Stock and the price, if any, at which it may be sold in the future are subject to fluctuations in response to any of the following:

- limited number of holders of the New Stock;
- limited market for common stock;
- variations in operating results and financial position of the Reorganized Debtor;
- involvement in litigation;
- general financial market conditions;
- the prices of natural gas and oil;
- announcements by the Reorganized Debtor and its competitors;
- liquidity;
- the ability to raise additional funds;
- changes in government regulations; and
- other events.

Because of the limited, or absence, of any market for the Reorganized Debtor's common stock and its price volatility, holders of the New Stock may be unable to sell their shares of New Stock when desired or at prices desired. The inability to sell shares of New Stock or the transfer of the New Stock at prices below prices that those holders believe to be appropriate, including prices below the face value or liquidation value of the New Stock, as applicable, may substantially increase a holder's financial risk of holding the New Stock and resulting risk of loss.

***The Reorganized Debtor may not be able to pay dividends on the shares of the New Stock and does not anticipate doing so with respect to the common stock in the foreseeable future.***

Under the Delaware General Corporation Law, cash dividends on capital stock may not be paid if, after giving effect to any such dividend, the Reorganized Debtor would not be able to pay its debts as they become due in the usual course of business or its total assets would be less than the sum of its total liabilities plus any amount needed to satisfy preferential rights upon dissolution of the Reorganized Debtor. Accordingly, despite the provision for dividends under the Certificate of Designations governing the shares of the Senior Preferred Stock and the Junior Preferred Stock, the Reorganized Debtor may not be able to make any such dividend payments.

In addition, the New Notes Indentures governing the New Notes restrict, and any New Notes Indentures and other financing agreements that the Reorganized Debtor may enter into in the future may limit, its ability to pay cash dividends on capital stock, including shares of the New Stock. Specifically, under the New Notes Indentures governing the New Notes and the Certificate of Designations governing the shares of preferred stock, the Reorganized Debtor is

restricted from paying pay cash dividends and making other distributions on or in respect of capital stock.

The Reorganized Debtor has not in the past paid any dividends on the shares of common stock and does not anticipate that it will pay any dividends on the New Common Stock in the foreseeable future. Any future decision to pay a dividend on the New Common Stock and the amount of any dividend paid, if permitted, will be made at the discretion of the Board. As a result of the above and expected financial results of the Reorganized Debtor, the Reorganized Debtor does not expect to pay dividends for the foreseeable future.

## ARTICLE VII

### FINANCIAL INFORMATION AND FEASIBILITY

**7.1    Financial Information.**

Attached as Exhibit G are the Projections prepared by the Debtor's management, setting forth the *pro forma* projections of the intended business operations of the Reorganized Debtor, including forecasted revenues and expenses.

The Projections set forth in Exhibit G and the above summary reflect the Debtor's best judgment as to the cash flow of the Reorganized Debtor based upon assumptions the Debtor believes are reasonable; however, there can be no assurance that any of the assumptions on which they are based will prove to be accurate, that any of the forecasted expenses will not exceed assumptions or that the projected results will be realized. Actual results will be impacted by a number of factors, including, without limitation, commodity prices, general economic and business conditions, successful implementation of business plans, third-party contractual relationships, sufficiency of Debtor's working capital and sources of funding, as well as other conditions that affect the capital markets and the oil and natural gas industry, all of which can be materially adverse to the Reorganized Debtor.

**7.2    Feasibility of the Plan.**

In connection with confirmation of the Plan, Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor. This is the so-called "feasibility" test. The Reorganized Debtor will be recapitalized with substantial additional capital contributed by the Exit Facility. The Reorganized Debtor's capital structure will provide that all interest payments and dividends on preferred stock may be "paid in kind," which eliminates the need for immediate cash outlay. As such, it is the Debtor's best judgment that confirmation of the Plan is not likely to be followed by liquidation or need for further reorganization. The Debtor believes that the "payment-in-kind" feature of its capital structure, including the Senior Secured Notes and the Preferred Stock, give the Debtor sufficient flexibility to enable it to implement its business plan, including development drilling and other capital operations, so long as commodity prices continue to fluctuate within foreseeable bounds. Debtor's management has carefully considered its development program, including drilling and completing its Proved Undeveloped Properties, as well as reasonable exploratory development on its untested acreage, and believes that the Debtor will be able to meet or

exceed the production projections shown by the CG&A Report (as adjusted from December 31, 2008 to the date of confirmation) within foreseeable commodity price fluctuations, though there can be no assurance that this will occur. This conclusion of Debtor's management is supported by the Projections attached hereto prepared by the Debtor and the going concern analysis prepared by Grant Thornton. Accordingly, the Debtor believes that the Plan complies with the standard of Section 1129(a)(11) of the Bankruptcy Code. *See* Exhibits E and G for the Valuation Report and the Projections, respectively.

## ARTICLE VIII

## LIQUIDATION ANALYSIS

### 8.1    Liquidation Analysis.

To calculate the probable distribution to members of each impaired class of holders of claims or interests if the Debtor were liquidated under Chapter 7, a Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtor if this Chapter 11 Case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by the claims of secured creditors to the extent of the value of their collateral and by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 Case. Costs of a liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a Chapter 7 trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtor in the Chapter 11 Case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the Debtor during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation would also prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of unsecured claims.

Once the Bankruptcy Court ascertains the recoveries in liquidation of the secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the Debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

As shown in the Liquidation Analysis prepared by Grant Thornton and attached as Exhibit E to this Disclosure Statement, the Debtor believes that each Class of Claims will receive more under the Plan than they would receive if the Debtor was liquidated in a Chapter 7 case. More specifically, a liquidation of the Debtor would significantly impair recoveries to all holders of Claims and clearly is not in the best interests of estate constituencies. For example, unsecured

DISCLOSURE STATEMENT                    74

creditors are getting paid in full under the Plan, but unsecured creditors would receive no recovery in a liquidation. Accordingly, it is clear that holders of Claims will fare much better under the Plan than in a liquidation. Furthermore, under a liquidation, Interests would not receive a distribution which is the same treatment provided to Class 8 under the Plan. The Plan therefore satisfies the best interests test.

## ARTICLE IX

## POST CONFIRMATION MANAGEMENT

On the Effective Date, the officers and directors of the Reorganized Debtor are expected to be:

| | |
|---|---|
| President and Director: | Thomas R. Kaetzer |
| Chief Financial Officer and Secretary: | Patrick H. McGarey |
| Controller: | Randal B. McDonald, Jr. |
| Directors: | Joshua L. Targoff, Thomas R. Kaetzer and Brian Wolfe |

Prior to the Petition Date, the Debtor entered into separate agreements with Mr. Kaetzer and Mr. McGarey, each dated October 29, 2008, whereby their existing employment arrangements were terminated and each was awarded a sum equal to their respective annual salary of $235,000 and $200,000, respectively, by reason of the "change of control" resulting from Third Point's purchase of the Debtor's outstanding 14% Senior Subordinate Convertible Notes in July 2007. The above sum was payable over time, with the final payment becoming due on July 31, 2009 unless otherwise earlier due upon the occurrence of events of default enumerated therein.

In addition to the above payments, in exchange for Mr. Kaetzer's agreement to serve through June 15, 2009, as the Debtor's President and Chief Executive Officer, he was paid a salary in the amount of $235,000 per annum. Likewise, Mr. McGarey was paid a salary in the amount of $200,000 per annum in exchange for his agreement to serve through June 15, 2009 as the Debtor's Chief Financial Officer.

Since June 15, 2009, Mr. Kaetzer and Mr. McGarey have continued to serve, and each is currently contemplated to continue to serve, as employees-at-will, in the position of Debtor's President and Chief Executive Officer, and Chief Financial Officer, respectively, with no change in salary.

## ARTICLE X

### DISTRIBUTIONS AND CLAIMS RESOLUTION

**10.1    Delivery of Distributions; Undeliverable or Unclaimed Distributions.**

    **A.    Delivery of Distributions in General.**

        The Reorganized Debtor shall make distributions to each holder of an Allowed Claim at the address reflected in the books and records of the Debtor, unless otherwise notified of an address change in writing by such holder sufficiently in advance of any distribution to allow the Debtor or Reorganizing Debtor to reflect such change on its books and records.

    **B.    Undeliverable and Unclaimed Distributions.**

        Any undeliverable or unclaimed distribution under the Plan that does not become deliverable on or before the second anniversary of the Effective Date shall be deemed to have been forfeited and waived, and the Person otherwise entitled thereto shall be forever barred and enjoined from asserting its Claim therefore against, or seeking to recover its distribution from, the Debtor, its Estate and the Reorganized Debtor.

**10.2    Allocation of Plan Distributions Between Principal and Interest.**

        To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

**10.3    Fractional Amounts.**

        The distributable amount of New Notes or New Stock may create fractional amounts otherwise distributable to the holders of Class 4 Claims. Notwithstanding such entitlement, all New Notes and New Stock issued by the Reorganized Debtor pursuant to the Plan will be issued and distributed only in full dollar denominations. To the extent any holder would be entitled to a fractional denomination of New Notes and/or New Stock, but for this provision, the denomination of New Notes and/or New Stock to be issued to such holder shall be rounded downward to eliminate any fractional amount.

**10.4    Withholding and Reporting Requirements.**

    **A.    Compliance with Applicable Laws.**

        In connection with the Plan and all distributions thereunder, the Reorganized Debtor shall comply with all applicable tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to those requirements. The Reorganized Debtor shall be authorized to take all actions necessary or

appropriate to comply with those withholding and reporting requirements. Notwithstanding any other provision of the Plan, the holders of Interests of the Reorganized Debtor shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution, and no distribution shall be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Reorganized Debtor for the payment and satisfaction of such tax obligations or has, to the Reorganized Debtor's satisfaction, established an exemption therefrom. Any distribution to be made pursuant to the Plan shall, pending the implementation of such arrangements, be treated as undeliverable pursuant to Section 10.1(B) "- Undeliverable and Unclaimed Distributions".

**B.     Tax Identification Numbers.**

Prior to receiving any distributions under the Plan, all holders of Allowed Claims shall provide the Reorganized Debtor with written notification or confirmation of their respective federal tax identification numbers or social security numbers for the sole purpose of allowing the Debtor and the Reorganized Debtor to comply with the applicable tax laws and rules.

**10.5     Setoffs.**

The Reorganized Debtor may, but shall not be required to, set off against any Claim, other than the Claims held by the Prepetition Noteholders, and the payments or other distributions to be made in respect of such Claims, claims of any nature whatsoever that the Debtor or the Reorganized Debtor may have against the Claim's holder; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any claim that the Debtor or the Reorganized Debtor may have.

## ARTICLE XI

### FEDERAL INCOME TAX CONSEQUENCES

**11.1     General.**

The following discussion summarizes certain anticipated U.S. federal income tax consequences of the Plan to the Debtor and certain holders of Claims or Interests. This summary is provided for general information purposes only and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to any particular holder of a Claim or an Interest. This summary does not purport to be a complete analysis or listing of all potential tax considerations.

This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder (the "Regulations"), judicial authorities, current published administrative rulings and pronouncements of the Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect as of the date hereof. Legislative, judicial, or administrative changes or new interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Plan. Any such changes or new interpretations could have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

This summary does not address all aspects of U.S. federal income taxation that may be relevant to a particular holder of a Claim or an Interest in light of its particular facts and circumstances or to certain types of holders of Claims subject to special treatment under the Tax Code (e.g., persons who are related to the Debtor within the meaning of the Tax Code, non-U.S. taxpayers, banks, mutual funds, financial institutions, broker-dealers, insurance companies, small business investment companies, tax-exempt organizations, real estate investment trusts, regulations investment companies, grantor trusts, persons holding a Claim as part of a "hedging," "integrated," or "constructive" sale or straddle transaction, persons holding Claims through a partnership or other pass-through entity, persons that have a "functional currency" other than the U.S. dollar, and holders of Claims or Interests who are themselves in bankruptcy).  If a partnership (or other entity or arrangement taxed as a partnership) holds a Claim or an Interest, the tax treatment of a partner in the partnership generally will depend upon the status of the partner and upon the activities of the partnership.  This summary does not address the tax considerations applicable to holders who obtained their Claims or Interests (or the rights underlying such Claims or Interests) in connection with the performance of services.  This summary does not discuss any aspects of foreign, state, local, estate or gift taxation, nor does it apply to any person that acquires any of the exchange consideration in the secondary market.  This summary does not address the U.S. federal income tax consequences to holders of Claims or Interests that are not entitled to vote on the Plan, including holders whose Claims or Interests are entitled to reinstatement or payment in full in Cash under the Plan or holders whose Claims or Interests are otherwise not Impaired under the Plan.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  In addition, a substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution or transfer under the Plan.  Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated hereby.  Thus, there can be no assurance that the IRS will not take a contrary view with respect to one or more of the issues discussed below.  No ruling will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtor with respect thereto.

This summary assumes that holders of Claims or Interests hold only Claims or Interests in a single Class.  Holders of multiple Classes of Claims or Interests should consult their own tax advisors as to the effect such ownership may have on the U.S. federal income tax consequences described below.  This summary also assumes that the various debt, equity, and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form.

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER OF A CLAIM OR AN INTEREST IS HEREBY NOTIFIED THAT (1) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER OF A CLAIM OR AN INTEREST FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER OF A CLAIM OR AN INTEREST UNDER THE TAX CODE; (2) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE CONFIRMATION OF THE**

**PLAN TO WHICH THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT ARE ANCILLARY; AND (3) A HOLDER OF A CLAIM OR AN INTEREST SHOULD SEEK ADVICE BASED UPON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**THE DISCUSSION SET FORTH IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR GENERAL INFORMATION ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED ON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR AN INTEREST. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL INCOME TAX CONSEQUENCES, AS WELL AS OTHER FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES, CONTEMPLATED UNDER OR IN CONNECTION WITH THE PLAN IN LIGHT OF ITS PARTICULAR CIRCUMSTANCES.**

## 11.2   Tax Consequences to the Debtor.

The Debtor expects to report consolidated net operating loss ("NOL") carryforwards for federal income tax purposes of approximately $42,314,464 as of December 31, 2008. With respect to the NOL carryforwards as of December 31, 2008, it should be noted that, due to the July 2008 purchase and conversion by Third Point of the Debtor's 14% Senior Subordinated Convertible Notes into 77.25% of the Debtor's common stock, this "ownership change" likely resulted in the application of the annual limitation on the use of the Debtor's NOLs under Section 382 of the Tax Code (as discussed in more detail below).

As discussed below, the amount of the Debtor's NOL carryforwards, and possibly certain other tax attributes, may be significantly reduced upon implementation of the Plan. In addition, the Reorganized Debtor's subsequent utilization of any net built-in losses with respect to its assets and NOLs remaining, and possibly certain other tax attributes, may be restricted as a result of and upon the implementation of the Plan.

### A.   Cancellation of Debt Income.

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any cancellation of indebtedness ("COD") income recognized during the taxable year. COD income generally equals the excess of the adjusted issue price of the indebtedness discharged over the sum of (i) the amount of cash, (ii) the issue price of any new debt, and (iii) the fair market value of any other property (including stock) transferred by the debtor in satisfaction of such discharged indebtedness. COD income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged.

Section 108(a)(I)(A) of the Tax Code provides an exception to this rule, however, where a taxpayer is in bankruptcy and where the discharge is granted, or is effected pursuant to a plan approved by, the bankruptcy court. In such a case, instead of recognizing income, the taxpayer is required, under Section 108(b) of the Tax Code, to reduce certain of its tax attributes by the amount of COD income. The attributes of the taxpayer are to be reduced in the following order: current year NOLs and NOL carryforwards, general business and minimum tax credit

carryforwards, capital loss carryforwards, the basis of the taxpayer's assets, and finally, foreign tax credit carryforwards (collectively, "Tax Attributes"). The reduction in Tax Attributes generally occurs after the calculation of a debtor's tax for the year in which the debt is discharged. Section 108(b)(5) of the Tax Code permits a taxpayer to elect to first apply the reduction to the basis of the taxpayer's depreciable assets, with any remaining balance applied to the taxpayer's other Tax Attributes in the order stated above. In addition to the foregoing, Section 108(e)(2) of the Tax Code provides a further exception to the realization of COD income upon the discharge of debt, providing that a taxpayer will not recognize COD income to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for federal income tax purposes.

The Debtor expects to realize a significant amount of COD income as a result of the Plan. The amount of the COD income would equal the excess of the Allowed Prepetition Notes canceled over the sum of (i) the aggregate issue prices of the New 20% Senior Secured Notes and the New 10% Subordinated Secured Notes and (ii) the aggregate fair market value of the Senior Preferred Stock, the Junior Preferred Stock and the New Common Stock issued in exchange therefor. The Debtor believes that the amount of debt satisfied will substantially exceed the issue price of the New Notes and the fair market value of the New Stock exchanged in satisfaction of the Allowed Prepetition Notes Claims. The ultimate amount of COD income realized by the Debtor is uncertain because, among other things, it will depend on the fair market value of all New Stock issued on the Effective Date.

Regardless of the amount of the Debtor's COD income, the Debtor will not be required to include COD income in gross income because the indebtedness will be discharged while the Debtor is under the jurisdiction of a court in a Title 11 case. Accordingly, the Debtor expects that there will be no U.S. federal income taxes payable by the Debtor as a result of the COD income. Instead, the Debtor will be required to reduce Tax Attributes by the amount of the COD income realized in the manner described above. The Debtor has not yet determined whether it would be beneficial to elect to reduce the basis of its depreciable property prior to any reduction of NOLs or other Tax Attributes. The extent to which NOLs and other Tax Attributes remain following Tax Attribute reduction will depend on the amount of the COD income.

A recently enacted amendment to the COD income rules, in Section 108(i) of the Tax Code, provides that taxpayers, including taxpayers operating under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code, that recognize COD income in 2009 or 2010 may elect to forego the COD income exclusion and attribute reduction rules described above and instead take the COD income into taxable income in equal installments in 2014 through 2018 (i.e., the taxpayer would report 20% of the COD income in each such year). The election to defer the taxable income, which may be made on an instrument-by-instrument basis, must be made on the taxpayer's tax return for the year which includes the transaction that creates the COD income (in this case, the year in which the Effective Date occurs). The Debtor has not yet determined if it will elect to defer COD income, in whole or in part, under this new provision or instead have the exclusion and attribute reduction rules apply.

**B.     NOLs and Other Attributes.**

Following the Effective Date, the Debtor expects to have NOLs. As provided above, the Debtor currently has NOLs, and the Debtor will generate NOLs on the Effective Date to the extent that the Debtor has generated deductions for U.S. federal income tax purposes that are not offset by income and/or gain and are not eliminated by the attribute reduction rules of Section 108(b) of the Tax Code discussed above. In addition, the Debtor may generate NOLs in future taxable years if and to the extent that future deductible expenses exceed their income and gain in those years.

**C.     Annual Limitation on Use of NOLs.**

The amount of the Debtor's NOLs may be significantly reduced as a result of the reduction of Tax Attributes described above in <u>Section 11.2(A)</u> "- Cancellation of Debt Income." Additionally, the Debtor's ability to utilize its NOLs allocable to periods prior to the Effective Date (the "<u>Pre-Change Losses</u>") may be subject to limitation pursuant to Section 382 of the Tax Code as a result of the change in ownership of the Debtor that will occur upon the emergence from bankruptcy, as described below.

**(i)     General Section 382 Limitation.**

In general, when a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the Bankruptcy Exception discussed below, Section 382 of the Tax Code limits the corporation's ability to utilize its Pre-Change Losses to offset future taxable income. Such limitation also may apply to certain losses or deductions that are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change and that are subsequently recognized. An "ownership change" generally is defined as a more than 50 percentage point aggregate increase in ownership of the value of the stock of a "loss corporation" (a corporation with NOLs) by one or more stockholders holding at least 5% of the outstanding equity of the corporation that takes place during a testing period (generally three years) ending on the date on which such change in ownership is tested. It is anticipated that the Debtor will undergo an ownership change as a result of the Plan.

In general, unless the corporation is eligible for and does not elect out of the Bankruptcy Exception (defined below), when a corporation undergoes an ownership change pursuant to a bankruptcy plan, Section 382 of the Tax Code places an annual limitation on a corporation's use of Pre-Change Losses equal to the product of (i) the fair market value of the stock of the corporation immediately after the ownership change (with certain adjustments, and unless the fair market value of all of the corporation's assets immediately before the ownership change is less than the post-change stock value); and (ii) the highest of the adjusted federal "long-term tax-exempt rates" in effect for any month in the three-calendar-month period ending with the month in which the ownership change occurs (the "<u>Annual Limitation</u>"). In the case of an ownership change occurring not under the Bankruptcy Exception (defined below), the stock value used in determining the Annual Limitation is the value immediately before the ownership change. For any taxable year ending after an ownership change, the NOLs that can be used in that year to offset taxable income of a corporation cannot exceed the amount of the Annual Limitation. Any unused Annual Limitation may be carried forward , thereby increasing the Annual Limitation in

the subsequent taxable years. If the corporation does not continue its historic business or use a significant portion of its assets in a new business for two years after the ownership change, the Annual Limitation resulting from the ownership change is zero.

### (ii)     Built-in Gain and Losses.

Under certain circumstances, Section 382 of the Tax Code also limits the deductibility of certain built-in losses that are recognized during the five years following the date of an ownership change. In particular, subject to a de minimis exception, if a loss corporation has a net unrealized built-in loss at the time of an ownership change (taking into account the difference between the tax basis and value of its assets and its items of "built-in" income and deduction), then any built-in losses recognized during the following five years (up to the amount of the net unrealized built-in loss at the time of the ownership change) generally will be treated as a Pre-Change Loss and will be subject to the Annual Limitation.

Conversely, if the loss corporation has more than a de minimis net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the net unrealized built-in gain at the time of the ownership change) generally will increase the Annual Limitation in the year recognized, such that the loss corporation would be permitted to use its Pre-Change Losses against such built-in gain income in addition to its regular Annual Limitation.

### (iii)     Bankruptcy Exception.

Section 382(l)(5) of the Tax Code provides an exception to the Annual Limitation for corporations under the jurisdiction of a court in a Title 11 case (the "Bankruptcy Exception") if shareholders of the debtor immediately before an ownership change and qualified (so-called "historic") creditors of a debtor receive, in respect of their claims, stock with at least 50 percent of the vote and value of all the stock of the reorganized debtor pursuant to a confirmed bankruptcy plan of reorganization. For this purpose, a "historic creditor" is a creditor that (i) has held its indebtedness since the date that is at least eighteen months before the date on which the debtor filed its petition with the Bankruptcy Court; or (ii) whose indebtedness arose in the ordinary course of the business of the debtor and is held by the creditor who at all times was the beneficial owner of such claim. In determining whether the Bankruptcy Exception applies, certain holders of claims that own directly or indirectly less than 5 percent of the total fair market value of the debtor's stock immediately after the ownership change are presumed to have held their claims since the origination of such claims, other than in certain cases where the debtor has actual knowledge that the creditor has not owned the debt for the requisite period. The Bankruptcy Exception applies to a reorganized debtor if these requirements are satisfied unless the debtor files an election for the Bankruptcy Exception not to apply.

If a corporation is eligible for and applies the Bankruptcy Exception, its Pre-Change Losses will not be subject to the Annual Limitation. However, under the Bankruptcy Exception, the amount of the corporation's Pre-Change Losses and certain pre-change Tax Attributes that may be carried over to a post-change year must be reduced to the extent attributable to any interest paid or accrued during the taxable year of the ownership change (up to the date of the ownership change) and the three preceding taxable years in respect of certain indebtedness that

was exchanged for stock pursuant to the bankruptcy reorganization. In addition, if the Bankruptcy Exception applies and there is another ownership change of the Debtor within two years after consummation of the bankruptcy plan of reorganization, an Annual Limitation of zero will be imposed on the use of NOLs and built-in losses that remain on the date of the second ownership change.

Even if the Debtor qualifies for the Bankruptcy Exception, it may nevertheless elect for such exception not to apply and instead remain subject to the Annual Limitation described above. This election would have to be made on the Debtor's U.S. federal income tax return for the taxable year in which the ownership change occurs. The determination of the application of the Bankruptcy Exception is fact specific. The Debtor has not yet determined whether it will be eligible for the Bankruptcy Exception, and if it were, whether it would make the election not to have the Bankruptcy Exception apply.

**D.    Accrued Interest.**

To the extent that the consideration issued to holders of Claims pursuant to the Plan is attributable to accrued but unpaid interest, the Debtor should be entitled to interest deductions in the amount of such accrued interest, but only to the extent the Debtor has not already deducted such amount. The Debtors should not have COD income from the discharge of any accrued but unpaid interest pursuant to the Plan to the extent that the payment of such interest would have given rise to a deduction pursuant to Section 108(e)(2) of the Tax Code.

**E.    Applicable High Yield Discount Obligations.**

If any of the New Notes constitute "applicable high yield discount obligations," the Debtor's ability to take a deduction for interest attributable to original issue discount (as discussed below in Section 11.4(A) "- Tax Consequences of Holding New Notes" of this Disclosure Statement) will be limited. An "applicable high yield discount obligation" is any debt instrument issued (directly or indirectly) by a corporation that (i) has a maturity date that is more than five years from the date of issue, (ii) has a yield to maturity that equals or exceeds the applicable federal rate ("AFR") for the calendar month in which the obligation is issued plus five percentage points, and (iii) has "significant original issue discount." The AFR is an interest rate, announced monthly by the IRS, that is based on the yield of debt obligations issued by the U.S. Treasury. A debt instrument generally has "significant original issue discount" if, as of the close of any accrual period ending more than five years after the issue date, the excess of the interest (including original issue discount) that has accrued on the obligation over the interest (including original issue discount) that is required to be paid thereunder exceeds the product of the issue price of the instrument and its yield to maturity. If any of the New Notes constitute applicable high yield discount obligations, the original issue discount on such New Note will not be deductible by the Debtor until paid.

In addition, if the yield to maturity exceeds the AFR plus six percentage points, a ratable portion of the Debtor's deduction for original issue discount (the "Disqualified OID") (based on the portion of the yield to maturity that exceeds the AFR plus six percentage points) will not be deductible by the Debtor at all. For purposes of the dividends received deduction under Section

243 of the Tax Code, the Disqualified OID will be treated as a dividend to the extent of the Debtor's current earnings and profits.

A recently enacted amendment, in Section 165(e)(5)(F) of the Tax Code, temporarily suspends the applicable high yield discount obligation rule stated above for any applicable high yield discount obligation issued during the period beginning on September 1, 2008 and ending on December 31, 2009 in exchange for an obligation that is not an applicable high yield discount obligation and the issuer (or obligor) of which is the same as the issuer (or obligor) of the applicable high yield discount obligation. The suspension does not apply to any newly issued debt instrument that is described in Section 871(h)(4) of the Tax Code (relating to certain contingent debt) or issued to a related person. If any holder of a New Note is treated as a related person, then the applicable high yield discount obligation rules will apply to the New Note issued to such related person.

F.     Federal Alternative Minimum Tax.

In general, a federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a rate of 20% to the extent that such tax exceeds the corporation's regular federal income tax for the year. A corporation's alternative minimum taxable income generally is equal to its regular taxable income with certain adjustments. In computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular federal income tax purposes by applying NOL carryforwards, only 90% of the corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes). Accordingly, usage of the Debtor's NOLs by the Reorganized Debtor may be subject to limitations for AMT purposes in addition to any other limitations that may apply.

In addition, if a corporation undergoes an "ownership change" within the meaning of Section 382 of the Tax Code and has a net unrealized built-in loss on the date of the ownership change, the corporation's aggregate tax basis in its assets may be reduced for certain AMT purposes to reflect the fair market value of the assets on the ownership change date. Accordingly, if the Debtor is in a net unrealized built-in loss position on the Effective Date, for AMT purposes the tax benefits attributable to basis in assets may be reduced.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future years when the corporation is no longer subject to the AMT.

11.3     Tax Consequences to Holders of Allowed Prepetition Notes Claims.

Pursuant to the Plan, each holder of an Allowed Prepetition Notes Claim will receive, in exchange for, and in full satisfaction and discharge of, its Allowed Prepetition Notes Claim, the following securities: New 10% Subordinated Secured Notes, Junior Preferred Stock, and New Common Stock. In addition to the above consideration, any holder of an Allowed Prepetition Notes Claim who elects to be an Exit Facility Lender also will receive, in exchange for, and in full satisfaction and discharge of, its Allowed Prepetition Notes Claim and the New Cash

Advance, the following securities: New Series A 20% Senior Secured Notes, New Series B 20% Senior Secured Notes, and Senior Preferred Stock.

The U.S. federal income tax consequences of the Plan to the holders of Allowed Prepetition Notes Claims will depend upon, among other things, (a) the nature of the indebtedness owed to it; (b) whether the Prepetition Notes constitute "securities" for U.S. federal income tax purposes; (c) the type of consideration received by the holder of an Allowed Prepetition Notes Claim in exchange for the Claim and whether such consideration constitutes a "security" for U.S. federal income tax purposes; (d) whether the holder reports income on the accrual or cash basis; (e) whether the holder has previously taken a bad debt deduction or worthless security deduction with respect to the Prepetition Note; and (f) whether the holder receives distributions under the Plan in more than one taxable year.

A.     **Definition of Securities.**

As stated above, the tax treatment of the exchange of Allowed Prepetition Notes Claims for New Notes will depend in part upon whether the Prepetition Notes and New Notes constitute "securities" for U.S. federal income tax purposes. The term "security" is not defined in the Tax Code or in the Regulations and has not been clearly defined by judicial decisions. Whether an instrument constitutes a "security" for U.S. federal income tax purposes is determined based upon all the facts and circumstances. Certain authorities have held that the length of the initial term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities generally have indicated that an initial term of less than five years is evidence that the instrument is not a security, whereas an initial term of ten years or more is evidence that it is a security. There are numerous other factors that may be taken into account in determining whether a debt instrument is a security, including, but not limited to, the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

B.     **Consequences to Holders of Allowed Prepetition Notes Claims if Prepetition Notes are Not Securities.**

If any of the Prepetition Notes are not treated as "securities" for U.S. federal income tax purposes, a holder of such Prepetition Notes would be treated as exchanging those Prepetition Notes for New Notes and New Stock in a fully taxable exchange. In that case, the holder would recognize gain or loss equal to the difference between (i) the sum of the issue price of New Notes and the fair market value as of the Effective Date of New Stock received by the holder in exchange for such Prepetition Notes (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the holder's basis in the Prepetition Notes exchanged therefor (other than tax basis attributable to accrued but unpaid interest previously included in the holder's taxable income). The treatment of accrued but unpaid interest and amounts allocable thereto varies depending on the nature of the holder's Claim and is discussed below.