Any gain or loss recognized would be capital or ordinary, depending on the status of the Prepetition Note in the holder's hands, including whether the Prepetition Note constitutes a market discount bond in the holder's hands. Generally, any gain or loss recognized by a holder of a Prepetition Note not constituting a security for U.S. federal income tax purposes would be a long-term capital gain or loss if the Prepetition Note is a capital asset in the hands of the holder and the holder has held the Prepetition Note for more than one year, unless the holder had previously claimed a bad debt deduction or the holder had accrued but untaxed market discount with respect to such Prepetition Note. The deductibility of capital losses is subject to limitations. To the extent that a portion of the New Notes and New Stock received in the exchange is allocable to accrued interest, the holder may recognize ordinary income. A holder's tax basis in the New Notes and New Stock received would equal the fair market value of the New Notes and New Stock as of the Effective Date. A holder's holding period for the New Notes and New Stock would begin on the day following the Effective Date.

### C.   Consequences to Holders of Allowed Prepetition Notes Claims if Prepetition Notes are Securities.

#### (i)   If New Notes are Securities.

If the Prepetition Notes and New Notes are treated as "securities" for U.S. federal income tax consequences, the exchange of a holder's Prepetition Notes for New Notes and New Stock would be treated as a recapitalization, and therefore a generally tax-free reorganization under the Tax Code. In general, this means that a holder will not recognize gain or loss with respect to the exchange (except with respect to accrued but unpaid interest on the Prepetition Notes). It should be noted that nonrecognition results only to the extent the principal amount of the New Notes does not exceed the principal amount of the Prepetition Notes surrendered in exchange therefor. A holder would obtain a tax basis in the New Notes and New Stock received equal to the tax basis of the Prepetition Notes exchanged therefor and would have a holding period for the New Notes and New Stock that includes the holding period for the Prepetition Notes; provided that the tax basis of any New Note or share of New Stock treated as received in satisfaction of accrued but unpaid interest would equal the fair market value of such New Note or share of New Stock, and the holding period for such New Note or share of New Stock would begin on the day following the day of receipt.

#### (ii)   If New Notes are Not Securities.

If, for U.S. federal income tax consequences, the Prepetition Notes are treated as "securities" but the New Notes are not treated as "securities," the exchange of a holder's Prepetition Notes for New Notes and New Stock would still be treated as a recapitalization, but the exchange would be taxable in part. In general, this means that, in addition to income with respect to accrued but unpaid interest on the Prepetition Notes, a holder will recognize gain (but not loss) with respect to the exchange in an amount not in excess of the fair market value of the New Notes. A holder would obtain a tax basis in the New Stock received equal to the tax basis of the Prepetition Notes, decreased by the amount of the fair market value of the New Notes, and increased by the amount of gain recognized on the exchange. A holder would obtain a tax basis in the New Notes received equal to the fair market value of the New Notes. A holder would have a holding period for the New Stock that includes the holding period for the Prepetition

Notes and for the New Notes beginning on the day following the day of receipt. However, the tax basis of any New Note or share of New Stock treated as received in satisfaction of accrued but unpaid interest would equal the fair market value of such New Note or share of New Stock, and the holding period for such New Note or share of New Stock would begin on the day following the day of receipt.

### D.    Accrued but Unpaid Interest.

Whether or not the Prepetition Notes are treated as "securities" for U.S. federal income tax purposes, any amount received by a holder of a Prepetition Note that is attributable to accrued interest not theretofore included in income would be taxable to the holder as interest income. Conversely, a holder of a Prepetition Note may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Prepetition Notes was previously included in the holder's gross income but was not paid in full by the Debtor. Such loss may be ordinary, but the tax law is unclear on this point.

Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the consideration paid pursuant to the Plan with respect to a Prepetition Note shall be allocated, pursuant to the Plan, first to the principal amount of such Prepetition Note as determined for U.S. federal income tax purposes and then to accrued interest, if any, with respect to such Prepetition Note. Accordingly, in cases where a holder receives distributions under the Plan having a value less than the principal amount of its Prepetition Note, the Debtor allocates the full amount of consideration transferred to such holder to the principal amount of such obligation and does not treat any amount of the consideration to be received by such holder as attributable to accrued interest. Holders should be aware, however, that the IRS may take a different position with respect to the proper allocation.

### E.    Market Discount.

Under the "market discount" provisions of Sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a holder of a Prepetition Note who exchanges the Prepetition Note for New Notes or New Stock on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the Prepetition Notes. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the Prepetition Note, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a holder of an Allowed Prepetition Notes Claim on the taxable disposition of Prepetition Notes that had been acquired with market discount would be treated as ordinary income to the extent of the market discount that accrued thereon while such Prepetition Notes were considered to be held by such holder (unless such holder elected to include market discount in income as it accrued). To the extent that the surrendered Prepetition Notes that had

been acquired with market discount are deemed to be exchanged for New Notes or shares of New Stock in a tax-free reorganization, any market discount that accrued on such debts but was not recognized by the holder may cause any gain recognized on the subsequent sale, exchange, redemption or other disposition of the New Notes or shares of New Stock to be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged Prepetition Note.

### F.    Bad Debt or Worthless Securities Deduction.

To the extent that the Prepetition Notes are construed not to be "securities" for U.S. federal income tax purposes, a holder who, under the Plan, receives in respect of a Prepetition Note an amount less than the holder's tax basis in the Prepetition Note may be entitled to a bad debt deduction in some amount under Section 166(a) of the Tax Code or a worthless securities deduction under Section 165 of the Tax Code. The rules governing the character, timing, and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed and are subject to the exchange provisions of Section 1271 of the Tax Code. Holders of Prepetition Notes, therefore, should consult their tax advisors with respect to their ability to take such a deduction.

### G.    Post-Effective Date Distributions.

Holders of Prepetition Notes may receive distributions subsequent to the Effective Date. The imputed interest provisions of the Tax Code may apply to treat a portion of any post-Effective Date distribution as imputed interest. Imputed interest may, with respect to certain holders, accrue over time using the constant interest method, in which event the holder may, under some circumstances, be required to include imputed interest in income prior to receipt of a distribution.

### 11.4    Tax Consequences of Holding New Notes.

### A.    Original Issue Discount and Payable in Kind Interest.

Because the New Notes will provide that, at its option, the Reorganized Debtor may pay a portion of the interest on the New Notes by issuing additional New Notes, the New Notes will have original issue discount for U.S. federal income tax purposes. Further, if the issue price of the New Notes is less than the "stated redemption price at maturity" of such New Notes by more than a de minimis amount, holders of New Notes will be considered to have purchased such New Notes with original issue discount. Consequently, holders will be required to include original issue discount in ordinary income for one or both reasons over the period that they hold the New Notes in accordance with a constant yield to maturity method. As a result, holders of New Notes may have taxable interest income in excess of the amount of cash they receive in a taxable year.

In general, a holder of a New Note, whether such holder uses the cash or the accrual method of tax accounting, will be required to include as ordinary income the sum of the "daily portions" of original issue discount on such New Note for all days during the taxable year that the holder owns such New Note. The daily portions of original issue discount are determined by allocating to each day in any accrual period a ratable portion of the original issue discount

allocable to that accrual period. Accrual periods may be of any length and may vary in length over the term of the New Notes, provided that no accrual period is longer than one year and each scheduled payment of principal or interest occurs on either the final day or the first day of an accrual period. The amount of original issue discount on a New Note allocable to each accrual period equals the product of the "adjusted issue price" of such New Note at the beginning of the accrual period and the yield to maturity of such New Note, less the amount of any qualified stated interest allocable to the accrual period. The adjusted issue price of a New Note at the beginning of any accrual period will generally be the sum of its issue price and the amount of original issue discount allocable to all prior accrual periods, reduced by the amount of all cash payments made with respect to such Note, other than payments of qualified stated interest, in all prior accrual periods. The yield to maturity of a New Note is the discount rate that causes the present value of all principal and interest payments on such New Note as of its issue date to equal the issue price of such New Note.

For purposes of determining the yield to maturity, if the issue price of the New Notes is equal to or greater than the stated principal amount, a holder must assume that the Reorganized Debtor will not exercise the option to issue additional New Notes, except in respect of any period in which the Reorganized Debtor has actually elected to pay a portion of the interest by issuing additional New Notes. If that assumption applies and, for any interest payment period, the Reorganized Debtor pays the interest entirely in cash on the New Notes, then a holder will not be required to adjust its original issue discount inclusions. If that assumption applies but, for any interest payment period, the Reorganized Debtor exercises its option to pay a portion of the interest by issuing additional New Notes, then a holder of a New Note will be required to adjust its calculation for determining the amount of original issue discount it must include in gross income during future periods by treating such New Note as if, on the date of such exercise, such New Note had been retired and then reissued for an amount equal to its adjusted issue price on such date, and by recalculating the yield to maturity of the reissued Note by treating the amount of interest paid in kind that increased the principal amount of such Notes (and of any prior interest paid in kind that increased the principal amount of such Notes) as a payment that will be made on the maturity date of such reissued Note.

For purposes of determining the yield to maturity, if the issue price of the New Notes is less than the stated principal amount, the Reorganized Debtor is deemed to exercise whichever option (payment of interest in cash or in kind) minimizes the yield on the New Notes. If payment of a portion of the interest in kind minimizes the yield on the New Notes, the Reorganized Debtor is presumed to do so. If payment of interest in cash reduces the yield on the New Notes, the Reorganized Debtor is presumed to do so.

If for any interest payment period the Reorganized Debtor is presumed to pay interest in cash but instead it exercises its option to pay a portion of the interest by issuing additional New Notes, a holder of a New Note will be required to adjust its calculation for determining the amount of original issue discount it must include in gross income during future periods by treating such New Note as if, on the date of such exercise, such New Note had been retired and then reissued for an amount equal to its adjusted issue price on such date, and by recalculating the yield to maturity of the reissued New Note by treating the amount of interest paid in kind that increased the principal amount of such New Notes (and of any prior interest paid in kind that increased the principal amount of such New Notes) as a payment that will be made on the

maturity date of such reissued New Note. Following the interest payment, the New Notes would need to be retested to determine whether the yield would still be minimized by the Reorganized Debtor paying interest in cash in accordance with the presumption.

If for any interest payment period the Reorganized Debtor is presumed to pay a portion of the interest in kind but instead it pays the interest in cash, to the extent the interest payable in kind is paid in cash by the Reorganized Debtor, the New Notes are treated as if the Reorganized Debtor made a pro rata prepayment, which reduces the amount of each payment remaining on the New Notes. The New Notes would be treated as consisting of two debt instruments, one that is retired on the interest payment date and one that remains outstanding after the interest payment date. The adjusted issue price, adjusted basis in the hands of the holder, and accrued original issue discount of the original New Notes would be allocated between the two instruments based on the portion of the original New Notes treated as retired. The pro rata prepayment and deemed retirement of a portion of the New Notes may result in gain or loss to a holder of the New Notes. Following the interest payment, the New Notes would need to retested to determined whether yield would still be minimized by the Reorganized Debtor paying interest in kind in accordance with the presumption.

Each payment made in cash on a New Note, other than a payment of qualified stated interest, will be treated first as a payment of any accrued original issue discount that has not been allocated to prior payments and second as a payment of principal (which is not includible in income), and no portion of such payments will be treated as prepaid interest. A holder of a New Note generally is not required to include separately in income cash payments received on such note to the extent such payments constitute payments of previously accrued original issue discount.

If a holder's initial tax basis in the New Notes is greater than the issue price of such New Notes but less than the stated redemption price at maturity, such holder generally will be considered to have "acquisition premium" with respect to the New Notes, which may reduce the amount of original issue discount that the holder is required to include in taxable income. The stated redemption price at maturity generally will include all payments of principal and interest under the New Notes, other than payments of qualified stated interest. Furthermore, if, immediately after the Effective Date, a holder's initial tax basis in its New Notes exceeds the stated redemption price at maturity, the New Notes would be treated as issued with bond premium, and no original issue discount would be required to be included in the gross income of the holder in respect of such New Notes. In addition, a holder may elect to amortize the bond premium. Any election to amortize bond premium applies to all taxable debt obligations held at the beginning of the first taxable year to which the election applies or acquired thereafter, and may not be revoked without the consent of the IRS.

The Reorganized Debtor will report annually to the IRS and to record holders information with respect to the amount of original issue discount accruing during the calendar year.

**B.      Sale, Exchange, or Other Taxable Disposition of New Notes.**

A holder of New Notes will generally recognize capital gain or loss upon the sale, exchange, or other taxable disposition of New Notes in an amount equal to the difference between (x) the amount realized by such holder (less any amount attributable to accrued and unpaid interest not previously included in income, which will be treated as ordinary interest income) and (y) such holder's adjusted tax basis in the New Notes. Any such gain or loss will be long-term if the New Notes have been held for more than one year. The deductibility of capital losses is subject to limitations.

In addition, under Section 108(e)(7) of the Tax Code, any gain recognized on the subsequent sale, exchange, redemption, or other disposition of New Notes or shares of New Stock will be treated as ordinary income to the extent the holder of the surrendered Prepetition Notes previously claimed ordinary loss deductions with respect to the surrendered Prepetition Notes.

**11.5    Tax Consequences of Holding New Stock.**

**A.      Distributions.**

**(i)      In General.**

Distributions with respect to the New Stock generally will be taxable as dividend income when paid to the extent of the Reorganized Debtor's current and accumulated earnings and profits as determined for U.S. federal income tax purposes. To the extent that the amount of any distributions exceeds the Reorganized Debtor's earnings and profits with respect to such distribution, the excess will be applied against and will reduce the holder's adjusted tax basis in respect of the stock as to which the distribution was made (but not below zero). Any remaining excess will be treated as gain or loss from the sale or exchange of such stock, with the consequences discussed below in <u>Section 11.5(C)</u> "- Sale or Other Disposition" of this Disclosure Statement.

**(ii)      Dividends in the Form of Additional Stock.**

The Reorganized Debtor may make a distribution on the Senior Preferred Stock and Junior Preferred Stock in the form of additional shares of such stock. The general rule under Section 305 of the Tax Code is that such a stock distribution is tax-free, unless one or more of the following exceptions apply: (a) at the election of any shareholder, the dividend can be paid in property instead of stock; (b) the result of the distribution is that some shareholders receive property while other shareholders increase their interest in the earnings or assets of the corporation; (c) as a result of the distribution, some common shareholders receive common stock and other common shareholders receive preferred stock; (d) the dividend is a distribution on preferred stock; or (e) the dividend is payable in convertible preferred stock, unless it can be established that the dividend will not have the effect listed in (b). Taxability under exception (d), for distributions on preferred stock, applies if the stock does not participate in corporate growth to any significant extent (disregarding conversion privileges). A right to participate in corporate growth that lacks substance (i.e., as to which it is reasonable to anticipate at the time of the

distribution that there is little or no likelihood of participating beyond a fixed preferential return) will not be respected.

Although not free from doubt, the Debtor believes that the Senior Preferred Stock and Junior Preferred Stock should not qualify as participating preferred stock because neither the Senior Preferred Stock nor the Junior Preferred Stock is convertible into common stock, is entitled to participate, over and above its dividend and liquidation priority, with another less privileged class of stock in earnings and profits and upon liquidation, or is entitled to be redeemed at a significant redemption premium. Thus, any dividends made in the form of additional shares of the Senior Preferred Stock or Junior Preferred Stock should be taxable in the same manner described above in Section 11.5(A)(i) "- Distribution – In General" of this Disclosure Statement. The amount of such distributions will be equal to the fair market value of the additional shares of Senior Preferred Stock or Junior Preferred Stock on the date of the distribution. A holder's tax basis in such additional shares of Senior Preferred Stock or Junior Preferred Stock will equal the fair market value of the additional stock on the distribution date, and such holder's holding period for such additional stock will begin on the day following the distribution date.

### (iii)   Dividends to Non-Corporate Shareholders.

Dividends generally are taxed as ordinary income. However, dividends received by non-corporate holders in taxable years beginning on or before December 31, 2010 may qualify for taxation at lower rates applicable to long-term capital gains, provided certain holding period and other requirements are satisfied. Non-corporate holders should consult their own tax advisors regarding the applicability of such lower rates under their particular factual situation.

### (iv)   Dividends to Corporate Shareholders.

In general, a distribution to a corporate shareholder that is treated as a dividend for U.S. federal income tax purposes will qualify for the 70% dividends received deduction that is available to corporate shareholders that own less than 20% of the voting power or value of the outstanding stock of the distributing corporation (other than certain preferred stock). A corporate shareholder holding 20% or more of the distributing corporation may be eligible for an 80% dividends received deduction. No assurance can be given that the Reorganized Debtor will have sufficient earnings and profits (as determined for U.S. federal income tax purposes) to cause distributions to be eligible for a dividends received deduction. Dividend income that is not subject to regular U.S. federal income tax as a consequence of the dividends received deduction may be subject to the U.S. federal alternative minimum tax.

The dividends received deduction is only available if certain holding period and taxable income requirements are satisfied. The length of time that a shareholder has held stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed. Finally, the tax consequences of the receipt of

a dividend by a corporate shareholder may be different if the dividend were treated as an "extraordinary dividend" under applicable rules.

## B.    Constructive Dividend Potential.

Under Section 305 of the Tax Code, a holder of Junior Preferred Stock or Senior Preferred Stock may be treated as receiving constructive distributions over the term of such stock based on the excess, if any, of the stock's liquidation preference over the stock's fair market value on the Effective Date (subject to a de minimis exception)—sometimes referred to as "preferred original issue discount" or "preferred OID." These "preferred OID" rules apply to stock that does not participate in corporate growth to any significant extent (disregarding conversion privileges). A right to participate in corporate growth that lacks substance (i.e., as to which it is reasonable to anticipate at the time of the distribution that there is little or no likelihood of participating beyond a fixed preferential return) will not be respected.

As discussed above in Section 11.5(A)(ii) of this Disclosure Statement, the Debtor believes that the Senior Preferred Stock and Junior Preferred Stock should not qualify as participating preferred stock and, thus, should be subject to the preferred OID rules. In general, each holder is bound by the Reorganized Debtor's determination as to whether there is accruable preferred OID, unless the holder explicitly discloses that it is taking a contrary position in a statement attached to its timely filed U.S. federal income tax return for the taxable year in which it acquires the stock.

## C.    Sale or Other Disposition.

Subject to the discussion below, any gain or loss recognized by a holder on the sale, exchange, or other disposition of the New Stock generally should be capital gain or loss in an amount equal to the difference, if any, between (x) the amount realized by the holder and (y) the holder's adjusted tax basis in the New Stock immediately before the sale, exchange, or other disposition. Any such capital gain or loss generally should be long-term capital gain or loss if the holder's holding period for its stock is more than one year at that time. The use of capital losses is subject to limitations.

In the case of redemption of Senior Preferred Stock or Junior Preferred Stock for cash or property, the U.S. federal income tax treatment depends on the particular facts relating to such holder at the time of the redemption. If the redemption of such Senior Preferred Stock or Junior Preferred Stock (i) is "not essentially equivalent to a dividend" with respect to the holder, (ii) is "substantially disproportionate" with respect to the holder (as defined generally as greater than 20% reduction in a shareholder's relative voting stock and common stock of a corporation where such shareholder owns less than 50% of the voting stock of the corporation immediately following the redemption), or (iii) results in a "complete termination" of all of such holder's equity interest in the corporation, then the receipt of cash or property by such holder will be treated as a sale or exchange of such Senior Preferred Stock or Junior Preferred Stock, whatever the case may be, and taxed accordingly. In applying these tests, certain constructive ownership rules apply to determine stock ownership. If the redemption does not qualify for sale or exchange treatment, the holder instead will be treated as having a distribution on such stock (in an amount that generally will be equal to the amount of cash and fair market value of property

received in the redemption) with the general consequences described above in <u>Section 11.5(A)</u> "- Distributions" of this Disclosure Statement, and the holder's basis in the stock redeemed will shift to the other shares actually owned by such holder. If the holder does not retain any actual stock ownership in the company following such redemption, the holder may lose its tax basis completely. If such distribution is taxable as a dividend to a corporate shareholder, it may be subject to the "extraordinary dividend" provisions of the Tax Code.

As discussed above in <u>Section 11.3(F)</u> "- Bad Debt or Worthless Securities Deduction" of this Disclosure Statement, in the case of any exchange of Prepetition Notes that qualifies as a recapitalization for U.S. federal income tax consequences, the Tax Code indicates that any accrued market discount in respect of such Prepetition Notes in excess of the gain realized in the exchange should not be currently includible in income. However, such accrued market discount would carry over to any non-recognition property received in exchange therefor (presumably in accordance with the relative fair market values of such property), such that any gain recognized by the holder upon a subsequent disposition of the stock should be treated as ordinary income to the extent of any carryover of accrued market discount to the stock not previously included in income. To date, specific Regulations implementing this rule have not been issued.

In addition, any gain recognized by the holder upon a subsequent taxable disposition of the New Stock received in respect of its Allowed Prepetition Notes Claim (or any stock or property received for such New Stock in a later tax-free exchange) would be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any bad debt deductions (or additions to a bad debt reserve) claimed with respect to the Allowed Prepetition Notes Claim for which the New Stock was received and any ordinary loss deductions incurred upon satisfaction of the Allowed Prepetition Notes Claim, less any income (other than interest income) recognized by the holder upon satisfaction of the Allowed Prepetition Notes Claim, and (ii) with respect to a cash basis holder, also any amounts that would have been included in its gross income if the holder's Allowed Prepetition Notes Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

## 11.6   Information Reporting and Backup Withholding.

Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting by the Debtor to the IRS. Moreover, such reportable payments may be subject to backup withholding (currently at a rate of 28%) under certain circumstances. Backup withholding is not an additional tax. Rather, amounts withheld under the backup withholding rules may be credited against a holder's federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally a U.S. federal income tax return). The Debtor intends to comply with all applicable reporting withholding requirements of the Tax Code.

Holders should consult their tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

The Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. Holders should consult their tax advisors regarding these Regulations and whether the exchanges contemplated by the Plan would be subject to these Regulations and require disclosure on the holders' tax returns.

**11.7    Importance of Obtaining Professional Tax Assistance.**

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## ARTICLE XII

## REQUIREMENTS FOR CONFIRMATION

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11, including, among other things, that (a) the Debtor's prepetition solicitation of votes complies with the requirements of Bankruptcy Rule 3018(b), (b) the Plan was transmitted to substantially all creditors and equity holders in the same class, (c) the solicitation was in compliance with Section 1126(b) of the Bankruptcy Code, (d) the Debtor did not prescribe an "unreasonably short" time for creditors and equity holders to accept or reject the Plan, (e) the Plan properly classifies Claims and Interests, (f) the Plan complies with applicable provisions of the Bankruptcy Code, (g) the Debtor has complied with applicable provisions of the Bankruptcy Code, (h) the Debtor has proposed the Plan in good faith and not by any means forbidden by law, (i) disclosure of "adequate information" as required by Section 1125 of the Bankruptcy Code has been made, (j) the Plan has been accepted by the requisite votes of creditors (except to the extent that "cramdown" is exercised under Section 1129(b) of the Bankruptcy Code), (k) the Plan is in the "best interests" of all holders of Claims or Interests in each Impaired Class, (l) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date, and (m) the Plan provides for the continuation after the Effective Date of all retiree benefits, as defined in Section 1114 of the Bankruptcy Code, at the level established at any time before Confirmation in accordance with Sections 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, for the duration of the period that the Debtor has obligated itself to provide such benefits.

**12.1    Solicitation and Voting Requirements.**

Bankruptcy Rule 3018(b) requires that the same reorganization plan be transmitted to substantially all creditors and equity holders in the same class.  The Debtor caused the Plan, Disclosure Statement, and Ballot to be transmitted to each holder of Prepetition Notes Claims. Bankruptcy Rule 3018(b) further requires that the Debtor not fix an "unreasonably short time"

for the holders of Prepetition Notes Claims to accept or reject the Plan. The Debtor ensured that all holders of Prepetition Notes Claims in Class 4 (the only Class entitled to vote to accept or reject the Plan) received the Solicitation Materials with sufficient time to respond.

Under the Bankruptcy Code, only classes of claims and interests that are "impaired" (as that term is defined in Section 1124 of the Bankruptcy Code) under a plan are entitled to vote to accept or reject the plan. A class is impaired if the plan modifies the legal, equitable or contractual rights of holders of claims or interests in the class (other than by curing defaults and reinstating debt). Under Section 1126(f) of the Bankruptcy Code, classes of claims and interests that are not impaired are conclusively presumed to have accepted the plan and are not entitled to vote on the plan. Under Section 1126(g) of the Bankruptcy Code, classes of claims and interests whose holders will not receive or retain any property under the plan are deemed to have rejected the plan and are not entitled to vote on the plan.

An impaired class of interests will have accepted a plan if such plan has been accepted by holders of such interests, other than any entity designated under Section 1126(e), that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under Section 1126(e), that have accepted or rejected such plan.

An impaired class of interests will have accepted the plan if (a) the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the allowed Interests actually voting in such class have voted to accept the plan and (b) the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the allowed claims actually voting in such class have voted to accept the plan.

The only classes that are Impaired under the Plan are Classes 4 and 8, which are comprised of the Prepetition Notes Claims (Class 4), and Interests in the Debtor (Class 8). Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan. Interests in the Debtor in Class 8 are deemed to have rejected the Plan by operation of law because they will not receive distributions under the Plan. Thus, their votes will not be solicited. The other remaining Classes are not Impaired. Thus they are deemed to have accepted the Plan, and solicitation of their votes is not required.

## 12.2   Best Interests Test.

Even if the Plan is accepted by each class of holders of Claims and Interests, the Bankruptcy Code requires a Bankruptcy Court to find that the Plan is in the "best interests" of all holders of Claims or Interests that are impaired by the Plan and that have not accepted the Plan. The "best interests" test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that (i) all members of an impaired class of claims or interests have accepted the plan or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date. As described in Section 4.3 "-Liquidation Analysis", the liquidation values in the Valuation Report demonstrate that holders of Claims in Class 4 would recover a smaller percentage on account of their Allowed Claims if the Debtor were to be liquidated than they would recover under the Plan. Further, holders of Interests in Class 8 would receive no distribution pursuant to a liquidation or under the Plan. Class 4 and Class 8 are the only Impaired Classes.

### 12.3    Confirmation Without Acceptance of All Impaired Classes - "Cramdown".

The Debtor shall request Confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) of the Bankruptcy Code, and it reserves the right to modify the Plan to the extent acceptable to the Exit Facility Lenders and to the extent Confirmation in accordance with Section 1129(b) of the Bankruptcy Code requires modification.  Under Section 1129(b) of the Bankruptcy Code, a bankruptcy court may confirm a plan over the objection of a rejecting class, if, among other things, (a) at least one impaired class of claims has accepted the plan (not counting the votes of any "insiders" as defined in the Bankruptcy Code) and (b) if the plan "does not discriminate unfairly" against and is "fair and equitable" to each rejecting class.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a rejecting impaired class is treated equally with respect to other classes of equal rank.  A plan is fair and equitable as to a class of secured claims that rejects the plan if, among other things, the plan provides (a) (i) that the holders of claims in the rejecting class retain the liens securing those claims (whether the property subject to those liens is retained by the debtor or transferred to another entity) to the extent of the allowed amount of such claims and (ii) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (b) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (a) or (c) of this paragraph; or (c) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan, if, among other things, the plan provides that (a) each holder of a claim in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of the claim; or (b) no holder of a claim or interest that is junior to the claims of the rejecting class will receive or retain under the plan any property on account of such junior claim or interest.

A plan is fair and equitable as to a class of interests that rejects the plan if the plan provides, among other things that (a) each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that no holder of an interest that is junior to the interests of such class will receive or retain under the plan any property on account of such junior interest.

As explained above, the only Impaired Class entitled to vote on the Plan is Class 4 which is comprised of holders of Prepetition Notes Claims.  Since Class 8 is deemed to have rejected the Plan, the Debtor intends to pursue "cramdown" of that Class.

Third Point and Jefferies, which hold the requisite majority in number and amount of Claims in Class 4 have entered into a Plan Support Agreement with the Debtor pursuant to which they agreed to vote to accept the Plan, subject to the terms and conditions of the Plan Support Agreement.

If Class 4 accepts the Plan, the Debtor will have at least one Impaired Class of Claims voting to accept the Plan and will seek confirmation of the Plan under the "cramdown" provision, since Class 8 is deemed, by operation of law, to have rejected the Plan.

As evidenced by the Liquidation Analysis, the treatment provided in the Plan for Class 8 Interest is fair and equitable. Under liquidation, Class 8 would not receive a distribution. Moreover, senior claims such as unsecured creditors also would not receive a distribution. The Plan provides for the cancellation of Interests, and holders of Interests in the Debtor will not receive distributions under the Plan. Accordingly, the Debtor will be able to satisfy the fair and equitable test and proceed with confirmation of the Plan.

## ARTICLE XIII

### ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes the Plan affords the best alternative for maximizing the prospects of a successful turnaround and value for all stakeholders and, therefore, is in the best interests of all constituencies. If the Plan is not confirmed, theoretical alternatives include: (a) continuation of the pending Chapter 11 Case, (b) formulation of an alternative plan or plans of reorganization, (c) a sale of the Debtor's assets under Section 363 of the Bankruptcy Code, or (d) liquidation of the Debtor under chapters 7 or 11 of the Bankruptcy Code. The Debtor does not believe that any of these theoretical going concern alternatives is viable or realistic and that the only practical alternative to prompt confirmation of the Plan is immediate liquidation under chapter 11 or chapter 7.

As explained above, the Debtor does not believe that a lengthy chapter 11 process under which a plan is developed and proposed post-petition is viable in this case given the Debtor's lack of liquidity. The Debtor's business simply will not withstand the uncertainty and doubt engendered by such a process. Moreover, administrative expenses would be far higher in a traditional, lengthy chapter 11.

While a lengthy chapter 11 is not a realistic alternative, the Debtor and its advisors did consider the possibility of a sale of their assets or other transaction under Section 363 of the Bankruptcy Code and alternative structures that theoretically would allow an infusion of cash from an outside source. However, this alternative is also not a realistic alternative given the exigencies of the Debtor's cash situation and the current economic climate and depressed asset values, and hence, is not a value-maximizing propositions at this time.

After much analysis of available alternatives and consideration of various options, the Debtor and its management concluded that the prepackaged Chapter 11 Case was the best option.

Absent prompt confirmation, the Debtor believes there is a substantial likelihood that many of the Debtor's creditors will not be paid in full. The Debtor believes that in a liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtor's Estate. The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation

and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtor's assets.

As evidenced by the liquidation analysis prepared by Grant Thornton, attached as Exhibit E to this Disclosure Statement, the holders of Claims against the Debtor will receive more under this prepackaged Chapter 11 Case than they would in a chapter 7 case. Interests will receive the same distribution under the Plan as they would under any available alternative.

THE DEBTOR THEREFORE BELIEVES THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER BENEFITS TO HOLDERS OF CLAIMS THAN WOULD ANY OTHER ALTERNATIVE AND THAT IT SHOULD BE CONFIRMED PROMPTLY.

## ARTICLE XIV

## OTHER MATTERS

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any exhibits to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rules 3017(d)), please contact the counsel for the Debtor.

[Remainder of Page Intentionally Blank]

## ARTICLE XV

## RECOMMENDATION AND CONCLUSION

THE DEBTOR BELIEVES THAT THE PLAN'S CONFIRMATION IS IN THE BEST INTERESTS OF THE DEBTOR, THE ESTATE, AND ITS CREDITORS.  FOR THESE REASONS, THE DEBTOR URGES ALL HOLDERS OF CLASS 4 CLAIMS TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE THEIR ACCEPTANCE BY DULY COMPLETING AND RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY THE VOTING AGENT ON OR BEFORE AUGUST 19, 2009.

**DATED**:  July 21, 2009.

BASELINE OIL & GAS CORP.

By: _____

Thomas R. Kaetzer, Chairman,
President and Chief Executive Officer

*EXHIBIT A*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO.** _____ |
| | § | |
| **BASELINE OIL & GAS CORP.,** | § | |
| | § | |
| **Debtor.** | § | **(Chapter 11)** |
| | § | |
| | § | |

---

# PREPACKAGED PLAN OF REORGANIZATION
## OF BASELINE OIL & GAS CORP.
## <u>PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE</u>

RHETT G. CAMPBELL
Texas State Bar No.03714500
MILLIE A. SALL
Texas State Bar No. 01278050
**THOMPSON & KNIGHT LLP**
333 Clay Street, Suite 3300
Houston, Texas  77002
Telephone:  713.654.8111
*and*
MATTHEW S. COHEN
IRA L. HERMAN
Texas State Bar No. 24063314
**THOMPSON & KNIGHT LLP**
919 Third Avenue, 39th Floor
New York, New York  10022-3915
Telephone: 212.751.3001

ATTORNEYS FOR BASELINE OIL & GAS CORP.

**DATED:** [August ___,] 2009.

**TABLE OF CONTENTS**

ARTICLE I DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF
        TIME.................................................................................................................... 4

    A.    Scope of Definitions; Rules of Construction ........................................................ 4

    B.    Definitions............................................................................................................ 4

    C.    Rules of Interpretation ...................................................................................... 11

    D.    Computation of Time......................................................................................... 12

ARTICLE II CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS....... 12

    A.    Classification...................................................................................................... 12

    B.    Classes and Treatment of Claims and Interests Therein ...................................... 12

    C.    Aggregation........................................................................................................ 14

    D.    Alternative Treatment........................................................................................ 14

ARTICLE III MEANS FOR IMPLEMENTATION OF THE PLAN.......................................... 15

    A.    Exit Facility........................................................................................................ 15

    B.    Satisfaction of Allowed Claims ......................................................................... 17

    C.    Cancellation of Interests; Issuance of New Common Stock................................ 17

    D.    Restructuring Transactions ................................................................................ 17

    E.    Continued Corporate Existence; Certificates of Incorporation and By-laws....... 18

    F.    Authority ............................................................................................................ 19

    G.    Substantial Consummation ................................................................................ 20

    H.    Cancellation of Instruments and Agreements ..................................................... 20

    I.    Directors and Officers........................................................................................ 20

    J.    Releases.............................................................................................................. 20

    K.    Certain Retained Causes of Action..................................................................... 21

    L.    Exemption from Certain Transfer Taxes ............................................................ 21

    M.    Assignment of Litigation Claims. ...................................................................... 21

ARTICLE IV PROVISIONS GOVERNING DISTRIBUTIONS .............................................. 21

    A.    Delivery of Distributions; Undeliverable or Unclaimed Distributions................ 21

    B.    Withholding and Reporting Requirements .......................................................... 22

    C.    Setoffs ................................................................................................................ 23

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES23

    A.    Assumed Contracts and Leases........................................................................... 23

**TABLE OF CONTENTS**
(continued)

Page

B.    Payments Related to Assumption of Contracts and Leases .................................. 23

C.    Compensation, Benefit, and Pension Programs .................................................. 23

D.    Indemnification Obligations ............................................................................. 24

E.    Treatment of Change of Control Provisions ...................................................... 24

ARTICLE VI ACCEPTANCE OR REJECTION OF THE PLAN ............................................. 24

A.    Classes Entitled To Vote................................................................................... 24

B.    Acceptance by Impaired Classes ...................................................................... 24

C.    Cramdown......................................................................................................... 24

ARTICLE VII CONDITIONS PRECEDENT TO PLAN'S CONFIRMATION AND
EFFECTIVE DATE.............................................................................................. 25

A.    Conditions Precedent to Confirmation.............................................................. 25

B.    Conditions Precedent to Effective Date............................................................ 25

C.    Waiver of Conditions........................................................................................ 26

ARTICLE VIII MODIFICATION; WITHDRAWAL ............................................................... 26

ARTICLE IX RETENTION OF JURISDICTION..................................................................... 26

ARTICLE X EFFECTS OF CONFIRMATION ........................................................................ 27

A.    Binding Effect and Discharge of the Debtor..................................................... 27

B.    Vesting.............................................................................................................. 28

C.    Release, Exculpation And Limitation Of Liability ........................................... 28

D.    Good Faith ........................................................................................................ 28

E.    Injunction ......................................................................................................... 29

ARTICLE XI MISCELLANEOUS PROVISIONS.................................................................... 29

A.    Objections to Claims......................................................................................... 29

B.    Payment of Statutory Fees ............................................................................... 29

C.    Severability of Plan Provisions......................................................................... 29

D.    Headings ........................................................................................................... 30

E.    Successors and Assigns..................................................................................... 30

F.    Term of Injunctions or Stays............................................................................ 30

G.    Notices to Debtor .............................................................................................. 30

H.    Governing Law ................................................................................................. 31

## INTRODUCTION

Baseline Oil & Gas Corp., a Nevada corporation ("Baseline"), proposes this prepackaged reorganization plan ("Plan") pursuant to Chapter 11 of Title 11 of the United States Code. Reference hereby is made to the Disclosure Statement (as defined hereafter) distributed with this Plan, which provides information concerning the history, business, properties, assets, liabilities and claims of Baseline. Additionally, the Disclosure Statement describes (a) the treatment of claims and interests under the Plan, including a description of the securities to be issued thereunder in satisfaction of certain claims, and (b) certain matters relating to confirmation of the Plan. **YOU ARE URGED TO READ THE DISCLOSURE STATEMENT WITH CARE IN EVALUATING HOW THIS PLAN WILL AFFECT YOUR CLAIM(S) AND TO CONSULT WITH COUNSEL OF YOUR CHOICE.**

## ARTICLE I

### DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

**A.    Scope of Definitions; Rules of Construction**

1.1    Capitalized terms not otherwise defined in this Plan shall have the respective meanings ascribed to them in this Article I. Any capitalized term used herein, but not defined, shall have the meaning ascribed in the Bankruptcy Code or the Bankruptcy Rules. Definitions shall apply to the plural as well as the singular number.

**B.    Definitions**

1.2    "Administrative Claim" means a Claim for payment of an administrative expense of a kind specified in sections 503(b) and 1114(e)(2) and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including (a) actual, necessary costs and expenses of preserving property of the Estate, including operational expenses, wages, salaries, or commissions for services rendered, and (b) all fees and charges assessed against the Estate under chapter 123 of title 28, United States Code.

1.3    "Allowance Date" means the later of (a) the Effective Date and (b) the date a claim becomes an Allowed Claim.

1.4    "Allowed" means (a) any Claim (other than an Administrative Claim) (i) that has been allowed by a Final Order, (ii) that is listed in the Debtor's Schedules as liquidated, non-contingent, undisputed in an amount greater than zero, as the same may from time to time be amended in accordance with the Bankruptcy Code, Bankruptcy Rules or order of the Bankruptcy Court, (iii) that is the subject of a timely filed proof of claim as to which either no objection to its allowance has been filed (either by way of objection or amendment to the Schedules) within the periods fixed by the Bankruptcy Code or by any order of the Bankruptcy Court, or (iv) that is expressly allowed in a liquidated amount in the Plan; and (b) any Administrative Claim as to which a timely request for payment has been made in accordance with this Plan (if such written request is required) that has been allowed by a

Final Order; and (c) any Interest that, as of the Petition Date, appears of record in the equity register maintained by or on behalf of a Debtor.

1.5 "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, as now in effect or hereafter amended.

1.6 "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

1.7 "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, and the Federal Rules of Civil Procedure and the local rules of the Bankruptcy Court, as applicable to Chapter 11 cases or proceedings therein, together with all amendments and modifications thereto.

1.8 "Bar Date" means the last day for filing all proofs of claim in this Chapter 11 Case.

1.9 "Baseline" shall have the meaning set forth in the Introduction to this Plan, page 1 above.

1.10 "Board" means the Board of Directors of the Reorganized Debtor.

1.11 "Business Day" means any day, excluding Saturdays, Sundays or "legal holidays" (as defined in Fed. R. Bankr. P. 9006(a)), on which commercial banks are open for business in New York, New York.

1.12 "Cash" means legal tender of the United States.

1.13 "Causes of Action" means all rights, claims, causes of action, defenses, debts, demands, damages, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

1.14 "Certificate of Incorporation" has the meaning set forth in Article III, Section E.3.10.

1.15 "Chapter 11 Case" means the Chapter 11 case of the Debtor.

1.16 "Claim" means a claim within the meaning of section 101(5) of the Bankruptcy Code.

1.17 "Class" means a class of Claims or Interests listed in the Plan.

1.18 "Collateral" means any property or interest in property of the Estate subject to a Lien to secure the payment or performance of a Claim.

1.19 "Collateral Agent" means The Bank of New York Mellon Trust Company, N.A., as collateral agent under each of the New Notes Indentures.

5

1.20    "Collateral Documents" means the agreements, documents, and filings related to the Security Agreements creating liens in favor of the Collateral Agent.

1.21    "Confirmation" means the entry by the Bankruptcy Court of the Confirmation Order.

1.22    "Confirmation Date" means the date the clerk of the Bankruptcy Court enters the Confirmation Order.

1.23    "Confirmation Hearing" means the hearing to consider confirmation of the Plan under section 1128 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.24    "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

1.25    "Cure" means the payment of Cash by the Debtor, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to cure defaults under an executory contract or unexpired lease of the Debtor that permits such Debtor to assume that contract or unexpired lease under section 365(a) of the Bankruptcy Code.

1.26    "Debtor" means Baseline, as debtor and debtor-in-possession, under sections 1107 and 1108 of the Bankruptcy Code.

1.27    "Disclosure Statement" means the written disclosure statement relating to the Plan, as amended, supplemented or modified from time to time, distributed in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3018.

1.28    "Distribution Date" means the later of the Effective Date and the Allowance Date.

1.29    "Effective Date" means the first Business Day on which (a) all conditions to the Plan's confirmation in Article VII, Section B of the Plan have been satisfied or waived and (b) either (i) the Confirmation Order is a Final Order, or (ii) any date after the entry of the Confirmation Order, provided that no stay is then in effect, unless the Debtor agrees otherwise.

1.30    "Estate" means the Debtor's property wherever located and by whomever held, as provided under section 541 of the Bankruptcy Code.

1.31    "Exit Facility" means the new notes in an aggregate principal amount of $30 million represented by (a) $5 million in aggregate principal amount of the New Series A 20% Senior Secured Notes issued by the Reorganized Debtor to the Exit Facility Lenders in exchange for the New Cash Advance and (b) $25 million in aggregate principal amount of the New Series B 20% Senior Secured Notes issued by the Reorganized Debtor to the Exit Facility Lenders in exchange for rolling forward $25 million of the Prepetition Notes held by the Exit Facility Lenders.

1.32   "Exit Facility Lenders" means those Prepetition Noteholders and/or their affiliates or related parties participating in the Exit Facility, as evidenced by their affirmative election on the ballot provided herewith and timely returned as provided herein.

1.33   "Final Order" means (a) an order or judgment of the Bankruptcy Court (i) as to which the time to appeal, petition for certiorari, or file a motion for reargument or rehearing has expired, and (ii) as to which no appeal, petition for certiorari, or motion for reargument or rehearing shall then be pending, or (b) in the event an appeal, petition for certiorari, or motion for reargument or rehearing has been sought, such order of the Bankruptcy Court shall have been (i) affirmed by the highest court to which such order was appealed or from which reargument or rehearing was sought, or certiorari has been denied, and (ii) the time to take any further appeal, petition for certiorari or other proceedings for reargument or rehearing shall have expired; provided, however, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or a motion under section 1144 of the Bankruptcy Code may be filed with respect to such order.

1.34   "Findings and Conclusions" means the findings and conclusions entered by the Bankruptcy Court pursuant to Bankruptcy Rule 7052 in relation to the Confirmation Order.

1.35   "General Unsecured Claim" means any Claim against the Debtor that is neither secured by a Lien nor entitled to priority under the Bankruptcy Code or any order of the Court, including, without limitation, any Claim arising from the rejection of an executory contract or unexpired lease under section 365 of the Bankruptcy Code.

1.36   "Impaired" means any Claim impaired within the meaning of section 1124 of the Bankruptcy Code.

1.37   "Indenture Trustee" means The Bank of New York Mellon Trust Company, N.A., as indenture trustee under each of the New Notes Indentures.

1.38   "Intercreditor Agreement" means the Intercreditor Agreement to be entered into between the Reorganized Debtor and The Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent, dated as of [_____, 2009]

1.39   "Interest" means the legal, equitable, contractual and other rights of any Person with respect to any shares in the Debtor or any other right thereto (or relating thereto), including, but not limited to, common stock, preferred stock, stock options and warrants.

1.40   "Jefferies" means Jefferies & Company, Inc., a Delaware corporation, and Jefferies High Yield Trading, LLC, a Delaware limited liability corporation.

1.41   "Junior Preferred Stock" means the 18% Series B Redeemable Preferred Stock in the aggregate liquidation preference of $5 million, with a liquidation preference of $1,000 per share, to be issued by the Reorganized Debtor.

1.42    "Lien" has the meaning ascribed to such term in section 101(37) of the Bankruptcy Code.

1.43    "Make-Up Common Shares" has the meaning set forth in clause (c)(i) under the heading "Class 4" in Article II, Section B.

1.44    "New Cash Advance" means the $5 million to be advanced by the Exit Facility Lenders to the Reorganized Debtor as part of the Exit Facility in exchange for the New Series A 20% Senior Secured Notes.  The New Cash Advance will provide funding for the Debtor post-Effective Date.

1.45    "New Common Stock" means the 1 million shares of common stock to be issued by the Reorganized Debtor to the Prepetition Noteholders.

1.46    "New Notes" means, collectively, the New 10% Subordinated Secured Notes and the New 20% Senior Secured Notes.

1.47    "New Notes Indentures" means the Series A Senior Notes Indenture, in the case of the New Series A 20% Senior Secured Notes; the Series B Senior Notes Indenture, in the case of the New Series B 20% Senior Secured Notes; and the Subordinated Notes Indenture, in the case of the New 10% Subordinated Secured Notes; in each case to be entered into between the Reorganized Debtor and The Bank of New York Mellon Trust Company, N.A., as Indenture Trustee and Collateral Agent, dated as of [_____, 2009].

1.48    "New Stock" means, collectively, the Senior Preferred Stock, the Junior Preferred Stock and/or the New Common Stock of the Reorganized Debtor to be issued to the Exit Facility Lenders and/or the Prepetition Noteholders pursuant to the Plan.

1.49    "New Series A 20% Senior Secured Notes" means the Series A 20% Senior Secured PIK Notes due 2014 in the aggregate principal amount of $5 million, maturing on the 5th anniversary of their issuance and secured by a <u>first</u> priority Lien on substantially all of the assets of the Reorganized Debtor.

1.50    "New Series B 20% Senior Secured Notes" means the Series B 20% Senior Secured PIK Notes due 2014 in the aggregate principal amount of $25 million, maturing on the 5th anniversary of their issuance and secured by a <u>second</u> priority Lien on substantially all of the assets of the Reorganized Debtor.

1.51    "New 10% Subordinated Secured Notes" means the 10% Senior Subordinated PIK Notes in the aggregate principal amount of $10 million, maturing on the 7th anniversary of their issuance, subordinated in right of payment to the New 20% Senior Secured Notes and secured by a <u>third</u> priority Lien on substantially all of the assets of the Reorganized Debtor.

1.52    "New 20% Senior Secured Notes" means, collectively, the New Series A 20% Senior Secured Notes and the New Series B 20% Senior Secured Notes.

1.53    "Other Priority Claim" means a Claim entitled to priority under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

1.54    "Other Secured Claims" means all Secured Claims against the Debtor other than the Prepetition Notes Claims.

1.55    "Pay Status" as to Royalty Claims means the owner of the Royalty Claim (a) whose identity is known; (b) as to which no portion of the Royalty Claim is subject to a dispute; and (c) whose properly executed documents of title, including division orders, require the operator to pay such Royalty Claim in accordance with applicable nonbankruptcy law. To the extent the ownership of a Royalty Claim is subject to a dispute or is the subject of pending litigation, the Royalty Claim is not in Pay Status.

1.56    "Person" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, or other entity.

1.57    "Petition Date" means the date on which the Debtor filed its petition for relief commencing the Chapter 11 Case.

1.58    "Plan Supplement" means the organizational, corporate, and financing documents that shall be entered into by the Reorganized Debtor to give effect to the Restructuring Transactions.

1.59    "Plan Support Agreement" means the Plan Support and Lock-Up Agreement, dated as of July 17, 2009, among Baseline and each of Jefferies & Company, Inc., Jefferies High Yield Trading, LLC, Third Point, LLC, Third Point Offshore Master Fund, L.P. and Third Point Ultra Master Fund L.P.

1.60    "Prepetition Noteholder" means any Person who owns 15% Prepetition Notes and/or 12½% Prepetition Notes issued by the Debtor.

1.61    "Prepetition Notes" means, collectively, the 15% Prepetition Notes and the 12½% Prepetition Notes.

1.62    "Prepetition Notes Claims" means the Claims attributable to the holders of the outstanding Prepetition Notes.

1.63    "Priority Tax Claim" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.64    "Pro Rata" means, at any time, the proportion that the principal amount of a Claim (and with regard to a Secured Claim accrued interest through the Petition Date) in a particular Class bears to the aggregate principal amount of all Claims or Interests in that Class or Interest, calculated as of the Petition Date.

1.65    "Purchase Agreement" means the Purchase Agreement to be entered into among the Reorganized Debtor and the Purchasers named therein dated as of [_____, 2009].

1.66    "Reorganized Debtor" means Baseline as reorganized and reincorporated in Delaware, as described in Article III, Section E. of this Plan from and after the Effective Date.

1.67    "Restructuring Transactions" has the meaning set forth in Article III, Section D.

1.68    "Retained Plans" means the employee compensation and benefit plans, if any, of the Debtor subject to sections 1114 and 1129(a) of the Bankruptcy Code that are in existence as of the Petition Date, in each case only to the extent set forth on a schedule included in the Plan Supplement.

1.69    "Royalty" means a cost-free share of production from the oil, gas and mineral estate measured by production and/or sale of minerals from the oil, gas and/or mineral leases owned by Baseline.

1.70    "Royalty Claimant" means a Person with a Royalty Claim.

1.71    "Royalty Claim" means a claim for Royalty arising from the production or sale of oil, gas and/or minerals from oil, gas and/or mineral leases owned by Baseline.

1.72    "Secured Claim" means any Claim, including principal, interest, fees and expenses as determined pursuant to section 506(b) of the Bankruptcy Code, against the Debtor (a) secured, in whole or in part as of the Petition Date, by a Lien on the assets or property of the Debtor, which Lien is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, but only to the extent of the value of the assets or property securing any such Claims, or (b) subject to setoff under section 553 of the Bankruptcy Code, but only the extent of the amount subject to such setoff.

1.73    "Security Agreements" means, as such terms are defined in the Disclosure Statement, the First Lien Security Agreement, in the case of the New Series A 20% Senior Secured Notes; the Second Lien Security Agreement, in the case of the New Series B 20% Senior Secured Notes; and the Third Lien Security Agreement, in the case of the New 10% Subordinated Secured Notes; in each case, to be entered into between the Reorganized Debtor and The Bank of New York Mellon Trust Company, N.A., as Collateral Agent, dated as of [_____, 2009]

1.74    "Senior Preferred Stock" means the 18% Series A Redeemable Preferred Stock in the aggregate liquidation preference of $25 million, with a liquidation preference of $1,000 per share, to be issued by the Reorganized Debtor.

1.75    "Stockholders Agreement" has the meaning set forth in Article III, Section E.3.11.

1.76    "Third Point" means Third Point, LLC, a Delaware limited liability company; Third Point Offshore Master Fund, L.P., a Cayman Islands limited partnership; and Third Point Ultra Master Fund, L.P., a Cayman Islands limited partnership.

1.77    "12½% Noteholders" means the holders of 12½% Prepetition Notes.

1.78    "12½% Prepetition Notes" means the 12½% Senior Secured Notes Due 2012 in the aggregate principal amount of $115,000,000.00, of which $15 million in principal is currently outstanding, which notes were issued pursuant to an Indenture dated October 1, 2007, as amended and restated on October 30, 2008, between Baseline and The Bank of New York Mellon Trust Company, N.A., as Indenture Trustee and Collateral Agent.

1.79    "15% Noteholders" means the holders of 15% Prepetition Notes.

1.80    "15% Prepetition Notes" means the 15% Senior Secured PIK Notes due 2009 in the aggregate principal amount of $106,681,250.00, all of which is currently outstanding, which notes were issued pursuant to an Indenture dated October 1, 2007, as amended and restated on October 30, 2008, between Baseline and The Bank of New York Mellon Trust Company, N.A., as Indenture Trustee and Collateral Agent.

## C.    Rules of Interpretation

1.81    General

In this Plan (a) any reference to a contract, instrument, release, or other agreement or document as being in a particular form or on particular terms and conditions means the agreement or document substantially in that form or on those terms and conditions, (b) any reference to an existing document or exhibit means that document or exhibit as it may have been or may be amended, modified, or supplemented, (c) unless otherwise specified, all references to Sections, Articles, Schedules, and Exhibits are references to Sections, Articles, Schedules, and Exhibits of or to the Plan, (d) the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan, (e) captions and headings to Articles and Sections are for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan, and (f) the rules of construction in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

1.82    "Including"

As used in this Plan, "including" means "including without limitation."

1.83    "On"

With reference to any distribution under this Plan, "on" a date means on or as soon as reasonably practicable after that date.

1.84    "*Contra Proferentum*" Rule Not Applicable

This Plan is the product of extensive discussions and negotiations between and among, *inter alia*, Baseline, certain holders of Interests, Third Point and Jefferies. Each of the foregoing was represented by counsel who either participated in the formulation and documentation of, or was afforded the opportunity to review and provide comments on, the Plan, the Disclosure Statement, and the documents ancillary thereto. Accordingly, the general rule of contract

construction known as "*contra proferentum*" shall not apply to the interpretation of any provision of this Plan, the Disclosure Statement, or any agreement or document generated in connection herewith.

**D.     Computation of Time**

      1.85    In computing any period of time prescribed or allowed by the Plan, Bankruptcy Rule 9006(a) shall apply.

**ARTICLE II**

**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

**A.     Classification**

      2.1    The Plan classifies all Claims and Interests into the Classes listed in section B below.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and is classified in other Classes to the extent that any portion thereof qualifies within the description of a different Class. Claims against or Interests in the Debtor are grouped in accordance with section 1122(a) of the Bankruptcy Code.

**B.     Classes and Treatment of Claims and Interests Therein**

      2.2    <u>Class 1</u>.    Administrative Claims.  Class 1 Claims are not Impaired.  Each holder of an Allowed Administrative Claim shall be paid in full, in Cash, as soon as practicable on the later of (a) the Effective Date and (b) the date on which such Administrative Claim becomes an Allowed Claim payable under applicable law or any agreement relating thereto. Class 1 is deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

      2.3    <u>Class 2</u>.    Priority Tax Claims.  Class 2 Claims are not Impaired.  Each holder of an Allowed Priority Tax Claim shall be paid in full, in Cash, as soon as practicable on the later of (a) the Effective Date and (b) the date on which such Priority Tax Claim becomes an Allowed Claim payable under applicable law or any agreement relating thereto. Class 2 is deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

      2.4    <u>Class 3</u>.    Other Priority Claims.  Class 3 Claims are not Impaired.  Class 3 shall include all Priority Claims not included in Class 1, 2, 4, 5 or 6.  Each holder of an Allowed Class 3 Claim shall be paid in full, in Cash, as soon as practicable on the later of (a) the Effective Date and (b) the date on which such Other Priority Claim becomes an Allowed Claim payable under applicable law or any agreement relating thereto.  Class 3 is deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

      2.5    <u>Class 4</u>.    Prepetition Notes Claims.  Class 4 Claims are Impaired.  Each holder of an Allowed Prepetition Notes Claim shall be entitled to receive the securities listed

A- 12

below as soon as practicable on the later of (x) the Effective Date and (y) the date on which such Prepetition Notes Claim becomes an Allowed Claim payable under applicable law or any agreement relating thereto. Class 4 is entitled to vote to accept or reject the Plan.

(a)     New 10% Subordinated Secured Notes. These notes will be allocated among the Prepetition Noteholders in proportion to the aggregate principal amount of Prepetition Notes held by the Prepetition Noteholders; provided, however, that for purposes of this allocation calculation, the principal amount of Prepetition Notes rolled forward pursuant to the Exit Facility shall be excluded.

(b)     Junior Preferred Stock. These shares will be allocated among the Prepetition Noteholders in proportion to the aggregate principal amount of Prepetition Notes held by the Prepetition Noteholders. For the avoidance of doubt, this allocation calculation will include the principal amount of Prepetition Notes rolled forward pursuant to the Exit Facility.

(c)     New Common Stock. A total of 1 million shares of New Common Stock will be issued to the holders of Allowed Prepetition Notes Claims. These shares will be allocated as follows:

(i)     Any holder of Allowed Prepetition Notes Claims who does not elect to participate in the Exit Facility described in Article III below will receive, in addition to the shares described in clause (ii) below, a number of shares of New Common Stock equal to (x) the aggregate liquidation preference of the Senior Preferred Stock that such holder would have received if it had participated in the Exit Facility, divided by (y) $10.00 per share (all such shares issued to holders of Allowed Prepetition Notes Claims, the "Make-Up Common Shares"); and

(ii)     All remaining shares of New Common Stock (i.e., after giving effect to the issuance of the Make-Up Common Shares pursuant to clause (c)(i) above) will be issued to all holders of Allowed Prepetition Notes Claims in proportion to their respective aggregate principal amount of Prepetition Notes held by them, including, for purposes of this allocation calculation, the aggregate amount of Prepetition Notes rolled forward; provided, however, that any Prepetition Noteholders that do not participate in the Exit Facility will be entitled to additional shares of New Common Stock equal in the aggregate to 2.22% of the total number of shares of New Common Stock to be issued pursuant to this clause (c)(ii), which shares will be allocated in proportion to the principal amount of Prepetition Notes held by such Prepetition Noteholders; provided further, that holders who participate in the Exit Facility will share in the dilution caused by this additional allocation pro rata based upon the respective principal amounts of Prepetition Notes held by them.

(d)     In addition to the above-described securities, the Prepetition Noteholders who participate in the Exit Facility in accordance with Article III below, as further consideration, shall roll forward their pro rata share, based on the amount of New Cash Advance contributed by such Prepetition Noteholder, of the $25 million in aggregate

A-13

principal amount of Prepetition Notes being rolled forward pursuant to this Plan, which roll forward shall be allocated as set forth in Article III below.

2.6    Class 5.    Royalty Claims. Class 5 Claims are not Impaired. Each holder of an Allowed Class 5 Claim shall be paid in full, in Cash, as soon as practicable on the later of (a) the Effective Date and (b) the date when such Royalty Claim (i) becomes an Allowed Claim payable under applicable law or any agreement relating thereto and (ii) is in Pay Status. Class 5 is deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

2.7    Class 6.    Other Secured Claims. Class 6 Claims are not Impaired. Class 6 shall include all Secured Claims other than Class 4 and Class 5 Claims. Each holder of an Allowed Class 6 Claim shall be paid in full, in Cash, as soon as practicable on the later of (a) the Effective Date and (b) the date on which such Other Secured Claim becomes an Allowed Claim payable under applicable law or any agreement relating thereto. Class 6 is deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

2.8    Class 7.    General Unsecured Claims. Class 7 Claims are not Impaired. Each holder of an Allowed Class 7 Claim shall be paid in full, in Cash, as soon as practicable on the later of (a) the Effective Date and (b) the date on which such General Unsecured Claim becomes an Allowed Claim payable under applicable law or any agreement relating thereto. Class 7 is deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the plan.

2.9    Class 8.    Interests. Class 8 holders are Impaired. Interests in the Debtor shall be cancelled and annulled on the Effective Date. As the Interest holders shall not receive distributions under the Plan, Class 8 is deemed to have rejected the Plan by operation of law and is not entitled to vote to accept or reject the Plan.

## C.    Aggregation

If a Person has more than one Claim in the same Class, such Claims shall be aggregated and treated as a single Claim. If a Person has Claims in different Classes, such claims shall be aggregated only within the same Class and not between Classes.

## D.    Alternative Treatment

Notwithstanding any provision herein to the contrary, any holder of an Allowed Claim may receive, instead of the distribution or treatment to which it is entitled hereunder, any other lesser distribution or treatment to which it and the Debtor may agree in writing.

# ARTICLE III

# MEANS FOR IMPLEMENTATION OF THE PLAN

## A.    Exit Facility

3.1    All Prepetition Noteholders will have the option, but not the obligation, to participate in the Exit Facility. The election to participate in the Exit Facility shall be exercised by the Prepetition Noteholders prior to the Petition Date as part of the solicitation of acceptances or rejection of this Plan. The election to participate in the Exit Facility shall be made on the ballot provided, shall be signed by the Prepetition Noteholder and shall be submitted in accordance with the instructions provided in the ballot. Each written election by a Prepetition Noteholder to participate in the Exit Facility (a) shall set forth the maximum amount of Cash that such Prepetition Noteholder is willing to contribute in connection with the New Cash Advance, and (b) shall be the binding commitment of such Prepetition Noteholder to provide such Cash contribution.

Notwithstanding anything in a ballot to the contrary, if two affiliates (as defined in Section 101(2) of the Bankruptcy Code) are Prepetition Noteholders and one affiliate fails to, or chooses not to, participate in the Exit Facility, the other affiliate will have the right, before any other Prepetition Noteholders, to increase such other affiliate's participation in the Exit Facility in an amount up to such non-participating affiliate's *pro rata* share of the Exit Facility, based on the aggregate principal amount of Prepetition Notes held by such non-participating affiliate.

The Debtor has commitments under the Plan Support Agreement from Third Point and Jefferies to participate in the Exit Facility, subject to the terms and conditions of the Plan Support Agreement, in order to enable the Debtor to consummate the Plan and emerge from Chapter 11 as a reorganized entity.

3.2    The Exit Facility Lenders will (a) provide the New Cash Advance in exchange for $5 million in aggregate principal amount of the New Series A 20% Senior Secured Notes and (b) roll forward $25 million in aggregate principal amount of Prepetition Notes in exchange for $25 million of New Series B 20% Senior Secured Notes. Allocation of the Exit Facility among the Exit Facility Lenders shall be as follows:

(a)    New Cash Advance. If the aggregate amount of Cash that the Exit Facility Lenders have committed to contribute is greater than the amount of the New Cash Advance, the Cash to be contributed to the New Cash Advance will be allocated among such Exit Facility Lenders in proportion to their respective *pro rata* share of outstanding principal of Prepetition Notes; provided, however, that if any such Exit Facility Lender commits to contribute less than its *pro rata* share of the New Cash Advance, all other Exit Facility Lenders shall have the right to contribute additional amounts of Cash to make up the shortfall, which additional Cash contribution shall be allocated among such other Exit Facility Lenders in proportion to their respective *pro rata* share of outstanding principal of Prepetition Notes. If any portion of the New Cash Advance remains unallocated after the allocation described in the immediately preceding sentence, then the remaining portion will be allocated in proportion to the unallocated portion of the

commitments made by the Exit Facility Lenders.

(b)     Roll Forward of Prepetition Notes.  As part of the aggregate $25 million in Prepetition Notes to be rolled forward in the Exit Facility (which will be accomplished by exchanging such Prepetition Notes for the securities described in sections 3.3(b) and 3.3(c) below), the Exit Facility Lenders shall be entitled to roll forward a portion of the outstanding principal amount of their respective Prepetition Notes equal to product of (i) $25 million multiplied by (ii) their respective *pro rata* share of the New Cash Advance.

3.3     In exchange for participation in the Exit Facility, each Exit Facility Lender shall receive:

(a)     New Series A 20% Senior Secured Notes with a principal amount equal to the amount of Cash contributed by such Exit Facility Lender as part of the of the New Cash Advance;

(b)     New Series B 20% Senior Secured Notes with a principal amount equal to the aggregate principal amount of the Prepetition Notes that such Exit Facility Lender rolls forward; and

(c)     shares of Senior Preferred Stock with a liquidation preference equal to the aggregate principal amount of the Prepetition Notes that such Exit Facility Lender rolls forward.

3.4     Repayment of the New Series A 20% Senior Secured Notes will be secured by a first and senior Lien on all assets of the Reorganized Debtor, and repayment of the New Series B 20% Senior Secured Notes will be secured by a second Lien on all assets of the Reorganized Debtor.

3.5     The security interests and liens securing repayment of the Prepetition Notes shall be released and re-granted on the Effective Date (i) on a first priority basis to secure the New Series A 20% Senior Secured Notes, (ii) on a second priority basis to secure the New Series B 20% Senior Secured Notes, and (iii) on a third priority basis to secure the New 10% Subordinated Secured Notes, in each case pursuant to the Security Agreements, the Collateral Documents, and the Intercreditor Agreement.

3.6     The New Series A 20% Senior Secured Notes will be issued pursuant to that certain Series A Senior Notes Indenture, the New Series B 20% Senior Secured Notes will be issued pursuant to that certain Series B Senior Notes Indenture, and the New 10% Subordinated Secured Notes will be issued pursuant to that certain Subordinated Notes Agreement, in each case, to be entered into between the Reorganized Debtor and The Bank of New York Mellon Trust Company, N.A., as Indenture Trustee and Collateral Agent.  Each such indenture will govern the rights and obligations of the Reorganized Debtor and the holders of the applicable series of New Notes issued thereunder.

**B.**     **Satisfaction of Allowed Claims**

3.7     The holders of Allowed Claims in Classes 1 through 7 shall be satisfied in accordance with the terms of this Plan.

**C.**     **Cancellation of Interests; Issuance of New Common Stock**

3.8     All Interests of the Debtor shall be cancelled and annulled on the Effective Date. The Reorganized Debtor shall issue a total of 1 million shares of New Common Stock in a manner described in Article II, Section B.2.5 above.

**D.**     **Restructuring Transactions**

3.9     On the Effective Date, and pursuant to the Plan or the applicable Plan Supplement, the Debtor or Reorganized Debtor shall enter into the restructuring transactions contemplated herein (the "Restructuring Transactions"), and shall take any actions as may be reasonably necessary or appropriate to effect a restructuring of its respective businesses or the overall organizational structure of the Reorganized Debtor. The actions to be taken by the Debtor and Reorganized Debtor to effect the Restructuring Transactions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition or transfer containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation or reincorporation, including the Certificate of Incorporation and the Certificate of Designations, limited partnership, or formation, merger or consolidation pursuant to applicable state law; and (d) all other actions determined to be reasonably necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions. The Plan Supplement evidencing the Restructuring Transactions shall be filed with the Bankruptcy Court within five (5) Business Days before the Confirmation Hearing. The chairman of the board of directors, president, chief executive officer, chief financial officer, any executive vice president or senior vice president, or any other appropriate officer, manager or managing partner of each of Debtor or Reorganized Debtor, as appropriate, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, the New Notes Indentures, the Collateral Documents, the Security Agreements, the Intercreditor Agreement, the Certificate of Designations and other agreements or documents, and take such other actions, as may be reasonably necessary or appropriate, to effectuate and further evidence the terms and conditions of this Plan. The secretary or assistant secretary of Debtor or Reorganized Debtor, as appropriate, shall be authorized to certify or attest to any of the foregoing actions.

**E.     Continued Corporate Existence; Certificates of Incorporation and By-laws**

3.10    The Reorganized Debtor shall continue to exist as a separate legal entity, and shall be reincorporated under the laws of the State of Delaware.  On the Effective Date, the Reorganized Debtor will file the Certificate of Incorporation in substantially the form attached to the Disclosure Statement as Exhibit R with the Secretary of State of the State of Delaware (the "Certificate of Incorporation") and adopt amended and restated bylaws in substantially the form attached to the Disclosure Statement as Exhibit S.  Such Certificate of Incorporation and amended and restated bylaws shall, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities.

3.11    The Certificate of Incorporation will authorize the Reorganized Debtor to issue (a) two million (2,000,000) shares of Common Stock, par value $0.001 per share, of which the Reorganized Debtor will issue 1 million shares of New Common Stock to the Prepetition Noteholders on the Effective Date in the amounts described in Article II, Section B.2.5 above; and (b) sixty thousand (60,000) shares of Preferred Stock, par value $0.001 per share, of which 50,000 shares will be designated the Senior Preferred Stock and 10,000 shares will be designated the Junior Preferred Stock, in each case as set forth in the Certificate of Designations, of which 25,000 shares of Senior Preferred Stock and 5,000 shares of Junior Preferred Stock will be issued by the Reorganized Debtor on the Effective Date as described in Article II, Section B.2.5 and Article III, Section A.3.3.

Except as provided in the Stockholders Agreement to be entered into by the Reorganized Debtor, Third Point and Jefferies (the "Stockholders Agreement"), the holders of New Common Stock will vote as a single class, and each share New Common Stock will be entitled to one vote in all matters to be voted on by the holders of the New Common Stock.  The Stockholders Agreement provides that as long as Jefferies and Third Point each holds at least 5% of the outstanding shares of New Common Stock on a fully-diluted basis, Jefferies and Third Point will each have the right to elect one director to the Board and mutually designate a third director to the Board.

3.12    As provided in the Stockholders Agreement, the Reorganized Debtor and the holders of the New Stock party thereto will be subject to certain rights and obligations, including restrictions regarding issuance of new securities and transfer of outstanding securities, as set forth in the Stockholders Agreement, which provides in part that:

•       No stockholder party thereto may sell, assign, transfer or pledge (subject to customary exceptions) its shares of New Stock except to its majority-owned affiliates without the prior consent of Jefferies and Third Point, if not a party to the transaction and still a stockholder.

•       If Jefferies sells a majority of any class or series of its shares of New Stock to a third party, Jefferies will have the right to cause all of the other stockholders party thereto to sell, pro rata, their shares of New Stock of the same class or series to such third party on substantially the same terms and conditions.

•    If one or more stockholders sell a majority of any class or series of its or their shares of New Stock to a third party, each other stockholder will have the right to sell, *pro rata*, its shares of New Stock of the same class or series to such third party on substantially the same terms and conditions.

•    If any stockholder party thereto wishes to sell any of its shares of New Stock to a third party, such stockholder must first offer to sell such shares of New Stock to the other stockholders. If the selling stockholder accepts the offer by another stockholder offering the highest price for the selling stockholder's shares of New Stock, such other stockholder will be required to purchase the selling stockholder's shares of new Stock at the price offered by such other stockholder within the next 15 calendar days.  If the selling stockholder does not elect to accept any offers by the other stockholders or fails to accept any such offer within 30 calendar days after notifying the other stockholders of its desire to sell its shares of New Stock, the selling stockholder may sell its shares of New Stock to a third party; provided, however, that the sale to the third party must be consummated within 60 calendar days after such 30-calendar day period and at a price not less than 106% of the highest price offered by the other stockholders.

•    Without the prior written consent of Jefferies and Third Point the Reorganized Debtor may not, among other things:

> o    change its charter or bylaws;

> o    change its capital structure (e.g., authorize, issue, redeem or modify the terms of any securities of the Reorganized Debtor);

> o    except as necessary to accommodate Jefferies' and Third Point's right to designate a Board member, change the composition of the Board;

> o    change the Reorganized Debtor's line of business;

> o    incur any debt outside of the ordinary course of business;

> o    declare or pay any dividends;

> o    sell any material assets outside of the ordinary course of business; or

> o    enter into any change of control transaction.

•    The Reorganized Debtor may not issue any new equity securities without first offering each of Jefferies and Third Point the right to purchase its *pro rata* share of such new equity securities.

## F.    Authority

3.13    Until the Effective Date, the Bankruptcy Court shall retain jurisdiction of the Debtor, its assets and operations.

**G.    Substantial Consummation**

3.14    On the Effective Date, unless otherwise provided by the Confirmation Order, the following shall occur, be deemed to have occurred simultaneously, and constitute substantial consummation of the Plan: (a) new corporate documents shall be authorized, approved and effective in all respects without further action under applicable law, regulation, order, or rule, including, without express or implied limitation, any action by the stockholders or directors of the Debtor or the Reorganized Debtor; except that the new organizational documents of the Debtor shall be filed as may be appropriate with the applicable Secretary of State as soon as practicable on or after the Effective Date; (b) the Debtor's property deemed transferred to the Reorganized Debtor shall automatically vest in the Reorganized Debtor without further action on the part of the Debtor or any other Person; (c) the New Stock and the New Notes shall be authorized and issued to the Exit Facility Lenders and Prepetition Noteholders, and the related Collateral securing the New Notes shall be granted, and the related Intercreditor Agreement will be entered into, in each case as contemplated by Articles II and III hereof.

**H.    Cancellation of Instruments and Agreements**

3.15    Upon the occurrence of the Effective Date, except as otherwise provided herein or in the Confirmation Order, instruments, indentures, notes, warrants, options, share certificates, or other documents (other than any insurance policy of a Debtor) evidencing, giving rise to, or governing any Claim or Interest shall be deemed canceled and annulled without further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtor under such agreements, instruments, indentures, notes, warrants, options, share certificates, or other documents shall be discharged.

**I.    Directors and Officers**

3.16    On the Effective Date, the officers and directors of the Reorganized Debtor shall be:  President: Thomas R. Kaetzer; CFO/Secretary Patrick H. McGarey; Controller: Randal B. McDonald, Jr.; directors: Joshua L. Targoff, Thomas R. Kaetzer, and Brian Wolfe.

**J.    Releases**

3.17    On the Effective Date, except for Causes of Action arising under the Exit Facility or the Plan (a) the Exit Facility Lenders and the Prepetition Noteholders shall be deemed to forever waive, release, and discharge any and all Causes of Action against the Debtor based, whether in whole or in part, upon any act, omission, event, condition, or thing in existence or that occurred, whether in whole or in part, prior to the Effective Date of the Plan and (b) in exchange for the preceding release and the valuable consideration being provided by the Exit Facility Lenders (in the form of new money) and the Prepetition Noteholders (in the form of significant compromise and reduction of their Secured Claims), the Debtor shall be deemed to forever waive, release, and discharge any and all Causes of Action against the Exit Facility Lenders and the Prepetition Noteholders based, whether in whole or in part, upon any act, omission, event, condition, or thing in existence or that occurred, whether in whole or in part, prior to the Effective Date of the Plan.  For the purpose

of the Releases granted by this section, the Exit Facility Lenders, Prepetition Noteholders and Debtor shall include their officers, directors, employees, agents, partners, subsidiaries, affiliates, advisors, attorneys, and successors-in-interest.

**K.    Certain Retained Causes of Action**

3.18    Except as otherwise provided in this Plan or the Confirmation Order, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall receive by transfer from the Debtor and shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights or causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any Person or that arose prior to the Effective Date or that relates to a Claim. The Reorganized Debtor may pursue such retained claims, rights or causes of action, suits, or proceedings as appropriate, in accordance with the best interests of the Estate.

**L.    Exemption from Certain Transfer Taxes**

3.19    Pursuant to section 1146(a) of the Bankruptcy Code, any transfers or mortgages from or by the Debtor to the Reorganized Debtor or any other Person or entity pursuant to the Plan, including, without limitation, any filings made in connection with the Exit Facility, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**M.    Assignment of Litigation Claims.**

3.20    The Debtor will assign any Causes of Action or Claims, whether asserted or unasserted, to the Reorganized Debtor, including but not limited to, Claims and Causes of Action against officers and directors.

## ARTICLE IV

## PROVISIONS GOVERNING DISTRIBUTIONS

**A.    Delivery of Distributions; Undeliverable or Unclaimed Distributions**

4.1    Delivery of Distributions in General

The Reorganized Debtor shall make distributions to each holder of an Allowed Claim at the address reflected in the books and records of the Debtor, unless otherwise notified in writing by such holder sufficiently in advance of any distribution to allow the Debtor or Reorganized Debtor to reflect such change on its books and records.

4.2     Undeliverable and Unclaimed Distributions

Any undeliverable or unclaimed distribution under this Plan that does not become deliverable on or before the second anniversary of the Effective Date shall be deemed to have been forfeited and waived, and the Person otherwise entitled thereto shall be forever barred and enjoined from asserting its Claim therefor against, or seeking to recover its distribution from, the Debtor, its Estate, and the Reorganized Debtor.

4.3     Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim or Interest entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

4.4     Fractional Amounts

The distributable amount of New Notes or New Stock may create fractional amounts otherwise distributable to holders of Allowed Class 4 Claims. Notwithstanding such entitlement, all New Notes and New Stock issued by the Reorganized Debtor pursuant to the Plan will be issued and distributed only in full dollar denominations. To the extent any holder would be entitled to a fractional denomination of New Notes and/or New Stock, but for this provision, the denomination of New Notes and/or New Stock to be issued to such holder shall be rounded downward to eliminate any fractional amount.

**B.     Withholding and Reporting Requirements**

4.5     Compliance with Applicable Laws.

In connection with this Plan and all distributions hereunder, the Reorganized Debtor shall comply with all applicable tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to those requirements. The Reorganized Debtor shall be authorized to take all actions necessary or appropriate to comply with those withholding and reporting requirements. Notwithstanding any other provision of this Plan, the holders of Interests of the Reorganized Debtor shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution, and no distribution shall be made to or on behalf of such holder pursuant to this Plan unless and until such holder has made arrangements satisfactory to the Reorganized Debtor for the payment and satisfaction of such tax obligations or has, to the Reorganized Debtor's satisfaction, established an exemption therefrom. Any distribution to be made pursuant to this Plan shall, pending the implementation of such arrangements, be treated as undeliverable pursuant to Article IV, Section A. hereof.

4.6     Tax Identification Numbers

Prior to receiving any distributions under this Plan, all holders of Allowed Claims shall provide the Reorganized Debtor with written notification or confirmation of their respective federal tax identification numbers or social security numbers for the sole purpose of allowing the Debtor and the Reorganized Debtor to comply with the applicable tax laws and rules.

**C.     Setoffs**

4.7     The Reorganized Debtor may, but shall not be required to, set off against any Claim, other than the Claims held by the Prepetition Noteholders, and the payments or other distributions to be made in respect of that Claim, claims of any nature whatsoever that the Debtor or Reorganized Debtor may have against the Claim's holder; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any claim that the Debtor or Reorganized Debtor may have.

## ARTICLE V

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.     Assumed Contracts and Leases**

5.1     Except for the executory contracts or unexpired leases designated for rejection prior to the Confirmation Hearing, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan as of the Effective Date, the Debtor shall be deemed to have assumed each executory contract and unexpired lease and assigned them to the Reorganized Debtor.  The Confirmation Order shall constitute an order of the Bankruptcy Court under section 365 of the Bankruptcy Code approving the contract and lease assumptions and assignments to the Reorganized Debtor as of the Effective Date.

**B.     Payments Related to Assumption of Contracts and Leases**

5.2     Any monetary amounts by which any executory contract and unexpired lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure in the ordinary course of business.  Such Claims are not Impaired.

**C.     Compensation, Benefit, and Pension Programs**

5.3     With the sole exception of the Retained Plans, all employee compensation, benefit and pension plans, and employment agreements or settlements reached thereunder of the Debtors, including benefit plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as if they were, terminated executory contracts. Each Retained Plan will be treated as if it were an executory contract assumed hereunder, and the Debtor's respective obligations under each such Retained Plan shall survive Confirmation of this Plan.

**D.     Indemnification Obligations**

5.4     Except as otherwise specifically provided herein, any obligations or rights of any Debtor to indemnify, defend or advance expenses to its present and former directors, officers, employees, agents or representatives under its certificate of incorporation, by-laws, employee-indemnification policy, or under state law, or any agreement with respect to any claim, demand, suit, cause of action, or proceeding, shall survive Confirmation of this Plan. The employees of the Debtor who become employed by the Reorganized Debtor shall receive indemnification by the Reorganized Debtor in the ordinary course of their businesses. Claims against the Debtor for indemnification shall be classified under this Plan as General Unsecured Claims and are payable as Class 7 Claims.

**E.     Treatment of Change of Control Provisions**

5.5     The entry of the Confirmation Order, consummation of the Plan, and/or any other acts taken to implement the Plan shall not constitute a "change in control" under any provision of any contract, agreement or other document which provides for the occurrence of any event, the granting of any right, or any other change in the then-existing relationship between the parties upon a change in control.

## ARTICLE VI

## ACCEPTANCE OR REJECTION OF THE PLAN

**A.     Classes Entitled To Vote**

6.1     Class 4 Claims are Impaired and are entitled to vote to accept or reject the Plan. By operation of law, Class 1, 2, 3, 5, 6, and 7 Claims are not Impaired, are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan. Interests in Class 8 will not receive distributions under the Plan, are deemed to have rejected the Plan by operation of law and are not entitled to vote to accept or reject the Plan.

**B.     Acceptance by Impaired Classes**

6.2     An Impaired Class of Claims or Interests shall have accepted the Plan if (a) the holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan, and (b) the holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan, in each case not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code. An Impaired Class of Interests shall have accepted the Plan if the holders of at least two thirds in amount of the allowed interests have voted to accept the Plan, not counting the vote of any holder designated under section 1126(e).

**C.     Cramdown**

6.3     Class 8 is deemed to have rejected the Plan under sections 1124 and 1126 of the Bankruptcy Code. The Debtor shall request that the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

## ARTICLE VII

## CONDITIONS PRECEDENT TO PLAN'S
## CONFIRMATION AND EFFECTIVE DATE

### A.   Conditions Precedent to Confirmation

7.1     The Plan's Confirmation is subject to the satisfaction or written waiver of each of the following conditions precedent:

(a)     the Court finding the prepetition solicitation and the Disclosure Statement to have been adequate and not in violation of law;

(b)     timely and affirmative election by the Exit Facility Lenders that they will provide the New Cash Advance pursuant to the Exit Facility;

(c)     the assumption and assignment of all executory contracts and unexpired leases that are not expressly rejected which the Debtor may seek to assume and assign under the Plan;

(d)     approval of the mutual releases as set forth in Article III, Section J.;

(e)     approval of the release of parties as set forth in Article X, Section C. and the injunction against prosecution as provided in Article X, Section E.;

(f)     the Findings and Conclusions be in form and substance and contain findings and conclusions in support of confirmation of the Plan that are reasonably satisfactory to the Debtor and the Exit Facility Lenders; and

(g)     entry of the Confirmation Order on or before September 30, 2009.

### B.   Conditions Precedent to Effective Date

7.2     Effectiveness of the Plan is subject to the satisfaction or written waiver of each of the following conditions precedent:

(a)     The Bankruptcy Court shall have entered the Confirmation  Order, in form and substance reasonably satisfactory to the Debtor and the Exit Facility Lenders, confirming the Plan, as the same may have been modified;

(b)     the Confirmation Order shall have been entered, no timely appeal shall have been taken from the Confirmation Order, and the Confirmation Order shall have become a Final Order;

(c)     the Debtor shall have received the New Cash Advance under the Exit Facility;

(d)     the Debtor and/or Reorganized Debtor shall have executed and delivered