all documents necessary to effectuate the issuance of the New Stock and the New Notes as set forth in the Plan;

(e)     all necessary and material consents, authorizations, and approvals shall have been given or waived for the transfers and transactions described in the Plan, including, without limitation, the transfers of property and the payments described in the Plan, as applicable;

(f)     all conditions to the consummation of the transactions contemplated by the Plan shall have been satisfied or waived.

## C.     Waiver of Conditions

7.3     The conditions set forth above can be waived in writing, in whole or in part, jointly by the Debtor and the Exit Facility Lenders at any time without an order of the Bankruptcy Court. Unless waived, the failure to satisfy any condition to the Effective Date will preclude the Effective Date's occurrence, regardless of the circumstances giving rise thereto (including any action or inaction by the Debtor or the Reorganized Debtor). The waiver of any condition to Confirmation or to the Effective Date shall not constitute or be deemed a waiver of any other condition.

## ARTICLE VIII

## MODIFICATION; WITHDRAWAL

8.1     The Debtor reserves the right to modify the Plan in a manner that is acceptable to the Exit Facility Lenders, either before or after Confirmation, to the fullest extent permitted under section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. The Debtor may withdraw the Plan at any time before the Effective Date.

## ARTICLE IX

## RETENTION OF JURISDICTION

9.1     Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of or related to the Chapter 11 Case and the Plan, to the fullest extent permitted by law, including jurisdiction to:

a.     Enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

b.     Hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan and all

contracts, instruments, and other agreements executed in connection with the Plan;

c.    Hear and determine any request to modify the Plan or to cure any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court;

d.    Issue and enforce injunctions or other orders, or take any other action that may be necessary or appropriate to restrain any interference with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

e.    Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

f.    Hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

g.    Enforce all orders, judgments, injunctions, releases, exculpations, and rulings entered in connection with the Chapter 11 Case;

h.    Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

i.    To hear and determine matters relating to the allowance, disallowance, estimation, and liquidation of Claims against the Debtor and to enter or enforce any order requiring the filing of any such Claim before a particular date;

j.    To determine all applications, Claims, adversary proceedings, and contested matters pending on the Effective Date; and

k.    Enter a final decree closing the Chapter 11 Case.

## ARTICLE X

## EFFECTS OF CONFIRMATION

A.    **Binding Effect and Discharge of the Debtor**

10.1    The Plan shall be binding upon and inure to the benefit of the Debtor, all present and former holders of Claims and Interests, and their respective successors and assigns, and all other parties-in-interest in this Chapter 11 Case.  All consideration distributed

under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against, or Interests in, the Debtor or any of their assets or properties, and, except as otherwise provided herein or in the Confirmation Order, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, upon the Effective Date, the Debtor shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims and Interests, including, but not limited to, any conduct of the Debtor and any and all demands and liabilities that arose before the Confirmation Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of the Debtor prior to the Petition Date and that arises from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not the holder of a Claim based upon such debt accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all liabilities of the Debtor, subject to the Effective Date occurring.

**B.    Vesting**

10.2    Except as otherwise provided in the Plan or in the Confirmation Order, on the Effective Date, the Reorganized Debtor shall be vested with all of the property of the Estate free and clear of all Claims, Liens, encumbrances, charges and Interests, and shall thereafter hold, dispose or otherwise deal with such property and operate its business free of any restrictions imposed by the Bankruptcy Code or by the Bankruptcy Court. Prosecution of Causes of Action shall be the exclusive responsibility of the Reorganized Debtor, which shall have sole and absolute discretion over whether to prosecute or settle such Causes of Action.

**C.    Release, Exculpation And Limitation Of Liability**

10.3    Notwithstanding any other provision of this Plan, no holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, shall have any claim or right of action, whether in law or equity, whether for breach of contract, statute, or tort claim, against the Debtor, the Estate, the Reorganized Debtor, the Exit Facility Lenders (including in their capacity as Prepetition Noteholders), the Indenture Trustee or any of their respective affiliates, representatives, present or former members, officers, directors, employees, advisors, attorneys, or agents, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the pursuit of Confirmation of the Plan, consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence.

**D.    Good Faith**

10.4    As of the Confirmation Date, the Debtor shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtor, the Prepetition Noteholders and the Exit Facility Lenders

have participated in good faith and in compliance with section 1125(e) of the Bankruptcy Code in the offer and issuance of the New Common Stock under the Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of the New Stock under the Plan.

### E.    Injunction

10.5    Except as otherwise provided in the Plan, from and after the Confirmation Date, all Persons who have held, hold, or may hold Claims against or Interests in the Debtor prior to the Effective Date are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, the Exit Facility Lenders (including in their capacity as Prepetition Noteholders), the Estate and the Indenture Trustee on account of any such Claims or Interests: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of this Plan.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

### A.    Objections to Claims

11.1    Objections to Claims as to which no objection is pending as of the Confirmation Date may be filed solely by the Debtor or the Reorganized Debtor. All Objections to Claims shall be filed no later than thirty (30) calendar days after the Effective Date, however, notwithstanding the foregoing, objections to Claims of a "governmental unit" (which for the purpose hereof shall have the meaning ascribed to it in section 502(b)(9) of the Bankruptcy Code) shall be filed no later than 210 calendar days after the Petition Date.

### B.    Payment of Statutory Fees

11.2    All fees payable under section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date. All such fees that arise after the Effective Date but before the closing of the Chapter 11 Case shall be paid from funds otherwise available for distribution hereunder.

### C.    Severability of Plan Provisions

11.3    If, before Confirmation, the Bankruptcy Court holds that any provision of the Plan is invalid, void or unenforceable, the Debtor, at its option and if acceptable to the Exit Facility Lenders, may amend or modify the Plan to correct the defect, by amending or

deleting the offending provision or otherwise, or may withdraw the Plan. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been amended or modified in accordance with the foregoing, is valid and enforceable.

**D.    Headings**

11.4    The headings of the articles, paragraphs and sections of this Plan are inserted for convenience only and shall not affect the interpretation thereof.

**E.    Successors and Assigns**

11.5    The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of that Person.

**F.    Term of Injunctions or Stays**

11.6    Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case, either by virtue of sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, shall remain in full force and effect until all distributions contemplated by this Plan have been made and the Bankruptcy Court has entered an order closing the Chapter 11 Case. The injunctive provisions of section 524 and 1141 of the Bankruptcy Code and those contained in Article X are permanent and shall not be affected by this provision.

**G.    Notices to Debtor**

11.7    Any notice, request, or demand required or permitted to be made or provided to or upon the Debtor and the Reorganized Debtor under the Plan shall be (a) in writing, (b) served by (i) certified mail, return receipt requested, (ii) hand delivery, (iii) overnight delivery service, (iv) first class mail, or (v) facsimile transmission, and (c) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

BASELINE OIL & GAS CORP.
411 N. Sam Houston Pkwy E., Suite 300
Houston, Texas 77060
Fax: 281.591.6101
Attn: Thomas R. Kaetzer

with a copy to:

> THOMPSON & KNIGHT LLP
> 333 Clay Street, Suite 3300
> Houston, Texas 77002
> Fax: 713-654-1871
> Attn: Rhett G. Campbell

## H.    Governing Law

11.8    Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (a) the State of Texas shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan other than the New Notes Indentures, the Purchase Agreement, the Security Agreements, the Collateral Documents (except for any deeds of trust, which will be governed by the laws of the State of Texas), and the Intercreditor Agreement, each of which shall be governed by the State of New York, (b) the laws of the state of incorporation of the Debtor shall govern corporate governance matters with respect to such Debtor and (c) the laws of the state of incorporation of the Reorganized Debtor shall govern corporate governance matters with respect to such Reorganized Debtor, in each case without giving effect to the principles of conflicts of law thereof.

**DATED:**  [August ___,] 2009.

**BASELINE OIL & GAS CORP.**

By: _____

                      Thomas R. Kaetzer, Chairman,
                      President and Chief Executive Officer

*EXHIBIT B*

# Cawley, Gillespie & Associates, Inc.

**PETROLEUM CONSULTANTS**

<table>
<tr><td>AUSTIN OFFICE:<br>9601 AMBERGLEN BLVD., SUITE 117<br>AUSTIN, TEXAS 78729<br>(512) 249-7000<br>FAX (512) 233-2618</td><td>MAIN OFFICE:<br>306 WEST 7TH STREET, SUITE 302<br>FORT WORTH, TEXAS 76102-4987<br>(817) 336-2461<br>FAX (817) 877-3728</td><td>HOUSTON OFFICE:<br>1000 LOUISIANA, SUITE 625<br>HOUSTON, TEXAS 77002-5008<br>(713) 651-9944<br>FAX (713) 651-9980</td></tr>
</table>

February 13, 2009

Mr. Thomas Kaetzer
Baseline Oil & Gas Corp.
411 North Sam Houston Parkway
Suite 300
Houston, Texas 77060

> Re: Evaluation Summary
> *Baseline Oil & Gas Interests*
> Proved & Probable Reserves
> Matagorda and Stephens Counties, Texas
> As of December 31, 2008

Dear Mr. Kaetzer:

    As requested, we are submitting our estimates of proved and probable reserves and forecasts of economics attributable to the Baseline Oil & Gas ("Baseline") interests in certain oil and gas properties located in various fields in Matagorda and Stephens Counties, Texas. The results of this evaluation are presented in the accompanying tabulations, with a composite summary presented below:

| | | Proved | Proved Developed Producing | Proved Developed Non-Producing | Proved Undeveloped | Probable |
|---|---|---|---|---|---|---|
| **Net Reserves** | | | | | | |
| Oil – Mbbl | | 5,367 | 3,107 | 890 | 1,370 | 1,164 |
| Gas – MMcf | | 28,025 | 3,717 | 13,410 | 10,897 | 19,421 |
| **Net Revenue** | | | | | | |
| Oil – M$ | | 236450 | 136,599 | 39,347 | 60,504 | 51,493 |
| Gas – M$ | | 165,593 | 20,867 | 79,903 | 64,823 | 115,677 |
| | | | | | | |
| Severance Taxes | – M$ | 23,316 | 7,862 | 7,805 | 7,649 | 11,047 |
| Ad Valorem Taxes | – M$ | 5,504 | 2,189 | 1,611 | 1,704 | 2,256 |
| Operating Expenses | – M$ | 168,456 | 102,260 | 36,382 | 29,813 | 37,914 |
| Investments | – M$ | 47,221 | 1,201 | 9,580 | 36,440 | 39,480 |
| Net Operating | – M$ | | | | | |
| Income | | 157,546 | 43,954 | 63,871 | 49,721 | 76,473 |
| Discounted @ 10% | – M$ | 69,484 | 27,270 | 23,495 | 18,719 | 20,162 |

The discounted cash flow values shown above should not be construed to represent an estimate of the fair market value by Cawley, Gillespie & Associates, Inc. ("CG&A").

## Presentation

The report is divided into four major sections: Baseline Total Proved, Blessing Field Area, Stephens County and Baseline Probable. Within the first three major sections are Total Proved ("I-Proved"), Proved Developed Producing ("I-PDP"), Proved Developed Non-Producing ("I-PDNP") and Proved Undeveloped ("I-PUD"). The last section presents the Total Probable ("I-Probable") and Probable by area. Within each reserve category section are Tables I which present composite reserve estimates and economic forecasts for the particular reserve category. Following the Tables I in each section are Summary Plots and Table II "oneline" summaries that present estimates of ultimate recovery, gross and net reserves, ownership, revenue, expenses, investments, net income and discounted cash flow for the individual properties that make up the corresponding Table I. Individual lease or well reserves and economics tables follow the Tables II in the PDP, PDNP, PUD and Probable sections of the report.

For a more detailed explanation of the report layout, please refer to the Table of Contents following this letter. The data presented in the tables are explained in page 1 of the Appendix. The methods employed in estimating reserves are described in page 2 of the Appendix.

## Hydrocarbon Pricing

As requested, the year-end December 31, 2008 WTI Cushing spot oil price of $44.60/bbl and Henry Hub spot gas price of $5.62/MMbtu were used. These prices were held constant.

Oil and gas price differentials were applied on a per property basis as provided and include adjustments for basis differential, transportation and/or crude quality and gravity corrections. Gas shrinkage and heating value as provided were applied separately as corrections to net gas sales and net gas price, respectively.

## Risking

Reserves and economics were <u>not</u> risked for any of the properties in this report.

## Expenses and Taxes

Operating expenses and capital expenditures were not escalated. Initial lease operating expenses were forecast on a per-well basis based on historical expenses. Oil and gas severance tax values were determined by applying normal state severance tax rates. Ad Valorem taxes were 1.4% for Stephens County and 1.34% for Matagorda County.

## Miscellaneous

An on-site field inspection of the properties has <u>not</u> been performed. The mechanical operation or conditions of the wells and their related facilities have <u>not</u> been examined nor have the wells been tested by Cawley, Gillespie & Associates, Inc. Possible environmental liability related to the properties has not been investigated nor considered. The salvage value of equipment at abandonment and the cost of plugging at abandonment have been included.

*Baseline Oil & Gas Interests*
February 13, 2009
Page 3

The proved reserve classifications used conform to the criteria of the *Securities and Exchange Commission ("SEC")* as defined in page 3 of the Appendix. The inclusion of probable reserves does not conform to the criteria of the SEC. It is not intended that the probable section of the report be used for any purpose requiring such conformity. The reserves and economics are predicated on regulatory agency classifications, rules, policies, laws, taxes and royalties in effect as noted herein. The possible effects of changes in legislation or other Federal or State restrictive actions have not been considered. All reserve estimates represent our best judgment based on data available at the time of preparation, and assumptions as to future economic and regulatory conditions. It should be realized that the reserves actually recovered, the revenue derived therefrom and the actual cost incurred could be more or less than the estimated amounts.

The reserve estimates were based on interpretations of factual data furnished by Baseline. Oil and gas prices, pricing differentials, expense data, capital investments, plug and abandonment costs, tax values and ownership interests were also supplied by Baseline and were accepted as furnished. To some extent, information from public records has been used to check and/or supplement these data. The basic engineering and geological data were subject to third party reservations and qualifications. Nothing has come to our attention, however, that would cause us to believe that we are not justified in relying on such data.

This report was prepared for the exclusive use of Baseline Oil & Gas Corporation. Third parties should not rely on it without the written consent of the above and Cawley, Gillespie & Associates, Inc. Our work papers and related data are available for inspection and review by authorized, interested parties.

*Cawley, Gillespie & Assoc., Inc.*

**CAWLEY, GILLESPIE & ASSOCIATES, INC.**

*Exhibit C*

### Glossary of Oil & Gas Terms

| | |
|---|---|
| **AMI (area of mutual interest)** | An agreement between or among parties by which the parties attempt to describe a geographical area within which they agree to share certain additional leases or other interests acquired by any of them in the future. |
| **Barrel** | A unit of volume measurement used for petroleum and its products (7.3 barrels = 1 ton: 6.29 barrels = 1 cubic meter). |
| **bbl** | One barrel of oil; 1 barrel = 35 Imperial gallons (approx.), or 159 liters (approx.); 7.5 barrels = 1 ton (approx.); 6.29 barrels = 1 cubic meter. |
| **Bcf** | Billion cubic feet; 1 bcf = 0.83 million tons of oil equivalent. |
| **Block** | An acreage sub-division measuring approximately 10 x 20 kms, forming part of a quadrant. e.g. Block 9/13 is the 13th block in Quadrant 9. |
| **Boepd** | Barrels of oil equivalent per day. |
| **Bopd** | Barrels of oil per day. |
| **Condensate** | Hydrocarbons which are in the gaseous state under reservoir conditions and which become liquid when temperature or pressure is reduced. A mixture of pentanes and higher hydrocarbons. |
| **Development wells** | A well drilled to a known producing formation in a previously discovered field. The legal duty to drill development wells sometimes is expressly set out in the lease, but more often depends on the implied covenant of reasonable development. |
| **Enhanced oil recovery** | A process whereby oil is recovered other than by the natural pressure in a reservoir. |
| **Field** | A geographical area under which an oil or gas reservoir lies. |
| **Lease** | (1) The conveyance of a nonfreehold interest in land. (2) The instrument by which a leasehold or working interest is created in minerals. |
| **Mbbl** | Thousand barrels of oil. |
| **mboe** | Million Barrels Oil Equivalent. |
| **Mcf – Thousand cubic feet** | The standard unit for measuring the volume of natural gas. |
| **Mcfe** | Thousand cubic feet of natural gas equivalent. |
| **Mcfepd** | Thousand cubic feet of natural gas equivalent per day. |
| **Mcfpd** | Thousand cubic feet per day. |

| | |
|---|---|
| **Mmboe** | Million barrels of oil equivalent. |
| **Mmbtu** | Million British thermal units. |
| **Mmcf** | Million cubic feet. |
| **Operator** | The company that has legal authority to drill wells and undertake the production of hydrocarbons that are found. The Operator is often part of a consortium and acts on behalf of this consortium. |
| **Probable reserves** | Those reserves which are not yet Proven Reserves but which are estimated to have a better than 50% chance of being technically and economically producible. |
| **Proved Developed Producing Reserves or PDP** | Means Proved Reserves which are categorized as both "Developed" and "Producing" in the Definitions for Oil and Gas Reserves promulgated by the Society of Petroleum Engineers (or any generally recognized successor) as in effect at the time in question. |
| **Proved Developed Non-Producing Reserves or PDNP** | Means Proved Reserves which are categorized as "Developed" but not "Producing" in the Definitions for Oil and Gas Reserves promulgated by the Society of Petroleum Engineers (or any generally recognized successor) as in effect at the time in question. |
| **Proved Reserves** | Means Proved Reserves as defined in the Definitions for Oil and Gas Reserves promulgated by the Society of Petroleum Engineers (or any generally recognized successor) as in effect at the time in question. |
| **Proved Undeveloped Reserves or PUD** | Means Proved Reserves which are categorized as neither "Developed" nor "Producing" in the Definitions for Oil and Gas reserves promulgated by the Society of Petroleum Engineers (or any generally recognized successor) as in effect at the time in question. |
| **PV-10** | Means the present worth of future net income, discounted to present value at the simple interest rate of ten percent (10%) per year. |
| **Waterflood operations or waterflood recovery projects** | Means secondary recovery operations in which water is injected into an oil reservoir for the purpose of forcing the oil out of the reservoir rock and into the bore of a producing well. |
| **Workover** | Remedial work to the equipment within a well, the well pipework, or relating to attempts to increase the rate of flow. |
| **WTI** | West Texas Intermediate, a grade of crude oil. |
| **WTI Cushing spot price** | The price offered for immediate delivery of WTI grade crude oil at Cushing, Oklahoma. |

*EXHIBIT D*

## Beneficial Ownership Table

The following chart sets forth the beneficial ownership of the Debtor's common stock as of the June 30, 2009 (unless provided otherwise in the accompanying notes) for (i) each director and executive officer of the Debtor and (ii) each person who, to the Debtor's knowledge, beneficially owns more than 5% of outstanding shares of common stock.

| Name Of Beneficial Owner | Shares Beneficially Owned[1] | Percentage[2] |
|---|---|---|
| Thomas R. Kaetzer, President, Chief Executive Officer and Director (Chairman) | 5,009,000[3] | 3.2% |
| Patrick H. McGarey, Chief Financial Officer | 1,515,000[4] | 1.0% |
| Randal B. McDonald, Jr., Controller | 79,999[5] | * |
| Joshua L. Targoff, Director | 0 | * |
| Third Point LLC | 88,321,348[6][7] | 58.3% |
| Third Point Qualified Partners L.P. | 52,423,301[7] | 34.6% |
| Third Point Partners L.P. | 35,502,047[7] | 23.4% |
| John V. Lovoi | 29,200,000[8][10] | 19.3% |
| JVL Advisors, LLC | 23,350,000[9][10] | 15.4% |
| JVL Global Energy (QP), LP | 8,842,593[10] | 5.8% |
| Alan Gaines | 7,664,250[11] | 5.0% |

---

(*)    less than 1%

(1)    Determined in accordance with Rule 13d-3 promulgated under the Securities Exchange Act of 1934, as amended, based upon information furnished by the persons listed or contained in filings made by them with the SEC. As provided under such rule, the chart gives effect to the exercise or conversion of those derivative securities that are held by persons identified in the table (but not those held by any other person identified therein) and which are exercisable or convertible within 60 days from June 30, 2009.

(2)    Based upon 151,497,530 shares of common stock issued and outstanding as of June 30, 2009.

(3)    Includes options currently exercisable to purchase: (i) up to 3,000,000 shares of common stock at an exercise price of $0.40 per share; (ii) up to 1,000,000 shares of common stock at an exercise price of $0.50 per share; (iii) up to 500,000 shares of common stock at an exercise price of $0.60 per share; and (iv) up to 500,000 shares of common stock at an exercise price of $1.00 per share. Also includes 5,000 shares of common stock held for the benefit of children of Mr. Kaetzer, which Mr. Kaetzer has discretionary authority to vote and accordingly may be deemed to be the beneficial owner thereof. Mr. Kaetzer expressly disclaims any such beneficial ownership of these shares.

(4)    Refers to options currently exercisable to purchase (i) up to 500,000 shares of common stock at an exercise price of $0.55 per share, (ii) up to 500,000 shares of common stock at an exercise price of $0.825 per share, and (iii) up to 500,000 shares of common stock at an exercise price of $1.10 per share.

(5)     Includes option granted April 22, 2008 to purchase up to 100,000 shares of common stock at an exercise price of $0.50 per share, which option is currently exercisable with respect to 46,666 underlying shares. Such option vests with respect to 20% of such underlying shares at the grant date and then, as to 1/3rd of such remaining underlying shares on each of January 3, 2009, 2010 and 2011. Also includes option granted August 3, 2007 to purchase up to 50,000 shares of common stock at an exercise price of $0.55 per share, which option is currently exercisable with respect to 33,333 underlying shares. Such option vests as to 1/3rd of such underlying shares on each of August 3, 2008, 2009 and 2010.

(6)     Third Point LLC acts as the investment manager of (i) Third Point Partners L.P. ("Partners"), which directly or indirectly owns 35,502,047 shares of common stock and (ii) Third Point Partners Qualified L.P. ("Qualified Partners"), which directly or indirectly owns 52,423,301 shares of common stock. Third Point LLC, as investment manager of Partners and Qualified Partners, and Daniel S. Loeb, as Chief Executive Officer of Third Point LLC, may each be deemed to beneficially own the shares of common stock directly or indirectly owned or held by Partners and by Qualified Partners.

(7)     Based on the relationships described in note (5) above, the entities named therein may also be deemed to constitute a "group" within the meaning of Rule 13d-5(b)(1) under the Exchange Act; however, this statement shall not be construed as an admission that Third Point LLC, Partners, Qualified Partners and Mr. Loeb are a group, or have agreed to act as a group. Each joint filer disclaims beneficial ownership of these securities except to the extent of any direct pecuniary interest therein, and this Disclosure Statement shall not be deemed to be an admission that any such joint filer is the beneficial owner of these securities for purposes of Section 16 or for any other purpose. The foregoing information is based upon (i) the Schedule 13D, as amended through December 30, 2008, initially filed with the SEC on July 18, 2008 by Third Point LLC, Partners, Qualified Partners and Mr. Loeb and (ii) Form 4 filed December 31, 2008 by Third Point LLC.

(8)     John V. Lovoi is the managing partner of each of JVL Advisors, LLC ("Advisors") and Peninsula – JVL Capital Advisors, LLC ("Capital Advisors"), and may be deemed to beneficially own the 23,350,000 aggregate shares of common stock directly or indirectly owned or held by Advisors and the 5,850,000 shares of common stock directly or indirectly owned or held by Capital Advisors. Capital Advisors is the general partner of Belridge Energy Advisors, LP ("Belridge"), which directly or indirectly owns 5,850,000 shares of common stock, and accordingly may be deemed to beneficially own all of the shares of common stock directly or indirectly owned or held by Belridge. Mr. Lovoi served as a director of the Company from September 8, 2008 until his resignation, effective May 6, 2009. See note (8) below.

(9)     Advisors is the general partner of: (i) JVL Global Energy (QP), LP ("Energy Qualified LP"), which directly or indirectly owns 8,842,593 shares of common stock; (ii) JVL Global Energy, LP ("Energy LP"), which directly or indirectly owns 6,718,110 shares of common stock; (iii) Navitas Fund LP ("Navitas LP"), which directly or indirectly owns 6,143,094 shares of common stock; and (iv) Navitas Fund (QP), LP ("Navitas Qualified LP"), which directly or indirectly owns 1,646,203 shares of common stock. As the general partner, Advisors may be deemed to beneficially own all of the shares of common stock directly or indirectly owned or held by Energy Qualified LP, Energy LP, Navitas LP and Navitas Qualified LP. See note (8) below.

(10)     Based on the relationships described in notes (6) and (7) above, the entities and persons named therein may also be deemed to constitute a "group" within the meaning of Rule 13d-5(b)(1) under the Exchange Act; however, this statement shall not be construed as an admission that Advisors, Energy Qualified LP, Energy LP, Navitas LP, Navitas Qualified LP, Capital Advisors, Belridge and Mr. Lovoi are a group, or have agreed to act as a group. Each joint filer disclaims beneficial ownership of these securities except to the extent of any direct pecuniary interest therein, and this Disclosure Statement shall not be deemed to be an admission that any such joint filer is the beneficial owner of these securities for purposes of Section 16 or for any other purpose. The foregoing information and the information contained in notes (6) and (7) above is based upon the Schedule 13D, as amended through December 30, 2008, initially filed with the SEC on August 22, 2008.

(11)     Includes options currently exercisable to purchase up to 1,730,000 shares of our common stock at an exercise price of $0.05 per share.

*EXHIBIT E*

 **Grant Thornton**

June 16, 2009

To The Board of Directors of Baseline Oil & Gas,

Thank you for asking Grant Thornton to assist with the restructuring of Baseline Oil & Gas. We used industry experts in oil and gas, and functional experts in valuation and restructuring to evaluate the proposed transaction. The following are our major findings:

- Valuation of the enterprise as a going concern indicates a value of approximately $82,000,000, see attachment 1.

- In our opinion the Plan of Reorganization appears to be feasible, see attachment 1.

- In the event of Chapter 7 liquidation, recoveries are less than the anticipated recoveries outlined in the Plan of Reorganization.

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

### Disclaimer

The information contained herein and the underlying data relied upon by Grant Thornton were prepared by the Company on the basis of numerous assumptions, including assumptions as to business, economic and market conditions, which are subject to substantial uncertainty. Those assumptions are included in the attachments. Grant Thornton did not audit or verify the Debtors' financial statements and supporting documentation (the "Debtors' Financials"). Our services cannot be relied upon to disclose errors or fraud should they exist.

No assurance can be given that the assumptions used will prove to be correct, and, consequently, no assurance can be given as to the accuracy of the analyses or resulting conclusions. The actual results may vary materially from the estimates provided herein. In addition, Grant Thornton has not inspected the assets of the Company.

Changes may occur that would materially affect the financial and other information we received or included in this report. We reserve the right but have no obligation to update this report or to revise the information contained herein to reflect events which occur and information which becomes available subsequent to this date.

© Grant Thornton LLP
All rights reserved
U.S. member firm of Grant Thornton International Ltd

2

This report has been prepared for the exclusive use of Baseline Oil & Gas Corp. and its legal counsel for the purposes of confirming a Plan of Reorganization. This report may not be used, distributed or referred to for any other purpose.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

If you have any questions please feel free to call me at 832.476.3630

Loretta Cross, Managing Partner

Grant Thornton LLP

© Grant Thornton LLP
All rights reserved
U.S. member firm of Grant Thornton International Ltd

# Attachment 1

# Proforma Financial Statements and Assumptions

Attachment 1

## Baseline Oil & Gas Proforma Balance Sheet

| | Jun 30, '09 | Dec 31, '09 | Dec 31, '10 | Dec 31, '11 | Dec 31, '12 | Dec 31, '13 | Dec 31, '14 |
|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | |
| *Current assets* | | | | | | | |
| Restricted Cash | $ 1,311,000 | $ 1,311,560 | $ 2,046,275 | $ 2,750,374 | $ 3,232,522 | $ 3,379,897 | $ 3,367,095 |
| Unrestricted Cash | 2,203,000 | 5,003,917 | 7,787,197 | 19,074,401 | 37,575,427 | 56,351,006 | 74,174,766 |
| Total Cash | $ 3,514,000 | $ 6,315,477 | $ 9,833,472 | $ 21,824,775 | $ 40,807,949 | $ 59,730,903 | $ 77,541,860 |
| Accounts Receivable | 1,450,683 | 2,010,940 | 3,076,439 | 4,101,336 | 4,772,443 | 4,971,952 | 4,928,095 |
| Prepaid and Other Current Assets | 140,227 | 166,870 | 255,286 | 340,334 | 396,023 | 412,578 | 408,939 |
| **Total current assets** | 5,104,910 | 8,493,287 | 13,165,197 | 26,266,444 | 45,976,415 | 65,115,433 | 82,878,894 |
| *Non-current assets* | | | | | | | |
| Oil and Gas Properties, Net | 76,721,024 | 77,108,330 | 92,146,683 | 101,519,434 | 108,410,390 | 117,242,088 | 126,914,173 |
| Other Assets | 31,939 | 31,939 | 31,939 | 31,939 | 31,939 | 31,939 | 31,939 |
| Other Property and Equipment, Net | 318,127 | 298,244 | 258,478 | 218,712 | 178,946 | 139,181 | 99,415 |
| **Total assets** | $ 82,176,000 | $ 85,931,799 | $ 105,602,297 | $ 128,036,530 | $ 154,597,690 | $ 182,528,640 | $ 209,924,420 |
| | | | | | | | |
| **Liabilities** | | | | | | | |
| *Current liabilities* | | | | | | | |
| Accounts Payable | $ 1,632,028 | $ 1,727,686 | $ 4,434,667 | $ 3,881,000 | $ 3,747,667 | $ 4,227,667 | $ 4,483,000 |
| Accrued Expenses | 1,747,387 | 823,113 | 1,434,265 | 1,921,067 | 2,247,733 | 2,345,586 | 2,315,095 |
| Royalties Payable | 1,311,954 | 1,311,560 | 2,046,275 | 2,750,374 | 3,232,522 | 3,379,897 | 3,367,095 |
| Current Liabilities | 62,800 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total current liabilities** | 4,754,169 | 3,862,358 | 7,915,207 | 8,552,441 | 9,227,921 | 9,953,149 | 10,165,190 |
| *Non-current liabilities* | | | | | | | |
| Asset Retirement Obligation | 344,392 | 409,826 | 626,973 | 835,845 | 972,615 | 1,013,275 | 1,004,337 |
| Series A Senior Secured PIK Notes | 5,000,000 | 5,500,000 | 6,600,000 | 7,920,000 | 9,504,000 | 11,404,800 | 13,685,760 |
| Series B Senior Secured PIK Notes | 25,000,000 | 27,500,000 | 33,000,000 | 39,600,000 | 47,520,000 | 57,024,000 | 68,428,800 |
| Senior Subordinated PIK Notes | 10,000,000 | 10,500,000 | 11,550,000 | 12,705,000 | 13,975,500 | 15,373,050 | 16,910,355 |
| **Total liabilities** | 45,098,561 | 47,772,184 | 59,692,179 | 69,613,286 | 81,200,037 | 94,768,274 | 110,194,442 |
| *Preferred Issues* | | | | | | | |
| Senior Preferred Stock | 25,000,000 | 27,250,000 | 32,155,000 | 37,942,900 | 44,772,622 | 52,831,694 | 62,341,399 |
| Juinor Preferred Stock | 5,000,000 | 5,450,000 | 6,431,000 | 7,588,580 | 8,954,524 | 10,566,339 | 12,468,280 |
| **Total Preferred Issues** | 30,000,000 | 32,700,000 | 38,586,000 | 45,531,480 | 53,727,146 | 63,398,033 | 74,809,679 |
| **Equity** | | | | | | | |
| Common Stock | 7,077,439 | 7,077,439 | 7,077,439 | 7,077,439 | 7,077,439 | 7,077,439 | 7,077,439 |
| Retained Earnings | 0 | (1,617,824) | 246,679 | 5,814,325 | 12,593,068 | 17,284,894 | 17,842,861 |
| **Total equity** | 7,077,439 | 5,459,616 | 7,324,118 | 12,891,764 | 19,670,508 | 24,362,334 | 24,920,300 |
| **Total Liab.& Equity** | $ 82,176,000 | $ 85,931,800 | $ 103,602,297 | $ 128,036,530 | $ 154,597,691 | $ 182,528,641 | $ 209,924,421 |

See assumptions on page 4 & 5

**Attachment 1**

## Baseline Oil & Gas Proforma Income Statement

| | 6 Month Ended Dec 31, '09 | Dec 31, '10 | Dec 31, '11 | Dec 31, '12 | Dec 31, '13 | Dec 31, '14 |
|---|---|---|---|---|---|---|
| **Gross Production:** | | | | | | |
| Gross Oil Production | 163,043 | 416,016 | 503,125 | 529,688 | 527,083 | 491,667 |
| Gross Gas Production | 954,627 | 2,711,323 | 3,463,570 | 4,269,874 | 4,560,210 | 4,899,212 |
| **Prices** | | | | | | |
| Avg. Net Oil Price $/BBL | $ 67.59 | $ 71.77 | $ 74.79 | $ 76.78 | $ 78.13 | $ 79.66 |
| Avg. Net Gas Price $/MCF | $ 5.22 | $ 7.13 | $ 8.11 | $ 8.43 | $ 8.50 | 8.20 |
| **Revenue:** | | | | | | |
| Gross Oil Revenue | $ 11,020,346 | $ 29,856,401 | $ 37,628,719 | $ 40,669,406 | $ 41,181,021 | $ 39,166,167 |
| Gross Gas Revenue | 4,979,973 | 19,338,512 | 28,089,551 | 35,995,039 | 38,761,786 | 40,173,538 |
| **Gross Revenue** | 16,000,319 | 49,194,913 | 65,718,269 | 76,664,446 | 79,942,807 | 79,339,705 |
| **Royalty Expense** | | | | | | |
| Oil Royalty | 2,556,720 | 6,926,685 | 8,729,863 | 9,435,302 | 9,553,997 | 9,086,551 |
| Gas Royalty | 1,377,959 | 5,350,966 | 7,772,379 | 9,959,827 | 10,725,386 | 11,116,018 |
| Total Royalty Expense | 3,934,679 | 12,277,651 | 16,502,241 | 19,395,130 | 20,279,383 | 20,202,569 |
| **Net Revenue:** | | | | | | |
| Net Oil Revenue | 8,463,626 | 22,929,716 | 28,898,856 | 31,234,104 | 31,627,024 | 30,079,616 |
| Net Gas Revenue | 3,602,014 | 13,987,546 | 20,317,172 | 26,035,212 | 28,036,400 | 29,057,520 |
| **Net Revenue** | 12,065,640 | 36,917,262 | 49,216,028 | 57,269,316 | 59,663,424 | 59,137,136 |
| **Production Expenses:** | | | | | | |
| Production Taxes | 659,492 | 3,068,000 | 4,144,000 | 4,896,000 | 5,124,000 | 5,020,000 |
| Lease Operating Expense | 3,588,057 | 8,372,000 | 9,936,000 | 11,036,000 | 11,812,000 | 12,436,000 |
| Operating Insurance | 95,286 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 |
| Total Production Expenses | 4,342,835 | 11,565,000 | 14,205,000 | 16,057,000 | 17,061,000 | 17,581,000 |
| **Gross Profit** | 7,722,805 | 25,352,262 | 35,011,028 | 41,212,316 | 42,602,424 | 41,556,136 |
| **Operating Expenses:** | | | | | | |
| General and Administrative | 1,330,341 | 2,541,000 | 2,668,050 | 2,801,453 | 2,941,525 | 3,088,601 |
| Depletion | 1,207,694 | 3,197,647 | 3,977,249 | 4,559,044 | 4,722,303 | 4,789,915 |
| Depreciation | 19,883 | 39,766 | 39,766 | 39,765 | 39,766 | 39,766 |
| Total Operating Expenses | 2,557,918 | 5,778,413 | 6,685,065 | 7,400,262 | 7,703,594 | 7,918,282 |
| **Operating Income (Loss)** | 5,164,887 | 19,573,849 | 28,325,963 | 33,812,054 | 34,898,830 | 33,637,854 |
| Interest Expense | (3,500,000) | (7,650,000) | (9,075,000) | (10,774,500) | (12,802,350) | (15,223,065) |
| **Earnings (Loss) Before Income Tax** | 1,664,887 | 11,923,849 | 19,250,963 | 23,037,554 | 22,096,480 | 18,414,789 |
| Provision for Income Taxes | 582,710 | 4,173,347 | 6,737,837 | 8,063,144 | 7,733,768 | 6,445,176 |
| **Net Income** | $ 1,082,176 | $ 7,750,502 | $ 12,513,126 | $ 14,974,410 | $ 14,362,712 | $ 11,969,613 |
| **EBITDA** | 6,392,464 | 22,811,262 | 32,342,978 | 38,410,864 | 39,660,899 | 38,467,535 |

See assumptions on page 4 & 5

**Attachment 1**

## Baseline Oil & Gas Proforma Cash Flow Statement

| | 06 Month Ended Dec 31, '09 | Dec 31, '10 | Dec 31, '11 | Dec 31, '12 | Dec 31, '13 | Dec 31, '14 |
|---|---|---|---|---|---|---|
| **Cash flow from Operations** | | | | | | |
| Net Income | $ 1,082,176 | $ 7,750,502 | $ 12,513,126 | $ 14,974,410 | $ 14,362,712 | $ 11,969,613 |
| Depletion | 1,207,694 | 3,197,647 | 3,977,249 | 4,559,044 | 4,722,303 | 4,789,915 |
| Depreciation | 19,883 | 39,766 | 39,766 | 39,766 | 39,766 | 39,766 |
| Net Change in Operating Working Capital | -1,416,471 | 2,164,218 | -1,176,809 | -533,464 | 361,788 | 272,339 |
| Net Change in Asset Retirement Obligations | 65,434 | 217,147 | 208,872 | 136,770 | 40,660 | -8,938 |
| **Total Cash from Operation** | 958,717 | 13,369,280 | 15,562,205 | 19,176,526 | 19,527,229 | 17,062,695 |
| **Cash Flow from Investing** | | | | | | |
| (Capital Expenditure) | (1,595,000) | (18,236,000) | (13,350,000) | (11,450,000) | (13,554,000) | (14,462,000) |
| **Total cash from Investing** | (1,595,000) | (18,236,000) | (13,350,000) | (11,450,000) | (13,554,000) | (14,462,000) |
| **Cash Flow from Financing** | | | | | | |
| Increase (Decrease) in Short Term Debt | (62,800) | | | | | |
| Increase (Decrease) in LTD | 3,500,000 | 7,650,000 | 9,075,000 | 10,774,500 | 12,802,350 | 15,223,065 |
| Increase (Decrease) in Senior Preferred Stock | 2,250,000 | 4,905,000 | 5,787,900 | 6,829,722 | 8,059,072 | 9,509,705 |
| Increase (Decrease) in Junior Preferred Stock | 450,000 | 981,000 | 1,157,580 | 1,365,944 | 1,611,814 | 1,901,941 |
| Increase (Decrease) in Common stock | 0 | 0 | 0 | 0 | 0 | 0 |
| Preferred Dividends | (2,700,000) | (5,886,000) | (6,945,480) | (8,195,666) | (9,670,886) | (11,411,646) |
| Dividends to Common Stockholders | | | | | | |
| **Total Cash from Financing** | 3,437,200 | 7,650,000 | 9,075,000 | 10,774,500 | 12,802,350 | 15,223,065 |
| **Total Net Change in Cash** | $ 2,800,917 | $ 2,783,280 | $ 11,287,205 | $ 18,501,026 | $ 18,775,579 | $ 17,823,760 |
| **Beginning Unrestricted Cash Balance** | 2,203,000 | 5,003,917 | 7,787,197 | 19,074,401 | 37,575,427 | 56,351,006 |
| Total Net Change in Cash | 2,800,917 | 2,783,280 | 11,287,205 | 18,501,026 | 18,775,579 | 17,823,760 |
| **Ending Unrestricted Cash Balance** | $ 5,003,917 | $ 7,787,197 | $ 19,074,401 | $ 37,575,427 | $ 56,351,006 | $ 74,174,766 |

See assumptions on page 4 & 5

Attachment 1

## Baseline Oil & Gas Proforma Assumptions

### Income Statement Assumptions:

#### Revenues:

Oil and natural gas production volumes were estimated using a December 31, 2008 evaluation summary prepared by Cawley, Gillespie, & Associates, Inc. These production volume reserves in the evaluation summary report were adjusted to reflect increased riskiness of recovery of these production volumes and to adjust for capital expenditures being shifted to later periods.

Oil and natural gas prices were estimated based on NYMEX strip price as of June 1, 2009 along with any applicable pricing adjustments for each field.

#### Expenses:

Lease operating expenses were estimated based on anticipated well count and prior experience in operating in these oil and gas fields.

General and administrative expenses were estimated based on planned headcount reductions and prior experience in operating the company along with certain expected cost reductions associated with operating as a private Company. In addition, general and administrative costs were increased by 5% annually.

Interest expense was estimated based on proposed debt structure and was assumed to be paid in kind.

### Balance Sheet Assumptions:

#### Assets:

June 30, 2009 cash balance assumes a $5 million cash infusion from issuance of Series A Senior Secured Notes.

All asset values are estimates of book value after the application of fresh start accounting, which require assets and liabilities to be stated at fair market value upon emergence from chapter 11 bankruptcy.

Accounts receivable were estimated based on the historical collection period of 30 days and adjusted each year based on revenue levels.

Oil and Gas Properties, net are valued based on two methods to determine fair value, including the discounted cash flow approach and the public company comparable multiples approach.

In the discounted cash flow approach, free cash flow available to the firm was based on future revenue and cash expense assumptions described above in the income statement. The free cash flow to the firm was discounted back to present value based on a discount rate that incorporated the inherent riskiness of the firm in order to derive an estimated enterprise value of firm.

4

Attachment 1

In the public company comparable multiple valuation approach, oil and gas companies with similar characteristics to Baseline were analyzed.  The value of these peer firms relative to their revenue and "EBITDA" levels were used to determine their market trading multiples.  The average market trading multiples of the peer group was applied to Baseline's revenue and EBITDA levels to determine an approximate enterprise value for Baseline.

The results of the two valuation methods were weighted to come up with an estimated fair market value.

| (in 000's) | Weighting | | Fair Value |
|---|---|---|---|
| Public Company Multiples Approach | 25% | $ | 94,991 |
| Discounted Cash Flow Approach | 75% | $ | 77,905 |
| **Fair Market Value of Firm** | | **$** | **82,176** |

Liabilities:

Accounts payable were estimated based on historical payment aging of 60 days and adjusted each year based on revenue levels.

Market value of all debt issues is assumed to be face value.

Long term debt levels were based on proposed terms and amounts described in the disclosure statement.  Interest expense was assumed to be paid in kind.  All debt obligations that mature during the forecast period based on proposed terms in the disclosure statement are assumed to be refinanced.

Preferred issues were based on proposed terms and amounts described in the disclosure statement. Dividends on these preferred shares were assumed to be paid in kind.

Common Stock issuance was based on proposed terms and amounts described in the disclosure statement.

# Attachment 2

# Liquidation Analysis and Assumptions

## Attachment 2

**Baseline Oil & Gas Corp. Liquidation Analysis**

| ASSETS | Estimated Book Value As of June 30, 2009 | High Value Assumed Liquidation Recoveries | High Value Liquidation Value | Low Value Assumed Liquidation Recoveries | Low Value Liquidation Value |
|---|---|---|---|---|---|
| Cash and Cash Equivalents | $ 297,819 | 100% | $ 297,819 | 100% | $ 297,819 |
| Royalty Cash | 470,214 | 100% | 470,214 | 100% | 470,214 |
| Accounts receivable | 1,563,228 | 75% | 1,172,421 | 70% | 1,094,260 |
| Prepaid and other current assets | 116,948 | 20% | 23,390 | 10% | 11,695 |
| Oil and Natural Gas Properties, Net | 124,756,861 | 42% | 53,000,000 | 32% | 40,000,000 |
| Other Assets | 31,939 | 10% | 3,194 | 10% | 3,194 |
| PPE, Net | 364,339 | 10% | 36,434 | 10% | 36,434 |
| **Total** | **$ 127,601,348** | | **$ 55,003,471** | | **$ 41,913,615** |

| | | | | | |
|---|---|---|---|---|---|
| **Total Recovery** | | | 54,533,257 | | 41,443,401 |
| Less Trustee and Professional Fees | 5% | | 2,726,663 | | 2,072,170 |
| **Total Available Funds** | | | **51,806,595** | | **39,371,231** |

| Creditor Claims | Estimated Book Value As of June 30, 2009 | Recovery | Available for Disbursement | Recovery | Available for Disbursement |
|---|---|---|---|---|---|
| Secured | $ 132,297,546 | 39% | $ 51,806,595 | 30% | $ 39,371,231 |
| Royalty | 3,288,490 | 14% | 470,214 | 14% | 470,214 |
| Priority Claims | 1,665,914 | 0% | - | 0% | - |
| | 137,251,950 | | 52,276,809 | | 39,841,445 |
| **Available for Unsecured** | | | - | | - |
| Unsecured Claims | 937,000 | 0% | - | 0% | - |
| Unsecured - Deficiency Royalty | 2,818,276 | 0% | - | 0% | - |
| Unsecured - Deficiency Claim Secured | $ 80,490,951 | 0% | - | 0% | - |
| **Total Claims Satisfied** | | | **$ 52,276,809** | | **$ 39,841,445** |

See page 2 for assumptions

## Attachment 2

## Baseline Oil & Gas Corp. Liquidation Analysis Assumptions

**Assumptions**

1  Liquidation analysis assumes that Baseline Oil & Gas files a Chapter 7 proceeding on 06/30/09.

2  Unrestricted Cash and Cash Equivalents - Consists of unrestricted cash in banks or operating accounts and liquid investments.

3  Restricted Royalty Cash - Consists of restricted cash in banks or operating accounts to be paid to royalty owners.

4  Accounts Receivable - represents amounts owed to the Debtors by various parties. For the purpose of the Liquidation Analysis, the accounts receivable balance is estimated to have a recovery rate of 70%. We assume that the book value listed on March 31, 2009 will not be materially different for June 30, 2009.

5  Oil & Natural gas Properties - we assumed a liquidation value of properties based on transactions that have occurred in the last 6 months. We utilized multiples based on the price paid for implied proved reserves and implied daily production. Additionally, we added $3 million for acreage located in Indiana. The Low Estimate was discounted by 25%.

6  All Other Assets - We assume that the book value listed on March 31, 2009 will not be materially different for June 30, 2009.

7  Trustee and Professional Fees - are based on the statutory escalating scale set forth in section 326 of the Bankruptcy Code, which provides for fees equal to 25% of the first $5,000 of proceeds, 10% of the next $45,000 of proceeds not to exceed $50,000, 5% of the next $950,000 of proceeds, and 3% of all proceeds in excess of $1,000,000. It is also assumed that the liquidation of the generating assets would require outside legal and investment banking firms generating fees estimated at 2% of sales proceeds. Therefore, total trustee and professional fees used in the Liquidation Analysis were 5%. Included in the 5% for professional and trustee fees is also any cash proceeds necessary to operate the Company until the estate could be liquidated.

8  No value has been assigned for causes of action.

*EXHIBIT F*

## Table 1A

### REORGANIZED DEBTOR

**Capitalization as of Effective Date (\*)**

| | Aggregate $ Amount | Jefferies | Third Point | Other Prepetition Noteholders |
|---|---|---|---|---|
| | | (in $ millions) | | |
| **Debt** | | | | |
| New Series A 20% Senior Secured Notes (1) | $   5.0 | 3.572 (1a) | 0.788 (1b) | 0.640 (1c) |
| New Series B 20% Senior Secured Notes (1) | 25.0 | 17.862 (1a) | 3.942 (1b) | 3.196 (1c) |
| New 10% Subordinated Secured Notes (2) | 10.0 | 6.876 (2a) | 1.517 (2b) | 1.607 (2c) |
| Total: | $ 40.0 | | | |
| **Equity** | | | | |
| Senior Preferred Stock, 25,000 shares (1) | $ 25.0 (3) | 17.862 (1a) | 3.942 (1b) | 3.196 (1c) |
| Junior Preferred Stock, 5,000 shares (1) | 5.0 (4) | 3.572 (1a) | 0.788 (1b) | 0.640 (1c) |
| New Common Stock, 1,000,000 shares (1) | 10.0 (5) | 6.876 (1a) | 1.517 (1b) | 1.607 (1c) |
| Total: | $ 40.0 | | | |

(\*) Allocation of the New Notes and New Stock as of the Effective Date, after giving effect to the Plan and assuming the pro rata participation by all of the Prepetition Noteholders in the Exit Facility.

(1) Allocated based upon the initial respective holdings of the outstanding $122.32 million aggregate principal amount of the Prepetition Notes:

    a.   71.4% held by Jefferies, or $87.4 million of the 15% Prepetition Notes

    b.   15.8% held by Third Point, $19.29 million of the 15% Prepetition Notes

    c.   12.8% held by Other Prepetition Noteholders, or 15.64 million of the 12½% Prepetition Notes

(2) Allocated based upon the respective holdings of the outstanding $122.32 million aggregate principal amount of the Prepetition Notes, as adjusted for the $25 million aggregate principal amount rolled forward by the Prepetition Noteholders participating in the Exit Facility:

    a.   71.4% held by Jefferies, or $69.54 million of the 15% Prepetition Notes (adjusted for roll up)

    b.   15.8% held by Third Point, or $15.34 million of the 15% Prepetition Notes (adjusted for roll up)

    c.   12.8% held by Other Prepetition Noteholders, or $12.44 million of the 12½% Prepetition Notes (adjusted for roll up)

(3) Senior Preferred Stock has a liquidation preference of $1,000 per share.

(4) Junior Preferred Stock has a liquidation preference of $1,000 per share.

(5) New Common Stock has a deemed value of $10.00 per share under the Plan.

## Table 1B

### REORGANIZED DEBTOR

Capitalization as of Effective Date (*)

| | Aggregate $ Amount | Jefferies | Third Point | Other Prepetition Noteholders |
|---|---|---|---|---|
| | | (in $ millions) | | |
| **Debt** | | | | |
| New Series A 20% Senior Secured Notes (1) | $ 5.0 | 4.096 (1a) | 0.904 (1b) | N/A |
| New Series B 20% Senior Secured Notes (1) | 25.0 | 20.480 (1a) | 4.520 (1b) | N/A |
| New 10% Subordinated Secured Notes (2) | 10.0 | 6.876 (2a) | 1.517 (2b) | 1.607 (2c) |
| Total: | $ 40.0 | | | |
| **Equity** | | | | |
| Senior Preferred Stock, 25,000 shares (1) | $ 25.0 (3) | 20.480 (1a) | 4.520 (1b) | N/A |
| Junior Preferred Stock, 5,000 shares (4) | 5.0 (5) | 3.572 (4a) | 0.788 (4b) | 0.640 (4c) |
| New Common Stock, 1,000,000 shares (6) | 10.0 (7) | 4.738 (8) | 1.045 (9) | 4.217 (10) |
| Total: | $ 40.0 | | | |

_____

(*) Allocation of the New Notes and New Stock as of the Effective Date, after giving effect to the Plan and assuming the pro rata participation by only of the 15% Noteholders in the Exit Facility.

(1) Allocated based upon the initial respective holdings of the outstanding $106,681,000 aggregate principal amount of the 15% Prepetition Notes:

    a.   81.9% held by Jefferies, or $87.395 million of the 15% Prepetition Notes

    b.   15.8% held by Third Point, $19.286 million of the 15% Prepetition Notes

(2) Allocated based upon the respective holdings of the outstanding $122.32 million aggregate principal amount of the Prepetition Notes, as adjusted for the $25 million aggregate principal amount rolled forward by the Prepetition Noteholders participating in the Exit Facility:

    a.   71.4% held by Jefferies, or $69.54 million of the 15% Prepetition Notes (adjusted for roll up)

    b.   15.8% held by Third Point, or $15.34 million of the 15% Prepetition Notes (adjusted for roll up)

    c.   12.8% held by Other Prepetition Noteholders, or $12.44 million of the 12½% Prepetition Notes (adjusted for roll up)

(3) Senior Preferred Stock has a liquidation preference of $1,000 per share.

(4) Allocated based upon the initial respective holdings of the outstanding $122.32 million aggregate principal amount of the Prepetition Notes:

    a.   71.4% held by Jefferies, or $87.4 million of the 15% Prepetition Notes

    b.   15.8% held by Third Point, $19.29 million of the 15% Prepetition Notes

    c.   12.8% held by Other Prepetition Noteholders, or 15.64 million of the 12½% Prepetition Notes

(5) Junior Preferred Stock has a liquidation preference of $1,000 per share.

(6) Subject to adjustments, if any, in (i) the number of shares of New Common Stock available and (ii) the *pro rata* share of the New Common Stock to which the Prepetition Noteholders are entitled, each as more particularly set forth in note (10) below, allocated based upon the initial respective holdings of the outstanding $122.32 million aggregate principal amount of the Prepetition Notes (see note (4) above). For purposes of the calculation, a total of 1 million shares of the New Common Stock have been authorized for issuance under the Plan.

(7) New Common Stock has a deemed value of $10.00 per share under the Plan.

(8) Represents 473,800 shares of New Common Stock. Based upon valuation resulting from multiplying $6.8 million (value of New Common Stock available for issuance under the Plan after deducting the Make-Up Common Shares – see note (10) below) by 69.9% (Jefferies holdings of the outstanding Prepetition Notes, as diluted by the issuance of the Dilutive Common Shares - see note (10) below).

(9) Represents 104,500 shares of New Common Stock. Based upon valuation resulting from multiplying $6.8 million (value of New Common Stock available for issuance under the Plan after deducting the Make-Up Common Shares – see note (10) below) by 15.4% (Third Point holdings of the outstanding Prepetition Notes, as diluted by the issuance of the Dilutive Common Shares - see note (10) below).

(10) Represents 421,700 aggregate shares of New Common Stock, consisting of:

    a. 319,600 Make-Up Common Shares (defined below), based upon valuation resulting from multiplying $25 million (amount rolled forward in Exit Facility) by 12.8% (Other Prepetition Noteholders' aggregate holdings of the outstanding Prepetition Notes - see note (4) above);

    b. 15,100 Dilutive Common Shares (defined below), based upon valuation resulting from multiplying $6.8 million (value of New Common Stock available for issuance under the Plan after deducting the Make-Up Common Shares) by 2.2%; and

    c. 87,000 shares (balance) of common stock, based upon valuation resulting from multiplying $6.8 million (value of New Common Stock available for issuance under the Plan after deducting the Make-Up Common Shares) by 12.8% (Other Prepetition Noteholders' aggregate holdings of the outstanding Prepetition Notes).

As used in this Table:

    (i) "Make-Up Common Shares" shall mean that number of shares of New Common Stock having a share value equivalent to the pro rata share of the $25 million aggregate principal amount rolled forward in the Exit Facility which Prepetition Holder forewent by not electing to participate in the Exit Facility. For purposes of the calculation, the pro rata amount is based upon the percentage of the Prepetition Noteholder's initial respective holding in the outstanding principal amount of the Prepetition Notes (see note (4) above).

    (ii) "Dilutive Common Shares" shall mean that number of shares of New Common Stock having a share value equivalent to 2.2% of the outstanding shares of New Common Stock issuable under the Plan, after giving effect to issuance of the Make-Up Common Shares (see above), which shares are issuable under the Plan to each of the Prepetition Noteholders who does not elect to participate in the Exit Facility. All Exit Facility Lenders shall share in the dilution caused thereby.

**EXHIBIT G**

## BASELINE - 2009 FORECAST

*(Rotated financial spreadsheet. Column headers are successive month‑end dates across 2009 — 01/31/09, 02/28/09, 03/31/09, 04/30/09, 05/31/09, 06/30/09, 07/31/09, 08/31/09, 09/30/09, 10/31/09, 11/30/09, 12/31/09 — plus an annual total column F 01/31/09.)*

### OIL AND GAS PRICES
- Avg. Net Oil Price, $/BBL
- Avg. Net Gas Price, $/MCF

### SALES VOLUMES
- Gross Oil, BBL
- Gross Gas, MCF
- Net Oil, BBL
- Net Gas, MCF
- MCFEoil

### REVENUE
- Gross Oil Revenues, $
- Gross Gas Revenues, $
- Total Gross Revenues, $
- Total Royalties, $
- Net Oil Revenues, $
- Net Gas Revenues, $
- Total Net Revenues, $

### EXPENSES
- Severance Taxes, $
- Ad Valorem Taxes, $
- LOE, $
- Operating Insurance, $

### FIELD LEVEL INCOME $
- Field Level Cash Flow, $

### GENERAL & ADMINISTRATIVE
- Office Rent, $
- Supplies, Subscripts, Postage, Maps, $
- Phone, Computers, Copiers, Printers, $
- Travel, Entertainment, Auto, $
- Insurance
- Stock Transfer, SEC Reporting, Printing $
- Franchise Tax, $
- **Sub-total - Office Expenses, $**
- Officers Salaries, $
- Administrative Salaries, $
- Payroll Taxes, Medical & 401k, $
- **Sub-Total - Salaries & Labor, $**
- Legal Fees - General Corp. & SEC, $
- Auditors and Accounting Fees, $
- Engineering, Reserve Reports, $
- Contract Labor - Office Fees, $
- Consultants - Geological, $
- Consultants - Land, $
- **Sub-Total - Professional Fees, $**
- T&K, $
- James Day, $
- Administrative Professionals
- Other Restructuring Professionals
- **Sub-Total - Restructuring Professionals**

### TOTAL - GENERAL & ADMINISTRATIVE, $
- **Corporate EBITDA, $**

**BASELINE:   MONTHLY CASH BALANCES FORECAST FOR OPERATING AND REVENUE ACCOUNTS MAINTAINED AT COMPASS BANK**

| Operating Account Balance (#343) | F:11/01/09 T:11/31/09 | F:12/01/09 T:12/31/09 | F:01/01/09 T:01/31/09 | F:02/01/09 T:02/31/09 | F:03/01/09 T:03/31/09 | F:04/01/09 T:04/31/09 | F:05/01/09 T:05/31/09 | F:06/01/09 T:06/31/09 | F:07/01/09 T:07/31/09 | F:08/01/09 T:08/31/09 | F:09/01/09 T:09/31/09 | F:10/01/09 T:10/31/09 | F:11/01/09 T:11/31/08 | F:12/01/09 T:12/31/09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash at Start of Month (General Ledger) | 5,959,865 | 2,070,790 | 2,094,732 | 1,106,216 | 812,411 | 39,014 | 535,944 | 229,560 | 333,476 | 355,716 | 473,210 | 3,132,250 | 3,132,250 | 1,889,708 |
| Receipt of Prior Month Production Revenue, $ | 1,691,039 | 1,542,878 | 1,279,313 | 1,710,678 | 1,591,135 | 1,870,888 | 2,115,491 | 1,814,016 | 1,872,070 | 1,919,498 | 1,887,771 | 2,057,917 | | |
| Timing Differences on Revenue Receipt, $ | -451,206 | 27,575 | 573,374 | 598 | -542,149 | 541,754 | 2,593 | | | | | | | |
| Prior Month Royalty Due - Move to Rev Acct., $ | -375,000 | -379,137 | -742,854 | -291,111 | -238,857 | -434,700 | -518,872 | -542,111 | -558,605 | -469,878 | -460,646 | -509,410 | | |
| Catch-Up Royalty Due - Move to Rev Acct., $ | | | | | | | | | | | | | | |
| LOE & CAPEX Paid, $ | -2,138,707 | -535,783 | -1,327,331 | -1,160,774 | -773,024 | -893,003 | -789,191 | -759,191 | -740,881 | -740,881 | -740,881 | -740,881 | | |
| Current Month Payroll, $ | -155,784 | -193,288 | -130,882 | -946,921 | -172,112 | -189,883 | -147,535 | -147,535 | -759,191 | -147,535 | -147,535 | -147,535 | | |
| Prior Month Non-Payroll G&A, $ | -142,266 | -431,326 | -150,550 | -187,002 | -189,883 | -172,112 | -41,656 | -46,555 | -33,956 | -33,956 | -157,206 | -157,206 | | |
| Payment of Restructuring Costs, $ | 0 | 0 | -50,000 | -132,512 | -106,360 | -51,556 | -515,678 | -450,000 | -450,000 | -360,000 | -33,956 | -44,706 | | |
| Deposit-Thompson & Knight, $ | | | -200,000 | -209,742 | -308,982 | -450,000 | | | | | -75,000 | | | |
| Deposit-Jones Day, Grant Thornton, $ | | | -150,000 | | | | | | | | | | | |
| Draw on Exit Financing Facility, $ | 0 | 0 | 0 | 0 | -75,000 | | | | | | 3,200,000 | 3,132,250 | | |
| Cash Interest Paid, $ | -3,333,789 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -32,000 | -32,000 | | |
| Cash Hedge Settlements Net, $ | 4,958,673 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Payoff of Wells Fargo Foothill Loan, $ | -3,589,159 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -1,182,000 | | | |
| Other Misc. Receipts (Payments), $ | 36,132 | -12,407 | 785 | 10,700 | 13,191 | 750 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Balancing Figure to Reach GL Balance, $ | 10,592 | 5,830 | 30,431 | 33,641 | 44,572 | 40,521 | 0 | 2 | 0 | 0 | 0 | 0 | | |
| Cash at End of Month (General Ledger), $ | 2,070,790 | 2,094,732 | 1,106,216 | 812,411 | 39,014 | 535,944 | 229,560 | 333,476 | 334,159 | 406,942 | 179,113 | 1,443,002 | | |
| | | | | | | | | | | | | | | |
| Actual General Ledger Balance, $ | 2,070,790 | 2,094,732 | 1,106,216 | 812,411 | 39,014 | 535,944 | 495,935 | 334,159 | 406,942 | | | | | |

| Royalty Account Balance (#351) | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash at Start of Month (General Ledger) | 244,205 | 3,811 | -16,524 | 370,854 | 355,356 | 256,465 | 279,560 | 333,476 | 356,716 | 473,210 | 3,132,250 | 1,889,708 | | |
| Royalty Funds Received from Operating Acct., $ | 375,000 | 379,137 | 742,854 | 292,111 | 238,857 | 434,700 | 518,872 | 518,872 | 542,111 | 558,605 | 3,117,045 | 3,689,208 | | |
| Royalties Paid, $ | -629,333 | -395,522 | -356,775 | -294,478 | -353,241 | -411,679 | -464,955 | -518,872 | -518,872 | -442,111 | -458,605 | -1,433,330 | | |
| Balancing entry | | 1,349 | -13,091 | 15,454 | 74 | | | | | | | | | |
| Suspense Royalties Paid $ | -486,061 | 0 | 0 | 355,356 | 279,560 | 333,476 | 473,210 | 1,689,708 | 1,689,708 | 205,162 | | | | |
| Cash at End of Month (General Ledger) | 3,811 | -16,524 | 370,854 | 256,465 | 632,800 | 683,476 | 706,716 | 823,210 | | | | | | |
| Suspense Account Balance, $ | 496,427 | 399,628 | 748,425 | 597,693 | 599,117 | | | | | | | | | |
| End of Month Balance from Bank Statement | | | | | | | | | | | | | | |

*Note: red = actual balances.*

*green = forecast balances start of each month.*

**NOTES/ASSUMPTIONS**

A draw of $3.2 million on the Exit Financing (12%, interest only assumed) is made in October to bring Royalty Account Balance up to Suspense Balance, and to provide working capital

Suspense Royalty balance of $2,880,022 is retired in equal payments Nov.-Dec. 2009; also Blessing Severance Tax balance of $1,182,000 retired October 2009.

The Ch 11 filing is assumed to be made at the end of August 2009 and plan is assumed to be confirmed at the end of September.

Cost of the profess ionals (Thompson & Knight; Jones Day, Grant Thornton) for the Chapter 11 process totals ~$2.0 million, including return/application of unused deposits.

D&O policy goes into "run-off" mode upon emergence from Chapter 11, requiring premium payment of $125 thousand in October 2009.

Auditors continue support for taxes, audit and preparation of year-end financials (not as extensive as public company).  A year-end and 3rd party reserve report is also included.

At year-end, ~$1.4 million of cash is forecast to be in the Operating account.

## GENERAL & ADMINISTRATIVE

| | F1 1/3/09 | F2 1/25/09 | F3 1/01/09 | F4 1/04/09 | F5 1/08/09 | F6 1/06/09 | F7 1/07/31/09 | F8 1/08/31/09 | F9 1/09/30/09 | F10 1/10/31/09 | F11 1/11/09 | F12 1/12/25/09 | TOTAL 1/12/31/09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Office Rent | 12,016 | 12,016 | 12,016 | 12,016 | 12,016 | 12,016 | 12,016 | 12,016 | 12,016 | 12,016 | 12,016 | 12,016 | 144,192 |
| Supplies, subscript, postage, maps | 86 | 40,371 | 6,899 | 3,277 | 3,150 | 3,150 | 3,150 | 3,150 | 3,150 | 3,150 | 3,150 | 3,150 | 75,833 |
| Phones, computers & copiers, printers | 3,040 | 8,272 | 3,958 | 5,065 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,335 |
| Bank fees and charges | 4,821 | 1,202 | 1,180 | 59 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 39,262 |
| Travel, entertainment, auto | 4,545 | 5,294 | 3,496 | 2,568 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 39,903 |
| Insurance expense, D&O | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 125,000 | 125,000 | 0 | 0 | 125,000 |
| Stock transfer, SEC reporting, printing | 750 | 3,034 | 1,518 | 6,029 | 7,050 | 7,050 | 2,950 | 2,450 | 2,450 | 700 | 700 | 700 | 35,381 |
| Franchise tax | 1,840 | 1,840 | 1,839 | 1,840 | 1,840 | 1,840 | 1,840 | 1,840 | 1,840 | 1,840 | 1,840 | 1,840 | 22,079 |
| sub-total: Office expenses | 27,098 | 72,039 | 30,906 | 30,854 | 33,556 | 33,556 | 29,456 | 28,956 | 28,956 | 152,206 | 27,206 | 27,206 | 521,985 |
| Officers salaries | 72,500 | 72,500 | 72,500 | 72,500 | 72,500 | 55,834 | 72,500 | 36,250 | 36,250 | 36,250 | 36,250 | 36,250 | 672,084 |
| Director's fees | 51,000 | 51,000 | 51,000 | 51,000 | 51,000 | 51,000 | 51,000 | 51,000 | 51,000 | 51,000 | 51,000 | 51,000 | 612,000 |
| Administrative salaries | 26,039 | 24,907 | 22,422 | 18,502 | 21,383 | 20,278 | 21,383 | 15,285 | 15,285 | 15,285 | 15,285 | 15,285 | 231,238 |
| Payroll taxes, Medical & 401k | 149,539 | 148,407 | 145,822 | 142,002 | 144,883 | 127,112 | 144,883 | 101,535 | 102,535 | 102,535 | 102,535 | 102,535 | 1,515,372 |
| sub-total: Salaries & Labor | | | | | | | | | | | | | |
| Legal fees - corp/SEC | 39,518 | 39,222 | 38,204 | | | | | | | | | | 117,044 |
| Auditors, accounting fees | 55,310 | 30,000 | 30,000 | 47,500 | | | 12,500 | | | | 12,500 | 30,000 | 157,810 |
| Engineering - reserves | 0 | 16,838 | 13,402 | 12,006 | | | | | | | | | 92,246 |
| Contract labor - office tasks | 300,000 | 8,550 | | 13,000 | 15,000 | 7,500 | | | | | | | 326,550 |
| Consultants - geological & general | 6,000 | 6,521 | | | | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 65,021 |
| Consultants - land | 3,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,500 | |
| Consultants - engineering | 0 | 2,390 | 101,606 | 3,000 | 3,000 | 0 | 2 | 0 | 0 | 0 | 17,500 | 3,500 | 20,390 |
| sub-total: Professionals | 404,438 | 78,521 | | 75,506 | 18,000 | 7,500 | 17,500 | 5,000 | 5,000 | 5,000 | | 4,3,500 | 779,061 |
| T&K | 0 | 0 | 59,742 | 298,982 | 250,000 | 274,518 | 200,000 | 175,000 | 50,000 | -150,000 | 0 | 0 | 1,118,242 |
| Jones Day | 0 | 0 | 0 | 150,000 | 200,000 | 174,183 | 200,000 | 75,000 | 25,000 | -150,000 | 0 | 0 | 524,383 |
| Other Restructuring Professionals | 0 | 0 | 50,000 | 150,000 | 50,000 | 66,777 | 50,000 | 50,000 | 0 | -21,000 | 0 | 0 | 395,777 |
| sub-total: restructuring professionals | 0 | 0 | 109,742 | 408,982 | 500,000 | 515,678 | 450,000 | 300,000 | 75,000 | -321,000 | 0 | 0 | 2,038,402 |
| **TOTAL - GENERAL & ADMIN.** | $585,065 | $298,597 | $388,076 | $657,544 | $696,439 | $688,846 | $641,839 | $456,491 | $211,491 | -$61,259 | $147,241 | $373,241 | $4,854,770 |

G-3

Oil and Natural Gas Pricing Forecast for 180 Day Chapter 11 Budget

**NYMEX Closing Prices as of July 16, 2009**                                          **NYMEX Strip as of July 16, 2009 Market Close**

|           |      | Lt. Sweet Crude | Natural Gas | Year | Lt. Sweet Crude | Natural Gas |
|-----------|------|-----------------|-------------|------|-----------------|-------------|
|           |      |                 |             | 2009 | $64.29          | $4.30       |
|           |      |                 |             | 2010 | $70.04          | $5.82       |
|           |      |                 |             | 2011 | $73.81          | $6.65       |
| August    | 2009 | $62.02          | $3.668      | 2012 | $76.65          | $6.87       |
| September | 2009 | $63.06          | $3.813      | 2013 | $78.98          | $7.04       |
| October   | 2009 | $64.33          | $4.020      | 2014 | $81.43          | $7.20       |
| November  | 2009 | $65.53          | $4.666      | 2015 | $84.49          | $7.37       |
| December  | 2009 | $66.52          | $5.314      | 2016 | $87.02          | $7.58       |
|           |      | $64.29          | $4.30       | 2017 | $89.47          | $7.74       |
|           |      |                 |             |      |                 |             |
| January   | 2010 | $67.36          | $5.594      |      |                 |             |
| February  | 2010 | $68.05          | $5.625      |      |                 |             |
| March     | 2010 | $68.62          | $5.559      |      |                 |             |
| April     | 2010 | $69.14          | $5.472      |      |                 |             |
| May       | 2010 | $69.64          | $5.519      |      |                 |             |
| June      | 2010 | $70.12          | $5.617      |      |                 |             |
| July      | 2010 | $70.51          | $5.735      |      |                 |             |
| August    | 2010 | $70.80          | $5.825      |      |                 |             |
| September | 2010 | $71.08          | $5.887      |      |                 |             |
| October   | 2010 | $71.38          | $5.997      |      |                 |             |
| November  | 2010 | $71.70          | $6.342      |      |                 |             |
| December  | 2010 | $72.03          | $6.722      |      |                 |             |
|           |      | $70.04          | $5.825      |      |                 |             |
|           |      |                 |             |      |                 |             |
| January   | 2011 | $72.29          | $6.942      |      |                 |             |
| February  | 2011 | $72.57          | $6.942      |      |                 |             |
| March     | 2011 | $72.85          | $6.767      |      |                 |             |
| April     | 2011 | $73.13          | $6.302      |      |                 |             |
| May       | 2011 | $73.41          | $6.272      |      |                 |             |
| June      | 2011 | $73.69          | $6.357      |      |                 |             |
| July      | 2011 | $73.96          | $6.457      |      |                 |             |
| August    | 2011 | $74.23          | $6.527      |      |                 |             |
| September | 2011 | $74.50          | $6.557      |      |                 |             |
| October   | 2011 | $74.77          | $6.637      |      |                 |             |
| November  | 2011 | $75.04          | $6.872      |      |                 |             |
| December  | 2011 | $75.31          | $7.162      |      |                 |             |
|           |      | $73.81          | $6.650      |      |                 |             |
|           |      |                 |             |      |                 |             |
| January   | 2012 | $75.53          | $7.372      |      |                 |             |
| February  | 2012 | $75.75          | $7.367      |      |                 |             |
| March     | 2012 | $75.97          | $7.142      |      |                 |             |
| April     | 2012 | $76.18          | $6.492      |      |                 |             |
| May       | 2012 | $76.39          | $6.447      |      |                 |             |
| June      | 2012 | $76.59          | $6.527      |      |                 |             |
| July      | 2012 | $76.78          | $6.622      |      |                 |             |
| August    | 2012 | $76.96          | $6.687      |      |                 |             |
| September | 2012 | $77.14          | $6.717      |      |                 |             |
| October   | 2012 | $77.33          | $6.797      |      |                 |             |
| November  | 2012 | $77.52          | $7.022      |      |                 |             |
| December  | 2012 | $77.71          | $7.307      |      |                 |             |
|           |      | $76.65          | $6.875      |      |                 |             |
|           |      |                 |             |      |                 |             |
| January   | 2013 | $77.90          | $7.512      |      |                 |             |
| February  | 2013 | $78.09          | $7.507      |      |                 |             |
| March     | 2013 | $78.28          | $7.287      |      |                 |             |
| April     | 2013 | $78.48          | $6.647      |      |                 |             |
| May       | 2013 | $78.68          | $6.607      |      |                 |             |
| June      | 2013 | $78.88          | $6.692      |      |                 |             |
| July      | 2013 | $79.08          | $6.787      |      |                 |             |
| August    | 2013 | $79.28          | $6.857      |      |                 |             |
| September | 2013 | $79.48          | $6.887      |      |                 |             |
| October   | 2013 | $79.68          | $6.972      |      |                 |             |
| November  | 2013 | $79.88          | $7.212      |      |                 |             |
| December  | 2013 | $80.08          | $7.497      |      |                 |             |
|           |      | $78.98          | $7.039      |      |                 |             |

*Exhibit H*

**Exhibit H**

Financial Statements and Financial Statement Schedules of Baseline Oil & Gas Corp. for the fiscal year ended December 31, 2008, as filed with the Securities and Exchange Commission on Form 10-KREPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors
Baseline Oil & Gas Corp.
Houston, Texas

We have audited the accompanying balance sheets of Baseline Oil and Gas Corp. (a Nevada Corporation) as of December 31, 2008 and 2007, and the related statements of operations, stockholders' equity (deficit), and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform an audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Baseline Oil and Gas Corp. as of December 31, 2008 and 2007 and the results of operations and cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming that Baseline Oil & Gas Corp. will continue as a going concern. As discussed in Note 2 to the financial statements, Baseline Oil & Gas Corp. suffered losses from operations and has a working capital deficiency, which raises substantial doubt about its ability to continue as a going concern. Management's plans regarding those matters also are described in Note 2. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

s/ Malone & Bailey, PC
www.malone-bailey.com
Houston, Texas

March 31, 2009

**BASELINE OIL & GAS CORP.**
**BALANCE SHEETS**

| | December 31, 2008 | December 31, 2007 |
|---|---|---|
| **ASSETS** | | |
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ 6,350,520 | $ 5,014,455 |
| Short term investments – trading securities | — | 13,901,275 |
| Accounts receivable | 2,137,204 | 3,774,033 |
| Derivative asset | 4,432,079 | — |
| Deferred loan costs | 341,152 | 2,310,975 |
| Prepaid and other current assets | 157,210 | 111,884 |
| **Total current assets** | 13,418,165 | 25,112,622 |
| OIL AND NATURAL GAS PROPERTIES – using successful efforts method of accounting | | |
| Proved properties | 149,699,206 | 128,381,629 |
| Unproved properties | 8,510,126 | 8,475,666 |
| Less accumulated depletion, depreciation and amortization | (34,119,869) | (1,823,233) |
| **Oil and natural gas properties, net** | 124,089,463 | 135,034,062 |
| Other assets | 37,939 | 15,989 |
| Deferred loan costs, net of accumulated amortization of $22,197,084 and $6,390,283, respectively | — | 13,038,093 |
| Other property and equipment, net of accumulated depreciation of $98,129 and $17,519, respectively | 371,151 | 184,551 |
| **TOTAL ASSETS** | $ 137,916,718 | $ 173,385,317 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| CURRENT LIABILITIES | | |
| Accounts payable | $ 2,718,303 | $ 2,151,549 |
| Accrued interest | 4,483,359 | 5,387,671 |
| Accrued expenses | 1,303,056 | 405,465 |
| Royalties payable | 4,164,955 | 3,827,901 |
| Short term debt and current portion of long-term debt, net of discount of $2,444,967 and $0, respectively | 123,693,783 | 65,006 |
| Derivative liabilities – short term | — | 3,076,709 |
| **Total current liabilities** | 136,363,456 | 14,914,301 |
| Long term debt, net of discount of $0 and $4,436,137, respectively | — | 160,816,395 |
| Asset retirement obligations | 314,532 | 282,947 |
| Derivative liability – long term | — | 5,759,471 |
| **Total liabilities** | 136,677,988 | 181,773,114 |
| COMMITMENTS AND CONTINGENCIES | — | — |
| STOCKHOLDERS' EQUITY (DEFICIT) | | |
| Common stock, $0.001 par value per share; 300,000,000 shares authorized; 151,497,530 and 34,408,006 shares issued and outstanding, respectively | 151,498 | 34,408 |
| Additional paid-in capital | 111,703,204 | 33,617,266 |
| Accumulated other comprehensive gain (loss) | 4,955,580 | (7,362,151) |
| Accumulated deficit | (115,571,552) | (34,677,320) |
| **Total stockholders' equity (deficit)** | 1,238,730 | (8,387,797) |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT) (DEFICIT)** | $ 137,916,718 | $ 173,385,317 |

The accompanying notes are an integral part of the financial statements

**BASELINE OIL & GAS CORP.**
**STATEMENTS OF OPERATIONS**

| | | Year Ended December 31, | |
| --- | --- | --- | --- |
| | | 2008 | 2007 |
| REVENUES | | | |
| Oil and gas sales | $ | 37,361,186 | $ 13,970,654 |
| Oil and gas hedging | | (4,706,964) | (2,361,614) |
| **Total revenue** | | 32,654,222 | 11,609,040 |
| COSTS AND EXPENSES | | | |
| Production | | 10,506,835 | 5,148,418 |
| General and administrative | | 6,597,315 | 3,406,450 |
| Depreciation, depletion, amortization and impairment | | 32,377,246 | 1,840,752 |
| Accretion expense | | 31,585 | 41,988 |
| **Total costs and expenses** | | 49,512,981 | 10,437,608 |
| **Net Income (loss) from operations** | $ | (16,858,759) | $ 1,171,432 |
| OTHER INCOME (EXPENSE) | | | |
| Other income | | 497,417 | 66,407 |
| Interest income | | 514,422 | 98,885 |
| Interest expense | | (23,517,437) | (14,094,504) |
| Loss on conversion of debt | | (41,482,678) | — |
| Realized loss on marketable securities | | (47,197) | — |
| Unrealized gain on marketable securities | | — | 45,875 |
| **Total other expense, net** | | (64,035,473) | (13,883,337) |
| **NET LOSS** | $ | (80,894,232) | $ (12,711,905) |
| OTHER COMPREHENSIVE INCOME (LOSS) | | | |
| Unrealized gain (loss) on derivative instruments | | 12,317,731 | (7,362,151) |
| **Total comprehensive loss** | $ | (68,576,501) | $ (20,074,056) |
| NET LOSS PER SHARE – Basic and Diluted | $ | (0.93) | $ (0.39) |
| WEIGHTED AVERAGE NUMBER OF SHARES OUTSTANDING | | 87,354,985 | 32,554,343 |

The accompanying notes are an integral part of the financial statements

BASELINE OIL & GAS CORP.
STATEMENTS OF CASH FLOWS

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2008 | 2007 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net loss | $ (80,894,232) | $ (12,711,905) |
| Adjustments to reconcile net loss to net cash | | |
| Used in operating activities | | |
| Share based compensation | 1,612,711 | 816,365 |
| Common stock issued for services | — | 360,000 |
| Depreciation, depletion, amortization and impairment | 32,377,246 | 1,840,752 |
| Amortization of debt discount | 1,712,617 | 576,812 |
| Amortization of deferred loan costs | 2,558,765 | 6,153,091 |
| Loss(gain) on derivative instruments | (950,528) | 1,893,069 |
| Loss on conversion of debt | 41,482,678 | — |
| Unrealized gain on marketable securities | — | (45,875) |
| Loss on sale of short term investments | 47,197 | — |
| Accretion expense | 31,585 | 41,988 |
| Changes in operating assets and liabilities | | |
| Accounts receivable | 1,636,829 | (3,774,033) |
| Prepaid and other current assets | (67,276) | 96,838 |
| Accounts payable | 566,754 | 2,068,676 |
| Accrued interest | 4,782,587 | 5,526,618 |
| Accrued expenses | 976,170 | 319,971 |
| Royalties payable | 337,054 | 3,827,901 |
| Net cash provided by operating activities | 6,210,157 | 6,990,268 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Acquisition of proved oil and gas properties | — | (124,490,793) |
| Investment in proved properties | (21,865,577) | (5,228,246) |
| Investment in unproved properties | (34,460) | (665,531) |
| Premiums paid for hedge contracts | — | (419,040) |
| Purchase of marketable securities | (10,563,674) | (15,851,790) |
| Proceeds from sale of marketable securities | 24,417,752 | 1,996,390 |
| Purchase of property and equipment, other | (267,210) | (202,070) |
| Net cash used in investing activities | (8,313,169) | (144,861,080) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from debt | 11,405,859 | 195,847,305 |
| Repayments of debt | (7,715,897) | (36,914,178) |
| Deferred loan costs incurred | (250,885) | (16,171,538) |
| Net cash provided By financing activities | 3,439,077 | 142,761,589 |
| | | |
| **INCREASE IN CASH AND CASH EQUIVALENTS** | 1,336,065 | 4,890,777 |
| **CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD** | 5,014,455 | 123,678 |
| **CASH AND CASH EQUIVALENTS, END OF PERIOD** | $ 6,350,520 | $ 5,014,455 |
| **SUPPLEMENTAL DISCLOSURES:** | | |
| Cash paid for interest | 14,384,039 | 1,571,815 |
| Cash paid for income taxes | — | — |
| **NON-CASH ACTIVITIES** | | |
| Unrealized gain (loss) on derivative liability | 12,317,731 | (7,362,151) |
| Debt issued in lieu of cash interest | 3,500,000 | — |
| Stock issued in lieu of cash interest | — | 226,203 |
| Stock issued on conversion of debt | 53,041,544 | 725,000 |
| Stock issued for make whole premium on conversion of debt | 17,906,744 | — |
| Warrants issued in conjunction with debt | — | 2,373,674 |
| Overriding royalty interest granted in conjunction with debt | — | 2,678,000 |
| Stock issued for note extension | — | 190,000 |
| Asset retirement obligation incurred | — | 240,959 |

**The accompanying notes are an integral part of the financial statements**

H-3

## BASELINE OIL & GAS CORP.
## STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY (DEFICIT)

| | Common Stock | | Paid-in Capital | Other Comprehensive Loss | Accumulated Deficit | Total Equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance at December 31, 2006 ... | 31,342,738 | $ 31,343 | $ 28,423,418 | $ — | $ (21,564,640) | $ 6,890,121 |
| Fair value of warrants issued in conjunction with debt............ | — | — | 2,373,674 | — | — | 2,373,674 |
| Stock-based compensation.......... | — | — | 816,365 | — | — | 816,365 |
| Stock issued for consulting fees.. | 600,000 | 600 | 359,400 | — | — | 360,000 |
| Stock issued for note extension... | 380,000 | 380 | 189,620 | — | — | 190,000 |
| Stock issued on conversion of debt......................................... | 1,450,000 | 1,450 | 723,550 | — | — | 725,000 |
| Stock issued in lieu of cash interest...................................... | 393,032 | 393 | 225,810 | — | — | 226,203 |
| Stock issued for cashless exercise of stock options........ | 242,236 | 242 | (242) | — | — | |
| Cumulative change in derivative liability ................................. | — | — | 505,671 | — | (400,775) | 104,896 |
| Unrealized loss on hedge contracts ................................. | — | — | — | (7,362,151) | | (7,362,151) |
| Net loss ...................................... | — | — | — | | (12,711,905) | (12,711,905) |
| Balance at December 31, 2007 ... | 34,408,006 | $ 34,408 | $ 33,617,266 | $ (7,362,151) | $ (34,677,320) | $ (8,387,797) |
| Stock-based compensation.......... | — | — | 1,612,711 | — | — | 1,612,711 |
| Stock issued on conversion of debt......................................... | 117,035,248 | 117,036 | 76,473,281 | — | — | 76,590,317 |
| Stock issued for cashless exercise of stock options........ | 54,276 | 54 | (54) | — | — | |
| Unrealized gain on hedge contracts ................................. | — | — | — | 12,317,731 | | 12,317,731 |
| Net loss ...................................... | — | — | — | | (80,894,232) | (80,894,232) |
| Balance at December 31, 2008 ... | 151,497,530 | $ 151,498 | $ 111,703,204 | $ 4,955,580 | $ (115,571,552) | $ 1,238,730 |

**The accompanying notes are an integral part of the financial statements**

H-4

**BASELINE OIL & GAS CORP.**
**NOTES TO FINANCIAL STATEMENTS**

## NOTE 1 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Nature of Operations and Organization*

Baseline Oil & Gas Corp. ("Baseline" or the "Company") is an independent exploration and production company primarily engaged in the acquisition, development, production and exploration of oil and natural gas properties onshore in the United States.

*Use of Estimates*

The preparation of these financial statements is in conformity with accounting principles generally accepted in the United States of America and requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of revenues and expenses during the reporting period. Actual results could differ from those estimates.

The most critical estimate the Company uses is the engineering estimate of proved oil and gas reserves. This estimate affects the application of the successful efforts method of accounting, the calculation of depreciation and depletion of oil and gas properties and the estimate of the impairment of the Company's oil and gas properties. It also affects the estimated lives of the Company's assets used to determine asset retirement obligations.

*Successful Efforts Method Accounting*

The Company uses the successful efforts method of accounting for oil and gas producing activities. Costs to acquire mineral interests in oil and gas properties, to drill and equip exploratory wells that find proved reserves, to drill and equip development wells and related asset retirement costs are capitalized. Costs to drill exploratory wells that do not find proved reserves, geological and geophysical costs, and costs of carrying and retaining unproved properties are expensed.

*Impairment of Oil and Natural Gas Properties*

Unproved oil and gas properties that are individually significant are periodically assessed for impairment of value, and a loss is recognized at the time of the impairment by providing an impairment allowance. An asset would be impaired if the undiscounted cash flows were less than its carrying value. Impairments are measured by the amount by which the carrying value exceeds its fair value. Because the Company uses the successful efforts method, the Company assesses its properties individually for impairment, instead of on an aggregate pool of costs.

*Depreciation and Depletion of Oil and Natural Gas Properties*

Capitalized costs of producing oil and gas properties, after considering estimated residual salvage values, are depreciated and depleted by the unit-of-production method. This method is applied through the simple multiplication of reserve units produced by the leasehold costs per unit on a field by field basis. Leasehold cost per unit is calculated by dividing the total cost of acquiring the leasehold by the estimated total proved oil and gas reserves associated with that lease. Field cost is calculated by dividing the total cost by the estimated total proved producing oil and gas reserves associated with that field.

*Asset Retirement Obligations*

The Company records a liability for legal obligations associated with the retirement of tangible long-lived assets in the period in which they are incurred in accordance with SFAS No. 143 "Accounting for Asset Retirement Obligations." Under this method, when liabilities for dismantlement and abandonment costs (ARO) are initially recorded, the carrying amount of the related oil and natural gas properties are increased. Accretion of the liability is recognized each period using the interest method of allocation, and the capitalized cost is depleted over the useful life of the related asset. Revisions to such estimates are recorded as adjustments to the ARO, capitalized asset retirement costs and charges to operations during the periods in which they become known. At the time the abandonment cost is incurred, the Company is required to recognize a gain or loss if the actual costs do not equal the estimated costs included in ARO.

*Concentrations of Credit Risk*

All of the Company's receivables are due from oil and natural gas purchasers. The Company sold 99% and 89% of its oil and natural gas production to three customers in 2008 and 2007, respectively.

Baseline maintains its cash in bank deposit accounts which, at times, may exceed federally insured limits. Accounts are guaranteed by the Federal Deposit Insurance Corporation ("FDIC") up to $250,000. At December 31, 2008 and 2007, Baseline had approximately $6,100,520 and $4,774,678, in excess of FDIC insured limits, respectively. Baseline has not experienced any losses in such accounts.

*Revenue and Cost Recognition*

The Company uses the sales method of accounting for natural gas and oil revenues. Under this method, revenues are recognized based on the actual volumes of gas and oil sold to purchasers. The volume sold may differ from the volumes to which the Company is entitled based on its interest in the properties. Costs associated with production are expensed in the period incurred.

*Cash and Cash Equivalents*

Cash and cash equivalents include cash in banks and liquid deposit with maturities of three months or less.

*Short-term Investments*

The Company's short-term investments consist primarily of U. S. government and agency securities and investment grade corporate notes and bonds, all of which are classified as trading securities. Trading securities are recorded at fair value, and unrealized holding gains and losses are included in net earnings. The maximum maturity of securities is two years at the time of purchase with an average maturity not to exceed one year for the entire portfolio. Available-for-sale securities are classified as short-term based on their highly liquid nature and because such marketable securities represent the investment of cash that is available for current operations. Realized gains and losses are accounted for on the specific identification method. Purchases and sales are recorded on a trade date basis.

*Fair Value of Financial Instruments*

The carrying value of cash and cash equivalents approximates fair value because of the short-term maturity of those instruments. The fair value of the Company's investments in marketable debt securities is based on the quoted market price on the last business day of the year. Declines in fair value below the Company's carrying value deemed to be other than temporary are charged against net earnings. The carrying value of short-term and long-term debt approximates fair value.

*Property and Equipment*

Support equipment and other property and equipment are valued at cost and depreciated over their estimated useful lives, using the straight-line method over estimated useful lives of 3 to 5 years. Additions are capitalized and maintenance and repairs are charged to expense as incurred. Gains and losses on dispositions of equipment are reflected in income or loss from operations.

*Stock-based compensation*

On January 1, 2006, the Company adopted SFAS No. 123(R), "Share-Based Payment." SFAS 123(R) replaced SFAS No. 123 and supersedes APB Opinion No. 25. SFAS 123(R) requires all stock-based payments to employees, including grants of employee stock options, to be measured at their grant-date fair value and recognized over the requisite service period, which is normally the vesting period.

*Loss per share*

Basic earnings per share amounts are calculated based on the weighted average number of shares of common stock outstanding during each period. Diluted earnings per share is based on the weighted average numbers of shares of common stock outstanding for the periods, including the dilutive effects of stock options, warrants granted and convertible preferred stock. Dilutive options and warrants that are issued during a period or that expire or are canceled during a period are reflected in the computations for the time they were outstanding during the periods being reported. Since the Company has incurred losses for all periods, the impact of the common stock equivalents would be antidilutive and therefore are not included in the calculation.

*Derivatives*

Derivative financial instruments, utilized to manage or reduce commodity price risk related to Baseline's production, are accounted for under the provisions of SFAS No. 133, "Accounting for Derivative Instruments and for Hedging Activities", and related interpretations and amendments. Under this statement, derivatives are carried on the balance sheet at fair value. If the derivative is designated as a fair value hedge, the changes in the fair value of the derivative and of the hedged item attributable to the hedged risk are recognized in earnings. If the derivative is designated as a cash flow hedge, the effective portions of changes in the fair value of the derivative are recorded in other comprehensive income or loss and are recognized in the statement of operations when the hedged item affects earnings. If the derivative is not designated as a hedge, changes in the fair value are recognized in other expense. Ineffective portions of changes in the fair value of cash flow hedges are also recognized in loss on derivative liabilities.

*Income taxes*

The Company recognizes deferred tax assets and liabilities based on differences between the financial reporting and tax bases of assets and liabilities using the enacted tax rates and laws that are expected to be in effect when the differences are expected to be recovered. The Company provides a valuation allowance for deferred tax assets for which it does not consider realization of such assets to be more likely than not.

In July 2006, the FASB issued Financial Interpretation (FIN) 48, Accounting for Uncertainty in Income Taxes—an Interpretation of FASB 109 (FIN 48). FIN 48 created a single model to address accounting for the uncertainty in income tax positions and prescribes a minimum recognition threshold a tax position must meet before recognition in the financial statements.

The evaluation of a tax position in accordance with FIN 48 is a two-step process. The first step is a recognition process to determine whether it is more likely than not that a tax position will be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. In evaluating whether a tax position has met the more likely than not recognition threshold, it is presumed that the position will be examined by the appropriate taxing authority with full knowledge of all relevant information. The second step is a measurement process whereby a tax position that meets the more likely than not recognition threshold is calculated to determine the amount of benefit/expense to recognize in the financial statements. The tax position is measured at the largest amount of benefit/expense that is more likely than not of being realized upon ultimate settlement.

The Company adopted the provisions of FIN 48 effective January 1, 2007 which did not have a material impact on the Company's operating results, financial position or cash flows. The Company did not record a cumulative effect adjustment related to the adoption of FIN 48.

*New Accounting Pronouncements*

On December 31, 2008, the SEC published the final rules and interpretations updating its oil and gas reporting requirements. Many of the revisions are updates to definitions in the existing oil and gas rules to make them consistent with the petroleum resource management system, which is a widely accepted standard for the management of petroleum resources that was developed by several industry organizations. Key revisions include changes to the pricing used to estimate reserves utilizing a 12-month average price rather than a single day spot price which eliminates the ability to utilize subsequent prices to the end of a reporting period when the full cost ceiling was exceeded and subsequent pricing exceeds pricing at the end of a reporting period, the ability to include nontraditional resources in reserves, the use of new technology for determining reserves, and permitting disclosure of probable and possible reserves. The SEC will require companies to comply with the amended disclosure requirements for registration statements filed after January 1, 2010, and for annual reports on Form 10-K for fiscal years ending on or after December 15, 2009. Early adoption is not permitted. The Company is currently assessing the impact that the adoption will have on the Company's disclosures, operating results, financial position and cash flows.

In May 2008, the FASB issued SFAS No. 162, "The Hierarchy of Generally Accepted Accounting Principles", (SFAS 162), which identifies a consistent framework for selecting accounting principles to be used in preparing financial statements for nongovernmental entities that are presented in conformity with United States generally accepted accounting principles (GAAP). The current GAAP hierarchy was criticized due to its complexity, ranking position of FASB Statements of Financial Accounting Concepts and the fact that it is directed at auditors rather than entities. SFAS 162 will be effective 60 days following the United States Securities and Exchange Commission's (SEC's) approval of the Public Company Accounting Oversight Board amendments to AU Section 411, The Meaning of Present Fairly in Conformity with Generally Accepted Accounting Principles. The FASB does not expect that SFAS 162 will have a change in current practice, and the Company does not believe that SFAS 162 will have an impact on operating results, financial position or cash flows.

In March 2008, the FASB issued SFAS No. 161, "Disclosures about Derivative Instruments and Hedging Activities" ("SFAS 161"), an amendment of FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities" ("SFAS 133"). SFAS 161 is effective beginning January 1, 2009 and required entities to provide expanded disclosures about derivative instruments and hedging activities including (1) the ways in which an entity uses derivatives, (2) the accounting for derivatives and hedging activities, and (3) the impact that derivatives have (or could have) on an entity's financial position, financial performance, and cash flows. SFAS 161 requires expanded disclosures and does not change the accounting for derivatives. The Company is currently evaluating the impact of SFAS 161, but we do not expect the adoption of this standard to have a material impact on our financial results.

In December 2007, the FASB issued SFAS No. 141(R), "Business Combinations" ("SFAS 141(R)"). SFAS 141(R) replaces SFAS 141, "Business Combinations", however it retains the fundamental requirements that the acquisition method of accounting be used for all business combinations and for an acquirer to be identified for each business combination. SFAS 141(R) requires an acquirer to recognize the assets acquired, liabilities assumed, and any noncontrolling interest in the acquiree at the acquisition date, be measured at their fair values as of that date, with specified limited exceptions. Changes subsequent to that date are to be recognized in earnings, not goodwill. Additionally, SFAS 141 (R) requires costs incurred in connection with an acquisition be expensed as incurred. Restructuring costs, if any, are to be recognized separately from the acquisition. The acquirer in a business combination achieved in stages must also recognize the identifiable assets and liabilities, as well as the noncontrolling interests in the acquiree, at the full amounts of their fair values. SFAS 141(R) is effective for business combinations occurring in fiscal years beginning on or after December 15, 2008. The Company will apply the requirements of SFAS 141(R) upon its adoption on January 1, 2009 and is currently evaluating whether SFAS 141(R) will have an impact on its financial position and results of operations.

In February 2007, the FASB issued SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities" ("SFAS 159"). SFAS 159 permits companies to elect to measure many financial instruments and certain other items at fair value. Upon adoption of SFAS 159, a company may elect the fair value option for eligible items that exist at the adoption date. Subsequent to the initial adoption, the election of the fair value option should only be made at initial recognition of the asset or liability or upon a remeasurement event that gives rise to new-basis accounting. The decision about whether to elect the fair value option is applied on an instrument-by-instrument basis, is irrevocable and is applied only to an entire instrument and not only to specified risks, cash flows or portions of that instrument. SFAS No. 159 does not affect any existing accounting standards that require certain assets and liabilities to be carried at fair value nor does it eliminate disclosure requirements included in other accounting standards. Baseline adopted SFAS No. 159 effective January 1, 2008 and did not elect the fair value option for any existing eligible items.

In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements" ("SFAS 157"). SFAS No. 157 defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements. SFAS No. 157 does not impose fair value measurements on items not already accounted for at fair value; rather it applies, with certain exceptions, to other accounting pronouncements that either require or permit fair value measurements. Under SFAS No. 157, fair value refers to the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants in the principal or most advantageous market. The standard clarifies that fair value should be based on the assumptions market participants would use when pricing the asset or liability. In February 2008, the FASB issued FASB Staff Position No. 157-2, Effective Date of FASB Statement No. 157 ("FSP FAS 157-2"), which delays the effective date of SFAS 157 for all non-financial assets and liabilities, except those that are recognized or disclosed at fair value in the financial statements on a recurring basis, until fiscal years beginning after November 15, 2008. These non-financial items include assets and liabilities such as non-financial assets and liabilities assumed in a business combination, reporting units measured at fair value in a goodwill impairment test and asset retirement obligations initially measured at fair value. Effective January 1, 2008, Baseline adopted SFAS 157 for fair value measurements not delayed by FSP FAS No. 157-2. The adoption resulted in additional disclosures as required by the pronouncement (See Note 7 – Fair Value Measurements) related to our fair value measurements for oil and gas derivatives and marketable securities but no change in our fair value calculation methodologies. Accordingly, the adoption had no impact on our financial condition or results of operations.

## NOTE 2 – GOING CONCERN

The accompanying financial statements have been prepared assuming the Company will continue as a going concern. On October 31, 2008, the Company completed a restructuring of its debt. As result of such restructuring, the majority of its debt will mature on June 15, 2009. The future of the Company is dependent on its ability to obtain addition capital through debt or equity offerings or the sale of oil and natural gas properties. Given the current instability in the financial and equity markets and current oil and natural gas pricing levels there is no assurance that the Company will be able to raise the capital needed.

These conditions raise substantial doubt about the Company's ability to continue as a going concern. The financial statements do not include any adjustments that might be necessary if the Company was unable to continue as a going concern.

**NOTE 3 – DEBT**

Total debt at December 31, 2008 and 2007 consists of the following:

| | December 31, 2008 | December 31, 2007 |
|---|---|---|
| Short term notes | $ — | $ 65,006 |
| Senior secured notes, net of discount | 15,450,000 | 111,051,530 |
| New notes, net of discount | 104,236,283 | — |
| Convertible notes, net of discount | — | 49,512,333 |
| Revolving line of credit | 4,007,500 | 252,532 |
| | 123,693,783 | 160,881,401 |
| Less short term debt and current portion of long-term debt | (123,693,783) | (65,006) |
| Long-term debt | $ — | $ 160,816,395 |

On October 1, 2007 Baseline completed a debt offering consisting of $115 million aggregate principal amount of 12 $1/2$% Senior Secured Notes due 2012 (the "Senior Secured Notes") and $50 million in aggregate principal amount of 14% Senior Subordinated Convertible Notes due 2013 (the "Convertible Notes"). The bulk of the proceeds from these bond offerings were used to fund the purchase of the Blessing Field Properties, retire prior outstanding indebtedness and to pay fees and expenses related to the offerings.

Interest on the $115 million of Senior Secured Notes was due semi-annually on April 1st and October 1st. The principal on the Senior Secured Notes was due on October 1, 2012. The Senior Secured Notes were subject to an optional redemption beginning October 1, 2009 in the amount of 25% per quarter, at Baseline's option and upon certain conditions being met. Upon a "Change of Control" (as defined in the indenture governing the Senior Secured Notes), the Senior Secured Notes could be put back to us at 101% of par, plus accrued unpaid interest.

Interest on the $50 million of Convertible Notes was payable semi-annually on April 1st and October 1st, with Baseline having the option of paying any interest in cash or, subject to certain conditions being met, as additional principal amounts under the Convertible Notes, or Paid-in-Kind (PIK) Notes. On April 1, 2008, Baseline elected to issue PIK notes to the holders of the Convertible Notes for interest payable for the period from October 1, 2007 through March 31, 2008 in the amount of $3,500,000. The Convertible Notes were convertible into shares of our common stock at an initial conversion price of $0.72 per share, or 1,389 shares of common stock for each $1,000 principal amount of the Convertible Notes converted.

On October 1, 2007, Baseline also entered into a Credit Agreement with Wells Fargo Foothill, Inc. (the "Credit Agreement"). Subject to the satisfaction of a Borrowing Base formula (based on Proved Developed Producing and Proved Developed Nonproducing reserves of Baseline minus certain reserves established by the administrative agent to credit exposure created by other bank products, including 125% of the mark-to-market value of the hedge positions), and numerous conditions precedent and covenants, the Credit Agreement provided for a revolving commitment of up to $20 million, with a sublimit of $10 million for the issuance of letters of credit. Unless earlier repayment was required under the Credit Agreement, advances under the loan facility were due on or before October 1, 2010. Baseline's oil and gas properties were pledged as collateral under the Credit Agreement, as well as the Senior Notes and the Convertible Notes. Baseline also agreed not to pay dividends on its common stock.

During July 2008, a group of related investors acquired all of Baseline's outstanding Convertible Notes and converted all of such debt into common stock. Accordingly, Baseline issued to the investors a total of 74,311,500 shares of its common stock, valued at the $53,500,000 face value of the debt net of the unamortized discount of $458,456. In addition, Baseline issued an additional 42,723,748 shares of its common stock under the related conversion make-whole premium, valued at $23,548,773. As a result of these transactions, the investors beneficially held, as of July 30, 2008, approximately 77.25% of Baseline's issued and outstanding common stock which constituted a Change of Control. Issuance of the above conversion shares of common stock, together with the make-whole payment, satisfied in full Baseline's obligations under the Convertible Notes.

As a result of the conversion of the Convertible Notes, the $115 million of Senior Secured Notes became due resulting in the accelerated recognition of the remaining unamortized balance of deferred loan costs, totaling $4,531,634, this amount was expensed during the year and included in our loss on conversion of debt. In addition, Baseline expensed the $23,548,773 related to the conversion make-whole premium, net of $2,265,478 in interest accrued through the date of conversion as loss on conversion of debt.

On August 8, 2008, by reason of the Change of Control, Baseline commenced an offer to purchase for cash all of its Senior Secured Notes at a price equal to 101% of the principal amount of the Senior Secured Notes tendered prior to the close of business on October 2, 2008, plus all accrued and unpaid interest. In addition, Baseline solicited consents from the holders of the Senior Secured Notes to amend the indenture governing the Senior Secured Notes and other collateral agreements. The proposed amendments among other things eliminated or modified substantially all of the restrictive covenants, certain events of default and related provisions contained in the indenture and limited the rights of the holders of the Senior Secured Notes and, consequently the practical benefit of the liens securing the Senior Secured Notes allowing Baseline to utilize the collateral to obtain financing to be used to purchase the Senior Secured Notes. As an incentive to holders of the Senior Secured Notes, Baseline agreed to pay a consent payment equal to 2% of the principal amount of the Senior Secured Notes for which consents were validly delivered under the consent solicitation. Consents were delivered by holders of Senior Secured Notes having an aggregate outstanding principal amount of $115 million, representing 100% of the outstanding Senior Secured Notes. As a result, Baseline was obligated to repurchase all of the outstanding Senior Secured Notes for $118,450,000, plus accrued and unpaid interest. On October 6, 2008, Baseline failed to repurchase the notes and by virtue of such non-payment, was in default of the Indenture governing the Notes, as well as its Credit Agreement (see further discussion below).

As a result of the purchase offer for the Senior Secured Notes, recognition of the remaining unamortized balances of deferred loan costs and note discount, totaling $8,716,402 and $3,501,347, respectively, were accelerated and expensed during the year as loss on conversion of debt. In addition, the face amount of the Senior Secured Notes was increased by $3,450,000 related to the premium under the Change of Control purchase offer and the consent solicitation. Such amount was expensed during the year as loss on conversion of debt.

Total loss on conversion of debt expensed during the year ended December 31, 2008 consists of the following:

| | |
|---|---:|
| Conversion make-whole premium, net of interest accrued through the date of conversion | $ 21,283,295 |
| Unamortized deferred loan costs related to the Senior Secured Notes | 8,716,402 |
| Unamortized debt discount on the Senior Secured Notes | 3,501,347 |
| Unamortized deferred loan costs related to the Convertible Notes | 4,531,634 |
| 1% premium under the Change of Control purchase offer | 1,150,000 |
| 2% premium under the consent solicitation | 2,300,000 |
| | $ 41,482,678 |

Baseline successfully reached an agreement with the majority of its note holders with respect to its failure to repurchase the Company's outstanding Senior Secured Notes (the "Old Notes") on October 6, 2008. As a result of such agreement, On October 31, 2008, holders of $100 million (the "Majority Holders") of the $115 million outstanding aggregate principal amount of the Old Notes exchanged all of their Old Notes for new Senior Secured Notes (the "New Notes") in the aggregate principal amount of $106,681,250. Such amount represents 103% of the principal amount of Old Notes held by the Majority Holders, plus an additional $3,681,250 (payable as satisfaction of certain consent, solicitation and other fees owing from the Company, including fees associated with the waiver of certain existing defaults under the Indenture for the Old Notes), which was recorded as a discount to the debt and is being amortized into interest expense over the life of the New Notes. In addition, there remains outstanding $15,450,000 in principal amount of Old Notes.

The New Notes mature on June 15, 2009 and accrue annualized interest of 15%, 12.5% of which is payable in cash, and 2.5% of which may be payable by the Company in additional New Notes (the "PIK Interest"). Interest under the New Notes will be payable quarterly. The New Notes and the Old Notes will share in the existing security interest on substantially all of the Company's properties that had been held by the holders of the Old Notes, on a pro rata basis.

If a holder of Old Notes delivers a consent to the Company prior to the maturity or earlier repayment of the New Notes, such holder will be entitled to receive, in exchange for its Old Notes, New Notes in a principal amount equal to (i) 104.25% of the principal amount of its Old Notes being exchanged and (ii) the amount of PIK Interest that would have accrued with respect to such New Notes had they been issued to such holder on October 30, 2008 through and including the date of such consent, offset by any interest received under such holder's Old Notes since October 1, 2008.

The New Notes have not been and will not be registered under the Securities Act of 1933, as amended, may not be offered or sold in the United States absent registration or an applicable exemption from registration requirements, and will therefore be subject to substantial restrictions on transfer.

The exchange of notes transaction was evaluated to determine whether the Old Notes were extinguished under SFAS No. 140 and EITF Issue No. 96-19. Based on this evaluation, the transaction was accounted for as a modification. Therefore, no gain or loss on extinguishment was recognized.

The Company's senior lender, Wells Fargo Foothill, Inc., subject to certain conditions, agreed to forbear from exercising remedies available to it under its senior credit facility and hedge agreement with the Company until April 15, 2009.

The senior credit facility has also been amended to provide, among other things, for (i) a new maturity date, with respect to any advances under the revolving credit commitment, of the earlier of October 1, 2010 or sixty days prior to the maturity date of the New Notes and (ii) an increase of 2% on the interest rate margin for both Prime and LIBOR based loans thereunder. The Intercreditor Agreement was also modified to permit the restructuring of the Company's obligations under the Old Notes and to extend the standstill period, during which time the Trustee for the Old Notes and New Notes cannot enforce any rights with respect to collateral from 90 to 180 days.

As part of the restructuring, on October 17, 2008, the Company paid to the holders of record on September 15, 2008 all accrued and unpaid interest initially due on October 1, 2008 under the Old Notes.

## NOTE 4 – SHORT-TERM INVESTMENTS

The Company's short-term investments consisted of the following at December 31, 2007:

| | Cost | | Unrealized Gain (Loss) | | Fair Value | |
|---|---|---|---|---|---|---|
| U.S. government and agency notes | $ | 3,713,696 | $ | 21,422 | $ | 3,735,118 |
| Commercial paper | | 7,895,439 | | 32,036 | | 7,927,475 |
| Corporate debt securities | | 2,246,265 | | (7,583) | | 2,238,682 |
| Long-term debt | $ | 13,855,400 | $ | 45,875 | $ | 13,901,275 |

At December 31, 2008, all of the Company's short-term investments have been liquidated and converted into cash resulting in realized losses of $47,197

## NOTE 5 – ACQUISITIONS

On April 12, 2007, Baseline acquired producing oil and natural gas properties located in Stephens County, Texas, from Statex Petroleum I, L.P. and Charles W. Gleeson LP. The properties consist of a 100% working interest in approximately 5,200 acres in the Eliasville Field. The preliminary adjusted purchase price was $26.6 million. Upon execution of the Purchase and Sale Agreement Baseline paid a $1,000,000 non-refundable deposit credited against the purchase price. Baseline entered into an amendment to the agreement, whereby for an additional deposit of $300,000, the deadline to close on the purchase was extended. The effective date for the transfer of the assets was February 1, 2007. Baseline funded the adjusted purchase price, less the deposits previously paid, and a portion of the costs associated with the transaction through borrowings under a newly created credit agreement.

On October 1, 2007 Baseline acquired producing natural gas and oil properties located in Matagorda County, Texas, from DSX Energy Limited LLP, Kebo Oil & Gas, Inc., and 25 other related parties for a preliminary adjusted purchase price of $96.6 million. The properties acquired by Baseline consist of a greater than 95% working interest in 2,374 net acres in the Blessing Field which contained twelve (12) producing wells. The effective date of the acquisition was June 1, 2007.

The Blessing Field acquisition was funded with proceeds from Baseline's issuance of $115 million of 12.5% Senior Secured Notes due 2012 at a purchase price of $110.9 million, plus $50 million of 14.0% Senior Subordinated Convertible Secured Notes due 2013 at a purchase price of $49.5 million. In addition, Baseline retired $33.1 million of indebtedness with proceeds of the offering, with the remainder being utilized for general corporate purposes, fees and expenses. Baseline also entered into a $20 million credit facility with a senior lender. The line of credit will be used for implementing Baseline's oil and natural gas hedging strategy, and for working capital if needed. The line of credit was not drawn at closing.

The following unaudited pro forma information assumes the acquisitions occurred as of the beginning of each period. The pro forma results are not necessarily indicative of what actually would have occurred had the acquisition been in effect for the period presented.

| | As Reported | | Pro Forma | |
|---|---|---|---|---|
| **Year ended December 31, 2007** | | | | |
| Revenues | $ | 11,609,040 | $ | 33,295,512 |
| Net Loss | | (12,711,905) | | (19,264,526) |
| Loss Per Share | | (0.39) | | (0.59) |

**NOTE 6 – COMMITMENTS AND CONTINGENCIES**

From time to time Baseline may become involved in litigation in the ordinary course of business. At the present time the Company's management is not aware of any such litigation.

The Company, as an owner or lessee and operator of oil and gas properties, is subject to various federal, state and local laws and regulations relating to discharge of materials into, and protection of, the environment. These laws and regulations may, among other things, impose liability on the lessee under an oil and gas lease for the cost of pollution clean-up resulting from operations and subject the lessee to liability for pollution damages. In some instances, the Company may be directed to suspend or cease operations in the affected area. We maintain insurance coverage, which we believe is customary in the industry, although we are not fully insured against all environmental risks. The Company is not aware of any environmental claims existing as of December 31, 2008, which have not been provided for, covered by insurance or otherwise have a material impact on its financial position or results of operations. There can be no assurance, however, that current regulatory requirements will not change, or past non-compliance with environmental laws will not be discovered on the Company's properties.

The Company has a long-term operating lease agreement for its corporate offices that expires in October 2012. Rent expense for the years ended December 31, 2008 and 2007 was $130,149 and $63,909, respectively.

Minimum rentals for each of the five years subsequent to December 31, 2008 are as follows:

| | | |
|---|---:|---:|
| 2009 | $ | 141,468 |
| 2010 | | 142,095 |
| 2011 | | 145,231 |
| 2012 | | 121,026 |
| 2013 | | — |
| Thereafter | | — |
| | $ | 549,820 |

**NOTE 7 – FAIR VALUE MEASUREMENTS**

Baseline has various financial instruments that are measured at fair value in the financial statements, including marketable debt securities and commodity derivatives. Baseline's financial assets and liabilities are measured using input from three levels of the fair value hierarchy. A financial asset or liability classification within the hierarchy is determined based on the lowest level input that is significant to the fair value measurement. The three levels are as follows:

Level 1 – Inputs are unadjusted quoted prices in active markets for identical assets or liabilities that Baseline has the ability to access at the measurement date.

Level 2 – Inputs include quoted prices for similar assets and liabilities in active markets, quoted prices for identical or similar assets or liabilities in markets that are not active, inputs other than quoted prices that are observable for the asset or liability and inputs that are derived principally from or corroborated by observable market data by correlation or other means (market corroborated inputs).

Level 3 – Unobservable inputs reflect Baseline's judgments about the assumptions market participants would use in pricing the asset of liability since limited market data exists. Baseline develops these inputs based on the best information available, using internal and external data.

The following table presents Baseline's assets and liabilities recognized in the balance sheet and measured at fair value on a recurring basis as of December 31, 2008:

| | Input Levels for Fair Value Measurements | | | |
|---|---|---|---|---|
| Description | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Commodity derivatives | — | $  4,432,079 | — | $  4,432,079 |
| | — | $  4,432,079 | — | $  4,432,079 |

Baseline's investments in debt securities are classified as trading securities and stated at fair value. The quoted market price or net asset value of an identical security in the principal market is used to record the fair value by multiplying the quoted market price or net asset value by the number of shares owned or par value. As of December 31, 2008, all such investments had been sold.

H-12

Baseline uses various commodity derivative instruments, including collars, swaps, floors and swaptions. The fair value of commodity derivatives is determined using forward price curves derived from market price quotations, externally developed and commercial models, with internal and external fundamental data inputs. Market price quotations are obtained from independent energy brokers, direct communication with market participants and actual transactions executed by Baseline. Market price quotations for the natural gas trading hubs utilized in our commodity derivatives are generally readily obtainable for the first six years, and therefore Baseline's forward price curves reflect observable market quotes.

## NOTE 8 – STOCKHOLDERS' EQUITY

*Common Stock*

On July 14, 2008, Baseline filed a Certificate of Amendment with the Secretary of State of Nevada which amended our Articles of Incorporation to increase the number of authorized shares of common stock, from 140,000,000 shares to 300,000,000 shares. The Certificate of Amendment became effective upon filing.

On March 31, 2007, Baseline issued an aggregate of 93,750 shares of common stock, with a value of $46,875, in payment of accrued interest through February 15, 2007, to holders of 10% convertible promissory notes.

On May 15, 2007, Baseline issued an aggregate of 93,750 shares of common stock, with a value of $46,875, in payment of accrued interest through May 15, 2007, to holders of 10% convertible promissory notes.

On May 30, 2007, Baseline issued 380,000 shares to holders of 10% convertible promissory notes in consideration of the holders' agreement to extend the maturity of the notes by six months. Such shares were valued at $190,000 which was charged to interest expense.

During June and July 2007, Baseline issued a total of 600,000 shares to outside consultants as compensation for services valued at $360,000.

On July, 5, 2007 non-employee option holders exercised options to purchase 200,000 shares of Common Stock at $ .05 per share on a "cashless" basis. As a result Baseline issued 185,714 shares.

On July 13, 2007, a consultant exercised an option to purchase 100,000 shares of Common Stock at $0.30 per share on a "cashless" basis. As a result, Baseline issued 56,522 shares.

During July and August 2007 holders of $250,000 of Baseline's 10% Convertible Promissory Notes converted such notes into 501,676 shares.

On August 15, 2007, Baseline issued an aggregate of 109,023 shares of common stock, with a value of $54,402, in payment of accrued interest through August 15, 2007, to holders of 10% convertible promissory notes.

During October and November 2007 holders of $475,000 of Baseline's 10% Convertible Promissory Notes converted such notes into 950,000 shares.

On November 15, 2007, Baseline issued an aggregate of 91,500 shares of common stock, with a value of $45,750, in payment of accrued interest through November 15, 2007, to holders of 10% convertible promissory notes.

On April, 15, 2008 a non-employee option holder exercised options to purchase 62,500 shares of Common Stock at $ .05 per share on a "cashless" basis. As a result Baseline issued 54,276 shares.

During July 2008, Baseline issued 74,311,500 shares of its common stock upon the conversion of its Convertible Notes. Such shares were valued at the $53,500,000 face value of the debt net of the unamortized discount of $458,456.

During July 2008, Baseline issued 42,723,748 shares of its common stock related to the conversion make-whole premium on the Convertible Notes. Such shares were valued at $23,548,773 base on the trading price of the Company's common stock on the date of issuance.

H-13

*Stock Options and Warrants*

Baseline utilizes restricted stock, stock options and warrants to compensate employees, officers, directors and consultants. Total stock based compensation expense (including options, warrants and restricted stock) was $1,612,711 and $816,365 for the years ended December 31, 2008 and 2007, respectively. The total unrecognized stock based compensation expense relating to non-vested options is $308,540 at December 31, 2008 and will be recognized over a weighted average period of one year.

On October 10, 2008, options with respect to 2,000,000 shares of Common Stock granted to Thomas Kaetzer, the Company's Chief Executive Officer, on December 20, 2006 vested in full as result of his resignation for "good reason" following conversion of the Company's Convertible Notes into shares of Common Stock representing greater than 50% of the then outstanding capital stock.

In July 2008, options with respect to 1,500,000 shares of Common Stock granted to Patrick McGarey, the Company's Chief Financial Officer, on August 3, 2007 vested in full as a result of that "Change of Control" following the acquisition by affiliated persons of the Company's Convertible Notes convertible into shares of Common Stock representing greater than 30% of the combined voting power of the Company's then issued and outstanding voting stock.

On January 4, 2007, Baseline granted a stock option to its former CFO, exercisable for up to 100,000 shares of Common Stock at an exercise price of $0.56 per share. Such option had a fair value of $55,371.

On March 15, 2007, concurrently with the closing of bridge loan financing , Alan Gaines, a former director and Barrie Damson, a former officer and director of Baseline, each cancelled stock options to purchase 1,670,000 shares of Baseline's common stock at an exercise price of $0.05 per share.

In connection with its entry into the Drawbridge Agreement, on April 12, 2007 the Company issued warrants to Drawbridge and D.B. Zwirn Special Opportunities Fund, L.P., another lender participating therein, which warrants are each exercisable for up to an aggregate of 3,200,000 shares of its Common Stock, at an exercise price of $0.50 per share. Pursuant to certain warrant agreements executed with these two lenders, any unexercised warrants expire on April 11, 2014. The warrants also afford the holders certain anti-dilution protection. In connection with the issuance of the warrants the Company also entered into a registration rights agreement dated April 12, 2007 with each of the holders of the warrants, under which the Company granted piggy-back registration rights, demand registration rights and shelf registration rights to these holders. Such warrants had a fair value of $1,150,603 which was capitalized as a deferred loan cost and amortized over the term of the Credit Agreement.

On April 12, 2007, concurrently with the execution of the Drawbridge Agreement, Alan Gaines, a former director, and Barrie Damson, a former officer and director of its Company, each surrendered additional options to purchase 1,600,000 shares of Common Stock at an exercise price of $0.05 per share.

On August 3, 2007, Baseline granted five-year stock options exercisable for up to an aggregate of 370,000 shares of common stock to several employees at an exercise price of $0.55. Such options vest in equal one-third installments on each of the first, second and third anniversary dates from the date of grant and had a fair value of $191,440.

On August 3, 2007, Baseline granted a five-year stock option to Richard d'Abo, former director, exercisable for up to 150,000 shares of common stock at an exercise price of $0.55. Such option had a fair value of $73,844.

On August 3, 2007 the Company entered into a two year employment agreement with Mr. Patrick McGarey to become Chief Financial Officer effective August 16, 2007. Mr. McGarey succeeded Richard Cohen. Concurrently with the entry into the employment agreement with Mr. McGarey, Baseline granted to Mr. McGarey five-year options, exercisable for (i) up to 500,000 shares of common stock, at an exercise price equal to $0.55, (ii) up to 500,000 shares, at an exercise price of $0.825 per share, and (iii) up to 500,000 shares, at an exercise price of $1.10 per share. Each option grant provides for the following vesting schedule: (i) 166,666 shares on August 3, 2007, (ii) 166,667 shares on August 3, 2008 and (iii) 166,667 shares on August 3, 2009, provided that Mr. McGarey remains in the employ of the Company through such dates. Such options had a fair value of $757,826.

On April 22, 2008, Baseline granted to its employees options to purchase up to 375,000 shares of its common stock at $0.50 per share. Such options vest in various amounts through April 22, 2010. The stock options have a five year term expiring on April 22, 2013. The grant-date fair value of these options was $94,608.

On June 19, 2008, Baseline granted to its Chief Executive Officer, Thomas R. Kaetzer, an option to purchase up to 3,000,000 shares of its common stock, immediately exercisable at $0.40 per share, in recognition of Mr. Kaetzer's performance and achievement to date. Such options vested on the grant date. The stock options have a five year term expiring on June 19, 2013. The grant-date fair value of these options was $896,527

The weighted average fair value of the stock options granted during year ended December 31, 2008 was $0.30. Variables used in the Black-Scholes option-pricing model include (1) risk free interest rates between 2.43% and 3.28%, (2) expected option life ranged from two and 1/2 to three years, (3) expected volatility is 141% to 142% and (4) zero expected dividends. A summary of stock option transactions follow:

|  | Weighted Average Exercise Price | Number of Options |
|---|---|---|
| Balance December 31, 2006 | $ 0.18 | 13,985,000 |
| Granted | 0.75 | 2,120,000 |
| Exercised | 0.13 | (300,000) |
| Forfeited or expired | 0.05 | (6,540,000) |
| Balance December 31, 2007 | 0.40 | 9,265,000 |
| Granted | 0.41 | 3,375,000 |
| Exercised | 0.05 | (62,500) |
| Forfeited or expired | 1.00 | (50,000) |
| Balance December 31, 2008 | 0.41 | 12,527,500 |

The following table summarizes information about the Company's outstanding stock options:

| Number Outstanding | Weighted Average Remaining Life | Weighted Average Exercise Price | Aggregate Intrinsic Value |
|---|---|---|---|
| **December 31, 2007** | | | |
| *Options Outstanding* | | | |
| 9,265,000 | 3.29 | $ 0.40 | $ 1,644,000 |
| *Options Exercisable* | | | |
| 7,228,330 | 2.97 | $ 0.32 | $ 1,644,000 |
| **December 31, 2008** | | | |
| *Options Outstanding* | | | |
| 12,527,500 | 2.88 | $ 0.41 | $ 38,975 |
| *Options Exercisable* | | | |
| 12,080,833 | 2.84 | $ 0.40 | $ 38,975 |

On August 13, 2007, Baseline issued seven-year warrants to its then senior lenders, exercisable in the aggregate for up to 260,000 shares of common stock at an exercise price of $0.52 per share. These warrants were issued as partial consideration for its lenders advancing us $2.5 million on August 13, 2007, thereby enabling us to make a $2.5 million performance deposit in connection with its then pending acquisition of assets from DSX Energy Limited. Such warrants were valued at $140,008 capitalized as a deferred loan cost and fully amortized upon payment of the related debt.

On August 20, 2007, Baseline issued five-year warrants to a former placement agent, exercisable in the aggregate for up to 340,000 shares of common stock at an exercise price of $0.65 per share. These warrants were issued as partial consideration for the termination of an agreement with such placement agent. Such warrants were valued at $216,087 and fully amortized as a component of interest expense upon issuance.

A summary of stock warrant transactions follow:

|  | Weighted Average Exercise Price | Number of Warrants |
|---|---|---|
| Balance December 31, 2006 | $ 0.79 | 734,090 |
| Granted | 0.51 | 7,140,000 |
| Balance December 31, 2007 | 0.53 | 7,874,090 |
| Balance December 31, 2008 | 0.53 | 7,874,090 |

The following table summarizes information about the Company's outstanding stock warrants:

| Number Outstanding | Weighted Average Remaining Life | Weighted Average Exercise Price | Aggregate Intrinsic Value |
|---|---|---|---|
| **December 31, 2007** | | | |
| *Warrants Outstanding* | | | |
| 7,874,090 | 4.97 | $ 0.53 | — |
| *Warrants Exercisable* | | | |
| 7,874,090 | 4.97 | $ 0.53 | — |
| **December 31, 2008** | | | |
| *Warrants Outstanding* | | | |
| 7,874,090 | 3.97 | $ 0.53 | — |
| *Warrants Exercisable* | | | |
| 7,874,090 | 3.97 | $ 0.53 | — |

## NOTE 9 – INVESTMENT IN JOINT VENTURE AND REDEMPTION OF MEMBERSHIP INTEREST

On March 16, 2007, Baseline delivered $300,000 to New Albany-Indiana LLC ("New Albany") in partial satisfaction of the outstanding capital calls that it, as a member of New Albany, was required to make. Pursuant to a Membership Interest Redemption Agreement between the Company and New Albany, Baseline then redeemed its membership interest in New Albany for the direct assignment to the Company of an undivided 40.423% working interest in and to all oil and gas properties, rights, and assets of New Albany. Such assets were then pledged to under a mortgage to secure our Senior Secured Debenture. The reduction in our membership interest of 50% to a 40.423% direct working interest reflected an adjustment of our membership interest in New Albany at the time of our redemption, as a result of outstanding capital calls owed by us but assumed by the affiliates and/or assigns of Rex Energy, the other joint venture partner.

After redeeming its membership interest in New Albany on March 16, 2007, Baseline now owns the following assets:

- 19.7% working interest in an area of mutual interest, covering approximately 122,000 gross acres (approximately 24,400 acres net to Baseline), primarily located in Greene County and operated by Atlas Energy, L.L.C. (the "Wabash AMI");

- 18.2% working interest in an area of mutual interest, covering approximately 41,000 total acres (approximately 7,380 acres net to Baseline) primarily located in Knox County and operated by Atlas Energy, L.L.C. (the "Knox AMI"); and

- 6.9% working interest in an area of mutual interest, covering approximately 8,000 gross acres (560 acres net to Baseline), primarily located in Greene County and operated by El Paso (the "Greene AMI")

## NOTE 10 – DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES

On April 12, 2007, in accordance with a requirement of the Drawbridge Agreement, Baseline entered into a Swap Agreement with Macquarie Bank Limited, which provided that Baseline put in place, for each month through the third anniversary of April 12, 2007, separate swap hedges with respect to approximately 75% of the projected production from Proved Developed Producing Reserves from the Eliasville Field Properties. The swap hedges provided for a fixed price of $68.20 per barrel for a three year period, commencing June 1, 2007 and ending May 31, 2010. The hedging arrangement was based upon a monthly volume of 11,000 barrels during the first year and provided for monthly settlements.

During July 2007, Baseline modified its hedge from a fixed price swap to a collar with a floor of $68.20 and a ceiling of $74.20 for the period from August 2007 through December 2008. The original fixed price $68.20 swap remained in place for the period January 2009 to May 2010. In exchange for the July 2007–December 2008 modification from a fixed price swap to a collar, Baseline provided a right to the hedge provider to purchase 7,000 barrels per month at $73.20 per barrel from June 2010 through December 2011.

At the closing of the Blessing Field Properties acquisition on October 1, 2007, Baseline's hedge positions under the Macquarie Swap Agreement, as described above, were novated to Wells Fargo Foothill, Inc. Also since the closing of this acquisition, Baseline has added to its hedge positions, in accordance with the requirement of the Wells Fargo Agreement, the Senior Notes Indenture and the Convertible Note Indenture. These additional hedges include both collars and floors, with Wells Fargo Foothill serving as our counterparty on each hedge position. All of our hedge positions as of December 31, 2008 are detailed in the table at the end of this section.

SFAS No. 133 "Accounting for Derivative Instruments and Hedging Activities" requires that all derivative instruments be recorded on the balance sheet at their fair value. Changes in the fair value of each derivative is recorded each period in current earnings or other comprehensive income, depending on whether the derivative is designated as part of a hedge transaction and, if it is, the type of hedge transaction. To make this determination, management formally documents the hedging relationship and its risk-management objective and strategy for undertaking the hedge, the hedging instrument, the item, the nature of the risk being hedged, how the hedging instrument's effectiveness in offsetting the hedged risk will be assessed, and a description of the method of measuring effectiveness. This process includes linking all derivatives that are designated as cash-flow hedges to specific cash flows associated with assets and liabilities on the balance sheet or to specific forecasted transactions. Baseline also formally assesses, both at the hedge's inception and on an ongoing basis, whether the derivatives that are used in hedging transactions are highly effective in offsetting cash flows of hedged items. A derivative that is highly effective and that is designated and qualifies as a cash-flow hedge has its changes in fair value recorded in other comprehensive income to the extent that the derivative is effective as a hedge. Any other changes determined to be ineffective do not qualify for cash-flow hedge accounting and are reported currently in earnings.

Baseline discontinues cash-flow hedge accounting when it is determined that the derivative is no longer effective in offsetting cash flows of the hedged item, the derivative expires or is sold, terminated, or exercised, the derivative is redesignated as a non-hedging instrument because it is unlikely that a forecasted transaction will occur, or management determines that designation of the derivative as a cash-flow hedge instrument is no longer appropriate. In situations in which cash-flow hedge accounting is discontinued, Baseline continues to carry the derivative at its fair value on the balance sheet and recognizes any subsequent changes in its fair value in earnings.

When the criteria for cash-flow hedge accounting are not met, realized gains and losses (i.e., cash settlements) are recorded in income (loss) from operations (oil and gas hedging) in the Statements of Operations. Similarly, changes in the fair value of the derivative instruments are recorded as income (loss) from operations in the Statements of Operations. In contrast cash settlements for derivative instruments that qualify for hedge accounting are recorded as additions to or reductions in income (loss) from operations (oil and gas hedging) while changes in fair value of cash flow hedges are recognized, to the extent the hedge is effective, in other comprehensive income until the hedged item is recognized in earnings.

Based on the above, management has determined the swaps and collars noted above qualify for cash-flow hedge accounting treatment. Due to the sharp decline in oil and gas prices during the fourth quarter of 2008, we recorded a $12,317,731 unrealized gain related to the mark-to-market of our open hedge contracts. At December 31, 2008, we had a derivative asset of $4,432,079. The unrealized gain is reported as a component of other comprehensive income.

As of December 31, 2008 Baseline had the following hedge contracts outstanding:

*Crude Oil Hedges (1)*

| Instrument | Beginning Date | Ending Date | Floor | Ceiling | Fixed | Total Bbls 2009 | Total Bbls 2010 | Total Bbls 2011 |
|---|---|---|---|---|---|---|---|---|
| Collar | Jan-09 | Dec-09 | $ 68.00 | $ 74.05 | | 42,000 | | |
| Swap | Jan-09 | Dec-09 | | | $ 68.20 | 117,000 | | |
| Swap | Jan-10 | May-10 | | | $ 68.20 | | 47,500 | |
| Floor | Jan-09 | Dec-09 | $ 75.00 | | | 48,000 | | |
| Swaption | June-10 | Dec-10 | | $ 73.20 | | | 49,000 | |
| Swaption | Jan-11 | Dec-11 | | $ 73.20 | | | | 84,000 |
| | | | | | | 207,000 | 96,500 | 84,000 |

(1)   All indexed to NYMEX WTI Cushing Light Sweet Crude

*Natural Gas Hedges (1)*

| Instrument | Beginning Date | Ending Date | Floor | Ceiling | Fixed | Total MMBtu 2009 | Total MMBtu 2010 | Total MMBtu 2011 |
|---|---|---|---|---|---|---|---|---|
| Collar | Jan-09 | Dec-09 | $ 7.50 | $ 8.44 | | 660,000 | | |
| | | | | | | 660,000 | — | — |

(1)   All indexed to inside FERC Houston Ship Channel

## NOTE 11 – INCOME TAXES

Net deferred tax assets at December 31, 2008 and 2007 consisted primarily of deferred tax assets related to tax attributes including the Company's NOL and timing differences associated with the recognition of depletion, debt discount, deferred financing costs and intangible drilling costs. Deferred tax assets have a valuation allowance provided for the total amount.

|  | December 31, 2008 | December 31, 2007 |
|---|---|---|
| Deferred tax assets - NOLs | $ 14,386,918 | $ 3,321,000 |
| Less: valuation allowance | (14,386,918) | (3,321,000) |
| Net deferred tax asset | $ — | $ — |

Baseline has net operating loss carry-forwards of approximately $42,314,464 at December 31, 2008, which begin expiring in 2024.

Our effective tax rate applicable to operations in 2008 and 2007 is as follows:

|  | 2008 | 2007 |
|---|---|---|
| Statutory tax rate | (34)% | (34)% |
| Change in valuation allowance recognized in earnings | 34% | 34% |
|  | — | — |

## NOTE 12 – ASSET RETIREMENT OBLIGATION

|  | Year Ended December 31, | |
|---|---|---|
|  | 2008 | 2007 |
| Asset retirement obligations, beginning of year | $ 282,947 | $ — |
| Fair value of liabilities assumed in acquisitions | — | 240,959 |
| Accretion expense | 31,585 | 41,988 |
| Asset retirement obligations, end of year | $ 314,532 | $ 282,947 |

## NOTE 13 – SUPPLEMENTAL OIL AND GAS INFORMATION (UNAUDITED)

There are numerous uncertainties inherent in estimating quantities of proved crude oil and natural gas reserves. Crude oil and natural gas reserve engineering is a subjective process of estimating underground accumulations of crude oil and natural gas that cannot be precisely measured. The accuracy of any reserve estimate is a function of the quality of available data and of engineering and geological interpretation and judgment.

The Company retained Cawley, Gillespie & Associates, Inc., independent third-party reserve engineers, to perform an independent evaluation of proved reserves as of December 31, 2008. Results of drilling, testing and production subsequent to the date of the estimates may justify revision of such estimates. Accordingly, reserve estimates are often different from the quantities of crude oil and natural gas that are ultimately recovered. All of the Company's reserves are located in the United States.

*Proved Reserves*

The following reserve schedule was developed by the Company's reserve engineers and sets forth the changes in estimated quantities for proved reserves of the Company during each of the periods presented:

| | Oil (Bbls) | Gas (Mcf) |
|---|---|---|
| | (In thousands) | |
| **Proved Reserves** | | |
| Estimated Quantities – December 31, 2006 | — | — |
| Purchase of minerals in place | 6,389 | 32,633 |
| Production | (149) | (336) |
| Extensions, discoveries and other additions | — | — |
| Revisions of Previous estimates | — | — |
| Estimated Quantities – December 31, 2007 | 6,240 | 32,297 |
| Purchase of minerals in place | — | — |
| Production | (252) | (1,246) |
| Extensions, discoveries and other additions | 505 | 1,461 |
| Revisions of Previous estimates | (1,126) | (4,487) |
| Estimated Quantities – December 31, 2008 | 5,367 | 28,025 |
| **Proved Developed Reserves** | | |
| December 31, 2007 | 4,202 | 16,791 |
| December 31, 2008 | 3,996 | 17,127 |

*Oil and Gas Operations*

Aggregate results of operations, in connection with the Company's crude oil and natural gas producing activities are shown below:

| | Year Ended December 31, | |
|---|---|---|
| | 2008 | 2007 |
| Revenues | $ 32,654,222 | $ 11,609,040 |
| Production costs | (10,506,835) | (5,148,418) |
| Exploration expenses | — | — |
| Depreciation, depletion and amortization | (32,296,636) | (1,823,233) |
| Accretion expense | (31,585) | (41,988) |
| Income (loss) before income tax | (10,180,834) | 4,595,401 |
| Income tax | — | — |
| Results of operations from oil and natural gas producing activities | $ (10,180,834) | $ 4,595,401 |

*Costs Incurred in Oil and Gas Activities*

Costs incurred in connection with the Company's crude oil and natural gas acquisition, exploration and development activities are shown below:

| | Year Ended December 31, | |
|---|---|---|
| | 2008 | 2007 |
| Property acquisition costs | $ — | $ 123,153,383 |
| Unproved prospects | 34,460 | 665,531 |
| Exploration costs | — | — |
| Development costs | 21,865,577 | 5,228,246 |
| Total Operations | $ 21,900,037 | $ 129,047,160 |
| Asset retirement obligation (non-cash) | $ — | $ 240,959 |

*Aggregate Capitalized Costs*

Aggregate capitalized costs relating to the Company's crude oil and natural gas producing activities, including asset retirement costs and related accumulated depreciation, depletion and amortization are as follows:

| | December 31, | | |
| --- | --- | --- | --- |
| | 2008 | | 2007 |
| Proved oil and gas properties | $ 149,699,206 | $ | 128,381,629 |
| Unproved oil and gas properties | 8,510,126 | | 8,475,666 |
| Accumulated depreciation, depletion and amortization | (34,119,869) | | (1,823,233) |
| Net capitalized costs | $ 124,089,463 | $ | 135,034,062 |

*Standardized Measure of Discounted Future Net Cash Flows Relating to Proved Oil and Gas Reserves*

The following information is based on the Company's best estimate of the required data for the Standardized Measure of Discounted Future Net Cash Flows as of December 31, 2008 and 2007 in accordance with SFAS No. 69, "Disclosures About Oil and Gas Producing Activities" which requires the use of a 10% discount rate. This information is not the fair market value, nor does it represent the expected present value of future cash flows of the Company's proved oil and gas reserves.

| | December 31, | | |
| --- | --- | --- | --- |
| | 2008 | | 2007 |
| | ($ in thousands) | | |
| Future cash inflows | $ 402,043 | $ | 849,361 |
| Future production costs | (197,276) | | (262,906) |
| Future development costs | (47,221) | | (43,468) |
| Future income tax expense | (10,421) | | (141,470) |
| Future net cash flows | 147,125 | | 401,517 |
| 10% annual discount for estimating timing of cash flows | (82,248) | | (190,905) |
| Standardized measure of discounted future net cash flows | $ 64,877 | $ | 210,612 |

Future cash inflows are computed by applying year-end commodity prices, adjusted for location and quality differentials on a property-by-property basis, to year-end quantities of proved reserves, except in those instances where fixed and determinable price changes are provided by contractual arrangements at year-end. The discounted future cash flow estimates do not include the effects of the Company's derivative instruments. In its 2008 year-end reserve report, the Company used the December 31, 2008 WTI Cushing spot price of $44.60 per Bbl and Henry Hub spot natural gas price of $5.62 per MMbtu, adjusted by property for energy content, quality, transportation fees, and regional price differentials. The weighted average price over the lives of the properties was $44.06 per Bbl for oil and $5.91 per Mcf for gas.

Future production and development costs, which include dismantlement and restoration expense, are computed by estimating the expenditures to be incurred in developing and producing the Company's proved crude oil and natural gas reserves at the end of the year, based on the year-end costs, and assuming continuation of existing economic conditions. While the Company believes that future operating costs can be reasonably estimated, future prices are difficult to estimate since market prices are influenced by events beyond its control. Future global economic and political events will most likely result in significant fluctuations in future oil prices, while future U.S. natural gas prices will continue to be influenced by primarily domestic market factors, including supply and demand, weather patterns and public policy.

Future income tax expenses are computed by applying the appropriate year-end statutory tax rates to the estimated future pretax net cash flows relating to the Company's proved crude oil and natural gas reserves, less the tax basis of the properties involved. The future income tax expenses give effect to tax credits and allowances, but do not reflect the impact of general and administrative costs and exploration expenses of ongoing operations relating to the Company's proved crude oil and natural gas reserves.

*Sources of Changes in Discounted Future Net Cash Flows*

Principal changes in the aggregate standardized measure of discounted future net cash flows attributable to the Company's proved crude oil and natural gas reserves, as required by SFAS No. 69, during 2008 and 2007 are set forth in the table below:

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2008 | 2007 |
| | ($ in thousands) | |
| Standardized measure of discounted future net cash flows at The beginning of the year | $ 210,610 | $   — |
| Purchases of mineral in place | — | 153,696 |
| Extensions discoveries and improved recovery | 13,612 | 18,531 |
| Revisions of previous quantity estimates | (75,403) | 1,417 |
| Net changes in timing | (3,747) | (11,537) |
| Changes in estimated future development costs | (2,012) | (1,036) |
| Net changes in prices and production costs | (162,716) | 76,212 |
| Accretion of discount | 21,061 | 5,850 |
| Sales of oil and gas produced, net of production costs | (28,854) | (8,822) |
| Development costs incurred during the period | 21,865 | 5,228 |
| Net change in income taxes | 68,461 | (28,927) |
| Standardized measure of discounted future net cash flows | $   64,877 | $ 210,610 |

## NOTE 14 – SUBSEQUENT EVENTS

On January 28, 2009, the Company liquidated all of its oil and natural gas hedge positions resulting in net proceeds to the Company of approximately $4.5 million. The cumulative unrealized gain, reported as a component of accumulated other comprehensive income in stockholders' equity, will be recognized into income in the periods for which the related oil and gas volumes are produced.

On January 30, 2009, the Company fully repaid all of its obligations (approximately $3.6 million) under its Credit Agreement with Wells Fargo Foothill, Inc. As a result, the Credit Agreement was terminated and the Agent released its liens on all of the Company's properties and assets. The Company utilized a portion of the funds obtained from the liquidation of its hedges to fund the repayment of the debt.

*EXHIBIT I*

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 10-Q

---

**(Mark One)**

☒ **QUARTERLY REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2009**

☐ **TRANSITION REPORT UNDER SECTION 13 or 15(d) OF THE EXCHANGE ACT**

**For the transition period from              to**

**Commission file number: 000-51888**

---

# BASELINE OIL & GAS CORP.
(Exact name of small business issuer as specified in its charter)

---

| | |
|---|---|
| **Nevada** | **30-0226902** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

**411 North Sam Houston Parkway East, Suite 300**
**Houston, Texas 77060**
(Address of principal executive offices)

**(281) 591-6100**
(Issuer's telephone number)

---

(Former name, former address and former fiscal year, if changed since last report)

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☐   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer            ☐ |
| Non-accelerated filer  ☐  (Do not check if a smaller reporting company) | Smaller reporting company ☒ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☒

At May 12, 2009, Issuer had 151,497,530 shares of common stock, $.001 par value, issued and outstanding.

PART I
FINANCIAL INFORMATION

Item 1.     Financial Statements

BASELINE OIL & GAS CORP.
BALANCE SHEETS
(Unaudited)

| | March 31, 2009 | December 31, 2008 |
|---|---|---|
| **ASSETS** | | |
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ 1,477,069 | $ 6,350,520 |
| Accounts receivable | 1,450,683 | 2,137,204 |
| Derivative asset | — | 4,432,079 |
| Deferred loan Costs, net of accumulated amortization of $22,538,236 and $22,197,084, respectively | — | 341,152 |
| Prepaid and other current assets | 116,948 | 157,210 |
| **Total current assets** | 3,044,700 | 13,418,165 |
| OIL AND NATURAL GAS PROPERTIES – using successful efforts method of accounting | | |
| Proved properties | 151,643,608 | 149,699,206 |
| Unproved properties | 8,591,580 | 8,510,126 |
| Less accumulated depletion, depreciation and amortization | (35,478,327) | (34,119,869) |
| **Oil and natural gas properties, net** | 124,756,861 | 124,089,463 |
| Other assets | 31,939 | 37,939 |
| Other property and equipment, net of accumulated depreciation of $121,236 and $98,129, respectively | 364,339 | 371,151 |
| **TOTAL ASSETS** | $ 128,197,839 | 137,916,718 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| CURRENT LIABILITIES | | |
| Accounts payable | $ 1,632,028 | $ 2,718,303 |
| Accrued interest | 4,991,175 | 4,483,359 |
| Accrued expenses | 1,441,227 | 1,303,056 |
| Royalties payable | 3,451,510 | 4,164,955 |
| Short term debt and current portion of long-term debt, net of discount of $1,141,558 and $2,444,967, respectively | 121,656,450 | 123,693,783 |
| **Total current liabilities** | 133,172,390 | 136,363,456 |
| Asset retirement obligations | 324,283 | 314,532 |
| **Total liabilities** | 133,496,673 | 136,677,988 |
| COMMITMENTS AND CONTINGENCIES | — | — |
| STOCKHOLDERS' EQUITY (DEFICIT) | | |
| Common stock, $0.001 par value per share; 300,000,000 shares authorized; 151,497,530 shares issued and outstanding | 151,498 | 151,498 |
| Additional paid-in capital | 111,894,217 | 111,703,204 |
| Accumulated other comprehensive income | 4,419,554 | 4,955,580 |
| Accumulated deficit | (121,764,103) | (115,571,552) |
| **Total stockholders' equity (deficit)** | (5,298,834) | 1,238,730 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | $ 128,197,839 | $ 137,916,718 |

The accompanying notes are an integral part of the financial statements

**BASELINE OIL & GAS CORP.**
**STATEMENTS OF OPERATIONS**
**(Unaudited)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2009 | 2008 |
| REVENUES | | |
| Oil and gas sales | $ 3,572,844 | $ 8,897,838 |
| Oil and gas hedging | 1,497,020 | (2,504,155) |
| **Total revenue** | 5,069,864 | 6,393,683 |
| COSTS AND EXPENSES | | |
| Production | 1,984,407 | 2,182,096 |
| General and administrative | 1,723,007 | 1,055,305 |
| Depreciation, depletion and amortization | 1,381,565 | 1,306,347 |
| Accretion expense | 9,751 | 7,535 |
| **Total costs and expenses** | 5,098,730 | 4,551,283 |
| **Net income (loss) from operations** | $ (28,866) | $ 1,842,400 |
| OTHER INCOME (EXPENSE) | | |
| Other income | 2,250 | 30,788 |
| Interest income | 6,906 | 170,354 |
| Interest expense | (6,172,841) | (6,005,574) |
| Realized gain on marketable securities | — | 7,054 |
| Unrealized gain on marketable securities | — | 78,978 |
| **Total other expense, net** | $ (6,163,685) | $ (5,718,400) |
| **NET LOSS** | $ (6,192,551) | $ (3,876,000) |
| OTHER COMPREHENSIVE LOSS | | |
| Unrealized loss on derivative instruments | (536,026) | (3,611,897) |
| **Total comprehensive loss** | $ (6,728,577) | $ (7,487,897) |
| NET LOSS PER SHARE – Basic and Diluted | $ (0.04) | $ (0.11) |
| WEIGHTED AVERAGE NUMBER OF SHARES OUTSTANDING | 151,497,530 | 34,408,006 |

The accompanying notes are an integral part of the financial statements

**BASELINE OIL & GAS CORP.**
**STATEMENTS OF CASH FLOW**
**(Unaudited)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2009 | 2008 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net loss | $(6,192,551) | $ (3,876,000) |
| Adjustments to reconcile net loss to net cash | | |
| Used in operating activities | | |
| Share based compensation | 191,013 | 161,373 |
| Depreciation, depletion and amortization | 1,381,565 | 1,306,347 |
| Amortization of debt discount | 1,303,409 | 155,967 |
| Amortization of deferred loan costs | 341,152 | 546,696 |
| Loss (gain) on derivative instruments | (863,947) | 1,191,796 |
| Gain on short term investments | — | (78,978) |
| Accretion expense | 9,751 | 7,535 |
| Changes in operating assets and liabilities | | |
| Accounts receivable | 686,521 | (515,662) |
| Prepaid and other current assets | 46,262 | 42,264 |
| Derivative asset | 4,760,000 | — |
| Accounts payable | (1,086,275) | (613,060) |
| Accrued interest | 1,174,574 | 5,299,829 |
| Accrued expenses | 138,171 | 842,588 |
| Royalties payable | (713,445) | 294,765 |
| Net cash provided by operating activities | 1,176,200 | 4,765,460 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Investment in proved properties | (1,944,402) | (2,308,572) |
| Investment in unproved properties | (81,454) | — |
| Purchase of marketable securities | — | (6,821,974) |
| Proceeds from sale of marketable securities | — | 13,917,974 |
| Purchase of property and equipment, other | (16,295) | (172,438) |
| Net cash provided by (used in) investing activities | (2,042,151) | 4,614,990 |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from debt | 1,641,733 | 518,453 |
| Repayments of debt | (5,649,233) | (592,106) |
| Net cash used in financing activities | (4,007,500) | (73,653) |
| **INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS** | (4,873,451) | 9,306,797 |
| **CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD** | 6,350,520 | 5,014,455 |
| **CASH AND CASH EQUIVALENTS, END OF PERIOD** | $ 1,477,069 | $14,321,252 |
| **SUPPLEMENTAL DISCLOSURES:** | | |
| Cash paid for interest | 3,354,588 | 2,583 |
| Cash paid for income taxes | — | — |
| **NON-CASH ACTIVITIES** | | |
| Unrealized gain on derivative liability | 536,026 | 4,108,790 |
| Debt issued in lieu of cash interest | 666,758 | — |

**The accompanying notes are an integral part of the financial statements**

**BASELINE OIL & GAS CORP.**
**NOTES TO FINANCIAL STATEMENTS**

## NOTE 1 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Nature of Operations and Organization*

Baseline Oil & Gas Corp. ("Baseline" or the "Company") is an independent exploration and production company primarily engaged in the acquisition, development, production and exploration of oil and natural gas properties onshore in the United States.

*Basis of Presentation*

The accompanying unaudited interim financial statements of Baseline have been prepared in accordance with accounting principles generally accepted in the United States of America and the rules of the Securities and Exchange Commission (the "SEC"), and should be read in conjunction with Baseline's audited financial statements for the year ended December 31, 2008, and notes thereto, which are included in the Company's annual report on Form 10-K filed with the SEC on March 31, 2009. In the opinion of management, all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of financial position and the results of operations for the interim periods presented have been reflected herein. The results of operations for interim periods are not necessarily indicative of the results to be expected for the full year. Notes to the financial statements, which would substantially duplicate the disclosure required in Baseline's 2008 annual financial statements have been omitted. Certain prior period amounts have been reclassified to conform to current period presentation. These reclassifications had no effect on previously reported results of operations or retained earnings.

*Concentrations of credit risk*

Baseline maintains its cash in bank deposit accounts which, at times, may exceed federally insured limits. Accounts are guaranteed by the Federal Deposit Insurance Corporation ("FDIC") up to $250,000. At March 31, 2009 and December 31, 2008, Baseline had approximately $1,227,069 and $6,100,520, in excess of FDIC insured limits, respectively. Baseline has not experienced any losses in such accounts.

*New Accounting Pronouncements*

In April 2009, the FASB issued FASB Staff Position (FSP) No. FAS 107-1 and Accounting Principles Board (APB) 28-1, Interim Disclosures about Fair Value of Financial Instruments, (FAS 107-1) to amend SFAS No. 107, Disclosures about Fair Value of Financial Instruments and APB 28, Interim Financial Reporting. FAS 107-1 changes the reporting requirements on certain fair value disclosures of financial instruments to include interim reporting periods. FAS 107-1 is effective for interim reporting periods ending after June 15, 2009, with early adoption encouraged. The Company is currently assessing the impact, if any, that the adoption of this pronouncement will have on the Company's disclosures.

In April 2009, the FASB issued FSP No. FAS 157-4, Determining Fair Value When the Volume and Level of Activity for the Asset or Liability Have Significantly Decreased and Identifying Transactions That Are Not Orderly, (FAS 157-4) to amend SFAS No. 157, Fair Value Measurements, (SFAS 157). FAS 157-4 provides additional guidance for estimating fair value in accordance with SFAS 157 when the volume and level of activity for an asset or liability has significantly decreased. In addition, FAS 157-4 includes guidance on identifying circumstances that indicate a transaction is not orderly. FAS 157-4 is effective for interim and annual reporting periods ending after June 15, 2009. The Company is currently assessing the impact, if any, that the adoption of this pronouncement will have on the Company's operating results, financial position or cash flows.