**NOTE 2 – GOING CONCERN**

The accompanying financial statements have been prepared assuming the Company will continue as a going concern. On October 31, 2008, the Company completed a restructuring of its debt. As result of such restructuring, the majority of its debt will mature on June 15, 2009. The future of the Company is dependent on its ability to obtain addition capital through debt or equity offerings or the sale of oil and natural gas properties. Given the current instability in the financial and equity markets and current oil and natural gas pricing levels there is no assurance that the Company will be able to raise the capital needed.

These conditions raise substantial doubt about the Company's ability to continue as a going concern. These financial statements do not include any adjustments that might arise from this uncertainty.

**NOTE 3 – DEBT**

Total debt at March 31, 2009 and December 31, 2008 consists of the following:

|  | March 31, 2009 | December 31, 2008 |
|---|---|---|
| Senior secured notes, net of discount | 15,450,000 | 15,450,000 |
| New notes, net of discount | 106,206,450 | 104,236,283 |
| Revolving line of credit | — | 4,007,500 |
|  | 121,656,450 | 123,693,783 |
| Less short term debt and current portion of long-term debt | (121,656,450) | (123,693,783) |
| Long-term debt | $      — | $      — |

On October 1, 2007 Baseline completed a debt offering consisting of $115 million aggregate principal amount of 12 1/2% Senior Secured Notes due 2012 (the "Senior Secured Notes") and $50 million in aggregate principal amount of 14% Senior Subordinated Convertible Notes due 2013 (the "Convertible Notes"). The bulk of the proceeds from these bond offerings were used to fund the purchase of the Blessing Field Properties, retire prior outstanding indebtedness and to pay fees and expenses related to the offerings.

Interest on the $115 million of Senior Secured Notes was due semi-annually on April 1st and October 1st. The principal on the Senior Secured Notes was due on October 1, 2012. The Senior Secured Notes were subject to an optional redemption beginning October 1, 2009 in the amount of 25% per quarter, at Baseline's option and upon certain conditions being met. Upon a "Change of Control" (as defined in the indenture governing the Senior Secured Notes), the Senior Secured Notes could be put back to the Company at 101% of par, plus accrued unpaid interest.

Interest on the $50 million of Convertible Notes was payable semi-annually on April 1st and October 1st, with Baseline having the option of paying any interest in cash or, subject to certain conditions being met, as additional principal amounts under the Convertible Notes, or Paid-in Kind (PIK) Notes. The principal on the Convertible Notes was due on October 1, 2013. On April 1, 2008, Baseline elected to issue PIK notes to the holders of the Convertible Notes for interest payable for the period from October 1, 2007 through March 31, 2008 in the amount of $3,500,000. The Convertible Notes were convertible into shares of our common stock at an initial conversion price of $0.72 per share, or 1,389 shares of common stock for each $1,000 principal amount of the Convertible Notes converted.

On October 1, 2007, Baseline also entered into a Credit Agreement with Wells Fargo Foothill, Inc. (the "Credit Agreement"). Subject to the satisfaction of a Borrowing Base formula (based on Proved Developed Producing and Proved Developed Nonproducing reserves of Baseline minus certain reserves established by the administrative agent related to credit exposure created by other bank products, including 125% of the mark-to-market value of the hedge positions), and numerous conditions precedent and covenants, the Credit Agreement provided for a revolving commitment of up to $20 million, with a sublimit of $10 million for the issuance of letters of credit. Unless earlier repayment was required under the Credit Agreement, advances under the loan facility were due on or before October 1, 2010. Baseline's oil and gas properties were pledged as collateral under the Credit Agreement, as well as the Senior Notes and the Convertible Notes. Baseline also agreed not to pay dividends on its common stock.

During July 2008, a group of related investors acquired all of Baseline's outstanding Convertible Notes and converted all of such debt into common stock. Accordingly, Baseline issued to the investors a total of 74,311,500 shares of its common stock, valued at the $53,500,000 face value of the debt net of the unamortized discount of $458,456. In addition, Baseline issued an additional 42,723,748 shares of its common stock under the related conversion make-whole premium, valued at $23,548,773. As a result of these transactions, the investors beneficially held, as of July 30, 2008, approximately 77.25% of Baseline's issued and outstanding common stock which constituted a Change of Control. Issuance of the above conversion shares of common stock, together with the make-whole payment, satisfied in full Baseline's obligations under the Convertible Notes. As a result of the conversion of the Convertible Notes, the Company was required to offer to purchase the $115 million of Senior Secured Notes at 101% of par, plus accrued interest.

On August 8, 2008, by reason of the Change of Control, Baseline commenced an offer to purchase for cash all of its Senior Secured Notes at a price equal to 101% of the principal amount of the Senior Secured Notes tendered prior to the close of business on October 2, 2008, plus all accrued and unpaid interest. In addition, Baseline solicited consents from the holders of the Senior Secured Notes to amend the indenture governing the Senior Secured Notes and other collateral agreements. The proposed amendments sought to eliminate or modify substantially all of the restrictive covenants, certain events of default and related provisions contained in the indenture and to limit the rights of the holders of the Senior Secured Notes and, consequently to limit the practical benefit of the liens securing the Senior Secured Notes in order that Baseline could utilize the

collateral to obtain financing to purchase the Senior Secured Notes. As an incentive to holders of the Senior Secured Notes, Baseline agreed to pay a consent payment equal to 2% of the principal amount of the Senior Secured Notes for which consents were validly delivered under the consent solicitation. Consents were delivered by holders of Senior Secured Notes having an aggregate outstanding principal amount of $115 million, representing 100% of the outstanding Senior Secured Notes. As a result, Baseline was obligated to repurchase all of the outstanding Senior Secured Notes for $118,450,000, plus accrued and unpaid interest. On October 6, 2008, Baseline failed to repurchase the notes and by virtue of such non-payment, was in default of the Indenture governing the Notes, as well as its Credit Agreement (see further discussion below).

As a result of the purchase offer for the Senior Secured Notes, the face amount of the Senior Secured Notes was increased by $3,450,000 related to the premium under the Change of Control purchase offer and the consent solicitation

Baseline successfully reached an agreement with the majority of its note holders with respect to its failure to repurchase the Company's outstanding Senior Secured Notes (the "Old Notes") on October 6, 2008. As a result of such agreement, On October 31, 2008, holders of $100 million (the "Majority Holders") of the $115 million outstanding aggregate principal amount of the Old Notes exchanged all of their Old Notes for new Senior Secured Notes (the "New Notes") in the aggregate principal amount of $106,681,250. Such amount represents 103% of the principal amount of Old Notes held by the Majority Holders, plus an additional $3,681,250 (payable as satisfaction of certain consent, solicitation and other fees owing from the Company, including fees associated with the waiver of certain existing defaults under the Indenture for the Old Notes), which was recorded as a discount to the debt and is being amortized into interest expense over the life of the New Notes. In addition, there remains outstanding $15,450,000 in principal amount of Old Notes.

The New Notes mature on June 15, 2009 and accrue annualized interest of 15%, 12.5% of which is payable in cash, and 2.5% of which may be payable by the Company in additional New Notes (the "PIK Interest"). Interest under the New Notes is payable quarterly. Baseline elected to issue PIK notes to the holders of the New Notes for interest payable for the period from October 1, 2008 through December 31, 2008 in the amount of $666,758. On April 1, 2009, the Company failed to pay the interest due under the New Notes in the amount of $4,025,550 (see Note 6).

The New Notes and the Old Notes will share in the existing security interest on substantially all of the Company's properties that had been held by the holders of the Old Notes, on a pro rata basis.

If a holder of Old Notes delivers a consent to the Company prior to the maturity or earlier repayment of the New Notes, such holder will be entitled to receive, in exchange for its Old Notes, New Notes in a principal amount equal to (i) 104.25% of the principal amount of its Old Notes being exchanged and (ii) the amount of cash and PIK Interest that would have accrued with respect to such New Notes had they been issued to such holder on October 30, 2008 through and including the date of such consent, offset by any interest received under such holder's Old Notes since October 1, 2008.

The New Notes have not been and will not be registered under the Securities Act of 1933, as amended, may not be offered or sold in the United States absent registration or an applicable exemption from registration requirements, and are therefore subject to substantial restrictions on transfer.

The senior credit facility was also amended to provide, among other things, for (i) a new maturity date, with respect to any advances under the revolving credit commitment, of the earlier of October 1, 2010 or sixty days prior to the maturity date of the New Notes and (ii) an increase of 2% on the interest rate margin for both Prime and LIBOR based loans thereunder. The Intercreditor Agreement was also modified to permit the restructuring of the Company's obligations under the Old Notes and to extend the standstill period, during which time the Trustee for the Old Notes and New Notes cannot enforce any rights with respect to collateral from 90 to 180 days.

On January 30, 2009, the Company fully repaid all of its obligations (approximately $4.0 million) under its Credit Agreement with Wells Fargo Foothill, Inc. As a result, the Credit Agreement was terminated and the Agent released its liens on all of the Company's properties and assets. The Company utilized a portion of the funds obtained from the liquidation of 100% of its commodity hedge positions to fund the repayment of the debt.

## NOTE 4 – ASSET RETIREMENT OBLIGATION

|  | Three Months Ended March 31, 2009 |
|---|---|
| Asset retirement obligations, beginning of period | $ 314,532 |
| Accretion expense | 9,751 |
| Asset retirement obligations, end of period | $ 324,283 |

## NOTE 5 – DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES

On January 28, 2009, the Company liquidated all of its oil and natural gas hedge positions resulting in proceeds of $4,760,000. The cumulative unrealized gain, reported as a component of accumulated other comprehensive income in stockholders' equity, is being recognized into income in the periods for which the related oil and natural gas volumes are produced. The Company paid fees totaling $300,000 related to the liquidation of the hedge positions. Such fees were expensed during the current period.

## NOTE 6 – SUBSEQUENT EVENTS

On May 1, 2009, the Company incurred an Event of Default under its outstanding 12 $1/2$% Senior Secured Notes due 2012 and 15% New Notes due 2009 (collectively, the "Notes").

The Company was obligated to pay all accrued interest on the outstanding Notes due on April 1, 2009, which we failed to do. Our nonpayment of such interest, in the aggregate sum of $4.29 million, on April 1, 2009 constituted an Event of Default upon the continuation of such default for thirty days thereafter, or as of May 1, 2009. The Company incurred an additional Event of Default on May 9, 2009 for failing to meet a financial covenant (minimum ratio of PV10 to senior secured indebtedness) under the amended indenture governing the Notes. The above Events of Default entitle holders of at least 25% of the aggregate outstanding principal amount of the Notes to declare the principal amount of all Notes, together with any accrued and unpaid interest thereon, immediately due and payable.

As disclosed in our annual report for the year ended December 31, 2008 filed with the Commission on March 31, 2009, the continuing turmoil and slowdown in transaction activity occurring in the U.S. and global credit markets since September and October 2008, as compounded by the sharp fall in operating revenues and stock prices of many publicly traded E&P companies caused by the decline in oil and natural gas prices to their lowest levels since 2001, have made it extremely difficult for below-investment grade companies such as the Company to raise debt or equity capital in the U.S. markets. As a result, we have been unable to obtain the loan and equity commitments required to meet our maturing obligations under the Notes or to generate cash flow from our operations sufficient to meet cash interest payment requirements. Currently, we have not identified a means for making the cash interest payments due April 1, 2009 or for repaying either the 12 $1/2$% Senior Secured Notes which became due in October 2008, or the 15% New Notes when they become due on June 15, 2009.

As also disclosed previously, we have engaged a financial advisor to advise the Company on courses of action available to us, including, without limitation, available financing and capital restructuring alternatives, targeted cost reductions, the sale of assets and the sale or merger of the Company. If we are not able to successfully implement one or more of these strategies, or in order for us to implement one or more of these strategies, we may voluntarily seek protection under the U.S. Bankruptcy Code.

**Item 2.    Management's Discussion and Analysis of Financial Condition and Results of Operations.**

**Cautionary Notice Regarding Forward Looking Statements**

*Baseline Oil & Gas Corp. (referred to herein as "Baseline", "we" or "the Company") desires to take advantage of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. This report contains a number of forward-looking statements that reflect management's current views and expectations with respect to business, strategies, future results and events and financial performance. All statements made in this Quarterly Report other than statements of historical fact, including statements that address operating performance, events or developments that management expects or anticipates will or may occur in the future, including statements related to revenues, cash flow, profitability, adequacy of funds from operations, statements expressing general optimism about future operating results and non-historical information, are forward looking statements. In particular, the words "believe," "expect," "intend," "anticipate," "estimate," "may," "will," variations of such words, and similar expressions identify forward-looking statements, but are not the exclusive means of identifying such statements and their absence does not mean that the statement is not forward-looking.*

*Readers should not place undue reliance on these forward-looking statements, which are based on management's current expectations and projections about future events, are not guarantees of future performance, are subject to risks, uncertainties and assumptions and apply only as of the date of this report. Baseline's actual results, performance or achievements could differ materially from the results expressed in, or implied by, these forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, those discussed below in "Risk Factors" as well as those discussed elsewhere in this report and in our Annual Report on Form 10-K on file with the Securities and Exchange Commission, as well as the risks discussed in press releases and other communications to stockholders issued by Baseline from time to time which attempt to advise interested parties of the risks and factors that may affect the business. Except as may be required under the federal securities laws, Baseline undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.*

**Introductory Note**

We are a Houston, Texas-based independent oil and natural gas company engaged in the exploration, production, development, acquisition and exploitation of crude oil and natural gas properties, with interests in: (i) the Eliasville Field in North Texas, or the Eliasville Field Properties; (ii) the Blessing Field in Matagorda County, Texas, onshore along the Texas Gulf Coast, or the Blessing Field Properties; and, (iii) the New Albany Shale resource play in Southern Indiana, or the New Albany Shale Play. Our properties cover 39,945 net acres in these three core areas.

Despite a number of identified opportunities to increase production and develop the reserve base in our core areas, we are presently unable to make the necessary capital expenditures given continuing unfavorable conditions in the capital markets and, more importantly, substantial upcoming repayment obligations with respect to our outstanding senior notes – all of which have significantly adversely affected our liquidity. See Liquidity and Capital Resources discussion below.

Our financial statements have been prepared assuming that we will continue as a going concern; however, as reflected in notes accompanying our financial statements, our losses from operations and our working capital deficiency raise substantial doubt about our ability to continue as a going concern.

**Liquidity and Capital Resources**

Our primary sources of liquidity and capital resources for 2009 are cash on hand, short-term cash equivalent investments, internally generated cash flows from operations, committed credit facilities and any additional or replacement credit facilities we are able to arrange. On October 1, 2007, we entered into a $20 million Credit Agreement with Wells Fargo Foothill, Inc. as arranger and administrative agent (the "Credit Agreement"). This Credit Agreement was retired in full and terminated on January 30, 2009, using a portion of the proceeds from our January 28, 2009 liquidation of our hedge positions.

As of March 31, 2009, our current liabilities exceeded our current assets by approximately $130 million, primarily due to the fact that all of our debt is classified as current. Also as of March 31, 2009, we held approximately $1.5 million of cash on hand, and had no access to additional credit facilities. We were required to pay interest of $4.29 million (including cash interest of $3.8 million) on our Senior Secured Notes on April 1, 2009. We incurred an Event of Default under the indenture (as amended) governing our Senior Secured Notes on May 1, 2009 for failing to make this interest payment, and additionally incurred an Event of Default on May 9, 2009 for failing to meet a financial covenant (minimum ratio of PV10 to senior secured indebtedness) under the amended indenture. As a result of these uncured Events of Default, holders of at least 25% of the aggregate outstanding principal amount of the Senior Secured Notes are entitled to declare the principal amount of the Senior Secured Notes, together with any accrued and unpaid

interest thereon, immediately due and payable. Absent any acceleration occurring as a result of uncured Events of Default, we are required to repay approximately $107.3 million of our Senior Secured Notes, together with any accrued and unpaid interest, on June 15, 2009. We have not identified a way of paying or refinancing this obligation.

As disclosed previously, we have engaged a financial advisor to advise the Company on courses of action available to us, including without limitation, available financing and capital restructuring alternatives, targeted cost reductions, the sale of assets and the sale or merger of the Company. If we are not able to successfully implement one or more of these strategies, or in order for us to implement one or more of these strategies, we may voluntarily seek protection under the U.S. Bankruptcy Code.

## Results of Operations

*Three Months Ended March 31, 2009 compared to Three Months Ended March 31, 2008*

We produced 62.4 thousand barrels of oil and 257.8 million cubic feet of natural gas during the first quarter of 2009, and received an average price of $38.37 per barrel and $4.58 per thousand cubic feet respectively. This resulted in total oil and gas sales revenue for the quarter of $3.6 million, before the effects of hedging. Oil and gas hedging revenue totaled $1.5 million during the quarter, of which cash settlements received from our counterparties under our commodity price hedging contracts totaled $633 thousand. We produced 62.9 thousand barrels of oil and 309.2 million cubic feet of natural gas during the first quarter of 2008, and received an average price of $96.40 per barrel and $9.15 per thousand cubic feet respectively. This resulted in revenue from oil and natural gas production activities during the period of $8.9 million, before the effects of hedging. Hedge revenue for the first quarter of 2008 was ($2.5 million), including cash settlements paid to hedge counterparties of ($1.3 million).

Our production expenses totaled $2.0 million during the first quarter of 2009, of which lease operating expenses comprised $1.7 million, production taxes comprised $199 thousand and ad valorem taxes represented $133 thousand. Our production expenses equaled $3.14 per mcfe during the first quarter, of which lease operating expenses were $2.62 per mcfe. Our production expenses totaled $2.2 million during the first quarter of 2008, of which $1.6 million was comprised of lease operating expenses and $492 thousand was paid for severance taxes.

General and administrative expenses totaled $1.7 million during the first quarter of 2009, including professional and consulting fees of $667 thousand, salaries and labor of $635 thousand, loan fees of $241 thousand and office expenses of $180 thousand. All told, general and administrative expenses equaled $2.73 per mcfe for the period. By comparison, our general and administrative expenses were $1.1 million during the first quarter of 2008. The major components of this total included salaries and benefits at $496 thousand (including $161 thousand of non-cash stock based compensation), consulting and professional fees at $325 thousand and office expenses of $197 thousand.

Our interest expense totaled $6.2 million during the first quarter of 2009, of which $4.5 million represented accrued interest on our Senior Secured Notes (New Notes and Old Notes). The remaining $1.6 million was comprised of amortization of debt discounts and debt issuance costs related to the Senior Secured Notes. Our interest expenses totaled $6.0 million during the first quarter of 2008, of which $5.3 million was comprised of interest on our Senior Secured Notes ($3.6 million, paid in cash) and our since-retired Convertible Notes ($1.7 million, paid-in-kind). The remaining $705 thousand consisted of amortization of debt discounts and issuance costs for these two bond issues.

During the first quarter of 2009, we spent $1.9 million on drilling, workovers and equipment, including $908 thousand on production and well equipment, $714 thousand on well recompletions and $323 thousand on drilling and completion operations. During the first quarter of 2008, we spent $2.3 million on drilling and workovers, comprised of $1.0 million for drilling and completion activities, $787 thousand for well recompletions and $477 thousand for production and well equipment.

## Item 4T.   Controls and Procedures

An evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the three-month period covered by this quarterly report on Form 10-Q was carried out by us under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, at March 31, 2009, our disclosure controls and procedures are effective to ensure that the information required to be disclosed by us in reports filed under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission.

As previously disclosed in our annual report on Form 10-K for the year ended December 31, 2008, management identified as a material weakness deficiencies in the documentation and consistent performance of certain detective controls surrounding account balances. We believe that the identified deficiencies stemmed principally from our rapid growth over a relatively short span and could be adequately addressed through organizational and process changes.

During 2009 we intend to modify our analytical procedures to ensure the accurate, timely and complete reconciliation of all major accounts to remediate such inconsistencies and strengthen our internal controls environment. Proposed actions is an iterative process and will evolve as we continue to evaluate and improve our internal controls over financial reporting. Management intends to review progress on these activities on a consistent and ongoing basis at the CEO and senior management level in conjunction with our board of directors.

Despite the need to augment our internal controls over financial reporting, as outlined above, our management currently believes that the financial reports underlying our financial statements contained in this annual report are reliable given the organizational and process changes implemented through the date of this report.

There have been no changes in our internal controls over financial reporting during the fiscal quarter ended March 31, 2009 that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

## PART II
## OTHER INFORMATION

### Item 1A.   Risk Factors

You should carefully consider each of the risks described below, together with all of the other information contained in this report, before deciding to invest in our securities. If any of the following risks develop into actual events, our business, financial condition or results of operations could be materially adversely affected and you may lose all or part of your investment.

**We have substantial debt obligations coming due in June 2009 that we may be unable to satisfy. Any failure to meet our debt obligations could harm our business, financial condition, results of operations or cash flows.**

We have a substantial amount of debt. As of March 31, 2009, we had short term debt of approximately $121.6 million net of discount, relating to our New Notes and Senior Notes. The Senior Notes became due in October 2008 after we defaulted on our change of control purchase offer, and The New Notes mature June 15, 2009. The default on our Senior Notes is continuing. In addition, on May 1, 2009, the New Notes went into default. As of March 31, 2009, our Senior Notes, New Notes, trade payables and other current liabilities exceeded our current assets by $130.1 million. As such, our short-term and long-term liquidity as of March 31, 2009 was not adequate to fund our operations, including significant capital expenditures, interest and repayment of the June 2009 debt maturities.

Our substantial level of indebtedness has important adverse consequences, including the following:

- it may make it difficult for us to satisfy our obligations under our indebtedness and contractual and commercial commitments;

- we must use a substantial portion of our cash flow from operations to pay interest on our indebtedness, which reduces the funds available to us for other purposes;

- our ability to obtain additional debt financing in the future for working capital, capital expenditures, acquisitions or general corporate purposes may be limited;

- our flexibility in reacting to changes in the industry may be limited and we could be more vulnerable to adverse changes in our business or economic conditions in general; and

- we may be at a competitive disadvantage to those of our competitors who operate on a less leveraged basis.

We do not have the ability to generate cash flows from operations and to make scheduled payments on our indebtedness (including principal maturities already due and to become due), and therefore we are forced to adopt an alternative strategy that may include actions such as reducing, delaying or foregoing acquisitions and capital expenditures, selling assets, restructuring or refinancing our indebtedness or seeking equity capital. We cannot assure you that any of these alternative strategies could be effected on satisfactory terms, if at all, or that they would yield sufficient funds to make required payments of interest and principal on our debt in the future, including payments on the notes, and any such alternative measures may be unsuccessful or may not permit us to meet scheduled debt service obligations, which could cause us to default on our obligations and impair our liquidity. Ultimately, it may become necessary for us to seek voluntary protection under the U.S. Bankruptcy Code.

**We have substantial capital requirements that, if not met, may hinder operations and cause us to go out of business.**

External financing will be required in the future if we are to successfully fund our growth. On January 28, 2009, we liquidated our oil and natural gas hedging arrangements and terminated our credit facility with Wells Fargo Foothill, Inc., repaying in full our then existing obligations under such credit facility. Accordingly, operational revenue represents our only current source of funding for our ongoing operations. We may not be able to obtain additional financing, and financing under new credit facilities may not be available to us in the future. Without additional capital resources, we may be forced to limit, defer or cease any future natural gas and oil exploration and development, adversely affecting the producing rates and ultimate value of our natural gas and oil properties and, in turn, negatively affecting our business, financial condition, and results of operations.

Our growth and continued operations could be impaired by limitations on our access to the capital markets or traditional secured sources of credit. Because of the unprecedented volatility and disruption experienced in the capital and credit markets, adequate capital may not be available to us, or if available, would be adequate for the long-range growth of the Company or obtainable by us on acceptable terms. In the event we do not raise additional capital from conventional sources, such as our existing investors or commercial banks, our growth will be restricted and we will need to scale back or curtail implementing our business plan.

Without adequate capital resources or funding on acceptable terms, we may be forced to limit our planned oil and natural gas acquisition and development activities and thereby adversely affect the producing rates and ultimate value of our oil and natural gas properties. If we are unable to service our indebtedness, we may also be forced to adopt an alternative strategy that may include actions such as reducing or delaying acquisitions and capital expenditures, selling assets, restructuring or refinancing our indebtedness or seeking equity capital. Because of today's deteriorating capital market conditions, these alternative strategies may fail to yield sufficient funds to make required payments on our indebtedness.

**Item 6**      **Exhibits**

| Exhibit No. | Description |
| --- | --- |
| 31.1 | Section 302 Certification of Principal Executive Officer |
| 31.2 | Section 302 Certification of Principal Financial Officer |
| 32.1 | Section 906 Certification of Chief Executive Officer |
| 32.2 | Section 906 Certification of Chief Financial Officer |

## SIGNATURES

In accordance with the requirements of the Securities and Exchange Act of 1934, the registrant has caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Dated: May 15, 2009

**Baseline Oil & Gas Corp.**

By:   /s/ Thomas R. Kaetzer
Thomas R. Kaetzer
Chief Executive Officer

**EXHIBIT 31.1**

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO
## SECTION 302(a) OF THE SARBANES-OXLEY ACT OF 2002

I, Thomas R. Kaetzer, President and Chief Executive Officer of Baseline Oil & Gas Corp. (the "Company"), certify that:

1. I have reviewed this quarterly report on Form 10-Q of the Company for the quarterly period ended March 31, 2009;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fiscal quarter ended March 31, 2009 that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 15, 2009

|  | /s/ Thomas R. Kaetzer |
|---|---|
| Name: | Thomas R. Kaetzer |
| Title: | President and Chief Executive Officer |

EXHIBIT 31.2

**CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO
SECTION 302(a) OF THE SARBANES-OXLEY ACT OF 2002**

I, Patrick H. McGarey, Chief Financial Officer of Baseline Oil & Gas Corp. (the "Company"), certify that:

1. I have reviewed this quarterly report on Form 10-Q of the Company for the quarterly period ended March 31, 2009;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fiscal quarter ended March 31, 2009 that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 15, 2009

|  |  |
|---|---|
| | /s/ Patrick H. McGarey |
| Name: | Patrick H. McGarey |
| Title: | Chief Financial Officer |

**EXHIBIT 32.1**

### CERTIFICATION OF CHIEF EXECUTIVE OFFICER
### PURSUANT TO 18 U.S.C. SECTION 1350
### AS ADOPTED PURSUANT TO
### SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

The undersigned, the Chief Executive Officer of Baseline Oil & Gas Corp. (the "Company"), does hereby certify under the standards set forth and solely for the purposes of 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Quarterly Report on Form 10-Q of the Company for the quarterly period ended March 31, 2009 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in that Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: May 15, 2009

/s/ Thomas R. Kaetzer
**Thomas R. Kaetzer**
**President and Chief Executive Officer**

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

**EXHIBIT 32.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

The undersigned, the Chief Financial Officer of Baseline Oil & Gas Corp. (the "Company"), does hereby certify under the standards set forth and solely for the purposes of 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Quarterly Report on Form 10-Q of the Company for the quarterly period ended March 31, 2009 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in that Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: May 15, 2009

_____ /s/ Patrick H. McGarey
Patrick H. McGarey
Chief Financial Officer

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

*EXHIBIT J*

## Insurance Policies

| **Insurance Issuer** | **Coverage** |
|---|---|
| Traveler's Casualty & Surety of America | Worker's Compensation |
| St. Paul Fire and Marine Insurance Co. | General Liability |
| St. Paul Fire and Marine Insurance Co. | Commercial Auto |
| St. Paul Fire and Marine Insurance Co. | Umbrella |
| St. Paul Surplus Lines Insurance Co. | Operator's Extra Expense |
| St. Paul Fire and Marine Insurance Co. | Equipment Floater |
| St. Paul Fire and Marine Insurance Co. | Property |
| Carolina Casualty | Directors & Officers Liability ($5 M) |
| American Insurance Group | Excess Directors & Officers Liability ($5M x of 5M) |

*EXHIBIT K*

## Executory Contracts and Unexpired Leases

| Name | Contract or Lease |
|---|---|
| 411 NSHP Partners, LP | Office Lease |
| A-Texian Compressor, Inc. | Gas Compressor/Equipment Master Rental and Service Agreement |
| Administaff | Client Service Agreement |
| Brazos River Authority | Interruptible Water Availability Agreement |
| DSX Energy Ltd. , LLP | 3D Onshore Master Seismic Data Sub-Licensing Agreement |
| Gulfmark Energy, Inc. | Crude Oil Purchase Agreement |
| Hanlon Gas Processing, Ltd. | Gas Purchase Contract |
| Hesco | Gas Purchase Agreement |
| John Garber | Consulting Agreement for Geological and Geophysical Services |
| Kirkwood & Darby | Appointment of Agent |
| Sharp | Copier Lease Agreement |
| Stephens Regional Special Utility District | Service Application and Agreement |
| Sunco Partners Marketing & Terminals, LP | Crude Oil Purchase Agreement |
| Texon, LP | Purchase Agreement Contract<br><br>Non-Disclosure Agreement<br><br>Pipeline Agreement<br><br>Marketing Agreement<br><br>Interconnect Agreement |
| United Electric Cooperative Services | Agreement for Electric Service |
| Valerus Compression Services | Gas Compressor Equipment Master Rental and Servicing Agreement |

*EXHIBIT L*

---

INDENTURE,

Dated as of _____, 2009

BETWEEN

BASELINE OIL & GAS CORP.

as Issuer

AND

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,

as Trustee and Collateral Agent

_____

Series A 20% Senior Secured PIK Notes due 2014

---

**CROSS-REFERENCE TABLE**

| TIA Section | Indenture Section |
|---|---|
| 310(a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | 7.10 |
| (a)(4) | N.A. |
| (a)(5) | 7.10 |
| (b) | 7.03; 7.08; 7.10 |
| (c) | N.A. |
| 311(a) | 7.03; 7.11 |
| (b) | 7.03; 7.11 |
| (c) | N.A. |
| 312(a) | 2.05 |
| (b) | 7.07; 11.03 |
| (c) | 11.03 |
| 313(a) | 7.06 |
| (b)(1) | 7.06 |
| (b)(2) | 7.06 |
| (c) | 7.06 |
| (d) | 7.06 |
| 314(a) | 4.06; 4.08 |
| (b) | 12.03 |
| (c)(1) | 4.06; 11.04 |
| (c)(2) | 11.04 |
| (c)(3) | 4.06 |
| (d) | 12.04 |
| (e) | 11.05 |
| (f) | N.A. |
| 315(a) | 7.01(b) |
| (b) | 7.05 |
| (c) | 7.01(a) |
| (d) | 7.01(c) |
| (e) | 6.11 |
| 316(a)(last sentence) | 2.09 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| (c) | 9.04 |
| 317(a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.04 |
| 318(a) | 11.01 |
| (b) | N.A. |
| (c) | 11.01 |

N.A. means Not Applicable

NOTE:  This Cross-Reference Table shall not, for any purpose, be deemed to be a part of this Indenture.

Table of Contents

Page

ARTICLE One        Definitions and Incorporation by Reference ............................................. 1
        Section 1.01.        Definitions ................................................................................... 1
        Section 1.02.        Incorporation by Reference of Trust Indenture Act ........................... 25
        Section 1.03.        Rules of Construction ........................................................................ 26
ARTICLE Two        The Notes ....................................................................................... 26
        Section 2.01.        Form and Dating ................................................................................. 26
        Section 2.02.        Execution and Authentication; Aggregate Principal Amount ........... 27
        Section 2.03.        Registrar and Paying Agent ............................................................... 28
        Section 2.04.        Obligations of Paying Agent .............................................................. 28
        Section 2.05.        Holder Lists .......................................................................................... 29
        Section 2.06.        Transfer and Exchange ....................................................................... 29
        Section 2.07.        Replacement Notes ............................................................................. 29
        Section 2.08.        Outstanding Notes ............................................................................... 30
        Section 2.09.        Treasury Notes; When Notes Are Disregarded ................................. 30
        Section 2.10.        Temporary Notes ................................................................................. 30
        Section 2.11.        Cancellation ......................................................................................... 30
        Section 2.12.        CUSIP Numbers ................................................................................... 30
        Section 2.13.        Deposit of Moneys .............................................................................. 31
        Section 2.14.        Book-Entry Provisions for Global Notes ............................................ 31
        Section 2.15.        Special Transfer Provisions ............................................................... 32
        Section 2.16.        Issuance of PIK Notes ......................................................................... 33
ARTICLE Three        Redemption ....................................................................................... 34
        Section 3.01.        Optional Redemption .......................................................................... 34
        Section 3.02.        Mandatory Redemption ...................................................................... 34
        Section 3.03.        Selection of Notes to Be Redeemed ................................................. 35
        Section 3.04.        Notice of Redemption ......................................................................... 35
        Section 3.05.        Effect of Notice of Redemption .......................................................... 36
        Section 3.06.        Deposit of Redemption Price .............................................................. 36
        Section 3.07.        Notes Redeemed in Part ..................................................................... 36
ARTICLE Four        Covenants ........................................................................................... 36

Section 4.01.      Payment of Notes ............................................................................. 36
Section 4.02.      Maintenance of Office or Agency ..................................................... 37
Section 4.03.      Corporate Existence .......................................................................... 37
Section 4.04.      Payment of Taxes and Other Claims ................................................ 37
Section 4.05.      Maintenance of Properties and Insurance ......................................... 37
Section 4.06.      Compliance Certificate; Notice of Default ....................................... 38
Section 4.07.      Compliance with Laws ...................................................................... 38
Section 4.08.      Reports to Holders ............................................................................ 39
Section 4.09.      Waiver of Stay, Extension or Usury Laws ........................................ 40
Section 4.10.      Limitation on Restricted Payments ................................................... 40
Section 4.11.      Limitations on Transactions with Affiliates ..................................... 41
Section 4.12.      Limitation on Incurrence of Additional Indebtedness ...................... 42
Section 4.13.      Limitation on Dividend and Other Payment Restrictions
                   Affecting Restricted Subsidiaries ..................................................... 42
Section 4.14.      Additional Guarantees ...................................................................... 43
Section 4.15.      Repurchase upon Change of Control ................................................. 44
Section 4.16.      Limitation on Asset Sales ................................................................. 46
Section 4.17.      Limitation on Liens ........................................................................... 48
Section 4.18.      Conduct of Business ......................................................................... 48
Section 4.19.      Limitation on Issuances and Sales of Capital Stock of
                   Subsidiaries ...................................................................................... 48
Section 4.20.      Payments for Consent ....................................................................... 48
Section 4.21.      Impairment of Security Interest ........................................................ 48
Section 4.22.      Real Estate Mortgages and Filings ................................................... 49
Section 4.23.      Oil and Gas Mortgages and Filings .................................................. 49
Section 4.24.      Leasehold Mortgages and Filings; Landlord Waivers ...................... 50
Section 4.25.      Other Collateral ................................................................................ 50
Section 4.26.      Purchases ........................................................................................... 50
Section 4.27.      No Amendment to Subordination Provisions .................................... 51
ARTICLE Five      Successor Corporation ...................................................................... 51
Section 5.01.      Merger, Consolidation and Sale of Assets ........................................ 51
Section 5.02.      Successor Corporation Substituted .................................................... 53
ARTICLE Six       Default and Remedies ....................................................................... 53

| | | |
|---|---|---|
| Section 6.01. | Events of Default | 53 |
| Section 6.02. | Acceleration | 54 |
| Section 6.03. | Other Remedies | 55 |
| Section 6.04. | Waiver of Past Defaults | 55 |
| Section 6.05. | Control by Holders Owning at Least 85% | 55 |
| Section 6.06. | Limitation on Suits | 56 |
| Section 6.07. | Rights of Holders to Receive Payment | 56 |
| Section 6.08. | Collection Suit by Trustee or Collateral Agent | 56 |
| Section 6.09. | Trustee May File Proofs of Claim | 57 |
| Section 6.10. | Priorities | 57 |
| Section 6.11. | Undertaking for Costs | 57 |
| Section 6.12. | Restoration of Rights and Remedies | 58 |
| Section 6.13. | Rights and Remedies Cumulative | 58 |
| Section 6.14. | Delay or Omission not Waiver | 58 |
| ARTICLE Seven | Trustee | 58 |
| Section 7.01. | Duties of Trustee | 58 |
| Section 7.02. | Rights of Trustee | 59 |
| Section 7.03. | Individual Rights of Trustee | 61 |
| Section 7.04. | Trustee's Disclaimer | 61 |
| Section 7.05. | Notice of Default | 61 |
| Section 7.06. | Reports by Trustee to Holders | 62 |
| Section 7.07. | Compensation and Indemnity | 62 |
| Section 7.08. | Replacement of Trustee | 63 |
| Section 7.09. | Successor Trustee by Merger, Etc | 64 |
| Section 7.10. | Eligibility; Disqualification | 64 |
| Section 7.11. | Preferential Collection of Claims Against Company | 64 |
| Section 7.12. | Trustee as Collateral Agent and Paying Agent | 65 |
| Section 7.13. | Co-Trustees, Co-Collateral Agent and Separate Trustees, Collateral Agent | 65 |
| ARTICLE Eight | Defeasance; Satisfaction and Discharge of Indenture | 66 |
| Section 8.01. | Legal Defeasance and Covenant Defeasance | 66 |
| Section 8.02. | Satisfaction and Discharge | 68 |
| Section 8.03. | Survival of Certain Obligations | 69 |

Section 8.04.     Acknowledgment of Discharge by Trustee.......................................... 69

Section 8.05.     Application of Trust Moneys.................................................................. 69

Section 8.06.     Repayment to the Company; Unclaimed Money................................ 69

Section 8.07.     Reinstatement........................................................................................ 70

Section 8.08.     Indemnity for Government Obligations............................................. 70

ARTICLE Nine        Amendments, Supplements and Waivers ................................................. 70

Section 9.01.     Without Consent of Holders ................................................................. 70

Section 9.02.     With Consent of Holders ...................................................................... 71

Section 9.03.     Compliance with TIA ........................................................................... 72

Section 9.04.     Revocation and Effect of Consents...................................................... 72

Section 9.05.     Notation on or Exchange of Notes....................................................... 73

Section 9.06.     Trustee to Sign Amendments, Etc ...................................................... 73

Section 9.07.     Conformity with Trust Indenture Act ................................................. 73

ARTICLE Ten        Guarantee ......................................................................................................... 73

Section 10.01.     Guarantee ............................................................................................ 73

Section 10.02.     Release of a Guarantor....................................................................... 74

Section 10.03.     Limitation of Guarantor's Liability .................................................. 75

Section 10.04.     Guarantors May Consolidate, etc., on Certain Terms...................... 75

Section 10.05.     Contribution ........................................................................................ 76

Section 10.06.     Waiver of Subrogation........................................................................ 76

Section 10.07.     Evidence of Guarantee........................................................................ 76

Section 10.08.     Waiver of Stay, Extension or Usury Laws........................................ 76

ARTICLE Eleven        Miscellaneous .................................................................................................. 76

Section 11.01.     Trust Indenture Act Controls ............................................................. 76

Section 11.02.     Notices ................................................................................................. 77

Section 11.03.     Communications by Holders with Other Holders.............................. 77

Section 11.04.     Certificate and Opinion as to Conditions Precedent.......................... 78

Section 11.05.     Statements Required in Certificate or Opinion.................................. 78

Section 11.06.     Rules by Trustee, Paying Agent, Registrar......................................... 78

Section 11.07.     Legal Holidays.................................................................................... 78

Section 11.08.     Governing Law ................................................................................... 78

Section 11.09.     No Adverse Interpretation of Other Agreements............................... 79

Section 11.10.     No Recourse Against Others............................................................... 79

| Section 11.11. | Successors | 79 |
|---|---|---|
| Section 11.12. | Duplicate Originals | 79 |
| Section 11.13. | Severability | 79 |
| Section 11.14. | Waiver of Jury Trial | 79 |
| Section 11.15. | Force Majeure | 79 |
| ARTICLE Twelve | Security | 79 |
| Section 12.01. | Grant of Security Interest | 79 |
| Section 12.02. | Intercreditor Agreement | 80 |
| Section 12.03. | Recording and Opinions | 81 |
| Section 12.04. | Release of Collateral | 81 |
| Section 12.05. | Specified Releases of Collateral | 82 |
| Section 12.06. | Release upon Satisfaction or Defeasance of all Outstanding Obligations | 82 |
| Section 12.07. | Form and Sufficiency of Release | 82 |
| Section 12.08. | Purchaser Protected | 83 |
| Section 12.09. | Authorization of Actions to Be Taken by the Collateral Agent Under the Collateral Agreements | 83 |
| Section 12.10. | Authorization of Receipt of Funds by the Collateral Agent Under the Collateral Agreements | 84 |

**EXHIBITS:**

| Exhibit A | -- | Form of Series A 20% Senior Secured PIK Note due 2014 and related Guarantee |
|---|---|---|
| Exhibit B | -- | Form of Legend for Global Notes |
| Exhibit C | -- | Form of Certificate to Be Delivered in Connection with Transfers to Non-QIB Accredited Investors |
| Exhibit D | -- | Form of Certificate to Be Delivered in Connection with Transfers Pursuant to Regulation S |
| NOTE: | | This Table of Contents shall not, for any purpose, be deemed to be part of this Indenture. |

INDENTURE, dated as of _____, 2009 (this "Indenture"), between Baseline Oil & Gas Corp., a Delaware corporation (the "Company"), the Guarantors (as defined herein) and The Bank of New York Mellon Trust Company, N.A., as Trustee (in such capacity, the "Trustee") and Collateral Agent (in such capacity, the "Collateral Agent").

WHEREAS, the Company has duly authorized the creation of the Series A 20% Senior Secured PIK Notes due 2014 (the "Notes"), including the Series A Senior Notes to be issued in lieu of the payment of interest in cash on any Note (the "PIK Notes"), and the related Guarantee by the Guarantor thereof; and

WHEREAS, all things necessary to make the Notes and the Guarantees, when each are duly issued and executed by the Company and the Guarantors, as applicable, and authenticated and delivered hereunder, the valid and legally binding obligations of each of the Company and the Guarantors, respectively, and to make this Indenture a valid and legally binding agreement of each of the Company and the Guarantors, have been done.

NOW THEREFORE, the Company, the Guarantors, the Trustee and the Collateral Agent agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders (as defined):

## ARTICLE ONE

### Definitions and Incorporation by Reference

Section 1.01.   Definitions.

"Acquired Indebtedness" means Indebtedness of a Person or any of its Subsidiaries (a) existing at the time such Person becomes a Restricted Subsidiary of the Company or at the time it merges or consolidates with or into the Company or any of its Restricted Subsidiaries or (b) assumed in connection with the acquisition of assets from such Person and in each case not incurred by such Person in connection with, or in anticipation or contemplation of, such Person becoming a Restricted Subsidiary of the Company or such acquisition, merger or consolidation and which Indebtedness is without recourse to the Company or any of its Subsidiaries or to any of their respective properties or assets other than the Person or the assets to which such Indebtedness related prior to the time such Person became a Restricted Subsidiary of the Company or the time of such acquisition, merger or consolidation.

"Affiliate" means, with respect to any specified Person, any other Person who directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise; provided that Beneficial Ownership of 10% or more of the Voting Stock of the Person shall be deemed to constitute control. The terms "controlling" and "controlled" have meanings correlative of the foregoing.

"Affiliate Transaction" has the meaning set forth in Section 4.11.

"Agent" means any Registrar, Paying Agent or co-Registrar.

"Agent Members" has the meaning set forth in Section 2.14(a) and means, with respect to the Depository, Euroclear or Clearstream, a Person who has an account with the Depository, Euroclear or Clearstream, respectively (and, with respect to the Depository, shall include Euroclear and Clearstream).

"Applicable Premium" means, with respect to a Senior Note on any redemption date, the greater of:

(1)    1.0% of the principal amount of the Senior Note; or

(2)    the excess of:

(a)    the present value at such redemption date of (i) the redemption price of the Senior Note at _____, 2012, (such redemption price being set forth in Section 3.01 herein) plus (ii) all required interest payments due on the Senior Note through _____, 2012 (excluding accrued but unpaid interest to the redemption date), computed using a discount rate equal to the Treasury Rate as of such redemption date plus 50 basis points; over

(b)    the principal amount of the Senior Note, if greater.

"Applicable Procedures" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depository, Euroclear and Clearstream that apply to such transfer or exchange.

"Asset Acquisition" means:

(1)    an Investment by the Company or any Restricted Subsidiary of the Company in any other Person pursuant to which such Person shall become a Restricted Subsidiary of the Company or any Restricted Subsidiary of the Company, or shall be merged with or into the Company or any Restricted Subsidiary of the Company, or

(2)    the acquisition by the Company or any Restricted Subsidiary of the Company of the assets of any Person (other than a Restricted Subsidiary of the Company) which constitute all or substantially all of the assets of such Person or comprise any division or line of business of such Person or any other properties or assets of such Person other than in the ordinary course of business.

"Asset Sale" means any direct or indirect sale, issuance, conveyance, transfer, lease (other than operating leases entered into in the ordinary course of business), assignment or other transfer (other than a Lien in accordance with this Indenture) for value by the Company or any of its Restricted Subsidiaries to any Person other than the Company or a Guarantor of:

(1)    any Capital Stock of any Restricted Subsidiary of the Company; or

(2)    any other property or assets of the Company or any Restricted Subsidiary of the Company other than in the ordinary course of business;

provided, however, that Asset Sales shall not include:

(a)    a transaction or series of related transactions for which the Company or its Restricted Subsidiaries receive aggregate consideration of less than $1.0 million;

(b)    the sale, lease, conveyance, disposition or other transfer of all or substantially all of the assets of the Company as permitted under Section 5.01;

L- 9

      (c)     any Restricted Payment permitted under <u>Section 4.10</u> including a Permitted Investment;

      (d)     the sale of Cash Equivalents;

      (e)     the sale or other disposal of the Collateral secured by Permitted Liens of the type described in clause (11) of the definition thereof;

      (f)     the sale or other disposition of used, worn out, obsolete or surplus equipment; and

      (g)     the abandonment, assignment, lease, sub-lease or farm-out of Oil and Gas Properties or, the forfeiture or other disposition of such properties, pursuant to operating agreements or other instruments or agreements that, in each case, are entered into in a manner that is customary in the Oil and Gas Business (but not including sales of dollar denominated or volumetric production payments, which shall be considered Asset Sales).

"<u>Authenticating Agent</u>" has the meaning set forth in <u>Section 2.02</u>.

"<u>Bankruptcy Code</u>" means the Bankruptcy Reform Act of 1978, as amended, and codified as 11 U.S.C. §§101 <u>et seq.</u>

"<u>Beneficial Owner</u>" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in <u>Section 13(d)(3)</u> of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition.  The terms "Beneficial Ownership," "Beneficially Owns" and "Beneficially Owned" have meanings correlative to the foregoing.

"<u>Board of Directors</u>" means, as to any Person, the board of directors or similar governing body of such Person or any duly authorized committee thereof.

"<u>Board Resolution</u>" means, with respect to any Person, a copy of a resolution certified by the Secretary or an Assistant Secretary of such Person to have been duly adopted by the Board of Directors of such Person and to be in full force and effect on the date of such certification.

"<u>Business Day</u>" means a day that is not a Legal Holiday.

"<u>Capital Stock</u>" means:

      (1)     with respect to any Person that is a corporation, any and all shares, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, including each class of Common Stock and Other Preferred Stock of such Person;

      (2)     with respect to any Person that is not a corporation, any and all partnership, membership or other equity interests of such Person; and

      (3)     any warrants, rights or options to purchase any of the instruments or interests referred to in clause (1) or (2) above.

"Capitalized Lease Obligation" means, as to any Person, the obligations of such Person under a lease that are required to be classified and accounted for as capital lease obligations under GAAP and, for purposes of this definition, the amount of such obligations at any date shall be the capitalized amount of such obligations at such date, determined in accordance with GAAP.

"Cash Equivalents" means:

(1)     marketable direct obligations issued by, or unconditionally guaranteed by, the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof;

(2)     marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Ratings Group ("S&P") or Moody's Investors Service, Inc. ("Moody's");

(3)     commercial paper maturing no more than one year from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's;

(4)     certificates of deposit or bankers' acceptances maturing within one year from the date of acquisition thereof issued by any bank organized under the laws of the United States of America or any state thereof or the District of Columbia or any U.S. branch of a foreign bank having at the date of acquisition thereof combined net capital and surplus of not less than $250.0 million;

(5)     repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (1) above entered into with any bank meeting the qualifications specified in clause (4) above; and

(6)     investments in money market funds which invest substantially all their assets in securities of the types described in clauses (1) through (5) above.

"CFC Subsidiary" means any Subsidiary that is a "controlled foreign corporation" within the meaning of Section 957 of the Internal Revenue Code of 1986, as amended.

"Change of Control" means the occurrence of one or more of the following events:

(1)     any direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one transaction or a series of related transactions, of all or substantially all of the assets of the Company to any Person or group of related Persons for purposes of Section 13(d) of the Exchange Act (a "Group") other than a Principal;

(2)     the Company consolidates with, or merges with or into, any Person, or any Person consolidates with, or merges with or into, the Company, other than any such transaction where the Voting Stock of the Company outstanding immediately prior to such transaction is converted into or exchanged for Voting Stock (other than Disqualified Capital Stock) of the surviving or transferee Person constituting a majority of the outstanding shares of such Voting Stock of such surviving or transferee Person (immediately after giving effect to such issuance);

(3)      the approval by the holders of Capital Stock of the Company of any plan or proposal for the liquidation, winding up or dissolution of the Company;

(4)      the consummation of any transaction (including without limitation, any merger or consolidation) the result of which is that any Person or Group other than a Principal is or becomes the Beneficial Owner, directly or indirectly, in the aggregate of more than 35% of the total voting power of the Voting Stock of the Company then outstanding; or

(5)      individuals who on the Issue Date constituted the Board of Directors of the Company (together with any new directors whose election by such Board of Directors or whose nomination for election by the stockholders of the Company was approved pursuant to a vote of a majority of the directors then still in office who were either directors on the Issue Date or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors then in office.

"Change of Control Offer" has the meaning set forth in Section 4.15(a).

"Change of Control Payment Date" has the meaning set forth in Section 4.15(b)(2).

"Clearstream" means Clearstream Banking, société anonyme.

"Collateral" shall mean Collateral as such term is defined in the Security Agreement, Other Collateral, all property mortgaged under the Mortgages and any other property, whether now owned or hereafter acquired, upon which a Lien securing the Obligations under this Indenture, the Collateral Agreements, the Notes or the Guarantees is granted or purported to be granted under any Collateral Agreement; provided, however, that Collateral shall not include any Excluded Collateral.

"Collateral Agent" means The Bank of New York Mellon Trust Company, N.A., as collateral agent under this Indenture and the Collateral Agreements, with respect to the rights to the Collateral of the holders of the Notes until a successor replaces it in accordance with the provisions of this Indenture and, thereafter, means such successor.  References to the Collateral Agent or applicable Collateral Agent in this Indenture mean the Collateral Agent in its respective or applicable capacities as collateral agent for the Holders of the Notes.

"Collateral Agreements" means, collectively, the Intercreditor Agreement, the Security Agreement, each Mortgage and each other instrument creating Liens in favor of the Collateral Agent as required by this Indenture, in each case, as the same may be in force from time to time.

"Commission" means the Securities and Exchange Commission.

"Common Stock" of any Person means any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of such Person's common stock, whether outstanding on the Issue Date or issued after the Issue Date, and includes, without limitation, all series and classes of such common stock.

"Company" means the party named as such in this Indenture until a successor replaces it pursuant to this Indenture and thereafter means such successor.

"Consolidated EBITDA" means, with respect to any Person, for any period, the sum (without duplication) of:

(1)      Consolidated Net Income; and

(2)      to the extent Consolidated Net Income has been reduced thereby:

      (a)      all income taxes of such Person and its Restricted Subsidiaries paid or accrued in accordance with GAAP for such period;

      (b)      Consolidated Interest Expense;

      (c)      Consolidated Non-cash Charges less any non-cash items increasing Consolidated Net Income for such period; and

      (d)      restructuring costs (including employee relocations costs) and integration expenses and charges that are identified at the time of closing of any acquisition as resulting from such acquisition (including, without limitation, cash severance payments and facility closures);

all as determined on a consolidated basis for such Person and its Restricted Subsidiaries in accordance with GAAP.

"Consolidated Fixed Charge Coverage Ratio" means, with respect to any Person, the ratio of Consolidated EBITDA of such Person during the four consecutive full fiscal quarters (the "Four Quarter Period") most recently ending on or prior to the date of the transaction or event giving rise to the need to calculate the Consolidated Fixed Charge Coverage Ratio for which financial statements are available (the "Transaction Date") to Consolidated Fixed Charges of such Person for the Four Quarter Period.

In addition to and without limitation of the foregoing, for purposes of this definition, "Consolidated EBITDA" and "Consolidated Fixed Charges" shall be calculated after giving effect on a pro forma basis for the period of such calculation to:

(1)      the incurrence or repayment of any Indebtedness of such Person or any of its Restricted Subsidiaries (and the application of the proceeds thereof) giving rise to the need to make such calculation and any incurrence or repayment of other Indebtedness (and the application of the proceeds thereof), other than the incurrence or repayment of Indebtedness in the ordinary course of business for working capital purposes pursuant to working capital facilities, occurring during the Four Quarter Period or at any time subsequent to the last day of the Four Quarter Period and on or prior to the Transaction Date, as if such incurrence or repayment, as the case may be (and the application of the proceeds thereof), occurred on the first day of the Four Quarter Period; and

(2)      any Asset Sale or other disposition or Asset Acquisition (including, without limitation, any Asset Acquisition giving rise to the need to make such calculation as a result of such Person or one of its Restricted Subsidiaries (including any Person who becomes a Restricted Subsidiary as a result of any such Asset Acquisition) incurring, assuming or otherwise being liable for Acquired Indebtedness during the Four Quarter Period or at any time subsequent to the last day of the Four Quarter Period and on or prior to the Transaction Date), as if such Asset Sale or other disposition or Asset Acquisition (including the incurrence, assumption or liability for any such Indebtedness or Acquired Indebtedness and also including any Consolidated EBITDA associated with such Asset Acquisition) occurred on the first day of the Four Quarter Period, provided that the Consolidated EBITDA of any Person acquired shall be included only to the

extent includible pursuant to the definition of "Consolidated Net Income." If such Person or any of its Restricted Subsidiaries directly or indirectly guarantees Indebtedness of a third Person, the preceding sentence shall give effect to the incurrence of such guaranteed Indebtedness as if such Person or any Restricted Subsidiary of such Person had directly incurred or otherwise assumed such guaranteed Indebtedness.

Furthermore, in calculating "Consolidated Fixed Charges" for purposes of determining the denominator (but not the numerator) of this "Consolidated Fixed Charge Coverage Ratio":

(1)     interest on outstanding Indebtedness determined on a fluctuating basis as of the Transaction Date (including Indebtedness actually incurred on the Transaction Date) and which will continue to be so determined thereafter shall be deemed to have accrued at a fixed rate per annum equal to the rate of interest on such Indebtedness in effect on the Transaction Date; and

(2)     notwithstanding clause (1) above, interest on Indebtedness determined on a fluctuating basis, to the extent such interest is covered by agreements relating to Interest Swap Obligations, shall be deemed to accrue at the rate per annum resulting after giving effect to the operation of such agreements.

"Consolidated Fixed Charges" means, with respect to any Person for any period, the sum, without duplication, of:

(1)     Consolidated Interest Expense; plus

(2)     the product of (x) the amount of all dividend payments on any series of Preferred Stock of such Person (other than dividends paid in Qualified Capital Stock) paid, accrued or scheduled to be paid or accrued during such period times (y) a fraction, the numerator of which is one and the denominator of which is one minus the then current effective consolidated federal, state and local tax rate of such Person, expressed as a decimal.

"Consolidated Interest Expense" means, with respect to any Person for any period, the aggregate of the interest expense of such Person and its Restricted Subsidiaries for such period, on a consolidated basis, as determined in accordance with GAAP, and including, without duplication:

(1)     all amortization or accretion of original issue discount;

(2)     the interest component of Capitalized Lease Obligations paid, accrued and/or scheduled to be paid or accrued by such Person and its Restricted Subsidiaries during such period; and

(3)     net cash costs under all Interest Swap Obligations (including amortization of fees); but excluding the amortization or write-off during such period of capitalized financing or debt issuance costs.

"Consolidated Net Income" means, with respect to any Person, for any period, the aggregate net income (or loss) of such Person and its Restricted Subsidiaries for such period on a consolidated basis, determined in accordance with GAAP; provided, however, that there shall be excluded therefrom:

(1)     after-tax gains and losses from Asset Sales or abandonments or reserves relating thereto;

(2)    after-tax items classified as extraordinary gains or losses;

(3)    the net income (but not loss) of any Restricted Subsidiary of the referent Person to the extent that the declaration of dividends or similar distributions by that Restricted Subsidiary of that income is restricted by a contract, operation of law or otherwise;

(4)    the net income of any Person, other than the referent Person or a Restricted Subsidiary of the referent Person, except to the extent of cash dividends or distributions paid to the referent Person or to a Wholly-Owned Restricted Subsidiary of the referent Person by such Person;

(5)    any restoration to income of any material contingency reserve, except to the extent that provision for such reserve was made out of Consolidated Net Income accrued at any time following the Issue Date;

(6)    income or loss attributable to discontinued operations (including, without limitation, operations disposed of during such period whether or not such operations were classified as discontinued);

(7)    all gains and losses realized on or because of the purchase or other acquisition by such Person or any of its Restricted Subsidiaries of any securities of such Person or any of its Restricted Subsidiaries;

(8)    the cumulative effect of a change in accounting principles;

(9)    interest expense attributable to dividends on Qualified Capital Stock pursuant to Statement of Financial Accounting Standards No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity";

(10)    any write-downs of non-current assets; provided that any ceiling limitation write-downs under SEC guidelines shall be treated as capitalized costs, as if such write-downs had not occurred;

(11)    in the case of a successor to the referent Person by consolidation or merger or as a transferee of the referent Person's assets, any earnings of the successor corporation prior to such consolidation, merger or transfer of assets; and

(12)    non-cash compensation charges or other non-cash expenses or charges arising from the grant of or issuance or repricing of stock, stock options or other equity-based awards or any amendment, modification, substitution or change of any such stock, stock options or other equity-based awards.

"Consolidated Non-cash Charges" means, with respect to any Person, for any period, the aggregate depreciation, amortization, amortization and other non-cash items and expenses of such Person and its Restricted Subsidiaries to the extent they reduce Consolidated Net Income of such Person and its Restricted Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP (excluding any such charges constituting an extraordinary item or loss or any such charge which requires an accrual of or a reserve for cash charges for any future period).

"Corporate Trust Office" means the office of the Trustee at which the corporate trust business of the Trustee shall, at any particular time, be principally administered, which office is, at the

date of this Indenture, located at 601 Travis, 16th Floor, Houston, Texas 77002, Attn: Corporate Trust Administration.

"Covenant Defeasance" has the meaning set forth in Section 8.01(c).

"Custodian" means any receiver, trustee, assignee, liquidator, sequestrator or similar official under the Bankruptcy Code.

"Default" means an event or condition the occurrence of which is, or with the lapse of time or the giving of notice or both would be, an Event of Default.

"Depository" means The Depository Trust Company, its nominees and successors ("DTC").

"Disqualified Capital Stock" means that portion of any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event (other than an event that would constitute a Change of Control), matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (except in each case, upon the occurrence of a Change of Control) on or prior to the first anniversary of the final maturity date of the Notes for cash or is convertible into or exchangeable for debt securities of the Company or its Subsidiaries at any time prior to such anniversary.

"Domestic Restricted Subsidiary" means, with respect to any Person, a Domestic Subsidiary of such Person that is a Restricted Subsidiary of such Person.

"Domestic Subsidiary" means, with respect to any Person, a Subsidiary of such Person that is not a CFC Subsidiary of such Person.

"Euroclear" means Euroclear Bank S.A./N.V., as operator of the Euroclear system.

"Event of Default" has the meaning set forth in Section 6.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

"Excluded Collateral" means:

(i)     the Voting Stock of any CFC Subsidiary in excess of 65% of the outstanding Voting Stock of such CFC Subsidiary owned directly or indirectly by the Company;

(ii)    motor vehicles;

(iii)   rights under any contracts, leases or other instruments that contain a valid and enforceable prohibition on assignment of such rights (other than to the extent that any such prohibition would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code of any relevant jurisdiction or any other applicable law or principles of equity), but only for so long as such prohibition exists and is effective and valid;

(iv)    property and assets owned by the Company or any Guarantors that are the subject of Permitted Liens described in clause (6) or (7) of the definition thereof for so long as such

Permitted Liens are in effect and the Indebtedness secured thereby otherwise prohibits any other Liens thereon;

    (v)    property and assets owned by the Company or any Guarantor in which a Lien may not be granted without governmental approval or consent or in which the granting of a Lien is prohibited by applicable law (but only for so long as the Company or the applicable Guarantor has not obtained such approval or consents);

    (vi)    deposits described in clause (3) or (10) of the definition of Permitted Liens; and

    (vii)    Oil and Gas Properties of the Company and its Subsidiaries to which no proved reserves of oil and gas are attributed.

"Fair Market Value" means, with respect to any asset or property, the price which could be negotiated in an arm's length, free market transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction. Fair Market Value shall be determined by the Board of Directors of the Company acting in good faith; provided, however, that with respect to any price less than $2.5 million only the good faith determination by the Company's senior management shall be required.

"GAAP" means accounting principles generally accepted in the United States set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession of the United States, which are in effect as of the Issue Date.

"Global Notes" has the meaning set forth in Section 2.01.

"Guarantee" has the meaning set forth in Section 10.01.

"Guarantor" means (1) each of the Company's Domestic Restricted Subsidiaries existing on the Issue Date and (2) each of the Company's Domestic Restricted Subsidiaries that in the future executes a supplemental indenture in which such Domestic Restricted Subsidiary agrees to be bound by the terms of this Indenture as a Guarantor; provided that any Person constituting a Guarantor as described above shall cease to constitute a Guarantor when its respective Guarantee is released in accordance with the terms of this Indenture.

"Hedging Obligations" means the obligations of the Company or any of its Restricted Subsidiaries pursuant to agreements:

    (1)    designed to protect the Company or any of its Restricted Subsidiaries against

    (a)    fluctuations in interest rates in respect of Indebtedness of the Company or such Restricted Subsidiary or

    (b)    fluctuations in currency exchange rates or commodity prices and

    (2)    entered into in the ordinary course of business and not for purposes of speculation.

"Holder" means Person in whose name a Note is registered on the registrar's books.

"Hydrocarbons" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"IAI Global Note has the meaning set forth in Section 2.01.

"Indebtedness" means with respect to any Person, without duplication:

(1)    all Obligations of such Person for borrowed money;

(2)    all Obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3)    all Capitalized Lease Obligations of such Person;

(4)    all Obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations and all Obligations under any title retention agreement (but excluding trade accounts payable and other accrued liabilities arising in the ordinary course of business that are not overdue by 90 days or more or are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and any deferred purchase price represented by earn outs);

(5)    all Obligations for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction, whether or not then due;

(6)    guarantees and other contingent obligations in respect of Indebtedness referred to in clauses (1) through (5) above and clause (8) below;

(7)    all Obligations of any other Person of the type referred to in clauses (1) through (6) which are secured by any Lien on any property or asset of such Person, the amount of any such Obligation being deemed to be the lesser of the Fair Market Value of the property or asset securing such Obligation or the amount of such Obligation;

(8)    all Hedging Obligations of such Person; and

(9)    all Disqualified Capital Stock issued by such Person with the amount of Indebtedness represented by such Disqualified Capital Stock being equal to the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price, but excluding accrued dividends, if any.

Notwithstanding the foregoing, Indebtedness shall not include any Qualified Capital Stock. For purposes hereof, the "maximum fixed repurchase price" of any Disqualified Capital Stock which does not have a fixed repurchase price shall be calculated in accordance with the terms of such Disqualified Capital Stock as if such Disqualified Capital Stock were purchased on any date on which Indebtedness shall be required to be determined pursuant to this Indenture, and if such price is based upon, or measured by, the Fair Market Value of such Disqualified Capital Stock, such Fair Market Value shall be determined reasonably and in good faith by the Board of Directors of the issuer of such Disqualified Capital Stock.

"Indemnified Party" has the meaning set forth in Section 7.07.

"Indenture" means this Indenture, as amended or supplemented from time to time in accordance with the terms hereof.

"Independent Financial Advisor" means a nationally-recognized accounting, appraisal or investment banking firm: (1) that does not, and whose directors, officers and employees or Affiliates do not, have a direct or indirect financial interest in the Company; and (2) that, in the judgment of the Board of Directors of the Company, is otherwise independent and qualified to perform the task for which it is to be engaged.

"Institutional Accredited Investor" means an institution that is an "accredited investor" as that term is defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act.

"Intercreditor Agreement" means the Intercreditor Agreement, dated the date hereof, among the Trustee, the Collateral Agent and the Company, as the same may be amended, supplemented or modified from time to time.

"Interest Payment Date" means the stated maturity of an installment of interest on the Notes.

"Interest Swap Obligations" means the obligations of any Person pursuant to any arrangement with any other Person, whereby, directly or indirectly, such Person is entitled to receive from time to time periodic payments calculated by applying either a floating or a fixed rate of interest on a stated notional amount in exchange for periodic payments made by such other Person calculated by applying a fixed or a floating rate of interest on the same notional amount and shall include, without limitation, interest rate swaps, caps, floors, collars and similar agreements.

"Investment" in any Person means any direct or indirect advance, loan (other than advances to customers in the ordinary course of business that are recorded as accounts receivable on the balance sheet of the lender) or other extensions of credit (including by way of guarantee or similar arrangement) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), or any purchase or acquisition for value of Capital Stock, Indebtedness or other similar instruments issued by such Person. If the Company or any Restricted Subsidiary issues, sells or otherwise disposes of any Capital Stock of a Person that is a Restricted Subsidiary such that, after giving effect thereto, such Person is no longer a Restricted Subsidiary, any Investment by the Company or any Restricted Subsidiary in such Person remaining after giving effect thereto will be deemed to be a new Investment at such time. The acquisition by the Company or any Restricted Subsidiary of a Person that holds an Investment in a third Person will be deemed to be an Investment by the Company or such Restricted Subsidiary in such third Person at such time. Except as otherwise provided herein, the amount of an Investment shall be its Fair Market Value at the time the Investment is made and without giving effect to subsequent changes in value.

For purposes of the definition of "Unrestricted Subsidiary," the definition of "Restricted Payment" and Section 4.10:

(i)    "Investment" shall include the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of any Subsidiary of the Company at the time that such Subsidiary is designated an Unrestricted Subsidiary; provided, however, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Company shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary equal to an amount (if positive) equal to (A) the Company's "Investment" in such Subsidiary at the time of such redesignation less (B) the portion (proportionate to the Company's equity interest

in such Subsidiary) of the Fair Market Value of the net assets of such Subsidiary at the time of such redesignation; and

(ii)     any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of such transfer, in each case as determined in good faith by the Board of Directors of the Company.

"Issue Date" means the date of original issuance of the Notes.

"Jefferies" means Jefferies & Company, Inc., a Delaware corporation, and/or its Affiliates.

"Lease(s)" has the meaning set forth in Section 4.24.

"Leased Premises" has the meaning set forth in Section 4.24.

"Legal Defeasance" has the meaning set forth in Section 8.01(b).

"Legal Holiday" has the meaning set forth in Section 11.07.

"Lien" means any lien, mortgage, deed of trust, pledge, security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof and any agreement to give any security interest).

"Maturity Date" means _____, 2014.

"Mortgages" means the mortgages, deeds of trust, deeds to secure Indebtedness or other similar documents granting Liens on the Company and its Restricted Subsidiaries' Oil and Gas Assets and interests, Premises and/or Leased Premises in favor of the Collateral Agent for the benefit of itself, the Trustee and the Holders of the Notes, as amended or supplemented from time to time in accordance with its terms.

"Net Cash Proceeds" means, with respect to any Asset Sale, the proceeds in the form of cash or Cash Equivalents including payments in respect of deferred payment obligations when received in the form of cash or Cash Equivalents (other than the portion of any such deferred payment constituting interest) received by the Company or any of its Restricted Subsidiaries from such Asset Sale net of:

(1)     reasonable out-of-pocket expenses and fees relating to such Asset Sale (including, without limitation, legal, accounting and investment banking fees and sales commissions);

(2)     all taxes and other costs and expenses actually paid or estimated by the Company (in good faith) to be payable in cash in connection with such Asset Sale;

(3)     repayment of Indebtedness that is secured by the property or assets that are the subject of such Asset Sale and is required to be repaid in connection with such Asset Sale; and

(4)     appropriate amounts to be provided by the Company or any Restricted Subsidiary, as the case may be, as a reserve, in accordance with GAAP, against any liabilities associated with such Asset Sale and retained by the Company or any Restricted Subsidiary, as the case may be, after such Asset Sale, including, without limitation, pension and other post-

employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale;

provided, however, that if, after the payment of all taxes with respect to such Asset Sale, the amount of estimated taxes, if any, pursuant to clause (2) above exceeded the tax amount actually paid in cash in respect of such Asset Sale, the aggregate amount of such excess shall, at such time, constitute Net Cash Proceeds.

"Net Proceeds Offer" has the meaning set forth in Section 4.16.

"Net Proceeds Offer Amount" has the meaning set forth in Section 4.16.

"Net Proceeds Offer Payment Date" has the meaning set forth in Section 4.16.

"Net Proceeds Offer Trigger Date" has the meaning set forth in Section 4.16.

"Non-U.S. Person" means a Person who is not a U.S. person, as defined in Regulation S.

"Notes" has the meaning set forth in the recitals to this Indenture and, for all purposes of this Indenture, includes all PIK Notes.

"Obligations" means all obligations for principal, premium, interest (including, without limitation, interest occurring after an insolvency, bankruptcy or similar proceeding, whether or not such interest is an allowed claim in any such proceeding), penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

"Officer" means the Chief Executive Officer, the President, the Chief Financial Officer or any Vice President of the Company.

"Officers' Certificate" means a certificate signed by two Officers of the Company, at least one of whom shall be the principal financial officer of the Company, and delivered to the Trustee and/or the Collateral Agent, as the context may require.

"Oil and Gas Assets" means:

(a)     any and all Oil and Gas Properties;

(b)     any and all properties now or hereafter pooled or unitized with Oil and Gas Properties;

(c)     any and all presently existing or future unitization, communitization, or pooling agreements and declarations of pooled units and the units created thereby (including without limitation all units created under orders, regulations, rules or other official acts of any federal, state or other governmental body, agency or authority) that affect any Oil and Gas Property;

(d)     any and all operating agreements, contracts and other agreements, including production sharing contracts and agreements, that relate to any Oil and Gas Property or the production, sale, purchase, exchange or processing, handling, storage, transporting or marketing of Hydrocarbons from or attributable to any Oil and Gas Property;

(e)      any and all Hydrocarbons in and under and which may be produced and saved from, or are attributable to, any Oil and Gas Property, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to any Oil and Gas Property;

(f)      all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to any Oil and Gas Property; and

(g)      all properties, rights, titles, interests and estates described or referred to above, including any and all property, real or personal, immovable or immovable, that is now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any Oil and Gas Property or other property (excluding drilling rigs, automotive equipment, rental equipment or other personal Property which may be taken to such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, buildings, structures, field separators, liquid extraction plants, plant compressors, pumps, pumping units, sales and flow lines, gathering systems,  field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, steam generation facilities, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes licenses and other surface and subsurface rights, together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"Oil and Gas Business" means the business of exploiting, exploring for, developing, acquiring, operating, producing, processing, gathering, marketing, storing, selling, hedging, treating, swapping, refining and transporting Hydrocarbons and other related energy businesses.

"Oil and Gas Liens" means:

(i)      Liens on any specific Oil and Gas Asset or any interest therein, construction thereon or improvement thereto to secure all or any part of the costs incurred for surveying, exploration, drilling extraction, development, operation, production, construction, alteration, repair or improvement of, in, under or on such Oil and Gas Asset and the plugging and abandonment of wells located thereon (it being understood that, in the case of any producing Oil and Gas Asset, or any interest therein, costs incurred for "development" shall include costs incurred for all facilities relating to such Oil and Gas Asset or to projects, ventures or other arrangements of which such Oil and Gas Asset forms a part or which relate to such Oil and Gas Asset);

(ii)      Liens on a producing Oil and Gas Asset to secure obligations incurred or guarantees of obligations incurred in connection with or necessarily incidental to commitments for the purchase or sale of, or the transportation or distribution of, the products derived from such Oil and Gas Asset;

(iii)      Liens arising under partnership agreements, oil and gas leases, overriding royalty agreements, net profits agreements, production payment agreements, royalty trust agreements, incentive compensation programs for geologists, geophysicists and other providers of technical services to the Company or a Restricted Subsidiary, master limited partnership agreements, farm-out agreements, farm-in agreements, division orders, contracts for the sale, purchase, exchange, transportation, gathering or processing of Hydrocarbons, unitizations and pooling designations, declarations, orders and agreements, development agreements, operating agreements, production sales contracts, area of mutual interest agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal

agreements, seismic or geophysical permits or agreements, and other agreements which are customary in the Oil and Gas Business; provided, however, in all instances that such Liens are limited to the assets that are the subject of the relevant agreement, program, order or contract; and

  (iv) Liens on pipelines or pipeline facilities that arise by operation of law.

  "Oil and Gas Properties" means any and all rights, titles, interests and estates in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous Hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature, together with all fixtures and improvements pertaining thereto.

  "Opinion of Counsel" means a written opinion of counsel who shall be reasonably acceptable to the Trustee.

  "Other Collateral" has the meaning set forth in Section 4.25.

  "Paying Agent" has the meaning set forth in Section 2.03.

  "Permitted Business" means any business that is the same as or similar, reasonably related, complementary or incidental to the business in which the Company and its Restricted Subsidiaries are engaged on the Issue Date.

  "Permitted Indebtedness" means, without duplication, each of the following:

  (1) Indebtedness under the Notes and the Series B Senior Notes in an aggregate principal amount not to exceed $30.0 million, any PIK Notes and Series B Senior PIK Notes issued in respect thereof in accordance with the terms hereof and the Series B Senior Notes Indenture and the related Guarantees and Series B Senior Notes Guarantee, as applicable;

  (2) Indebtedness under the Subordinated Notes in an aggregate principal amount not to exceed $10.0 million, any Subordinated PIK Notes issued in respect thereof in accordance with the terms hereof and the related Subordinated Notes Guarantee;

  (3) other Indebtedness of the Company and its Restricted Subsidiaries outstanding on the Issue Date;

  (4) (a) Hedging Obligations of the Company or any of its Restricted Subsidiaries that are subordinated in right of payment to the Notes, the Series B Senior Notes or the Subordinated Notes and the related Guarantees, Series B Senior Notes Guarantee or Subordinated Notes Guarantee, as applicable, and matures at least 91 days after the final stated maturity of the Subordinated Notes and (b) Hedging Obligations of the Company or any of its Restricted Subsidiaries outstanding on the date hereof;

  (5) Intercompany Indebtedness of the Company or a Guarantor that is subordinated in right of payment to the Notes, the Series B Senior Notes or the Subordinated Notes and the related Guarantees, Series B Senior Notes Guarantee or Subordinated Notes Guarantee, as applicable, and matures at least 91 days after the final stated maturity of any series of Notes for so long as such Indebtedness is held by the Company or a Guarantor; provided that if as of any date any Person other than the Company or a Guarantor owns or holds any such Indebtedness or holds a Lien in respect of such Indebtedness (other than Permitted Liens of the type described in clause

(11) of the definition thereof that are permitted under this Indenture or a Permitted Lien of the type described in clause (14) of the definition thereof), such date shall be deemed the incurrence of Indebtedness not constituting Permitted Indebtedness under this clause (6) by the issuer of such Indebtedness;

(6)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; provided, however, that such Indebtedness is extinguished within three business days after the Company obtains knowledge thereof;

(7)     Indebtedness of the Company or any of its Restricted Subsidiaries represented by reimbursement obligations in respect of letters of credit for the account of the Company or such Restricted Subsidiary, as the case may be, in order to provide security for workers' compensation claims, payment obligations in connection with self-insurance, bonds and completion guarantees described in the following clause in the ordinary course of business;

(8)     obligations in respect of plugging and abandonment, performance, bid and surety bonds and completion guarantees provided by the Company or any Restricted Subsidiary in the ordinary course of business;

(9)     Indebtedness represented by Capitalized Lease Obligations and Purchase Money Indebtedness of the Company and its Restricted Subsidiaries that is subordinated in right of payment to the Notes, the Series B Senior Notes or the Subordinated Notes and the related Guarantees, Series B Senior Notes Guarantee or Subordinated Notes Guarantee, as applicable, and matures at least 91 days after the final stated maturity of any series of Notes incurred in the ordinary course of business (including Refinancings thereof that do not result in an increase in the aggregate principal amount of Indebtedness of such Person as of the date of such proposed Refinancing (plus the amount of any premium required to be paid under the terms of the instrument governing such Indebtedness and plus the amount of reasonable expenses incurred by the Company in connection with such Refinancing)) not to exceed $5.0 million at any time outstanding;

(10)     Refinancing Indebtedness;

(11)     Indebtedness represented by guarantees by the Company or a Restricted Subsidiary of Indebtedness incurred by the Company or a Restricted Subsidiary so long as the incurrence of such Indebtedness by the Company or any such Restricted Subsidiary is otherwise permitted by the terms of this Indenture, the Series B Senior Notes Indenture or the Subordinated Notes Indenture and that is subordinated in right of payment to the Notes, the Series B Senior Notes or the Subordinated Notes and the related Guarantees, Series B Senior Notes Guarantee or Subordinated Notes Guarantee, as applicable, and matures at least 91 days after the final stated maturity of the Notes;

(12)     Indebtedness that is subordinated in right of payment to the Notes, the Series B Senior Notes or the Subordinated Notes and the related Guarantees, Series B Senior Notes Guarantee or Subordinated Notes Guarantee, as applicable, and matures at least 91 days after the final stated maturity of the Notes arising from agreements of the Company or a Subsidiary providing for indemnification, adjustment of purchase price or similar obligations, in each case, incurred in connection with the disposition of any business, assets or Subsidiary, other than guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business,

assets or Subsidiary for the purpose of financing such acquisition; provided that the maximum aggregate liability in respect of all such Indebtedness shall at no time exceed the gross proceeds actually received by the Company and the Subsidiary in connection with such disposition;

(13)    Indebtedness of the Company or any of its Restricted Subsidiaries to the extent the net proceeds thereof are promptly used to redeem the Notes in full or deposited to defease or discharge the Notes, in each case, in accordance with this Indenture; and

(14)    Indebtedness solely represented by premium financing or similar payment obligations incurred with respect to insurance policies purchased in the ordinary course of business and consistent with past practices.

For purposes of determining compliance with Section 4.12, (a) the outstanding principal amount of any item of Indebtedness shall be counted only once and (b) in the event that an item of Indebtedness meets the criteria of more than one of the categories of Permitted Indebtedness described in clauses (1) through (14) above, the Company shall, in its sole discretion, classify (or later reclassify) such item of Indebtedness in any manner that complies with this covenant. Accrual of interest, accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, and the payment of dividends on Disqualified Capital Stock in the form of additional shares of the same class of Disqualified Capital Stock will not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified Capital Stock for purposes of Section 4.12.

"Permitted Investments" means:

(1)    Investments by the Company or any Restricted Subsidiary of the Company in any Person that is or will become immediately after such Investment a Guarantor or that will merge or consolidate with or into the Company or a Guarantor, or that transfers or conveys all or substantially all of its assets to the Company or a Guarantor;

(2)    Investments in the Company by any Restricted Subsidiary of the Company; provided that any Indebtedness evidencing or comprising such Investment is unsecured and subordinated, pursuant to a written agreement, to the Company's Obligations under the Notes and this Indenture;

(3)    Investments in cash and Cash Equivalents;

(4)    Hedging Obligations in compliance with Section 4.12;

(5)    Investments in the Notes;

(6)    Investments in securities of trade creditors or customers received pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers in exchange for claims against such trade creditors or customers;

(7)    Investments made by the Company or its Restricted Subsidiaries as a result of consideration received in connection with an Asset Sale made in compliance with Section 4.16;

(8)    Investments in existence on the Issue Date;

(9)    loans and advances, including advances for travel and moving expenses, to employees, officers and directors of the Company and its Restricted Subsidiaries in the ordinary

course of business for bona fide business purposes not in excess of $1.0 million at any one time outstanding; and

(10)    advances to suppliers and customers in the ordinary course of business.

"Permitted Liens" means the following types of Liens:

(1)    Liens for taxes, assessments or governmental charges or claims either (a) not delinquent or (b) contested in good faith by appropriate proceedings and as to which the Company or its Restricted Subsidiaries shall have set aside on its books such reserves as may be required pursuant to GAAP;

(2)    statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen and other Liens imposed by law or pursuant to customary reservations or retentions of title incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made in respect thereof;

(3)    Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, including any Lien securing letters of credit issued in the ordinary course of business consistent with past practice in connection therewith, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(4)    any judgment Lien not giving rise to an Event of Default;

(5)    easements, rights-of-way, zoning restrictions and other similar charges or encumbrances in respect of real property not interfering in any material respect with the ordinary conduct of the business of the Company or any of its Restricted Subsidiaries;

(6)    any interest or title of a lessor under any Capitalized Lease Obligation permitted pursuant to clause (9) of the definition of "Permitted Indebtedness;" provided that such Liens do not extend to any property or assets which is not leased property subject to such Capitalized Lease Obligation;

(7)    Liens securing Purchase Money Indebtedness permitted pursuant to clause (9) of the definition of "Permitted Indebtedness"; provided, however, that (a) the Indebtedness shall not exceed the cost of the property or assets acquired, together, in the case of real property, with the cost of the construction thereof and improvements thereto, and shall not be secured by a Lien on any property or assets of the Company or any Restricted Subsidiary of the Company other than such property or assets so acquired or constructed and improvements thereto and (b) the Lien securing such Indebtedness shall be created within 180 days of such acquisition or construction or, in the case of a refinancing of any Purchase Money Indebtedness, within 180 days of such refinancing;

(8)    Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(9)     Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(10)     Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of the Company or any of its Restricted Subsidiaries, including rights of offset and set-off;

(11)     Liens securing Indebtedness under Hedging Obligations that are permitted under this Indenture or that relate to Indebtedness that is otherwise permitted under this Indenture;

(12)     Liens securing Acquired Indebtedness incurred in accordance with Section 4.12; provided that:

(a)     such Liens secured such Acquired Indebtedness at the time of and prior to the incurrence of such Acquired Indebtedness by the Company or a Restricted Subsidiary of the Company and were not granted in connection with, or in anticipation of, the incurrence of such Acquired Indebtedness by the Company or a Restricted Subsidiary of the Company; and

(b)     such Liens do not extend to or cover any property or assets of the Company or of any of its Restricted Subsidiaries other than the property or assets that secured the Acquired Indebtedness prior to the time such Indebtedness became Acquired Indebtedness of the Company or a Restricted Subsidiary of the Company and are no more favorable to the lienholders than those securing the Acquired Indebtedness prior to the incurrence of such Acquired Indebtedness by the Company or a Restricted Subsidiary of the Company;

(13)     Liens existing as of the Issue Date and securing Indebtedness permitted to be outstanding under clause (3) of the definition of the term "Permitted Indebtedness" to the extent and in the manner such Liens are in effect on the Issue Date;

(14)     Liens securing the Notes, the Series B Senior Notes and the Subordinated Notes and all other Obligations under this Indenture, the Series B Notes Indenture and the Subordinated Notes Indenture with respect to the Notes, the Series B Senior Notes and the Subordinated Notes, as applicable; the Collateral Agreements and security agreements and related collateral agreements securing the Series B Senior Notes and the Subordinated Notes; and the Guarantees, the Series B Senior Notes Guarantee and Subordinated Notes Guarantee;

(15)     [reserved]

(16)     Liens securing Refinancing Indebtedness which is incurred to Refinance any Indebtedness which has been secured by a Lien permitted under this paragraph and which has been incurred in accordance with Section 4.12; provided, however, that such Liens: (i) are no less favorable to the Holders and are not more favorable to the lienholders with respect to such Liens than the Liens in respect of the Indebtedness being Refinanced; and (ii) do not extend to or cover any property or assets of the Company or any of its Restricted Subsidiaries not securing the Indebtedness so Refinanced; and

(17)     Oil and Gas Liens, in each case which are not incurred in connection with the borrowing of money.

"Person" means an individual, partnership, corporation, limited liability company, unincorporated organization, trust or joint venture, a governmental agency or political subdivision thereof or other company or entity.

"Physical Notes" has the meaning set forth in Section 2.14(a).

"PIK Dividends" means any regularly scheduled dividend payment payable on the Preferred Stock which may be paid, pursuant to the terms of the applicable series of Preferred Stock, in additional shares of the applicable series of Preferred Stock.

"PIK Interest Amount" means up to the full amount of interest on any Note which the Company is required to pay on regularly scheduled interest payment dates which is paid in-kind with additional Notes pursuant to Section 2.16, which shall be specified by the Company in a notice to the Trustee pursuant to Section 2.16.

"PIK Notes" has the meaning set forth in the recitals to this Indenture and, for all purposes of this Indenture, means the Notes issued in lieu of the payment of interest in cash on any Note from time to time in accordance with the provisions of Sections 2.02 and 2.16.

"Preferred Stock" means the 18% Series A Redeemable Preferred Stock, stated value $1,000 per share, of the Company and the 18% Series B Redeemable Preferred Stock, stated value $1,000 per share.

"Premises" has the meaning set forth in Section 4.22.

"principal" of any Indebtedness (including the Notes) means the principal amount (or accreted value, as the case may be) of such Indebtedness plus the premium, if any, on such Indebtedness.

"Principal" means Jefferies and Third Point and:

(1)     any controlling stockholder or 80% (or more) owned Subsidiary of a Principal; or

(2)     any trust, corporation, partnership, limited liability company or other entity, the beneficiaries, stockholders, partners, members, owners or Persons beneficially holding an 80% or more controlling interest of which consist of any one or more Principals.

"Private Placement Legend" means the legend initially set forth on the Notes in the form set forth in Exhibit B.

"Purchase Money Indebtedness" means Indebtedness of the Company and its Restricted Subsidiaries incurred for the purpose of financing all or any part of the purchase price, or the cost of installation, construction or improvement, of property or equipment, provided that the aggregate principal amount of such Indebtedness does not exceed the lesser of the Fair Market Value of such property or such purchase price or cost.

"QIB" means a "qualified institutional buyer" as defined in Rule 144A.

"Qualified Capital Stock" means any Capital Stock that is not Disqualified Capital Stock.

"Record Date" means any of the Record Dates specified in the Notes, whether or not a Legal Holiday.

"Redemption Date" means, when used with respect to any Note to be redeemed, the applicable date fixed for redemption of such Note pursuant to this Indenture and the Notes.

"Redemption Price" means, when used with respect to any Note to be redeemed, the applicable price fixed for redemption pursuant to this Indenture and the Notes.

"Refinance" means, in respect of any security or Indebtedness, to refinance, extend, renew, refund, repay, prepay, redeem, defease or retire, or to issue a security or Indebtedness in exchange or replacement for, such security or Indebtedness in whole or in part. "Refinanced" and "Refinancing" shall have correlative meanings.

"Refinancing Indebtedness" means any Refinancing by the Company or any Restricted Subsidiary of the Company of Indebtedness incurred in accordance with Section 4.12 (other than pursuant to Permitted Indebtedness) or clause (1), (2), (3) or (10) of the definition of Permitted Indebtedness, in each case that does not:

    (1)    have an aggregate principal amount (or, if such Indebtedness is issued with original issue discount, an aggregate offering price) greater than the sum of (x) the aggregate principal amount of the Indebtedness being Refinanced (or, if such Indebtedness being Refinanced is issued with original issue discount, the aggregate accreted value) as of the date of such proposed Refinancing plus (y) the amount of fees, expenses, premium, defeasance costs and accrued but unpaid interest relating to the Refinancing of such Indebtedness being Refinanced;

    (2)    create Indebtedness with: (a) a Weighted Average Life to Maturity that is less than the Weighted Average Life to Maturity of the Indebtedness being Refinanced; or (b) a final maturity earlier than the final maturity of the Indebtedness being Refinanced; or

    (3)    affect the security, if any, for such Refinancing Indebtedness (except to the extent that less security is granted to holders of such Refinancing Indebtedness).

If such Indebtedness being Refinanced is subordinate or junior by its terms to the Notes, then such Refinancing Indebtedness shall be subordinate by its terms to the Notes at least to the same extent and in the same manner as the Indebtedness being Refinanced.

"Registrar" has the meaning set forth in Section 2.03.

"Regulation S" means Regulation S under the Securities Act.

"Regulation S Global Note" has the meaning set forth in Section 2.01.

"Restricted Payment" has the meaning set forth in Section 4.10.

"Restricted Period" means the 40-day distribution compliance period as defined in Regulation S.

"Restricted Security" has the meaning assigned to such term in Rule 144(a)(3) under the Securities Act; provided that the Trustee shall be entitled to request and conclusively rely on an Opinion of Counsel with respect to whether any Note constitutes a Restricted Security.

"Restricted Subsidiary" of any Person means any Subsidiary of such Person which at the time of determination is not an Unrestricted Subsidiary.

"Rule 144A" means Rule 144A under the Securities Act.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the Commission promulgated thereunder.

"Security Agreement" means the Security Agreement, dated as of the date hereof, made by the Company and any Guarantors in favor of the Collateral Agent, for the benefit of itself, the Trustee and the Holders of the Notes, as amended or supplemented from time to time in accordance with its terms.

"Senior Notes" means the Notes and the Series B Senior Notes.

"Series B Senior Notes" means the Company's Series B 20% Senior Secured PIK Notes due 2014 and, for all purposes of this Indenture, includes the Series B Senior PIK Notes.

"Series B Senior Notes Guarantee" has the meaning set forth in Section 10.01 of the Series B Senior Notes Indenture.

"Series B Senior Notes Indenture" means the Indenture, dated as of the date hereof, between the Company, the Guarantors and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent, as amended from time to time, which Series B Senior Notes Indenture governs the Series B Senior Notes.

"Series B Senior PIK Notes" means the Series B Senior Notes issued in lieu of the payment of interest in cash on any Series B Senior Note from time to time in accordance with the provisions of Sections 2.02 and 2.16 of the Series B Senior Notes Indenture.

"Significant Subsidiary" with respect to any Person, means any Restricted Subsidiary of such Person that satisfies the criteria for a "significant subsidiary" set forth in Rule 1-02(w) of Regulation S-X under the Exchange Act.

"Subordinated Notes" means the Company's 10% Senior Subordinated Secured PIK Notes due 2016 and, for all purposes of this Indenture, includes the Subordinated PIK Notes.

"Subordinated Notes Guarantee" has the meaning set forth in Section 10.01 of the Subordinated Notes Indenture.

"Subordinated Notes Indenture" means the Indenture, dated as of the date hereof, between the Company, the Guarantors and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent, as amended from time to time, which Subordinated Notes Indenture governs the Subordinated Notes.

"Subordinated PIK Notes" means the Subordinated Notes issued in lieu of the payment of interest in cash on any Subordinated Note from time to time in accordance with the provisions of Sections 2.02 and 2.16 of the Subordinated Notes Indenture.

"Subsidiary" with respect to any Person, means:

(1)     any corporation of which the outstanding Capital Stock having at least a majority of the votes entitled to be cast in the election of directors under ordinary circumstances shall at the time be owned, directly or indirectly, by such Person; or

(2)    any other Person of which at least a majority of the voting interest under ordinary circumstances is at the time, directly or indirectly, owned by such Person.

"<u>Surviving Entity</u>" has the meaning set forth in <u>Section 5.01(1)(b)</u>.

"<u>Third Point</u>" means Third Point, LLC or one or more funds managed by Third Point, and their Affiliates, including but not limited to Third Point Offshore Master Fund, L.P. and Third Point Ultra Master Fund, L.P.

"<u>TIA</u>" means the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa-77bbbb), as amended, as in effect on the date of this Indenture, except as otherwise set forth in <u>Section 9.03</u>.

"<u>Treasury Rate</u>" means, as of any redemption date, the yield to maturity as of such redemption date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two business days prior to the redemption date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the redemption date to _____, 2012; <u>provided, however</u>, that if the period from the redemption date to _____, 2012, is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"<u>Trust Officer</u>" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"<u>Trustee</u>" means the party named as such in this Indenture until a successor replaces it in accordance with the provisions of this Indenture and thereafter means such successor.

"<u>Unrestricted Subsidiary</u>" of any Person means:

(1)    any Subsidiary of such Person that at the time of determination shall be or continue to be designated an Unrestricted Subsidiary by the Board of Directors of such Person in the manner provided below; and

(2)    any Subsidiary of an Unrestricted Subsidiary.

The Board of Directors of the Company may designate any Subsidiary (including any newly acquired or newly formed Subsidiary) to be an Unrestricted Subsidiary unless such Subsidiary owns any Capital Stock of, or owns or holds any Lien on any property of, the Company or any other Subsidiary of the Company that is not a Subsidiary of the Subsidiary to be so designated, <u>provided</u> that:

(1)    the Company certifies to the Trustee that such designation complies with <u>Section 4.10</u>; and

(2)    each Subsidiary to be so designated and each of its Subsidiaries has not at the time of designation, and does not thereafter, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to any Indebtedness pursuant to which the lender has recourse to any of the assets of the Company or any of its Restricted Subsidiaries.

The Board of Directors of the Company may designate any Unrestricted Subsidiary to be a Restricted Subsidiary only if:

(1)    immediately after giving effect to such designation, the Consolidated Fixed Charge Coverage Ratio of the Company will be, after giving effect to the incurrence thereof that arises by such designation, greater than 2.5 to 1.0 (other than Permitted Indebtedness) calculated on a pro forma basis; and

(2)    immediately before and immediately after giving effect to such designation, no Default or Event of Default shall have occurred and be continuing.

Any such designation by the Board of Directors shall be evidenced to the Trustee by promptly filing with the Trustee a copy of the Board Resolution giving effect to such designation and an Officers' Certificate certifying that such designation complied with the foregoing provisions.

"U.S. Government Obligations" means non-callable direct obligations of, and non-callable obligations guaranteed by, the United States of America for the payment of which the full faith and credit of the United States of America is pledged.

"U.S. Legal Tender" means such coin or currency of the United States which, as at the time of payment, shall be immediately available legal tender for the payment of public and private debts.

"Voting Stock" means, with respect to any Person, securities of any class or classes of Capital Stock of such Person entitling the holders thereof (whether at all times or only so long as no senior class of stock has voting power by reason of any contingency) to vote in the election of members of the Board of Directors (or equivalent governing body) of such Person.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing (1) the then outstanding aggregate principal amount of such Indebtedness into (2) the sum of the total of the products obtained by multiplying:

(a)    the amount of each then remaining installment, sinking fund, serial maturity or other required payment of principal, including payment at final maturity, in respect thereof, by

(b)    the number of years (calculated to the nearest one-twelfth) which will elapse between such date and the making of such payment.

"Wholly-Owned Restricted Subsidiary" of any Person means any Restricted Subsidiary of such Person of which all the outstanding Capital Stock (other than in the case of a CFC Subsidiary, directors' qualifying shares or an immaterial amount of shares required to be owned by other Persons pursuant to applicable law) are owned by such Person or any Wholly-Owned Restricted Subsidiary of such Person.

Section 1.02.    Incorporation by Reference of Trust Indenture Act.    Whenever this Indenture refers to a provision of the TIA, such provision is incorporated by reference in, and made a part of, this Indenture. The following TIA terms used in this Indenture have the following meanings:

"indenture securities" means the Notes.

"indenture security holder" means a Holder.

"indenture to be qualified" means this Indenture.

"indenture trustee" or "institutional trustee" means the Trustee.

"obligor" on the Indenture securities means the Company or any other obligor on the Notes.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by Commission rule and not otherwise defined herein have the meanings assigned to them therein.  To the extent or if any provision of this Indenture differs from or is inconsistent with the TIA, this Indenture shall control.

Section 1.03.    Rules of Construction.  Unless the context otherwise requires:

(1)    a term has the meaning assigned to it;

(2)    an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(3)    "or" is not exclusive;

(4)    words in the singular include the plural, and words in the plural include the singular;

(5)    "herein," "hereof" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision;

(6)    when the words "includes" or "including" are used herein, they shall be deemed to be followed by the words "without limitation"; and

(7)    all references to Sections or Articles refer to Sections or Articles of this Indenture unless otherwise indicated.

## ARTICLE TWO

### The Notes

Section 2.01.    Form and Dating.  The Notes, the related Guarantees and the Trustee's certificate of authentication thereon shall be substantially as set forth in the form of Exhibit A hereto.  The Global Notes issued to Third Point shall bear the applicable legend set forth in Exhibit B.

The Notes shall be issued pursuant to Section 1145(a) of the Bankruptcy Code and shall be issued initially in the form of one or more permanent Global Notes in registered form, substantially in the form set forth in Exhibit A hereto (each, a "Global Note").  Notes initially issued to Third Point on the Issue Date, any replacement Notes issued pursuant to Section 2.07, any temporary Notes issued pursuant to Section 2.10, any PIK Notes issued pursuant to Section 2.16 and transferred Notes transferred after the Issue Date by Third Point to Institutional Accredited Investors (an "IAI Global Note") or to non-U.S. Persons in reliance on Regulation S (a "Regulation S Global Note") shall bear the applicable legends set forth in Exhibit B.

The Notes may have notations, legends or endorsements required by law, stock exchange rule or Depository rule or usage. The Company shall approve the form of the Notes and any notation, legend or endorsement on them. The terms and provisions contained in the form of the Notes annexed hereto as Exhibit A shall constitute, and are hereby expressly made, a part of this Indenture and, to the extent applicable, the Company, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. Each Note shall be dated the date of its authentication. To the extent the terms of this Indenture and any Note differ or are inconsistent, this Indenture shall govern.

[The Global Notes, upon issuance shall be deposited with the Trustee, as custodian for the Depository, duly executed by the Company and authenticated by the Trustee as hereinafter provided. The provisions of the "Operating Procedures of the Euroclear System" and "Terms and Conditions Governing Use of Euroclear" and the "General Terms and Conditions of Clearstream Banking" and "Customer Handbook" of Clearstream will be applicable to transfers of beneficial interests in a Regulation S Global Note that are held by participants through Euroclear or Clearsteam.] *[Depositary and DTC provisions to be clarified globally.]*

The aggregate principal amount of any Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for the Depository, as hereinafter provided.

Any definitive Notes shall be typed, printed, lithographed or engraved or produced by any combination of these methods or may be produced in any other manner permitted by the rules of any securities exchange on which the Notes may be listed, all as determined by the Officers executing such Notes, as evidenced by their execution of such Notes.

Section 2.02.   Execution and Authentication; Aggregate Principal Amount. An Officer (who shall have been duly authorized by all requisite corporate actions) shall sign the Notes for the Company by manual or facsimile signature.

If an Officer whose signature is on a Note was an Officer at the time of such execution but no longer holds that office or position at the time the Trustee authenticates the Note, the Note shall nevertheless be valid.

A Note shall not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the Note. The signature shall be conclusive evidence, and the only evidence, that the Note has been authenticated under this Indenture.

The Trustee shall authenticate:

(i)      Notes for original issue in the aggregate principal amount not to exceed $5 million; and

(ii)     PIK Notes, from time to time after the date hereof but prior to the Maturity Date for issue only in lieu of the payment of interest payable with respect to the Notes (including previously issued PIK Notes) prior to the Maturity Date for the Notes in an aggregate principal amount equal to the PIK Interest Amount.

In addition, each Officers' Certificate shall specify the amount of Notes to be authenticated and the date on which such Notes are to be authenticated.