Section 11.11.    Successors ........................................................................................ 79

Section 11.12.    Duplicate Originals ......................................................................... 79

Section 11.13.    Severability ..................................................................................... 79

Section 11.14.    Waiver of Jury Trial........................................................................ 79

Section 11.15.    Force Majeure ................................................................................. 79

ARTICLE Twelve      Security ..................................................................................... 80

Section 12.01.    Grant of Security Interest................................................................ 80

Section 12.02.    Intercreditor Agreement.................................................................. 80

Section 12.03.    Recording and Opinions ................................................................. 81

Section 12.04.    Release of Collateral ....................................................................... 82

Section 12.05.    Specified Releases of Collateral ..................................................... 82

Section 12.06.    Release upon Satisfaction or Defeasance of all Outstanding
                  Obligations....................................................................................... 83

Section 12.07.    Form and Sufficiency of Release ..................................................... 83

Section 12.08.    Purchaser Protected......................................................................... 83

Section 12.09.    Authorization of Actions to Be Taken by the Collateral Agent
                  Under the Collateral Agreements..................................................... 83

Section 12.10.    Authorization of Receipt of Funds by the Collateral Agent
                  Under the Collateral Agreements..................................................... 84

**EXHIBITS**:

| | | |
|---|---|---|
| Exhibit A | -- | Form of Series B 20% Senior Secured PIK Note due 2014 and related Guarantee |
| Exhibit B | -- | Form of Legend for Global Notes |
| Exhibit C | -- | Form of Certificate to Be Delivered in Connection with Transfers to Non-QIB Accredited Investors |
| Exhibit D | -- | Form of Certificate to Be Delivered in Connection with Transfers Pursuant to Regulation S |

NOTE:            This Table of Contents shall not, for any purpose, be deemed to be part of this Indenture.

INDENTURE, dated as of _____, 2009 (this "Indenture"), between Baseline Oil & Gas Corp., a Delaware corporation (the "Company"), the Guarantors (as defined herein) and The Bank of New York Mellon Trust Company, N.A., as Trustee (in such capacity, the "Trustee") and Collateral Agent (in such capacity, the "Collateral Agent").

WHEREAS, the Company has duly authorized the creation of the Series B 20% Senior Secured PIK Notes due 2014 (the "Notes"), including the Series B Senior Notes to be issued in lieu of the payment of interest in cash on any Note (the "PIK Notes"), and the related Guarantee by the Guarantor thereof; and

WHEREAS, all things necessary to make the Notes and the Guarantees, when each are duly issued and executed by the Company and the Guarantors, as applicable, and authenticated and delivered hereunder, the valid and legally binding obligations of each of the Company and the Guarantors, respectively, and to make this Indenture a valid and legally binding agreement of each of the Company and the Guarantors, have been done.

NOW THEREFORE, the Company, the Guarantors, the Trustee and the Collateral Agent agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders (as defined):

## ARTICLE ONE

### Definitions and Incorporation by Reference

Section 1.01.    Definitions.

"Acquired Indebtedness" means Indebtedness of a Person or any of its Subsidiaries (a) existing at the time such Person becomes a Restricted Subsidiary of the Company or at the time it merges or consolidates with or into the Company or any of its Restricted Subsidiaries or (b) assumed in connection with the acquisition of assets from such Person and in each case not incurred by such Person in connection with, or in anticipation or contemplation of, such Person becoming a Restricted Subsidiary of the Company or such acquisition, merger or consolidation and which Indebtedness is without recourse to the Company or any of its Subsidiaries or to any of their respective properties or assets other than the Person or the assets to which such Indebtedness related prior to the time such Person became a Restricted Subsidiary of the Company or the time of such acquisition, merger or consolidation.

"Affiliate" means, with respect to any specified Person, any other Person who directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise; provided that Beneficial Ownership of 10% or more of the Voting Stock of the Person shall be deemed to constitute control. The terms "controlling" and "controlled" have meanings correlative of the foregoing.

"Affiliate Transaction" has the meaning set forth in Section 4.11.

"Agent" means any Registrar, Paying Agent or co-Registrar.

"Agent Members" has the meaning set forth in Section 2.14(a) and means, with respect to the Depository, Euroclear or Clearstream, a Person who has an account with the Depository, Euroclear or Clearstream, respectively (and, with respect to the Depository, shall include Euroclear and Clearstream).

*Indenture*

"Applicable Premium" means, with respect to a Senior Note on any redemption date, the greater of:

(1)     1.0% of the principal amount of the Senior Note; or

(2)     the excess of:

(a)     the present value at such redemption date of (i) the redemption price of the Senior Note at _____, 2012, (such redemption price being set forth in Section 3.01 herein) plus (ii) all required interest payments due on the Senior Note through _____, 2012 (excluding accrued but unpaid interest to the redemption date), computed using a discount rate equal to the Treasury Rate as of such redemption date plus 50 basis points; over

(b)     the principal amount of the Senior Note, if greater.

"Applicable Procedures" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depository, Euroclear and Clearstream that apply to such transfer or exchange.

"Asset Acquisition" means:

(1)     an Investment by the Company or any Restricted Subsidiary of the Company in any other Person pursuant to which such Person shall become a Restricted Subsidiary of the Company or any Restricted Subsidiary of the Company, or shall be merged with or into the Company or any Restricted Subsidiary of the Company, or

(2)     the acquisition by the Company or any Restricted Subsidiary of the Company of the assets of any Person (other than a Restricted Subsidiary of the Company) which constitute all or substantially all of the assets of such Person or comprise any division or line of business of such Person or any other properties or assets of such Person other than in the ordinary course of business.

"Asset Sale" means any direct or indirect sale, issuance, conveyance, transfer, lease (other than operating leases entered into in the ordinary course of business), assignment or other transfer (other than a Lien in accordance with this Indenture) for value by the Company or any of its Restricted Subsidiaries to any Person other than the Company or a Guarantor of:

(1)     any Capital Stock of any Restricted Subsidiary of the Company; or

(2)     any other property or assets of the Company or any Restricted Subsidiary of the Company other than in the ordinary course of business;

provided, however, that Asset Sales shall not include:

(a)     a transaction or series of related transactions for which the Company or its Restricted Subsidiaries receive aggregate consideration of less than $1.0 million;

(b)     the sale, lease, conveyance, disposition or other transfer of all or substantially all of the assets of the Company as permitted under Section 5.01;

(c)     any Restricted Payment permitted under Section 4.10 including a Permitted Investment;

(d)     the sale of Cash Equivalents;

(e)     the sale or other disposal of the Collateral secured by Permitted Liens of the type described in clause (11) of the definition thereof;

(f)     the sale or other disposition of used, worn out, obsolete or surplus equipment; and

(g)     the abandonment, assignment, lease, sub-lease or farm-out of oil and gas properties or, the forfeiture or other disposition of such properties, pursuant to operating agreements or other instruments or agreements that, in each case, are entered into in a manner that is customary in the Oil and Gas Business (but not including sales of dollar denominated or volumetric production payments, which shall be considered Asset Sales).

"Authenticating Agent" has the meaning set forth in Section 2.02.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended, and codified as 11 U.S.C. §§101 et seq.

"Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition. The terms "Beneficial Ownership," "Beneficially Owns" and "Beneficially Owned" have meanings correlative to the foregoing.

"Board of Directors" means, as to any Person, the board of directors or similar governing body of such Person or any duly authorized committee thereof.

"Board Resolution" means, with respect to any Person, a copy of a resolution certified by the Secretary or an Assistant Secretary of such Person to have been duly adopted by the Board of Directors of such Person and to be in full force and effect on the date of such certification.

"Business Day" means a day that is not a Legal Holiday.

"Capital Stock" means:

(1)     with respect to any Person that is a corporation, any and all shares, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, including each class of Common Stock and Other Preferred Stock of such Person;

(2)     with respect to any Person that is not a corporation, any and all partnership, membership or other equity interests of such Person; and

(3)     any warrants, rights or options to purchase any of the instruments or interests referred to in clause (1) or (2) above.

"Capitalized Lease Obligation" means, as to any Person, the obligations of such Person under a lease that are required to be classified and accounted for as capital lease obligations under GAAP and, for purposes of this definition, the amount of such obligations at any date shall be the capitalized amount of such obligations at such date, determined in accordance with GAAP.

"Cash Equivalents" means:

(1)     marketable direct obligations issued by, or unconditionally guaranteed by, the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof;

(2)     marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Ratings Group ("S&P") or Moody's Investors Service, Inc. ("Moody's");

(3)     commercial paper maturing no more than one year from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's;

(4)     certificates of deposit or bankers' acceptances maturing within one year from the date of acquisition thereof issued by any bank organized under the laws of the United States of America or any state thereof or the District of Columbia or any U.S. branch of a foreign bank having at the date of acquisition thereof combined net capital and surplus of not less than $250.0 million;

(5)     repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (1) above entered into with any bank meeting the qualifications specified in clause (4) above; and

(6)     investments in money market funds which invest substantially all their assets in securities of the types described in clauses (1) through (5) above.

"CFC Subsidiary" means any Subsidiary that is a "controlled foreign corporation" within the meaning of Section 957 of the Internal Revenue Code of 1986, as amended.

"Change of Control" means the occurrence of one or more of the following events:

(1)     any direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one transaction or a series of related transactions, of all or substantially all of the assets of the Company to any Person or group of related Persons for purposes of Section 13(d) of the Exchange Act (a "Group") other than a Principal;

(2)     the Company consolidates with, or merges with or into, any Person, or any Person consolidates with, or merges with or into, the Company, other than any such transaction where the Voting Stock of the Company outstanding immediately prior to such transaction is converted into or exchanged for Voting Stock (other than Disqualified Capital Stock) of the surviving or transferee Person constituting a majority of the outstanding shares of such Voting Stock of such surviving or transferee Person (immediately after giving effect to such issuance);

(3)      the approval by the holders of Capital Stock of the Company of any plan or proposal for the liquidation, winding up or dissolution of the Company;

(4)      the consummation of any transaction (including without limitation, any merger or consolidation) the result of which is that any Person or Group other than a Principal is or becomes the Beneficial Owner, directly or indirectly, in the aggregate of more than 35% of the total voting power of the Voting Stock of the Company then outstanding; or

(5)      individuals who on the Issue Date constituted the Board of Directors of the Company (together with any new directors whose election by such Board of Directors or whose nomination for election by the stockholders of the Company was approved pursuant to a vote of a majority of the directors then still in office who were either directors on the Issue Date or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors then in office.

"Change of Control Offer" has the meaning set forth in Section 4.15(a).

"Change of Control Payment Date" has the meaning set forth in Section 4.15(b)(2).

"Clearstream" means Clearstream Banking, société anonyme.

"Collateral" shall mean Collateral as such term is defined in the Security Agreement, Other Collateral, all property mortgaged under the Mortgages and any other property, whether now owned or hereafter acquired, upon which a Lien securing the Obligations under this Indenture, the Collateral Agreements, the Notes or the Guarantees is granted or purported to be granted under any Collateral Agreement; provided, however, that Collateral shall not include any Excluded Collateral.

"Collateral Agent" means The Bank of New York Mellon Trust Company, N.A., as collateral agent under this Indenture and the Collateral Agreements, with respect to the rights to the Collateral of the holders of the Notes until a successor replaces it in accordance with the provisions of this Indenture and, thereafter, means such successor.   References to the Collateral Agent or applicable Collateral Agent in this Indenture mean the Collateral Agent in its respective or applicable capacities as collateral agent for the Holders of the Notes.

"Collateral Agreements" means, collectively, the Intercreditor Agreement, the Security Agreement, each Mortgage and each other instrument creating Liens in favor of the Collateral Agent as required by this Indenture, in each case, as the same may be in force from time to time.

"Commission" means the Securities and Exchange Commission.

"Common Stock" of any Person means any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of such Person's common stock, whether outstanding on the Issue Date or issued after the Issue Date, and includes, without limitation, all series and classes of such common stock.

"Company" means the party named as such in this Indenture until a successor replaces it pursuant to this Indenture and thereafter means such successor.

"Consolidated EBITDA" means, with respect to any Person, for any period, the sum (without duplication) of:

(1)      Consolidated Net Income; and

(2)      to the extent Consolidated Net Income has been reduced thereby:

      (a)      all income taxes of such Person and its Restricted Subsidiaries paid or accrued in accordance with GAAP for such period;

      (b)      Consolidated Interest Expense;

      (c)      Consolidated Non-cash Charges less any non-cash items increasing Consolidated Net Income for such period; and

      (d)      restructuring costs (including employee relocations costs) and integration expenses and charges that are identified at the time of closing of any acquisition as resulting from such acquisition (including, without limitation, cash severance payments and facility closures);

all as determined on a consolidated basis for such Person and its Restricted Subsidiaries in accordance with GAAP.

"Consolidated Fixed Charge Coverage Ratio" means, with respect to any Person, the ratio of Consolidated EBITDA of such Person during the four consecutive full fiscal quarters (the "Four Quarter Period") most recently ending on or prior to the date of the transaction or event giving rise to the need to calculate the Consolidated Fixed Charge Coverage Ratio for which financial statements are available (the "Transaction Date") to Consolidated Fixed Charges of such Person for the Four Quarter Period.

In addition to and without limitation of the foregoing, for purposes of this definition, "Consolidated EBITDA" and "Consolidated Fixed Charges" shall be calculated after giving effect on a pro forma basis for the period of such calculation to:

(1)      the incurrence or repayment of any Indebtedness of such Person or any of its Restricted Subsidiaries (and the application of the proceeds thereof) giving rise to the need to make such calculation and any incurrence or repayment of other Indebtedness (and the application of the proceeds thereof), other than the incurrence or repayment of Indebtedness in the ordinary course of business for working capital purposes pursuant to working capital facilities, occurring during the Four Quarter Period or at any time subsequent to the last day of the Four Quarter Period and on or prior to the Transaction Date, as if such incurrence or repayment, as the case may be (and the application of the proceeds thereof), occurred on the first day of the Four Quarter Period; and

(2)      any Asset Sale or other disposition or Asset Acquisition (including, without limitation, any Asset Acquisition giving rise to the need to make such calculation as a result of such Person or one of its Restricted Subsidiaries (including any Person who becomes a Restricted Subsidiary as a result of any such Asset Acquisition) incurring, assuming or otherwise being liable for Acquired Indebtedness during the Four Quarter Period or at any time subsequent to the last day of the Four Quarter Period and on or prior to the Transaction Date), as if such Asset Sale or other disposition or Asset Acquisition (including the incurrence, assumption or liability for any such Indebtedness or Acquired Indebtedness and also including any Consolidated EBITDA associated with such Asset Acquisition) occurred on the first day of the Four Quarter Period, provided that the Consolidated EBITDA of any Person acquired shall be included only to the

extent includible pursuant to the definition of "Consolidated Net Income." If such Person or any of its Restricted Subsidiaries directly or indirectly guarantees Indebtedness of a third Person, the preceding sentence shall give effect to the incurrence of such guaranteed Indebtedness as if such Person or any Restricted Subsidiary of such Person had directly incurred or otherwise assumed such guaranteed Indebtedness.

Furthermore, in calculating "Consolidated Fixed Charges" for purposes of determining the denominator (but not the numerator) of this "Consolidated Fixed Charge Coverage Ratio":

(1)     interest on outstanding Indebtedness determined on a fluctuating basis as of the Transaction Date (including Indebtedness actually incurred on the Transaction Date) and which will continue to be so determined thereafter shall be deemed to have accrued at a fixed rate per annum equal to the rate of interest on such Indebtedness in effect on the Transaction Date; and

(2)     notwithstanding clause (1) above, interest on Indebtedness determined on a fluctuating basis, to the extent such interest is covered by agreements relating to Interest Swap Obligations, shall be deemed to accrue at the rate per annum resulting after giving effect to the operation of such agreements.

"Consolidated Fixed Charges" means, with respect to any Person for any period, the sum, without duplication, of:

(1)     Consolidated Interest Expense; plus

(2)     the product of (x) the amount of all dividend payments on any series of Preferred Stock of such Person (other than dividends paid in Qualified Capital Stock) paid, accrued or scheduled to be paid or accrued during such period times (y) a fraction, the numerator of which is one and the denominator of which is one minus the then current effective consolidated federal, state and local tax rate of such Person, expressed as a decimal.

"Consolidated Interest Expense" means, with respect to any Person for any period, the aggregate of the interest expense of such Person and its Restricted Subsidiaries for such period, on a consolidated basis, as determined in accordance with GAAP, and including, without duplication:

(1)     all amortization or accretion of original issue discount;

(2)     the interest component of Capitalized Lease Obligations paid, accrued and/or scheduled to be paid or accrued by such Person and its Restricted Subsidiaries during such period; and

(3)     net cash costs under all Interest Swap Obligations (including amortization of fees); but excluding the amortization or write-off during such period of capitalized financing or debt issuance costs.

"Consolidated Net Income" means, with respect to any Person, for any period, the aggregate net income (or loss) of such Person and its Restricted Subsidiaries for such period on a consolidated basis, determined in accordance with GAAP; provided, however, that there shall be excluded therefrom:

(1)     after-tax gains and losses from Asset Sales or abandonments or reserves relating thereto;

(2)     after-tax items classified as extraordinary gains or losses;

(3)     the net income (but not loss) of any Restricted Subsidiary of the referent Person to the extent that the declaration of dividends or similar distributions by that Restricted Subsidiary of that income is restricted by a contract, operation of law or otherwise;

(4)     the net income of any Person, other than the referent Person or a Restricted Subsidiary of the referent Person, except to the extent of cash dividends or distributions paid to the referent Person or to a Wholly-Owned Restricted Subsidiary of the referent Person by such Person;

(5)     any restoration to income of any material contingency reserve, except to the extent that provision for such reserve was made out of Consolidated Net Income accrued at any time following the Issue Date;

(6)     income or loss attributable to discontinued operations (including, without limitation, operations disposed of during such period whether or not such operations were classified as discontinued);

(7)     all gains and losses realized on or because of the purchase or other acquisition by such Person or any of its Restricted Subsidiaries of any securities of such Person or any of its Restricted Subsidiaries;

(8)     the cumulative effect of a change in accounting principles;

(9)     interest expense attributable to dividends on Qualified Capital Stock pursuant to Statement of Financial Accounting Standards No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity";

(10)    any write-downs of non-current assets; provided that any ceiling limitation write-downs under SEC guidelines shall be treated as capitalized costs, as if such write-downs had not occurred;

(11)    in the case of a successor to the referent Person by consolidation or merger or as a transferee of the referent Person's assets, any earnings of the successor corporation prior to such consolidation, merger or transfer of assets; and

(12)    non-cash compensation charges or other non-cash expenses or charges arising from the grant of or issuance or repricing of stock, stock options or other equity-based awards or any amendment, modification, substitution or change of any such stock, stock options or other equity-based awards.

"Consolidated Non-cash Charges" means, with respect to any Person, for any period, the aggregate depreciation, amortization and other non-cash items and expenses of such Person and its Restricted Subsidiaries to the extent they reduce Consolidated Net Income of such Person and its Restricted Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP (excluding any such charges constituting an extraordinary item or loss or any such charge which requires an accrual of or a reserve for cash charges for any future period).

"Corporate Trust Office" means the office of the Trustee at which the corporate trust business of the Trustee shall, at any particular time, be principally administered, which office is, at the

date of this Indenture, located at 601 Travis, 16th Floor, Houston, Texas 77002, Attn: Corporate Trust Administration.

"Covenant Defeasance" has the meaning set forth in Section 8.01(c).

"Custodian" means any receiver, trustee, assignee, liquidator, sequestrator or similar official under the Bankruptcy Code.

"Default" means an event or condition the occurrence of which is, or with the lapse of time or the giving of notice or both would be, an Event of Default.

"Depository" means The Depository Trust Company, its nominees and successors ("DTC").

"Disqualified Capital Stock" means that portion of any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event (other than an event that would constitute a Change of Control), matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (except in each case, upon the occurrence of a Change of Control) on or prior to the first anniversary of the final maturity date of the Notes for cash or is convertible into or exchangeable for debt securities of the Company or its Subsidiaries at any time prior to such anniversary.

"Domestic Restricted Subsidiary" means, with respect to any Person, a Domestic Subsidiary of such Person that is a Restricted Subsidiary of such Person.

"Domestic Subsidiary" means, with respect to any Person, a Subsidiary of such Person that is not a CFC Subsidiary of such Person.

"Euroclear" means Euroclear Bank S.A./N.V., as operator of the Euroclear system.

"Event of Default" has the meaning set forth in Section 6.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

"Excluded Collateral" means:

(i)      the Voting Stock of any CFC Subsidiary in excess of 65% of the outstanding Voting Stock of such CFC Subsidiary owned directly or indirectly by the Company;

(ii)      motor vehicles;

(iii)      rights under any contracts, leases or other instruments that contain a valid and enforceable prohibition on assignment of such rights (other than to the extent that any such prohibition would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code of any relevant jurisdiction or any other applicable law or principles of equity), but only for so long as such prohibition exists and is effective and valid;

(iv)      property and assets owned by the Company or any Guarantors that are the subject of Permitted Liens described in clause (6) or (7) of the definition thereof for so long as such

Permitted Liens are in effect and the Indebtedness secured thereby otherwise prohibits any other Liens thereon;

    (v)     property and assets owned by the Company or any Guarantor in which a Lien may not be granted without governmental approval or consent or in which the granting of a Lien is prohibited by applicable law (but only for so long as the Company or the applicable Guarantor has not obtained such approval or consents);

    (vi)    deposits described in clause (3) or (10) of the definition of Permitted Liens; and

    (vii)    Oil and Gas Properties of the Company and its Subsidiaries to which no proved reserves of oil and gas are attributed.

"Fair Market Value" means, with respect to any asset or property, the price which could be negotiated in an arm's length, free market transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction. Fair Market Value shall be determined by the Board of Directors of the Company acting in good faith; provided, however, that with respect to any price less than $2.5 million only the good faith determination by the Company's senior management shall be required.

"GAAP" means accounting principles generally accepted in the United States set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession of the United States, which are in effect as of the Issue Date.

"Global Notes" has the meaning set forth in Section 2.01.

"Guarantee" has the meaning set forth in Section 10.01.

"Guarantor" means (1) each of the Company's Domestic Restricted Subsidiaries existing on the Issue Date and (2) each of the Company's Domestic Restricted Subsidiaries that in the future executes a supplemental indenture in which such Domestic Restricted Subsidiary agrees to be bound by the terms of this Indenture as a Guarantor; provided that any Person constituting a Guarantor as described above shall cease to constitute a Guarantor when its respective Guarantee is released in accordance with the terms of this Indenture.

"Hedging Obligations" means the obligations of the Company or any of its Restricted Subsidiaries pursuant to agreements:

    (1)    designed to protect the Company or any of its Restricted Subsidiaries against

    (a)    fluctuations in interest rates in respect of Indebtedness of the Company or such Restricted Subsidiary or

    (b)    fluctuations in currency exchange rates or commodity prices and

    (2)    entered into in the ordinary course of business and not for purposes of speculation.

"Holder" means Person in whose name a Note is registered on the registrar's books.

"Hydrocarbons" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"IAI Global Note has the meaning set forth in Section 2.01.

"Indebtedness" means with respect to any Person, without duplication:

(1)    all Obligations of such Person for borrowed money;

(2)    all Obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3)    all Capitalized Lease Obligations of such Person;

(4)    all Obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations and all Obligations under any title retention agreement (but excluding trade accounts payable and other accrued liabilities arising in the ordinary course of business that are not overdue by 90 days or more or are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and any deferred purchase price represented by earn outs);

(5)    all Obligations for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction, whether or not then due;

(6)    guarantees and other contingent obligations in respect of Indebtedness referred to in clauses (1) through (5) above and clause (8) below;

(7)    all Obligations of any other Person of the type referred to in clauses (1) through (6) which are secured by any Lien on any property or asset of such Person, the amount of any such Obligation being deemed to be the lesser of the Fair Market Value of the property or asset securing such Obligation or the amount of such Obligation;

(8)    all Hedging Obligations of such Person; and

(9)    all Disqualified Capital Stock issued by such Person with the amount of Indebtedness represented by such Disqualified Capital Stock being equal to the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price, but excluding accrued dividends, if any.

Notwithstanding the foregoing, Indebtedness shall not include any Qualified Capital Stock. For purposes hereof, the "maximum fixed repurchase price" of any Disqualified Capital Stock which does not have a fixed repurchase price shall be calculated in accordance with the terms of such Disqualified Capital Stock as if such Disqualified Capital Stock were purchased on any date on which Indebtedness shall be required to be determined pursuant to this Indenture, and if such price is based upon, or measured by, the Fair Market Value of such Disqualified Capital Stock, such Fair Market Value shall be determined reasonably and in good faith by the Board of Directors of the issuer of such Disqualified Capital Stock.

"Indemnified Party" has the meaning set forth in Section 7.07.

"Indenture" means this Indenture, as amended or supplemented from time to time in accordance with the terms hereof.

"Independent Financial Advisor" means a nationally-recognized accounting, appraisal or investment banking firm: (1) that does not, and whose directors, officers and employees or Affiliates do not, have a direct or indirect financial interest in the Company; and (2) that, in the judgment of the Board of Directors of the Company, is otherwise independent and qualified to perform the task for which it is to be engaged.

"Institutional Accredited Investor" means an institution that is an "accredited investor" as that term is defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act.

"Intercreditor Agreement" means the Intercreditor Agreement, dated the date hereof, among the Trustee, the Collateral Agent and the Company, as the same may be amended, supplemented or modified from time to time.

"Interest Payment Date" means the stated maturity of an installment of interest on the Notes.

"Interest Swap Obligations" means the obligations of any Person pursuant to any arrangement with any other Person, whereby, directly or indirectly, such Person is entitled to receive from time to time periodic payments calculated by applying either a floating or a fixed rate of interest on a stated notional amount in exchange for periodic payments made by such other Person calculated by applying a fixed or a floating rate of interest on the same notional amount and shall include, without limitation, interest rate swaps, caps, floors, collars and similar agreements.

"Investment" in any Person means any direct or indirect advance, loan (other than advances to customers in the ordinary course of business that are recorded as accounts receivable on the balance sheet of the lender) or other extensions of credit (including by way of guarantee or similar arrangement) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), or any purchase or acquisition for value of Capital Stock, Indebtedness or other similar instruments issued by such Person. If the Company or any Restricted Subsidiary issues, sells or otherwise disposes of any Capital Stock of a Person that is a Restricted Subsidiary such that, after giving effect thereto, such Person is no longer a Restricted Subsidiary, any Investment by the Company or any Restricted Subsidiary in such Person remaining after giving effect thereto will be deemed to be a new Investment at such time. The acquisition by the Company or any Restricted Subsidiary of a Person that holds an Investment in a third Person will be deemed to be an Investment by the Company or such Restricted Subsidiary in such third Person at such time. Except as otherwise provided for herein, the amount of an Investment shall be its Fair Market Value at the time the Investment is made and without giving effect to subsequent changes in value.

For purposes of the definition of "Unrestricted Subsidiary," the definition of "Restricted Payment" and Section 4.10:

(i)  "Investment" shall include the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of any Subsidiary of the Company at the time that such Subsidiary is designated an Unrestricted Subsidiary; provided, however, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Company shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary equal to an amount (if positive) equal to (A) the Company's "Investment" in such Subsidiary at the time of such redesignation less (B) the portion (proportionate to the Company's equity interest

in such Subsidiary) of the Fair Market Value of the net assets of such Subsidiary at the time of such redesignation; and

(ii)     any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of such transfer, in each case as determined in good faith by the Board of Directors of the Company.

"Issue Date" means the date of original issuance of the Notes.

"Jefferies" means Jefferies & Company, Inc., a Delaware corporation, and/or its Affiliates.

"Lease(s)" has the meaning set forth in Section 4.24.

"Leased Premises" has the meaning set forth in Section 4.24.

"Legal Defeasance" has the meaning set forth in Section 8.01(b).

"Legal Holiday" has the meaning set forth in Section 11.07.

"Lien" means any lien, mortgage, deed of trust, pledge, security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof and any agreement to give any security interest).

"Maturity Date" means _____, 2014.

"Mortgages" means the mortgages, deeds of trust, deeds to secure Indebtedness or other similar documents granting Liens on the Company and its Restricted Subsidiaries' Oil and Gas Assets and interests, Premises and/or Leased Premises in favor of the Collateral Agent for the benefit of itself, the Trustee and the Holders of the Notes, as amended or supplemented from time to time in accordance with its terms.

"Net Cash Proceeds" means, with respect to any Asset Sale, the proceeds in the form of cash or Cash Equivalents including payments in respect of deferred payment obligations when received in the form of cash or Cash Equivalents (other than the portion of any such deferred payment constituting interest) received by the Company or any of its Restricted Subsidiaries from such Asset Sale net of:

(1)     reasonable out-of-pocket expenses and fees relating to such Asset Sale (including, without limitation, legal, accounting and investment banking fees and sales commissions);

(2)     all taxes and other costs and expenses actually paid or estimated by the Company (in good faith) to be payable in cash in connection with such Asset Sale;

(3)     repayment of Indebtedness that is secured by the property or assets that are the subject of such Asset Sale and is required to be repaid in connection with such Asset Sale; and

(4)     appropriate amounts to be provided by the Company or any Restricted Subsidiary, as the case may be, as a reserve, in accordance with GAAP, against any liabilities associated with such Asset Sale and retained by the Company or any Restricted Subsidiary, as the case may be, after such Asset Sale, including, without limitation, pension and other post-

employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale;

provided, however, that if, after the payment of all taxes with respect to such Asset Sale, the amount of estimated taxes, if any, pursuant to clause (2) above exceeded the tax amount actually paid in cash in respect of such Asset Sale, the aggregate amount of such excess shall, at such time, constitute Net Cash Proceeds.

"Net Proceeds Offer" has the meaning set forth in Section 4.16.

"Net Proceeds Offer Amount" has the meaning set forth in Section 4.16.

"Net Proceeds Offer Payment Date" has the meaning set forth in Section 4.16.

"Net Proceeds Offer Trigger Date" has the meaning set forth in Section 4.16.

"Non-U.S. Person" means a Person who is not a U.S. person, as defined in Regulation S.

"Notes" has the meaning set forth in the recitals to this Indenture and, for all purposes of this Indenture, includes all PIK Notes.

"Obligations" means all obligations for principal, premium, interest (including, without limitation, interest occurring after an insolvency, bankruptcy or similar proceeding, whether or not such interest is an allowed claim in any such proceeding), penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

"Officer" means the Chief Executive Officer, the President, the Chief Financial Officer or any Vice President of the Company.

"Officers' Certificate" means a certificate signed by two Officers of the Company, at least one of whom shall be the principal financial officer of the Company, and delivered to the Trustee and/or the Collateral Agent, as the context may require.

"Oil and Gas Assets" means:

(a)      any and all Oil and Gas Properties;

(b)      any and all properties now or hereafter pooled or unitized with Oil and Gas Properties;

(c)      any and all presently existing or future unitization, communitization, or pooling agreements and declarations of pooled units and the units created thereby (including without limitation all units created under orders, regulations, rules or other official acts of any federal, state or other governmental body, agency or authority) that affect any Oil and Gas Property;

(d)      any and all operating agreements, contracts and other agreements, including production sharing contracts and agreements, that relate to any Oil and Gas Property or the production, sale, purchase, exchange or processing, handling, storage, transporting or marketing of Hydrocarbons from or attributable to any Oil and Gas Property;

(e)    any and all Hydrocarbons in and under and which may be produced and saved from, or are attributable to, any Oil and Gas Property, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to any Oil and Gas Property;

(f)    all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to any Oil and Gas Property; and

(g)    all properties, rights, titles, interests and estates described or referred to above, including any and all property, real or personal, immovable or immovable, that is now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any Oil and Gas Property or other property (excluding drilling rigs, automotive equipment, rental equipment or other personal Property which may be taken to such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, buildings, structures, field separators, liquid extraction plants, plant compressors, pumps, pumping units, sales and flow lines, gathering systems,  field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, steam generation facilities, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes licenses and other surface and subsurface rights, together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"Oil and Gas Business" means the business of exploiting, exploring for, developing, acquiring, operating, producing, processing, gathering, marketing, storing, selling, hedging, treating, swapping, refining and transporting Hydrocarbons and other related energy businesses.

"Oil and Gas Liens" means:

(i)    Liens on any specific Oil and Gas Asset or any interest therein, construction thereon or improvement thereto to secure all or any part of the costs incurred for surveying, exploration, drilling extraction, development, operation, production, construction, alteration, repair or improvement of, in, under or on such Oil and Gas Asset and the plugging and abandonment of wells located thereon (it being understood that, in the case of any producing Oil and Gas Asset, or any interest therein, costs incurred for "development" shall include costs incurred for all facilities relating to such Oil and Gas Asset or to projects, ventures or other arrangements of which such Oil and Gas Asset forms a part or which relate to such Oil and Gas Asset);

(ii)    Liens on a producing Oil and Gas Asset to secure obligations incurred or guarantees of obligations incurred in connection with or necessarily incidental to commitments for the purchase or sale of, or the transportation or distribution of, the products derived from such Oil and Gas Asset;

(iii)    Liens arising under partnership agreements, oil and gas leases, overriding royalty agreements, net profits agreements, production payment agreements, royalty trust agreements, incentive compensation programs for geologists, geophysicists and other providers of technical services to the Company or a Restricted Subsidiary, master limited partnership agreements, farm-out agreements, farm-in agreements, division orders, contracts for the sale, purchase, exchange, transportation, gathering or processing of Hydrocarbons, unitizations and pooling designations, declarations, orders and agreements, development agreements, operating agreements, production sales contracts, area of mutual interest agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal

agreements, seismic or geophysical permits or agreements, and other agreements which are customary in the Oil and Gas Business; provided, however, in all instances that such Liens are limited to the assets that are the subject of the relevant agreement, program, order or contract; and

(iv)     Liens on pipelines or pipeline facilities that arise by operation of law.

"Oil and Gas Properties" means any and all rights, titles, interests and estates in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous Hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature, together with all fixtures and improvements pertaining thereto.

"Opinion of Counsel" means a written opinion of counsel who shall be reasonably acceptable to the Trustee.

"Other Collateral" has the meaning set forth in Section 4.25.

"Paying Agent" has the meaning set forth in Section 2.03.

"Permitted Business" means any business that is the same as or similar, reasonably related, complementary or incidental to the business in which the Company and its Restricted Subsidiaries are engaged on the Issue Date.

"Permitted Indebtedness" means, without duplication, each of the following:

(1)     Indebtedness under the Notes and the Series A Senior Notes in an aggregate principal amount not to exceed $30.0 million, any PIK Notes and Series A Senior PIK Notes issued in respect thereof in accordance with the terms hereof and the Series A Senior Notes Indenture, as applicable, and the related Guarantees and Series A Senior Notes Guarantee, as applicable;

(2)     Indebtedness under the Subordinated Notes in an aggregate principal amount not to exceed $10.0 million, any Subordinated PIK Notes issued in respect thereof in accordance with the terms of the Subordinated Notes Indenture hereof and the related Subordinated Notes Guarantee;

(3)     other Indebtedness of the Company and its Restricted Subsidiaries outstanding on the Issue Date;

(4)     (a) Hedging Obligations of the Company or any of its Restricted Subsidiaries that are subordinated in right of payment to the Notes, the Series A Senior Notes or the Subordinated Notes and the related Guarantees, Series A Senior Notes Guarantee or Subordinated Notes Guarantees, as applicable, and matures at least 91 days after the final stated maturity of the Notes and (b) Hedging Obligations of the Company or any of its Restricted Subsidiaries outstanding on the date hereof;

(5)     Intercompany Indebtedness of the Company or a Guarantor that is subordinated in right of payment to the Notes, Series A Senior Notes or Subordinated Notes and the related Guarantees, Series A Senior Notes Guarantee or Subordinated Notes Guarantee, as applicable, and matures at least 91 days after the final stated maturity of the Notes for so long as such Indebtedness is held by the Company or a Guarantor; provided that if as of any date any Person

other than the Company or a Guarantor owns or holds any such Indebtedness or holds a Lien in respect of such Indebtedness (other than Permitted Liens of the type described in clause (11) of the definition thereof that are permitted under this Indenture or a Permitted Lien of the type described in clause (14) of the definition thereof), such date shall be deemed the incurrence of Indebtedness not constituting Permitted Indebtedness under this clause (6) by the issuer of such Indebtedness;

(6)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; provided, however, that such Indebtedness is extinguished within three business days after the Company obtains knowledge thereof;

(7)    Indebtedness of the Company or any of its Restricted Subsidiaries represented by reimbursement obligations in respect of letters of credit for the account of the Company or such Restricted Subsidiary, as the case may be, in order to provide security for workers' compensation claims, payment obligations in connection with self-insurance, bonds and completion guarantees described in the following clause in the ordinary course of business;

(8)    obligations in respect of plugging and abandonment, performance, bid and surety bonds and completion guarantees provided by the Company or any Restricted Subsidiary in the ordinary course of business;

(9)    Indebtedness represented by Capitalized Lease Obligations and Purchase Money Indebtedness of the Company and its Restricted Subsidiaries that is subordinated in right of payment to the Notes, Series A Senior Notes or Subordinated Notes and the related Guarantees, Series A Senior Notes Guarantee or Subordinated Notes Guarantee, as applicable, and matures at least 91 days after the final stated maturity of any series of Notes incurred in the ordinary course of business (including Refinancings thereof that do not result in an increase in the aggregate principal amount of Indebtedness of such Person as of the date of such proposed Refinancing (plus the amount of any premium required to be paid under the terms of the instrument governing such Indebtedness and plus the amount of reasonable expenses incurred by the Company in connection with such Refinancing)) not to exceed $5.0 million at any time outstanding;

(10)    Refinancing Indebtedness;

(11)    Indebtedness represented by guarantees by the Company or a Restricted Subsidiary of Indebtedness incurred by the Company or a Restricted Subsidiary so long as the incurrence of such Indebtedness by the Company or any such Restricted Subsidiary is otherwise permitted by the terms of this Indenture, the Series A Senior Notes Indenture or the Subordinated Notes Indenture and that is subordinated in right of payment to the Notes, the Series A Senior Notes or the Subordinated Notes and the related Guarantees, Series A Senior Notes Guarantee or Subordinated Notes Guarantee, as applicable, and matures at least 91 days after the final stated maturity of the Notes;

(12)    Indebtedness that is subordinated in right of payment to the Notes, Series A Senior Notes or Subordinated Notes and the related Guarantees, Series A Senior Notes Guarantee or Subordinated Notes Guarantee, as applicable, and matures at least 91 days after the final stated maturity of the Notes arising from agreements of the Company or a Subsidiary providing for indemnification, adjustment of purchase price or similar obligations, in each case, incurred in connection with the disposition of any business, assets or Subsidiary, other than guarantees of

Indebtedness incurred by any Person acquiring all or any portion of such business, assets or Subsidiary for the purpose of financing such acquisition; provided that the maximum aggregate liability in respect of all such Indebtedness shall at no time exceed the gross proceeds actually received by the Company and the Subsidiary in connection with such disposition;

(13)    Indebtedness of the Company or any of its Restricted Subsidiaries to the extent the net proceeds thereof are promptly used to redeem the Notes in full or deposited to defease or discharge the Notes, in each case, in accordance with this Indenture; and

(14)    Indebtedness solely represented by premium financing or similar payment obligations incurred with respect to insurance policies purchased in the ordinary course of business and consistent with past practices.

For purposes of determining compliance with Section 4.12, (a) the outstanding principal amount of any item of Indebtedness shall be counted only once and (b) in the event that an item of Indebtedness meets the criteria of more than one of the categories of Permitted Indebtedness described in clauses (1) through (14) above or is entitled to be incurred pursuant to the Consolidated Fixed Charge Coverage Ratio provisions of such covenant, the Company shall, in its sole discretion, classify (or later reclassify) such item of Indebtedness in any manner that complies with this covenant. Accrual of interest, accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, and the payment of dividends on Disqualified Capital Stock in the form of additional shares of the same class of Disqualified Capital Stock will not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified Capital Stock for purposes of Section 4.12.

"Permitted Investments" means:

(1)    Investments by the Company or any Restricted Subsidiary of the Company in any Person that is or will become immediately after such Investment a Guarantor or that will merge or consolidate with or into the Company or a Guarantor, or that transfers or conveys all or substantially all of its assets to the Company or a Guarantor;

(2)    Investments in the Company by any Restricted Subsidiary of the Company; provided that any Indebtedness evidencing or comprising such Investment is unsecured and subordinated, pursuant to a written agreement, to the Company's Obligations under the Notes and this Indenture;

(3)    Investments in cash and Cash Equivalents;

(4)    Hedging Obligations in compliance with Section 4.12;

(5)    Investments in the Notes if the Series A Senior Notes are no longer outstanding, or the Series A Senior Notes;

(6)    Investments in securities of trade creditors or customers received pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers in exchange for claims against such trade creditors or customers;

(7)    Investments made by the Company or its Restricted Subsidiaries as a result of consideration received in connection with an Asset Sale made in compliance with Section 4.16;

(8)    Investments in existence on the Issue Date;

(9)    loans and advances, including advances for travel and moving expenses, to employees, officers and directors of the Company and its Restricted Subsidiaries in the ordinary course of business for bona fide business purposes not in excess of $1.0 million at any one time outstanding; and

(10)    advances to suppliers and customers in the ordinary course of business.

"Permitted Liens" means the following types of Liens:

(1)    Liens for taxes, assessments or governmental charges or claims either (a) not delinquent or (b) contested in good faith by appropriate proceedings and as to which the Company or its Restricted Subsidiaries shall have set aside on its books such reserves as may be required pursuant to GAAP;

(2)    statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen and other Liens imposed by law or pursuant to customary reservations or retentions of title incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made in respect thereof;

(3)    Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, including any Lien securing letters of credit issued in the ordinary course of business consistent with past practice in connection therewith, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(4)    any judgment Lien not giving rise to an Event of Default;

(5)    easements, rights-of-way, zoning restrictions and other similar charges or encumbrances in respect of real property not interfering in any material respect with the ordinary conduct of the business of the Company or any of its Restricted Subsidiaries;

(6)    any interest or title of a lessor under any Capitalized Lease Obligation permitted pursuant to clause (9) of the definition of "Permitted Indebtedness;" provided that such Liens do not extend to any property or assets which is not leased property subject to such Capitalized Lease Obligation;

(7)    Liens securing Purchase Money Indebtedness permitted pursuant to clause (9) of the definition of "Permitted Indebtedness"; provided, however, that (a) the Indebtedness shall not exceed the cost of the property or assets acquired, together, in the case of real property, with the cost of the construction thereof and improvements thereto, and shall not be secured by a Lien on any property or assets of the Company or any Restricted Subsidiary of the Company other than such property or assets so acquired or constructed and improvements thereto and (b) the Lien securing such Indebtedness shall be created within 180 days of such acquisition or construction or, in the case of a refinancing of any Purchase Money Indebtedness, within 180 days of such refinancing;

(8)     Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(9)     Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(10)    Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of the Company or any of its Restricted Subsidiaries, including rights of offset and set-off;

(11)    Liens securing Indebtedness under Hedging Obligations that are permitted under this Indenture or that relate to Indebtedness that is otherwise permitted under this Indenture;

(12)    Liens securing Acquired Indebtedness incurred in accordance with Section 4.12; provided that:

(a)     such Liens secured such Acquired Indebtedness at the time of and prior to the incurrence of such Acquired Indebtedness by the Company or a Restricted Subsidiary of the Company and were not granted in connection with, or in anticipation of, the incurrence of such Acquired Indebtedness by the Company or a Restricted Subsidiary of the Company; and

(b)     such Liens do not extend to or cover any property or assets of the Company or of any of its Restricted Subsidiaries other than the property or assets that secured the Acquired Indebtedness prior to the time such Indebtedness became Acquired Indebtedness of the Company or a Restricted Subsidiary of the Company and are no more favorable to the lienholders than those securing the Acquired Indebtedness prior to the incurrence of such Acquired Indebtedness by the Company or a Restricted Subsidiary of the Company;

(13)    Liens existing as of the Issue Date and securing Indebtedness permitted to be outstanding under clause (3) of the definition of the term "Permitted Indebtedness" to the extent and in the manner such Liens are in effect on the Issue Date;

(14)    Liens securing the Notes, the Series A Senior Notes and the Subordinated Notes and all other Obligations under this Indenture, the Series A Senior Notes Indenture and the Subordinated Notes Indenture with respect to the Notes, the Series A Senior Notes and the Subordinated Notes, as applicable; the Collateral Agreements and security agreements and related collateral agreements securing the Series A Senior Notes and the Subordinated Notes; and the Guarantees, Series A Senior Notes Guarantee and Subordinated Notes Guarantee;

(15)    [reserved]

(16)    Liens securing Refinancing Indebtedness which is incurred to Refinance any Indebtedness which has been secured by a Lien permitted under this paragraph and which has been incurred in accordance with Section 4.12; provided, however, that such Liens: (i) are no less favorable to the Holders and are not more favorable to the lienholders with respect to such Liens than the Liens in respect of the Indebtedness being Refinanced; and (ii) do not extend to or cover

any property or assets of the Company or any of its Restricted Subsidiaries not securing the Indebtedness so Refinanced; and

(17)    Oil and Gas Liens, in each case which are not incurred in connection with the borrowing of money.

"Person" means an individual, partnership, corporation, limited liability company, unincorporated organization, trust or joint venture, a governmental agency or political subdivision thereof or other company or entity.

"Physical Notes" has the meaning set forth in Section 2.14(a).

"PIK Dividends" means any regularly scheduled dividend payment payable on the Preferred Stock which may be paid, pursuant to the terms of the applicable series of Preferred Stock, in additional shares of the applicable series of Preferred Stock.

"PIK Interest Amount" means up to the full amount of interest on any Note which the Company is required to pay on regularly scheduled interest payment dates which is paid in-kind with additional Notes pursuant to Section 2.16, which shall be specified by the Company in a notice to the Trustee pursuant to Section 2.16.

"PIK Notes" has the meaning set forth in the recitals to this Indenture and, for all purposes of this Indenture, means the Notes issued in lieu of the payment of interest in cash on any Note from time to time in accordance with the provisions of Sections 2.02 and 2.16.

"Preferred Stock" means the 18% Series A Redeemable Preferred Stock, stated value $1,000 per share, of the Company and the 18% Series B Redeemable Preferred Stock, stated value $1,000 per share.

"Premises" has the meaning set forth in Section 4.22.

"principal" of any Indebtedness (including the Notes) means the principal amount (or accreted value, as the case may be) of such Indebtedness plus the premium, if any, on such Indebtedness.

"Principal" means Jefferies and Third Point and:

(1)    any controlling stockholder or 80% (or more) owned Subsidiary of a Principal; or

(2)    any trust, corporation, partnership, limited liability company or other entity, the beneficiaries, stockholders, partners, members, owners or Persons beneficially holding an 80% or more controlling interest of which consist of any one or more Principals.

"Private Placement Legend" means the legend initially set forth on the Notes in the form set forth in Exhibit B.

"Purchase Money Indebtedness" means Indebtedness of the Company and its Restricted Subsidiaries incurred for the purpose of financing all or any part of the purchase price, or the cost of installation, construction or improvement, of property or equipment, provided that the aggregate principal amount of such Indebtedness does not exceed the lesser of the Fair Market Value of such property or such purchase price or cost.

"QIB" means a "qualified institutional buyer" as defined in Rule 144A.

"Qualified Capital Stock" means any Capital Stock that is not Disqualified Capital Stock.

"Record Date" means any of the Record Dates specified in the Notes, whether or not a Legal Holiday.

"Redemption Date" means, when used with respect to any Note to be redeemed, the applicable date fixed for redemption of such Note pursuant to this Indenture and the Notes.

"Redemption Price" means, when used with respect to any Note to be redeemed, the applicable price fixed for redemption pursuant to this Indenture and the Notes.

"Refinance" means, in respect of any security or Indebtedness, to refinance, extend, renew, refund, repay, prepay, redeem, defease or retire, or to issue a security or Indebtedness in exchange or replacement for, such security or Indebtedness in whole or in part. "Refinanced" and "Refinancing" shall have correlative meanings.

"Refinancing Indebtedness" means any Refinancing by the Company or any Restricted Subsidiary of the Company of Indebtedness incurred in accordance with Section 4.12 (other than pursuant to Permitted Indebtedness) or clause (1), (2), (3) or (10) of the definition of Permitted Indebtedness, in each case that does not:

(1)      have an aggregate principal amount (or, if such Indebtedness is issued with original issue discount, an aggregate offering price) greater than the sum of (x) the aggregate principal amount of the Indebtedness being Refinanced (or, if such Indebtedness being Refinanced is issued with original issue discount, the aggregate accreted value) as of the date of such proposed Refinancing plus (y) the amount of fees, expenses, premium, defeasance costs and accrued but unpaid interest relating to the Refinancing of such Indebtedness being Refinanced;

(2)      create Indebtedness with: (a) a Weighted Average Life to Maturity that is less than the Weighted Average Life to Maturity of the Indebtedness being Refinanced; or (b) a final maturity earlier than the final maturity of the Indebtedness being Refinanced; or

(3)      affect the security, if any, for such Refinancing Indebtedness (except to the extent that less security is granted to holders of such Refinancing Indebtedness).

If such Indebtedness being Refinanced is subordinate or junior by its terms to the Notes, then such Refinancing Indebtedness shall be subordinate by its terms to the Notes at least to the same extent and in the same manner as the Indebtedness being Refinanced.

"Registrar" has the meaning set forth in Section 2.03.

"Regulation S" means Regulation S under the Securities Act.

"Regulation S Global Note" has the meaning set forth in Section 2.01.

"Restricted Payment" has the meaning set forth in Section 4.10.

"Restricted Period" means the 40-day distribution compliance period as defined in Regulation S.

"Restricted Security" has the meaning assigned to such term in Rule 144(a)(3) under the Securities Act; provided that the Trustee shall be entitled to request and conclusively rely on an Opinion of Counsel with respect to whether any Note constitutes a Restricted Security.

"Restricted Subsidiary" of any Person means any Subsidiary of such Person which at the time of determination is not an Unrestricted Subsidiary.

"Rule 144A" means Rule 144A under the Securities Act.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the Commission promulgated thereunder.

"Security Agreement" means the Security Agreement, dated as of the date hereof, made by the Company and any Guarantors in favor of the Collateral Agent, for the benefit of itself, the Trustee and the Holders of the Notes, as amended or supplemented from time to time in accordance with its terms.

"Senior Notes" means the Notes and the Series A Senior Notes.

"Series A Senior Notes" means the Company's Series A 20% Senior Secured PIK Notes due 2014 and, for all purposes of this Indenture, includes the Series A Senior PIK Notes.

"Series A Senior Notes Guarantee" has the meaning set forth in Section 10.01 of the Series A Senior Notes Indenture.

"Series A Senior Notes Indenture" means the Indenture, dated as of the date hereof, between the Company, the Guarantors and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent, as amended from time to time, which Series A Senior Notes Indenture governs the Series A Senior Notes.

"Series A Senior PIK Notes" means the Series A Senior Notes issued in lieu of the payment of interest in cash on any Series A Senior Note from time to time in accordance with the provisions of Sections 2.02 and 2.16 of the Series A Senior Notes Indenture.

"Significant Subsidiary" with respect to any Person, means any Restricted Subsidiary of such Person that satisfies the criteria for a "significant subsidiary" set forth in Rule 1-02(w) of Regulation S-X under the Exchange Act.

"Subordinated Notes" means the Company's 10% Senior Subordinated Secured PIK Notes due 2016 and, for all purposes of this Indenture, includes the Subordinated PIK Notes.

"Subordinated Notes Guarantee" has the meaning set forth in Section 10.01 of the Subordinated Notes Indenture.

"Subordinated Notes Indenture" means the Indenture, dated as of the date hereof, between the Company, the Guarantors and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent, as amended from time to time, which Subordinated Notes Indenture governs the Subordinated Notes.

"Subordinated PIK Notes" means the Subordinated Notes issued in lieu of the payment of interest in cash on any Subordinated Note from time to time in accordance with the provisions of Sections 2.02 and 2.16 of the Subordinated Notes Indenture.

"Subsidiary" with respect to any Person, means:

(1)     any corporation of which the outstanding Capital Stock having at least a majority of the votes entitled to be cast in the election of directors under ordinary circumstances shall at the time be owned, directly or indirectly, by such Person; or

(2)     any other Person of which at least a majority of the voting interest under ordinary circumstances is at the time, directly or indirectly, owned by such Person.

"Surviving Entity" has the meaning set forth in Section 5.01(1)(b).

"Third Point" means Third Point, LLC or one or more funds managed by Third Point, and their Affiliates, including but not limited to Third Point Offshore Master Fund, L.P. and Third Point Ultra Master Fund, L.P.

"TIA" means the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa-77bbbb), as amended, as in effect on the date of this Indenture, except as otherwise set forth in Section 9.03.

"Treasury Rate" means, as of any redemption date, the yield to maturity as of such redemption date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two business days prior to the redemption date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the redemption date to _____, 2012; provided, however, that if the period from the redemption date to _____, 2012, is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"Trust Officer" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"Trustee" means the party named as such in this Indenture until a successor replaces it in accordance with the provisions of this Indenture and thereafter means such successor.

"Unrestricted Subsidiary" of any Person means:

(1)     any Subsidiary of such Person that at the time of determination shall be or continue to be designated an Unrestricted Subsidiary by the Board of Directors of such Person in the manner provided below; and

(2)     any Subsidiary of an Unrestricted Subsidiary.

The Board of Directors of the Company may designate any Subsidiary (including any newly acquired or newly formed Subsidiary) to be an Unrestricted Subsidiary unless such Subsidiary owns any Capital Stock of, or owns or holds any Lien on any property of, the Company or any other Subsidiary of the Company that is not a Subsidiary of the Subsidiary to be so designated, provided that:

(1)     the Company certifies to the Trustee that such designation complies with <u>Section 4.10</u>; and

(2)     each Subsidiary to be so designated and each of its Subsidiaries has not at the time of designation, and does not thereafter, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to any Indebtedness pursuant to which the lender has recourse to any of the assets of the Company or any of its Restricted Subsidiaries.

The Board of Directors of the Company may designate any Unrestricted Subsidiary to be a Restricted Subsidiary only if:

(1)     immediately after giving effect to such designation, the Consolidated Fixed Charge Coverage Ratio of the Company will be, after giving effect to the incurrence thereof that arises by such designation, greater than 2.5 to 1.0 (other than Permitted Indebtedness) calculated on a pro forma basis; and

(2)     immediately before and immediately after giving effect to such designation, no Default or Event of Default shall have occurred and be continuing.

Any such designation by the Board of Directors shall be evidenced to the Trustee by promptly filing with the Trustee a copy of the Board Resolution giving effect to such designation and an Officers' Certificate certifying that such designation complied with the foregoing provisions.

"<u>U.S. Government Obligations</u>" means non-callable direct obligations of, and non-callable obligations guaranteed by, the United States of America for the payment of which the full faith and credit of the United States of America is pledged.

"<u>U.S. Legal Tender</u>" means such coin or currency of the United States which, as at the time of payment, shall be immediately available legal tender for the payment of public and private debts.

"<u>Voting Stock</u>" means, with respect to any Person, securities of any class or classes of Capital Stock of such Person entitling the holders thereof (whether at all times or only so long as no senior class of stock has voting power by reason of any contingency) to vote in the election of members of the Board of Directors (or equivalent governing body) of such Person.

"<u>Weighted Average Life to Maturity</u>" means, when applied to any Indebtedness at any date, the number of years obtained by dividing (1) the then outstanding aggregate principal amount of such Indebtedness into (2) the sum of the total of the products obtained by multiplying:

(a)     the amount of each then remaining installment, sinking fund, serial maturity or other required payment of principal, including payment at final maturity, in respect thereof, by

(b)     the number of years (calculated to the nearest one-twelfth) which will elapse between such date and the making of such payment.

"<u>Wholly-Owned Restricted Subsidiary</u>" of any Person means any Restricted Subsidiary of such Person of which all the outstanding Capital Stock (other than in the case of a CFC Subsidiary, directors' qualifying shares or an immaterial amount of shares required to be owned by other Persons pursuant to applicable law) are owned by such Person or any Wholly-Owned Restricted Subsidiary of such Person.

Section 1.02.   <u>Incorporation by Reference of Trust Indenture Act</u>.   Whenever this Indenture refers to a provision of the TIA, such provision is incorporated by reference in, and made a part of, this Indenture.  The following TIA terms used in this Indenture have the following meanings:

"<u>indenture securities</u>" means the Notes.

"<u>indenture security holder</u>" means a Holder.

"<u>indenture to be qualified</u>" means this Indenture.

"<u>indenture trustee</u>" or "<u>institutional trustee</u>" means the Trustee.

"<u>obligor</u>" on the Indenture securities means the Company or any other obligor on the Notes.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by Commission rule and not otherwise defined herein have the meanings assigned to them therein.  To the extent or if any provision of this Indenture differs from or is inconsistent with the TIA, this Indenture shall control.

Section 1.03.   <u>Rules of Construction</u>.  Unless the context otherwise requires:

(1)     a term has the meaning assigned to it;

(2)     an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(3)     "or" is not exclusive;

(4)     words in the singular include the plural, and words in the plural include the singular;

(5)     "herein," "hereof" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision;

(6)     when the words "includes" or "including" are used herein, they shall be deemed to be followed by the words "without limitation"; and

(7)     all references to Sections or Articles refer to Sections or Articles of this Indenture unless otherwise indicated.

## ARTICLE TWO

### The Notes

Section 2.01.   <u>Form and Dating</u>.  The Notes, the related Guarantees and the Trustee's certificate of authentication thereon shall be substantially as set forth in the form of <u>Exhibit A</u> hereto.  The Global Notes issued to Third Point shall bear the applicable legend set forth in <u>Exhibit B</u>.

The Notes shall be issued pursuant to Section 1145(a) of the Bankruptcy Code and shall be issued initially in the form of one or more permanent Global Notes in registered form, substantially in the form set forth in <u>Exhibit A</u> hereto (each, a "<u>Global Note</u>").  Notes initially issued to Third Point on the

Issue Date, any replacement Notes issued pursuant to <u>Section 2.07</u>, any temporary Notes issued pursuant to <u>Section 2.10</u>, any PIK Notes issued pursuant to <u>Section 2.16</u> and transferred Notes transferred after the Issue Date by Third Point to Institutional Accredited Investors (an "<u>IAI Global Note</u>") or to non-U.S. Persons in reliance on Regulation S (a "<u>Regulation S Global Note</u>") shall bear the applicable legends set forth in <u>Exhibit B</u>.

The Notes may have notations, legends or endorsements required by law, stock exchange rule or Depository rule or usage. The Company shall approve the form of the Notes and any notation, legend or endorsement on them. The terms and provisions contained in the form of the Notes annexed hereto as <u>Exhibit A</u> shall constitute, and are hereby expressly made, a part of this Indenture and, to the extent applicable, the Company, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. Each Note shall be dated the date of its authentication. To the extent the terms of this Indenture and any Note differ or are inconsistent, this Indenture shall govern.

[The Global Notes, upon issuance shall be deposited with the Trustee, as custodian for the Depository, duly executed by the Company and authenticated by the Trustee as hereinafter provided. The provisions of the "Operating Procedures of the Euroclear System" and "Terms and Conditions Governing Use of Euroclear" and the "General Terms and Conditions of Clearstream Banking" and "Customer Handbook" of Clearstream will be applicable to transfers of beneficial interests in a Regulation S Global Note that are held by participants through Euroclear or Clearstream.] *[Depositary and DTC provisions to be clarified globally.]*

The aggregate principal amount of any Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for the Depository, as hereinafter provided.

Any definitive Notes shall be typed, printed, lithographed or engraved or produced by any combination of these methods or may be produced in any other manner permitted by the rules of any securities exchange on which the Notes may be listed, all as determined by the Officers executing such Notes, as evidenced by their execution of such Notes.

Section 2.02.   <u>Execution and Authentication; Aggregate Principal Amount</u>. An Officer (who shall have been duly authorized by all requisite corporate actions) shall sign the Notes for the Company by manual or facsimile signature.

If an Officer whose signature is on a Note was an Officer at the time of such execution but no longer holds that office or position at the time the Trustee authenticates the Note, the Note shall nevertheless be valid.

A Note shall not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the Note. The signature shall be conclusive evidence, and the only evidence, that the Note has been authenticated under this Indenture.

The Trustee shall authenticate:

(i)     Notes for original issue in the aggregate principal amount not to exceed $25 million; and

(ii)     PIK Notes, from time to time after the date hereof but prior to the Maturity Date for issue only in lieu of the payment of interest payable with respect to the Notes (including

previously issued PIK Notes) prior to the Maturity Date for the Notes in an aggregate principal amount equal to the PIK Interest Amount.

In addition, each Officers' Certificate shall specify the amount of Notes to be authenticated and the date on which such Notes are to be authenticated.

The Trustee may appoint an authenticating agent (the "Authenticating Agent") reasonably acceptable to the Company to authenticate Notes. Unless otherwise provided in the appointment, an Authenticating Agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such Authenticating Agent. An Authenticating Agent has the same rights as an Agent to deal with the Company and Affiliates of the Company.

The Notes shall be issuable in fully registered form only, without coupons, and in the case of any Note (other than a PIK Note), in denominations of $1,000 in principal amount and any integral multiple thereof.

Section 2.03.   Registrar and Paying Agent. The Company shall maintain an office or agency in the Borough of Manhattan, The City of New York, where (a) Notes may be presented or surrendered for registration of transfer or for exchange (the "Registrar"), (b) Notes may be presented or surrendered for payment (the "Paying Agent") and (c) notices and demands to or upon the Company in respect of the Notes and this Indenture may be served. Such office or agency shall initially be located at the office of The Bank of New York Mellon, 101 Barclay Street – 7 East, New York, New York 10286. The Registrar shall keep a register of the Notes and of their transfer and exchange. The Company, upon prior written notice to the Trustee, may have one or more co-Registrars and one or more additional Paying Agents reasonably acceptable to the Trustee. The term "Paying Agent" includes any additional Paying Agent. Neither the Company nor any Affiliate of the Company may act as Paying Agent.

The Company shall enter into an appropriate agency agreement with any Agent not a party to this Indenture, which agreement shall incorporate the provisions of the TIA and implement the provisions of this Indenture that relate to such Agent. The Company shall notify the Trustee in writing, in advance, of the name and address of any such Agent. If the Company fails to maintain a Registrar or Paying Agent, or fails to give the foregoing notice, the Trustee shall act as such, as shall be entitled to appropriate compensation therefore, pursuant to Section 7.07.

The Company initially appoints the Trustee as Registrar, Paying Agent and agent for service of demands and notices in connection with the Notes. The Paying Agent or Registrar may resign upon thirty (30) days' written notice to the Company.

The Company appoints The Depository Trust Company as Depositary.

Section 2.04.   Obligations of Paying Agent. The Company shall require each Paying Agent other than the Trustee to agree in writing that such Paying Agent shall hold separate and apart from, and not commingle with any other properties, for the benefit of the Holders or the Trustee, all assets held by the Paying Agent for the payment of principal of, or interest on, the Notes (whether such assets have been distributed to it by the Company or any other obligor on the Notes), and the Paying Agent shall promptly notify the Trustee in writing of any Default by the Company (or any other obligor on the Notes) in making any such payment. The Company at any time may require a Paying Agent to distribute all assets held by it to the Trustee and account for any assets disbursed and the Trustee may at any time during the continuance of any payment Default, upon written request to a Paying Agent, require such Paying Agent to distribute all assets held by it to the Trustee and to account for any assets distributed.

Upon receipt by the Trustee of all assets that shall have been delivered by the Company to the Paying Agent, the Paying Agent shall have no further liability for such assets.

Section 2.05.   Holder Lists.   The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of the Holders and the series of Notes held by them and shall otherwise comply with TIA Section 312(a).  If the Trustee is not the Registrar, the Company shall furnish or cause the Registrar to furnish to the Trustee before each Record Date and at such other times as the Trustee may request in writing a list as of such date and in such form as the Trustee may reasonably request of the names and addresses of the Holders, which list may be conclusively relied upon by the Trustee.

Section 2.06.   Transfer and Exchange.   Subject to the provisions of Sections 2.14 and 2.15, when Notes are presented to the Registrar or a co-Registrar with a request to register the transfer of such Notes or to exchange such Notes for an equal principal amount of Notes of other authorized denominations of the same series, the Registrar or co-Registrar shall register the transfer or make the exchange as requested; provided, however, that the Notes presented or surrendered for registration of transfer or exchange shall be duly endorsed or accompanied by a written instrument of transfer in form satisfactory to the Company and the Registrar or co-Registrar, duly executed by the Holder thereof or his attorney duly authorized in writing and such other documents as the Registrar or Co-Registrar may reasonably require.  To permit registrations of transfers and exchanges, the Company shall issue and the Trustee shall authenticate Notes at the Registrar's or co-Registrar's request.  No service charge shall be made for any registration of transfer or exchange, but the Company or the Trustee may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchanges or transfers pursuant to Section 2.10, 3.07, 4.16 or 9.05, in which event the Company shall be responsible for the payment of such taxes).

The Registrar or co-Registrar shall not be required to register the transfer or exchange of any Note (i) during a period beginning at the opening of business fifteen (15) days before the mailing of a notice of redemption of Notes and ending at the close of business on the day of such mailing and (ii) selected for redemption in whole or in part pursuant to Article Three, except the unredeemed portion of any Note being redeemed in part.

Any Holder of a Global Note shall, by acceptance of such Global Note, agree that transfers of beneficial interests in such Global Note may be effected only through the Depository, in accordance with this Indenture and the Applicable Procedures.

Section 2.07.   Replacement Notes.   If a mutilated Note is surrendered to the Trustee or if the Holder of a Note claims in writing that the Note has been lost, destroyed or wrongfully taken, then, in the absence of written notice to the Company or the Trustee that such Note has been acquired by a protected purchaser, the Company shall issue and the Trustee shall authenticate a replacement Note of like tenor and principal amount and bearing a number not contemporaneously outstanding if the Trustee's requirements are met. Except with respect to mutilated Notes, if required by the Trustee or the Company, such Holder must provide an affidavit of lost certificate and an indemnity bond or other indemnity, sufficient in the judgment of both the Company and the Trustee, to protect the Company, the Trustee or any Agent from any loss which any of them may suffer if a Note is replaced. The Company may charge such Holder for its reasonable out-of-pocket expenses in replacing a Note, including reasonable fees and expenses of its counsel and of the Trustee and its counsel.  In case any mutilated, lost, destroyed or wrongfully taken Note has become or is about to become due and payable, the Company in its discretion may pay such Note instead of issuing a new Note in replacement thereof. Every replacement Note shall

constitute an additional obligation of the Company, entitled to the benefits of this Indenture, subject to Section 2.08.

Section 2.08.   Outstanding Notes.   Notes outstanding at any time are all the Notes that have been authenticated by the Trustee except those cancelled by it, those delivered to it for cancellation and those described in this Section 2.08 as not outstanding.  Subject to the provisions of Section 2.09, a Note does not cease to be outstanding because the Company or any of its Affiliates holds the Note.

If a Note is replaced pursuant to Section 2.07 (other than a mutilated Note surrendered for replacement), it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a protected purchaser.  A mutilated Note ceases to be outstanding upon surrender of such Note and replacement thereof pursuant to Section 2.07.

If on a Redemption Date or the Maturity Date the Paying Agent holds U.S. Legal Tender or U.S. Government Obligations sufficient to pay all of the principal and interest due on the Notes payable on that date and is not prohibited from paying such money to the Holders thereof pursuant to the terms of this Indenture, then on and after that date such Notes cease to be outstanding and interest on them ceases to accrue.

Section 2.09.   Treasury Notes; When Notes Are Disregarded.   In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver, consent or notice, Notes owned by the Company or any of its Affiliates shall be considered as though they are not outstanding, except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes which a Trust Officer of the Trustee actually knows are so owned shall be so considered.  Notes so owned which have been pledged in good faith may be regarded as outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not the Company or any other obligor upon the Notes or any Affiliate of the Company or of such other obligor.

Section 2.10.   Temporary Notes.   Until definitive Notes are ready for delivery, the Company may prepare and execute and the Trustee shall authenticate temporary Notes upon receipt of a written order of the Company in the form of an Officers' Certificate.  The Officers' Certificate shall specify the amount of temporary Notes to be authenticated and the date on which the temporary Notes are to be authenticated.  Temporary Notes shall be substantially in the form of definitive Notes but may have variations that the Company considers appropriate for temporary Notes.  Without unreasonable delay, the Company shall prepare and the Trustee shall authenticate upon receipt of a written order of the Company pursuant to Section 2.02 definitive Notes in exchange for temporary Notes.  Until so exchanged, the temporary Notes shall be entitled to the same benefits under this Indenture as definitive Notes.

Section 2.11.   Cancellation.   The Company at any time may deliver Notes previously authenticated hereunder which the Company has acquired in any lawful manner, to the Trustee for cancellation.  The Registrar and the Paying Agent shall forward to the Trustee any Notes surrendered to them for transfer, exchange or payment.  The Trustee, or at the direction of the Trustee, the Registrar or the Paying Agent, and no one else, shall cancel all Notes surrendered for transfer, exchange, payment or cancellation.  Subject to Section 2.07, the Company may not issue new Notes to replace Notes that it has paid or delivered to the Trustee for cancellation.  If the Company shall acquire any of the Notes, such acquisition shall not operate as a redemption or satisfaction of the Indebtedness represented by such Notes unless and until the same are surrendered to the Trustee for cancellation pursuant to this Section 2.11.  The Trustee shall dispose of all cancelled Notes in accordance with the Trustee's customary procedures.

Section 2.12.   _CUSIP Numbers_.  A "CUSIP" number shall be printed on the Notes, and the Trustee shall use the CUSIP number in notices of redemption, purchase or exchange as a convenience to Holders; provided that any such notice may state that no representation is made as to the correctness or accuracy of the CUSIP number printed in the notice or on the Notes and that reliance may be placed only on the other identification numbers printed on the Notes.  The Company shall promptly notify the Trustee of any change in the CUSIP number.

Section 2.13.   _Deposit of Moneys_.  Prior to 10:00 a.m. New York City time on each Interest Payment Date and the Maturity Date, the Company shall deposit with the Paying Agent U.S. Legal Tender sufficient to make cash payments, if any, due on such Interest Payment Date or the Maturity Date, as the case may be.

Section 2.14.   _Book-Entry Provisions for Global Notes_.  Each series of Global Notes initially shall (i) be registered in the name of the Depository or the nominee of such Depository and (ii) be delivered to the Trustee as custodian for such Depository.  The Global Notes issued to Third Point shall bear the applicable legends set forth in Exhibit B.  Members of, or participants in, the Depository ("Agent Members") shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Depository, or the Trustee as its custodian, or under any Global Note, and the Depository may be treated by the Company, the Trustee and any agent of the Company or the Trustee as the absolute owner of a Global Note for all purposes whatsoever.  Notwithstanding the foregoing, nothing herein shall prevent the Company, the Trustee or any agent of the Company or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depository or impair, as between the Depository and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Note. *[Depositary and DTC provisions to be clarified globally]*

(a)   Transfers of a Global Note shall be limited to transfers in whole, but not in part, to the Depository, its successors or their respective nominees.  Interests of beneficial owners in a Global Note may be transferred or exchanged in accordance with the Applicable Procedures of the Depository and the provisions of Section 2.15, provided, however, that prior to the expiration of the Restricted Period, transfers of beneficial interests in a Regulation S Global Note may not be made to a U.S. Person or for the account or benefit of a U.S. Person.  In addition, Notes in the form of certificated Notes in registered form in substantially the form set forth in Exhibit A hereto (collectively, the "Physical Notes") shall be transferred to all beneficial owners in exchange for their beneficial interests in a Global Note if (i) the Depository notifies the Company that it is unwilling or unable to continue as Depository for the Global Notes and a successor Depository is not appointed by the Company within ninety (90) days of such notice or (ii) an Event of Default has occurred and is continuing and the Registrar has received a request from the Depository to issue Physical Notes; provided that a beneficial interest in a Regulation S Global Note may not be exchanged for a Physical Note or transferred to a Person who takes delivery thereof in the form of a Physical Note prior to the expiration of the Restricted Period.

(b)   Any beneficial interest in a Global Note that is transferred to a Person who takes delivery in the form of an interest in another Global Note shall, upon transfer, cease to be an interest in such first Global Note and become a beneficial interest in such other Global Note and, accordingly, shall thereafter be subject to all transfer restrictions, if any, and other procedures applicable to a beneficial interest in such other Global Notes for as long as it remains such an interest.

(c)   In connection with any transfer or exchange of a portion of the beneficial interest in a Global Note to beneficial owners pursuant to paragraph (b), the Registrar shall (if one or more Physical Notes are to be issued) reflect on its books and records the date and a decrease in the principal amount of such Global Note in an amount equal to the principal amount of the beneficial interest in such

Global Note to be transferred, and the Company shall execute, and the Trustee shall authenticate and deliver, one or more Physical Notes of like tenor and aggregate principal amount.

(d)     In connection with the transfer of an entire Global Note to beneficial owners pursuant to paragraph (b), such Global Note shall be deemed to be surrendered to the Trustee for cancellation, and the Company shall execute, and the Trustee shall authenticate and deliver, to each beneficial owner identified by the Depository in exchange for its beneficial interest in such Global Note, an equal aggregate principal amount of Physical Notes of authorized denominations.

(e)     Any Physical Note constituting a Restricted Security delivered in exchange for an interest in a Global Note pursuant to paragraph (b), except as otherwise provided by paragraphs (a)(i)(x) and (c) of Section 2.15, bear the legend regarding transfer restrictions applicable to the Physical Notes set forth in Exhibit B.

(f)     The Holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes.

Section 2.15.     Special Transfer Provisions.     (a) Transfers to Non-QIB Institutional Accredited Investors and Non-U.S. Persons.  The following provisions shall apply with respect to the registration of any proposed transfer of a Note constituting a Restricted Security to any Institutional Accredited Investor which is not a QIB or to any Non-U.S. Person:

(i)     the Registrar shall register the transfer of any Note constituting a Restricted Security, whether or not such Note bears the Private Placement Legend, if (x) the requested transfer is after _____, 2010 or (y) (1) in the case of a transfer to an Institutional Accredited Investor which is not a QIB (excluding Non-U.S. Persons), the proposed transferee has delivered to the Registrar a certificate substantially in the form of Exhibit C hereto or (2) in the case of a transfer to a Non-U.S. Person, the proposed transferor has delivered to the Registrar a certificate substantially in the form of Exhibit D hereto; and

(ii)     if the proposed transferor is an Agent Member holding a beneficial interest in a Global Note, upon receipt by the Registrar of (x) the certificate, if any, required by paragraph (i) above and (y) instructions given in accordance with the Applicable Procedures and the Registrar's procedures,

whereupon (1) the Registrar shall reflect on its books and records the date and (if the transfer does not involve a transfer of outstanding Physical Notes) a decrease in the principal amount of such Global Note in an amount equal to the principal amount of the beneficial interest in such Global Note to be transferred, and (2) the Company shall execute and the Trustee shall authenticate and deliver one or more Physical Notes of like tenor and principal amount.

(b)     Transfers to QIBs.  The following provisions shall apply with respect to the registration of any proposed transfer of a Note constituting a Restricted Security to a QIB (excluding transfers to Non-U.S. Persons):

(i)     the Registrar shall register the transfer if such transfer is being made by a proposed transferor who has checked the box provided for on the form of Note stating, or has otherwise advised the Company and the Registrar in writing, that the sale has been made in compliance with the provisions of Rule 144A to a transferee who has signed the certification provided for on the form of Note stating, or has otherwise advised the Company and the Registrar

in writing, that it is purchasing the Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a QIB within the meaning of Rule 144A, and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Company as it has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon its foregoing representations in order to claim the exemption from registration provided by Rule 144A; and

(ii)    if the proposed transferee is an Agent Member, and the Notes to be transferred consist of Physical Notes which after transfer are to be evidenced by an interest in a Global Note, upon receipt by the Registrar of instructions given in accordance with the Applicable Procedures and the Registrar's procedures, the Registrar shall reflect on its books and records the date and an increase in the principal amount of such Global Note in an amount equal to the principal amount of the Physical Notes to be transferred, and the Trustee shall cancel the Physical Notes so transferred.

(c)    Private Placement Legend.  Upon the transfer, exchange or replacement of Notes not bearing the Private Placement Legend, the Registrar shall deliver Notes that do not bear the Private Placement Legend.  Upon the transfer, exchange or replacement of Notes bearing the Private Placement Legend pursuant to Section 2.01, the Registrar shall deliver only Notes that bear the Private Placement Legend unless (i) the circumstance contemplated by paragraph (a)(i)(x) of this Section 2.15 exists or (ii) there is delivered to the Registrar an Opinion of Counsel reasonably satisfactory to the Company and the Trustee to the effect that neither such legend nor the related restrictions on transfer are required in order to maintain compliance with the provisions of the Securities Act.  The Registrar shall not register a transfer of any Note unless such transfer complies with the restrictions on transfer of such Note set forth in this Indenture.  In connection with any transfer of Notes, each Holder agrees by its acceptance of the Notes to furnish the Registrar or the Company such certifications, legal opinions or other information as either of them may reasonably require to confirm that such transfer is being made pursuant to an exemption from, or a transaction not subject to, the registration requirements of the Securities Act; provided that the Registrar shall not be required to determine (but may rely on a determination made by the Company with respect to) the sufficiency of any such certifications, legal opinions or other information.

(d)    General.  By its acceptance of any Note bearing the Private Placement Legend, each Holder of such a Note acknowledges the restrictions on transfer of such Note set forth in this Indenture and in the Private Placement Legend and agrees that it shall transfer such Note only as provided in this Indenture.

The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any security (including any transfers between or among Agent Members or beneficial owners of interest in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

The Registrar shall retain for three (3) years beyond the Maturity Date copies of all letters, notices and other written communications received pursuant to Section 2.14 or this Section 2.15. The Company shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable written notice to the Registrar.

Section 2.16.   <u>Issuance of PIK Notes</u>.  (a) The Company shall be entitled to issue PIK Notes under this Indenture, which PIK Notes shall have identical terms as the Notes in respect of which such PIK Notes are being issued in lieu of the payment of interest in cash on any Note (including a PIK Note); <u>provided</u> that:

(i)     the aggregate principal amount of PIK Notes issued with respect to any interest payment may not exceed the aggregate amount of interest then due and payable;

(ii)    the Company shall pay to all Holders of Notes the same percentage of accrued and unpaid interest on Notes in PIK Notes; and

(iii)   the Company may not pay interest in cash on Subordinated Notes while any Senior Notes remain outstanding and may not pay interest in cash on any Notes unless the Company pays cash interest on Series A Senior Notes in the same percentage.

(b)     With respect to any PIK Notes, the Company shall deliver to the Trustee:

(i)     no later than the Record Date for the relevant Interest Payment Date (which Interest Payment Date shall be prior to the applicable Maturity Date for the Notes), a written notice setting forth the amount of interest to be paid by issuing PIK Notes; and

(ii)    no later than one Business Day prior to the relevant interest payment date, an order to authenticate and deliver such PIK Notes.

(c)     Any PIK Notes shall, after being executed and authenticated pursuant to <u>Section 2.02</u>, be (i) delivered by the Trustee to the Holders as of the relevant Record Date at such Holders' registered address if the Notes are then held in the form of certificated Notes or (ii) deposited with or on behalf of the Depository for the benefit of the beneficial owners of the Notes as of the relevant Record Date if the Notes are held in global form.

## ARTICLE THREE

### Redemption

Section 3.01.   <u>Optional Redemption</u>.   (a) *Optional Redemption of Notes Prior to [_____], 2012.*  At any time prior to _____, 2012, the Company may redeem all or a part of the Notes, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Notes to be redeemed, at a Redemption Price equal to 100% of the principal amount of Notes to be redeemed plus the Applicable Premium as of, and accrued and unpaid interest to the third anniversary of the Issue Date, subject to the rights of Holders of Notes on the relevant Record Date to receive interest due on the relevant Interest Payment Date on the redemption date (the "Redemption Date"); <u>provided</u>, <u>however</u>, that the Company may not redeem any Notes if any Series A Senior Notes will remain outstanding after the Redemption Date.

(b)     *Optional Redemption of Notes on or After [_____], 2012.*  On or after _____, 2012, the Company may redeem all or a part of the Notes, upon not less than 30 nor more than 60 days' notice mailed by first-class mail to the registered address of each Holder of Notes to be redeemed, at a Redemption Price equal to 100% of the principal amount of Notes to be redeemed plus accrued and unpaid interest to the date of redemption, subject to the rights of Holders of Notes on the relevant Record Date to receive interest due on the relevant Interest Payment Date on the Redemption

Date; provided, however, that the Company may not redeem any Notes if any Series A Senior Notes will remain outstanding after the Redemption Date.

Section 3.02.    Mandatory Redemption.    The Company is not required to make any mandatory redemption or sinking fund payments with respect to the Notes.

Section 3.03.    Selection of Notes to Be Redeemed.    If fewer than all of the Notes are to be redeemed pursuant to the provisions of this Indenture, the Trustee shall select the Notes to be redeemed (1) in compliance with the requirements of the principal national securities exchange, if any, on which such Notes are listed or (2) if such Notes are not then listed on a national securities exchange, on a pro rata basis, by lot or by such method as the Trustee may reasonably determine is fair and appropriate. The Trustee shall make the selection from the applicable Notes outstanding and not previously called for redemption and shall promptly notify the Company in writing of the applicable Notes selected for redemption and, in the case of any Note selected for partial redemption, the principal amount thereof, to be redeemed.

No Notes of a principal amount of $1,000 or less shall be redeemed in part and Notes of a principal amount in excess of $1,000 may be redeemed in part in multiples of $1,000 only. The Trustee may select for redemption portions (equal to $1,000 or any integral multiple thereof) of the principal amount of applicable Notes that have denominations larger than $1,000. Provisions of this Indenture that apply to applicable Notes called for redemption also apply to portions of applicable Notes called for redemption.

Section 3.04.    Notice of Redemption.    At least 10 days but not more than 20 days before the Redemption Date, the Company shall mail or cause to be mailed a notice of redemption by first class mail, postage prepaid, to each Holder whose Notes are to be redeemed at its registered address, with a copy to the Trustee and any Paying Agent. At the Company's written request delivered at least fifteen days prior to the date such notice is to be given (unless a shorter period shall be acceptable to the Trustee), the Trustee shall give the notice of redemption in the Company's name and at the Company's expense, provided the Company provides the Trustee with all information required for such notice of redemption. Failure to give notice of redemption, or any defect therein to any Holder of any Note selected for redemption shall not impair or affect the validity of the redemption of any other Note.

Each notice of redemption shall identify the Notes to be redeemed and shall state:

(1)    the applicable Redemption Date;

(2)    the applicable Redemption Price and the amount of accrued interest, if any, to be paid;

(3)    the name and address of the Paying Agent;

(4)    the CUSIP number;

(5)    the subparagraph of the Notes pursuant to which such redemption is being made;

(6)    the place where such Notes called for redemption must be surrendered to the Paying Agent to collect the Redemption Price plus accrued interest, if any;

(7)    that, unless the Company fails to deposit with the Paying Agent funds in satisfaction of the applicable Redemption Price plus accrued interest, if any, interest on the Notes

called for redemption ceases to accrue on and after the Redemption Date in accordance with Section 3.06, and the only remaining right of the Holders of such Notes is to receive payment of the Redemption Price plus accrued interest, if any, upon surrender to the Paying Agent of the Notes redeemed;

(8)     if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the Redemption Date, and upon surrender of such Note, a new Note or Notes of the same series in the aggregate principal equal to the unredeemed portion thereof shall be issued in the name of the Holder thereof upon cancellation of the original Note (or appropriate adjustments to the amount and beneficial interests in a Global Note will be made); and

(9)     if fewer than all the Notes are to be redeemed, the identification of the particular Notes (or portion thereof) to be redeemed, as well as the aggregate principal amount of applicable Notes to be redeemed and the aggregate principal amount of applicable Notes to be outstanding after such partial redemption.

If any of the Notes to be redeemed is in the form of a Global Note, then the Company shall modify such notice to the extent necessary to accord with the procedures of the Depository applicable to redemption.

Section 3.05.     Effect of Notice of Redemption.   Once notice of redemption is mailed in accordance with Section 3.04, Notes or portions thereof called for redemption shall become irrevocably due and payable on the Redemption Date and at the Redemption Price plus accrued interest thereon. Upon surrender to the Trustee or Paying Agent, such Notes or portions thereof called for redemption shall be paid at the Redemption Price plus accrued interest thereon, to the Redemption Date, but installments of interest thereon, the maturity of which is on or prior to the Redemption Date, shall be payable to Holders of record at the close of business on the relevant Record Dates referred to in the applicable Notes.

Section 3.06.     Deposit of Redemption Price.   Not later than 10:00 a.m. local time in the place of payment on the Redemption Date, the Company shall deposit with the Paying Agent U.S. Legal Tender sufficient to pay the Redemption Price plus accrued interest, if any, of all Notes or portions thereof to be redeemed on that date.

The Paying Agent shall promptly return to the Company any U.S. Legal Tender so deposited which is not required for that purpose, except with respect to monies owed as obligations to the Trustee pursuant to Article Seven.

If the Company complies with the preceding paragraph, then, unless the Company defaults in the payment of such Redemption Price plus accrued interest, if any, interest on the Notes to be redeemed shall cease to accrue on and after the applicable Redemption Date, whether or not such Notes are presented for payment.

Section 3.07.     Notes Redeemed in Part.   Upon surrender of a Note that is to be redeemed in part, the Company shall issue and the Trustee shall authenticate for the Holder at the expense of the Company a new Note or Notes equal in principal amount to the unredeemed portion of the Note surrendered.

## ARTICLE FOUR

Covenants

The following covenants contained in this Article Four shall apply to the Notes.

Section 4.01.    Payment of Notes.  The Company shall pay the principal of, or premium, if any, and interest, if any, on the Notes on the dates and in the manner provided in the Notes and in this Indenture.  An installment of principal of, or premium, if any, or interest, if any, on the Notes shall be considered paid on the date it is due if the Trustee or Paying Agent (other than the Company or an Affiliate of the Company) holds at 10:00 a.m. (New York time) on that date U.S. Legal Tender designated for and sufficient to pay the installment in full and is not prohibited from paying such money to the Holders pursuant to the terms of this Indenture.  The Company shall pay interest on overdue principal at 1% per annum in excess of the rate per annum set forth in the Notes, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

Notwithstanding anything to the contrary contained in this Indenture, the Company may, to the extent it is required to do so by law, deduct or withhold income or other similar taxes imposed by the United States from principal or interest payments hereunder.

Section 4.02.    Maintenance of Office or Agency.  The Company shall maintain the office or agency required under Section 2.03.  The Company shall give prior written notice to the Trustee and the Holders of the location, and any change in the location, of such office or agency.  If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office and the Company hereby appoints the Trustee as its agent to receive all such presentations, surrenders, notices and demands.

Section 4.03.    Corporate Existence.  Except as otherwise permitted by Articles Four, Five, and Ten the Company shall do or cause to be done, at its own cost and expense, all things necessary to preserve and keep in full force and effect its corporate existence and the limited liability company, partnership or corporate existence of each of its Restricted Subsidiaries in accordance with the respective organizational documents of the Company and each such Restricted Subsidiary, as the case may be, and the material rights (charter and statutory) and franchises of the Company and each such Restricted Subsidiary; provided, however, that the Company shall not be required to preserve, with respect to itself, any material right or franchise and, with respect to any of its Restricted Subsidiaries, any such existence, material right or franchise, if the Board of Directors of the Company shall determine in good faith that the preservation thereof is no longer desirable in the conduct of the business of the Company and its Restricted Subsidiaries, taken as a whole.

Section 4.04.    Payment of Taxes and Other Claims.  The Company shall pay or discharge or cause to be paid or discharged, before the same shall become delinquent, (i) all material taxes, assessments and governmental charges (including withholding taxes and any penalties, interest and additions to taxes) levied or imposed upon it or any of its Restricted Subsidiaries or its properties or any of its Restricted Subsidiaries' properties and (ii) all material lawful claims for labor, materials and supplies that, if unpaid, might by law become a Lien upon its properties or any of its Restricted Subsidiaries' properties; provided, however, that the Company shall not be required to pay or discharge or cause to be paid or discharged any such tax, assessment, charge or claim whose amount, applicability or validity is being or shall be contested in good faith by appropriate proceedings properly instituted and diligently conducted for which adequate reserves, to the extent required under GAAP, have been taken.

Section 4.05.   Maintenance of Properties and Insurance.   (a) The Company shall, and shall cause each of its Restricted Subsidiaries to, maintain its properties in good working order and condition in all material respects (subject to ordinary wear and tear) and make all necessary repairs, renewals, replacements, additions, betterments and improvements thereto and actively conduct and carry on its business; provided, however, that nothing in this Section 4.05 shall prevent the Company or any of its Restricted Subsidiaries from discontinuing the operation and maintenance of any of its properties if such discontinuance is, in the good faith judgment of the Board of Directors or other governing body of the Company or the Subsidiary concerned, as the case may be, desirable in the conduct of its businesses and is not disadvantageous in any material respect to the Holders.

(b)       The Company shall maintain insurance (including appropriate self-insurance) against loss or damage of the kinds that, in the good faith judgment of the Company, are adequate and appropriate for the conduct of the business of the Company and its Restricted Subsidiaries in a prudent manner, with reputable insurers or with the government of the United States or an agency or instrumentality thereof, in such amounts, with such deductibles, and by such methods as shall be customary, in the good faith judgment of the Company, for companies similarly situated in the industry in which the Company and its Restricted Subsidiaries are engaged.

Section 4.06.   Compliance Certificate; Notice of Default.   (a) The Company and each Guarantor shall deliver to the Trustee, within ninety (90) days after the end of the Company's fiscal year, an Officers' Certificate stating that a review of the activities of the Company and its Restricted Subsidiaries during the preceding fiscal year has been made under the supervision of the signing Officers (one of whom is the principal executive officer, principal financial officer or principal accounting officer) with a view to determining whether they have kept, observed, performed and fulfilled their obligations under this Indenture and further stating, as to each such Officer signing such certificate, that to the best of such Officer's actual knowledge the Company and its Restricted Subsidiaries during such preceding fiscal year have kept, observed, performed and fulfilled each and every condition and covenant under this Indenture and no Default or Event of Default occurred during such year and at the date of such certificate there is no Default or Event of Default that has occurred and is continuing or, if such signers do know of such Default or Event of Default, the certificate shall describe the Default or Event of Default and its status with particularity. The Officers' Certificate shall also notify the Trustee should the Company elect to change the manner in which it fixes its fiscal year end.

(b)       The annual financial statements delivered pursuant to Section 4.08 shall be accompanied by a written report of the Company's independent accountants (who shall be a firm of established national reputation) that in conducting their audit of such financial statements nothing has come to their attention that would lead them to believe that the Company has violated any provisions hereof insofar as they relate to accounting matters or, if any such violation has occurred, specifying the nature and period of existence thereof, it being understood that such accountants shall not be liable directly or indirectly to any Person for any failure to obtain knowledge of any such violation.

(c)       (i) If any Default or Event of Default has occurred and is continuing or (ii) if any Holder seeks to exercise any remedy hereunder with respect to a claimed Default under this Indenture or the Notes, the Company shall deliver to the Trustee, at its address set forth in Section 11.02, by registered or certified mail or by telegram, telex or facsimile transmission followed by hard copy by registered or certified mail an Officers' Certificate specifying such event, notice or other action within five (5) Business Days of its becoming aware of such occurrence.

Section 4.07.   Compliance with Laws.   The Company shall, and shall cause each of its Restricted Subsidiaries to, comply with all applicable statutes, rules, regulations, orders and restrictions of the United States, all states and municipalities thereof, and of any governmental department, commission,