Section 11.08.  Governing Law.  THIS INDENTURE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. EACH OF THE PARTIES HERETO SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE OR THE TRANSACTIONS CONTEMPLATED BY THIS INDENTURE.

Section 11.09.  No Adverse Interpretation of Other Agreements.  This Indenture may not be used to interpret another indenture, loan or debt agreement of the Company or any of its Subsidiaries. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

Section 11.10.  No Recourse Against Others.  No affiliate, director, officer, employee, incorporator or holder of any equity interests in the Company or any direct or indirect parent corporation of the Company, as such, will have any liability for any obligations of the Company under the Notes or this Indenture, or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. The parties hereto acknowledge that such waiver may not be effective to waive liabilities under the federal securities laws.

Section 11.11.  Successors.  All agreements of the Company and the Guarantors in this Indenture, the Notes, and the Guarantees shall bind their successors. All agreements of the Trustee and the Collateral Agent in this Indenture shall bind their respective successors.

Section 11.12.  Duplicate Originals.  All parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together shall represent the same agreement.

Section 11.13.  Severability.  In case any one or more of the provisions in this Indenture, the Notes or in the Guarantees shall be held invalid, illegal or unenforceable, in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions shall not in any way be affected or impaired thereby, it being intended that all of the provisions hereof shall be enforceable to the full extent permitted by law.

Section 11.14.  Waiver of Jury Trial.  EACH OF THE COMPANY, THE GUARANTORS, THE TRUSTEE, THE COLLATERAL AGENT, AND BY ITS ACCEPTANCE THEREOF, EACH HOLDER OF A NOTE, HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS INDENTURE, THE COLLATERAL AGREEMENTS, THE NOTES, THE GUARANTEES OR THE TRANSACTIONS CONTEMPLATED BY THIS INDENTURE.

Section 11.15.  Force Majeure.  In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

## ARTICLE TWELVE

### Security

Section 12.01.  <u>Grant of Security Interest</u>.  (a) To secure the due and punctual payment of the principal of, premium, if any, and interest on the Notes and amounts due hereunder and under the Guarantees when and as the same shall be due and payable, whether on an Interest Payment Date, at maturity, by acceleration, purchase, repurchase, redemption or otherwise, and interest on the overdue principal of, premium, if any, and interest (to the extent permitted by law), if any, on the Notes and the performance of all other Obligations of the Company and the Guarantors to the Holders of Notes, the Collateral Agent or the Trustee under this Indenture, the Collateral Agreements, the Guarantees and the Notes, the Company and the Guarantors hereby covenant to cause the Collateral Agreements to be executed and delivered concurrently with this Indenture.  The Collateral Agreements shall provide for the grant by the Company and Guarantors party thereto to the Collateral Agent of security interests in the Collateral, and such grants shall be subject to the Intercreditor Agreement.  To the extent that any provision of this Indenture is not consistent with or contradicts the Security Agreement, the Security Agreement shall govern.

(b)  Each Holder of Notes, by its acceptance of a Note, consents and agrees to the terms of each Collateral Agreement (including, without limitation, the provisions providing for foreclosure and release of Collateral), as the same may be in effect or may be amended from time to time in accordance with their respective terms and the terms of this Indenture, and authorizes and directs the Collateral Agent to enter into this Indenture, the Intercreditor Agreement and the other Collateral Agreements, to bind such Holder to the terms set forth in the Intercreditor Agreement and the other Collateral Agreements, and to perform its obligations and exercise its rights thereunder in accordance therewith.  The Company shall, and shall cause its Domestic Restricted Subsidiaries to, do or cause to be done, at its sole cost and expense, all such actions and things as may be required or contemplated by the provisions of the Intercreditor Agreement and the other Collateral Agreements, to assure and confirm to the Collateral Agent the security interests in the Collateral contemplated by the Collateral Agreements, as from time to time constituted, so as to render the same available for the security and benefit of this Indenture and of the Notes, the Guarantees and all other Obligations of the Company and the Guarantors secured thereby, according to the intent and purpose herein and therein expressed and subject to the Intercreditor Agreement, including taking all commercially reasonable actions required or as may be reasonably requested by the Collateral Agent to cause the Collateral Agreements to create and maintain valid, enforceable and perfected security interests in and on all the Collateral, in favor of the Collateral Agent for the benefit of itself, the Trustee and Holders of the Notes, superior to and prior to the rights of all third Persons other than as set forth in the Intercreditor Agreement, and subject to no other Liens, in each case, except as expressly provided herein or therein.  If required for the purpose of meeting the legal requirements of any jurisdiction in which any of the Collateral may at the time be located, the Company, the Trustee and the Collateral Agent shall have the power to appoint, and shall take all reasonable action to appoint, one or more Persons approved by the Trustee and reasonably acceptable to the Company to act as co-Collateral Agent with respect to any such Collateral, with such rights and powers limited to those deemed necessary for the Company, the Trustee or the Collateral Agent to comply with any such legal requirements with respect to such Collateral, and which rights and powers shall not be inconsistent with the provisions of this Indenture, the Notes, the Guarantees and the Collateral Agreements.  The Company shall from time to time promptly pay all financing and continuation statement recording and/or filing fees, charges and taxes relating to this Indenture, the Collateral Agreements and any amendments hereto or thereto and any other instruments of further assurance required pursuant hereto or thereto.

Section 12.02.  <u>Intercreditor Agreement</u>.  This Indenture and the Collateral Agreements (other than the Intercreditor Agreement) are subject to the terms, limitations and conditions set forth in

the Intercreditor Agreement. The Trustee, the Company and each Holder of a Note, by its acceptance of a Note, is deemed to have authorized and instructed the Collateral Agent to enter into the Intercreditor Agreement on its behalf and to bind such Holder to the terms set forth in the Intercreditor Agreement as the same may be in effect or may be amended from time to time in accordance with its terms, and to perform its obligations and exercise its rights thereunder in accordance therewith.

Each Holder of Notes (including, for the avoidance of doubt, any PIK Notes) issued pursuant hereto (a) acknowledges that it has received a copy of the Intercreditor Agreement, (b) consents to the subordination of Liens provided for in the Intercreditor Agreement, (c) agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement and (d) authorizes and instructs The Bank of New York Mellon Trust Company, N.A. as Collateral Agent for the Holders of the Notes to enter into the Intercreditor Agreement as Collateral Agent for and on behalf of such Holder. The foregoing provisions are intended as an inducement to the holders of Series A Senior Notes and to permit the incurrence of Indebtedness under the Series A Senior Indenture and to extend credit to the Company, and the provisions of this Section 12.02 are for the benefit of the holders of Senior Indebtedness. In the event of any conflict or inconsistency between the provisions of the Intercreditor Agreement and the provisions of this Indenture or the other Collateral Agreements, the provisions of the Intercreditor Agreement shall control.

Section 12.03. Recording and Opinions. (a) Each of the Company and the Guarantors shall file financing statements in its jurisdiction of organization and in any other relevant jurisdictions describing itself as debtor, the Collateral Agent as secured party, and the collateral covered by such financing statements as "All assets of Debtor, all proceeds thereof, and all rights and privileges with respect thereto" (or substantially similar words) and, if the Collateral Agent so requests, containing more specific descriptions of some or all of the Collateral. The Company and the Guarantors, and each of them, hereby authorize the Collateral Agent to file the foregoing financing statements from time to time on their behalf in all relevant jurisdictions and to file amendments and continuation statements from time to time with respect thereto.

(b) Contemporaneously with the execution and delivery of this Indenture and promptly after the execution and delivery of any other instrument of further assurance or amendment, the Company shall furnish to the Trustee and the Collateral Agent an Opinion of Counsel either (i) stating that, in the opinion of such counsel, the Collateral Agreements and such other instruments of further assurance or amendment are effective to create a security interest in the Collateral and that all recordings, registrations and filings necessary to perfect and maintain the perfection of the security interests created thereby have been taken and reciting the details of such actions, and stating that such recordings, registrations and filings are the only actions necessary to perfect and maintain the perfection of such security interests, or (ii) stating that, in the Opinion of such Counsel, no other actions are necessary to perfect or maintain the perfection of any security interest created by the Collateral Agreements and such other instrument of assurance or amendment.

(c) No later than thirty days prior to [＿＿] 1 in each year, commencing [＿＿] 1, 2010, the Company shall furnish to the Trustee and the Collateral Agent an Opinion of Counsel either (i) stating that, in the opinion of such counsel, all action necessary to perfect or continue the perfection of the security interests created by the Collateral Agreements and any other instrument of further assurance or amendment and reciting the details of such action or referring to prior Opinions of Counsel in which such details are given have been taken or (ii) stating that, in the Opinion of such Counsel, no such action is necessary to perfect or continue the perfection of the security interests created under the Collateral Agreements and any other instrument of further assurance or amendment.

(d) The Company shall otherwise comply with the provisions of TIA Section 314(b).

Section 12.04. <u>Release of Collateral</u>. (a) Subject to the Intercreditor Agreement, the Collateral Agent shall not at any time release Collateral from the security interests created by the Collateral Agreements unless such release is in accordance with the provisions of this Indenture and the applicable Collateral Agreements.

(b)     Subject to the Intercreditor Agreement, at any time when a Default or an Event of Default shall have occurred and be continuing (regardless of whether any declaration of acceleration with respect to the Notes has occurred), no release of Collateral pursuant to the provisions of this Indenture or the Collateral Agreements shall be effective as against the Holders.

(c)     The release of any Collateral from the Liens created by the Collateral Agreements shall not be deemed to impair such Liens in contravention of the provisions hereof if and to the extent such Collateral is released in accordance with the Intercreditor Agreement, this Indenture and the Collateral Agreements. To the extent applicable, the Company shall cause TIA Section 313(b) relating to reports, and TIA Section 314(d) relating to the release of property from the security interests created by the Collateral Agreements, to be complied with. Any certificate or opinion required by TIA Section 314(d) may be given by an Officer of the Company, except in cases where TIA Section 314(d) requires that such certificate or opinion be given by an independent Person, which Person shall be an independent engineer, appraiser or other expert selected or approved by the Trustee in the exercise of reasonable care. A Person is "independent" if such Person (a) is in fact independent, (b) does not have any direct financial interest or any material indirect financial interest in the Company or in any Affiliate of the Company and (c) is not an officer, employee, promoter, underwriter, trustee, partner or director or person performing similar functions to any of the foregoing for the Company. The Trustee and the Collateral Agent shall be entitled to receive and rely upon a certificate provided by any such Person confirming that such Person is independent within the foregoing definition.

Section 12.05. <u>Specified Releases of Collateral</u>. Subject to <u>Section 12.04</u>, upon the request of the Company pursuant to an Officers' Certificate certifying that all conditions precedent hereunder and under the Collateral Agreements have been met and without the consent of any Holder, the Company will be entitled to releases of assets included in the Collateral from the Liens created by the Collateral Documents under any one or more of the following circumstances:

(1)     to enable the Company to consummate asset dispositions permitted or not prohibited under <u>Section 4.16</u>, subject to compliance by the Company with the provisions relating to the application of any Net Cash Proceeds under <u>Section 4.16</u>;

(2)     if any Subsidiary that is a Guarantor is released from its Guarantee that Subsidiary's assets will also be released from the Liens created by the Collateral Agreements;

(3)     if required in accordance with the terms of the Intercreditor Agreement; or

(4)     as described in <u>Article Nine</u>.

Upon receipt of such Officers' Certificate and any necessary or proper instruments of termination, satisfaction or release prepared by the Company, the Collateral Agent shall execute, deliver or acknowledge such instruments or releases to evidence the release of any Collateral permitted to be released pursuant to this Indenture and the Collateral Agreements (each such release to be made at the sole cost and expense of the Company and without any recourse, representation or warranty by the Collateral Agent).

Section 12.06.  Release upon Satisfaction or Defeasance of all Outstanding Obligations. Subject to Section 12.04, the Liens on all Collateral will be terminated and released upon any of (i) payment in full of (x) the principal of, and premium, if any, and accrued and unpaid interest on, the Notes and amounts due hereunder and under the Guarantees, (y) interest on the overdue principal of, premium, if any, and interest (to the extent permitted by law), if any on the Notes and (z) all other Obligations of the Company and the Guarantors to the Holders, the Collateral Agent or the Trustee under this Indenture, the Collateral Agreements, the Guarantees and the Notes that are then due and payable.

Section 12.07.  Form and Sufficiency of Release.  In the event that the Company or any Guarantor has sold, exchanged, or otherwise disposed of or proposes to sell, exchange or otherwise dispose of any portion of the Collateral that may be sold, exchanged or otherwise disposed of by the Company or such Guarantor in accordance with this Indenture, the Intercreditor Agreement and the other Collateral Documents, and the Company or such Guarantor requests the Trustee or the Collateral Agent to furnish a written disclaimer, release or quit-claim of any interest in such property, the Collateral Agent and the Trustee, as applicable, shall execute, acknowledge and deliver to the Company or such Guarantor (in proper form) such an instrument promptly after satisfaction of the conditions set forth herein for delivery of any such release. Notwithstanding the preceding sentence, all purchasers and grantees of any property or rights purporting to be released herefrom shall be entitled to rely upon any release executed by the Collateral Agent hereunder as sufficient for the purpose of this Indenture and as constituting a good and valid release of the property therein described from the Lien created by the Collateral Agreements.

Section 12.08.  Purchaser Protected.  No purchaser or grantee of any property or rights purporting to be released herefrom shall be bound to ascertain the authority of the Trustee or the Collateral Agent to execute the release or to inquire as to the existence of any conditions herein prescribed for the exercise of such authority; nor shall any purchaser or grantee of any property or rights permitted by this Indenture to be sold or otherwise disposed of by the Company be under any obligation to ascertain or inquire into the authority of the Company to make such sale or other disposition.

Section 12.09.  Authorization of Actions to Be Taken by the Collateral Agent Under the Collateral Agreements. (a) The Bank of New York Mellon Trust Company, N.A. is hereby appointed to act in its capacity as the Collateral Agent.  Subject to the provisions of the Intercreditor Agreement and the applicable Collateral Agreements:

(b)      the Collateral Agent shall execute and deliver the Collateral Agreements and act in accordance with the terms thereof;

(c)      the Collateral Agent may, in its sole discretion and without the consent of the Trustee or the Holders, take all actions it deems necessary or appropriate in order to:

(i)      enforce any of the terms of the Collateral Agreements; and

(ii)     collect and receive any and all amounts payable in respect of the Obligations of the Company and the Guarantors to the Holders, the Collateral Agent or the Trustee hereunder and under the Notes, the Guarantees and the Collateral Agreements; and

(d)      the Collateral Agent shall have power to institute and to maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Collateral by any act that may be unlawful or in violation of the Collateral Agreements or this Indenture, and suits and proceedings as the Collateral Agent may deem expedient to preserve or protect its interests and the interests of the Trustee and the Holders in the Collateral (including the power to institute and maintain suits or proceedings to

restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest thereunder or be prejudicial to the interests of the Holders, the Trustee or the Collateral Agent).

Notwithstanding the foregoing, the Collateral Agent may, at the expense of the Company, request the direction of the Holders of the Notes with respect to any such actions and upon receipt of the written consent of the Holders of at least 85% in aggregate principal amount of the outstanding Notes, shall take such actions; provided that all actions so taken shall, at all times, be in conformity with the requirements of the Intercreditor Agreement.

Section 12.10.  Authorization of Receipt of Funds by the Collateral Agent Under the Collateral Agreements.  The Collateral Agent is authorized to receive any funds for the benefit of itself, the Trustee and the Holders distributed under the Collateral Agreements to the extent permitted under the Intercreditor Agreement, for turnover to the Trustee to make further distributions of such funds to itself, the Collateral Agent and the Holders in accordance with the provisions of Section 6.11 and the other provisions of this Indenture.

## SIGNATURES

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed, all as of the date first written above.

BASELINE OIL & GAS CORP.

By:_____
    Name:
    Title:

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Trustee and Collateral Agent

By:_____
    Name:
    Title:

*Exhibit A*

FORM OF SERIES B 20% SENIOR SECURED NOTE

[FOR THIRD POINT NOTES] NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF (COLLECTIVELY, A "TRANSFER") IN THE ABSENCE OF THE REGISTRATION OF SUCH TRANSFER UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, REGISTRATION. THE TRANSFER OF THIS SECURITY AND THE REQUEST TO REMOVE THIS LEGEND SHALL BE SUBJECT TO THE COMPANY'S AND THE TRUSTEE'S RIGHT TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION REASONABLY SATISFACTORY TO EACH OF THEM, AND A CERTIFICATE OF TRANSFER IN THE FORM APPEARING ON THE OTHER SIDE OF THIS SECURITY IS COMPLETED AND DELIVERED BY THE TRANSFEROR TO THE TRUSTEE OR TRANSFER AGENT.

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY OR A SUCCESSOR DEPOSITARY.  THIS NOTE IS NOT EXCHANGEABLE FOR NOTES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS NOTE (OTHER THAN A TRANSFER OF THIS NOTE AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY) MAY BE REGISTERED EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR PURPOSES OF SECTIONS 1271 ET SEQ. OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED. FOR INFORMATION REGARDING THE ISSUE PRICE, AMOUNT OF OID PER $1,000 OF PRINCIPAL AMOUNT AND THE YIELD TO MATURITY FOR PURPOSES OF THE OID RULES, PLEASE CONTACT THE CHIEF FINANCIAL OFFICER OF THE ISSUER AT 11811 NORTH FREEWAY I-45, SUITE 200, HOUSTON, TEXAS 77060, (281) 591-6100.

*Exhibit A*

## BASELINE OIL & GAS CORP.

### SERIES B 20% SENIOR SECURED PIK NOTES DUE 2014

CUSIP No. [          ]

No. [    ]                                                                                                                    $_____

Baseline Oil & Gas Corp., a Delaware corporation (the "Company," which term includes any successor entity), for value received promises to pay to [Cede & Co.] or registered assigns the principal sum of Twenty-Five Million Dollars (or such principal amount as may be set forth in the records of the Trustee hereinafter referred to in accordance with the Indenture) on _____, 2014, and to pay interest thereon as hereinafter set forth. *[Depositary arrangement to be clarified.]*

Interest Rate:  20% per annum.

Interest Payment Dates:  Interest will be payable quarterly in cash in arrears on January 1, April 1, July 1 and October 1 of each year, beginning on _____ 1, 2009.

Record Dates: December 15, March 15, June 15 and September 15.

Reference is made to the further provisions of this Note contained on the reverse side of this Note, which will for all purposes have the same effect as if set forth at this place.

IN WITNESS WHEREOF, the Company has caused this Note to be signed manually or by facsimile by its duly authorized officer.

BASELINE OIL & GAS CORP.

By: _____

Name:

Title:

Dated: _____, 2009

*Exhibit A*

## TRUSTEE CERTIFICATE OF AUTHENTICATION

This is one of the Series B 20% Senior Secured PIK Notes due 2014 referred to in the within-mentioned Indenture.

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., as Trustee

Dated: _____, 2009          By: _____
                                        Authorized Signatory

EXHIBIT M                         A-3

*Exhibit A*

(REVERSE OF SECURITY)

**Series B 20% Senior Secured PIK Note due 2014**

1.    Interest.  The Company promises to pay interest on the principal amount of this Note at the rate per annum shown above; provided, however, that a portion of such interest in an amount equal to the applicable PIK Interest Amount may be paid by the Company on the applicable Interest Payment Date by issuing to the registered Holder hereof on the applicable Record Date one or more PIK Notes in an aggregate principal amount equal to such PIK Interest Amount in lieu of paying such portion of such interest in cash, subject to the Company complying with Section 2.16 of the Indenture.  Interest on the Note will accrue from the most recent date on which interest has been paid or, if no interest has been paid, from and including [_____ 1, 2009].  The Company will pay interest quarterly in arrears on each Interest Payment Date, commencing [_____ 1, 2009].  Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.  The Company will pay interest on overdue principal at 1% per annum in excess of the above rate and will pay interest on overdue installments of interest at such higher rate to the extent lawful.

2.    Method of Payment.  The Company shall pay interest on the Notes (except defaulted interest) to the Persons who are the registered Holders at the close of business on the Record Date immediately preceding the Interest Payment Date even if the Notes are cancelled on registration of transfer or registration of exchange after such Record Date, and on or before such Interest Payment Date.  Holders must surrender Notes to a Paying Agent to collect principal payments.  The Company shall pay principal and interest in money of the United States that at the time of payment is legal tender for payment of public and private debts ("U.S. Legal Tender"); provided, however, the Company may pay principal and interest in cash by check payable in such U.S. Legal Tender.  The Company may deliver any such interest payment to the Paying Agent or to a Holder at the Holder's registered address.

3.    Paying Agent and Registrar.  Initially, The Bank of New York Mellon Trust Company, N.A. (the "Trustee") will act as Paying Agent and Registrar.  The Company may change any Paying Agent, Registrar or co-Registrar without notice to the Holders.

4.    Indenture; Ranking.  The Notes and the Guarantees were issued under an Indenture, dated _____, 2009 (the "Indenture"), among the Company, the Trustee and the Collateral Agent.  Capitalized terms herein are used as defined in the Indenture unless otherwise defined herein.  The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S. Code §§ 77aaa-77bbbb) (the "TIA"), as in effect on the date of the Indenture until, if applicable, such time as the Indenture is qualified under the TIA, and thereafter as in effect on the date on which the Indenture is qualified under the TIA.  Notwithstanding anything to the contrary herein, the Notes are subject to all such terms, and Holders of Notes are referred to the Indenture and the TIA for a statement of such terms.  Each Holder, by accepting a Note, agrees to be bound by all of the terms and provisions of the Indenture, as the same may be amended from time to time.  To the extent this Note and the Indenture are inconsistent, the Indenture shall control.  The Notes are senior secured obligations of the Company.

5.    Redemption.

(a)    Optional Redemption Prior to [_____], 2012.  At any time prior to _____], 2012, the Company may redeem all or a part of the Notes, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of the Notes to be redeemed, at a Redemption Price equal to 100% of the principal amount of Notes to be redeemed

plus the Applicable Premium as of, and accrued and unpaid interest to the third anniversary of the Issue Date, subject to the rights of Holders of the Notes on the relevant Record Date to receive interest due on the relevant Interest Payment Date on the redemption date (the "<u>Redemption Date</u>"); <u>provided, however,</u> that the Company may not redeem any Notes if any Series A Senior Notes will remain outstanding after the Redemption Date.

(b)      <u>Optional Redemption on or After [_____], 2012</u>. On or after [_____, 2012], the Company may redeem all or a part of the Notes upon not less than 30 nor more than 60 days' notice mailed by first-class mail to the registered address of each Holder of the Notes to be redeemed, at a Redemption Price equal to 100% of the principal amount of the Notes to be redeemed plus accrued and unpaid interest to the date of redemption, subject to the rights of Holders of the Notes on the relevant Record Date to receive interest due on the relevant Interest Payment Date on the Redemption Date <u>provided, however,</u> that the Company may not redeem any Notes if any Series A Senior Notes will remain outstanding after the Redemption Date.

(c)      <u>Mandatory Redemption</u>. The Company is not required to make any mandatory redemption or sinking fund payments with respect to the Notes.

(d)      <u>Notice of Redemption</u>. Notice of redemption will be mailed by first-class mail at least 30 days but not more than 60 days before the Redemption Date to each Holder of the Notes to be redeemed at such Holder's registered address with a copy to the Trustee and Paying Agent. If fewer than all of the Notes are to be redeemed, at any time, selection of the Notes for redemption will be made by the Trustee in compliance with the requirements of the principal national securities exchange, if any, on which the Notes are listed, or, if the Notes are not so listed, on a <u>pro rata</u> basis, by lot or by such method as the Trustee deems to be fair and appropriate. Notes in denominations of $1,000 may be redeemed only in whole. The Trustee may select for redemption portions (equal to $1,000 or any integral multiple thereof) of the principal amount of Notes that have denominations larger than $1,000.

Except as set forth in the Indenture, if monies for the redemption of the Notes called for redemption shall have been deposited with the Paying Agent for redemption on such Redemption Date sufficient to pay such Redemption Price plus accrued and unpaid interest, the Notes called for redemption will cease to bear interest from and after such Redemption Date, and the only remaining right of the Holders of such Notes will be to receive payment of the Redemption Price plus accrued and unpaid interest as of the Redemption Date upon surrender to the Paying Agent of the Notes redeemed.

6.      <u>Restrictive Covenants</u>. The Indenture imposes certain limitations on the ability of the Company and its Restricted Subsidiaries to, among other things, incur additional Indebtedness or grant Liens, make payments in respect of their Capital Stock or certain Indebtedness, enter into transactions with Affiliates, create dividend or other payment restrictions affecting Restricted Subsidiaries, merge or consolidate with any other Person, sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its assets or adopt a plan of liquidation, in each case, as set forth in the Indenture.

7.      <u>Offers to Purchase</u>. <u>Sections 4.15</u> and <u>4.16</u> of the Indenture provide that in the event of a Change of Control and after certain Asset Sales, respectively, and subject to further limitations contained therein, the Company will be required to make an offer to purchase the Notes in accordance with the terms and procedures set forth in the Indenture; <u>provided, however,</u> that any payments made in connection with either a Change of Control or Net Proceeds Offer must be made first and in full to the holders of the Series A Senior Notes before any such payments are made to Holders of the Notes.

8.      <u>Denominations; Transfer; Exchange</u>. The Notes are in registered form, without coupons, and except in the case of PIK Notes, in denominations of $1,000 and integral multiples thereof.

*Exhibit A*

A Holder shall register the transfer of or exchange of Notes in accordance with the Indenture. The Registrar may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay any taxes, fees or similar governmental charges payable in connection therewith as permitted by the Indenture. The Registrar need not register the transfer of or exchange of any Notes or portions thereof selected for redemption.

9.    Persons Deemed Owners.  The registered Holder of a Note shall be treated as the owner of it for all purposes.

10.    Unclaimed Money.  If money for the payment of principal or interest remains unclaimed for two years, the Trustee and the Paying Agent may pay the money without interest thereon back to the Company.  After that, all liability of the Trustee and such Paying Agent with respect to such money shall cease.

11.    Defeasance; Satisfaction and Discharge Prior to Redemption or Maturity.  If the Company defeases Notes at any time or deposits with the Trustee U.S. Legal Tender or U.S. Government Obligations sufficient to pay the principal of and interest on the Notes to redemption or stated maturity and complies with the other provisions of the Indenture relating thereto, the Company will be discharged from certain provisions of the Indenture and the Notes (including certain covenants, but excluding its obligation to pay the principal of and interest on the Notes), as set forth in the Indenture; provided, however, that the Notes may be defeased or satisfied and discharged only if the Series A Senior Notes are no longer outstanding or have been previously or simultaneously been defeased or satisfied and discharged, as applicable, in the same manner and to the same extent.

12.    Amendment; Supplement; Waiver.  The Indenture, the Notes, the Guarantees and the Collateral Agreements may be amended or supplemented with the written consent of the Holders of at least 85% in aggregate principal amount of the Notes then outstanding, and any existing Default or Event of Default or noncompliance with any provision may be waived with the written consent of the Holders of at least 85% in aggregate principal amount of the Notes then outstanding, subject to and as set forth in the Indenture and the Collateral Agreements.  Without consent of any Holder, the parties thereto may amend or supplement the Indenture, the Notes, the Guarantees, or the Collateral Agreements to, among other things, cure any ambiguity, defect or inconsistency, provide for uncertificated Notes in addition to or in place of certificated Notes, provide for the assumption of the Company's or any Guarantor's obligations in accordance with Section 5.01 and Section 10.04 of the Indenture, make any other change that would provide any additional rights or benefits to the Holders that does not adversely affect the legal rights of any Holder of a Note, to comply with the TIA, to allow for additional guarantees, if necessary, in connection with any addition or release of Collateral permitted under the Indenture or the Collateral Agreements and to release a Guarantor from its Guarantee as permitted by the Indenture.  However no such amendment, modification, supplement or waiver, including a waiver pursuant to Section 6.04 of the Indenture, may without the consent of each Holder affected thereby, make the modifications specified in the second paragraph of Section 9.02 of the Indenture. No amendment, modification, supplement or waiver may, without the consent of the Holders holding at least 85% in aggregate principal amount of the Notes outstanding at such time, release all or substantially all of the Collateral from the Liens created by the Collateral Agreements otherwise than in accordance with the terms of this Indenture, the Intercreditor Agreement and the Collateral Agreements.

13.    Successors.  When a successor assumes, in accordance with the Indenture, all the obligations of its predecessor under the Notes, the Guarantees and the Indenture, the predecessor will be released from those obligations.

14.    Defaults and Remedies.  If an Event of Default occurs and is continuing (other than certain events of bankruptcy involving the Company), the Trustee or the Holders of at least 25% in

EXHIBIT M                                              A-6

aggregate principal amount of the Notes may declare all the Notes to be due and payable in the manner, at the time and with the effect provided in the Indenture. Holders of the Notes may not enforce the Indenture except as provided in the Indenture. The Trustee is not obligated to enforce the Indenture or the Notes unless it has received indemnity satisfactory to it. The Indenture permits, subject to certain limitations therein provided, Holders of at least 85% in aggregate principal amount of the Notes then outstanding to direct the Trustee in its exercise of any trust or power. For purposes of Sections 6.02 and 6.05 of the Indenture, the Notes and the Series A Senior Notes shall be considered separate series to the extent an Event of Default shall occur and be continuing and has not been waived with respect to rights of Holders thereof under this Indenture and the Series A Senior Notes Indenture, respectively, affecting Holders of the Notes or the holders of Series A Senior Notes differently, which for the avoidance of ambiguity may include different payment terms under this Indenture or the Series A Senior Notes Indenture.

15.    Trustee Dealings with Company. Subject to the terms of the TIA and the Indenture, the Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Company, its Subsidiaries or their respective Affiliates as if it were not the Trustee.

16.    No Recourse Against Others. No past, present or future affiliate, director, officer, employee, incorporator or holder of any equity interests in the Company or a Guarantor or any direct or indirect parent corporation of the Company or a Guarantor, as such, will have any liability for any obligations of the Company or a Guarantor under the Notes, the Guarantees or the Indenture, or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. Each of the parties hereto acknowledge that such waiver may not be effective to waive liabilities under the federal securities laws.

17.    Authentication. This Note shall not be valid until the Trustee or Authenticating Agent manually signs the certificate of authentication on this Note.

18.    Governing Law. THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. EACH OF THE PARTIES HERETO SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED BY THIS NOTE.

19.    Abbreviations and Defined Terms. Customary abbreviations may be used in the name of a Holder of a Note or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

20.    Security. The Company's and Guarantors' obligations under the Notes are secured by second priority liens on the Collateral pursuant to the terms of the Collateral Agreements. The actions of the Trustee and the Holders of the Notes secured by such liens and the application of proceeds from the enforcement of any remedies with respect to such Collateral are limited pursuant to the terms of the Collateral Agreements.

21.    CUSIP Numbers. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes as a convenience to the Holders of the Notes. No representation is made as to the accuracy of such numbers as printed on the Notes and reliance may be placed only on the other identification numbers printed thereon.

EXHIBIT M                                        A-7

*Exhibit A*

    The Company will furnish to any Holder of a Note upon written request and without charge a copy of the Indenture.  Requests may be made to:  Baseline Oil & Gas Corp., 11811 North Freeway I-45, Suite 200, Houston, Texas 77060.

EXHIBIT M       A-8

*Exhibit A*

## FORM OF GUARANTEE

The undersigned and its successors under the Indenture has irrevocably and unconditionally guaranteed, on a senior secured basis to the extent set forth in the Indenture, dated as of _____, 2009 (the "Indenture"), by and between Baseline Oil & Gas Corp. (the "Company") and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent, (i) the due and punctual payment of the principal of, premium, if any, and interest on the Notes, whether at maturity, by acceleration or otherwise, the due and punctual payment of interest on the overdue principal of (including interest accruing at the then applicable rate provided in the Indenture, the Notes, the Guarantees or any Collateral Agreement after the occurrence of any Event of Default set forth in Section 6.01(6) or (7) of the Indenture, whether or not a claim for post-filing or post-petition interest is allowed under applicable law following the institution of a proceeding under bankruptcy, insolvency or similar law) and interest on the Notes, to the extent lawful, and the due and punctual performance of all other obligations of the Company to the Holders or the Trustee all in accordance with the terms set forth in Article Ten of the Indenture and (ii) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise. Capitalized terms used herein have the meanings assigned to them in the Indenture unless otherwise indicated.

THE OBLIGATIONS OF THE UNDERSIGNED TO HOLDERS OF THE NOTES AND TO THE TRUSTEE PURSUANT TO THIS NOTATION OF GUARANTEE (THE "GUARANTEE") AND THE INDENTURE ARE EXPRESSLY SET FORTH IN ARTICLE TEN OF THE INDENTURE AND REFERENCE IS HEREBY MADE TO THE INDENTURE FOR THE PRECISE TERMS OF THE GUARANTEE AND ALL OTHER PROVISIONS OF THE INDENTURE TO WHICH THE GUARANTEE RELATES. EACH HOLDER OF A NOTE, BY ACCEPTING THE SAME, (A) AGREES TO AND SHALL BE BOUND BY SUCH PROVISIONS AND (B) APPOINTS THE TRUSTEE ATTORNEY-IN-FACT FOR SUCH HOLDER FOR SUCH PURPOSES.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York.

[NAME OF GUARANTOR]

By: _____
Name:
Title:

*Exhibit A*

## ASSIGNMENT FORM

If you the Holder want to assign this Note, fill in the form below and have your signature guaranteed:

I or we assign and transfer this Note to:

_____

_____

(Print or type name, address and zip code and
social security or tax ID number of assignee)

and irrevocably appoint _____
agent to transfer this Note on the books of the Company.  The agent may substitute another to act for him.

Dated: _____        Signed: _____

(Sign exactly as your name appears on the
other side of this Note)

Signature Guarantee: _____

      In connection with any transfer of this Note occurring prior to the date which is the earlier of (i) the date of the declaration by the SEC of the effectiveness of a registration statement under the Securities Act of 1933, as amended (the "Securities Act"), covering resales of this Note (which effectiveness shall not have been suspended or terminated at the date of the transfer) and (ii) _____, 2010, the undersigned confirms that it has not utilized any general solicitation or general advertising in connection with the transfer and that this Note is being transferred:

### [Check One]

___    to the Company or a subsidiary thereof; or

___    pursuant to and in compliance with Rule 144A under the Securities Act; or

___    to an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) that has furnished to the Trustee a signed letter containing certain representations and agreements (the form of which letter can be obtained from the Trustee); or

___    outside the United States to a person other than a "U.S. person" in compliance with Rule 904 of Regulation S under the Securities Act; or

___    pursuant to the exemption from registration provided by Rule 144 under the Securities Act; or

___    pursuant to an effective registration statement under the Securities Act.

Unless one of the boxes is checked, the Trustee will refuse to register any of the Notes evidenced by this certificate in the name of any person other than the registered Holder thereof; provided that if box (3), (4) or (5) is checked, the Company or the Trustee may require, prior to registering any such transfer of the Notes, in its sole discretion, such legal opinions, certifications (including an investment letter in the case of box (3) or (4)) and other information as the Trustee or the Company has reasonably requested to confirm that such transfer is being made pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act.

EXHIBIT M                                                    A-10

*Exhibit A*

If none of the foregoing boxes is checked, the Trustee or Registrar shall not be obligated to register this Note in the name of any person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in <u>Section 2.15</u> of the Indenture shall have been satisfied.

Dated: _____     Signed: _____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee: _____

### TO BE COMPLETED BY PURCHASER IF (2) ABOVE IS CHECKED

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Company as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Dated: _____     _____

NOTICE:  To be executed by an executive officer

*Exhibit A*

OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Company pursuant to Section 4.15 or Section 4.16 of the Indenture, check the appropriate box:

Section 4.15 [        ]

Section 4.16 [        ]

If you want to elect to have only part of this Note purchased by the Company pursuant to Section 4.15 or Section 4.16 of the Indenture, state the amount you elect to have purchased:

$ _____

Dated: _____       _____

NOTICE:  The signature on this assignment must correspond with the name as it appears upon the face of the within Note in every particular without alteration or enlargement or any change whatsoever and be guaranteed by the endorser's bank or broker.

Signature Guarantee: _____

EXHIBIT M                              A-12

*Exhibit B*

## Form of Private Placement Legend

[FOR THIRD POINT NOTES] NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF (COLLECTIVELY, A "TRANSFER") IN THE ABSENCE OF THE REGISTRATION OF SUCH TRANSFER UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, REGISTRATION. THE TRANSFER OF THIS SECURITY AND THE REQUEST TO REMOVE THIS LEGEND SHALL BE SUBJECT TO THE COMPANY'S AND THE TRUSTEE'S RIGHT TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION REASONABLY SATISFACTORY TO EACH OF THEM, AND A CERTIFICATE OF TRANSFER IN THE FORM APPEARING ON THE OTHER SIDE OF THIS SECURITY IS COMPLETED AND DELIVERED BY THE TRANSFEROR TO THE TRUSTEE OR TRANSFER AGENT.

## Form of Global Note Legend

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY OR A SUCCESSOR DEPOSITARY.  THIS NOTE IS NOT EXCHANGEABLE FOR NOTES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS NOTE (OTHER THAN A TRANSFER OF THIS NOTE AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY) MAY BE REGISTERED EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

## Other Legends

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR PURPOSES OF SECTIONS 1271 ET SEQ. OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED. FOR INFORMATION REGARDING THE ISSUE PRICE, AMOUNT OF OID PER $1,000 OF PRINCIPAL AMOUNT AND THE YIELD TO MATURITY FOR PURPOSES OF THE OID RULES, PLEASE CONTACT THE CHIEF FINANCIAL OFFICER OF THE ISSUER AT 11811 NORTH FREEWAY I-45, SUITE 200, HOUSTON, TEXAS 77060, (281) 591-6100.

*Exhibit C*

FORM OF CERTIFICATE FROM
ACQUIRING INSTITUTIONAL ACCREDITED INVESTOR

Baseline Oil & Gas Corp.
411 N. Sam Houston Parkway East
Suite 300
Houston, Texas  77060
Attention: Chief Executive Officer
Facsimile Number:  (281) 591-6101

The Bank of New York Mellon Trust Company, N.A.
601 Travis Street, 16th Floor
Houston, Texas 77002
Attn:  Corporate Trust Administration
Facsimile Number:  (713) 483-6954

Re:    Series B 20% Senior Secured PIK Notes Due 2014

Reference is hereby made to the Indenture, dated as of _____, 2009 (the "Indenture"), among Baseline Oil & Gas Corp. (the "Company"), as Issuer, the Guarantors (as defined in the Indenture) and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

In connection with our proposed purchase of $_____ aggregate principal amount of:

     (a)    ☐    a beneficial interest in a Global Note, or

     (b)    ☐    a Definitive Note,

we confirm that:

1.    We understand that any subsequent transfer of the Notes or any interest therein is subject to certain restrictions and conditions set forth in the Indenture and the undersigned agrees to be bound by, and not to resell, pledge or otherwise transfer the Notes or any interest therein except in compliance with, such restrictions and conditions and the United States Securities Act of 1933, as amended (the "Securities Act").

2.    We understand that the offer and sale of the Notes have not been registered under the Securities Act, and that the Notes and any interest therein may not be offered or sold except as permitted in the following sentence.  We agree, on our own behalf and on behalf of any accounts for which we are acting as hereinafter stated, that if we should sell the Notes or any interest therein, we will do so only (A) to the Company or any subsidiary thereof, (B) in accordance with Rule 144A under the Securities Act to a "qualified institutional buyer" (as defined therein), (C) to an institutional "accredited investor" (as defined below) that, prior to such transfer, furnishes (or has furnished on its behalf by a U.S. broker-dealer) to you and to the Company a signed letter substantially in the form of this letter, and if such transfer is in respect of a principal amount of Notes, at the time of transfer of less than $[250,000], an Opinion of Counsel in form reasonably acceptable to the Company to the effect that such transfer is in compliance with the Securities Act, (D) outside the United States in accordance with Rule 904 of Regulation S under the Securities Act, (E) pursuant to the provisions of Rule 144(k) under the Securities Act or (F) pursuant to an effective registration statement under the Securities Act, and we further agree to provide to any person

EXHIBIT M                          C-1

*Exhibit C*

purchasing the Definitive Note or beneficial interest in a Global Note from us in a transaction meeting the requirements of clauses (A) through (E) of this paragraph a notice advising such purchaser that resales thereof are restricted as stated herein.

3.    We understand that, on any proposed resale of the Notes or beneficial interest therein, we will be required to furnish to you and the Company such certifications, legal opinions and other information as you and the Company may reasonably require to confirm that the proposed sale complies with the foregoing restrictions.  We further understand that the Notes purchased by us will bear a legend to the foregoing effect.  We further understand that any subsequent transfer by us of the Notes or beneficial interest therein acquired by us must be effected through one of the Placement Agents.

4.    We are an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3), or (7) of Regulation D under the Securities Act) and have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the Notes, and we and any accounts for which we are acting are each able to bear the economic risk of our or its investment.

5.    We are acquiring the Notes or beneficial interest therein purchased by us for our own account or for one or more accounts (each of which is an institutional "accredited investor") as to each of which we are exercise sole investment discretion.

You and the Company are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.

_____

[Insert Name of Accredited Investor]

By:_____
Name:
Title:

Dated:_____._____

*Exhibit D*

FORM OF CERTIFICATE FROM
TRANSFEREE ACQUIRING PURSUANT TO REGULATION S

Baseline Oil & Gas Corp.
411 N. Sam Houston Parkway East
Suite 300
Houston, Texas 77060
Attention: Chief Executive Officer
Facsimile Number: (281) 591-6101

The Bank of New York Mellon Trust Company, N.A.
601 Travis Street, 16th Floor
Houston, Texas 77002
Attn: Corporate Trust Administration
Facsimile Number: (713) 483-6954

Re:     Series B 20% Senior Secured PIK Notes Due 2014

Reference is hereby made to the Indenture, dated as of _____, 2009 (the "Indenture"), among
Baseline Oil & Gas Corp. (the "Company"), as Issuer, the Guarantors (as defined in the Indenture) and
The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent. Capitalized terms
used but not defined herein shall have the meanings given to them in the Indenture.

In connection with our proposed purchase of $_____ aggregate principal amount of:

      (a)    ☐    a beneficial interest in a Global Note, or

      (b)    ☐    a Definitive Note,

we confirm that:

6.      We understand that any subsequent transfer of the Notes or any interest therein is subject to
certain restrictions and conditions set forth in the Indenture and the undersigned agrees to be
bound by, and not to resell, pledge or otherwise transfer the Notes or any interest therein except
in compliance with, such restrictions and conditions and the United States Securities Act of 1933,
as amended (the "Securities Act").

7.      We understand that the offer and sale of the Notes have not been registered under the Securities
Act, and that the Notes and any interest therein may not be offered or sold except as permitted in
the following sentence. We agree, on our own behalf and on behalf of any accounts for which we
are acting as hereinafter stated, that if we should sell the Notes or any interest therein, we will do
so only (A) to the Company or any subsidiary thereof, (B) in accordance with Rule 144A under
the Securities Act to a "qualified institutional buyer" (as defined therein), (C) to an institutional
"accredited investor" (as defined below) that, prior to such transfer, furnishes (or has furnished on
its behalf by a U.S. broker-dealer) to you and to the Company a signed letter substantially in the
form of this letter, and if such transfer is in respect of a principal amount of Notes, at the time of
transfer of less than $[250,000], an Opinion of Counsel in form reasonably acceptable to the
Company to the effect that such transfer is in compliance with the Securities Act, (D) outside the
United States in accordance with Rule 904 of Regulation S under the Securities Act, (E) pursuant
to the provisions of Rule 144(k) under the Securities Act or (F) pursuant to an effective

EXHIBIT M                             D-1

*Exhibit D*

registration statement under the Securities Act, and we further agree to provide to any person purchasing the Definitive Note or beneficial interest in a Global Note from us in a transaction meeting the requirements of clauses (A) through (E) of this paragraph a notice advising such purchaser that resales thereof are restricted as stated herein.

8.      We understand that, on any proposed resale of the Notes or beneficial interest therein, we will be required to furnish to you and the Company such certifications, legal opinions and other information as you and the Company may reasonably require to confirm that the proposed sale complies with the foregoing restrictions.  We further understand that the Notes purchased by us will bear a legend to the foregoing effect.  We further understand that any subsequent transfer by us of the Notes or beneficial interest therein acquired by us must be effected through one of the Placement Agents.

9.      We are acquiring the Notes or beneficial interest therein pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and, accordingly, we certify that (i) we are not a Person in the United States and (x) at the time the buy order was originated, we were outside the United States or the transferor and any Person acting on its behalf reasonably believed and believes that we were outside the United States or (y) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither such transferor nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States, (ii) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S under the Securities Act, (iii) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act and (iv) if the proposed transfer is being made prior to the expiration of the 40-day distribution compliance period as defined in Regulation S under the Securities Act, the transfer is not being made to a U.S. Person or for the account or benefit of a U.S. Person.

10.     Upon consummation of the proposed purchase in accordance with the terms of the Indenture, the purchased Notes or beneficial interest therein will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Note and in the Indenture and the Securities Act.

You and the Company are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.

_____
[Insert Name of Transferee]


By:_____
Name:
Title:

Dated:_____._____

*EXHIBIT N*

---

INDENTURE,

Dated as of _____, 2009

BETWEEN

BASELINE OIL & GAS CORP.

as Issuer

AND

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,

as Trustee and Collateral Agent

---

10% Senior Subordinated Secured PIK Notes due 2016

---

**CROSS-REFERENCE TABLE**

| TIA Section | Indenture Section |
|---|---|
| 310(a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | 7.10 |
| (a)(4) | N.A. |
| (a)(5) | 7.10 |
| (b) | 7.03; 7.08; 7.10 |
| (c) | N.A. |
| 311(a) | 7.03; 7.11 |
| (b) | 7.03; 7.11 |
| (c) | N.A. |
| 312(a) | 2.05 |
| (b) | 7.07; 11.03 |
| (c) | 11.03 |
| 313(a) | 7.06 |
| (b)(1) | 7.06 |
| (b)(2) | 7.06 |
| (c) | 7.06 |
| (d) | 7.06 |
| 314(a) | 4.06; 4.08 |
| (b) | 12.03 |
| (c)(1) | 4.06; 11.04 |
| (c)(2) | 11.04 |
| (c)(3) | 4.06 |
| (d) | 12.04 |
| (e) | 11.05 |
| (f) | N.A. |
| 315(a) | 7.01(b) |
| (b) | 7.05 |
| (c) | 7.01(a) |
| (d) | 7.01(c) |
| (e) | 6.11 |
| 316(a)(last sentence) | 2.09 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| (c) | 9.04 |
| 317(a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.04 |
| 318(a) | 11.01 |
| (b) | N.A. |
| (c) | 11.01 |

N.A. means Not Applicable

NOTE:  This Cross-Reference Table shall not, for any purpose, be deemed to be a part of this Indenture.

Table of Contents

Page

ARTICLE One        Definitions and Incorporation by Reference ............................................. 1
        Section 1.01.    Definitions ........................................................................................ 1
        Section 1.02.    Incorporation by Reference of Trust Indenture Act ........................... 26
        Section 1.03.    Rules of Construction ....................................................................... 26
ARTICLE Two        The Notes ............................................................................................ 27
        Section 2.01.    Form and Dating ............................................................................... 27
        Section 2.02.    Execution and Authentication; Aggregate Principal Amount ........... 28
        Section 2.03.    Registrar and Paying Agent .............................................................. 28
        Section 2.04.    Obligations of Paying Agent ............................................................. 29
        Section 2.05.    Holder Lists ...................................................................................... 29
        Section 2.06.    Transfer and Exchange ..................................................................... 29
        Section 2.07.    Replacement Notes ........................................................................... 30
        Section 2.08.    Outstanding Notes ............................................................................ 30
        Section 2.09.    Treasury Notes; When Notes Are Disregarded ................................. 30
        Section 2.10.    Temporary Notes .............................................................................. 31
        Section 2.11.    Cancellation ...................................................................................... 31
        Section 2.12.    CUSIP Numbers ............................................................................... 31
        Section 2.13.    Deposit of Moneys ........................................................................... 31
        Section 2.14.    Book-Entry Provisions for Global Notes .......................................... 31
        Section 2.15.    Special Transfer Provisions .............................................................. 32
        Section 2.16.    Issuance of PIK Notes ...................................................................... 34
ARTICLE Three      Redemption .......................................................................................... 35
        Section 3.01.    Optional Redemption ........................................................................ 35
        Section 3.02.    Mandatory Redemption .................................................................... 35
        Section 3.03.    Selection of Notes to Be Redeemed .................................................. 35
        Section 3.04.    Notice of Redemption ....................................................................... 35
        Section 3.05.    Effect of Notice of Redemption ........................................................ 36
        Section 3.06.    Deposit of Redemption Price ............................................................ 36
        Section 3.07.    Notes Redeemed in Part .................................................................... 37
ARTICLE Four       Covenants ............................................................................................ 37

| | | |
|---|---|---|
| Section 4.01. | Payment of Notes | 37 |
| Section 4.02. | Maintenance of Office or Agency | 37 |
| Section 4.03. | Corporate Existence | 37 |
| Section 4.04. | Payment of Taxes and Other Claims | 38 |
| Section 4.05. | Maintenance of Properties and Insurance | 38 |
| Section 4.06. | Compliance Certificate; Notice of Default | 38 |
| Section 4.07. | Compliance with Laws | 39 |
| Section 4.08. | Reports to Holders | 39 |
| Section 4.09. | Waiver of Stay, Extension or Usury Laws | 40 |
| Section 4.10. | Limitation on Restricted Payments | 40 |
| Section 4.11. | Limitations on Transactions with Affiliates | 41 |
| Section 4.12. | Limitation on Incurrence of Additional Indebtedness | 42 |
| Section 4.13. | Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries | 42 |
| Section 4.14. | Additional Guarantees | 44 |
| Section 4.15. | Repurchase upon Change of Control | 44 |
| Section 4.16. | Limitation on Asset Sales | 46 |
| Section 4.17. | Limitation on Liens | 48 |
| Section 4.18. | Conduct of Business | 48 |
| Section 4.19. | Limitation on Issuances and Sales of Capital Stock of Subsidiaries | 48 |
| Section 4.20. | Payments for Consent | 48 |
| Section 4.21. | Impairment of Security Interest | 48 |
| Section 4.22. | Real Estate Mortgages and Filings | 49 |
| Section 4.23. | Oil and Gas Mortgages and Filings | 50 |
| Section 4.24. | Leasehold Mortgages and Filings; Landlord Waivers | 50 |
| Section 4.25. | Other Collateral | 50 |
| Section 4.26. | Purchases | 51 |
| Section 4.27. | No Amendment to Subordination Provisions | 51 |
| Section 4.28. | No Layering of Debt | 51 |
| ARTICLE Five | Successor Corporation | 51 |
| Section 5.01. | Merger, Consolidation and Sale of Assets | 51 |
| Section 5.02. | Successor Corporation Substituted | 53 |

ARTICLE Six      Default and Remedies ............................................................. 53
　　Section 6.01.      Events of Default ................................................................. 53
　　Section 6.02.      Acceleration ........................................................................ 55
　　Section 6.03.      Other Remedies.................................................................... 55
　　Section 6.04.      Waiver of Past Defaults ...................................................... 56
　　Section 6.05.      Control by Holders Owning at Least 85%........................... 56
　　Section 6.06.      Limitation on Suits.............................................................. 56
　　Section 6.07.      Rights of Holders to Receive Payment ............................... 57
　　Section 6.08.      Collection Suit by Trustee or Collateral Agent................... 57
　　Section 6.09.      Trustee May File Proofs of Claim ....................................... 57
　　Section 6.10.      Priorities.............................................................................. 58
　　Section 6.11.      Undertaking for Costs ......................................................... 58
　　Section 6.12.      Restoration of Rights and Remedies.................................... 58
　　Section 6.13.      Rights and Remedies Cumulative........................................ 58
　　Section 6.14.      Delay or Omission not Waiver ........................................... 58
ARTICLE Seven      Trustee................................................................................... 59
　　Section 7.01.      Duties of Trustee................................................................. 59
　　Section 7.02.      Rights of Trustee................................................................. 60
　　Section 7.03.      Individual Rights of Trustee ............................................... 61
　　Section 7.04.      Trustee's Disclaimer ........................................................... 61
　　Section 7.05.      Notice of Default................................................................. 62
　　Section 7.06.      Reports by Trustee to Holders ............................................ 62
　　Section 7.07.      Compensation and Indemnity ............................................. 62
　　Section 7.08.      Replacement of Trustee ...................................................... 63
　　Section 7.09.      Successor Trustee by Merger, Etc ...................................... 64
　　Section 7.10.      Eligibility; Disqualification................................................. 65
　　Section 7.11.      Preferential Collection of Claims Against Company.......... 65
　　Section 7.12.      Trustee as Collateral Agent and Paying Agent................... 65
　　Section 7.13.      Co-Trustees, Co-Collateral Agent and Separate Trustees, Collateral Agent.................................................................. 65
ARTICLE Eight      Defeasance; Satisfaction and Discharge of Indenture .............. 66
　　Section 8.01.      Legal Defeasance and Covenant Defeasance ..................... 66
　　Section 8.02.      Satisfaction and Discharge.................................................. 69

Section 8.03.    Survival of Certain Obligations ........................................................... 69
Section 8.04.    Acknowledgment of Discharge by Trustee......................................... 69
Section 8.05.    Application of Trust Moneys .............................................................. 70
Section 8.06.    Repayment to the Company; Unclaimed Money ............................... 70
Section 8.07.    Reinstatement.................................................................................... 70
Section 8.08.    Indemnity for Government Obligations.............................................. 70
ARTICLE Nine    Amendments, Supplements and Waivers ............................................... 71
Section 9.01.    Without Consent of Holders ............................................................. 71
Section 9.02.    With Consent of Holders ................................................................... 71
Section 9.03.    Compliance with TIA ....................................................................... 73
Section 9.04.    Revocation and Effect of Consents.................................................... 73
Section 9.05.    Notation on or Exchange of Notes..................................................... 73
Section 9.06.    Trustee to Sign Amendments, Etc ..................................................... 73
Section 9.07.    Conformity with Trust Indenture Act ................................................ 74
ARTICLE Ten     Guarantee ............................................................................................... 74
Section 10.01.   Guarantee .......................................................................................... 74
Section 10.02.   Release of a Guarantor...................................................................... 75
Section 10.03.   Limitation of Guarantor's Liability .................................................. 75
Section 10.04.   Guarantors May Consolidate, etc., on Certain Terms....................... 76
Section 10.05.   Contribution ..................................................................................... 76
Section 10.06.   Waiver of Subrogation...................................................................... 76
Section 10.07.   Evidence of Guarantee...................................................................... 76
Section 10.08.   Waiver of Stay, Extension or Usury Laws......................................... 77
ARTICLE Eleven Miscellaneous ........................................................................................ 77
Section 11.01.   Trust Indenture Act Controls ............................................................ 77
Section 11.02.   Notices .............................................................................................. 77
Section 11.03.   Communications by Holders with Other Holders.............................. 78
Section 11.04.   Certificate and Opinion as to Conditions Precedent .......................... 78
Section 11.05.   Statements Required in Certificate or Opinion................................... 79
Section 11.06.   Rules by Trustee, Paying Agent, Registrar........................................ 79
Section 11.07.   Legal Holidays.................................................................................. 79
Section 11.08.   Governing Law ................................................................................. 79
Section 11.09.   No Adverse Interpretation of Other Agreements................................ 79

Section 11.10. No Recourse Against Others................................................................ 79

Section 11.11. Successors ...................................................................................... 79

Section 11.12. Duplicate Originals ........................................................................ 80

Section 11.13. Severability .................................................................................... 80

Section 11.14. Waiver of Jury Trial....................................................................... 80

Section 11.15. Force Majeure ................................................................................ 80

ARTICLE Twelve Security ...................................................................................... 80

Section 12.01. Grant of Security Interest................................................................ 80

Section 12.02. Intercreditor Agreement.................................................................. 81

Section 12.03. Recording and Opinions ................................................................. 81

Section 12.04. Release of Collateral ...................................................................... 82

Section 12.05. Specified Releases of Collateral ..................................................... 83

Section 12.06. Release upon Satisfaction or Defeasance of all Outstanding Obligations...................................................................................... 83

Section 12.07. Form and Sufficiency of Release..................................................... 83

Section 12.08. Purchaser Protected......................................................................... 83

Section 12.09. Authorization of Actions to Be Taken by the Collateral Agent Under the Collateral Agreements..................................................... 84

Section 12.10. Authorization of Receipt of Funds by the Collateral Agent Under the Collateral Agreements..................................................... 84

ARTICLE Thirteen Subordination............................................................................. 84

Section 13.01. Agreement to Subordinate ............................................................... 84

Section 13.02. Liquidation; Dissolution; Bankruptcy.............................................. 85

Section 13.03. Default on Designated Senior Indebtedness ..................................... 85

Section 13.04. Acceleration of Notes ..................................................................... 86

Section 13.05. When Distribution Must Be Paid Over.............................................. 86

Section 13.06. Notice by Company ......................................................................... 86

Section 13.07. Subrogation.................................................................................... 86

Section 13.08. Relative Rights................................................................................ 86

Section 13.09. Subordination May Not Be Impaired by Company ........................... 87

Section 13.10. Distribution or Notice to Representative .......................................... 87

Section 13.11. Rights of Trustee and Paying Agent................................................. 87

Section 13.12. Authorization to Effect Subordination.............................................. 87

**EXHIBITS:**

| Exhibit A | -- | Form of 10% Senior Subordinated PIK Note due 2016 and related Guarantee |
| Exhibit B | -- | Form of Legend for Global Notes |
| Exhibit C | -- | Form of Certificate to Be Delivered in Connection with Transfers to Non-QIB Accredited Investors |
| Exhibit D | -- | Form of Certificate to Be Delivered in Connection with Transfers Pursuant to Regulation S |

NOTE:            This Table of Contents shall not, for any purpose, be deemed to be part of this Indenture.

INDENTURE, dated as of _____, 2009 (this "<u>Indenture</u>"), between Baseline Oil & Gas Corp., a Delaware corporation (the "<u>Company</u>"), the Guarantors (as defined herein) and The Bank of New York Mellon Trust Company, N.A., as Trustee (in such capacity, the "<u>Trustee</u>") and Collateral Agent (in such capacity, the "<u>Collateral Agent</u>").

WHEREAS, the Company has duly authorized the creation of the 10% Senior Subordinated Secured PIK Notes due 2016 (the "<u>Notes</u>"), including the Notes to be issued in lieu of the payment of interest in cash on any Note (the "<u>PIK Notes</u>"), and the related Guarantee by the Guarantor thereof; and

WHEREAS, all things necessary to make the Notes and the Guarantees, when each are duly issued and executed by the Company and the Guarantors, as applicable, and authenticated and delivered hereunder, the valid and legally binding obligations of each of the Company and the Guarantors, respectively, and to make this Indenture a valid and legally binding agreement of each of the Company and the Guarantors, have been done.

NOW THEREFORE, the Company, the Guarantors, the Trustee and the Collateral Agent agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders (as defined):

## ARTICLE ONE

### Definitions and Incorporation by Reference

Section 1.01.   Definitions.

"<u>Acquired Indebtedness</u>" means Indebtedness of a Person or any of its Subsidiaries (a) existing at the time such Person becomes a Restricted Subsidiary of the Company or at the time it merges or consolidates with or into the Company or any of its Restricted Subsidiaries or (b) assumed in connection with the acquisition of assets from such Person and in each case not incurred by such Person in connection with, or in anticipation or contemplation of, such Person becoming a Restricted Subsidiary of the Company or such acquisition, merger or consolidation and which Indebtedness is without recourse to the Company or any of its Subsidiaries or to any of their respective properties or assets other than the Person or the assets to which such Indebtedness related prior to the time such Person became a Restricted Subsidiary of the Company or the time of such acquisition, merger or consolidation.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person who directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person. The term "<u>control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise; <u>provided</u> that Beneficial Ownership of 10% or more of the Voting Stock of the Person shall be deemed to constitute control. The terms "<u>controlling</u>" and "<u>controlled</u>" have meanings correlative of the foregoing.

"<u>Affiliate Transaction</u>" has the meaning set forth in <u>Section 4.11</u>.

"<u>Agent</u>" means any Registrar, Paying Agent or co-Registrar.

"<u>Agent Members</u>" has the meaning set forth in <u>Section 2.14(a)</u> and means, with respect to the Depository, Euroclear or Clearstream, a Person who has an account with the Depository, Euroclear or Clearstream, respectively (and, with respect to the Depository, shall include Euroclear and Clearstream).

"Applicable Premium" means, with respect to a Senior Note on any redemption date, the greater of:

(1)     1.0% of the principal amount of the Senior Note; or

(2)     the excess of:

(a)     the present value at such redemption date of (i) the redemption price of the Senior Note at _____, 2012, (such redemption price being set forth in Section 3.01 herein) plus (ii) all required interest payments due on the Senior Note through _____, 2012 (excluding accrued but unpaid interest to the redemption date), computed using a discount rate equal to the Treasury Rate as of such redemption date plus 50 basis points; over

(b)     the principal amount of the Senior Note, if greater.

"Applicable Procedures" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depository, Euroclear and Clearstream that apply to such transfer or exchange.

"Asset Acquisition" means:

(1)     an Investment by the Company or any Restricted Subsidiary of the Company in any other Person pursuant to which such Person shall become a Restricted Subsidiary of the Company or any Restricted Subsidiary of the Company, or shall be merged with or into the Company or any Restricted Subsidiary of the Company, or

(2)     the acquisition by the Company or any Restricted Subsidiary of the Company of the assets of any Person (other than a Restricted Subsidiary of the Company) which constitute all or substantially all of the assets of such Person or comprise any division or line of business of such Person or any other properties or assets of such Person other than in the ordinary course of business.

"Asset Sale" means any direct or indirect sale, issuance, conveyance, transfer, lease (other than operating leases entered into in the ordinary course of business), assignment or other transfer (other than a Lien in accordance with this Indenture) for value by the Company or any of its Restricted Subsidiaries to any Person other than the Company or a Guarantor of:

(1)     any Capital Stock of any Restricted Subsidiary of the Company; or

(2)     any other property or assets of the Company or any Restricted Subsidiary of the Company other than in the ordinary course of business;

provided, however, that Asset Sales shall not include:

(a)     a transaction or series of related transactions for which the Company or its Restricted Subsidiaries receive aggregate consideration of less than $1.0 million;

(b)     the sale, lease, conveyance, disposition or other transfer of all or substantially all of the assets of the Company as permitted under Section 5.01;

(c)     any Restricted Payment permitted under Section 4.10 including a Permitted Investment;

(d)     the sale of Cash Equivalents;

(e)     the sale or other disposal of the Collateral secured by Permitted Liens of the type described in clause (11) of the definition thereof;

(f)     the sale or other disposition of used, worn out, obsolete or surplus equipment; and

(g)     the abandonment, assignment, lease, sub-lease or farm-out of oil and gas properties or, the forfeiture or other disposition of such properties, pursuant to operating agreements or other instruments or agreements that, in each case, are entered into in a manner that is customary in the Oil and Gas Business (but not including sales of dollar denominated or volumetric production payments, which shall be considered Asset Sales).

"Authenticating Agent" has the meaning set forth in Section 2.02.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended, and codified as 11 U.S.C. §§101 et seq.

"Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition. The terms "Beneficial Ownership," "Beneficially Owns" and "Beneficially Owned" have meanings correlative to the foregoing.

"Board of Directors" means, as to any Person, the board of directors or similar governing body of such Person or any duly authorized committee thereof.

"Board Resolution" means, with respect to any Person, a copy of a resolution certified by the Secretary or an Assistant Secretary of such Person to have been duly adopted by the Board of Directors of such Person and to be in full force and effect on the date of such certification.

"Business Day" means a day that is not a Legal Holiday.

"Capital Stock" means:

(1)     with respect to any Person that is a corporation, any and all shares, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, including each class of Common Stock and Other Preferred Stock of such Person;

(2)     with respect to any Person that is not a corporation, any and all partnership, membership or other equity interests of such Person; and

(3)     any warrants, rights or options to purchase any of the instruments or interests referred to in clause (1) or (2) above.

"Capitalized Lease Obligation" means, as to any Person, the obligations of such Person under a lease that are required to be classified and accounted for as capital lease obligations under GAAP and, for purposes of this definition, the amount of such obligations at any date shall be the capitalized amount of such obligations at such date, determined in accordance with GAAP.

"Cash Equivalents" means:

(1)    marketable direct obligations issued by, or unconditionally guaranteed by, the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof;

(2)    marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Ratings Group ("S&P") or Moody's Investors Service, Inc. ("Moody's");

(3)    commercial paper maturing no more than one year from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's;

(4)    certificates of deposit or bankers' acceptances maturing within one year from the date of acquisition thereof issued by any bank organized under the laws of the United States of America or any state thereof or the District of Columbia or any U.S. branch of a foreign bank having at the date of acquisition thereof combined net capital and surplus of not less than $250.0 million;

(5)    repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (1) above entered into with any bank meeting the qualifications specified in clause (4) above; and

(6)    investments in money market funds which invest substantially all their assets in securities of the types described in clauses (1) through (5) above.

"CFC Subsidiary" means any Subsidiary that is a "controlled foreign corporation" within the meaning of Section 957 of the Internal Revenue Code of 1986, as amended.

"Change of Control" means the occurrence of one or more of the following events:

(1)    any direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one transaction or a series of related transactions, of all or substantially all of the assets of the Company to any Person or group of related Persons for purposes of Section 13(d) of the Exchange Act (a "Group") other than a Principal;

(2)    the Company consolidates with, or merges with or into, any Person, or any Person consolidates with, or merges with or into, the Company, other than any such transaction where the Voting Stock of the Company outstanding immediately prior to such transaction is converted into or exchanged for Voting Stock (other than Disqualified Capital Stock) of the surviving or transferee Person constituting a majority of the outstanding shares of such Voting Stock of such surviving or transferee Person (immediately after giving effect to such issuance);

(3)    the approval by the holders of Capital Stock of the Company of any plan or proposal for the liquidation, winding up or dissolution of the Company;

(4)    the consummation of any transaction (including without limitation, any merger or consolidation) the result of which is that any Person or Group other than a Principal is or becomes the Beneficial Owner, directly or indirectly, in the aggregate of more than 35% of the total voting power of the Voting Stock of the Company then outstanding; or

(5)    individuals who on the Issue Date constituted the Board of Directors of the Company (together with any new directors whose election by such Board of Directors or whose nomination for election by the stockholders of the Company was approved pursuant to a vote of a majority of the directors then still in office who were either directors on the Issue Date or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors then in office.

"Change of Control Offer" has the meaning set forth in Section 4.15(a).

"Change of Control Payment Date" has the meaning set forth in Section 4.15(b)(2).

"Clearstream" means Clearstream Banking, société anonyme.

"Collateral" shall mean Collateral as such term is defined in the Security Agreement, Other Collateral, all property mortgaged under the Mortgages and any other property, whether now owned or hereafter acquired, upon which a Lien securing the Obligations under this Indenture, the Collateral Agreements, the Notes or the Guarantees is granted or purported to be granted under any Collateral Agreement; provided, however, that Collateral shall not include any Excluded Collateral.

"Collateral Agent" means The Bank of New York Mellon Trust Company, N.A., as collateral agent under this Indenture and the Collateral Agreements, with respect to the rights to the Collateral of the holders of the Notes until a successor replaces it in accordance with the provisions of this Indenture and, thereafter, means such successor.   References to the Collateral Agent or applicable Collateral Agent in this Indenture mean the Collateral Agent in its respective or applicable capacities as collateral agent for the Holders of the Notes.

"Collateral Agreements" means, collectively, the Intercreditor Agreement, the Security Agreement, each Mortgage and each other instrument creating Liens in favor of the Collateral Agent as required by this Indenture, in each case, as the same may be in force from time to time.

"Commission" means the Securities and Exchange Commission.

"Common Stock" of any Person means any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of such Person's common stock, whether outstanding on the Issue Date or issued after the Issue Date, and includes, without limitation, all series and classes of such common stock.

"Company" means the party named as such in this Indenture until a successor replaces it pursuant to this Indenture and thereafter means such successor.

"Consolidated EBITDA" means, with respect to any Person, for any period, the sum (without duplication) of:

(1)     Consolidated Net Income; and

(2)     to the extent Consolidated Net Income has been reduced thereby:

(a)     all income taxes of such Person and its Restricted Subsidiaries paid or accrued in accordance with GAAP for such period;

(b)     Consolidated Interest Expense;

(c)     Consolidated Non-cash Charges less any non-cash items increasing Consolidated Net Income for such period; and

(d)     restructuring costs (including employee relocations costs) and integration expenses and charges that are identified at the time of closing of any acquisition as resulting from such acquisition (including, without limitation, cash severance payments and facility closures);

all as determined on a consolidated basis for such Person and its Restricted Subsidiaries in accordance with GAAP.

"Consolidated Fixed Charge Coverage Ratio" means, with respect to any Person, the ratio of Consolidated EBITDA of such Person during the four consecutive full fiscal quarters (the "Four Quarter Period") most recently ending on or prior to the date of the transaction or event giving rise to the need to calculate the Consolidated Fixed Charge Coverage Ratio for which financial statements are available (the "Transaction Date") to Consolidated Fixed Charges of such Person for the Four Quarter Period.

In addition to and without limitation of the foregoing, for purposes of this definition, "Consolidated EBITDA" and "Consolidated Fixed Charges" shall be calculated after giving effect on a pro forma basis for the period of such calculation to:

(1)     the incurrence or repayment of any Indebtedness of such Person or any of its Restricted Subsidiaries (and the application of the proceeds thereof) giving rise to the need to make such calculation and any incurrence or repayment of other Indebtedness (and the application of the proceeds thereof), other than the incurrence or repayment of Indebtedness in the ordinary course of business for working capital purposes pursuant to working capital facilities, occurring during the Four Quarter Period or at any time subsequent to the last day of the Four Quarter Period and on or prior to the Transaction Date, as if such incurrence or repayment, as the case may be (and the application of the proceeds thereof), occurred on the first day of the Four Quarter Period; and

(2)     any Asset Sale or other disposition or Asset Acquisition (including, without limitation, any Asset Acquisition giving rise to the need to make such calculation as a result of such Person or one of its Restricted Subsidiaries (including any Person who becomes a Restricted Subsidiary as a result of any such Asset Acquisition) incurring, assuming or otherwise being liable for Acquired Indebtedness during the Four Quarter Period or at any time subsequent to the last day of the Four Quarter Period and on or prior to the Transaction Date), as if such Asset Sale or other disposition or Asset Acquisition (including the incurrence, assumption or liability for any such Indebtedness or Acquired Indebtedness and also including any Consolidated EBITDA associated with such Asset Acquisition) occurred on the first day of the Four Quarter Period, provided that the Consolidated EBITDA of any Person acquired shall be included only to the

extent includible pursuant to the definition of "Consolidated Net Income." If such Person or any of its Restricted Subsidiaries directly or indirectly guarantees Indebtedness of a third Person, the preceding sentence shall give effect to the incurrence of such guaranteed Indebtedness as if such Person or any Restricted Subsidiary of such Person had directly incurred or otherwise assumed such guaranteed Indebtedness.

Furthermore, in calculating "Consolidated Fixed Charges" for purposes of determining the denominator (but not the numerator) of this "Consolidated Fixed Charge Coverage Ratio":

(1)    interest on outstanding Indebtedness determined on a fluctuating basis as of the Transaction Date (including Indebtedness actually incurred on the Transaction Date) and which will continue to be so determined thereafter shall be deemed to have accrued at a fixed rate per annum equal to the rate of interest on such Indebtedness in effect on the Transaction Date; and

(2)    notwithstanding clause (1) above, interest on Indebtedness determined on a fluctuating basis, to the extent such interest is covered by agreements relating to Interest Swap Obligations, shall be deemed to accrue at the rate per annum resulting after giving effect to the operation of such agreements.

"Consolidated Fixed Charges" means, with respect to any Person for any period, the sum, without duplication, of:

(1)    Consolidated Interest Expense; plus

(2)    the product of (x) the amount of all dividend payments on any series of Preferred Stock of such Person (other than dividends paid in Qualified Capital Stock) paid, accrued or scheduled to be paid or accrued during such period times (y) a fraction, the numerator of which is one and the denominator of which is one minus the then current effective consolidated federal, state and local tax rate of such Person, expressed as a decimal.

"Consolidated Interest Expense" means, with respect to any Person for any period, the aggregate of the interest expense of such Person and its Restricted Subsidiaries for such period, on a consolidated basis, as determined in accordance with GAAP, and including, without duplication:

(1)    all amortization or accretion of original issue discount;

(2)    the interest component of Capitalized Lease Obligations paid, accrued and/or scheduled to be paid or accrued by such Person and its Restricted Subsidiaries during such period; and

(3)    net cash costs under all Interest Swap Obligations (including amortization of fees); but excluding the amortization or write-off during such period of capitalized financing or debt issuance costs.

"Consolidated Net Income" means, with respect to any Person, for any period, the aggregate net income (or loss) of such Person and its Restricted Subsidiaries for such period on a consolidated basis, determined in accordance with GAAP; provided, however, that there shall be excluded therefrom:

(1)    after-tax gains and losses from Asset Sales or abandonments or reserves relating thereto;

N- 15

(2)    after-tax items classified as extraordinary gains or losses;

(3)    the net income (but not loss) of any Restricted Subsidiary of the referent Person to the extent that the declaration of dividends or similar distributions by that Restricted Subsidiary of that income is restricted by a contract, operation of law or otherwise;

(4)    the net income of any Person, other than the referent Person or a Restricted Subsidiary of the referent Person, except to the extent of cash dividends or distributions paid to the referent Person or to a Wholly-Owned Restricted Subsidiary of the referent Person by such Person;

(5)    any restoration to income of any material contingency reserve, except to the extent that provision for such reserve was made out of Consolidated Net Income accrued at any time following the Issue Date;

(6)    income or loss attributable to discontinued operations (including, without limitation, operations disposed of during such period whether or not such operations were classified as discontinued);

(7)    all gains and losses realized on or because of the purchase or other acquisition by such Person or any of its Restricted Subsidiaries of any securities of such Person or any of its Restricted Subsidiaries;

(8)    the cumulative effect of a change in accounting principles;

(9)    interest expense attributable to dividends on Qualified Capital Stock pursuant to Statement of Financial Accounting Standards No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity";

(10)    any write-downs of non-current assets; provided that any ceiling limitation write-downs under SEC guidelines shall be treated as capitalized costs, as if such write-downs had not occurred;

(11)    in the case of a successor to the referent Person by consolidation or merger or as a transferee of the referent Person's assets, any earnings of the successor corporation prior to such consolidation, merger or transfer of assets; and

(12)    non-cash compensation charges or other non-cash expenses or charges arising from the grant of or issuance or repricing of stock, stock options or other equity-based awards or any amendment, modification, substitution or change of any such stock, stock options or other equity-based awards.

"Consolidated Non-cash Charges" means, with respect to any Person, for any period, the aggregate depreciation, amortization and other non-cash items and expenses of such Person and its Restricted Subsidiaries to the extent they reduce Consolidated Net Income of such Person and its Restricted Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP (excluding any such charges constituting an extraordinary item or loss or any such charge which requires an accrual of or a reserve for cash charges for any future period).

"Corporate Trust Office" means the office of the Trustee at which the corporate trust business of the Trustee shall, at any particular time, be principally administered, which office is, at the