*Exhibit A*

FORM OF 10% SENIOR SUBORDINATED SECURED NOTE

[FOR THIRD POINT NOTES] NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF (COLLECTIVELY, A "TRANSFER") IN THE ABSENCE OF THE REGISTRATION OF SUCH TRANSFER UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, REGISTRATION. THE TRANSFER OF THIS SECURITY AND THE REQUEST TO REMOVE THIS LEGEND SHALL BE SUBJECT TO THE COMPANY'S AND THE TRUSTEE'S RIGHT TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION REASONABLY SATISFACTORY TO EACH OF THEM, AND A CERTIFICATE OF TRANSFER IN THE FORM APPEARING ON THE OTHER SIDE OF THIS SECURITY IS COMPLETED AND DELIVERED BY THE TRANSFEROR TO THE TRUSTEE OR TRANSFER AGENT.

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY OR A SUCCESSOR DEPOSITARY.  THIS NOTE IS NOT EXCHANGEABLE FOR NOTES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS NOTE (OTHER THAN A TRANSFER OF THIS NOTE AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY) MAY BE REGISTERED EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR PURPOSES OF SECTIONS 1271 ET SEQ. OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED. FOR INFORMATION REGARDING THE ISSUE PRICE, AMOUNT OF OID PER $1,000 OF PRINCIPAL AMOUNT AND THE YIELD TO MATURITY FOR PURPOSES OF THE OID RULES, PLEASE CONTACT THE CHIEF FINANCIAL OFFICER OF THE ISSUER AT 11811 NORTH FREEWAY I-45, SUITE 200, HOUSTON, TEXAS 77060, (281) 591-6100.

*Exhibit A*

## BASELINE OIL & GAS CORP.

### 10% SENIOR SUBORDINATED SECURED PIK NOTES DUE 2016

CUSIP No. [      ]

No. [    ]                                                                                            $ _____

Baseline Oil & Gas Corp., a Delaware corporation (the "Company," which term includes any successor entity), for value received promises to pay to [Cede & Co.] or registered assigns the principal sum of Ten Million Dollars (or such principal amount as may be set forth in the records of the Trustee hereinafter referred to in accordance with the Indenture) on _____, 2016, and to pay interest thereon as hereinafter set forth. [*Depository arrangements to be clarified*]

Interest Rate:  10% per annum.

Interest Payment Dates:  Interest will be payable quarterly in cash in arrears on January 1, April 1, July 1 and October 1 of each year, beginning on _____ 1, 2009.

Record Dates: December 15, March 15, June 15 and September 15.

Reference is made to the further provisions of this Note contained on the reverse side of this Note, which will for all purposes have the same effect as if set forth at this place.

IN WITNESS WHEREOF, the Company has caused this Note to be signed manually or by facsimile by its duly authorized officer.

BASELINE OIL & GAS CORP.

By: _____

              Name:
              Title:

Dated: _____, 2009

*Exhibit A*

## TRUSTEE CERTIFICATE OF AUTHENTICATION

This is one of the 10% Senior Subordinated Secured PIK Notes due 2016 referred to in the within-mentioned Indenture.

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., as Trustee

Dated: _____, 2009          By: _____
                                      Authorized Signatory

*Exhibit A*

(REVERSE OF SECURITY)

**10% Senior Subordinated Secured PIK Note due 2016**

1.    <u>Interest</u>.  The Company promises to pay interest on the principal amount of this Note at the rate per annum shown above; <u>provided</u>, <u>however</u>, that a portion of such interest in an amount equal to the applicable PIK Interest Amount may be paid by the Company on the applicable Interest Payment Date by issuing to the registered Holder hereof on the applicable Record Date one or more PIK Notes in an aggregate principal amount equal to such PIK Interest Amount in lieu of paying such portion of such interest in cash, subject to the Company complying with <u>Section 2.16</u> of the Indenture.  Interest on the Note will accrue from the most recent date on which interest has been paid or, if no interest has been paid, from and including [_____ 1, 2009].  The Company will pay interest quarterly in arrears on each Interest Payment Date, commencing [_____ 1, 2009].  Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.  The Company will pay interest on overdue principal at 1% per annum in excess of the above rate and will pay interest on overdue installments of interest at such higher rate to the extent lawful.

2.    <u>Method of Payment</u>.  The Company shall pay interest on the Notes (except defaulted interest) to the Persons who are the registered Holders at the close of business on the Record Date immediately preceding the Interest Payment Date even if the Notes are cancelled on registration of transfer or registration of exchange after such Record Date, and on or before such Interest Payment Date.  Holders must surrender Notes to a Paying Agent to collect principal payments.  The Company shall pay principal and interest in money of the United States that at the time of payment is legal tender for payment of public and private debts ("<u>U.S. Legal Tender</u>"); <u>provided</u>, <u>however</u>, the Company may pay principal and interest in cash by check payable in such U.S. Legal Tender.  The Company may deliver any such interest payment to the Paying Agent or to a Holder at the Holder's registered address.

3.    <u>Paying Agent and Registrar</u>.  Initially, The Bank of New York Mellon Trust Company, N.A. (the "<u>Trustee</u>") will act as Paying Agent and Registrar.  The Company may change any Paying Agent, Registrar or co-Registrar without notice to the Holders.

4.    <u>Indenture; Ranking</u>.  The Notes and the Guarantees were issued under an Indenture, dated _____, 2009 (the "<u>Indenture</u>"), among the Company, the Trustee and the Collateral Agent.  Capitalized terms herein are used as defined in the Indenture unless otherwise defined herein.  The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S. Code §§ 77aaa-77bbbb) (the "<u>TIA</u>"), as in effect on the date of the Indenture until, if applicable, such time as the Indenture is qualified under the TIA, and thereafter as in effect on the date on which the Indenture is qualified under the TIA.  Notwithstanding anything to the contrary herein, the Notes are subject to all such terms, and Holders of Notes are referred to the Indenture and the TIA for a statement of such terms.  Each Holder, by accepting a Note, agrees to be bound by all of the terms and provisions of the Indenture, as the same may be amended from time to time.  To the extent this Note and the Indenture are inconsistent, the Indenture shall control.  The Notes are senior subordinated secured obligations of the Company.

5.    <u>Redemption</u>.

(b)    <u>Optional Redemption</u>.  The Company may redeem all or a part of the Notes upon not less than 30 nor more than 60 days' notice mailed by first-class mail to the registered address of each Holder of Notes to be redeemed, at a Redemption Price equal to 100% of the principal amount of Notes to be redeemed plus accrued and unpaid interest to the date of redemption, subject to the rights of Holders of

*Exhibit A*

Notes on the relevant Record Date to receive interest due on the relevant Interest Payment Date on the Redemption Date; provided, however, that the Company may not redeem any Notes if any Senior Notes will remain outstanding after the Redemption Date.

(c)     Mandatory Redemption.  The Company is not required to make any mandatory redemption or sinking fund payments with respect to the Notes.

(d)     Notice of Redemption.  Notice of redemption will be mailed by first-class mail at least 10 days but not more than 20 days before the Redemption Date to each Holder of the Notes to be redeemed at such Holder's registered address with a copy to the Trustee and Paying Agent.  If fewer than all of the Notes are to be redeemed, at any time, selection of the Notes for redemption will be made by the Trustee in compliance with the requirements of the principal national securities exchange, if any, on which the Notes are listed, or, if the Notes are not so listed, on a pro rata basis, by lot or by such method as the Trustee deems to be fair and appropriate.  Notes in denominations of $1,000 may be redeemed only in whole.  The Trustee may select for redemption portions (equal to $1,000 or any integral multiple thereof) of the principal amount of Notes that have denominations larger than $1,000.

Except as set forth in the Indenture, if monies for the redemption of the Notes called for redemption shall have been deposited with the Paying Agent for redemption on such Redemption Date sufficient to pay such Redemption Price plus accrued and unpaid interest, the Notes called for redemption will cease to bear interest from and after such Redemption Date, and the only remaining right of the Holders of such Notes will be to receive payment of the Redemption Price plus accrued and unpaid interest as of the Redemption Date upon surrender to the Paying Agent of the Notes redeemed.

6.     Restrictive Covenants.  The Indenture imposes certain limitations on the ability of the Company and its Restricted Subsidiaries to, among other things, incur additional Indebtedness or grant Liens, make payments in respect of their Capital Stock or certain Indebtedness, enter into transactions with Affiliates, create dividend or other payment restrictions affecting Restricted Subsidiaries, merge or consolidate with any other Person, sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its assets or adopt a plan of liquidation, in each case, as set forth in the Indenture.

7.     Offers to Purchase.  Sections 4.15 and 4.16 of the Indenture provide that in the event of a Change of Control and after certain Asset Sales, respectively, and subject to further limitations contained therein, the Company will be required to make an offer to purchase the Notes in accordance with the terms and procedures set forth in the Indenture; provided, however, that any payments made in connection with either a Change of Control or Net Proceeds Offer must be made first and in full to the holders of the Senior Notes before any such payments are made to Holders of the Notes.

8.     Denominations; Transfer; Exchange.  The Notes are in registered form, without coupons, and except in the case of PIK Notes, in denominations of $1,000 and integral multiples thereof. A Holder shall register the transfer of or exchange of Notes in accordance with the Indenture.  The Registrar may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay any taxes, fees or similar governmental charges payable in connection therewith as permitted by the Indenture.  The Registrar need not register the transfer of or exchange of any Notes or portions thereof selected for redemption.

9.     Subordination.  Each Holder by accepting a Note agrees that the payment of principal of and premium and interest on each Note is subordinated in right of payment, to the extent and in the manner provided in Article Thirteen of the Indenture, to the prior payment in full of all Senior Indebtedness of the Company (whether outstanding on the date of the Indenture or thereafter incurred,

assumed or guaranteed), and the subordination is for the benefit of the holders of such Senior Indebtedness.

        10.    <u>Persons Deemed Owners</u>. The registered Holder of a Note shall be treated as the owner of it for all purposes.

        11.    <u>Unclaimed Money</u>. If money for the payment of principal or interest remains unclaimed for two years, the Trustee and the Paying Agent may pay the money without interest thereon back to the Company. After that, all liability of the Trustee and such Paying Agent with respect to such money shall cease.

        12.    <u>Defeasance; Satisfaction and Discharge Prior to Redemption or Maturity</u>. If the Company defeases Notes at any time or deposits with the Trustee U.S. Legal Tender or U.S. Government Obligations sufficient to pay the principal of and interest on the Notes to redemption or stated maturity and complies with the other provisions of the Indenture relating thereto, the Company will be discharged from certain provisions of the Indenture and the Notes (including certain covenants, but excluding its obligation to pay the principal of and interest on the Notes) as set forth in the Indenture; <u>provided, however</u>, that the Notes may be defeased or satisfied and discharged only if the Senior Notes are no longer outstanding or have been previously or simultaneously been defeased or satisfied and discharged, as applicable, in the same manner and to the same extent.

        13.    <u>Amendment; Supplement; Waiver</u>. The Indenture, the Notes, the Guarantees and the Collateral Agreements, solely with respect to matters affecting the Notes, may be amended or supplemented with the written consent of the Holders of at least 85% in aggregate principal amount of the Notes then outstanding, and any existing Default or Event of Default or noncompliance with any provision may be waived with the written consent of the Holders of a at least 85% in aggregate principal amount of the Notes then outstanding, subject to and as set forth in the Indenture and the Collateral Agreements. Without consent of any Holder, the parties thereto may amend or supplement the Indenture, the Notes, the Guarantees, or the Collateral Agreements to, among other things, cure any ambiguity, defect or inconsistency, provide for uncertificated Notes in addition to or in place of certificated Notes, provide for the assumption of the Company's or any Guarantor's obligations in accordance with <u>Section 5.01</u> and <u>Section 10.04</u> of the Indenture, make any other change that would provide any additional rights or benefits to the Holders that does not adversely affect the legal rights of any Holder of a Note, to comply with the TIA, to allow for additional guarantees, if necessary, in connection with any addition or release of Collateral permitted under the Indenture or the Collateral Agreements and to release a Guarantor from its Guarantee as permitted by the Indenture. However no such amendment, modification, supplement or waiver, including a waiver pursuant to <u>Section 6.04</u> of the Indenture, may without the consent of each Holder affected thereby, make the modifications specified in the second paragraph of <u>Section 9.02</u> of the Indenture. No amendment, modification, supplement or waiver may, without the consent of the Holders holding at least 85% in aggregate principal amount of the Notes outstanding at such time, release all or substantially all of the Collateral from the Liens created by the Collateral Agreements otherwise than in accordance with the terms of this Indenture, the Intercreditor Agreement and the Collateral Agreements. Notwithstanding anything to the contrary in the Indenture, the provisions of <u>Article Thirteen</u> shall not be amended or modified without the written consent of the holders of all Senior Notes then outstanding.

        14.    <u>Successors</u>. When a successor assumes, in accordance with the Indenture, all the obligations of its predecessor under the Notes, the Guarantees and the Indenture, the predecessor will be released from those obligations.

        15.    <u>Defaults and Remedies</u>. If an Event of Default occurs and is continuing (other than certain events of bankruptcy involving the Company), the Trustee or the Holders of at least 25% in

aggregate principal amount of the outstanding Notes may declare all the Notes to be due and payable in the manner, at the time and with the effect provided in the Indenture. Holders of Notes may not enforce the Indenture except as provided in the Indenture. The Trustee is not obligated to enforce the Indenture or the Notes unless it has received indemnity satisfactory to it. The Indenture permits, subject to certain limitations therein provided, Holders of at least 85% in aggregate principal amount of the Notes then outstanding to direct the Trustee in its exercise of any trust or power.

16.    <u>Trustee Dealings with Company</u>. Subject to the terms of the TIA and the Indenture, the Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Company, its Subsidiaries or their respective Affiliates as if it were not the Trustee.

17.    <u>No Recourse Against Others</u>. No past, present or future affiliate, director, officer, employee, incorporator or holder of any equity interests in the Company or a Guarantor or any direct or indirect parent corporation of the Company or a Guarantor, as such, will have any liability for any obligations of the Company or a Guarantor under the Notes, the Guarantees or the Indenture, or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. Each of the parties hereto acknowledge that such waiver may not be effective to waive liabilities under the federal securities laws.

18.    <u>Authentication</u>. This Note shall not be valid until the Trustee or Authenticating Agent manually signs the certificate of authentication on this Note.

19.    <u>Governing Law</u>. THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. EACH OF THE PARTIES HERETO SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED BY THIS NOTE.

20.    <u>Abbreviations and Defined Terms</u>. Customary abbreviations may be used in the name of a Holder of a Note or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

21.    <u>Security</u>. The Company's and Guarantors' obligations under the Notes are secured by third priority liens on the Collateral pursuant to the terms of the Collateral Agreements. The actions of the Trustee and the Holders of the Notes secured by such liens and the application of proceeds from the enforcement of any remedies with respect to such Collateral are limited pursuant to the terms of the Collateral Agreements.

22.    <u>CUSIP Numbers</u>. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes as a convenience to the Holders of the Notes. No representation is made as to the accuracy of such numbers as printed on the Notes and reliance may be placed only on the other identification numbers printed thereon.

The Company will furnish to any Holder of a Note upon written request and without charge a copy of the Indenture. Requests may be made to: Baseline Oil & Gas Corp., 11811 North Freeway I-45, Suite 200, Houston, Texas 77060.

*Exhibit A*

## FORM OF GUARANTEE

The undersigned and its successors under the Indenture has irrevocably and unconditionally guaranteed, on a senior subordinated secured basis to the extent set forth in the Indenture, dated as of _____, 2009 (the "Indenture"), by and between Baseline Oil & Gas Corp. (the "Company") and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent, (i) the due and punctual payment of the principal of, premium, if any, and interest on the Notes, whether at maturity, by acceleration or otherwise, the due and punctual payment of interest on the overdue principal of (including interest accruing at the then applicable rate provided in the Indenture, the Notes, the Guarantees or any Collateral Agreement after the occurrence of any Event of Default set forth in Section 6.01(6) or (7) of the Indenture, whether or not a claim for post-filing or post-petition interest is allowed under applicable law following the institution of a proceeding under bankruptcy, insolvency or similar law) and interest on the Notes, to the extent lawful, and the due and punctual performance of all other obligations of the Company to the Holders or the Trustee all in accordance with the terms set forth in Article Ten of the Indenture and (ii) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise. Capitalized terms used herein have the meanings assigned to them in the Indenture unless otherwise indicated.

THE OBLIGATIONS OF THE UNDERSIGNED TO HOLDERS OF THE NOTES AND TO THE TRUSTEE PURSUANT TO THIS NOTATION OF GUARANTEE (THE "GUARANTEE") AND THE INDENTURE ARE EXPRESSLY SET FORTH IN ARTICLE TEN OF THE INDENTURE AND REFERENCE IS HEREBY MADE TO THE INDENTURE FOR THE PRECISE TERMS OF THE GUARANTEE AND ALL OTHER PROVISIONS OF THE INDENTURE TO WHICH THE GUARANTEE RELATES. EACH HOLDER OF A NOTE, BY ACCEPTING THE SAME, (A) AGREES TO AND SHALL BE BOUND BY SUCH PROVISIONS AND (B) APPOINTS THE TRUSTEE ATTORNEY-IN-FACT FOR SUCH HOLDER FOR SUCH PURPOSES.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York.

[NAME OF GUARANTOR]

By: _____
Name:
Title:

*Exhibit A*

### ASSIGNMENT FORM

If you the Holder want to assign this Note, fill in the form below and have your signature guaranteed:

I or we assign and transfer this Note to:

_____

_____

(Print or type name, address and zip code and
social security or tax ID number of assignee)

and irrevocably appoint _____
agent to transfer this Note on the books of the Company. The agent may substitute another to act for him.

Dated: _____     Signed: _____

(Sign exactly as your name appears on the
other side of this Note)

Signature Guarantee: _____

   In connection with any transfer of this Note occurring prior to the date which is the earlier of (i) the date of the declaration by the SEC of the effectiveness of a registration statement under the Securities Act of 1933, as amended (the "Securities Act"), covering resales of this Note (which effectiveness shall not have been suspended or terminated at the date of the transfer) and (ii) _____, 2010, the undersigned confirms that it has not utilized any general solicitation or general advertising in connection with the transfer and that this Note is being transferred:

### [Check One]

.  to the Company or a subsidiary thereof; or

.  pursuant to and in compliance with Rule 144A under the Securities Act; or

.  to an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) that has furnished to the Trustee a signed letter containing certain representations and agreements (the form of which letter can be obtained from the Trustee); or

.  outside the United States to a person other than a "U.S. person" in compliance with Rule 904 of Regulation S under the Securities Act; or

.  pursuant to the exemption from registration provided by Rule 144 under the Securities Act; or

.  pursuant to an effective registration statement under the Securities Act.

Unless one of the boxes is checked, the Trustee will refuse to register any of the Notes evidenced by this certificate in the name of any person other than the registered Holder thereof; provided that if box (3), (4) or (5) is checked, the Company or the Trustee may require, prior to registering any such transfer of the Notes, in its sole discretion, such legal opinions, certifications (including an investment letter in the case of box (3) or (4)) and other information as the Trustee or the Company has reasonably requested to confirm that such transfer is being made pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act.

*Exhibit A*

If none of the foregoing boxes is checked, the Trustee or Registrar shall not be obligated to register this Note in the name of any person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in <u>Section 2.15</u> of the Indenture shall have been satisfied.

Dated: _____      Signed: _____

                                                    (Sign exactly as your name appears on the other side of this Note)

Signature Guarantee: _____

## TO BE COMPLETED BY PURCHASER IF (2) ABOVE IS CHECKED

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Company as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Dated: _____      _____

                                           NOTICE:  To be executed by an executive officer

*Exhibit A*

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Company pursuant to Section 4.15 or Section 4.16 of the Indenture, check the appropriate box:

Section 4.15 [    ]

Section 4.16 [    ]

If you want to elect to have only part of this Note purchased by the Company pursuant to Section 4.15 or Section 4.16 of the Indenture, state the amount you elect to have purchased:

$ _____

Dated: _____

_____

NOTICE:  The signature on this assignment must correspond with the name as it appears upon the face of the within Note in every particular without alteration or enlargement or any change whatsoever and be guaranteed by the endorser's bank or broker.

Signature Guarantee: _____

*Exhibit B*

### Form of Private Placement Legend

[FOR THIRD POINT NOTES] NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF (COLLECTIVELY, A "TRANSFER") IN THE ABSENCE OF THE REGISTRATION OF SUCH TRANSFER UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, REGISTRATION. THE TRANSFER OF THIS SECURITY AND THE REQUEST TO REMOVE THIS LEGEND SHALL BE SUBJECT TO THE COMPANY'S AND THE TRUSTEE'S RIGHT TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION REASONABLY SATISFACTORY TO EACH OF THEM, AND A CERTIFICATE OF TRANSFER IN THE FORM APPEARING ON THE OTHER SIDE OF THIS SECURITY IS COMPLETED AND DELIVERED BY THE TRANSFEROR TO THE TRUSTEE OR TRANSFER AGENT.

### Form of Global Note Legend

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY OR A SUCCESSOR DEPOSITARY. THIS NOTE IS NOT EXCHANGEABLE FOR NOTES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS NOTE (OTHER THAN A TRANSFER OF THIS NOTE AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY) MAY BE REGISTERED EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

### Other Legends

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR PURPOSES OF SECTIONS 1271 ET SEQ. OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED. FOR INFORMATION REGARDING THE ISSUE PRICE, AMOUNT OF OID PER $1,000 OF PRINCIPAL AMOUNT AND THE YIELD TO MATURITY FOR PURPOSES OF THE OID RULES, PLEASE CONTACT THE CHIEF FINANCIAL OFFICER OF THE ISSUER AT 11811 NORTH FREEWAY I-45, SUITE 200, HOUSTON, TEXAS 77060, (281) 591-6100.

*Exhibit C*

FORM OF CERTIFICATE FROM
ACQUIRING INSTITUTIONAL ACCREDITED INVESTOR

Baseline Oil & Gas Corp.
411 N. Sam Houston Parkway East
Suite 300
Houston, Texas 77060
Attention: Chief Executive Officer
Facsimile Number: (281) 591-6101

The Bank of New York Mellon Trust Company, N.A.
601 Travis Street, 16th Floor
Houston, Texas 77002
Attn: Corporate Trust Administration
Facsimile Number: (713) 483-6954

Re:    10% Senior Subordinated Secured PIK Notes Due 2016

Reference is hereby made to the Indenture, dated as of _____, 2009 (the "Indenture"), among Baseline
Oil & Gas Corp. (the "Company"), as Issuer, the Guarantors (as defined in the Indenture) and The Bank
of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent.  Capitalized terms used but
not defined herein shall have the meanings given to them in the Indenture.

In connection with our proposed purchase of $_____ aggregate principal amount of:

(a)    ☐    a beneficial interest in a Global Note, or

(b)    ☐    a Definitive Note,

we confirm that:

1.    We understand that any subsequent transfer of the Notes or any interest therein is subject to
certain restrictions and conditions set forth in the Indenture and the undersigned agrees to be
bound by, and not to resell, pledge or otherwise transfer the Notes or any interest therein except
in compliance with, such restrictions and conditions and the United States Securities Act of 1933,
as amended (the "Securities Act").

2.    We understand that the offer and sale of the Notes have not been registered under the Securities
Act, and that the Notes and any interest therein may not be offered or sold except as permitted in
the following sentence.  We agree, on our own behalf and on behalf of any accounts for which we
are acting as hereinafter stated, that if we should sell the Notes or any interest therein, we will do
so only (A) to the Company or any subsidiary thereof, (B) in accordance with Rule 144A under
the Securities Act to a "qualified institutional buyer" (as defined therein), (C) to an institutional
"accredited investor" (as defined below) that, prior to such transfer, furnishes (or has furnished on
its behalf by a U.S. broker-dealer) to you and to the Company a signed letter substantially in the
form of this letter, and if such transfer is in respect of a principal amount of Notes, at the time of
transfer of less than $[250,000], an Opinion of Counsel in form reasonably acceptable to the
Company to the effect that such transfer is in compliance with the Securities Act, (D) outside the
United States in accordance with Rule 904 of Regulation S under the Securities Act, (E) pursuant
to the provisions of Rule 144(k) under the Securities Act or (F) pursuant to an effective
registration statement under the Securities Act, and we further agree to provide to any person

*Exhibit C*

purchasing the Definitive Note or beneficial interest in a Global Note from us in a transaction meeting the requirements of clauses (A) through (E) of this paragraph a notice advising such purchaser that resales thereof are restricted as stated herein.

3.      We understand that, on any proposed resale of the Notes or beneficial interest therein, we will be required to furnish to you and the Company such certifications, legal opinions and other information as you and the Company may reasonably require to confirm that the proposed sale complies with the foregoing restrictions. We further understand that the Notes purchased by us will bear a legend to the foregoing effect. We further understand that any subsequent transfer by us of the Notes or beneficial interest therein acquired by us must be effected through one of the Placement Agents.

4.      We are an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3), or (7) of Regulation D under the Securities Act) and have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the Notes, and we and any accounts for which we are acting are each able to bear the economic risk of our or its investment.

5.      We are acquiring the Notes or beneficial interest therein purchased by us for our own account or for one or more accounts (each of which is an institutional "accredited investor") as to each of which we are exercise sole investment discretion.

You and the Company are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.

[Insert Name of Accredited Investor]

By:_____
Name:
Title:

Dated:_____._____

*Exhibit D*

FORM OF CERTIFICATE FROM
TRANSFEREE ACQUIRING PURSUANT TO REGULATION S

Baseline Oil & Gas Corp.
411 N. Sam Houston Parkway East
Suite 300
Houston, Texas  77060
Attention: Chief Executive Officer
Facsimile Number:  (281) 591-6101

The Bank of New York Mellon Trust Company, N.A.
601 Travis Street, 16th Floor
Houston, Texas 77002
Attn:  Corporate Trust Administration
Facsimile Number:  (713) 483-6954

Re:     10% Senior Subordinated Secured PIK Notes Due 2016

Reference is hereby made to the Indenture, dated as of _____, 2009 (the "Indenture"), among Baseline Oil & Gas Corp. (the "Company"), as Issuer, the Guarantors (as defined in the Indenture) and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

In connection with our proposed purchase of $_____ aggregate principal amount of:

(a)      ☐      a beneficial interest in a Global Note, or

(b)      ☐      a Definitive Note,

we confirm that:

6.      We understand that any subsequent transfer of the Notes or any interest therein is subject to certain restrictions and conditions set forth in the Indenture and the undersigned agrees to be bound by, and not to resell, pledge or otherwise transfer the Notes or any interest therein except in compliance with, such restrictions and conditions and the United States Securities Act of 1933, as amended (the "Securities Act").

7.      We understand that the offer and sale of the Notes have not been registered under the Securities Act, and that the Notes and any interest therein may not be offered or sold except as permitted in the following sentence.  We agree, on our own behalf and on behalf of any accounts for which we are acting as hereinafter stated, that if we should sell the Notes or any interest therein, we will do so only (A) to the Company or any subsidiary thereof, (B) in accordance with Rule 144A under the Securities Act to a "qualified institutional buyer" (as defined therein), (C) to an institutional "accredited investor" (as defined below) that, prior to such transfer, furnishes (or has furnished on its behalf by a U.S. broker-dealer) to you and to the Company a signed letter substantially in the form of this letter, and if such transfer is in respect of a principal amount of Notes, at the time of transfer of less than $[250,000], an Opinion of Counsel in form reasonably acceptable to the Company to the effect that such transfer is in compliance with the Securities Act, (D) outside the United States in accordance with Rule 904 of Regulation S under the Securities Act, (E) pursuant to the provisions of Rule 144(k) under the Securities Act or (F) pursuant to an effective

*Exhibit D*

registration statement under the Securities Act, and we further agree to provide to any person purchasing the Definitive Note or beneficial interest in a Global Note from us in a transaction meeting the requirements of clauses (A) through (E) of this paragraph a notice advising such purchaser that resales thereof are restricted as stated herein.

8.  We understand that, on any proposed resale of the Notes or beneficial interest therein, we will be required to furnish to you and the Company such certifications, legal opinions and other information as you and the Company may reasonably require to confirm that the proposed sale complies with the foregoing restrictions. We further understand that the Notes purchased by us will bear a legend to the foregoing effect. We further understand that any subsequent transfer by us of the Notes or beneficial interest therein acquired by us must be effected through one of the Placement Agents.

9.  We are acquiring the Notes or beneficial interest therein pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and, accordingly, we certify that (i) we are not a Person in the United States and (x) at the time the buy order was originated, we were outside the United States or the transferor and any Person acting on its behalf reasonably believed and believes that we were outside the United States or (y) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither such transferor nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States, (ii) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S under the Securities Act, (iii) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act and (iv) if the proposed transfer is being made prior to the expiration of the 40-day distribution compliance period as defined in Regulation S under the Securities Act, the transfer is not being made to a U.S. Person or for the account or benefit of a U.S. Person.

10.  Upon consummation of the proposed purchase in accordance with the terms of the Indenture, the purchased Notes or beneficial interest therein will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Note and in the Indenture and the Securities Act.

You and the Company are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.

_____

[Insert Name of Transferee]


By:_____

Name:

Title:

Dated:_____,_____

*EXHIBIT O*

FIRST PRIORITY SECURITY AGREEMENT

dated as of

[_____], 2009,

among

BASELINE OIL & GAS CORP.,

and

each Subsidiary of BASELINE OIL & GAS CORP.
that may from time to time become a party hereto,
as Grantors,

and

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.
as Collateral Agent

## TABLE OF CONTENTS

Page

SECTION 1.     DEFINITIONS ....................................................................................................... 1
    1.1     Certain Defined Terms; UCC Definitions ............................................................ 1
    1.2     Rules of Interpretation .......................................................................................... 7
    1.3     Intercreditor Agreement ....................................................................................... 8
SECTION 2.     SECURITY INTEREST ........................................................................................ 8
    2.1     Grant of Security Interest ..................................................................................... 8
    2.2     Secured Obligations .............................................................................................. 9
    2.3     Transfer of Collateral ........................................................................................... 9
    2.4     Bailees ................................................................................................................. 10
SECTION 3.     REPRESENTATIONS AND WARRANTIES ..................................................... 10
    3.1     Representations in Financing Documents and Perfection Certificate ................. 10
    3.2     Title; No Other Liens ......................................................................................... 10
    3.3     Perfected First Priority Liens ............................................................................. 10
    3.4     Jurisdiction of Organization; Chief Executive Office ........................................ 11
    3.5     [Reserved] ........................................................................................................... 11
    3.6     Farm Products ..................................................................................................... 11
    3.7     Investment Property ............................................................................................ 11
    3.8     Receivables ......................................................................................................... 11
    3.9     Intellectual Property ........................................................................................... 11
    3.10    Deposit Accounts and Securities Accounts ........................................................ 12
    3.11    Benefit to each Grantor ...................................................................................... 12
    3.12    Consents .............................................................................................................. 12
    3.13    [Reserved] ........................................................................................................... 13
SECTION 4.     COVENANTS ...................................................................................................... 13
    4.1     [Reserved] ........................................................................................................... 13
    4.2     Delivery of Instruments, Certificated Securities and Chattel Paper .................. 13
    4.3     Maintenance of Insurance ................................................................................... 13
    4.4     [Reserved] ........................................................................................................... 13
    4.5     Maintenance of Perfected Security Interest; Further Assurances ....................... 13
    4.6     Changes in Locations, Name, etc. ....................................................................... 14
    4.7     Notices ................................................................................................................ 14
    4.8     Investment Property ............................................................................................ 15

**TABLE OF CONTENTS**
(continued)

Page

| | | | |
|---|---|---|---|
| | 4.9 | [Reserved] | 16 |
| | 4.10 | Intellectual Property | 16 |
| | 4.11 | Deposit Accounts | 17 |
| | 4.12 | New Accounts | 18 |
| | 4.13 | Commercial Tort Claims | 18 |
| SECTION 5. | | REMEDIAL PROVISIONS | 18 |
| | 5.1 | Certain Matters Relating to Receivables | 18 |
| | 5.2 | Communications with Obligors; Grantors Remain Liable | 19 |
| | 5.3 | Pledged Stock | 19 |
| | 5.4 | Proceeds To Be Turned Over to Collateral Agent | 21 |
| | 5.5 | Application of Proceeds | 21 |
| | 5.6 | Code and Other Remedies | 21 |
| | 5.7 | Registration Rights | 22 |
| | 5.8 | Deficiency | 23 |
| | 5.9 | Non-Judicial Enforcement | 23 |
| SECTION 6. | | THE COLLATERAL AGENT | 24 |
| | 6.1 | Collateral Agent's Appointment as Attorney-in-Fact, etc | 24 |
| | 6.2 | Collateral Agent's Appointment as Agent | 25 |
| | 6.3 | Duty in respect of Collateral | 26 |
| | 6.4 | Execution of Financing Statements. | 27 |
| | 6.5 | Authority of the Collateral Agent | 28 |
| | 6.6 | Actions by the Collateral Agent | 28 |
| SECTION 7. | | MISCELLANEOUS | 29 |
| | 7.1 | Amendments in Writing | 29 |
| | 7.2 | Notices | 29 |
| | 7.3 | No Waiver by Course of Conduct; Cumulative Remedies | 29 |
| | 7.4 | Enforcement Expenses; Indemnification | 29 |
| | 7.5 | Successors and Assigns | 30 |
| | 7.6 | Set-Off | 30 |
| | 7.7 | Counterparts | 30 |
| | 7.8 | Severability | 30 |
| | 7.9 | Section Headings | 31 |

**TABLE OF CONTENTS**
(continued)

Page

7.10   Integration ............................................................................................................31

7.11   GOVERNING LAW..............................................................................................31

7.12   Submission To Jurisdiction; Waivers ..................................................................31

7.13   Acknowledgements...............................................................................................31

7.14   WAIVER OF JURY TRIAL...................................................................................32

7.15   Additional Grantors .............................................................................................32

7.16   Releases ................................................................................................................32

SCHEDULES

Schedule I        Notice Addresses

ANNEXES

Annex I          Form of Assumption Agreement for Additional Grantors
Annex II         Form of Deposit Account Control Agreement
Annex III        Form of Securities Account Control Agreement
Annex IV         Form of Copyright Security Agreement
Annex V          Form of Patent Security Agreement
Annex VI         Form of Trademark Security Agreement
Annex VII        Form of Perfection Certificate

FIRST PRIORITY SECURITY AGREEMENT

THIS FIRST PRIORITY SECURITY AGREEMENT, dated as of [＿＿＿＿＿＿], 2009 (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), is made by BASELINE OIL & GAS CORP., a Delaware corporation (the "Company"), and each Domestic Restricted Subsidiary of the Company that hereafter becomes a party hereto from time to time as an additional Grantor hereunder pursuant to Section 7.15 hereof (any such Person, a "Subsidiary Grantor"; each Subsidiary Grantor and the Company, collectively, the "Grantors"), in favor of THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., in its capacity as collateral agent for (in such capacity, together with its successors and assigns, the "Collateral Agent") the Secured Parties (as defined below).

W I T N E S S E T H:

A.      Pursuant to that certain Indenture dated as of [＿＿＿＿＿＿], 2009 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Indenture") made by and among the Company, as issuer, and The Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent, the Company authorized the creation and issue of the Notes.

B.      It is a requirement under the Indenture that the Company shall have executed and delivered this Agreement to the Collateral Agent contemporaneously with the execution of the Indenture by the parties thereto.

C.      Each Grantor will derive substantial direct and indirect benefit from the transactions contemplated by the Indenture and, accordingly, desires to execute this Agreement to satisfy the requirements described in the preceding paragraph.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, each Grantor hereby agrees with the Collateral Agent as follows:

**SECTION 1.   DEFINITIONS.**

1.1      Certain Defined Terms; UCC Definitions.  For purposes of this Agreement, the following terms shall have the respective meanings given to them below.  All capitalized terms used in this Agreement and not otherwise defined herein shall have the respective meanings assigned to them in the Indenture, and any term used herein that is not defined herein or in the Indenture but is defined in the UCC shall be used herein as defined in the UCC.  In addition, for the avoidance of doubt, the terms "Accounts", "Chattel Paper", "Commercial Tort Claims", "Documents", "General Intangibles", "Goods", "Instruments", "Letter-of-Credit Rights", "Registered Organization" and "Supporting Obligations" shall have the meanings given to them in Section 9-102 of the UCC.

The following terms shall have the following meanings:

"Account Collateral" means each Grantor's right, title and interest, whether now existing or hereafter acquired or arising, in, to and under, each Deposit Account and Securities Account (including any successor accounts to any such accounts) and all amounts, investments and any other property (including Checks, securities, financial assets, investment property, security entitlements and instruments) at any time deposited in or credited to any such account and all security entitlements with respect thereto, including all income or gain earned thereon and any Proceeds thereof.

"Agreement" has the meaning provided in the first paragraph hereof.

"Books and Records" means all books, records and other written, electronic or other documentation in whatever form maintained now or hereafter by or for any Grantor in connection with, and relating to, the ownership of, or evidencing or containing information relating to, the Collateral.

"Certificates of Title" shall mean all certificates of title evidencing ownership of Titled Vehicles.

"Checks" means checks and other instruments and other payment instructions deposited into any Deposit Account or Securities Account.

"Collateral" has the meaning set forth in Section 2.1.

"Collateral Account" means any collateral account established by the Collateral Agent as provided in Section 5.1 or 5.4.

"Collateral Agent" has the meaning provided in the first paragraph of this Agreement.

"Company" has the meaning provided in the first paragraph of this Agreement.

"Computer Hardware and Software" means all rights (including rights as licensee and lessee) with respect to (i) computer and other electronic data processing hardware, including all integrated computer systems, central processing units, memory units, display terminals, printers, computer elements, card readers, tape drives, hard and soft disc drives, cables, electrical supply hardware, generators, power equalizers, accessories, peripheral devices and other related computer hardware; (ii) all software and all software programs designed for use on the computers and electronic data processing hardware described in clause (i) above, including all operating system software, utilities and application programs in any form (service code and object code in magnetic tape, disc or hard copy format or any other listings whatsoever); (iii) any firmware associated with any of the foregoing; (iv) any documentation for hardware, software and firmware described in clauses (i), (ii) and (iii) above, including flow charts, logic diagrams, manuals, specifications, training materials, charts and pseudo codes; and all rights with respect thereto, including any and all licenses, options, warrants, service contracts, program services, test rights, maintenance rights, support rights, improvement rights, renewal rights and indemnifications, and any substitutions, replacements, additions or model conversions of any of the foregoing.

"Contracts" means all contracts, agreements, instruments and indentures in any form (including any interest rate protection agreements, hedge agreements, licensing agreements and any partnership

agreements, joint venture agreements and limited liability company agreements), and portions thereof, to which any Grantor is a party or under which any Grantor or any property of any Grantor is subject, as the same may from time to time be amended, supplemented, waived or otherwise modified, including (i) all rights of any Grantor to receive moneys due and to become due to it thereunder or in connection therewith, (ii) all rights of any Grantor to damages arising thereunder, (iii) all rights of any Grantor to perform and to exercise all remedies thereunder, (iv) any and all rights to receive and compel performance thereunder and (v) any and all other rights, interests and claims now existing or in the future arising in connection therewith.

"Copyright Licenses" means any written agreement naming any Grantor as licensor or licensee (including those listed in the Perfection Certificate), granting any right under any Copyright, including the grant of rights to manufacture, distribute, exploit and sell materials derived from any Copyright.

"Copyrights" means (i) all copyrights arising under the laws of the United States, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished (including those listed in the Perfection Certificate), all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office, and (ii) the right to obtain all renewals thereof.

"Copyright Security Agreement" means a Copyright Security Agreement, in substantially the form set forth on Annex IV attached hereto, executed by a Grantor in favor of the Collateral Agent.

"Deposit Account Control Agreement" means a Deposit Account Control Agreement, in substantially the form set forth on Annex II attached hereto or otherwise reasonably acceptable to the Collateral Agent, by and among a Grantor, the Collateral Agent and a depositary institution.

"Domain Names" means all internet domain names and associated URL addresses in or to which any Grantor now or hereafter has any right, title or interest.

"Equity Interests" means, with respect to any Person, shares of capital stock of (or other ownership or profit interests in) such Person, warrants, options or other rights for the purchase or other acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or other acquisition from such Person of such shares (or such other interests), and other ownership or profit interests in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized on any date of determination.

"Filings" means the filing or recording of (i) the financing statements as set forth in the Perfection Certificate, (ii) this Agreement, any Copyright Security Agreement, Patent Security Agreement or Trademark Security Agreement, or a notice hereof or thereof, with respect to Intellectual Property set forth in the Perfection Certificate and (iii) any filings after the date hereof in any other jurisdiction as may be necessary under any requirement of applicable law.

"Financing Documents" means the Indenture, the Notes, the Intercreditor Agreement, this Agreement and each other Collateral Agreement pursuant to which a security interest is granted in favor of the Collateral Agent for the ratable benefit of the Secured Parties in respect of the Secured Obligations.

"General Intangibles" means all "general intangibles" as such term is defined in Section 9-102(a)(42) of the UCC and, in any event, including with respect to any Grantor, all Contracts, agreements, instruments and indentures in any form, and portions thereof, to which such Grantor is a party or under which such Grantor has any right, title or interest or to which such Grantor or any property of such Grantor is subject, as the same may from time to time be amended, restated, supplemented or otherwise modified, including (i) all rights of such Grantor to receive moneys due and to become due to it thereunder or in connection therewith, (ii) all rights of such Grantor to damages arising thereunder and (iii) all rights of such Grantor to perform and to exercise all remedies thereunder.

"Grantor" has the meaning provided in the first paragraph of this Agreement.

"Holder" means each Person in whose name a Note is registered in the relevant records of the Company.

"Indenture" has the meaning provided in the recitals to this Agreement.

"Intellectual Property" means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including the Copyrights, the Copyright Licenses, the Domain Names, the Patents, the Patent Licenses, the Trade Secrets, the Trade Secret Licenses, the Trademarks and the Trademark Licenses and all rights to sue at law or equity or otherwise recover for any and all past, present and future infringements, misappropriations, dilutions or other impairments thereof and all income, royalties, damages and other payments now and hereafter due and/or payable with respect thereto (including payments under all licenses entered into in connection therewith, and damages and payments for past, present or future infringements, misappropriations, dilutions or other impairments thereof).

"Intercompany Note" means any promissory note evidencing loans made by any Grantor or any Affiliate or Subsidiary thereof to any other Grantor or Affiliate or Subsidiary thereof.

"Intercreditor Agreement" means that certain intercreditor agreement dated as of [_____], 2009 (as amended, amended and restated, supplemented or otherwise modified from time to time) made by and among (i) The Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent for the holders of the Notes, (ii) [_____], as trustee and collateral agent for the holders of the Series B Senior Notes and (iii) [_____], as trustee and collateral agent for the holders of the Subordinated Notes.

"Investment Property" means the collective reference to (a) all "investment property" as such term is defined in Section 9-102(a)(49) of the UCC and (b) whether or not constituting "investment property" as so defined, all Pledged Notes and all Pledged Stock.

"Issuers" means the collective reference to each issuer of any Investment Property.

"Majority Holders" means, at any time, Holders of a majority in aggregate principal amount of the outstanding Notes at such time.

"Patent License" means all agreements, whether written or oral, providing for the grant by or to any Grantor of any right to manufacture, have manufactured, use or sell or import any invention covered in whole or in part by a Patent, including any of the foregoing referred to in the Perfection Certificate.

"Patents" means (i) all letters patent of the United States, any other country or any political subdivision thereof, all reissues and extensions thereof and all goodwill associated therewith, including any of the foregoing referred to in the Perfection Certificate, (ii) all applications for letters patent of the United States or any other country and all provisionals, divisions, continuations and continuations-in-part thereof, including any of the foregoing referred to in the Perfection Certificate, and (iii) all rights to obtain any reissues or extensions of the foregoing.

"Patent Security Agreement" means a Patent Security Agreement, in substantially the form set forth on Annex V attached hereto, executed by a Grantor in favor of the Collateral Agent.

"Perfection Certificate" means the perfection certificate delivered by the Grantors to the Collateral Agent on the Closing Date, in substantially the form set forth on Annex VII attached hereto.

"Pledged Notes" means all promissory notes issued to any Grantor listed on the Perfection Certificate, all Intercompany Notes at any time issued to any Grantor and all other promissory notes issued to or held by any Grantor.

"Pledged Securities" means the Pledged Notes and the Pledged Stock.

"Pledged Stock" means (i) the Equity Interests listed on the Perfection Certificate and (ii) all other shares, stock certificates, options, interests or rights of any nature whatsoever in respect of the Equity Interests of any Person that may be issued or granted to, or held by, any Grantor while this Agreement is in effect, provided, however, that Pledged Stock shall not include any of the Equity Interests described in clause (i) to the definition of "Excluded Collateral" in the Indenture.

"Proceeds" means all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC and, in any event, shall include all dividends or other income from the Investment Property, collections thereon or distributions or payments with respect thereto.

"Receivable" means any right to payment for goods sold or leased or for services rendered, whether or not such right is evidenced by an Instrument or Chattel Paper and whether or not it has been earned by performance (including any Account).

"Secured Obligations" means the unpaid principal of and interest on the Notes (including capitalized interest and interest accruing after the maturity thereof and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding,

relating to the Company, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) and all other obligations and liabilities of any Grantor to the Secured Parties, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, that may arise under, out of, or in connection with, this Agreement or any other Financing Document, whether on account of fees (including all fees and disbursements of counsel to the Collateral Agent and the Trustee), expenses, indemnities, costs, charges or otherwise.

"Secured Parties" means, at any time, the Trustee, the Collateral Agent and all Holders at such time.

"Securities Account Control Agreement" means a Securities Account Control Agreement, in substantially the form set forth on Annex III attached hereto or otherwise reasonably acceptable to the Collateral Agent, by and among a Grantor, the Collateral Agent and a Securities Intermediary.

"Securities Act" means the Securities Act of 1933, as amended.

"Subsidiary Grantor" has the meaning provided in the first paragraph of this Agreement.

"Titled Vehicles" shall mean all vehicles, including motor vehicles, tractors, trailers, aircraft and boats, now owned or hereafter acquired by any Grantor, that are subject to any certificate of title or other registration statute of the United States, any constituent state thereof or any other jurisdiction or protectorate thereto.

"Trade Secrets" means all trade secrets, including know-how, processes, formulae, compositions, designs, and confidential business and technical information, and all rights of any kind whatsoever accruing thereunder or pertaining thereto.

"Trade Secret Licenses" means any agreement, whether written or oral, providing for the grant by or to any Grantor of any right to use any Trade Secret, including any of the foregoing referred to in the Perfection Certificate.

"Trademark License" means any agreement, whether written or oral, providing for the grant by or to any Grantor of any right to use any Trademark, including any of the foregoing referred to in the Perfection Certificate.

"Trademarks" means (i) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, domain names, logos and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common-law rights related thereto, including any of the foregoing referred to in the Perfection Certificate, and (ii) the right to obtain all renewals thereof.

"Trademark Security Agreement" means a Trademark Security Agreement, in substantially the form set forth on Annex VI attached hereto, executed by a Grantor in favor of the Collateral Agent.

"UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York; provided that, if perfection or the effect of perfection or non perfection or the priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as from time to time in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non perfection or priority.

     1.2    Rules of Interpretation. As used herein, and any certificate or other document made or delivered pursuant hereto:

     (a)    the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

     (b)    the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings);

     (c)    the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, equity interests, securities, vessels, equipment, revenues, accounts, leasehold interests and contract rights;

     (d)    the words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and clause, subsection, Section, Schedule and Annex references are to this Agreement unless otherwise specified;

     (e)    the meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms;

     (f)    the expressions "payment in full", "paid in full" and any other similar terms or phrases when used herein with respect to the Secured Obligations shall mean the payment in full, in immediately available funds, of all the Secured Obligations and the termination of all obligations on the part of the Secured Parties to grant extensions of credit or other financial accommodations to any Grantor pursuant to the Financing Documents;

     (g)    in any computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding" and the word "through" means "to and including";

       (h)     references to agreements or other contractual obligations shall, unless otherwise specified, be deemed to refer to such agreements or contractual obligations as amended, supplemented, amended and restated or otherwise modified from time to time (subject to any applicable restrictions herein); and

       (i)     where the context requires, terms relating to the Collateral or any part thereof, when used in relation to a Grantor, shall refer to such Grantor's Collateral or the relevant part thereof.

    1.3     <u>Intercreditor Agreement</u>. Notwithstanding anything in this Agreement to the contrary, it is acknowledged, understood and agreed that the provisions of this Agreement, any security interest granted pursuant to this Agreement, and the exercise of any right or remedy by the Collateral Agent pursuant to this Agreement are subject to the provisions of the Intercreditor Agreement. In the event of any inconsistency between the provisions of this Agreement and the Intercreditor Agreement, the provisions of the Intercreditor Agreement shall control.

## SECTION 2.   SECURITY INTEREST.

    2.1     <u>Grant of Security Interest</u>. Each Grantor hereby pledges, assigns and transfers to the Collateral Agent, and hereby grants to the Collateral Agent, for the ratable benefit of the Secured Parties, a security interest in, all of the following property, wherever located, whether now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "<u>Collateral</u>"):

       (a)     all Accounts;

       (b)     all Account Collateral and all cash;

       (c)     all Books and Records;

       (d)     all Chattel Paper;

       (e)     all Commercial Tort Claims set forth in the Perfection Certificate;

       (f)     all Computer Hardware and Software;

       (g)     all Contracts;

       (h)     all Documents;

       (i)     all Equipment;

       (j)     all General Intangibles;

       (k)     all Goods;

(l)    all Hydrocarbons;

(m)    all Instruments;

(n)    all Intellectual Property;

(o)    all Inventory;

(p)    all Investment Property;

(q)    all Letter-of-Credit Rights;

(r)    all Oil and Gas Assets;

(s)    all Receivables;

(t)    all plant fixtures, business fixtures and other fixtures and storage and office facilities, and all accessions thereto and products thereof;

(u)    all other personal property to the extent not otherwise described above; and

(v)    to the extent not otherwise included, all Proceeds, Supporting Obligations and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing;

provided, however, that notwithstanding the foregoing, "Collateral" shall not include the Excluded Collateral.

2.2    Secured Obligations.  This Agreement secures, and the Collateral assigned by each Grantor is collateral security for, the prompt payment and performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code), of all Secured Obligations.

2.3    Transfer of Collateral.  All certificates and instruments representing or evidencing the Pledged Securities shall be delivered to and held pursuant hereto by the Collateral Agent, a person designated by the Collateral Agent or its agent and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, and accompanied by any required transfer tax stamps to effect the pledge of the Pledged Securities to the Collateral Agent. Notwithstanding the preceding sentence, at the Collateral Agent's discretion, all such Pledged Securities shall be delivered or transferred in such manner as to permit the Collateral Agent to be a "protected purchaser" to the extent of its security interest as provided in Section 8-303 of the UCC (if the Collateral Agent otherwise qualifies as a protected purchaser).  During the continuance of an Event of Default, the Collateral Agent shall have the right, at any time and without notice, to transfer to or to register in the name of the Collateral Agent or any of its nominees any or all of the Pledged Securities.  In addition,

during the continuance of an Event of Default, the Collateral Agent shall have the right at any time and without notice, to exchange certificates or instruments representing or evidencing Pledged Securities for certificates or instruments of smaller or larger denominations.

2.4     Bailees.  Any Person (other than the Collateral Agent) at any time and from time to time holding all or any portion of the Collateral shall be deemed to hold, and shall hold, the Collateral as pledge holder and bailee and agent for perfection for, the Collateral Agent.  At any time and from time to time during the continuance of an Event of Default, the Collateral Agent may give notice to any such Person holding all or any portion of the Collateral that such Person is holding the Collateral as the bailee of and agent for perfection for, and as pledge holder for, the Collateral Agent, and request such Person's written acknowledgment thereof.  Each Grantor will join with the Collateral Agent upon the Collateral Agent's request in notifying any Person who has possession of any Collateral of the Secured Parties' security interest therein and requesting an acknowledgment from such Person that it is holding the Collateral for the benefit of the Collateral Agent.

**SECTION 3.   REPRESENTATIONS AND WARRANTIES.**

To induce the Collateral Agent and the Trustee to enter into the Indenture and to induce the Holders to purchase the Notes, each Grantor hereby represents and warrants to the Secured Parties that:

3.1     Representations in Financing Documents and Perfection Certificate.  The representations and warranties of such Grantor set forth in the Indenture, in the Perfection Certificate or in any other Financing Document to which such Grantor is a party, in each case as they relate to such Grantor, each of which is hereby incorporated herein by reference, are true and correct in all material respects (except to the extent already qualified with respect to materiality, in which case such representations and warranties shall be true and correct), and the Secured Parties shall be entitled to rely on each of them as if it were fully set forth herein; provided that, each reference in each such representation and warranty to the Company's knowledge or to the knowledge of any Subsidiary of the Company shall, for the purposes of this Section 3.1, be deemed to be a reference to such Grantor's knowledge.

3.2     Title; No Other Liens.  Except for Permitted Liens, such Grantor owns each item of the Collateral free and clear of any and all Liens or claims of others.  No financing statement or other public notice or filing with respect to all or any part of the Collateral is on file or of record in any public office, except such as have been filed (i) in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, pursuant to this Agreement, (ii) in respect of Permitted Liens and (iii) in respect of Liens securing prior extensions of credit to the Company, which Liens are being released contemporaneously with the execution of this Deed of Trust.

3.3     Perfected First Priority Liens.  Upon completion of the Filings and other actions specified in the Perfection Certificate (which, in the case of all Filings and other documents referred to in said Perfection Certificate, have been delivered to the Collateral Agent in completed and duly executed form) or, in the case of (a) all Deposit Accounts, Securities Accounts and the Collateral Account, the obtaining and maintenance of "control" (as described in the UCC), (b) in the case of Commercial Tort Claims, the taking of the actions required by Section 4.13, and (c) in the case of Letter-of-Credit Rights, the taking of

the actions required by Section 4.5(c)) the security interests granted pursuant to this Agreement, (1) constitute valid first priority perfected security interests in all of the Collateral, to the extent that a security interest may be perfected by Filings or the taking of such other actions, in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, as collateral security for the Secured Obligations, enforceable in accordance with the terms hereof against all creditors of such Grantor and (2) rank prior to all other Liens on the Collateral in existence on the date hereof except for Permitted Liens.

3.4     Jurisdiction of Organization; Chief Executive Office.  On the date hereof, such Grantor's jurisdiction of organization and (if such Grantor is not a Registered Organization) the location of such Grantor's chief executive office or sole place of business, as the case may be, are specified in the Perfection Certificate.

3.5     [Reserved]

3.6     Farm Products.  None of the Collateral constitutes, or is the Proceeds of, Farm Products.

3.7     Investment Property.

(a)     The shares of Pledged Stock pledged by such Grantor hereunder constitute all the issued and outstanding Equity Interests of each Issuer owned by such Grantor.

(b)     All the shares of the Pledged Stock have been duly and validly issued and are fully paid and nonassessable (to the extent such concepts are applicable thereto).

(c)     Such Grantor is the record and beneficial owner of, and has good and marketable title to, the Investment Property pledged by it hereunder, free of any and all Liens or options in favor of, or claims of, any other Person, except the Liens created by this Agreement.

3.8     Receivables.

(a)     No amount payable to such Grantor under or in connection with any Receivable is evidenced by any Instrument or Chattel Paper that has not been delivered to the Collateral Agent.

(b)     None of the obligors on any Receivables is a governmental authority.

3.9     Intellectual Property.

(a)     The Perfection Certificate lists all registrations and applications for registration or issuance of Intellectual Property and trade names (whether or not subject to an application or registration) that are owned by such Grantor in its own name on the date hereof.

(b)     Except as set forth in the Perfection Certificate, on the date hereof, none of the Intellectual Property owned or used by such Grantor is the subject of any licensing or franchise agreement pursuant to which such Grantor is the licensor or franchisor.

3.10    Deposit Accounts and Securities Accounts. Each Grantor is the record and beneficial owner of, and has good title to, the Account Collateral pledged by it hereunder, free of any and all Liens or options in favor of, or claims of, any other Person, except the security interest created by this Agreement, rights of setoff of any depository bank or securities intermediary and Permitted Liens. Subject to the last sentence of Section 4.12, all Deposit Accounts and Securities Accounts held by a Grantor (other than those maintained with the Collateral Agent) are subject to a Deposit Account Control Agreement and a Securities Account Control Agreement respectively.

3.11    Benefit to each Grantor. Each Grantor that becomes a party to this Agreement after the date hereof is a member of an affiliated group of companies that includes such Grantor and the Company, and such Grantor and the Company are engaged in related businesses. Each Grantor (other than the Company) is a Subsidiary of the Company and each Grantor's obligations pursuant to this Agreement reasonably may be expected to benefit, directly or indirectly, it, and such Grantor has determined that this Agreement is necessary and convenient to the conduct, promotion and attainment of the business of such Grantor and the Company.

3.12    Consents. Except as set forth in the Perfection Certificate, no consent of any party (other than a Grantor) to any Copyright License, Patent License, Trade Secret License or Trademark License constituting Collateral or any obligor in respect of any material Account constituting Collateral or that owes in the aggregate a material portion of all the Accounts constituting Collateral is required, or purports to be required, to be obtained by or on behalf of any Grantor in connection with the execution, delivery and performance of this Agreement that has not been obtained. Each Copyright License, Patent License, Trade Secret License, Trademark License and Account constituting Collateral is in full force and effect and constitutes a valid and legally enforceable obligation of each Grantor party thereto and (to the knowledge of such Grantor) each other party thereto, except as enforceability thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditor's rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law) and except to the extent the failure of any such Copyright License, Patent License, Trade Secret License, Trademark License or Account constituting Collateral to be in full force and effect or valid or legally enforceable could not be reasonably expected, in the aggregate, to have a Material Adverse Effect on the value of the Collateral. Except as set forth on the Perfection Certificate, no consent or authorization of, filing with or other act by or in respect of any governmental authority or any other Person is required in connection with the execution, delivery, performance, validity or enforceability of any of the Copyright Licenses, Patent Licenses, Trade Secret Licenses, Trademark Licenses and Accounts constituting Collateral other than those that have been duly obtained, made or performed and are in full force and effect and those the failure of which to make or obtain could not be reasonably expected, in the aggregate, to have a Material Adverse Effect on the value of the Collateral. Except as set forth on the Perfection Certificate, no Grantor nor (to the knowledge of any Grantor) any other party to any Copyright License, Patent License, Trade Secret License or Trademark License or Account constituting Collateral is in default in the performance or observance of any of the terms thereof, except for such defaults as could not reasonably be expected, in the aggregate, to have a Material Adverse Effect on the value of the Collateral.

3.13    [Reserved].

**SECTION 4.  COVENANTS.**

Each Grantor covenants and agrees with the Collateral Agent, the Trustee and each Holder that, from and after the date of this Agreement until the discharge and payment of the Secured Obligations in full:

4.1    [Reserved]

4.2    <u>Delivery of Instruments, Certificated Securities and Chattel Paper</u>. If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument, Certificated Security or Chattel Paper, such Instrument, Certificated Security or Chattel Paper shall be promptly delivered to the Collateral Agent, duly indorsed in a manner satisfactory to the Collateral Agent, to be held as Collateral pursuant to this Agreement. The Grantor shall not take any action with respect to such Instrument, Certificated Security or Chattel Paper which could reasonably be expected to materially adversely affect its value, and shall promptly deliver to the Collateral Agent a copy of any demand, notice or document received by it relating to any such Instrument, Certificated Security or Chattel Paper.

4.3    <u>Maintenance of Insurance</u>.

(a)    All insurance policies maintained by the Grantor pursuant to the Indenture shall designate the Collateral Agent as the loss payee and an additional insured in respect of all property insurance and liability policies respectively, and shall contain such provisions relating to cancellation, material reduction in amount or material change in coverage thereof and such other matters as may be reasonably required by the Collateral Agent.

(b)    If an insured loss occurs, the Collateral Agent shall have the right (but not the obligation) to file a proof of loss with the relevant insurers, and all amounts so received shall be applied (i) to satisfy all costs and expenses (including reasonable attorneys' fees) incurred by the Collateral Agent in the collection thereof, and (ii) provided no Default or Event of Default has then occurred or is continuing, to remedy or make good the insured loss. The Collateral Agent is hereby authorized, but not obligated to, enforce in the name of the relevant Grantor, payment of any or all of said policies or settle or compromise any claim in respect thereof, and to collect and make receipts for the proceeds thereof.  If an Event of Default has occurred and is continuing, all right, title and interest of the Grantor in respect of all such insurance policies and all proceeds payable thereunder shall vest in the Collateral Agent.

4.4    [Reserved].

4.5    <u>Maintenance of Perfected Security Interest; Further Assurances</u>.

(a)     Other than as permitted by this Agreement or the Indenture, such Grantor shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in <u>Section 3.3</u> and shall defend such security interest against the claims and demands of all Persons whomsoever, including completing the Filings and filing any financing or continuation statements under the UCC (or other similar laws) in effect in any jurisdiction with respect to the security interests created hereby.

(b)     Such Grantor will furnish to the Collateral Agent from time to time statements and schedules further identifying and describing the Collateral of such Grantor and such other reports in connection therewith as the Collateral Agent may reasonably request, all in reasonable detail.

(c)     At any time and from time to time, upon the request of the Collateral Agent, and at the sole expense of such Grantor, such Grantor will promptly and duly execute and deliver, and have recorded, such further instruments and documents and take such further actions as the Collateral Agent may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, including (i) filing any financing or continuation statements under the UCC (or other similar laws) in effect in any jurisdiction with respect to the security interests created hereby, and (ii) in the case of Investment Property, Letter-of-Credit Rights and any other relevant Collateral, taking any actions reasonably necessary and reasonably available to it to enable the Collateral Agent to obtain "control" (within the meaning of the applicable UCC) with respect thereto, including the execution and delivery of Deposit Account Control Agreements and Securities Account Control Agreements and taking the actions set forth in Sections 9-106 and 9-107 of the UCC and other applicable sections of the UCC referred to in said sections.

4.6     <u>Changes in Locations, Name, etc.</u>  Such Grantor will not, except upon 15 Business Days' prior written notice to the Collateral Agent and delivery to the Collateral Agent of copies of all filed additional financing statements, and other documents (in each case, properly executed) reasonably requested by the Collateral Agent, to maintain the validity, perfection and priority of the security interests provided for herein:

(a)     change its jurisdiction of organization or (if such Grantor is not a Registered Organization) the location of its chief executive office or sole place of business from that referred to in <u>Section 3.4</u>; or

(b)     change its name.

4.7     <u>Notices.</u>  Such Grantor will advise the Collateral Agent promptly, in reasonable detail, of:

(a)     any Lien (other than Permitted Liens or Liens otherwise expressly permitted hereunder) on any of the Collateral; and

(b)      the occurrence of any other event that could reasonably be expected to have a material adverse effect on the aggregate value of the Collateral or on the security interests created hereby.

4.8      Investment Property.

(a)      If such Grantor shall become entitled to receive or shall receive any certificate (including any certificate representing a dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights in respect of the Equity Interests of any Issuer, whether in addition to, in substitution of, as a conversion of, or in exchange for, any shares of the Pledged Stock, or otherwise in respect thereof, such Grantor shall accept the same as the agent of the Secured Parties, hold the same in trust for the Secured Parties and deliver the same forthwith to the Collateral Agent in the exact form received, duly indorsed by such Grantor to the Collateral Agent, together with an undated stock power covering such certificate duly executed in blank by such Grantor and with signature guaranteed, to be held by the Collateral Agent, subject to the terms hereof, as additional collateral security for the Secured Obligations. Any sums paid upon or in respect of the Investment Property upon the liquidation or dissolution of any Issuer shall be paid over to the Collateral Agent to be held by it hereunder as additional collateral security for the Secured Obligations, and in case any distribution of capital shall be made on or in respect of the Investment Property or any property shall be distributed upon or with respect to the Investment Property pursuant to the recapitalization or reclassification of the capital of any Issuer or pursuant to the reorganization thereof, the property so distributed shall, unless otherwise subject to a perfected security interest in favor of the Collateral Agent, be delivered to the Collateral Agent to be held by it hereunder as additional collateral security for the Secured Obligations. If any sums of money or property so paid or distributed in respect of the Investment Property shall be received by such Grantor, such Grantor shall, until such money or property is paid or delivered to the Collateral Agent, hold such money or property in trust for the Secured Parties, segregated from other funds of such Grantor, as additional collateral security for the Secured Obligations.

(b)      In respect of any Issuer whose issued and outstanding Equity Interests have been pledged by a Grantor hereunder, such Grantor will not, without the prior written consent of the Collateral Agent (i) vote to enable, or take any other action to permit, such Issuer to issue any Equity Interests of any nature or to issue any other securities convertible into or granting the right to purchase or exchange for any Equity Interests of any nature of any Issuer, except to the extent such Equity Interests are pledged to the Collateral Agent hereunder in accordance with the terms hereof, (ii) sell, assign, transfer, exchange, or otherwise dispose of, or grant any option with respect to, the Investment Property or Proceeds thereof (except pursuant to a transaction expressly permitted by the Indenture), (iii) create, incur or permit to exist any Lien or option in favor of, or any claim of any Person with respect to, any of the Investment Property or Proceeds thereof, or any interest therein, except for Permitted Liens or (iv) enter into any agreement or undertaking that restricts the right or ability of such Grantor or the Collateral Agent to sell, assign or transfer any of the Investment Property or Proceeds thereof.

(c)     In the case of each Grantor that is an Issuer, such Issuer agrees that (i) it will be bound by the terms of this Agreement relating to the Investment Property issued by it and will comply with such terms insofar as such terms are applicable to it, (ii) it will notify the Collateral Agent promptly in writing of the occurrence of any of the events described in <u>Section 4.8(a)</u> with respect to the Investment Property issued by it and (iii) the terms of <u>Sections 5.3(c)</u> and <u>5.7</u> shall apply to it, mutatis mutandis, with respect to all actions that may be required of it pursuant to <u>Section 5.3(c)</u> or <u>5.7</u> with respect to the Investment Property issued by it.

4.9     [Reserved].

4.10     <u>Intellectual Property</u>.

(a)     Except as otherwise permitted under the Indenture, such Grantor (either itself or through licensees) will use such Trademark with the appropriate notice of registration and all other notices and legends required by applicable law and not (and not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby such Trademark may become invalidated or impaired in any way.

(b)     Except as otherwise permitted under the Indenture, such Grantor (either itself or through licensees) will not do any act, or omit to do any act, whereby any material Patent owned or used by such Grantor may become forfeited, abandoned or dedicated to the public.

(c)     Except as otherwise permitted under the Indenture, such Grantor (either itself or through licensees) will not (and will not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby any material portion of the Copyrights may become invalidated or otherwise impaired.

(d)     Such Grantor (either itself or through licensees) will not do any act that knowingly uses any material Intellectual Property owned or used by such Grantor to infringe the Intellectual Property rights of any other Person.

(e)     Such Grantor will notify the Collateral Agent immediately if it knows, or has reason to know, that any application or registration relating to any material Intellectual Property owned or used by a Grantor or in which a Grantor has rights may become forfeited, abandoned or dedicated to the public, or of any adverse determination or development regarding such Grantor's ownership of, or the validity of, any material Intellectual Property owned or used by a Grantor or in which a Grantor has rights or such Grantor's right to register the same or to own and maintain the same.

(f)     Whenever such Grantor, either by itself or through any agent, employee, licensee or designee, shall file an application for the registration of any Intellectual Property with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in any other country or any political subdivision thereof, such Grantor shall report such filing to the Collateral Agent within five Business Days after the last day of the fiscal

quarter in which such filing occurs and will notify the Collateral Agent of any acquisition by such Grantor of any exclusive rights under a material Copyright License, Patent License, Trade Secret License or Trademark License within five Business Days after the last day of the fiscal quarter in which such agreement shall have become effective. Such Grantor shall execute and deliver, and have recorded, any and all agreements, instruments, documents, and papers necessary to evidence the Secured Parties' security interest in any Copyright, Patent or Trademark and the goodwill and general intangibles of such Grantor relating thereto or represented thereby, including Copyright Security Agreements, Patent Security Agreements and Trademark Security Agreements, as applicable, with the United States Patent and Trademark Office or in the United States Copyrights Office, as the case may be, and any similar office or agency in any other commercially significant country or any political subdivision thereof mutually agreed upon by such Grantor and the Collateral Agent; provided, that if, in the reasonable judgment of such Grantor, after due inquiry, so evidencing such interest would result in the grant of a Trademark registration or Copyright registration in the name of any Secured Party, such Grantor shall give written notice to the Collateral Agent as soon as reasonably practicable and the filing shall instead be undertaken as soon as practicable but in no case later than immediately following the grant of the applicable Trademark registration or Copyright registration, as the case may be.

(g)     Except as otherwise permitted under the Indenture, such Grantor will take all reasonable and necessary steps, including in any proceeding before the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in any other country or any political subdivision thereof, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of the material Intellectual Property, including filing applications for renewal, affidavits of use and affidavits of incontestability.

(h)     In the event that any material Intellectual Property owned or used by a Grantor or in which a Grantor has rights is infringed, misappropriated or diluted by a third party, such Grantor shall (i) take such actions as such Grantor shall reasonably deem appropriate under the circumstances to protect such Intellectual Property and (ii) if such Intellectual Property is of material economic value, promptly notify the Collateral Agent after it learns thereof and use its best efforts to perfect or enforce such Intellectual Property, including suing for infringement, misappropriation or dilution, seeking injunctive relief where appropriate and seeking to recover any and all damages for such infringement, misappropriation or dilution.

(i)     such Grantor will take all reasonable and necessary steps to preserve and protect the secrecy of all material Trade Secrets of such Grantor.

4.11    Deposit Accounts. No Grantor shall deposit or in any way transfer any money into any account listed in Schedule 3 of the Perfection Certificate as an account used exclusively for payroll purposes, except to the extent required to pay such Grantor's employees' wages, or as otherwise required by law.

4.12   New Accounts. Except to the extent contemplated by the final sentence of this paragraph, the Grantors shall cause all Deposit Accounts and Securities Accounts hereafter established by any Grantor to be subject to Deposit Account Control Agreements and Securities Account Control Agreements, respectively, promptly following their establishment. All such Deposit Account Control Agreements and Securities Account Control Agreements shall be in substantially the same form as Annex II and Annex III, as applicable, or in such other form as the Collateral Agent shall reasonably approve, and the Grantors shall promptly deliver true, correct and complete and fully executed copies of the same to the Collateral Agent.

4.13   Commercial Tort Claims. If any Grantor shall at any time hold or acquire, or otherwise become plaintiff or claimant in respect of, any Commercial Tort Claim, such Grantor will (a) promptly notify the Collateral Agent thereof, and provide a reasonably detailed description of such Commercial Tort Claim, and (b) if requested by the Collateral Agent, grant to the Collateral Agent a security interest therein and in the Proceeds thereof, all upon the terms of this Agreement, pursuant to one or more written supplements in form and substance reasonably satisfactory to the Collateral Agent.

## SECTION 5.   REMEDIAL PROVISIONS

5.1   Certain Matters Relating to Receivables.

(a)   At any time and from time to time after the occurrence and during the continuance of an Event of Default, the Collateral Agent shall have the right to make test verifications of the Receivables in any manner and through any medium that it reasonably considers advisable, and each Grantor shall furnish all such assistance and information as the Collateral Agent may require in connection with such test verifications. At any time and from time to time after the occurrence and during the continuance of an Event of Default, upon the Collateral Agent's request, at the expense of the relevant Grantor, such Grantor shall cause independent public accountants or others satisfactory to the Collateral Agent to furnish to the Collateral Agent reports showing reconciliations, aging and test verifications of, and trial balances for, the Receivables.

(b)   The Collateral Agent hereby authorizes each Grantor to collect such Grantor's Receivables, and the Collateral Agent may curtail or terminate said authority at any time after the occurrence and during the continuance of an Event of Default. If required by the Collateral Agent at any time after the occurrence and during the continuance of an Event of Default, any payments of Receivables, when collected by any Grantor, (i) shall be forthwith (and, in any event, within two Business Days) deposited by such Grantor in the exact form received, duly indorsed by such Grantor to the Collateral Agent if required, in a Collateral Account maintained under the sole dominion and control of the Collateral Agent subject to withdrawal by the Collateral Agent for the account of the Secured Parties only as provided in Section 5.5 and (ii) until so turned over, shall be held by such Grantor in trust for the Secured Parties, segregated from other funds of such Grantor. Each such deposit of Proceeds of Receivables shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.

(c)     At the Collateral Agent's request, each Grantor shall deliver to the Collateral Agent all original and other documents evidencing, and relating to, the agreements and transactions that gave rise to the Receivables, including all original orders, invoices and shipping receipts.

5.2     Communications with Obligors; Grantors Remain Liable.

(a)     At any time and from time to time after the occurrence and during the continuance of an Event of Default, the Collateral Agent in its own name or in the name of others may at any time communicate with obligors under the Receivables to verify with them to the Collateral Agent's satisfaction the existence, amount and terms of any Receivables.

(b)     Upon the written request of the Collateral Agent at any time after the occurrence and during the continuance of an Event of Default, each Grantor shall notify obligors on the Receivables that the Receivables have been assigned to the Collateral Agent for the ratable benefit of the Secured Parties and that payments in respect thereof shall be made directly to the Collateral Agent.

(c)     Anything herein to the contrary notwithstanding, each Grantor shall remain liable under each of the Receivables and the Contracts to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto. Neither the Collateral Agent nor the Trustee nor any Holder shall have any obligation or liability under any Receivable (or any agreement giving rise thereto) or Contract, by reason of or arising out of this Agreement or the receipt by the Collateral Agent, the Trustee or any Holder of any payment relating thereto, nor shall the Collateral Agent, the Trustee or any Holder be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Receivable (or any agreement giving rise thereto) or Contract to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts that may have been assigned to it or to which it may be entitled at any time or times.

5.3     Pledged Stock.

(a)     Unless an Event of Default shall have occurred and be continuing and (unless any of the events described in clauses (6) and (7) of Section [6.01] of the Indenture shall have occurred with respect to such Grantor) the Collateral Agent shall have given written notice to the relevant Grantor of the Collateral Agent's intent to exercise its corresponding rights pursuant to Section 5.3(b), each Grantor shall be permitted to receive all cash dividends paid in respect of the Pledged Stock and all payments made in respect of the Pledged Notes, in each case paid in the normal course of business of the relevant Issuer and consistent with past practice, to the extent permitted in the Indenture, and to exercise all voting and corporate or other organizational rights with respect to the Investment Property; provided, however, that no vote shall be cast or corporate or other organizational right exercised or other action taken if the Collateral Agent has delivered