(xi)      to the extent not included above, all general intangibles (as defined in the UCC) of the Grantor related to the foregoing; and

(xii)     all proceeds of any and all of the foregoing.

SECTION 3.   Reference to Security Agreement. This Agreement has been entered into by the Grantor and the Collateral Agent primarily for recording purposes as contemplated by the Security Agreement. In the event of any inconsistency between any of the terms or provisions hereof and the terms and provisions of the Security Agreement, the terms and provisions of the Security Agreement shall govern.

SECTION 4.   Governing Law. This Agreement and the rights of the parties hereunder shall be construed and interpreted in accordance with the law of the State of New York.

SECTION 5.   JURY TRIAL WAIVER. THE ASSIGNOR HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER FINANCING DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

(Signature page follows.)

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized officers as of the date first set forth above.

[APPLICABLE GRANTOR]

By:_____
    Name:
    Title:


Accepted and acknowledged by:


THE BANK OF NEW YORK MELLON
TRUST COMPANY, N.A.,
as Collateral Agent


By:_____
    Name:
    Title:

Schedule A
to Trademark Security Agreement

| Grantor | Trademarks | Country | Registration No. | Registration Date |
|---------|-----------|---------|------------------|-------------------|

Annex VII to<br>
<u>Security Agreement</u>

PERFECTION CERTIFICATE

**BASELINE OIL & GAS CORP.**

Reference is made to that certain First Priority Security Agreement, dated as of [_____],
2009 (as amended, supplemented, amended and restated or otherwise modified from time to time, the
"<u>Security Agreement</u>"), made by and among Baseline Oil & Gas Corp., a Delaware corporation (the
"<u>Company</u>"),  and THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as trustee and
collateral agent for the Holders (as defined therein) (in such capacity, the "<u>Collateral Agent</u>").
Capitalized terms used herein that are not otherwise defined herein shall have the meanings assigned to
such terms in the Security Agreement.

The undersigned, being the _____ of the Company, hereby certifies to the Collateral Agent
as follows, assuming that the acquisition of the plant and related property has occurred:

1.    <u>Name</u>.  The exact name of the Company and each domestic subsidiary of the Company
(each, a "<u>Grantor</u>") as it appears in their respective organization or formation documents, as well as their
jurisdiction of organization/formation, are as follows:

| **Name** | **Jurisdiction of Incorporation/Formation** |
|----------|---------------------------------------------|
| _____ | _____ |

Set forth below is each other name that each Grantor has had since its organization/formation,
together with the date of the relevant change:

| **Name** | **Dates that names changed** |
|----------|------------------------------|

Except as set forth on <u>Schedule 1</u>, no Grantor has changed its identity or organizational structure
in any way within the past five years.  Changes in identity or corporate structure include mergers,
consolidations and acquisitions, as well as any change in form, name, nature or jurisdiction of
organization.  If any such change has occurred, <u>Schedule 1</u> includes the information required by
<u>Sections 1, 2</u> and <u>3</u> of this Certificate as to each acquiree or constituent party to a merger or consolidation.

The following is a list of all other names (including trade names or similar appellations) used by any Grantor or any of its divisions or other business units in connection with the conduct of its business or the ownership of its properties at any time during the past five years:

**Grantor**                                    **Additional Names**

2.      Current Locations.  The chief executive office of each Grantor is located at the address set forth opposite its name below:

**Grantor**                                    **Chief Executive Office**

Set forth on Schedule 2 is a list of all other locations where each Grantor maintains or has maintained tangible assets, including but not limited to any inventory or equipment (including any warehouses) over the last five years.;

3.      Prior Locations.  Set forth below is all of the business locations, not otherwise listed herein, which were maintained by any Grantor at any time during the past five years:

**Business Location**                          **Use**

4.      Bank Deposits/Letters of Credit.

Set forth on Schedule 3 is the name of each bank at which each Grantor maintains deposit accounts, the state of incorporation of such bank and the account numbers for each deposit account.

Set forth on Schedule 4 is a list of all letters of credit under which any Grantor is named as beneficiary, including the name of the issuing bank and the letter of credit number.

5.      Bailees.  Schedule 5 lists all third parties ("Bailees") with possession of any collateral (including inventory and equipment) of each Grantor, including the name and address of such Bailee, a description of the inventory and equipment in such Bailee's possession and the location of such inventory and equipment.

6.     Unusual Transactions.  All accounts have been originated by the Grantors, and all inventory and equipment have been acquired by the Grantors, in the ordinary course of business.

7.     Intellectual Property.  Attached hereto as Schedule 6 is a list of all the patents, patent rights, patent applications, copyrights and copyright applications, trademarks, trademark rights, patent licenses, copyright licenses and trademark licenses now owned or used by any Grantor.

8.     Lien Search Summary.  Attached hereto as Schedule 7 is a summary of each financing statement or other filing filed against the Company and any Grantor in the Uniform Commercial Code filing office or offices in each jurisdiction identified in paragraphs 2 or 3 above with respect to such Grantor.  Each Grantor has no knowledge of any other financing statement or other filing under the Uniform Commercial Code having been made in the name of Company or any Grantor.  True and correct copies of all filings listed on Schedule 7 have been delivered to the Collateral Agent.

9.     Stock Ownership.  Attached hereto as Schedule 8 is a true and correct list of all duly authorized, issued and outstanding types of stock or membership interests of each Grantor and the record and beneficial ownership of such stock or membership interests.  Also set forth on Schedule 8 is a list of each equity investment of each Grantor that represents 50% or less of the equity investment of the entity in which such investment was made.

10.    Notes.  Attached hereto as Schedule 9 is a true and correct list of all promissory notes held by each Grantor and all intercompany notes in favor of a Grantor.

11.    Real Property.  Attached hereto as Schedule 10 is:

(a)     each parcel of real property owned by any Grantor, the name of the Grantor that owns such property, and the filing office in which a mortgage or deed of trust (as applicable) with respect to such property must be filed or recorded in order for the Collateral Agent to obtain a perfected mortgage lien thereon;

(b)     each street address and county and state or similar jurisdiction where each Grantor leases real property, the name and current mailing address of the lessor of such property, the nature and current use of such property, the scheduled date of expiration of the lease with respect to such property, the current fair market value of such property and whether such property includes fixtures; and

(c)     the name and current mailing address of each lessee or sublessee with respect to all or any portion of any real property described in paragraphs (a) and (b) above, a description of the leased property, the scheduled date of expiration of the lease with respect to such property and the monthly rental payments receivable by any Grantor with respect to such property.

12.    Commercial Tort Claims.  Attached hereto as Schedule 12 is a true and correct list of commercial tort claims held by each Grantor, including a brief description thereof.

*[remainder of page intentionally left blank]*

IN WITNESS WHEREOF, each of the undersigned has executed this Certificate through its respective duly authorized officer as of this ___ day of _____, 2009.

BASELINE OIL & GAS CORP.

By: _____
Name:
Title:

## SCHEDULE 1

### CHANGES IN IDENTITY OR CORPORATE STRUCTURE

| Name of Entity | State of Organization | Tax ID# Organizational # | Current Location | Prior Location(s) |
|---|---|---|---|---|

**SCHEDULE 2**

**LOCATIONS OF COLLATERAL**

| Name of Grantor | Location of Property | Type of Property |
|---|---|---|

**SCHEDULE 3**

**DEPOSIT ACCOUNTS**

| Grantor | Name of Bank | State of Bank Incorporation | Account Numbers |
|---------|-------------|------------------------------|-----------------|

## SCHEDULE 4

### LETTERS OF CREDIT

| Grantor | Name of Issuing Bank | LC Number |
|---------|----------------------|-----------|
|         |                      |           |

## SCHEDULE 5

## BAILEES

| Grantor | Name of Bailee | Address of Bailee (Where Property Located) | Type of Property |
|---------|----------------|--------------------------------------------|------------------|

**SCHEDULE 6**

**INTELLECTUAL PROPERTY**

**Patents**

**Trademarks**

**Copyrights**

## SCHEDULE 7

## LIEN SEARCH SUMMARY

## SCHEDULE 8

### STOCK OWNERSHIP

| Issuer | Owner | Type of Security | Registration # | % Ownership |
|--------|-------|------------------|----------------|-------------|
|        |       |                  |                |             |

**Other Equity Investments (Less than 50% of total ownership):**

## SCHEDULE 9

### NOTES

| Maker | Payee | Date | Principal Amount |
|-------|-------|------|------------------|

## SCHEDULE 10

### (a) OWNED REAL PROPERTY

| Grantor | Property Location (Address including zip code) | County | Mortgagee-Mortgagor |
|---------|-----------------------------------------------|--------|---------------------|

### (b) LEASED REAL PROPERTY

| Grantor | Property Location (Address including zip code) | County | Mortgagee-Mortgagor | Nature and Use | Fair Market Value | Does Property include fixtures? |
|---------|-----------------------------------------------|--------|---------------------|----------------|-------------------|--------------------------------|

### (c) LEASED AND SUBLEASED REAL PROPERTY

| Grantor | Address of Lessee | Address of leased property | County | Term | Monthly Rental |
|---------|-------------------|----------------------------|--------|------|----------------|

**SCHEDULE 11**

**COMMERCIAL TORT CLAIMS**

*EXHIBIT P*

---

SECOND PRIORITY SECURITY AGREEMENT

dated as of

[_____], 2009,

among

BASELINE OIL & GAS CORP.,

and

each Subsidiary of BASELINE OIL & GAS CORP.
that may from time to time become a party hereto,
as Grantors,

and

[_____]
as Collateral Agent

---

## TABLE OF CONTENTS

Page

SECTION 1.      DEFINITIONS ..................................................................................... 1

    1.1    Certain Defined Terms; UCC Definitions ........................................................ 1

    1.2    Rules of Interpretation ........................................................................... 7

    1.3    Intercreditor Agreement ......................................................................... 8

SECTION 2.      SECURITY INTEREST .......................................................................... 8

    2.1    Grant of Security Interest ....................................................................... 8

    2.2    Secured Obligations ............................................................................. 9

    2.3    Transfer of Collateral ........................................................................... 9

    2.4    Bailees ......................................................................................... 10

SECTION 3.      REPRESENTATIONS AND WARRANTIES ........................................... 10

    3.1    Representations in Financing Documents and Perfection Certificate ............................... 10

    3.2    Title; No Other Liens ........................................................................... 10

    3.3    Perfected First Priority Liens ................................................................... 10

    3.4    Jurisdiction of Organization; Chief Executive Office ............................................ 11

    3.5    [Reserved] ..................................................................................... 11

    3.6    Farm Products .................................................................................. 11

    3.7    Investment Property ............................................................................ 11

    3.8    Receivables .................................................................................... 11

    3.9    Intellectual Property ............................................................................ 11

    3.10    Deposit Accounts and Securities Accounts ..................................................... 12

    3.11    Benefit to each Grantor ......................................................................... 12

    3.12    Consents ....................................................................................... 12

    3.13    [Reserved] ..................................................................................... 13

SECTION 4.      COVENANTS .................................................................................. 13

    4.1    [Reserved] ..................................................................................... 13

    4.2    Delivery of Instruments, Certificated Securities and Chattel Paper ............................... 13

    4.3    Maintenance of Insurance ....................................................................... 13

    4.4    [Reserved] ..................................................................................... 13

    4.5    Maintenance of Perfected Security Interest; Further Assurances .................................. 13

    4.6    Changes in Locations, Name, etc ............................................................... 14

    4.7    Notices ........................................................................................ 14

    4.8    Investment Property ............................................................................ 15

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 4.9 | [Reserved] | 16 |
| 4.10 | Intellectual Property | 16 |
| 4.11 | Deposit Accounts | 17 |
| 4.12 | New Accounts | 18 |
| 4.13 | Commercial Tort Claims | 18 |
| SECTION 5. | REMEDIAL PROVISIONS | 18 |
| 5.1 | Certain Matters Relating to Receivables | 18 |
| 5.2 | Communications with Obligors; Grantors Remain Liable | 19 |
| 5.3 | Pledged Stock | 19 |
| 5.4 | Proceeds To Be Turned Over to Collateral Agent | 21 |
| 5.5 | Application of Proceeds | 21 |
| 5.6 | Code and Other Remedies | 21 |
| 5.7 | Registration Rights | 22 |
| 5.8 | Deficiency | 23 |
| 5.9 | Non-Judicial Enforcement | 23 |
| SECTION 6. | THE COLLATERAL AGENT | 24 |
| 6.1 | Collateral Agent's Appointment as Attorney-in-Fact, etc | 24 |
| 6.2 | Collateral Agent's Appointment as Agent | 25 |
| 6.3 | Duty in respect of Collateral | 26 |
| 6.4 | Execution of Financing Statements | 27 |
| 6.5 | Authority of the Collateral Agent | 28 |
| 6.6 | Actions by the Collateral Agent | 28 |
| SECTION 7. | MISCELLANEOUS | 29 |
| 7.1 | Amendments in Writing | 29 |
| 7.2 | Notices | 29 |
| 7.3 | No Waiver by Course of Conduct; Cumulative Remedies | 29 |
| 7.4 | Enforcement Expenses; Indemnification | 29 |
| 7.5 | Successors and Assigns | 30 |
| 7.6 | Set-Off | 30 |
| 7.7 | Counterparts | 30 |
| 7.8 | Severability | 30 |
| 7.9 | Section Headings | 31 |

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 7.10 | Integration | 31 |
| 7.11 | GOVERNING LAW | 31 |
| 7.12 | Submission To Jurisdiction; Waivers | 31 |
| 7.13 | Acknowledgements | 31 |
| 7.14 | WAIVER OF JURY TRIAL | 32 |
| 7.15 | Additional Grantors | 32 |
| 7.16 | Releases | 32 |

SCHEDULES

Schedule I     Notice Addresses

ANNEXES

| | |
|---|---|
| Annex I | Form of Assumption Agreement for Additional Grantors |
| Annex II | Form of Deposit Account Control Agreement |
| Annex III | Form of Securities Account Control Agreement |
| Annex IV | Form of Copyright Security Agreement |
| Annex V | Form of Patent Security Agreement |
| Annex VI | Form of Trademark Security Agreement |
| Annex VII | Form of Perfection Certificate |

SECOND PRIORITY SECURITY AGREEMENT

THIS SECOND PRIORITY SECURITY AGREEMENT, dated as of [_____], 2009 (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), is made by BASELINE OIL & GAS CORP., a Delaware corporation (the "Company"), and each Domestic Restricted Subsidiary of the Company that hereafter becomes a party hereto from time to time as an additional Grantor hereunder pursuant to Section 7.15 hereof (any such Person, a "Subsidiary Grantor"; each Subsidiary Grantor and the Company, collectively, the "Grantors"), in favor of [_____], in its capacity as collateral agent for (in such capacity, together with its successors and assigns, the "Collateral Agent") the Secured Parties (as defined below).

W I T N E S S E T H:

A.      Pursuant to that certain Indenture dated as of [_____], 2009 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Indenture") made by and among the Company, as issuer, and [_____], as trustee and collateral agent, the Company authorized the creation and issue of the Notes.

B.      It is a requirement under the Indenture that the Company shall have executed and delivered this Agreement to the Collateral Agent contemporaneously with the execution of the Indenture by the parties thereto.

C.      Each Grantor will derive substantial direct and indirect benefit from the transactions contemplated by the Indenture and, accordingly, desires to execute this Agreement to satisfy the requirements described in the preceding paragraph.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, each Grantor hereby agrees with the Collateral Agent as follows:

**SECTION 1.   DEFINITIONS.**

1.1     Certain Defined Terms; UCC Definitions. For purposes of this Agreement, the following terms shall have the respective meanings given to them below. All capitalized terms used in this Agreement and not otherwise defined herein shall have the respective meanings assigned to them in the Indenture, and any term used herein that is not defined herein or in the Indenture but is defined in the UCC shall be used herein as defined in the UCC. In addition, for the avoidance of doubt, the terms "Accounts", "Chattel Paper", "Commercial Tort Claims", "Documents", "General Intangibles", "Goods", "Instruments", "Letter-of-Credit Rights", "Registered Organization" and "Supporting Obligations" shall have the meanings given to them in Section 9-102 of the UCC.

The following terms shall have the following meanings:

"Account Collateral" means each Grantor's right, title and interest, whether now existing or hereafter acquired or arising, in, to and under, each Deposit Account and Securities Account (including any successor accounts to any such accounts) and all amounts, investments and any other property (including Checks, securities, financial assets, investment property, security entitlements and instruments) at any time deposited in or credited to any such account and all security entitlements with respect thereto, including all income or gain earned thereon and any Proceeds thereof.

"Agreement" has the meaning provided in the first paragraph hereof.

"Books and Records" means all books, records and other written, electronic or other documentation in whatever form maintained now or hereafter by or for any Grantor in connection with, and relating to, the ownership of, or evidencing or containing information relating to, the Collateral.

"Certificates of Title" shall mean all certificates of title evidencing ownership of Titled Vehicles.

"Checks" means checks and other instruments and other payment instructions deposited into any Deposit Account or Securities Account.

"Collateral" has the meaning set forth in Section 2.1.

"Collateral Account" means any collateral account established by the Collateral Agent as provided in Section 5.1 or 5.4.

"Collateral Agent" has the meaning provided in the first paragraph of this Agreement.

"Company" has the meaning provided in the first paragraph of this Agreement.

"Computer Hardware and Software" means all rights (including rights as licensee and lessee) with respect to (i) computer and other electronic data processing hardware, including all integrated computer systems, central processing units, memory units, display terminals, printers, computer elements, card readers, tape drives, hard and soft disc drives, cables, electrical supply hardware, generators, power equalizers, accessories, peripheral devices and other related computer hardware; (ii) all software and all software programs designed for use on the computers and electronic data processing hardware described in clause (i) above, including all operating system software, utilities and application programs in any form (service code and object code in magnetic tape, disc or hard copy format or any other listings whatsoever); (iii) any firmware associated with any of the foregoing; (iv) any documentation for hardware, software and firmware described in clauses (i), (ii) and (iii) above, including flow charts, logic diagrams, manuals, specifications, training materials, charts and pseudo codes; and all rights with respect thereto, including any and all licenses, options, warrants, service contracts, program services, test rights, maintenance rights, support rights, improvement rights, renewal rights and indemnifications, and any substitutions, replacements, additions or model conversions of any of the foregoing.

"Contracts" means all contracts, agreements, instruments and indentures in any form (including any interest rate protection agreements, hedge agreements, licensing agreements and any partnership

agreements, joint venture agreements and limited liability company agreements), and portions thereof, to which any Grantor is a party or under which any Grantor or any property of any Grantor is subject, as the same may from time to time be amended, supplemented, waived or otherwise modified, including (i) all rights of any Grantor to receive moneys due and to become due to it thereunder or in connection therewith, (ii) all rights of any Grantor to damages arising thereunder, (iii) all rights of any Grantor to perform and to exercise all remedies thereunder, (iv) any and all rights to receive and compel performance thereunder and (v) any and all other rights, interests and claims now existing or in the future arising in connection therewith.

"Copyright Licenses" means any written agreement naming any Grantor as licensor or licensee (including those listed in the Perfection Certificate), granting any right under any Copyright, including the grant of rights to manufacture, distribute, exploit and sell materials derived from any Copyright.

"Copyrights" means (i) all copyrights arising under the laws of the United States, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished (including those listed in the Perfection Certificate), all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office, and (ii) the right to obtain all renewals thereof.

"Copyright Security Agreement" means a Copyright Security Agreement, in substantially the form set forth on Annex IV attached hereto, executed by a Grantor in favor of the Collateral Agent.

"Deposit Account Control Agreement" means a Deposit Account Control Agreement, in substantially the form set forth on Annex II attached hereto or otherwise reasonably acceptable to the Collateral Agent, by and among a Grantor, the Collateral Agent and a depositary institution.

"Domain Names" means all internet domain names and associated URL addresses in or to which any Grantor now or hereafter has any right, title or interest.

"Equity Interests" means, with respect to any Person, shares of capital stock of (or other ownership or profit interests in) such Person, warrants, options or other rights for the purchase or other acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or other acquisition from such Person of such shares (or such other interests), and other ownership or profit interests in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized on any date of determination.

"Filings" means the filing or recording of (i) the financing statements as set forth in the Perfection Certificate, (ii) this Agreement, any Copyright Security Agreement, Patent Security Agreement or Trademark Security Agreement, or a notice hereof or thereof, with respect to Intellectual Property set forth in the Perfection Certificate and (iii) any filings after the date hereof in any other jurisdiction as may be necessary under any requirement of applicable law.

"Financing Documents" means the Indenture, the Notes, the Intercreditor Agreement, this Agreement and each other Collateral Agreement pursuant to which a security interest is granted in favor of the Collateral Agent for the ratable benefit of the Secured Parties in respect of the Secured Obligations.

"General Intangibles" means all "general intangibles" as such term is defined in Section 9-102(a)(42) of the UCC and, in any event, including with respect to any Grantor, all Contracts, agreements, instruments and indentures in any form, and portions thereof, to which such Grantor is a party or under which such Grantor has any right, title or interest or to which such Grantor or any property of such Grantor is subject, as the same may from time to time be amended, restated, supplemented or otherwise modified, including (i) all rights of such Grantor to receive moneys due and to become due to it thereunder or in connection therewith, (ii) all rights of such Grantor to damages arising thereunder and (iii) all rights of such Grantor to perform and to exercise all remedies thereunder.

"Grantor" has the meaning provided in the first paragraph of this Agreement.

"Holder" means each Person in whose name a Note is registered in the relevant records of the Company.

"Indenture" has the meaning provided in the recitals to this Agreement.

"Intellectual Property" means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including the Copyrights, the Copyright Licenses, the Domain Names, the Patents, the Patent Licenses, the Trade Secrets, the Trade Secret Licenses, the Trademarks and the Trademark Licenses and all rights to sue at law or equity or otherwise recover for any and all past, present and future infringements, misappropriations, dilutions or other impairments thereof and all income, royalties, damages and other payments now and hereafter due and/or payable with respect thereto (including payments under all licenses entered into in connection therewith, and damages and payments for past, present or future infringements, misappropriations, dilutions or other impairments thereof).

"Intercompany Note" means any promissory note evidencing loans made by any Grantor or any Affiliate or Subsidiary thereof to any other Grantor or Affiliate or Subsidiary thereof.

"Intercreditor Agreement" means that certain intercreditor agreement dated as of [_____], 2009 (as amended, amended and restated, supplemented or otherwise modified from time to time) made by and among (i) The Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent for the holders of the Series A Senior Notes, (ii) [_____], as trustee and collateral agent for the holders of the Notes and (iii) [_____], as trustee and collateral agent for the holders of the Subordinated Notes.

"Investment Property" means the collective reference to (a) all "investment property" as such term is defined in Section 9-102(a)(49) of the UCC and (b) whether or not constituting "investment property" as so defined, all Pledged Notes and all Pledged Stock.

"Issuers" means the collective reference to each issuer of any Investment Property.

"Majority Holders" means, at any time, Holders of a majority in aggregate principal amount of the outstanding Notes at such time.

"Patent License" means all agreements, whether written or oral, providing for the grant by or to any Grantor of any right to manufacture, have manufactured, use or sell or import any invention covered in whole or in part by a Patent, including any of the foregoing referred to in the Perfection Certificate.

"Patents" means (i) all letters patent of the United States, any other country or any political subdivision thereof, all reissues and extensions thereof and all goodwill associated therewith, including any of the foregoing referred to in the Perfection Certificate, (ii) all applications for letters patent of the United States or any other country and all provisionals, divisions, continuations and continuations-in-part thereof, including any of the foregoing referred to in the Perfection Certificate, and (iii) all rights to obtain any reissues or extensions of the foregoing.

"Patent Security Agreement" means a Patent Security Agreement, in substantially the form set forth on Annex V attached hereto, executed by a Grantor in favor of the Collateral Agent.

"Perfection Certificate" means the perfection certificate delivered by the Grantors to the Collateral Agent on the Closing Date, in substantially the form set forth on Annex VII attached hereto.

"Pledged Notes" means all promissory notes issued to any Grantor listed on the Perfection Certificate, all Intercompany Notes at any time issued to any Grantor and all other promissory notes issued to or held by any Grantor.

"Pledged Securities" means the Pledged Notes and the Pledged Stock.

"Pledged Stock" means (i) the Equity Interests listed on the Perfection Certificate and (ii) all other shares, stock certificates, options, interests or rights of any nature whatsoever in respect of the Equity Interests of any Person that may be issued or granted to, or held by, any Grantor while this Agreement is in effect, provided, however, that Pledged Stock shall not include any of the Equity Interests described in clause (i) to the definition of "Excluded Collateral" in the Indenture.

"Proceeds" means all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC and, in any event, shall include all dividends or other income from the Investment Property, collections thereon or distributions or payments with respect thereto.

"Receivable" means any right to payment for goods sold or leased or for services rendered, whether or not such right is evidenced by an Instrument or Chattel Paper and whether or not it has been earned by performance (including any Account).

"Secured Obligations" means the unpaid principal of and interest on the Notes (including capitalized interest and interest accruing after the maturity thereof and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding,

relating to the Company, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) and all other obligations and liabilities of any Grantor to the Secured Parties, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, that may arise under, out of, or in connection with, this Agreement or any other Financing Document, whether on account of fees (including all fees and disbursements of counsel to the Collateral Agent and the Trustee), expenses, indemnities, costs, charges or otherwise.

"Secured Parties" means, at any time, the Trustee, the Collateral Agent and all Holders at such time.

"Securities Account Control Agreement" means a Securities Account Control Agreement, in substantially the form set forth on Annex III attached hereto or otherwise reasonably acceptable to the Collateral Agent, by and among a Grantor, the Collateral Agent and a Securities Intermediary.

"Securities Act" means the Securities Act of 1933, as amended.

"Subsidiary Grantor" has the meaning provided in the first paragraph of this Agreement.

"Titled Vehicles" shall mean all vehicles, including motor vehicles, tractors, trailers, aircraft and boats, now owned or hereafter acquired by any Grantor, that are subject to any certificate of title or other registration statute of the United States, any constituent state thereof or any other jurisdiction or protectorate thereto.

"Trade Secrets" means all trade secrets, including know-how, processes, formulae, compositions, designs, and confidential business and technical information, and all rights of any kind whatsoever accruing thereunder or pertaining thereto.

"Trade Secret Licenses" means any agreement, whether written or oral, providing for the grant by or to any Grantor of any right to use any Trade Secret, including any of the foregoing referred to in the Perfection Certificate.

"Trademark License" means any agreement, whether written or oral, providing for the grant by or to any Grantor of any right to use any Trademark, including any of the foregoing referred to in the Perfection Certificate.

"Trademarks" means (i) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, domain names, logos and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common-law rights related thereto, including any of the foregoing referred to in the Perfection Certificate, and (ii) the right to obtain all renewals thereof.

"Trademark Security Agreement" means a Trademark Security Agreement, in substantially the form set forth on Annex VI attached hereto, executed by a Grantor in favor of the Collateral Agent.

"UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York; provided that, if perfection or the effect of perfection or non perfection or the priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as from time to time in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non perfection or priority.

     1.2   Rules of Interpretation. As used herein, and any certificate or other document made or delivered pursuant hereto:

     (a)   the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

     (b)   the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings);

     (c)   the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, equity interests, securities, vessels, equipment, revenues, accounts, leasehold interests and contract rights;

     (d)   the words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and clause, subsection, Section, Schedule and Annex references are to this Agreement unless otherwise specified;

     (e)   the meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms;

     (f)   the expressions "payment in full", "paid in full" and any other similar terms or phrases when used herein with respect to the Secured Obligations shall mean the payment in full, in immediately available funds, of all the Secured Obligations and the termination of all obligations on the part of the Secured Parties to grant extensions of credit or other financial accommodations to any Grantor pursuant to the Financing Documents;

     (g)   in any computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding" and the word "through" means "to and including";

(h)     references to agreements or other contractual obligations shall, unless otherwise specified, be deemed to refer to such agreements or contractual obligations as amended, supplemented, amended and restated or otherwise modified from time to time (subject to any applicable restrictions herein); and

(i)     where the context requires, terms relating to the Collateral or any part thereof, when used in relation to a Grantor, shall refer to such Grantor's Collateral or the relevant part thereof.

1.3     <u>Intercreditor Agreement</u>.  Notwithstanding anything in this Agreement to the contrary, it is acknowledged, understood and agreed that the provisions of this Agreement, any security interest granted pursuant to this Agreement, and the exercise of any right or remedy by the Collateral Agent pursuant to this Agreement are subject to the provisions of the Intercreditor Agreement.  In the event of any inconsistency between the provisions of this Agreement and the Intercreditor Agreement, the provisions of the Intercreditor Agreement shall control.

**SECTION 2.   SECURITY INTEREST.**

2.1     <u>Grant of Security Interest</u>.  Each Grantor hereby pledges, assigns and transfers to the Collateral Agent, and hereby grants to the Collateral Agent, for the ratable benefit of the Secured Parties, a security interest in, all of the following property, wherever located, whether now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "<u>Collateral</u>"):

    (a)     all Accounts;

    (b)     all Account Collateral and all cash;

    (c)     all Books and Records;

    (d)     all Chattel Paper;

    (e)     all Commercial Tort Claims set forth in the Perfection Certificate;

    (f)     all Computer Hardware and Software;

    (g)     all Contracts;

    (h)     all Documents;

    (i)     all Equipment;

    (j)     all General Intangibles;

    (k)     all Goods;

    (l)     all Hydrocarbons;

    (m)    all Instruments;

    (n)    all Intellectual Property;

    (o)    all Inventory;

    (p)    all Investment Property;

    (q)    all Letter-of-Credit Rights;

    (r)    all Oil and Gas Assets;

    (s)    all Receivables;

    (t)    all plant fixtures, business fixtures and other fixtures and storage and office facilities, and all accessions thereto and products thereof;

    (u)    all other personal property to the extent not otherwise described above; and

    (v)    to the extent not otherwise included, all Proceeds, Supporting Obligations and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing;

provided, however, that notwithstanding the foregoing, "Collateral" shall not include the Excluded Collateral.

    2.2    Secured Obligations. This Agreement secures, and the Collateral assigned by each Grantor is collateral security for, the prompt payment and performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code), of all Secured Obligations.

    2.3    Transfer of Collateral. All certificates and instruments representing or evidencing the Pledged Securities shall be delivered to and held pursuant hereto by the Collateral Agent, a person designated by the Collateral Agent or its agent and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, and accompanied by any required transfer tax stamps to effect the pledge of the Pledged Securities to the Collateral Agent. Notwithstanding the preceding sentence, at the Collateral Agent's discretion, all such Pledged Securities shall be delivered or transferred in such manner as to permit the Collateral Agent to be a "protected purchaser" to the extent of its security interest as provided in Section 8-303 of the UCC (if the Collateral Agent otherwise qualifies as a protected purchaser). During the continuance of an Event of Default, the Collateral Agent shall have the right, at any time and without notice, to transfer to or to register in the name of the Collateral Agent or any of its nominees any or all of the Pledged Securities. In addition,

during the continuance of an Event of Default, the Collateral Agent shall have the right at any time and without notice, to exchange certificates or instruments representing or evidencing Pledged Securities for certificates or instruments of smaller or larger denominations.

2.4     Bailees.  Any Person (other than the Collateral Agent) at any time and from time to time holding all or any portion of the Collateral shall be deemed to hold, and shall hold, the Collateral as pledge holder and bailee and agent for perfection for, the Collateral Agent.  At any time and from time to time during the continuance of an Event of Default, the Collateral Agent may give notice to any such Person holding all or any portion of the Collateral that such Person is holding the Collateral as the bailee of and agent for perfection for, and as pledge holder for, the Collateral Agent, and request such Person's written acknowledgment thereof.  Each Grantor will join with the Collateral Agent upon the Collateral Agent's request in notifying any Person who has possession of any Collateral of the Secured Parties' security interest therein and requesting an acknowledgment from such Person that it is holding the Collateral for the benefit of the Collateral Agent.

**SECTION 3.   REPRESENTATIONS AND WARRANTIES.**

To induce the Collateral Agent and the Trustee to enter into the Indenture and to induce the Holders to purchase the Notes, each Grantor hereby represents and warrants to the Secured Parties that:

3.1     Representations in Financing Documents and Perfection Certificate.  The representations and warranties of such Grantor set forth in the Indenture, in the Perfection Certificate or in any other Financing Document to which such Grantor is a party, in each case as they relate to such Grantor, each of which is hereby incorporated herein by reference, are true and correct in all material respects (except to the extent already qualified with respect to materiality, in which case such representations and warranties shall be true and correct), and the Secured Parties shall be entitled to rely on each of them as if it were fully set forth herein; provided that, each reference in each such representation and warranty to the Company's knowledge or to the knowledge of any Subsidiary of the Company shall, for the purposes of this Section 3.1, be deemed to be a reference to such Grantor's knowledge.

3.2     Title; No Other Liens.  Except for Permitted Liens, such Grantor owns each item of the Collateral free and clear of any and all Liens or claims of others.  No financing statement or other public notice or filing with respect to all or any part of the Collateral is on file or of record in any public office, except such as have been filed (i) in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, pursuant to this Agreement, (ii) in respect of Permitted Liens and (iii) in respect of Liens securing prior extensions of credit to the Company, which Liens are being released contemporaneously with the execution of this Deed of Trust.

3.3     Perfected First Priority Liens.  Upon completion of the Filings and other actions specified in the Perfection Certificate (which, in the case of all Filings and other documents referred to in said Perfection Certificate, have been delivered to the Collateral Agent in completed and duly executed form) or, in the case of (a) all Deposit Accounts, Securities Accounts and the Collateral Account, the obtaining and maintenance of "control" (as described in the UCC), (b) in the case of Commercial Tort Claims, the taking of the actions required by Section 4.13, and (c) in the case of Letter-of-Credit Rights, the taking of

the actions required by Section 4.5(c)) the security interests granted pursuant to this Agreement will, subject to the Intercreditor Agreement, (1) constitute valid first priority perfected security interests in all of the Collateral, to the extent that a security interest may be perfected by Filings or the taking of such other actions, in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, as collateral security for the Secured Obligations, enforceable in accordance with the terms hereof against all creditors of such Grantor and (2) rank prior to all other Liens on the Collateral in existence on the date hereof except for Permitted Liens.

3.4     Jurisdiction of Organization; Chief Executive Office.  On the date hereof, such Grantor's jurisdiction of organization and (if such Grantor is not a Registered Organization) the location of such Grantor's chief executive office or sole place of business, as the case may be, are specified in the Perfection Certificate.

3.5     [Reserved]

3.6     Farm Products.  None of the Collateral constitutes, or is the Proceeds of, Farm Products.

3.7     Investment Property.

(a)     The shares of Pledged Stock pledged by such Grantor hereunder constitute all the issued and outstanding Equity Interests of each Issuer owned by such Grantor.

(b)     All the shares of the Pledged Stock have been duly and validly issued and are fully paid and nonassessable (to the extent such concepts are applicable thereto).

(c)     Such Grantor is the record and beneficial owner of, and has good and marketable title to, the Investment Property pledged by it hereunder, free of any and all Liens or options in favor of, or claims of, any other Person, except the Liens created by this Agreement.

3.8     Receivables.

(a)     No amount payable to such Grantor under or in connection with any Receivable is evidenced by any Instrument or Chattel Paper that has not been delivered to the Collateral Agent.

(b)     None of the obligors on any Receivables is a governmental authority.

3.9     Intellectual Property.

(a)     The Perfection Certificate lists all registrations and applications for registration or issuance of Intellectual Property and trade names (whether or not subject to an application or registration) that are owned by such Grantor in its own name on the date hereof.

(b)     Except as set forth in the Perfection Certificate, on the date hereof, none of the Intellectual Property owned or used by such Grantor is the subject of any licensing or franchise agreement pursuant to which such Grantor is the licensor or franchisor.

3.10     Deposit Accounts and Securities Accounts.  Each Grantor is the record and beneficial owner of, and has good title to, the Account Collateral pledged by it hereunder, free of any and all Liens or options in favor of, or claims of, any other Person, except the security interest created by this Agreement, rights of setoff of any depository bank or securities intermediary and Permitted Liens. Subject to the last sentence of Section 4.12, all Deposit Accounts and Securities Accounts held by a Grantor (other than those maintained with the Collateral Agent) are subject to a Deposit Account Control Agreement and a Securities Account Control Agreement respectively.

3.11     Benefit to each Grantor.  Each Grantor that becomes a party to this Agreement after the date hereof is a member of an affiliated group of companies that includes such Grantor and the Company, and such Grantor and the Company are engaged in related businesses. Each Grantor (other than the Company) is a Subsidiary of the Company and each Grantor's obligations pursuant to this Agreement reasonably may be expected to benefit, directly or indirectly, it, and such Grantor has determined that this Agreement is necessary and convenient to the conduct, promotion and attainment of the business of such Grantor and the Company.

3.12     Consents.  Except as set forth in the Perfection Certificate, no consent of any party (other than a Grantor) to any Copyright License, Patent License, Trade Secret License or Trademark License constituting Collateral or any obligor in respect of any material Account constituting Collateral or that owes in the aggregate a material portion of all the Accounts constituting Collateral is required, or purports to be required, to be obtained by or on behalf of any Grantor in connection with the execution, delivery and performance of this Agreement that has not been obtained. Each Copyright License, Patent License, Trade Secret License, Trademark License and Account constituting Collateral is in full force and effect and constitutes a valid and legally enforceable obligation of each Grantor party thereto and (to the knowledge of such Grantor) each other party thereto, except as enforceability thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditor's rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law) and except to the extent the failure of any such Copyright License, Patent License, Trade Secret License, Trademark License or Account constituting Collateral to be in full force and effect or valid or legally enforceable could not be reasonably expected, in the aggregate, to have a Material Adverse Effect on the value of the Collateral. Except as set forth on the Perfection Certificate, no consent or authorization of, filing with or other act by or in respect of any governmental authority or any other Person is required in connection with the execution, delivery, performance, validity or enforceability of any of the Copyright Licenses, Patent Licenses, Trade Secret Licenses, Trademark Licenses and Accounts constituting Collateral other than those that have been duly obtained, made or performed and are in full force and effect and those the failure of which to make or obtain could not be reasonably expected, in the aggregate, to have a Material Adverse Effect on the value of the Collateral. Except as set forth on the Perfection Certificate, no Grantor nor (to the knowledge of any Grantor) any other party to any Copyright License, Patent License, Trade Secret License or Trademark License or

Account constituting Collateral is in default in the performance or observance of any of the terms thereof, except for such defaults as could not reasonably be expected, in the aggregate, to have a Material Adverse Effect on the value of the Collateral.

3.13    [Reserved].

**SECTION 4.    COVENANTS.**

Each Grantor covenants and agrees with the Collateral Agent, the Trustee and each Holder that, from and after the date of this Agreement until the discharge and payment of the Secured Obligations in full:

4.1    [Reserved]

4.2    Delivery of Instruments, Certificated Securities and Chattel Paper.  If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument, Certificated Security or Chattel Paper, such Instrument, Certificated Security or Chattel Paper shall be promptly delivered to the Collateral Agent, duly indorsed in a manner satisfactory to the Collateral Agent, to be held as Collateral pursuant to this Agreement. The Grantor shall not take any action with respect to such Instrument, Certificated Security or Chattel Paper which could reasonably be expected to materially adversely affect its value, and shall promptly deliver to the Collateral Agent a copy of any demand, notice or document received by it relating to any such Instrument, Certificated Security or Chattel Paper.

4.3    Maintenance of Insurance.

(a)    All insurance policies maintained by the Grantor pursuant to the Indenture shall designate the Collateral Agent as the loss payee and an additional insured in respect of all property insurance and liability policies respectively, and shall contain such provisions relating to cancellation, material reduction in amount or material change in coverage thereof and such other matters as may be reasonably required by the Collateral Agent.

(b)    If an insured loss occurs, the Collateral Agent shall have the right (but not the obligation) to file a proof of loss with the relevant insurers, and all amounts so received shall be applied (i) to satisfy all costs and expenses (including reasonable attorneys' fees) incurred by the Collateral Agent in the collection thereof, and (ii) provided no Default or Event of Default has then occurred or is continuing, to remedy or make good the insured loss. The Collateral Agent is hereby authorized, but not obligated to, enforce in the name of the relevant Grantor, payment of any or all of said policies or settle or compromise any claim in respect thereof, and to collect and make receipts for the proceeds thereof.   If an Event of Default has occurred and is continuing, all right, title and interest of the Grantor in respect of all such insurance policies and all proceeds payable thereunder shall vest in the Collateral Agent.

4.4    [Reserved].

4.5     Maintenance of Perfected Security Interest; Further Assurances.

(a)     Other than as permitted by this Agreement or the Indenture, such Grantor shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in Section 3.3 and shall defend such security interest against the claims and demands of all Persons whomsoever, including completing the Filings and filing any financing or continuation statements under the UCC (or other similar laws) in effect in any jurisdiction with respect to the security interests created hereby.

(b)     Such Grantor will furnish to the Collateral Agent from time to time statements and schedules further identifying and describing the Collateral of such Grantor and such other reports in connection therewith as the Collateral Agent may reasonably request, all in reasonable detail.

(c)     At any time and from time to time, upon the request of the Collateral Agent, and at the sole expense of such Grantor, such Grantor will promptly and duly execute and deliver, and have recorded, such further instruments and documents and take such further actions as the Collateral Agent may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, including (i) filing any financing or continuation statements under the UCC (or other similar laws) in effect in any jurisdiction with respect to the security interests created hereby, and (ii) in the case of Investment Property, Letter-of-Credit Rights and any other relevant Collateral, taking any actions reasonably necessary and reasonably available to it to enable the Collateral Agent to obtain "control" (within the meaning of the applicable UCC) with respect thereto, including the execution and delivery of Deposit Account Control Agreements and Securities Account Control Agreements and taking the actions set forth in Sections 9-106 and 9-107 of the UCC and other applicable sections of the UCC referred to in said sections.

4.6     Changes in Locations, Name, etc.  Such Grantor will not, except upon 15 Business Days' prior written notice to the Collateral Agent and delivery to the Collateral Agent of copies of all filed additional financing statements, and other documents (in each case, properly executed) reasonably requested by the Collateral Agent, to maintain the validity, perfection and priority of the security interests provided for herein:

(a)     change its jurisdiction of organization or (if such Grantor is not a Registered Organization) the location of its chief executive office or sole place of business from that referred to in Section 3.4; or

(b)     change its name.

4.7     Notices.  Such Grantor will advise the Collateral Agent promptly, in reasonable detail, of:

(a)     any Lien (other than Permitted Liens or Liens otherwise expressly permitted hereunder) on any of the Collateral; and

(b)      the occurrence of any other event that could reasonably be expected to have a material adverse effect on the aggregate value of the Collateral or on the security interests created hereby.

4.8     Investment Property.

(a)      If such Grantor shall become entitled to receive or shall receive any certificate (including any certificate representing a dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights in respect of the Equity Interests of any Issuer, whether in addition to, in substitution of, as a conversion of, or in exchange for, any shares of the Pledged Stock, or otherwise in respect thereof, such Grantor shall accept the same as the agent of the Secured Parties, hold the same in trust for the Secured Parties and deliver the same forthwith to the Collateral Agent in the exact form received, duly indorsed by such Grantor to the Collateral Agent, together with an undated stock power covering such certificate duly executed in blank by such Grantor and with signature guaranteed, to be held by the Collateral Agent, subject to the terms hereof, as additional collateral security for the Secured Obligations.  Any sums paid upon or in respect of the Investment Property upon the liquidation or dissolution of any Issuer shall be paid over to the Collateral Agent to be held by it hereunder as additional collateral security for the Secured Obligations, and in case any distribution of capital shall be made on or in respect of the Investment Property or any property shall be distributed upon or with respect to the Investment Property pursuant to the recapitalization or reclassification of the capital of any Issuer or pursuant to the reorganization thereof, the property so distributed shall, unless otherwise subject to a perfected security interest in favor of the Collateral Agent, be delivered to the Collateral Agent to be held by it hereunder as additional collateral security for the Secured Obligations.  If any sums of money or property so paid or distributed in respect of the Investment Property shall be received by such Grantor, such Grantor shall, until such money or property is paid or delivered to the Collateral Agent, hold such money or property in trust for the Secured Parties, segregated from other funds of such Grantor, as additional collateral security for the Secured Obligations.

(b)      In respect of any Issuer whose issued and outstanding Equity Interests have been pledged by a Grantor hereunder, such Grantor will not, without the prior written consent of the Collateral Agent (i) vote to enable, or take any other action to permit, such Issuer to issue any Equity Interests of any nature or to issue any other securities convertible into or granting the right to purchase or exchange for any Equity Interests of any nature of any Issuer, except to the extent such Equity Interests are pledged to the Collateral Agent hereunder in accordance with the terms hereof, (ii) sell, assign, transfer, exchange, or otherwise dispose of, or grant any option with respect to, the Investment Property or Proceeds thereof (except pursuant to a transaction expressly permitted by the Indenture), (iii) create, incur or permit to exist any Lien or option in favor of, or any claim of any Person with respect to, any of the Investment Property or Proceeds thereof, or any interest therein, except for Permitted Liens or (iv) enter into any agreement or undertaking that restricts the right or ability of such Grantor or the Collateral Agent to sell, assign or transfer any of the Investment Property or Proceeds thereof.