SECTION 10.09. *Parties in Interest*. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, as well as the other First Priority Secured Parties, Second Priority Secured Parties and Third Priority Secured Parties, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement. No other Person shall have or be entitled to assert rights or benefits hereunder.

SECTION 10.10. *Specific Performance*. Each Agent may demand specific performance of this Agreement and, on behalf of itself and the respective other Secured Parties, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense that might be asserted to bar the remedy of specific performance in any action which may be brought by the respective Secured Parties.

SECTION 10.11. *Headings*. Article and Section headings used herein and the Table of Contents hereto are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 10.12. *Counterparts*. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in <u>Section 10.03</u>. Delivery of an executed signature page to this Agreement by facsimile transmission or electronic mail shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 10.13. *Provisions Solely to Define Relative Rights*. The provisions of this Agreement are and are intended primarily for the purpose of defining the relative rights as between First Priority Secured Parties, the Second Priority Secured Parties, and the Third Priority Secured Parties. None of the Company, any other Grantor, any Guarantor or any other creditor thereof shall have any rights or obligations hereunder, except as expressly provided in this Agreement, and none of the Company, any other Grantor or any Guarantor may rely on the terms hereof. Nothing in this Agreement is intended to or shall impair the obligations of the Company or any other Grantor or any Guarantor, which are absolute and unconditional, to pay the First Priority Claims, the Second Priority Claims and the Third Priority Claims as and when the same shall become due and payable in accordance with their terms.

SECTION 10.14. *Other Rights and Privileges*. In connection with its execution and acting hereunder, each Agent shall be entitled to all rights, privileges, benefits, protections, immunities and indemnities provided to each of them as trustees under the applicable Debt Documents to which it is party.

SECTION 10.15. *Force Majeure*. In no event shall any Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that each Agent shall use

reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

[Remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

BASELINE OIL & GAS CORP.,
a Delaware corporation

By: _____
Name: _____
Title: _____

FIRST PRIORITY AGENT

THE BANK OF NEW YORK MELLON
TRUST COMPANY, N.A., as First Priority
Agent,

By:_____
    Name:
    Title:


SECOND PRIORITY AGENT

[_____], as Second Priority Agent,

By:_____
    Name:
    Title:


THIRD PRIORITY AGENT

[_____], as Third Priority Agent,

By:_____
    Name:
Title:

Provision in respect of the Second Priority Indenture

"EACH HOLDER OF SERIES B SENIOR NOTES AND SERIES B SENIOR PIK NOTES ISSUED PURSUANT HERETO (A) ACKNOWLEDGES THAT IT HAS RECEIVED A COPY OF THE INTERCREDITOR AGREEMENT, (B) CONSENTS TO THE SUBORDINATION OF LIENS PROVIDED FOR IN THE INTERCREDITOR AGREEMENT, (C) AGREES THAT IT WILL BE BOUND BY AND WILL TAKE NO ACTIONS CONTRARY TO THE PROVISIONS OF THE INTERCREDITOR AGREEMENT AND (D) AUTHORIZES AND INSTRUCTS [_____] AS COLLATERAL AGENT FOR THE HOLDERS OF SERIES B SENIOR NOTES AND SERIES B SENIOR PIK NOTES TO ENTER INTO THE INTERCREDITOR AGREEMENT AS COLLATERAL AGENT FOR AND ON BEHALF OF SUCH HOLDER.   THE FOREGOING PROVISIONS ARE INTENDED AS AN INDUCEMENT TO THE HOLDERS OF SERIES A SENIOR NOTES AND SERIES A SENIOR PIK NOTES TO PERMIT THE INCURRENCE OF INDEBTEDNESS UNDER THE INDENTURE AND TO EXTEND CREDIT TO THE COMPANY. IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY BETWEEN THE PROVISIONS OF THE INTERCREDITOR AGREEMENT AND THE PROVISION OF THIS INDENTURE OR THE OTHER COLLATERAL DOCUMENTS, THE PROVISIONS OF THE INTERCREDITOR AGREEMENT SHALL CONTROL."

Provision for the Second Priority Collateral Agreements

"REFERENCE IS MADE TO THE INTERCREDITOR AGREEMENT DATED AS OF [_____], 2009 (AS AMENDED, RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "INTERCREDITOR AGREEMENT"), AMONG BASELINE OIL & GAS CORP., [_____], AS FIRST PRIORITY AGENT (AS DEFINED THEREIN), [_____], AS SECOND PRIORITY AGENT (AS DEFINED THEREIN), AND [_____], AS THIRD PRIORITY AGENT (AS DEFINED THEREIN). NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE LIEN AND SECURITY INTEREST GRANTED TO THE AGENT, FOR THE BENEFIT OF THE SECURED PARTIES, PURSUANT HERETO AND THE EXERCISE OF ANY RIGHT OR REMEDY BY THE AGENT AND THE OTHER SECURED PARTIES HEREUNDER ARE SUBJECT TO THE PROVISIONS OF THE INTERCREDITOR AGREEMENT.   IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY BETWEEN THE PROVISIONS OF THE INTERCREDITOR AGREEMENT AND THE PROVISIONS HEREOF, THE PROVISIONS OF THE INTERCREDITOR AGREEMENT SHALL CONTROL."

Provision for the Third Priority Indenture

"EACH HOLDER OF SUBORDINATED NOTES AND SUBORDINATED PIK NOTES ISSUED PURSUANT HERETO (A) ACKNOWLEDGES THAT IT HAS RECEIVED A COPY OF THE INTERCREDITOR AGREEMENT, (B) CONSENTS TO THE SUBORDINATION OF LIENS PROVIDED FOR IN THE INTERCREDITOR AGREEMENT, (C) AGREES THAT IT WILL BE BOUND BY AND WILL TAKE NO ACTIONS CONTRARY TO THE PROVISIONS OF THE INTERCREDITOR AGREEMENT AND (D) AUTHORIZES AND INSTRUCTS [_____] AS COLLATERAL AGENT FOR THE HOLDERS OF

SUBORDINATED NOTES AND SUBORDINATED PIK NOTES TO ENTER INTO THE INTERCREDITOR AGREEMENT AS COLLATERAL AGENT FOR AND ON BEHALF OF SUCH HOLDER. THE FOREGOING PROVISIONS ARE INTENDED AS AN INDUCEMENT TO THE HOLDERS OF SERIES A SENIOR NOTES AND SERIES A SENIOR PIK NOTES AND TO THE HOLDERS OF SERIES B SENIOR NOTES AND SERIES B SENIOR PIK NOTES TO PERMIT THE INCURRENCE OF INDEBTEDNESS UNDER THE INDENTURE AND TO EXTEND CREDIT TO THE COMPANY. IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY BETWEEN THE PROVISIONS OF THE INTERCREDITOR AGREEMENT AND THE PROVISIONS OF THIS AGREEMENT OR THE OTHER COLLATERAL DOCUMENTS, THE PROVISIONS OF THE INTERCREDITOR AGREEMENT SHALL CONTROL."

Provision for the Third Priority Collateral Agreements

"REFERENCE IS MADE TO THE INTERCREDITOR AGREEMENT DATED AS OF [_____], 2009 (AS AMENDED, RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "INTERCREDITOR AGREEMENT"), AMONG BASELINE OIL & GAS CORP., [_____], AS FIRST PRIORITY AGENT (AS DEFINED THEREIN), [_____] AS SECOND PRIORITY AGENT (AS DEFINED THEREIN), AND [_____] AS THIRD PRIORITY AGENT (AS DEFINED THEREIN). NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE LIEN AND SECURITY INTEREST GRANTED TO THE AGENT, FOR THE BENEFIT OF THE SECURED PARTIES, PURSUANT HERETO AND THE EXERCISE OF ANY RIGHT OR REMEDY BY THE AGENT AND THE OTHER SECURED PARTIES HEREUNDER ARE SUBJECT TO THE PROVISIONS OF THE INTERCREDITOR AGREEMENT. IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY BETWEEN THE PROVISIONS OF THE INTERCREDITOR AGREEMENT AND THE PROVISIONS HEREOF, THE PROVISIONS OF THE INTERCREDITOR AGREEMENT SHALL CONTROL."

*EXHIBIT S*

# STOCKHOLDERS AGREEMENT

## OF

## BASELINE OIL & GAS CORP.

Dated as of

_____, 2009

## TABLE OF CONTENTS

Page

ARTICLE 1      DEFINITIONS AND INTERPRETIVE MATTERS ...................................... 1

   1.1      Certain Defined Terms .................................................................................... 1

   1.2      Certain Interpretive Matters ........................................................................... 7

ARTICLE 2      TRANSFERS OF THE SHARES ................................................................ 7

   2.1      Generally ......................................................................................................... 7

   2.2      Restrictions on Transfer .................................................................................. 7

   2.3      Tag Along Rights. ........................................................................................... 8

   2.4      Drag Along Rights .......................................................................................... 9

   2.5      Right of First Offer ......................................................................................... 9

   2.6      Preemptive Rights ......................................................................................... 11

   2.7      Legends ......................................................................................................... 11

   2.8      Further Assurances ........................................................................................ 12

ARTICLE 3      VOTING RIGHTS IN RESPECT OF THE SHARES ................................ 13

   3.1      Election of Board of Directors ...................................................................... 13

   3.2      Director Voting ............................................................................................. 14

   3.3      Vacancy ......................................................................................................... 14

   3.4      Committees ................................................................................................... 14

   3.5      Period ............................................................................................................ 14

   3.6      Record Dates ................................................................................................. 14

   3.7      Initial Board of Directors .............................................................................. 14

ARTICLE 4      SECURITIES LAW COMPLIANCE .......................................................... 15

   4.1      Non-Registration of Stock ............................................................................ 15

   4.2      Representations and Warranties .................................................................... 15

   4.3      Additional Restrictions ................................................................................. 15

ARTICLE 5      SIGNIFICANT TRANSACTIONS AND OTHER CORPORATE
              MATTERS ................................................................................................. 16

   5.1      Certain Significant Transactions ................................................................... 16

ARTICLE 6      ACCESS TO INFORMATION ................................................................... 17

   6.1      Books and Records ....................................................................................... 17

   6.2      Right of Inspection ........................................................................................ 18

## TABLE OF CONTENTS
(continued)

Page

| 6.3 | Financial Reports | 18 |
| ARTICLE 7 | MISCELLANEOUS | 18 |
| 7.1 | Remedies | 18 |
| 7.2 | Effect of Sale | 18 |
| 7.3 | Termination | 18 |
| 7.4 | Amendment | 18 |
| 7.5 | Notices | 18 |
| 7.6 | Governing Law | 19 |
| 7.7 | Successors and Assigns | 19 |
| 7.8 | Severability; Invalid Provisions | 19 |
| 7.9 | Section Headings | 19 |
| 7.10 | Execution in Counterparts | 19 |
| 7.11 | Adjustments | 19 |
| 7.12 | Prior Agreements | 19 |

## STOCKHOLDERS AGREEMENT

THIS STOCKHOLDERS AGREEMENT (this "Agreement") is dated as of
_____, 2009 (the "Effective Date"), by and among:

(a)  Baseline Oil & Gas Corp., a Delaware corporation (the "Company");

(b)  Jefferies & Company, Inc., a Delaware corporation, and Jefferies High Yield
Trading, LLC, a Delaware limited liability company (collectively, "Jefferies");

(c)  Third Point, LLC, a Delaware limited liability company, Third Point Offshore
Master Fund, L.P., a Cayman Islands limited partnership, and Third Point Ultra Master Fund,
L.P., a Cayman Islands limited partnership (collectively, "Third Point"); and

(d)  each other person who acquires Securities from a Stockholder or from the
Company and becomes a Stockholder of the Company pursuant to the terms of this Agreement
and executes a counterpart signature page hereto.

## W I T N E S S E T H:

WHEREAS, pursuant to a plan of reorganization confirmed by the United States
Bankruptcy Court for the Southern District of Texas, Houston Division on the Effective Date, the
Company has issued Securities (as defined below) to each of Jefferies and Third Point; and

WHEREAS, the parties to this Agreement desire to promote their mutual interests by
imposing certain restrictions and obligations on the undersigned Stockholders and the
Company's Securities in accordance with the terms and conditions of this Agreement, as it may
be amended from time to time;

NOW THEREFORE, in consideration for the mutual covenants and agreements
hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of
which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1

## DEFINITIONS AND INTERPRETIVE MATTERS

1.1    Certain Defined Terms. As used in this Agreement with initial capital letters, the
following terms shall have the respective meanings set forth below (such meanings to be equally
applicable to and include both the singular and the plural forms of the terms defined):

"Affiliate" shall mean, with respect to any Person, (i) a spouse or member of the
immediate family of such Person, (ii) any member, stockholder, manager, director, officer or
partner of such Person, (iii) any corporation, partnership, business association, limited liability
company, firm or other entity of which such Person is a stockholder, member, manager, director,
officer or partner, and (iv) any other Person that directly or indirectly controls, is controlled by or
is under direct or indirect common control with such first Person. For purposes of this definition,
"control" shall mean the possession, directly or indirectly, of the power to direct or cause the

direction of the management and policies of a Person, whether through the ownership of voting equity interests, by contract or otherwise.

"Agreement" shall have the meaning set forth in the Preamble to this Agreement.

"Board" shall mean the Board of Directors of the Company.

"Certificate of Designations" shall mean the Certificate of Designations of the Company filed with the Secretary of State of the State of Delaware on the Effective Date, as amended from time to time.

"Certificate of Incorporation" shall mean the Certificate of Incorporation of the Company filed with the Secretary of State of the State of Delaware on the Effective Date, as amended from time to time.

"Common Stock" shall mean the Common Stock, par value $0.001 per share, of the Company.

"Company" shall have the meaning set forth in subsection (a) of the Preamble to this Agreement.

"Company Sale" shall mean (i) the sale of all or substantially all of the Company's and its Subsidiaries' assets, taken as a whole, whether by lease, license or other transfer, to any person or (ii) any other transaction whether by sale of stock, sale of assets, merger, recapitalization, reorganization or otherwise, pursuant to which one or more persons other than a member of the Jefferies Group or the Third Point Group shall own or control, directly or indirectly, in excess of 35% of the assets or voting securities of the Company on a fully diluted basis, in each case in a single transaction or series of related transactions.

"Default Director" shall have the meaning set forth in Section 3.3(b) of this Agreement.

"Disposition" shall have the meaning set forth in Section 2.2(a) of this Agreement. "Dispose" shall have a corresponding meaning.

"Drag Along Selling Stockholder" shall have the meaning set forth in Section 2.4(a) of this Agreement.

"Effective Date" shall have the meaning set forth in the Preamble to this Agreement.

"Fair Market Value" shall mean, as of any date, (a) as to securities traded on the organized securities markets, the average closing price for the securities in question for the 30 trading days immediately preceding the date of determination, (b) as to securities not traded on an organized exchange, a good faith determination by a majority of the Board, such majority to include the Jefferies Director and the Third Point Director, of the fair value of one share of such securities or the fair value of such other non-cash consideration, as applicable, as of the applicable reference date or (c) as to any other non-cash assets, a good faith determination by a majority of the Board, such majority to include the Jefferies Director and the Third Point Director, of the fair value of such other non-cash assets, as applicable, as of the applicable

reference date.  In determining Fair Market Value, the Board shall (x) consider, in addition to other factors that it determines in good faith to be relevant, the purchase price of such securities or other non-cash assets in recent arm's-length sales of such securities or such other non-cash assets, as applicable, and (y) not give effect to any discount that may otherwise be attributable to the fact that the securities that are the subject of such valuation constitute less than a majority of the securities outstanding or may not be freely tradable.  If the Board is unable to determine the Fair Market Value of the relevant securities or other non-cash assets pursuant to clause (b) above, the Board shall select a nationally recognized investment banking firm independent of the parties and the Company to determine the Fair Market Value of the relevant securities or other non-cash assets, and the determination of such investment banking firm shall be binding upon the parties.

"Highest Bidder" shall have the meaning set forth in Section 2.5(b) of this Agreement.

"Indentures" shall mean those certain Indentures, dated as of the date hereof, by and among the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent, as amended from time to time.

"Jefferies" shall have the meaning set forth in subsection (b) of the Preamble to this Agreement.

"Jefferies Board Amount" shall mean (a) one, as long as Jefferies (together with its Affiliates) owns at least 5% of the outstanding shares of Common Stock on a fully diluted basis and (b) zero, after the date that Jefferies (together with its Affiliates) owns less than 5% of the outstanding shares of Common Stock on a fully diluted basis.

"Jefferies Director" shall have the meaning set forth in Section 3.1(b) of this Agreement.

"Jefferies Group" shall mean Jefferies and its Related Persons, taken collectively.

"Liquidity Event" shall mean (i) any Company Sale or (ii) the dissolution, winding-up or other liquidation of the Company, whether voluntary or involuntary.

"Mutually Designated Director" shall have the meaning set forth in Section 3.1(b) of this Agreement.

"New Securities" shall mean any capital stock of the Company whether now authorized or not, and rights, options or warrants to purchase such capital stock, and securities of any type whatsoever that are, or may become, convertible into capital stock that are issued after the Effective Date; *provided, however,* that "New Securities" does not include the following:  (a) securities issued in a Public Offering, (b) securities issued in connection with any stock split, stock dividend or recapitalization of the Company that is pro rata according to each class of stock affected thereby, (c) securities issued to any Person in connection with or pursuant to any employee benefit plan for the employees and/or directors of the Company that is approved by the Board or (d) securities issued in connection with or pursuant to any acquisition of a business or one or more properties or other assets approved by the Board.

"Non-Qualified Transferee" shall mean, with respect to a Stockholder, any Person other than a Qualified Transferee.

"Party Group" shall refer to the Jefferies Party Group or the Third Point Party Group, as applicable.

"Person" shall mean an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, a limited liability company, an unlimited liability company, an unincorporated organization, or a governmental entity or any department, agency or political subdivision thereof.

"Pre-Approved Sale" shall have the meaning set forth in Section 2.4(c) of this Agreement.

"Preemptive Right Holder" shall have the meaning set forth in Section 2.6(a) of this Agreement.

"Preferred Stock" means the Series A Preferred Stock and the Series B Preferred Stock, taken together.

"Pro Rata Portion" means, with respect to any Stockholder, a fraction, the numerator of which is equal to the total number of shares of Common Stock held by such Stockholder divided by the total number of shares of Common Stock held by all of the Stockholders participating in a Disposition.

"Prospective Buyer" shall mean any person that intends to purchase any of the Securities.

"Prospective Selling Stockholder" shall have the meaning set forth in Section 2.5 of this Agreement.

"Public Offering" shall mean the sale of any class of equity securities of the Company (or any successor of the Company) to the public pursuant to an effective registration statement (other than a registration statement on a form solely to effect the issuance of securities in a business combination or under a benefit plan for employees or directors) filed under the Securities Act underwritten by an investment banking firm of national reputation reasonably acceptable to a majority of the Board.

"Purchase Notice" shall mean a written notice delivered in connection with a proposed Disposition or issuance of Securities setting forth (a) if known, the name of the Person or Persons to whom a Disposition or issuance, as applicable, of such Securities is proposed to be made, (b) the purchase price per share (or equivalent) at which such Securities are to be Disposed or issued, as applicable, (c) the terms and conditions of the Disposition or issuance, as applicable and (d) all other pertinent details of the proposed Disposition or issuance, as applicable.

"Qualified Transferee" shall mean, with respect to a Stockholder, (a) any Related Person or (b) any Affiliate of any such Related Person.

"Related Group" shall mean any two or more Persons with an agreement, arrangement or other understanding, whether written or oral, to act together for a common purpose of acquiring, selling or otherwise dealing in the shares of Common Stock.

"Related Person" shall mean, with respect to any Person, any partnership, trust, corporation, limited liability company or other legal entity of which more than 50% of the beneficial ownership or interest is controlled by or is under direct or indirect common control with such first Person or by any Affiliate of such Person.

"ROFO Acceptance Notice" shall have the meaning set forth in Section 2.5(b) of this Agreement.

"ROFO Acceptance Period" shall have the meaning set forth in Section 2.5(b) of this Agreement.

"ROFO Notice" shall have the meaning set forth in Section 2.5(a) of this Agreement.

"ROFO Offer Notice" shall have the meaning set forth in Section 2.5(a) of this Agreement.

"ROFO Price" shall have the meaning set forth in Section 2.5(a) of this Agreement.

"ROFO Response Period" shall have the meaning set forth in Section 2.5(a) of this Agreement.

"ROFO Sale Period" shall have the meaning set forth in Section 2.5(b) of this Agreement.

"ROFO Stockholders" shall have the meaning set forth in Section 2.5 of this Agreement.

"Same Terms" shall mean, with respect to any Disposition of Securities, the same terms and conditions, on a proportionate basis, under which the initiating Stockholder, or the Stockholder to whom an offer was made, is Disposing of such Securities. For the avoidance of doubt, a proposed Disposition shall not be deemed to be on the "Same Terms" if, in connection with such proposed Disposition, an additional benefit is offered to a member of one Party Group in connection with a Disposition that is not offered proportionately to one or more members of the other Party Group (or, if offered, the other Party Group is not reasonably capable of taking advantage of such benefit), including any benefits resulting from a business or other relationship between any member of a Party Group and the Person offering such benefit. Notwithstanding the foregoing, any opportunities given to a member of a Party Group to provide financing on customary terms and conditions in connection with a Disposition shall not be taken into account in determining Same Terms and shall not be required to be offered to any other Stockholders participating in such Disposition. References to "on a proportionate basis" or "proportionately" means in proportion to the number of Securities held and taking into account the relative rights, preferences and privileges of the applicable class or series of Securities subject to such Disposition.

"Securities" shall mean shares of the Company's Common Stock and Preferred Stock, taken together.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations of the SEC thereunder, all as the same shall be in effect at the time.

"Series A Designation" shall mean the designation by the Board of the powers, designations, preferences and other rights, and the qualifications, limitations and restrictions of, the Series A Redeemable Stock as set forth in the Certificate of Designations, and as amended from time to time.

"Series A Preferred Stock" shall mean the Series A Redeemable Preferred Stock of the Company.

"Series B Designation" shall mean the designation by the Board of the powers, designations, preferences and other rights, and the qualifications, limitations and restrictions of, the Series B Redeemable Stock as set forth in the Certificate of Designations, and as amended from time to time.

"Series B Preferred Stock" shall mean the Series B Redeemable Preferred Stock of the Company.

"Stockholder" shall mean each holder of shares of Common Stock or Preferred Stock subject to this Agreement.  The term Stockholders refers to all such Persons collectively.

"Subject Securities" shall have the meaning set forth in Section 2.5 of this Agreement.

"Tag Along Participant" shall have the meaning set forth in Section 2.3(a) of this Agreement.

"Tag Along Selling Stockholder" shall have the meaning set forth in Section 2.3(a) of this Agreement.

"Third Point" shall have the meaning set forth in subsection (c) of the Preamble to this Agreement.

"Third Point Board Amount" shall mean (a) one, as long as Third Point (together with its Affiliates) owns at least 5% of the outstanding shares of Common Stock on a fully diluted basis and (b) zero, after the date that Third Point (together with its Affiliates) owns less than 5% of the outstanding shares of Common Stock on a fully diluted basis.

"Third Point Director" shall have the meaning set forth in Section 3.1(b) of this Agreement.

"Third Point Group" shall mean Third Point and its Related Persons, taken collectively.

"Total Board Size" shall mean the sum of (i) the Jefferies Board Amount, plus (ii) the Third Point Board Amount, plus (iii) one, plus (iv) the number of any Default Directors, if any.

1.2     Certain Interpretive Matters.  Unless the context requires otherwise, (i) all references herein to Sections, Articles, Exhibits or Annexes are to the Sections, Articles, Exhibits or Annexes of or to this Agreement, (ii) each term defined in this Agreement has the meaning expressly assigned to it herein, (iii) each accounting term not otherwise defined in this Agreement has the meaning commonly applied to it in accordance with GAAP, (iv) words in the singular include the plural and vice versa, and the masculine, feminine or neuter gender shall be deemed to include each of the other genders, in each case, as required by the context, (v) the term "including" means "including without limitation," and (vi) with respect to the Company, the term "ordinary course of business" will be deemed to refer to the conduct of the Business in a manner consistent with the ordinary course of business of the Company, consistent with past practice.  Unless otherwise indicated, all references herein to $ or dollar amounts will be to lawful currency of the United States.  To the extent the term "day" or "days" is used, it means calendar days.  No provision of this Agreement will be interpreted in favor of, or against, any of the parties hereto by reason of the extent to which any such party or its counsel participated in the drafting thereof or by reason of the extent to which any such provision is inconsistent with any prior draft hereof or thereof.

## ARTICLE 2

## TRANSFERS OF THE SHARES

2.1     Generally.  All Securities at any time and from time to time outstanding and held by the Stockholders shall be held subject to the conditions and restrictions set forth in this Agreement, the provisions of which shall apply equally to the Stockholders and their transferees (except as otherwise expressly stated).  By executing this Agreement or by accepting a stock certificate or other indicia of ownership therefor from the Company, each Stockholder agrees with the Company and with each other Stockholder to such conditions and restrictions.  Without limiting the generality of the foregoing, the Company shall require as a condition to the transfer of ownership of any Securities that the transferee of such Securities execute and deliver this Agreement as evidence that such Securities are held subject to the terms, conditions and restrictions set forth herein.

2.2     Restrictions on Transfer.

(a)     No Stockholder shall sell, assign, transfer, give, exchange, pledge, encumber or otherwise dispose of any Securities or any interests therein (a "Disposition") except in accordance with the terms of this Agreement.

(b)     Notwithstanding the provisions set forth in Sections 2.3, 2.4 and 2.5, a Stockholder shall be entitled to make a Disposition of any Securities it owns or in which it has an ownership interest, and such Disposition will not be subject to the requirements set forth in Sections 2.3, 2.4 and 2.5:

(i)     if the Disposition is to a Related Person of such Stockholder; *provided, however,* that if such Related Person ceases to be a Related Person of such Stockholder, such former Related Person will immediately transfer any

interests in Securities it directly or indirectly holds back to the Stockholder from which such former Related Person received such Securities; or

(ii)     upon receipt of the written consent of Jefferies and Third Point, in each case if still a Stockholder and not a party to the Disposition.

2.3     <u>Tag Along Rights</u>.

(a)     Except for a Disposition permitted pursuant to <u>Section 2.2(b)</u>, and subject to the prior compliance with the provisions of <u>Section 2.5</u>, if one or more Stockholders propose or agree to make a Disposition of any of the outstanding shares of any class or series of Securities held by such Stockholder (the "<u>Tag Along Selling Stockholders</u>") in a single transaction, or in a series of related transactions to a Person or a Related Group of Persons, then each other Stockholder that is not a party to such transaction or agreement shall have the right to participate in such Disposition and Dispose of its Securities as provided herein. Not later than 15 days prior to the consummation of any such transaction, the Tag Along Selling Stockholders shall deliver or cause to be delivered a Purchase Notice to each of the Company's Stockholders who is eligible to participate pursuant to the immediately preceding sentence, which Purchase Notice shall include the maximum number and relevant class or classes or series of Securities the purchaser is willing to purchase on the Same Terms as the Tag Along Selling Stockholder; *provided, however* that in no event shall such maximum number for any class or series be less than the applicable number of shares of such class or series that the purchaser proposed to purchase from the Tag Along Selling Stockholders. Each such eligible Stockholder shall have at least 15 days from the receipt of the Purchase Notice required by this <u>Section 2.3</u> in which to elect to participate in the Disposition pursuant to the rights granted herein and on and under the Same Terms, and each such eligible Stockholder who so elects to participate, together with the Tag Along Selling Stockholder, will be referred to as a "<u>Tag Along Participant</u>." Notwithstanding the foregoing, no Tag Along Selling Stockholder shall be permitted to sell any Securities pursuant to this <u>Section 2.3</u> (x) other than on the Same Terms or (y) if a Stockholder who is otherwise eligible to participate in a transaction contemplated by this <u>Section 2.3</u> is prohibited after the exercise of commercially reasonably efforts from participating in such transaction by law or regulation.

(b)     Each Tag Along Participant (including those Persons who are a party to the Disposition) shall be entitled pursuant to this <u>Section 2.3</u> to Dispose of any number of shares of the applicable class or series of Securities held by such Tag Along Participant up to its Pro Rata Portion of the maximum number of shares of the applicable class or series of Securities the purchaser is willing to purchase, rounded down to the next whole share (if applicable). If any Tag Along Participant elects to Dispose of less than the maximum number of the applicable class or series of Securities such Member is entitled to Dispose of pursuant to the provisions of this <u>Section 2.3</u>, then each other Tag Along Participant shall have the right to Dispose of its Pro Rata Portion of additional shares of the applicable class or series of Securities (and further pro rata if any such other Tag Along Participant shall elect to Dispose of less than its Pro Rata Portion of additional shares of the applicable class or series of Securities, provided that such allocation shall be determined within 15 days after the date of the applicable Purchase Notice).

(c)     All reasonable costs and expenses incurred by the Tag Along Participants pursuant to this Section 2.3 shall be allocated pro rata based upon the percentage of the total net proceeds received by each Tag Along Participant.

2.4     Drag Along Rights.

(a)     If Jefferies (the "Drag Along Selling Stockholder") elects to make (or cause to be made) a Disposition to a Non-Qualified Transferee in a single, bona fide arms-length transaction, or in a series of related bona fide arms-length transactions, of at least a majority of the shares of Common Stock and/or Preferred Stock held by the Drag Along Selling Stockholder, then at the election of the Drag Along Selling Stockholder, the other Stockholders shall be required, and all Stockholders do hereby agree, to sell or convey up to all of the shares of Common Stock and/or Preferred Stock, as applicable, owned by the Stockholders, or, in the case of a Disposition by the Drag Along Selling Stockholder of less than all of its shares of Common Stock and/or Preferred Stock, the same percentage of the applicable class or classes of Securities as is being Disposed of by the Drag Along Selling Stockholder, on and under the Same Terms as the applicable class or classes of Securities being sold or conveyed by the Drag Along Selling Stockholder.

(b)     The Stockholders shall be given 10 days' prior written notice of such proposed transaction, which notice shall provide the terms and conditions and anticipated closing date for the transaction. On such closing date, the Stockholders shall deliver the certificates evidencing the shares they are required to sell pursuant to this Section 2.4, duly endorsed for transfer, to the purchaser or transferee in exchange for the receipt of the purchase price. Further, each Stockholder shall take all actions in connection with the consummation of such transaction as are reasonably requested by Jefferies.

(c)     If Jefferies approves of and participates in a Company Sale that requires Stockholder vote or consent (a "Pre-Approved Sale"), the Stockholders shall consent to and raise no objection, nor exercise any dissenter's or appraisal right, whether statutory or otherwise, to such Pre-Approved Sale. The rights set forth in Section 2.5 shall not be applicable to any Pre-Approved Sale. Further, each Stockholder shall take all actions in connection with the consummation of a Pre-Approved Sale as are reasonably requested by Jefferies.

2.5     Right of First Offer. Except for a Disposition permitted pursuant to Sections 2.2(b) and 2.5(d), any Stockholder who desires to Dispose of all or any portion of any class or classes or series of such Stockholder's Securities in a bona fide arms-length transaction to a Prospective Buyer (each such Stockholder, a "Prospective Selling Stockholder"), shall provide each other Stockholder (collectively, the "ROFO Stockholders") a notice (the "ROFO Notice"), which shall (i) be in writing and be signed by the Prospective Selling Stockholder, (ii) describe the Securities the Prospective Selling Stockholder is contemplating to Dispose of (the "Subject Securities"), and (iii) request that the ROFO Stockholders specify the cash purchase price at which the Principal Stockholders would purchase such Securities.

(a)     Each ROFO Stockholder shall have 10 days from the receipt of the ROFO Notice (the "ROFO Response Period") to deliver notice in writing (the "ROFO Offer Notice") to the Prospective Selling Stockholder offering to purchase all, but not less than all, of the Subject Securities and specifying the cash purchase price at which such ROFO Stockholder would

purchase the Subject Securities (the "ROFO Price"). Failure of any ROFO Stockholder to give a ROFO Offer Notice shall be deemed, upon expiration of the ROFO Response Period, to be an election of such ROFO Stockholder not to purchase the Subject Securities.

(b)     The Prospective Selling Stockholder shall have 30 days from the expiration of the ROFO Response Period (the "ROFO Acceptance Period") to deliver notice in writing (the "ROFO Acceptance Notice") to the ROFO Stockholder who submits a ROFO Offer Notice with the highest ROFO Price (the "Highest Bidder") electing to accept the offer contemplated in such ROFO Offer Notice. Failure of the Prospective Selling Stockholder to give a ROFO Acceptance Notice within the ROFO Acceptance Period shall be deemed, upon expiration of the ROFO Acceptance Period, to be an election not to accept any such offer. If the Prospective Selling Stockholder elects in the ROFO Acceptance Notice to sell the Subject Securities on terms offered by the Highest Bidder, then the Highest Bidder will have 15 days from the date of the ROFO Acceptance Notice to pay the price therefor and consummate the purchase. If any such purchase price is not timely paid or the transaction is not consummated within such time period, then the Highest Bidder shall forfeit its rights under this Section 2.5. If the Prospective Selling Stockholder either declines to accept any offers contemplated in the ROFO Offer Notices or is deemed to have elected not to accept any such offer, then the Prospective Selling Stockholder may during the succeeding 60-day period following the expiration of the ROFO Acceptance Period (the "ROFO Sale Period") sell the Subject Securities at a price not less than 106% of the ROFO Price offered by the Highest Bidder.

(c)     If at the end of the ROFO Sale Period the Prospective Selling Stockholder has not completed the sale of the Subject Securities as contemplated in Section 2.5(b), then prior to any Disposition of Securities by the Prospective Selling Stockholder, the Prospective Selling Stockholder will again comply with this Section 2.5 to the extent it applies by its terms. At the closing of any purchase and sale of Securities pursuant to this Section 2.5, the holder of Securities to be Disposed of shall deliver to the buyer(s) a certificate or certificates representing the Securities to be purchased duly endorsed, or with stock powers (or such other transfer document required to transfer the Securities) duly endorsed, as applicable, for transfer with signature guaranteed, free and clear of any lien or encumbrance and the buyers shall pay to such holder by bank check or wire transfer of immediately available funds, or other applicable delivery, the purchase price of the applicable Securities. The delivery of a certificate or certificates for Subject Securities by any Person selling Subject Securities pursuant to this Section 2.5 shall be deemed a representation and warranty by such Person that: (i) such Person has full right, title and interest in and to such Subject Securities; (ii) such Person has all necessary power and authority and has taken all necessary action to Dispose of such Subject Securities as contemplated; and (iii) such Subject Securities are free and clear of any and all liens or encumbrances.

(d)     Notwithstanding anything to the contrary in this Section 2.5, no ROFO Stockholder shall have any rights pursuant to this Section 2.5 with respect to any transfer of Securities:

(i)      by any Stockholder to a Related Person of such Stockholder;

(ii)     pursuant to a transaction under Section 2.4 of this Agreement; or

       (iii)    in a Public Offering.

2.6    Preemptive Rights. (a) The Company hereby grants to Jefferies and Third Point (the "Preemptive Right Holders") a preemptive right to purchase a pro rata share of any New Securities issued by the Company after the date hereof. A Preemptive Right Holder's pro rata share of New Securities for purposes of this preemptive right is the ratio, determined on a fully diluted basis, of the number of outstanding Securities of each affected class, or if such class is subdivided into series, each affected series of any class, owned by the Preemptive Right Holder immediately prior to the issuance of the New Securities to the aggregate number of Securities of each affected class, or if such class is subdivided into series, each affected series of any class, outstanding immediately prior to the issuance of the New Securities; *provided, however,* that if the New Securities are the first issuances of a new series or class of securities authorized or designated after the date hereof ("Initial Issuances of New Class or Series"), a Preemptive Right Holder's pro rata shares of such Initial Issuances of a New Class or Series for purposes of this preemptive right is the ratio, determined on a fully diluted basis, of the number of outstanding shares of Series A Preferred Stock owned by such Preemptive Right Holder immediately prior to the issuance of such Initial Issuances of a New Class or Series to the aggregate number of shares of Series A Preferred Stock outstanding immediately prior to the issuance of such Initial Issuances of a New Class or Series.

(b)    Upon a determination by the Company to proceed with the issuance and sale of New Securities, the Company shall first submit to the Preemptive Right Holders a Purchase Notice. Within 20 days after its receipt of the Purchase Notice, the Preemptive Right Holders shall elect whether to purchase the New Securities that are the subject of such Purchase Notice, and give written notice of its election to the Company. The Preemptive Right Holder's election may specify the maximum number of New Securities that the Preemptive Right Holder is willing to purchase. If all of the New Securities covered by the Purchase Notice are not purchased by the Preemptive Right Holder entitled to purchase hereunder, the Company may sell such New Securities to any Person named in such Purchase Notice on terms providing for a cash price equal to or higher than the amount set forth in the Purchase Notice. If the Company shall fail to consummate the sale of such New Securities within 60 days following the expiration of the time provided for the Preemptive Right Holder to elect to purchase the New Securities, the right of the Company to issue such unpurchased New Securities to such named Persons shall terminate and the Company shall be required to submit another Purchase Notice and comply with the procedures set forth herein in order to issue any such New Securities to any Person.

2.7    Legends.

(a)    Restrictive Legend. Each certificate representing shares shall have the following legend endorsed conspicuously thereupon:

> "THE VOTING OF THE SHARES OF THE ISSUER REPRESENTED BY THIS CERTIFICATE, AND THE SALE, ENCUMBRANCE OR OTHER DISPOSITION THEREOF, ARE SUBJECT TO THE PROVISIONS OF A STOCKHOLDERS AGREEMENT TO WHICH THE ISSUER AND ITS STOCKHOLDERS ARE PARTY, A COPY OF

WHICH MAY BE INSPECTED AT THE PRINCIPAL OFFICE OF THE
ISSUER OR OBTAINED FROM THE ISSUER WITHOUT CHARGE."

Any person who acquires shares that are not subject to all or part of the terms of this
Agreement shall have the right to have such legend (or the applicable portion thereof) removed
from certificates representing such shares.

(b)     Securities Act Legends.  Each certificate representing shares shall have the
following legend endorsed conspicuously thereupon:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE
ISSUED IN THE UNITED STATES IN A PRIVATE PLACEMENT,
WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF
1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD,
ASSIGNED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF
AN EFFECTIVE REGISTRATION UNDER THE ACT COVERING
THE TRANSFER OR AN OPINION OF COUNSEL, SATISFACTORY
TO THE ISSUER, THAT REGISTRATION UNDER THE ACT IS NOT
REQUIRED."

(c)     Stop Transfer Instruction.  The Company will instruct any transfer agent not to
register the transfer of any shares until the conditions specified in the foregoing legends are
satisfied.

2.8     Further Assurances.  Each Stockholder, whether in his capacity as a Stockholder,
officer or director of the Company, its subsidiaries, or otherwise, shall take or cause to be taken
all such commercially reasonable actions in order expeditiously to consummate each Disposition
pursuant to Section 2.3 or Section 2.4 and any related transactions, including, without limitation,
executing, acknowledging and delivering consents, assignments, waivers and other documents or
instruments as may be reasonably requested, and otherwise cooperating with the selling
Stockholder and any Prospective Buyer; *provided, however,* that the participating Stockholder
shall be obligated to become liable in respect of any representations, warranties, covenants,
indemnities or otherwise solely to the extent provided in the immediately following sentence.
Each participating Stockholder agrees to execute and deliver any agreements that are required to
be executed and delivered by the selling Stockholder, including, without limitation, agreements
to (a) make several, and not joint, representations and warranties as to the unencumbered title to
its shares and the power, authority and legal right to Dispose of such shares, and (b) be liable
(whether by purchase price adjustment, indemnity payments or otherwise) in respect of
representations, warranties, covenants and agreements in respect of the Company and its
subsidiaries on a pro rata basis; *provided, however,* that, except with respect to the several, and
not joint, representations and warranties of participating Stockholders of the type described in
clause (a) above (together with related indemnities), each participating Stockholder's liability
shall be limited to such participating Stockholder's pro rata portion of the proceeds in connection
with such Disposition or such lesser amount applied consistently to all other participating
Stockholders. References to "on a pro rata basis" means in proportion to the number of
Securities held by a participating Stockholder and taking into account the relative rights,

preferences and privileges of the applicable class or series of Securities subject to such Disposition.

## ARTICLE 3

## VOTING RIGHTS IN RESPECT OF THE SHARES

3.1     Election of Board of Directors. Notwithstanding the general right to vote on matters as provided under the General Corporation Law of the State of Delaware, each Stockholder agrees to take all actions necessary, including, without limitation, the voting of its shares of Common Stock of the Company, the execution of written consents, the calling of special meetings, the removal of directors, the filling of vacancies on the Board, the amendment of the Bylaws of the Company, the waiving of notice and attending of meetings, so as to, or cause the Board to, as applicable:

(a)     fix the number of directors of the Board at the Total Board Size;

(b)     elect as director of the Company (i) a number of Persons designated by Jefferies equal to the Jefferies Board Amount (each such individual, a "Jefferies Director"), (ii) a number of Persons designated by Third Point equal to the Third Point Board Amount (each such individual, a "Third Point Director"), (iii) one Person mutually designated by Jefferies and Third Point (the "Mutually Designated Director") and (iv) if Jefferies and Third Point own any Securities entitled to elect one or more additional directors under the terms of any applicable Series Designation, a number of Persons equal to such additional directorships mutually designated by Jefferies and Third Point ("Default Directors"); *provided, however*, that after the date that either Jefferies or Third Point owns less than 5% of the outstanding shares of Common Stock or the applicable series of Preferred Stock on a fully diluted basis, the other party will have the sole right to designate the Mutually Designated Director or Default Director, as applicable; *provided further*, that after the date that both Jefferies and Third Point own less than 5% of the outstanding shares of Common Stock or the applicable series of Preferred Stock on a fully diluted basis, neither party will have the right to designate any Mutually Designated Director or Default Director, as applicable.

(c)     elect as a director any successor designated pursuant to the terms of Section 3.3;

(d)     remove as a director of the Company any Jefferies Director upon the written request of Jefferies;

(e)     remove as a director of the Company any Third Point Director upon the written request of Third Point; and

(f)     remove as a director of the Company any Mutually Designated Director or Default Director upon the written request of Jefferies and Third Point

3.2     Director Voting. Notwithstanding any provision in the Bylaws to the contrary with respect to director voting, each director shall have one vote on each matter to which such director is entitled to vote.

3.3     Vacancy.  If a Jefferies Director ceases to serve as a director for any reason, then Jefferies shall have the right to designate a successor to such Jefferies Director in accordance with Section 3.1.  If a Third Point Director ceases to serve as a director for any reason, then Third Point shall have the right to designate a successor to such Third Point Director in accordance with the terms of Section 3.1.  If the Mutually Designated Director or Default Director ceases to serve as a director for any reason, then Jefferies and Third Point shall have the right to designate a successor to such Mutually Designated Director or Default Director, as applicable, in accordance with the terms of Section 3.1.

3.4     Committees.  In the event that the Board creates any committee of the Board, such committee shall include at least one Jefferies Director and one Third Point Director (subject to the provisions set forth in Section 3.4).

3.5     Period.  The foregoing provisions of this Article 3 shall expire on the last date permitted by law or as otherwise provided in this Agreement.

3.6     Record Dates.

(a)     In order that the Company may determine the Stockholders entitled to notice of or to vote at any meeting of the Stockholders or any adjournment thereof, the Board may fix a record date, which will not be more than 60 nor less than 10 calendar days before the date of such meeting.  If no record date is fixed by the Board, the record date for determining Stockholders entitled to notice of or to vote at a meeting of the Stockholders will be at the close of business on the calendar day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the calendar day next preceding the day on which the meeting is held.  A determination of Stockholders of record entitled to notice of or to vote at a meeting of the Stockholders will apply to any adjournment of the meeting; *provided, however*, that the Board may fix a new record date for the adjourned meeting.

(b)     The Company will be entitled to treat the person in whose name any share of its stock is registered as the owner thereof for all purposes, and will not be bound to recognize any equitable or other claim to, or interest in, such stock on the part of any other person, whether or not the Company has notice thereof, except as expressly provided by applicable law.

3.7     Initial Board of Directors.  In order to implement the provisions of Section 3.1 simultaneously with the effectiveness of this Agreement, upon the execution and delivery of this Agreement, the following persons will be elected as members of the Board so that the Board consists solely of the following persons (with the following respective designations as Jefferies Director, Third Point Director or Mutually Designated Director), subject in each case to the earlier resignation, removal or death of such persons:

Brian Wolfe – Jefferies Director

Joshua L. Targoff – Third Point Director

Thomas R. Kaetzer – Mutually Designated Director

# ARTICLE 4

## SECURITIES LAW COMPLIANCE

4.1     <u>Non-Registration of Stock</u>.  Each Stockholder understands and agrees that (a) none of the shares of Stock have been registered under the Securities Act, or under certain state securities laws in reliance, inter alia, upon the exemption from registration set forth in Section 4(2) of the Securities Act and on various exemptions from registration under applicable state securities laws, (b) such exemptions from registration have been relied upon the Company upon the basis of, and in reliance upon, the representations and undertakings of the Stockholders set forth in this <u>Article 4</u>, and (c) any subsequent sale, assignment, transfer, pledge or other disposition of the stock will be restricted in accordance with the provisions of this Agreement.

4.2     <u>Representations and Warranties</u>.  Each Stockholder, severally and not jointly, represents and warrants that (a) the acquisition or purchase of Securities is or has been made of his own initiative and not pursuant to any solicitation in a public manner, (b) such Securities are being or have been acquired for his own account and without a view to or for sale in connection with any distribution in violation of the Securities Act, (c) the Company is not obliged to register in the United States or otherwise facilitate the resale of such Securities, (d) such Stockholder has no need for liquidity in this investment and is able to bear the economic risk of investment in the Company, and in view of the foregoing, understands and acknowledges that such Securities must be held indefinitely unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration is available, (e) such Stockholder has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the purchase of Securities contemplated hereby, and the agreements relating to the Securities provided herein, and (f) in connection with such evaluation, such Stockholder is familiar with and has had access to all available information and documentation concerning the Company and its subsidiaries and has been furnished with all such information and documentation as has been requested or deemed relevant by such Stockholder. The Stockholders agree, severally and not jointly, to indemnify the Company and hold it harmless against all liabilities, claims, costs or expenses arising out of or resulting from any misrepresentations or breach of any agreement made by such Stockholder in this <u>Article 4</u>.

4.3     <u>Additional Restrictions</u>.  Each Stockholder further represents, warrants and covenants that such Stockholder will not at any time, directly or indirectly, sell, assign, transfer, or otherwise dispose of any portion of or interest in any of the Securities or offer or solicit the same unless such sale, assignment, transfer or other disposition is in accordance with the terms of this Agreement, and unless a registration statement under the Securities Act and applicable state securities laws is then in effect with respect to the Securities, or an exemption from such registration requirement is available, without first:

(a)     obtaining the written consent of the Company, which shall be given if such Stockholder furnishes to the Company, at such Stockholder's own expense, a written opinion of counsel, satisfactory to the Company as to counsel and substance, to the effect that such registration or prospectus filing is not required; and

(b)     furnishing the Company with an undertaking satisfactory to the Company in form and substance, indemnifying and holding the Company harmless against all cost, loss claims and expenses with respect to such proposed action.

## ARTICLE 5

### SIGNIFICANT TRANSACTIONS AND OTHER CORPORATE MATTERS

5.1     Certain Significant Transactions.  Subject to the Series A Designation and the Series B Designation, unless both Jefferies and Third Point grant their prior written consent, (x) neither the Company nor any of its subsidiaries shall take any of the following actions, and (y) each Stockholder agrees to vote its shares of Common Stock (whether at any meeting of Stockholders, by written consent or otherwise) to prohibit the Company or any of its subsidiaries from taking any of the following actions:

(a)     (i) authorize or issue any equity security or amend any term or provision of any equity security, other than any dividends paid in kind with respect to the Preferred Stock, (ii) establish, amend, modify or waive (A) any material term or condition of any option agreement with any Person or (B) any option plan, restricted security plan, phantom plan or similar plan, in each case, of the Company, or (iii) issue or grant any option, warrant, convertible security, phantom stock, stock appreciation right or similar right to any Person;

(b)     enter into any letter of intent or agreement with respect to, or take any steps to effect, a Liquidity Event or sell, assign, lease, license or otherwise Dispose of or voluntarily part with, the control of its material assets to any Person, or permit any subsidiary to do any of the foregoing, except for sales or other dispositions of assets in the ordinary course of business;

(c)     amend, modify or repeal the Company's or any subsidiary's Certificate of Incorporation, Certificate of Designations, the Series A Designation, the Series B Designation, Bylaws or comparable document (including, without limitation, provisions therein relating to the composition and responsibilities of the committees of the Board);

(d)     authorize the Company or any subsidiary to make any capital expenditure that would increase the aggregate capital expenditures for any year to an amount over $10,000,000;

(e)     create, invest in or acquire any interest in any subsidiary that is not a wholly-owned subsidiary, or sell or otherwise Dispose of any shares of capital stock of any subsidiary;

(f)     purchase, redeem or otherwise acquire or retire any of the Company's or any subsidiary's equity security of any class now or hereafter outstanding, or otherwise return capital or make distributions of assets to Stockholders as such, except for equity securities acquired pursuant to any buy-back or repurchase option under any agreement between the Company and one of its employees;

(g)     authorize or pay any distribution on any Securities other than dividends paid in kind with respect to the Preferred Stock;

(h)     enter into, amend, modify or waive any term or condition of any existing or future contract, arrangement or transaction with any Stockholder or any Affiliate or any Related Person of the Company or its subsidiaries or of any Stockholder;

(i)     make an assignment for the benefit of creditors, decide to subject any subsidiary to any proceedings under any bankruptcy or insolvency law, decide to avail the Company or any subsidiary of the benefit of any other legislation for the benefit of debtors, or take steps to wind up or terminate the Company's existence;

(j)     authorize or incur, or amend or modify the terms of, any indebtedness for borrowed money of the Company or any subsidiary;

(k)     guarantee any obligation of any Person other than the Company or any wholly-owned subsidiary, except in the ordinary course of business;

(l)     change the lines of business in which the Company participates;

(m)     initiate or conduct a Public Offering;

(n)     appoint, terminate or change the independent accountants for the Company or any subsidiary;

(o)     enter into any partnership or joint venture or amend the terms of any such partnership or joint venture;

(p)     negotiate or enter into any agreement to do any of the foregoing.

Notwithstanding the foregoing, any actions taken to implement the express provisions of any Indenture, the Series A Designation or the Series B Designation regarding the payment of interest or dividends, including any interest or dividends paid in kind in accordance with any Indentures, the Series A Designation or the Series B Designation shall not be subject to the provisions of this Section 5.1.

## ARTICLE 6

### ACCESS TO INFORMATION

6.1     <u>Books and Records</u>.  The Company shall maintain or cause to be maintained accurate and complete (i) minutes and records of the Stockholders and of the Board and (ii) books and records of account of the Company, which shall be kept at the principal place of business of the Company or at such other places, within or without the province of British Columbia, as the Board shall from time to time determine.

6.2     <u>Right of Inspection</u>.  Jefferies and Third Point shall have the right to examine at any reasonable time or times and for any purpose the minutes and records of the Stockholders and of the Board and the books and records of account of the Company, and to make copies thereof.  Such inspection may be made by any agent or duly appointed attorney of Jefferies or Third Point, as applicable.

6.3    Financial Reports. The Company will comply with all of the obligations set forth in Section 4.08 of any Indenture for the benefit of the Stockholders, including the delivery of the reports required to be delivered by the Company pursuant to Section 4.08 of any Indenture.

## ARTICLE 7

### MISCELLANEOUS

7.1    Remedies. Each party hereto acknowledges that a remedy at law for any breach or attempted breach of this Agreement will be inadequate, agrees that each other party hereto shall be entitled to specific performance and injunctive and other equitable relief in case of any such breach or attempted breach, and further agrees to waive any requirement for the securing or posting of any bond in connection with the obtaining of any such injunctive or any other equitable relief.

7.2    Effect of Sale. Any Stockholder who sells all of his stock pursuant to the terms of this Agreement shall cease to be a party to this Agreement and shall have no further rights or obligation hereunder.

7.3    Termination. This Agreement shall terminate automatically upon the bankruptcy or dissolution of the Company or the consummation of a Liquidity Event; *provided, however,* that any transfer directly related to a Public Offering shall not be subject to the provisions of this Agreement as long as the transaction is consummated only if the Public Offering is consummated.

7.4    Amendment. This Agreement may be amended from time to time by an instrument in writing signed by Jefferies and Third Point; *provided, however,* that no amendment that materially and adversely affects the rights of a Stockholder shall be binding upon such Stockholder without such Stockholder's written consent.

7.5    Notices. All notices, requests, demands or other communications that are required or may be given pursuant to the terms of this Agreement shall be in writing (including by electronic mail) and shall be deemed to have been duly given: (i) on the date of delivery, if personally delivered by hand, (ii) upon the third day after such notice is deposited in the United States mail, if mailed by registered or certified mail, postage prepaid, return receipt requested, (iii) upon the date scheduled for delivery after such notice is sent by a nationally recognized overnight express courier, (iv) by facsimile upon written confirmation (including the automatic confirmation that is received from the recipient's facsimile machine) of receipt by the recipient of such notice or (v) on the date sent if by electronic mail, receipt confirmed, in each case at the mailing address or facsimile number set forth under each party's name on Appendix A of this Agreement.

7.6    Governing Law. The terms of this Agreement shall be governed by, and interpreted in accordance with the provisions of, the laws of Delaware, without regard to principles of conflicts of law.

7.7     Successors and Assigns.  This Agreement shall be binding upon and inure to the parties contained in this Agreement and their respective heirs, executors, distributees, successors and assigns.

7.8     Severability; Invalid Provisions.  The provisions contained herein are independent and separate, and in the event that any provision or any portion of this Agreement is adjudged or held to be invalid, unenforceable or void, such holding shall not have the effect of invalidating or voiding the remainder of this Agreement and the parties hereby agree that the portion so held invalid, unenforceable or void shall, if possible, be deemed amended or reduced in scope, or to otherwise be stricken from this Agreement to the extent required for the purposes of validity and enforcement thereof.

7.9     Section Headings.  The section and paragraph headings contained herein are for reference purposes only and shall not in any way affect the meaning and interpretation of this Agreement

7.10    Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and such counterparts together shall constitute only one instrument.

7.11    Adjustments.  In the event the Company shall declare a stock split, stock dividend or other distribution of capital stock in respect of, or issue capital stock in replacement of or exchange for, shares of Common Stock (i) such shares shall be subject to this Agreement, and the provisions of this Agreement providing for calculations based on the number of shares of Common Stock, as applicable, shall include the shares issued in respect of the Common Stock, as applicable, and (ii) the numbers for shares shall be equitably adjusted as appropriate to give effect to such event.

7.12    Prior Agreements.  This Agreement shall supersede all prior agreements, documents or other instruments with respect to the matters covered hereby.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed themselves or by their respective representatives thereunto duly authorized as of the date first above set forth.

**The Company**:

BASELINE OIL & GAS CORP., a Delaware corporation

By:_____
Name:_____
Title:_____

**Jefferies**:

Jefferies & Company, Inc., a Delaware corporation

By:_____
Name:_____
Title:_____

Jefferies High Yield Trading, LLC, a Delaware limited liability company

By:_____
Name:_____
Title:_____

**Third Point**:

Third Point, LLC, a Delaware limited liability company

By:_____
    Jim Gallagher
    Chief Administrative Officer

Third Point Offshore Master Fund, L.P., a
Cayman Islands limited partnership
Third Point Ultra Master Fund, L.P., a Cayman
Islands limited partnership

By: [_____], its general
partner,


By:_____
     Jim Gallagher
     Chief Administrative Officer

**Appendix A**

If to the Company to:

      Baseline Oil & Gas Corp.
      411 N. Sam Houston Pkwy E., Suite 300
      Houston, Texas  77060
      Attn: Thomas R. Kaetzer
      Telecopy:  281.591.6101
      Email:  t.kaetzer@baselineoil.com

      with a copy to:

      Thompson & Knight LLP
      333 Clay Street, Suite 3300
      Houston, Texas  77002
      Attn:  Rhett G. Campbell
      Telecopy:  832.397.8260
      Email:  rhett.campbell@tklaw.com

If to Jefferies, to:

      Jefferies & Company, Inc.
      520 Madison Avenue
      New York, New York  10022
      Attention:  Brian Wolfe
      Telecopy:  (203) 708-5857
      Email:  bwolfe@jefferies.com

      with a copy to:

      Jones Day
      717 Texas Avenue, Suite 3300
      Houston, Texas  77002
      Attention:  J. Mark Metts
      Telecopy:  832.239.3600
      Email:  markmetts@jonesday.com

If to Third Point to:

      Third Point, LLC
      390 Park Avenue
      New York, New York  10022
      Attention:  Josh Targoff
      Telecopy:  ___.___.____
      Email:  jtargoff@thirdpoint.com

with a copy to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY  10166
Attention:  David M. Wilf
Telecopy:  (212) 351-6277
Email:  dwilf@gibsondunn.com

*EXHIBIT T*

# CERTIFICATE OF

# DESIGNATIONS, PREFERENCES AND RIGHTS OF

# SERIES A AND SERIES B

# REDEEMABLE PREFERRED STOCK

# OF

# BASELINE OIL & GAS CORP.

_____, 2009

(Pursuant to Section 151 of the
General Corporation Law of the State of Delaware)

Baseline Oil & Gas Corp., a corporation organized and existing under the General Corporation Law of the State of Delaware (hereinafter called the "*Corporation*"), does hereby certify:

That pursuant to the authority expressly granted to and vested in the board of directors of the Corporation (the "*Board*") by the provisions of the Certificate of Incorporation of the Corporation (the "*Certificate of Incorporation*"), the Board on _____, 2009 adopted the following resolution creating a series of 50,000 shares of preferred stock designated as "Series A Redeemable Preferred Stock" and a series of 10,000 shares of preferred stock designated as "Series B Redeemable Preferred Stock":

RESOLVED, that pursuant to the authority vested in the Board in accordance with the provisions of the Certificate of Incorporation, there is hereby created, out of the 60,000 shares of Preferred Stock, par value $0.001 a share, of the Corporation authorized in Article V of the Certificate of Incorporation (the "*Preferred Stock*"), (i) a series of the Preferred Stock consisting of 50,000 shares designated as "Series A Redeemable Preferred Stock" and (ii) a series of Preferred Stock consisting of 10,000 shares designated as "Series B Redeemable Preferred Stock," and each such series shall have the following powers, designations, preferences and other rights and the following qualifications, limitation and restrictions (in addition to any powers, designations, preferences and other rights, and any qualifications, limitations and restrictions set forth in the Certificate of Incorporation that are applicable to the Preferred Stock):

1.    Defined Terms.  In addition to the terms elsewhere defined herein, as used in this Certificate, the following terms shall have the respective meanings set forth below:

"*Applicable Premium*" means, with respect to each share of Series A Preferred Stock on any redemption date, the excess of:

    (1)    1.0% of the Series A Liquidation Preference; or

    (2)    the excess of:

        (a)    the present value at such redemption date of (i) the redemption price of each share of Series A Preferred Stock at [_____], 2012, (such redemption price being set forth in Section 5(c)(i) herein) plus (ii) all required dividend and any other payments due on each share of Series A Preferred Stock through [_____], 2012, (excluding accrued but unpaid Series A Dividends to _____, 2012), computed using a discount rate equal to the Treasury Rate as of such redemption date plus 50 basis points; over

        (b)    the Series A Liquidation Preference, if greater.

"***Applicable Rate***" means 18% per annum.

"***Board***" means the Board of Directors of the Corporation.

"***Business Day***" means a day other than Saturday, Sunday or date on which banking institutions in New York are authorized or required to remain closed.

"***Certificate***" means this Certificate of Designations, Preferences and Rights of Series A Preferred Stock and Series B Preferred Stock.

"***Change of Control Offer***" has the meaning set forth in Section 4(a).

"***Change of Control Purchase Amount***" has the meaning set forth in Section 4(a).

"***Change of Control Purchase Date***" has the meaning set forth in Section 4(a).

"***Common Stock***" means the Common Stock, par value $0.001 per share, of the Corporation.

"***Corporation***" means Baseline Oil & Gas Corp., a Delaware corporation.

"***Dividend Payment Date***" has the meaning set forth in Section 3(a)(i).

"***Duly Endorsed***" means duly endorsed in blank by the Person or Persons in whose name a certificate representing a security is registered or accompanied by a duly executed instrument of assignment separate from the certificate.

"***Event of Non-Compliance***" has the meaning set forth in Section 6(c).

"***Fair Market Value***" has the meaning set forth in the Stockholders Agreement.

"***Indenture***" means that certain Indenture, dated as of the Original Issuance Date, by and among the Corporation, the Guarantors (as defined therein) and The Bank of New York Mellon, as Indenture Trustee and Collateral Agent, as amended from time to time.

"***Indenture Change of Control***" has the meaning given to it in the Indenture.

"***Indenture Event of Default***" has the meaning given to it in the Indenture.

"***Liquidation***" means the liquidation, dissolution, or winding up of the Corporation, whether voluntary or involuntary.

"***Liquidation Event***" has the meaning set forth in Section 5(b)(i).

"***Original Issuance Date***" means _____, 2009.

"***Person***" means any natural person or any corporation, limited liability company, partnership, trust or other legal entity.

"***Preferred Stock***" means the Preferred Stock, par value $0.001 per share, of the Corporation, and for purposes of this Certificate, the Series A Preferred Stock and the Series B Preferred Stock, taken together.

"***Public Offering***" means the sale of shares of any class of equity securities of the Corporation (or any successor of the Corporation) to the public pursuant to an effective registration statement (other than a registration statement on Form S-4 or S-8 or any similar or successor form) filed under the Securities Act.

"***Record Date***" has the meaning set forth in Section 3(a)(i).

"***Securities Act***" means the Securities Act of 1933, as amended, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder.

"***Series A Dividends***" has the meaning set forth in Section 3(a)(i).

"***Series A Junior Securities***" has the meaning set forth in Section 2(b)(i).

"***Series A Liquidation Event***" has the meaning set forth in Section 5(a)(i).

"***Series A Liquidation Preference***" means $1,000 for each share of Series A Preferred Stock.

"***Series A Mandatory Redemption Date***" has the meaning set forth in Section 5(a)(i).

"***Series A Mandatory Redemption Price***" has the meaning set forth in Section 5(a)(i).

"***Series A Optional Redemption Date***" has the meaning set forth in Section 5(a)(ii)(A).

"***Series A Parity Securities***" has the meaning set forth in Section 2(b)(ii).

"***Series A Preferred Stock***" has the meaning set forth in Section 2(a).

"***Series A Senior Securities***" has the meaning set forth in Section 2(b)(iii).

"***Series B Dividends***" has the meaning set forth in Section 3(b)(i).

"*Series B Junior Securities*" has the meaning set forth in <u>Section 2(c)(i)</u>.

"*Series B Liquidation Event*" has the meaning set forth in <u>Section 5(b)(i)</u>.

"*Series B Liquidation Preference*" means $1,000 for each share of Series B Preferred Stock.

"*Series B Mandatory Redemption Date*" has the meaning set forth in <u>Section 5(b)(i)</u>.

"*Series B Mandatory Redemption Price*" has the meaning set forth in <u>Section 5(b)(i)</u>.

"*Series B Optional Redemption Date*" has the meaning set forth in <u>Section 5(b)(ii)</u>.

"*Series B Parity Securities*" has the meaning set forth in <u>Section 2(c)(ii)</u>.

"*Series B Preferred Stock*" has the meaning set forth in <u>Section 2(a)</u>.

"*Series B Junior Securities*" has the meaning set forth in <u>Section 2(c)(iii)</u>.

"*Stockholders Agreement*" means that certain Stockholders Agreement among the Corporation, Jefferies & Company, Inc., Jefferies High Yield Trading, LLC, Third Point, LLC, a Delaware limited liability company, Third Point Offshore Master Fund, L.P., a Cayman Islands limited partnership, and Third Point Ultra Master Fund, L.P., a Cayman Islands limited partnership, dated as of the Original Issuance Date, as may be amended from time to time.

"*Subsidiary*" means, with respect to any Person, (a) any corporation, of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote generally in the election of directors thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (b) any limited liability company, partnership, association, or other business entity, of which a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes of this definition, a Person or Persons will be deemed to have a majority ownership interest in a limited liability company, partnership, association, or other business entity if such Person or Persons will be allocated a majority of limited liability company, partnership, association, or other business entity gains or losses, or is or controls the managing member or general partner of such limited liability company, partnership, association, or other business entity.

"*Third Party*" has the meaning set forth in the Stockholders Agreement.

2.      <u>Designation of Series A Preferred Stock and Series B Preferred Stock</u>.

    (a)     <u>Designations</u>.  The two classes of Preferred Stock created hereby shall be designated (i) the "Series A Redeemable Preferred Stock" (the "*Series A Preferred Stock*") and (ii) the "Series B Redeemable Preferred Stock" (the "*Series B Preferred Stock*").  The number of shares initially constituting the Series A Preferred Stock shall be 50,000, and the number of shares initially constituting the Series B Preferred Stock shall be 10,000.

      **(b)**    <u>Ranking of Series A Preferred Stock</u>. The Series A Preferred Stock shall rank, with respect to dividends and distributions and with respect to distributions of assets upon a Liquidation:

      **(i)**    senior to (A) all classes of Common Stock, (B) the Series B Preferred Stock and (C) to each other class of capital stock or series of Preferred Stock established after the Original Issuance Date by the Board, the terms of which do not expressly provide that it ranks senior to or on parity with the Series A Preferred Stock as to dividends and distributions and as to distributions of assets upon a Liquidation (collectively, the "***Series A Junior Securities***");

      **(ii)**    on parity with any other class of capital stock or series of Preferred Stock established after the Original Issuance Date by the Board (which establishment shall be subject to the receipt of applicable consents described in <u>Section 6(b)</u> hereof), the terms of which expressly provide that such class or series will rank on parity with the Series A Preferred Stock as to dividends and distributions and as to distributions of assets upon a Liquidation (collectively, the "***Series A Parity Securities***"); and

      **(iii)**    junior to any other class of capital stock or series of Preferred Stock established after the Original Issuance Date by the Board (which establishment shall be subject to the receipt of applicable consents described in <u>Section 6(b)</u> hereof), the terms of which expressly provide that such class or series will rank Senior to the Series A Preferred Stock as to dividends and distributions and as to distributions of assets upon a Liquidation (collectively, the "***Series A Senior Securities***").

      **(c)**    <u>Ranking of Series B Preferred Stock</u>. The Series B Preferred Stock shall rank, with respect to dividends and distributions and with respect to distributions of assets upon a Liquidation:

      **(i)**    senior to (A) all classes of Common Stock and (B) to each other class of capital stock or series of Preferred Stock established after the Original Issuance Date by the Board, the terms of which do not expressly provide that it ranks senior to or on parity with the Series B Preferred Stock as to dividends and distributions and as to distributions of assets upon a Liquidation (collectively, the "***Series B Junior Securities***");

      **(ii)**    on parity with any other class of capital stock or series of Preferred Stock established after the Original Issuance Date by the Board (which establishment shall be subject to the receipt of applicable consents described in <u>Section 6(c)</u> hereof), the terms of which expressly provide that such class or series will rank on parity with the Series B Preferred Stock as to dividends and distributions and as to distributions of assets upon a Liquidation (collectively, the "***Series B Parity Securities***"); and

      **(iii)**    junior to (A) the Series A Preferred Stock and (B) any other class of capital stock or series of Preferred Stock established after the Original Issuance Date by the Board (which establishment shall be subject to the receipt of applicable consents described in <u>Section 6(c)</u> hereof), the terms of which expressly provide that such class or series will rank Senior to the Series B Preferred Stock as to dividends and distributions and as to distributions of assets upon a Liquidation (collectively, the "***Series B Senior Securities***").

3.    Dividends.

(a)    Series A Dividends.

(i)    The holders of the then outstanding shares of Series A Preferred Stock shall be entitled to receive dividends on a cumulative basis, accruing on a daily basis from the date of issuance at the Applicable Rate on the Series A Liquidation Preference and payable quarterly in arrears on the first day of each of January, April, July and October (each, a "*Dividend Payment Date*"), commencing on October 1, 2009; *provided, however*, that if any such payment date is not a Business Day then such dividend shall be payable on the next Business Day. Such dividends shall be deemed to accrue on each share of Series A Preferred Stock from the date it is issued and shall be cumulative whether or not earned or declared and whether or not there are profits, surplus or other funds of the Corporation legally available for the payment of dividends, and whether or not such dividends are authorized by the Board. The dividends provided for in this Section 3(a)(i) are hereinafter referred to as "*Series A Dividends*." Series A Dividends shall be payable to holders of record of the Series A Preferred Stock as they appear in the stock register of the Corporation at the close of business on such record date (each, a "*Record Date*") as may be fixed by the Board, which record date will not be less than 10 nor more than 20 days prior to the applicable Dividend Payment Date. The amount of any Series A Dividends per share of Series A Preferred Stock for any full quarterly period shall be computed by multiplying the Applicable Rate by the Series A Liquidation Preference and dividing the result by four. Series A Dividends payable on shares of Series A Preferred Stock for any period less than a full quarterly dividend period shall be computed on the basis of a 360-day year of twelve 30-day months and the actual number of days elapsed for any period less than one month.

(ii)    Series A Dividends shall be payable, at the option of the Corporation, either:

(A)    in cash, when, as and if declared by the Board or a duly authorized committee thereof out of funds of the Corporation legally available therefor;

(B)    by issuance of additional shares of Series A Preferred Stock having an aggregate Series A Liquidation Preference equal to the amount of the applicable Series A Dividend to be paid; or

(C)    in any combination thereof;

*provided, however*, that if the Corporation elects to pay any such Series A Dividend in a combination of forms, the relative amount of each such form shall be identical for each share of Series A Preferred Stock except to the extent otherwise required to satisfy fractional shares of Series A Preferred Stock.

The payout of dividends with additional shares of Series A Preferred Stock shall, for all purposes, increase the number of shares of Series A Preferred Stock outstanding, including for purposes of calculating dividends, aggregate Liquidation Preference and any redemption price. In the event that the Corporation elects to pay any Series A Dividend declared pursuant to Section 3(a)(ii)(B) hereof in shares of Series A Preferred Stock and the number of such shares to be issued to any holder is not a whole number, then the Corporation will, at its option, either (x) increase the

T-6

number of shares of Series A Preferred Stock to be issued to such holder up to the nearest whole number or (y) reduce the number of shares of Series A Preferred Stock to be issued to such holder down to the nearest whole number and substitute in lieu of any fractional share a cash payment equal to an amount in cash determined by multiplying the Series A Liquidation Preference by the fraction of a share of Series A Preferred Stock to which such holder would otherwise be entitled to receive pursuant to this Section 3(a).

      **(iii)**    Unless and until full cumulative Series A Dividends on shares of Series A Preferred Stock in respect of all past quarterly dividend periods have been paid, and the full amount of Series A Dividends on the shares of Series A Preferred Stock in respect of the then current quarterly dividend period shall have been or are contemporaneously declared in full and a sum sufficient set aside in trust for the payment thereof, (A) no dividends or other distributions shall be paid or declared or set aside for payment on any Series A Junior Securities (other than in shares of, or warrants or rights to acquire, solely Series A Junior Securities) and (B) no Series A Junior Securities shall be redeemed, retired, purchased or otherwise acquired for any consideration (or any payment made to or available for a sinking fund for the redemption of any such shares) by the Corporation or any Subsidiary (except by conversion into or exchange solely for shares of Series A Junior Securities).  No interest, or sum of money in lieu of interest, shall be payable in respect of any dividend on the Series A Preferred Stock that may be in arrears.

      **(b)**    Series B Dividends.

      **(i)**    Subject to the provisions of Section 3(c), the holders of the then outstanding shares of Series B Preferred Stock shall be entitled to receive dividends on a cumulative basis, accruing on a daily basis from the date of issuance at the Applicable Rate on the Series B Liquidation Preference and payable quarterly in arrears on each Dividend Payment Date, commencing on October 1, 2009; *provided, however*, that if any such payment date is not a Business Day then such dividend shall be payable on the next Business Day.  Such dividends shall be deemed to accrue on each share of Series B Preferred Stock from the date it is issued and shall be cumulative whether or not earned or declared and whether or not there are profits, surplus or other funds of the Corporation legally available for the payment of dividends, and whether or not such dividends are authorized by the Board.  The dividends provided for in this Section 3(b) are hereinafter referred to as "***Series B Dividends***."  Series B Dividends shall be payable to holders of record of the Series B Preferred Stock as they appear in the stock register of the Corporation at the close of business on such Record Date as may be fixed by the Board, which Record Date will not be less than 10 nor more than 20 days prior to the applicable Dividend Payment Date.  The amount of any Series B Dividends per share of Series B Preferred Stock for any full quarterly period shall be computed by multiplying the Applicable Rate by the Series B Liquidation Preference and dividing the result by four.  Series B Dividends payable on shares of Series B Preferred Stock for any period less than a full quarterly dividend period shall be computed on the basis of a 360-day year of twelve 30-day months and the actual number of days elapsed for any period less than one month.

      **(ii)**    Series B Dividends shall be payable, at the option of the Corporation, either:

           **(A)**     in cash when, as and if declared by the Board or a duly authorized committee thereof out of funds of the Corporation legally available therefor;

           **(B)**     by issuance of additional shares of Series B Preferred Stock having an aggregate Series B Liquidation Preference equal to the applicable amount of the Series B Base Dividend to be paid; or

           **(C)**     in any combination thereof;

*provided, however*, that if the Corporation elects to pay any such Series B Base Dividend in a combination of forms, the relative amount of each such form shall be identical for each share of Series B Preferred Stock except to the extent otherwise required to satisfy fractional shares of Series B Preferred Stock.

     The payment of dividends with additional shares of Series B Preferred Stock shall, for all purposes, increase the number of shares of Series B Preferred Stock outstanding, including for purposes of calculating dividends, aggregate Liquidation Preferences and any redemption price. In the event that the Corporation elects to pay any Series B Base Dividend declared pursuant to Section 3(b)(ii)(B) hereof in shares of Series B Preferred Stock and the number of such shares to be issued to any holder is not a whole number, then the Corporation will, at its option, either (x) increase the number of shares of Series A Preferred Stock to be issued to such holder up to the nearest whole number or (y) reduce the number of shares of Series B Preferred Stock to be issued to such holder down to the nearest whole number and substitute in lieu of any fractional share a cash payment equal to an amount in cash determined by multiplying the Series B Liquidation Preference by the fraction of a share of Series B Preferred Stock to which such holder would otherwise be entitled to receive pursuant to this Section 3(b).

          **(iii)**     Unless and until full cumulative Series B Dividends on the shares of Series B Preferred Stock in respect of all past quarterly dividend periods have been paid, and the full amount of Series B Dividends on the shares of Series B Preferred Stock in respect of the then current quarterly dividend period shall have been or are contemporaneously declared in full and a sum sufficient set aside in trust for the payment thereof, (A) no dividends or other distributions shall be paid or declared or set aside for payment on any Series B Junior Securities (other than in shares of, or warrants or rights to acquire, solely Series B Junior Securities) and (B) no Series B Junior Securities shall be redeemed, retired, purchased or otherwise acquired for any consideration (or any payment made to or available for a sinking fund for the redemption of any such shares) by the Corporation or any Subsidiary (except by conversion into or exchange solely for shares of Series B Junior Securities).

          **(c)**     Board Action; Preference of Dividends. Prior to declaring any dividend or making any distribution on or with respect to shares of Common Stock, the Corporation shall take all prior corporate action necessary to authorize the payment of any cash or the issuance of any securities payable as a dividend in respect of, first, the Series A Preferred Stock and second, the Series B Preferred Stock. The Corporation shall not declare or pay any dividends in cash on the Series B Preferred Stock or the Common Stock while any Series A Preferred Stock remain outstanding unless it is also paid on the Series A and shall not declare or pay any dividends in cash