on the Common Stock while any Series B Preferred Stock remain outstanding unless it is also paid on the Series B Preferred Stock.

    **4.**    Put Rights Upon a Change of Control.

    **(a)**    Upon the occurrence of an Indenture Change of Control, the Corporation shall offer (the "***Change of Control Offer***") to repurchase the shares of Series A Preferred Stock and Series B Preferred Stock at a purchase price per share in cash equal to the Liquidation Preference of each share plus all accrued and unpaid dividends on such shares thereon from the last Dividend Payment Date to the date fixed for repurchase (the "***Change of Control Purchase Amount***"). Within 20 days following any Indenture Change of Control, the Corporation shall mail a notice to each holder of shares of the applicable series of Preferred Stock describing the transaction or transactions that constitute the Indenture Change of Control and offering to repurchase such shares on a date specified in such notice (the "***Change of Control Purchase Date***"), which date shall be no earlier than 30 days and no later than 60 days from the date such notice is mailed, pursuant to the procedures required by Section 5(d) (without regard to the dates set forth therein) and described in such notice.

    **(b)**    On the Change of Control Purchase Date, the Corporation shall, to the extent lawful:

    **(i)**    accept for payment all shares of the applicable series of Preferred Stock properly tendered pursuant to the applicable Change of Control Offer; and

    **(ii)**    if the Corporation has a paying agent, deposit with such paying agent an amount equal to the applicable Change of Control Purchase Amount in respect of all shares of Preferred Stock so tendered.

    **(c)**    The Corporation's paying agent, or if the Corporation does not have a paying agent, the Corporation, shall promptly mail to each holder of shares of the applicable series of Preferred Stock so tendered the Change of Control Purchase Amount for such shares, and the Corporation or its transfer agent shall promptly mail (or cause to be transferred by book entry) to each holder a new certificate for any shares of the applicable series of Preferred Stock not tendered that are represented by the surrendered certificate. The Corporation shall notify each holder of the applicable series of Preferred Stock the results of the applicable Change of Control Offer on or as soon as practicable after the applicable Change of Control Purchase Date. The provisions of Section 5(c) shall apply to this Section 4, as appropriately modified for a repurchase of the applicable series of Preferred Stock pursuant to a Change of Control Offer.

    **(d)**    The provisions of this paragraph that permit the Corporation to make a Change of Control Offer shall be applicable regardless of whether any other provisions of this Certificate are applicable.

    **(e)**    The Corporation shall comply with the requirements of Rule 14e-1 under the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Securities and Exchange Commission thereunder, and any other securities laws and regulations to the extent such laws and regulations are applicable in connection with the repurchase of the Preferred Stock as a result of an Indenture Change of Control.

**(f)**     In connection with a Change of Control Offer, the Corporation shall pay the Change of Control Purchase Amount on the Series A Preferred Stock prior to making any such payment on the Series B Preferred Stock.

**5.**     Redemption.

    **(a)**     Redemption of Series A Preferred Stock.

        **(i)**     Mandatory Redemption. To the extent the Corporation shall have funds legally available for such payment, (A) on _____, 2019 (the "**Series A Mandatory Redemption Date**") or (B) upon any Indenture Event of Default, Liquidation or any redemption or repurchase of a Series A Junior Security without the prior consent required pursuant to Section 6(a), or any redemption or repurchase of a Series B Junior Security without the prior consent required pursuant to Section 6(b) (the events set forth in this clause (B), a "**Series A Liquidation Event**"), the Corporation shall redeem all then outstanding shares of Series A Preferred Stock at a redemption price per share equal to the Series A Liquidation Preference plus the amount of any accrued and unpaid Series A Dividends per share through and as of the Series A Mandatory Redemption Date (the "**Series A Mandatory Redemption Price**").

        **(ii)**     Optional Redemption.

        **(A)**     To the extent the Corporation shall have funds legally available for such payment, at any time prior to [_____], 2012, the Corporation may redeem from time to time, at its option, all or a part of the then outstanding shares of Series A Preferred Stock at a redemption price per share equal to the Series A Liquidation Preference, plus the Applicable Premium, plus the amount of any accrued and unpaid Series A Dividends per share as of the date of redemption (the "**Series A Optional Redemption Date**").

        **(B)**     To the extent the Corporation shall have funds legally available for such payment, at any time on or after [_____], 2012, the Corporation may redeem from time to time, at its option, all or a part of the then outstanding shares of Series A Preferred Stock at a redemption price per share equal to the Series A Liquidation Preference plus the amount of any accrued and unpaid Series A Dividends per share as of the Series A Optional Redemption Date.

        **(iii)**     No Other Redemption Rights. Except as expressly provided in this Section 5, the Corporation may not redeem any shares of Series A Preferred Stock.

    **(b)**     Redemption of Series B Preferred Stock.

        **(i)**     Mandatory Redemption. To the extent the Corporation shall have funds legally available for such payment, (A) on _____, 2021 (the "**Series B Mandatory Redemption Date**") or (B) upon any Indenture Event of Default, Liquidation or any redemption or repurchase of a Series B Junior Security without the prior consent required pursuant to Section 6(b) (the events set forth in this clause (B), a "**Series B Liquidation Event**" and, together with a Series A Liquidation Event, a "**Liquidation Event**"), the Corporation shall redeem all then outstanding shares of Series B Preferred Stock at a redemption price per share equal to the Series B Liquidation Preference plus the amount of any accrued and unpaid Series B Dividends per share as of the

Series B Mandatory Redemption Date (the "***Series B Mandatory Redemption Price***"). Notwithstanding anything herein to the contrary, subject to the consent provisions of <u>Section 6(a)</u>, if any shares of Series A Preferred Stock are still outstanding, all such shares of Series A Preferred Stock must be redeemed before any shares of Series B Preferred Stock are redeemed pursuant to this <u>Section 5(b)</u>.

        **(ii)**     <u>Optional Redemption</u>. To the extent the Corporation shall have funds legally available for such payment, at any time from time to time, the Corporation may redeem, at its option, all or a part of the then outstanding shares of Series B Preferred Stock at a price per share equal to the Series B Liquidation Preference plus the amount of any accrued and unpaid Series B Dividends per share as of the date of redemption (the "***Series B Optional Redemption Date***"); *provided, however*, that, subject to the consent provisions of <u>Section 6(a)</u>, no shares of Series B Preferred Stock may be redeemed pursuant to this <u>Section 5(c)(ii)</u> if any shares of Series A Preferred Stock are still outstanding as of the Series B Optional Redemption Date.

        **(iii)**     <u>No Other Redemption Rights</u>. Except as expressly provided in this <u>Section 5</u>, the Corporation may not redeem any shares of Series B Preferred Stock.

        **(c)**     <u>Additional Redemption Provisions</u>.

        **(i)**     If the Corporation does not have funds legally available for a mandatory redemption pursuant to either <u>Section 5(a)(i)</u> or <u>Section 5(b)(i)</u>, then the Corporation will redeem from each holder of a share of the applicable series of Preferred Stock on the applicable redemption date a number of share(s) of the applicable series of Preferred Stock equal to the product of (A) the number of share(s) of such Preferred Stock owned by such holder, multiplied by (B) a fraction, (1) the numerator of which is the total number of shares of such Preferred Stock that the Corporation could redeem in full with such legally available funds and (2) the denominator of which is the total number of shares of such Preferred Stock outstanding at the time of such redemption. Any shares of such series of Preferred Stock that are not redeemed shall remain outstanding and the holders of such unredeemed shares of such series of Preferred Stock shall retain all rights associated therewith. At any time thereafter when additional funds of the Corporation are legally available for the redemption of shares of such series of Preferred Stock, such funds shall immediately be used to redeem, in accordance with this <u>Section 5</u>, as much of the balance of the shares that the Corporation was obligated to redeem as can be redeemed with such additional funds. If and so long as the Corporation has not fully discharged its obligations under this <u>Section 5</u> with respect to the redemption of the Preferred Stock, the Corporation shall not (i) directly or indirectly, redeem, purchase, or otherwise acquire any Series A Parity Securities or Series B Parity Securities, as the case may be, or discharge any mandatory or optional redemption, sinking fund or other similar obligation in respect of any Series A Parity Securities or Series B Parity Securities, as the case may be (except in connection with a redemption, sinking fund or other similar obligation to be satisfied pro rata with the Series A Preferred Stock or Series B Preferred Stock, respectively) or (ii) declare or distribute any dividends on account of any Series A Junior Securities or Series B Junior Securities, as applicable, or directly or indirectly, redeem, purchase, or otherwise acquire or discharge any mandatory or optional redemption, sinking fund or other similar obligation in respect of any Series A Junior Securities or Series B Junior Securities, as the case may be.

    **(ii)**  If, on a redemption date for the Series A Preferred Stock or Series B Preferred Stock pursuant to <u>Section 5(a)</u> or <u>Section 5(b)</u>, the assets of the Corporation legally available for redemption of such series of Preferred Stock shall have been irrevocably set aside and deposited with a bank or trust company in trust for purposes of payment of such redemption price, then, notwithstanding that the certificates evidencing any shares so called for redemption shall not have been surrendered, the shares shall no longer be deemed outstanding, the holders thereof shall cease to be stockholders and all rights whatsoever with respect to the shares so called for redemption (except the right of the holders to receive the applicable redemption price upon surrender of their certificates therefore) shall terminate.

    **(iii)**  In connection with any Liquidation Event, if the consideration received by the Corporation is other than cash, its value will be deemed its Fair Market Value.

    **(d)**  <u>Redemption Procedures</u>.

    **(i)**  Notice of a redemption pursuant to this <u>Section 5</u> shall be given by first class mail, postage prepaid, mailed not less than 10 days nor more than 20 days prior to the applicable redemption date, to each holder of record of the applicable class of Preferred Stock at such holder's address as the same appears on the stock register of the Corporation.  Each such notice shall state:

      **(A)**  the applicable redemption date,

      **(B)**  the number of shares of the applicable class of Preferred Stock to be redeemed and, if fewer than all of the shares held by such holder are to be redeemed, the number of shares to be redeemed from such holder;

      **(C)**  the applicable redemption price;

      **(D)**  that holders of the applicable class of Preferred Stock must surrender their Preferred Stock certificates to the Corporation or its transfer agent for payment of the redemption price; and

      **(E)**  that dividends on the shares of the Preferred Stock to be redeemed will cease to accrue as of the applicable redemption date.

The Corporation will pay the applicable redemption price in cash to each holder of a share of the applicable class of Preferred Stock upon (x) surrender of the certificate therefor, Duly Endorsed, or (y) notice by the holder thereof to the Corporation that such certificate or certificates have been lost, stolen or destroyed and execution by such holder of an agreement to indemnify the Corporation from any loss incurred by it in connection with such certificate or the underlying shares.

    **6.**  <u>Protective Provisions; No Separate Voting Rights</u>.

    **(a)**  <u>Series A Preferred Stock Protective Provisions</u>.  So long as any shares of Series A Preferred Stock remain outstanding, the Corporation may not, without the affirmative

vote of holders of at least two-thirds of the holders of the outstanding shares of Series A Preferred Stock:

      **(i)**    create, authorize or increase the authorized or issued amount of any class, series or shares of any Series A Senior Security or Series A Parity Security;

      **(ii)**    amend, alter or repeal the Certificate of Incorporation or this Certificate or any provisions thereof if such amendment, alteration or repeal would adversely affect any power, preference or special right of the Series A Preferred Stock or the holders thereof;

      **(iii)**    redeem, purchase, or otherwise acquire any Series A Junior Security (including the Series B Preferred Stock).

      **(b)**    <u>Series B Preferred Stock Protective Provisions</u>.  So long as any shares of Series B Preferred Stock remain outstanding, the Corporation may not, without the affirmative vote of holders of at least two-thirds of the holders of the outstanding shares of Series B Preferred Stock:

      **(i)**    create, authorize or increase the authorized or issued amount of any class, series or shares of any Series B Senior Security or Series B Parity Security;

      **(ii)**    amend, alter or repeal the Certificate of Incorporation or this Certificate or any provisions thereof if such amendment, alteration or repeal would adversely affect any power, preference or special right of the Series B Preferred Stock or the holders thereof;

      **(iii)**    redeem, purchase, or otherwise acquire any Series B Junior Security.

      **(c)**    <u>Events of Non-Compliance & Remedies</u>.  If any of the following occurs (each, an "***Event of Non-Compliance***"):

      **(i)**    the Corporation breaches in any material respect any of its covenants or obligations under this Certificate to the holders of shares of Preferred Stock and fails to cure such breach within five Business Days after receipt of notice of such breach from any holder of shares of Preferred Stock;

      **(ii)**    one or more judgments in an aggregate amount in excess of $5.0 million shall have been rendered against the Corporation or any of its Subsidiaries (other than any judgment as to which a reputable and solvent third party insurer has accepted full coverage) and such judgments remain undischarged, unpaid or unstayed for a period of 60 days after such judgment or judgments become final and non-appealable;

      **(iii)**    the Corporation or any Subsidiary (i) commences a voluntary case or proceeding under any applicable bankruptcy laws with respect to itself, (ii) consents to the entry of a judgment, decree or order for relief against it in an involuntary case or proceeding under any applicable bankruptcy laws, (iii) consents to the appointment of a custodian of it or for substantially all of its property, (iv) consents to or acquiesces in the institution of a bankruptcy or an insolvency proceeding against it, (v) makes a general assignment for the benefit of its creditors,

(vi) generally is not paying debts as they become due or (vii) takes any corporate action to authorize or effect any of the foregoing;

and such Event of Non-Compliance continues for a period of 90 calendar days, the holders of shares of Series A Preferred Stock, if any remain outstanding, or if no shares of such Series A Preferred Stock remain outstanding, then the holders of the Series B Preferred Stock will be entitled to vote for the election of an additional director of the Corporation, and the number of directors on the Board shall be increased by one, at a special meeting called by the holders of record of at least 20% of the total outstanding shares of Series A Preferred Stock, if any remain outstanding, or if no shares of such Series A Preferred Stock remain outstanding, then the shares of Series B Preferred Stock (unless such request is received less than 90 days before the date fixed for the next annual or special meeting of the stockholders of the Corporation and such election is held at such annual or special meeting) or at the next annual meeting of the stockholders of the Corporation, and at each subsequent annual meeting until such Event of Non-Compliance shall have been cured.

        **(d)**   No Separate Voting Rights. Except as otherwise provided herein or as required by law, including *11 U.S.C §1123(a)(6)*, the holders of outstanding shares of Series A Preferred Stock and the holders of outstanding shares of Series B Preferred Stock shall not be entitled to vote on any matter to be voted on by the stockholders of the Corporation or to receive notice of meetings of stockholders. For purposes of the voting rights set forth in this Section 6, the holders of Series A Preferred Stock and the holders of Series B Preferred Stock shall be entitled to one vote for each share thereof held of record on all matters to be voted on by holders of Series A Preferred Stock or Series B Preferred Stock, voting as a separate class, respectively, and subject to any stockholders agreement to which the Corporation is a party, the act of the holders of shares of Series A Preferred Stock or Series B Preferred Stock, as applicable, shall be determined by the affirmative vote of the holders of a majority of the outstanding shares of Series A Preferred Stock or Series B Preferred Stock, voting as a separate class, respectively.

     **7.**   No Reissuance of Preferred Stock; No Preemptive Rights.

        **(a)**   No share or shares of Series A Preferred Stock or Series B Preferred Stock acquired by the Corporation by reason of redemption, purchase or otherwise will be reissued, and all such shares will be canceled, retired and eliminated from the shares that the Corporation will be authorized to issue.

        **(b)**   Neither the holders of Series A Preferred Stock nor the holders of Series B Preferred Stock shall have any preemptive or subscription rights.

     **8.**   Reports. Section 4.08 of the Indenture, as in effect as of the Original Insurance Date, is hereby incorporated by reference herein for the benefit of the holders of the Preferred Stock.

     **9.**   Miscellaneous.

        **(a)**   Notice. Except as may otherwise be provided for in this Certificate, all notices or other communications that are required or may be given pursuant to this Certificate shall be in writing and shall be deemed to have been duly given:

          **(i)**     on the date of delivery, if personally delivered by hand;

          **(ii)**    upon the third Business Day after such notice is deposited in the United States mail, if mailed by registered or certified mail, postage prepaid, return receipt requested (unless first-class mail shall be specifically permitted for such notice under the terms of this Certificate);

          **(iii)**   upon the date scheduled for delivery after such notice is sent by a nationally recognized overnight express courier; or

          **(iv)**   by facsimile upon written confirmation (including the automatic confirmation that is received from the recipient's facsimile machine) of receipt by the recipient of such notice, in each case: if to the Corporation to Baseline Oil & Gas Corp., 411 North Sam Houston Parkway East, Suite 300 Houston, Texas 77060, Attention: Chief Executive Officer, or to an agent of the Corporation designated as permitted by the Certificate of Incorporation or, if to any holder of shares of Series A Preferred Stock or Series B Preferred Stock, at the mailing address or facsimile number of such holder as listed in the stock register of the Corporation; or to such other address as the Corporation or holder, as the case may be, shall have designated by notice similarly given.

          **(b)**     <u>Headings of Subdivisions</u>.   The headings in this Certificate are for convenience of reference only and will not control or affect the meaning or construction of any of the provisions of this Certificate.

          **(c)**     <u>Severability of Provisions</u>.  If any voting powers, preferences and relative, participating, optional and other special rights of the Series A Preferred Stock or Series B Preferred Stock and qualifications, limitations and restrictions thereof set forth in this Certificate are invalid, unlawful or incapable of being enforced by reason of any rule of law or public policy, all other voting powers, preferences and relative, participating, optional and other special rights of the Series A Preferred Stock or Series B Preferred Stock and qualifications, limitations and restrictions thereof set forth in this Certificate that can be given effect without the invalid, unlawful or unenforceable voting powers, preferences and relative, participating, optional and other special rights of the Series A Preferred Stock or Series B Preferred Stock and qualifications, limitations and restrictions thereof shall, nevertheless, remain in full force and effect, and no voting powers, preferences and relative, participating, optional or other special rights of the Series A Preferred Stock or Series B Preferred Stock and qualifications, limitations and restrictions thereof herein set forth shall be deemed dependent upon any other such voting powers, preferences and relative, participating, optional or other special rights of the Series A Preferred Stock or Series B Preferred Stock and qualifications, limitations and restrictions thereof unless so expressed herein.

*EXHIBIT T*

IN WITNESS WHEREOF, the undersigned authorized officer has executed this Certificate as of the date first set forth above.

BASELINE OIL & GAS CORP.

By: _____
       [Name]
       [Title]

*EXHIBIT U*

## CERTIFICATE OF INCORPORATION

### OF

### BASELINE OIL & GAS CORP.

I, the undersigned, for the purpose of incorporating and organizing a corporation pursuant to the General Corporation Law of the State of Delaware (the "*DGCL*"), do hereby certify as follows:

### ARTICLE I

The name of the corporation is Baseline Oil & Gas Corp. (the "*Corporation*").

### ARTICLE II

The address of the registered office of the Corporation in the State of Delaware is 1209 Orange Street, County of New Castle, Wilmington, Delaware 19801, and the name of the registered agent at that address is The Corporation Trust Company.

### ARTICLE III

The duration of the Corporation is perpetual.

### ARTICLE IV

The purpose for which the Corporation is organized is to conduct any lawful business and to promote any lawful act or activity for which corporations may be organized under the DGCL.

### ARTICLE V

The total number of shares of capital stock that the Corporation shall have the authority to issue shall be divided into the following classes. The first class shall consist of two million (2,000,000) shares of Common Stock, par value $0.001 per share (the "*Common Stock*"). The second class shall consist of sixty thousand (60,000) shares of preferred stock, par value $0.001 per share (the "*Preferred Stock*"). Shares of Preferred Stock may be issued from time to time in one or more classes or series, with each such class or series to be so designated as to distinguish the shares thereof from the shares of all other classes and series. The Board is vested with the authority to divide the Preferred Stock into classes or series and to fix and determine the relative rights, preferences, qualifications and limitations of the shares of any class or series so established. Each share of Common Stock shall be entitled to one vote shall in all matters to be voted on by the holders of shares of Common Stock. Except as set forth in any designations of Preferred Stock by the Board, shares of Preferred Stock shall not be entitled to vote. Notwithstanding the foregoing, to the extent required by *11 U.S.C. § 1123(a)(6)*, the Corporation shall be prohibited from issuing any shares of nonvoting equity stock.

### ARTICLE VI

The Amended and Restated Bylaws of the Corporation (the "*Bylaws*") may be amended, altered, modified, or repealed by resolution adopted by the Board or the stockholders of the Corporation, subject to any provisions of law then applicable.

## ARTICLE VII

Election of directors at an annual or special meeting of stockholders need not be by written ballot unless the Bylaws of the Corporation shall so provide.

## ARTICLE VIII

To the fullest extent permitted by the DGCL, as in effect on the date hereof, and as hereafter amended from time to time, a Director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the DGCL or any successor statute is amended after adoption of this provision to authorize corporate action further eliminating or limiting the personal liability of Directors, then the liability of a Director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended from time to time, or such successor statute. Any repeal or modification of this Article VIII by the stockholders of the Corporation shall not affect adversely any right or protection of a Director of the Corporation existing at the time of such repeal or modification or with respect to events occurring prior to such time.

## ARTICLE IX

The Corporation shall indemnify every person who is or was a party or is or was threatened to be made a party to any action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of the fact that he or she is or was a Director or officer or is or was serving at the request of the Corporation as a Director, officer, employee, agent, or trustee of another corporation or of a partnership, joint venture, trust, employee benefit plan, or other enterprise, including service on a committee formed for any purpose (and, in each case, his or her heirs, executors, and administrators), against all expense, liability, and loss (including counsel fees, judgments, fines, ERISA excise taxes, penalties, and amounts paid in settlement) actual and reasonable incurred or suffered in connection with such action, suit, or proceeding, to the fullest extent permitted by applicable law, as in effect on the date hereof and as hereafter amended. Such indemnification may include advancement of expenses in advance of final disposition of such action, suit, or proceeding, subject to the provision of any applicable statute.

The indemnification and advancement of expenses provisions of this Article IX shall not be exclusive of any other right that any person (and his or her heirs, executors, and administrators) may have or hereafter acquire under any statute, this Certificate, the Bylaws, resolution adopted by the stockholders, resolution adopted by the Board, agreement, or insurance purchased by the Corporation or otherwise, both as to action in his or her official capacity and as to action in another capacity. The Corporation is hereby authorized to provide for indemnification and advancement of expenses through its Bylaws, resolutions of stockholders, resolution of the Board, or agreement, in addition to that provided by this Certificate.

## ARTICLE X

Meetings of stockholders may be held within or without the State of Delaware or by means of remote communication, as the Bylaws may provide. The books of the Corporation may be kept outside of the State of Delaware at such place or places as may be designated from time to time by the Board or in the Bylaws of the Corporation.

## ARTICLE XI

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate, in the manner now or hereafter prescribed by statute, and all rights conferred in this Certificate on the stockholders of the Corporation are granted subject to this reservation.

## ARTICLE XII

The name and mailing address of the incorporator is _____.

*[Signature Page Follows]*

IN WITNESS WHEREOF, I, the undersigned, being the incorporator hereinabove named, do hereby execute this Certificate this ___ day of _____, 2009.

_____
[NAME, TITLE]

*EXHIBIT V*

**BASELINE OIL & GAS CORP.**

**AMENDED AND RESTATED**

**BYLAWS**

As Adopted on _____, 2009

# I. STOCKHOLDERS' MEETINGS

1.1     Time and Place of Meetings.  All meetings of the stockholders of Baseline Oil & Gas Corp., a Delaware corporation (the "Corporation"), for the election of the members of the Board of Directors (each, a "Director") or for any other purpose will be held at such time and place, within or without the State of Delaware, as may be designated by the Board of Directors of the Corporation (the "Board") or, in the absence of a designation by the Board, the Chief Executive Officer, the President or the Secretary, and stated in the notice of meeting.  The Board may postpone and reschedule any previously scheduled annual or special meeting of the stockholders.

1.2     Annual Meeting.  An annual meeting of the stockholders will be held at such date and time as may be designated from time to time by the Board, at which meeting the stockholders will elect the Directors to succeed those whose terms expire at such meeting and will transact such other business as may properly be brought before the meeting.

1.3     Special Meetings.  Special meetings of the stockholders, unless otherwise prescribed by law or by the Certificate of Incorporation of the Corporation, as amended from time to time (the "Certificate"), may be called by the Chief Executive Officer or the President, and will be called by the Secretary upon receipt of a written request signed by a majority of the Board.  Any such request by a majority of the Board must be sent to the Secretary and must state the purpose or purposes of the proposed meeting.  The business transacted at any special meeting of stockholders will be limited to the purposes stated in the notice.

1.4     Notice of Meetings.  Written notice of every meeting of the stockholders, stating the place, if any, date, and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, will be given not less than 10 nor more than 60 calendar days before the date of the meeting to each stockholder of record entitled to vote at such meeting, except as otherwise required herein or by law.  Such notice shall include the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting.  Any meeting may be held without notice if all stockholders entitled to vote at such meeting are present in person, by proxy or by remote communication or if notice is waived in writing, either before or after the meeting, by those not present.  When a meeting is adjourned to another place, date, or time, written notice need not be given of the adjourned meeting if the place, date, and time thereof are announced at the meeting at which the adjournment is taken; *provided, however,* that if the adjournment is for more than 30 calendar days, or if after the adjournment a new record date is fixed for the adjourned meeting, written notice of the place, date, and time of the adjourned meeting must be given and conform to the terms of these Bylaws.  At any adjourned meeting, any business may be transacted which properly could have been transacted at the original meeting.

1.5     Inspectors.  The Board may appoint one or more inspectors of election to act as judges of the voting and to determine those entitled to vote at any meeting of the stockholders, or any adjournment thereof, in advance of such meeting.  The Board may designate one or more persons as alternate inspectors to replace any inspector who fails to act.  If no inspector or alternate is able to act at a meeting of stockholders, the presiding officer of the meeting may appoint one or more substitute inspectors.

1.6     Quorum.  Except as otherwise provided by law, the Certificate or these Bylaws, the holders of a majority of the shares of the Common Stock, issued and outstanding and entitled to vote, present in person, represented by proxy or by remote communication, will constitute a quorum at all meetings of the stockholders for the transaction of business thereat.  If, however, a quorum is not present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, will have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present or represented.  With respect to any matter requiring the vote of a separate class of the capital stock of the Corporation, the holders of a majority of the shares of such class issued and outstanding and entitled to vote, present in person, represented by proxy or by remote communication, will constitute a quorum at all meetings of such stockholders for the transaction of business with respect to any such matter.

1.7     Voting.  Except as otherwise provided by law, the Certificate or a preferred stock designation, each stockholder will be entitled at every meeting of the stockholders to one vote for each share of stock having voting power standing in the name of such stockholder on the books of the Corporation on the record date for the meeting and such votes may be cast either in person, by proxy or by remote communication.  Without affecting any vote previously taken, a stockholder may revoke any proxy that is not irrevocable by attending the meeting and voting in person, by revoking the proxy by giving notice to the Secretary, or by a later appointment of a proxy.  The vote upon any question brought before a meeting of the stockholders may be by voice vote, unless otherwise required by the Certificate or these Bylaws or unless the holders of a majority of the outstanding shares of Common Stock (determined on a fully-diluted basis) entitled to vote thereon present in person, by proxy or by remote communication at such meeting otherwise determine.  When a quorum is present at any meeting, an act of the stockholders will be determined by the affirmative vote of the holders of a majority of the Common Stock (determined on a fully-diluted basis) present in person or represented by proxy or by remote communication at the meeting and entitled to vote on the subject matter and which has actually been voted, except as otherwise provided by law, in these Bylaws, the Certificate, a preferred stock designation or a stockholders agreement to which the Corporation is a party.

1.8     Order of Business.  The Chairman of the Board, or such other officer of the Corporation designated by a majority of the Board, will call meetings of the stockholders to order and will act as presiding officer thereof.  Unless otherwise determined by the Board prior to the meeting, the presiding officer of the meeting of the stockholders will also determine the order of business and have the authority in his or her sole discretion to regulate the conduct of any such meeting, including, without limitation, (i) by imposing restrictions on the persons (other than stockholders of the Corporation or their duly appointed proxies) that may attend any such stockholders' meeting, and (ii) by determining the circumstances in which any person may make a statement or ask questions at any meeting of the stockholders.

1.9     Action by Consent.

(a)     Unless otherwise provided by law or in the Certificate, any action required or permitted to be taken at any annual or special meeting of stockholders of the Corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a written consent or consents

thereto, setting forth such action, is signed by the holders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voting and otherwise complies with Section 228 of the General Corporation Law of the State of Delaware (the "DGCL") (or any successor provision).

(b)     A telegram, cablegram or other electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, or by a person or persons authorized to act for a stockholder or proxyholder, shall be deemed to be written, signed and dated, provided that any such telegram, cablegram or other electronic transmission sets forth or is delivered with information from which the Corporation can determine (i) that the telegram, cablegram or other electronic transmission was transmitted by the stockholder or proxyholder or by a person or persons authorized to act for the stockholder or proxyholder and (ii) the date on which such stockholder or proxyholder or authorized person or persons transmitted such telegram, cablegram or electronic transmission. The date on which such telegram, cablegram or electronic transmission is transmitted shall be deemed to be the date on which such consent was signed. No consent given by telegram, cablegram or other electronic transmission will be deemed to have been delivered until such consent is reproduced in paper form and until such paper form is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office will be made by hand or by certified or registered mail, return receipt requested. Notwithstanding the foregoing limitations on delivery, consents given by telegram, cablegram or other electronic transmission may be otherwise delivered to the principal place of business of the Corporation or to an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded if, to the extent and in the manner provided by resolution of the Board. Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction is a complete reproduction of the entire original writing.

## II. DIRECTORS

2.1     Function. The business and affairs of the Corporation will be managed under the direction of its Board.

2.2     Number, Election and Terms. Subject to the Certificate, including the rights, if any, of any class of capital stock of the Corporation to designate and elect Directors and to designate and elect additional Directors under circumstances specified in the Certificate or in any preferred stock designation and subject to the provisions of any stockholders agreement to which the Corporation and the holders of a majority of the voting power of the Common Stock are parties, the authorized number of Directors shall be determined from time to time by a resolution passed by the Board. Directors shall be elected to office by the stockholders only in the manner and for the terms provided in the Certificate or these Bylaws. The election of Directors need not be by written ballot unless requested by the holders of a majority of the issued and outstanding Common Stock, present in person, by proxy or by remote communication, at a meeting of the stockholders at which Directors are to be elected.

2.3     Vacancies and Newly Created Directorships.  Subject to the Certificate and the provisions of any stockholders agreement to which the Corporation and the holders of a majority of the voting power of the Common Stock are parties, newly created directorships resulting from any increase in the number of Directors and any vacancies on the Board resulting from death, resignation, disqualification, removal or other cause will be filled solely by the Board, even though such number of Directors is less than a quorum of the Board.  Any Director elected in accordance with the preceding sentence will hold office for the remainder of the full term of the class of Directors in which the new directorship was created or the vacancy occurred and until such Director's successor is elected and qualified.

2.4     Removal.  Subject to the Certificate and the provisions of any stockholders agreement to which the Corporation and the holders of a majority of the voting power of the Common Stock are parties, any Director may be removed from office by the stockholders either with or without cause at any time by a vote of the holders of a majority of the shares of Common Stock of the Corporation, issued and outstanding and entitled to vote.

2.5     Nominations of Directors.  Subject to the Certificate and the provisions of any stockholders agreement to which the Corporation and the holders of a majority of the voting power of the Common Stock are parties, nominations of persons for election as Directors of the Corporation may be made only at an annual meeting of stockholders (i) by or at the direction of the Board or a committee thereof, or (ii) by any stockholder that is a stockholder of record at the time of giving of notice, who is entitled to vote for the election of Directors at such meeting.  All nominations by stockholders must be made pursuant to timely notice in proper written form to the Secretary.

2.6     Resignation.  Any Director may resign at any time by giving written notice of his resignation to the President or the Secretary.  Any resignation will be effective upon actual receipt by any such person or, if later, as of the date and time specified in such written notice.

2.7     Regular Meetings.  Regular meetings of the Board may be held immediately after the annual meeting of the stockholders and at such other time and place either within or without the State of Delaware as may from time to time be determined by the Board.  Notice of regular meetings of the Board need not be given.

2.8     Special Meetings.  Special meetings of the Board may be called by the Chairman of the Board or the President on 72 hours notice to each Director by whom such notice is not waived, given in accordance with Section 3.1, and will be called by the Chairman of the Board or the President in like manner and on like notice on the written request to the Chairman of the Board, the President or the Secretary of not less than two Directors.  Special meetings of the Board may be held at such time and place either within or without the State of Delaware as is determined by the Board or specified in the notice of any such meeting.

2.9     Quorum.  At all meetings of the Board, a majority of the members of the Board will constitute a quorum for the transaction of business.  Except for the designation of committees as hereinafter provided and except for actions required to be taken by a majority of the entire Board, or by a class (or a portion of a class) of capital stock of the Corporation by these Bylaws, the Certificate or any stockholders agreement to which the Corporation and the

holders of a majority of the voting power of the Common Stock are parties, the act of a majority of the Directors present at any meeting at which there is a quorum will be the act of the Board. If a quorum is not present at any meeting of the Board, the Directors present thereat may adjourn the meeting from time to time to another place, time, or date, without notice other than announcement at the meeting, until a quorum is present.

2.10   <u>Participation in Meetings by Telephone Conference</u>. Members of the Board or any committee designated by the Board shall be entitled to participate in any meeting of the Board or any such committee, as the case may be, by means of telephone conference or similar means of remote communication by which all persons participating in the meeting can hear each other, and such participation in a meeting will constitute presence in person at the meeting.

2.11   <u>Committees</u>.

(a)   The Board may designate one or more committees, each such committee to consist of two or more Directors and each to have such lawfully delegable powers and duties as the Board may confer.

(b)   Each committee of the Board will serve at the pleasure of the Board or as may be specified in any resolution from time to time adopted by the Board. The Board may designate one or more Directors as alternate members of any such committee, who may replace any absent or disqualified member at any meeting of such committee.

(c)   Except as otherwise provided by law, and except for the power to amend these Bylaws or the Certificate (except, to the extent authorized by a resolution of the Board, to fix the designations, preferences and other terms of any series of Preferred Stock), adopt an agreement of merger or consolidation, authorize the issuance of stock, declare a dividend, or recommend to the stockholders the sale, lease, or exchange of all or substantially all of the Corporation's property and assets, a dissolution of the Corporation, or a revocation of a dissolution, and subject to the provisions of the Certificate and any stockholders agreement to which the Corporation and the holders of a majority of the voting power of the Common Stock (determined on a fully-diluted basis) are parties, any committee of the Board will have and may exercise all the powers and authority of the Board in the direction of the management of the business and affairs of the Corporation. Any such committee designated by the Board will have such name as may be determined from time to time by resolution adopted by the Board. Unless otherwise prescribed by the Board, a majority of the votes of the members of any committee of the Board will constitute a quorum for the transaction of business, and the act of a majority of the votes of the committee members present at a meeting at which there is a quorum will be the act of such committee. Each committee of the Board may prescribe its own rules for calling and holding meetings and its method of procedure, subject to any rules prescribed by the Board, and will keep a written record of all actions taken by it.

2.12   <u>Compensation</u>. The Board may establish the compensation for, and policies and procedures for the reimbursement of the expenses of, Directors payable for membership on the Board and on committees of the Board, attendance at meetings of the Board or committees of the Board, and for other services by Directors to the Corporation.

2.13    Rules. The Board may adopt rules and regulations for the conduct of meetings and the oversight of the management of the affairs of the Corporation, not inconsistent with these Bylaws.

2.14    Action by Consent. Any action required or permitted to be taken at any meeting of the Board, or of any committee thereof, may be taken without a meeting, if prior to such action all members of the Board or the committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes or proceedings of the Board or committee.

## III. NOTICES

3.1    Generally. Except as otherwise provided by law, these Bylaws, or the Certificate, whenever by law or under the provisions of the Certificate or these Bylaws notice is required to be given to any Director or stockholder, it will not be construed to require personal notice, but such notice may be given in writing, by mail or courier service, addressed to such Director or stockholder, at the address of such Director or stockholder as it appears on the records of the Corporation, with postage thereon prepaid, and such notice will be deemed to be given (i) by mail 72 hours after the same is deposited in the United States mail, or (ii) by courier service one business day after having been sent for next-day delivery by a nationally recognized overnight courier service. Notice to Directors may also be given by telephone, facsimile, electronic mail or similar medium of communication and, if given in any such manner will be deemed to be given on the date sent, receipt confirmed in each case.

3.2    Waivers. Whenever any notice is required to be given by law or under the provisions of the Certificate or these Bylaws, a waiver thereof in writing, signed by the person or persons entitled to such notice, whether before or after the time of the event for which notice is to be given, will be deemed equivalent to such notice. Attendance of a person at a meeting will constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

## IV. OFFICERS

4.1    Officers; Election. The officers of the Corporation shall be elected by the Board of Directors and shall consist of the Chief Executive Officer, the President, the Treasurer and the Secretary, and the Board of Directors may, if it so determines, elect from among its members a Chairman of the Board. The Board may also elect one or more Vice Presidents, one or more Assistant Vice Presidents, one or more Assistant Secretaries, one or more Assistant Treasurers and such other officers as the Board may deem desirable or appropriate and may give any of them such further designations or alternate titles as it considers desirable. Any number of offices may be held by the same person unless the Certificate or these Bylaws provides otherwise.

4.2    Term of Office; Resignation; Removal; Vacancies. Unless otherwise provided in the resolution of the Board of Directors electing any officer, each officer shall hold office until his or her successor is elected and qualified or until his or her earlier resignation or removal. Any officer may resign at any time upon written notice to the Board or to the President or the

Secretary of the Corporation. Such resignation shall take effect at the time specified therein, and unless otherwise specified therein no acceptance of such resignation shall be necessary to make it effective. The Board may remove any officer with or without cause at any time. Any such removal shall be without prejudice to the contractual rights of such officer, if any, with the Corporation, but the election of an officer shall not of itself create contractual rights. Any vacancy occurring in any office of the Corporation by death, resignation, removal or otherwise may be filled by the Board at any regular or special meeting.

      4.3     Chairman of the Board. The Chairman of the Board, if any, shall preside at all meetings of the Board of Directors and of the stockholders at which he shall be present and shall have and may exercise such powers as may, from time to time, be assigned to him by the Board of Directors.

      4.4     Chief Executive Officer. The Chief Executive Officer shall be the chief executive and principal policymaking officer of the Corporation. Subject to the authority of the Board of Directors, he shall formulate the major policies to be pursued in the administration of the Corporation's affairs. He shall study and make reports and recommendations to the Board of Directors with respect to major problems and activities of the Corporation and shall see that the established policies are placed into effect and carried out under the direction of the Corporation's officers. In the absence of the Chairman of the Board, the Chief Executive Officer shall preside at meetings of the stockholders and of the Board of Directors.

      4.5     President. Subject to the provisions of Section 4.4, the President shall be the chief operating officer of the Corporation, shall exercise the powers and perform the duties which ordinarily appertain to that office and shall manage and operate the business and affairs of the Corporation in conformity with the policies established by the Board of Directors and by the Chief Executive Officer, or as may be provided for in these Bylaws. In connection with the performance of his duties, he shall keep the Chief Executive Officer fully informed as to all phases of the Corporation's activities. In the absence of the Chairman of the Board or the Chief Executive Officer, the President shall preside at meetings of the stockholders and of the Board of Directors. Notwithstanding any provision in these Bylaws to the contrary, if no Chief Executive Officer has been elected or designated, then the person serving as President shall be the Chief Executive Officer.

      4.6     Vice Presidents. Each Executive Vice President or Vice President, if any, shall have such powers and perform such duties as the Board of Directors may, from time to time, prescribe and as the Chief Executive Officer or President may, from time to time, delegate to him or her.

      4.7     Secretary. The Secretary shall have the duty to record the proceedings of the meetings of the stockholders, the Board of Directors and any committees in a book to be kept for that purpose, shall see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law, shall be custodian of the records of the Corporation, and, in general, shall perform all duties incident to the office of secretary of a Corporation and such other duties as may, from time to time, be assigned to him by the Board, the Chief Executive Officer or the President or as may be provided by law.

4.8     Treasurer. The Treasurer shall have charge of and be responsible for all funds, securities, receipts and disbursements of the Corporation and shall deposit or cause to be deposited, in the name of the Corporation, all moneys or other valuable effects in such banks, trust companies or other depositories as shall, from time to time, be selected by or under authority of the Board of Directors. The Treasurer shall keep or cause to be kept full and accurate records of all receipts and disbursements in books of the Corporation, shall render to the Chief Executive Officer and the President and to the Board, whenever requested, an account of the financial condition of the Corporation, and, in general, shall perform all the duties incident to the office of treasurer of a Corporation and such other duties as may, from time to time, be assigned to him by the Board, the Chief Executive Officer or the President or as may be provided by law.

4.9     Other Officers. The other officers, if any, of the Corporation shall have such powers and duties in the management of the Corporation as shall be stated in a resolution of the Board of Directors that is no inconsistent with these Bylaws and, to the extent not so stated, as generally pertain to their respective offices, subject to the control of the Board. The Board may require any officer, agent or employee to give security for the faithful performance of his or her duties.

## V. STOCK

5.1     Certificates. Certificates representing shares of stock of the Corporation will be in such form as is determined by the Board, subject to applicable legal requirements. Each such certificate will be numbered and its issuance recorded in the books of the Corporation, and such certificate will exhibit the holder's name and the number of shares and will be signed by, or in the name of, the Corporation by the Chairman of the Board, the President or a Vice President and also by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, if any, and may also be signed by, or bear the facsimile signature of, a duly authorized officer or agent of any properly designated transfer agent of the Corporation. Any or all of the signatures and the seal of the Corporation, if any, upon such certificates may be facsimiles, engraved or printed. Such certificates may be issued and delivered notwithstanding that the person whose facsimile signature appears thereon may have ceased to be such officer at the time the certificates are issued and delivered.

5.2     Classes of Stock. The designations, preferences and relative participating, optional, or other special rights of the various classes of stock or series thereof, and the qualifications, limitations, or restrictions thereof, will be set forth in full or summarized on the face or back of the certificates which the Corporation issues to represent its stock or, in lieu thereof, such certificates will set forth the office of the Corporation from which the holders of certificates may obtain a copy of such information at no charge.

5.3     Lost, Stolen, or Destroyed Certificates. The Secretary may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the Corporation alleged to have been lost, stolen, or destroyed, upon the making of an affidavit of that fact, satisfactory to the Secretary, by the person claiming the certificate of stock to be lost, stolen, or destroyed. As a condition precedent to the issuance of a new certificate or certificates, the Secretary may require the owners of such lost, stolen, or destroyed certificate or

certificates to give the Corporation a bond in such sum and with such surety or sureties as the Secretary may direct as indemnity against any claims that may be made against the Corporation with respect to the certificate alleged to have been lost, stolen, or destroyed or the issuance of the new certificate.

5.4     Record Dates.

(a)     In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which will not be more than 60 nor less than 10 calendar days before the date of such meeting. If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders will be at the close of business on the calendar day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the calendar day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of the stockholders will apply to any adjournment of the meeting; *provided, however,* that the Board may fix a new record date for the adjourned meeting.

(b)     In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board may fix a record date, which record date will not be more than 60 calendar days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose will be at the close of business on the calendar day on which the Board adopts the resolution relating thereto.

(c)     The Corporation will be entitled to treat the person in whose name any share of its stock is registered as the owner thereof for all purposes, and will not be bound to recognize any equitable or other claim to, or interest in, such share on the part of any other person, whether or not the Corporation has notice thereof, except as expressly provided by applicable law.

5.5     Transfer of Shares. Shares of stock of the Corporation shall be transferable only on the books of the Corporation by the holders thereof in person or by their duly authorized attorneys or legal representatives. Upon surrender to the Corporation or the transfer agent of the Corporation of a certificate representing shares duly endorsed or accompanied by proper evidence of succession, assignment, or authority to transfer, the Corporation or its transfer agent shall issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

5.6     Legends. The Board shall have the power and authority to provide that the certificates representing shares of stock bear such legends as the Board deems appropriate to assure that the Corporation does not become liable for violations of federal or state securities laws or other applicable law.

## VI. GENERAL

6.1     Fiscal Year. The fiscal year of the Corporation will end on December 31st of each year or such other date as may be fixed from time to time by the Board.

6.2     Seal. The Board may adopt a corporate seal and use the same by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

6.3     Books and Records. The Corporation shall keep correct and complete books and records of account, shall keep minutes of the proceedings of its stockholders, Board, and any committee of the Board, and shall keep at its registered office or principal place of business or at the office of its transfer agent or registrar, a record of its stockholders, giving the names and addresses of all stockholders and the number and class of the shares held by each.

6.4     Reliance Upon Books, Reports, and Records. Each Director, each member of a committee designated by the Board and each officer of the Corporation will, in the performance of his or her duties, be fully protected in relying in good faith upon the records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of the Corporation's officers or employees, or committees of the Board, or by any other person or entity as to matters the Director, committee member or officer believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

6.5     Time Periods. In applying any provision of these Bylaws that requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days will be used unless otherwise specified, the day of the doing of the act will be excluded and the day of the event will be included.

6.6     Dividends. Subject to provisions of applicable law and the Certificate and the provisions of any stockholders agreement to which the Corporation and the holders of a majority of the voting power of the Common Stock (determined on a fully-diluted basis) are parties, dividends may be declared by the Board at any time and from time to time and may be paid in cash, in property or in shares of stock of the Corporation. Such declaration and payment shall be at the discretion of the Board.

6.7     Resignation. Any committee member or officer may resign by so stating at any meeting of the Board or by giving written notice to the Board, the President or the Secretary. Such resignation shall take effect at the time specified therein, or immediately if no time is specified therein. Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

6.8     Securities and Other Corporations. The Chief Executive Officer, the President or any Vice President of the Corporation shall have the power and authority to transfer, endorse for transfer, vote and take any other action with respect to any securities of another issuer which may be held or owned by the Corporation and to make, execute and deliver any waiver, proxy or consent with respect to any such securities.

6.9   Amendments. Except as otherwise provided by law or by the Certificate, these Bylaws or any stockholders agreement to which the Corporation and the holders of a majority of the voting power of the Common Stock (determined on a fully-diluted basis) are parties, these Bylaws or any of them may be amended in any respect or repealed at any time, either (i) at any meeting of stockholders, provided that any amendment or supplement proposed to be acted upon at any such meeting has been described or referred to in the notice of such meeting, or (ii) at any meeting of the Board, provided that no amendment adopted by the Board may vary or conflict with any amendment adopted by the stockholders.

6.10   Certain Defined Terms. Terms used herein with initial capital letters that are not otherwise defined are used herein as defined in the Certificate.

## VII.  INDEMNIFICATION; TRANSACTIONS WITH INTERESTED PERSONS

7.1   Right to Indemnification. Each person who was or is made a party or is threatened to be made a party to or is involved (including without limitation, as a witness) in any actual or threatened action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she is or was a Director or officer of the Corporation or is or was serving at the request of the Corporation as a Director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to any employee benefit plan (hereinafter an "Indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a Director, officer, employee or agent or in any other capacity while serving as such a Director, officer, employee or agent, shall be indemnified and held harmless by the Corporation to the full extent authorized by the DGCL, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such amendment), or by other applicable law as then in effect, against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts to be paid in settlement) actually and reasonably incurred or suffered by such Indemnitee in connection therewith and such indemnification shall continue as to an Indemnitee who has ceased to be a Director, officer, employee or agent and shall inure to the benefit of the Indemnitee's heirs, executors and administrators; provided, however, that except as provided in Section 7.2 with respect to proceedings seeking to enforce rights to indemnification, the Corporation shall indemnify any such Indemnitee seeking indemnification in connection with a proceeding (or part thereof) initiated by such Indemnitee only if such proceeding (or part thereof) was authorized by the Board of the Corporation. The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that, if the DGCL requires, and advancement of expenses incurred by an Indemnitee in his or her capacity as a Director or officer (and not in any other capacity in which service was or is rendered by such Indemnitee while a Director or officer, including, without limitation, service to any employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking, by or on behalf of such Indemnitee, to repay all amounts so advanced if it shall ultimately be determined that such Indemnitee is not entitled to be indemnified under this Section 7.1, or otherwise. Without limiting the generality of the foregoing, the right to indemnification and advancement of

V- 11

expenses arising hereunder may not be eliminated or impaired by an amendment to these Bylaws after the occurrence of the act or omission that is the subject of the civil, criminal, administrative or investigative action, suit or proceeding for which indemnification or advancement of expenses is sought, regardless of when such action, suit or proceeding is commenced and regardless of when such indemnification or advancement of expenses is sought.

7.2     Right of Indemnitee to Bring Suit.  If a claim under this Article is not paid in full by the Corporation within sixty days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be twenty days, the Indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, to the extent successful in whole or in part, the Indemnitee shall be entitled to be paid also the expense of prosecuting such suit. The Indemnitee shall be presumed to be entitled to indemnification under this Article under submission of a written claim (and, in an action brought to enforce a claim for an advancement of expenses, where the required undertaking, if any is required, has been tendered to the Corporation), and thereafter the Corporation shall the burden of proof to overcome the presumption that the Indemnitee is not so entitled.  Neither the failure of the Corporation (including its Board, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such suit that indemnification of the Indemnitee is proper in the circumstances nor an actual determination by the Corporation (including its Board, independent legal counsel or its stockholders) that the Indemnitee is not entitled to indemnification shall be a defense to the suit or create a presumption that the Indemnitee is not so entitled.

7.3     Nonexclusivity of Rights.  The rights to indemnification and to the advancement of expenses conferred in this Article shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate, these Bylaws, agreement, vote of stockholders or disinterested Directors or otherwise.

7.4     Insurance, Contracts and Funding.  The Corporation may maintain insurance, at its expense, to protect itself and any Director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the corporation would have the power to indemnify such person against such expense, liability or loss under the DGCL.  The Corporation may enter into contracts with any Indemnitee in furtherance of the provisions of this Article and may create a trust fund, grant a security interest or use other means (including, without limitation, a letter of credit) to ensure the payment of such amounts as may be necessary to effect indemnification as provided in this Article.

7.5     Definition of Director and Officer.  Any person who is or was serving as a Director or officer of a wholly owned subsidiary of the Corporation shall be deemed, for purposes of this Article only, to be a Director or officer of the Corporation entitled to indemnification under this Article.

7.6     Indemnification of Employees and Agent of the Corporation.  The Corporation may, by action of the Board from time to time, grant rights to indemnification and advancement of expenses to employees and agents of the Corporation with the same scope and effect as the

provisions of this Article with respect to the indemnification and advancement of Directors and officers of the Corporation.

7.7     Transactions with Interested Persons.  No contract or transaction between the Corporation and any of its Directors or officers, or between the Corporation and any other corporation, partnership, association or other organization in which any of its Directors or officers is a director or officer or has a financial interest, shall be voided or voidable solely for that reason, or solely because the Director or officer is present at or participates in the meeting of the Board or committee thereof at which the contract or transactions is authorized or solely because his or her vote is counted for such purpose, if:

(a)     The material facts as to his or her relationship or interest and as to the contract or transaction are disclosed or are known to the Board or the committee, and the Board or committee in good faith authorizes the contract or transaction by the affirmative vote of a majority of the disinterested Directors, even though the disinterested Directors are less than a quorum;

(b)     The material facts as to his or her relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by the vote of the stockholders; or

(c)     The contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified by the Board, a committee thereof or the stockholders.

*[Remainder of Page Intentionally Left Blank]*

*EXHIBIT W*

$5,000,000

**BASELINE OIL & GAS CORP.**

**Series A 20% Senior Secured PIK Notes due 2014**

**PURCHASE AGREEMENT**

_____, 2009

This Agreement will confirm the arrangement between Baseline Oil & Gas Corp., a Delaware corporation (the "**Company**"), and the purchasers whose names and addresses are set forth on the signature pages hereof (collectively, the "**Purchasers**"), relating to the issuance and sale by the Company to the Purchasers of $5 million aggregate principal amount of its Series A 20% Senior Secured PIK Notes due 2014 (the "**Notes**") as described, and on the terms, conditions and other provisions contained, in this Agreement.

The Notes will be offered and sold to the Purchasers in a private placement without being registered under the Securities Act of 1933, as amended, and the rules and regulations of the Securities and Exchange Commission (the "**Commission**") thereunder (collectively, the "**Securities Act**"), in reliance upon Section 4(2) ("**Section 4(2)**") thereof and/or Regulation D ("**Regulation D**") thereunder in connection with and subject to the Company's Plan of Reorganization (the "**Plan**") confirmed by the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**") on _____, 2009.

The Notes are to be sold to the Purchasers pursuant to this Agreement (the "**Purchase Agreement**") to be entered into by the Company and the Purchasers and are to be issued pursuant to an Indenture (the "**Indenture**") to be entered into between the Company and The Bank of New York Mellon, as trustee (the "**Trustee**") and Collateral Agent (as defined below). The obligations of the Company under the Purchase Agreement and the Notes will be secured on a first priority basis by substantially all of the assets of the Company except for specified excluded assets (the "**Collateral**") pursuant to a security agreement (the "**Security Agreement**"), a deed of trust (the "**Deed of Trust**") and certain related security documents (collectively, the "**Collateral Agreements**") to be entered into among the Company and The Bank of New York Mellon, as collateral agent (the "**Collateral Agent**") for the ratable benefit of itself, the Trustee and the Purchasers (collectively, the "**Secured Parties**").

This Agreement, the Indenture and the Collateral Agreements are referred to herein collectively as the "**Transaction Documents**", and the transactions contemplated hereby and thereby are referred to herein collectively as the "**Transactions**".

The Company has prepared a Disclosure Statement dated as of July __, 2009 (the "**Disclosure Statement**") that has been filed with the Bankruptcy Court in connection with the Plan. All references in this Agreement to the Disclosure Statement or Plan include all documents and information contained in the Disclosure Statement or Plan and include such Disclosure Statement or Plan as amended or supplemented.

The Disclosure Statement, the Plan, the related Ballot and the documents attached thereto are referred to herein collectively as the "**Solicitation Package**".

### Section 1. Representations, Warranties and Agreements of the Company.

In addition to the other representations, warranties and agreements contained in the Agreement, the Company hereby represents, warrants and agrees with, the Purchasers as follows:

(i)     *No Material Misstatement or Omission.* The Solicitation Package, as of its date and as of the date hereof, did not and does not contain any untrue statement of a material fact and did not and does not omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(ii)    *Exchange Act Compliance.* The documents of the Company filed with the Commission as of their date and as of the date hereof, complied and comply in all material respects with the requirements of the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission thereunder (collectively, the "**Exchange Act**"). There are no contracts or other documents required to be described in such documents or to be filed as exhibits to such documents which have not been described or filed as required.

(iii)   *The Transaction Documents.* The Company has all necessary power and authority to execute and deliver the Transaction Documents and to perform its obligations thereunder; each of the Transaction Documents has been duly authorized, executed and delivered by the Company and constitutes a valid and binding agreement of the Company, enforceable against the Company in accordance with its terms; and the Indenture, when executed and delivered by the Company, will meet the requirements for qualification under the Trust Indenture Act of 1939, as amended, and the rules and regulations of the Commission thereunder (collectively, the "**Trust Indenture Act**").

(iv)    *The Notes.* The Company has all necessary power and authority to execute, issue and deliver the Notes; the Notes have been duly authorized for issuance

W-2

and sale by the Company, will be in the form contemplated by the Indenture and, when executed, authenticated and issued in accordance with the terms of the Indenture and delivered to and paid for by the Purchasers pursuant to the Purchase Agreement, will constitute valid and binding obligations of the Company, entitled to the benefits of the Indenture and the Collateral Agreements, enforceable against the Company in accordance with their terms.

(v)    *No Material Adverse Change.*  Except as otherwise disclosed in the Disclosure Statement, (i) there has been no material adverse change, or any development that could reasonably be expected to result in a material adverse change, in the condition, financial or otherwise, or in the earnings, business, operations or prospects, whether or not arising from transactions in the ordinary course of business, of the Company (any such change is called a "**Material Adverse Change**"); (ii) the Company has not incurred any material liability or obligation (including any off-balance sheet obligation), indirect, direct or contingent, not in the ordinary course of business nor entered into any material transaction or agreement not in the ordinary course of business; and (iii) there has been no dividend or distribution of any kind declared, paid or made by the Company on any class of capital stock or repurchase or redemption by the Company of any class of capital stock.

(vi)    *Incorporation and Good Standing of the Company.*  The Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of Delaware and has the power and authority to own, lease and operate its properties and to conduct its business as currently conducted an is proposed to be conducted, and to enter into and perform its obligations under the Transaction Documents. The Company is duly qualified as a foreign corporation, partnership or limited liability company, as applicable, to transact business and is in good standing in each jurisdiction in which such qualification is required, whether by reason of the ownership or leasing of property or the conduct of business, except where the failure to be so qualified would not, individually or in the aggregate, have a material adverse effect on the financial position, stockholders' equity, results of operations or business of the Company (a "**Material Adverse Effect**").

(vii)    *No Default; Non-Contravention of Existing Instruments; No Further Authorizations or Approvals Required.*  Except as disclosed in the Disclosure Statement, the Company is not (i) in violation of its charter or by laws, (ii) in default (or, with the giving of notice or lapse of time, would be in default or constitute a default) ("**Default**") under any indenture, mortgage, loan or credit agreement, note, contract, franchise, lease

or other instrument to which the Company is a party or by which it may be bound, or to which any of the property or assets of the Company are subject (each, an "**Existing Instrument**"), or (iii) in violation of any law, administrative regulation or administrative or court decree applicable to the Company except with respect to clauses (ii) and (iii) of this sentence, for such Defaults or violations as would not, individually or in the aggregate, result in a Material Adverse Effect. Except as disclosed in the Disclosure Statement, the Company's execution, delivery and performance of the Transaction Documents and the consummation of the Transactions, including the issuance and sale of the Notes (i) will not result in any violation of the provisions of the charter or bylaws of the Company, (ii) will not conflict with or constitute a breach of, or Default or a Debt Repayment Triggering Event (as defined below) under, or result in the creation or imposition of any security interest, mortgage, pledge, lien, charge, encumbrance or adverse claim upon any property or assets of the Company pursuant to, or require the consent of any other party to any Existing Instrument or other third party and (iii) will not result in any violation of any law, administrative regulation or administrative or court decree applicable to the Company except with respect to clauses (ii) and (iii) of this sentence, for such conflicts, breaches, Defaults, Debt Repayment Triggering Events or violations as would not, individually or in the aggregate, result in a Material Adverse Effect. No consent, approval, authorization or other order of, or registration or filing with, any federal, state, local or other governmental authority, governmental or regulatory agency or body, court, arbitrator or self-regulatory organization, domestic or foreign (each, a "**Governmental Authority**"), is required for the Company's execution, delivery and performance of the Transaction Documents and consummation of the Transactions, except (i) with respect to the confirmation of the Plan by the Bankruptcy Court, (ii) as required by the state securities or "blue sky" laws, (iii) for such consents, approvals, authorizations, orders, filings or registrations that have been obtained or made and are in full force and effect and (iv) the filing of UCC financing statements as contemplated by the Collateral Agreements. As used herein, a "**Debt Repayment Triggering Event**" means any event or condition that gives, or with the giving of notice or lapse of time would give, the holder of any note, debenture or other evidence of indebtedness (or any person acting on such holder's behalf) the right to require the repurchase, redemption or repayment of all or a portion of such indebtedness by the Company.

(viii)   *No Material Actions or Proceedings.* There are no legal or governmental actions, suits or proceedings pending or, to the best of the Company's knowledge, threatened (i) against or affecting the Company, (ii) which has as the subject thereof any officer or director of, or property owned or leased by, the Company or (iii) relating to environmental or discrimination matters, where in any such case (A) there is a reasonable

possibility that such action, suit or proceeding might be determined adversely to the Company or such officer or director, (B) any such action, suit or proceeding, if so determined adversely, would reasonably be expected to result in a Material Adverse Effect or adversely affect the consummation of the transactions contemplated by this Agreement or (C) any such action, suit or proceeding is or would be material in the context of the sale of Notes. No material labor dispute with the employees of the Company, or with the employees of any principal supplier of the Company, exists or, to the best of the Company's knowledge, is threatened or imminent.

(ix)    *Company Not an Investment Company.*   The Company has been advised of the rules and requirements under the Investment Company Act of 1940, as amended, and the rules and regulations of the Commission thereunder (collectively, the "**Investment Company Act**"). The Company is not, and after receipt of payment for the Notes will not be, an "investment company" within the meaning of Investment Company Act and will conduct its business in a manner so that it will not become subject to the Investment Company Act.

(x)    *No Registration Required Under the Securities Act.*   Assuming the accuracy of the representations and warranties of the Purchasers contained in the Ballot and the compliance of such parties with the agreements set forth herein and therein, it is not necessary, in connection with the issuance and sale of the Notes in the manner contemplated by the Transaction Documents, to register the Notes under the Securities Act or to qualify the Indenture under the Trust Indenture Act.

(xi)    *Collateral.*

(A)    In the case of Collateral constituting certificated securities or instruments, upon delivery to the Collateral Agent of the relevant certificates or instruments representing or evidencing such Collateral in accordance with the relevant Collateral Agreements, the Collateral Agent will obtain a valid and perfected security interest in such Collateral for the ratable benefit of the Secured Parties, subject only to the security interests, liens or encumbrances permitted under the Indenture, in each case, to the extent that a security interest in such Collateral may be perfected by possession.

(B)    Upon filing of (1) Uniform Commercial Code financing statements in the appropriate filing office naming the Company as the debtor and the Collateral Agent as the secured party and providing a sufficient description of the Collateral with respect to which the Company has purported to grant a security

interest, (2) any filings required with the United States Patent and Trademark Office with respect to such portion of the Collateral constituting registered patents and registered trademarks and (3) any filings required with the United States Copyright Office with respect to such portion of the Collateral constituting registered copyrights, the security interests granted pursuant to the Security Agreement in respect of such Collateral will constitute valid and perfected security interests, subject only to the security interests, liens or encumbrances permitted under the Indenture, on such Collateral described therein for the ratable benefit of the Secured Parties to the extent that a security interest in such Collateral may be perfected by such filings.

(C)     The Deed of Trust will be effective to grant a legal and valid mortgage Lien on all of the mortgagor's right, title and interest in the Deed of Trust Property (as defined in the Deed of Trust). When the Deed of Trust is duly recorded in the proper recorder's office or appropriate public records and the related recording fees and taxes in respect thereof are paid and compliance is otherwise had with the formal requirements of state or local law applicable to the recording of real estate mortgages generally, the Deed of Trust shall constitute a valid and perfected security interest in the related Deed of Trust Property, for the ratable benefit of the Secured Parties, subject only to the security interests, liens or encumbrances permitted under the Indenture and.

(D)     All information certified by the Chief Financial Officer of the Company in the Perfection Certificate delivered by such officer on behalf of the Company pursuant to the Security Agreement is true and correct.

(xii)    *Collateral Agreements.* Each Collateral Agreement creates a valid lien on, and enforceable security interests in favor of the Collateral Agent for the benefit of the Secured Parties in, all Collateral subject to such Collateral Agreement, which lien and security interests will secure the repayment of the Notes and the other obligations purported to be secured thereby; except that enforceability thereof may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability from time to time in effect relating to or affecting creditors' rights and general principles of equity (regardless of whether such enforcement is considered in a proceeding at law or in equity). The representations and warranties of the Company in the Collateral Agreements are true and correct (if such representations and warranties are not already qualified with respect to materiality) in all material respects.

(xiii)   *Certificates.*  Each certificate signed by any officer of the Company and delivered to the Purchasers shall be deemed a representation and warranty by the Company (and not individually by such officer) to the Purchasers with respect to the matters covered thereby.

The Company acknowledges that the Purchasers and, for purposes of the opinion to be delivered pursuant to Section 4 hereof, counsel to the Company, will rely upon the accuracy and truthfulness of the foregoing representations and hereby consents to such reliance.

### Section 2. Purchase, Sale & Delivery of the Notes.

**(a)**     ***Purchase and Sale of the Notes.***  Subject to the satisfaction or waiver of the conditions set forth in Section 4 below, the Company will issue and sell to the Purchasers and each of the Purchasers severally agrees to purchase from the Company, upon the terms, conditions and other provisions set forth herein, the aggregate principal amount of Notes set forth in Appendix 1 to this Agreement for the purchase price set forth therein (the "**Purchase Price**").

**(b)**     ***Delivery of the Notes at the Closing.***  Subject to the satisfaction or waiver of the conditions set forth in Section 4 below, the closing of the purchase and sale of the Notes (the "**Closing**") shall occur on _____ , 2009 (the "**Closing Date**") at the offices of Jones Day, 717 Texas, Suite 3300, Houston, Texas 77002, or such other location on which the Company and the Purchasers mutually agree.

**(c)**     ***Form of Payment.***  On the Closing Date, (a) the applicable Purchaser shall pay the applicable Purchase Price to the Company for Notes to be issued and sold to such Purchaser by wire transfer of immediately available funds in accordance with the Company's written wire instructions, pursuant to the amounts set forth on Appendix 1, and (b) the Company shall:  (i) deliver to the applicable Purchasers certificates duly executed on behalf of the Company representing the principal amount of Notes set forth on Appendix 1 or [(ii) cause the principal amount of Notes set forth on Appendix 1 to be delivered to the Purchasers in global form through the book-entry facilities of The Depository Trust Company ("**DTC**")].  The name(s) in which any such Notes are to be registered is set forth in Appendix 1.

### Section 3. Conditions of the Purchasers' Obligations.

The obligation of each Purchaser hereunder to purchase Notes at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that

these conditions are for such Purchaser's sole benefit and may be waived by such Purchaser at any time in its sole discretion:

(a)  **_Bankruptcy Court Approval; No Injunction._**  The Bankruptcy Court shall have issued an order confirming the Plan of Reorganization, the Transaction Documents and the transactions contemplated thereby.  The sale of the Notes shall not be enjoined (temporarily or permanently) on the Closing Date.

(b)  **_Officers' Certificate._**  On the Closing Date, the Purchasers shall have received a written certificate executed by the Chairman of the Board, Chief Executive Officer or President of the Company and the Chief Financial Officer or Chief Accounting Officer of the Company, dated as of the Closing Date, to the effect that:

> (A)  there has not occurred any Material Adverse Change;

> (B)  the representations, warranties and covenants of the Company set forth in Section 1(a) of this Agreement are true and correct with the same force and effect as though expressly made on and as of such Closing Date; and

> (C)  the Company has complied with all the agreements hereunder and satisfied all the conditions on its part to be performed or satisfied hereunder at or prior to such Closing Date.

(c)  **_Transaction Documents._**  A definitive, executed copy of each of the Transaction Documents in form and substance reasonably satisfactory to the Purchasers and duly executed and delivered by the Company and the other parties thereto, and the Notes, duly executed and delivered by the Company and, as applicable, duly authenticated by the Trustee, shall have been delivered to each of the Purchasers.

(d)  **_Collateral Agreements._**  The Collateral Agent shall have received (with a copy for the Purchasers):

> (A)  appropriately completed copies of Uniform Commercial Code financing statements naming the Company as a debtor and the Collateral Agent as the secured party and providing a sufficient description of the Collateral with respect to which the Company has purported to grant a security interest, or other similar instruments or documents to be filed under the Uniform Commercial Code of all jurisdictions as may be necessary or, in the reasonable opinion of the Collateral Agent and its counsel, desirable to perfect the security interests of the Collateral Agent pursuant to the Collateral Agreements;

(B)     appropriately completed copies of Uniform Commercial Code Form UCC-3 termination statements, if any, necessary to release all Liens (other than the security interests, liens or encumbrances permitted under the Indenture) of any Person in any Collateral described in or subject to any Collateral Agreement previously granted by any Person;

(C)     certified copies of Uniform Commercial Code Requests for Information or Copies (Form UCC 11), or a similar search report certified by a party acceptable to the Collateral Agent, dated a date reasonably near to the Closing Date, listing all effective financing statements which name the Company as the debtor, together with copies of such financing statements (none of which shall cover any Collateral described in any Security Document, other than such financing statements that evidence the security interests, liens or encumbrances permitted under the Indenture and other than such financing statements in respect of which a Form UCC 3 termination statement is to be filed on the Closing Date);

(D)     such other approvals, opinions, or documents as the Collateral Agent may reasonably request in form and substance reasonably satisfactory to the Collateral Agent; and

(E)     the Collateral Agent and its counsel shall be satisfied that (i) the Liens granted to the Collateral Agent, for the benefit of the Secured Parties in the Collateral described above is of the priority described in the Plan and Disclosure Statement; and (ii) no Lien exists on any of the Collateral described above other than the Liens created in favor of the Collateral Agent, for the benefit of the Secured Parties, pursuant to any Collateral Agreement, in each case subject to the security interests, liens or encumbrances permitted under the Indenture.

(e)     *Filing of Financing Statements*.  Provision shall have been made for (i) the filing of all Uniform Commercial Code financing statements or other similar financing statements in connection with the Collateral Agreements, (ii) the filing of all Uniform Commercial Code Form UCC-3 termination statements necessary to release all Liens (other than the security interests, liens or encumbrances permitted under the Indenture) of any Person in any Collateral described in or subject to any Collateral Agreement previously granted by any Person, (iii) the recording of the Deed of Trust in the proper recorder's office or appropriate public records, and (iv) the payment of all filing and recording fees, taxes and other costs in respect of the matters described in clauses (i) through (iii) above, in each case on or before the Closing Date.

(f)     *Additional Documents*.  On or before the Closing Date, the Purchasers shall have received such information and documents as they may reasonably require in order to evidence the accuracy of any of the representations and warranties, or the satisfaction of any of the conditions or agreements, herein contained.

**Section 4. Indemnification**.  The Company agrees to indemnify and hold harmless each of the Purchasers, their affiliates and their respective officers, directors, managers, members, partners, employees and agents, and any other persons controlling the Purchasers or any of their affiliates within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act (the Purchasers and each such other person being referred to as an "**Indemnified Person**"), to the fullest extent lawful, from and against all claims, liabilities, losses, damages and expenses (or actions in respect thereof), as incurred ("**Losses**"), to which such Indemnified Person may become subject under the Securities Act, the Exchange Act or other federal or state statutory law or regulation, or the laws or regulations of foreign jurisdictions where the Notes have been offered or at common law or otherwise (including in settlement of any litigation), insofar as such Losses (or actions in respect thereof as contemplated below) arises out of or is based upon:

(i)     any untrue statement or alleged untrue statement of a material fact contained in any materials or information provided to the Purchasers by, or with the approval in writing of, the Company in connection with the Plan, including the Solicitation Package, or the omission or alleged omission therefrom of a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; and

(ii)    any breach by the Company of any representation or warranty or failure to comply with any of the covenants and agreements contained in this Agreement; and

(iii)   to reimburse the Indemnified Person for all expenses (including, without limitation, reasonable fees and expenses of counsel chosen by Purchasers holding a majority of outstanding principal amount of the Notes) as such expenses are incurred by the Purchasers in connection with investigating, preparing, defending or settling any action or claim for which indemnification has or is reasonably likely to be sought by the Indemnified Person, whether or not in connection with litigation in which any Indemnified Person is a named party.

The indemnity agreement set forth in this Section 5 shall be in addition to any liabilities that the Company may otherwise have.

For purposes of this Section 5, each officer and employee of the Purchasers and each person, if any, who controls the Purchasers within the meaning of the Securities Act and the Exchange Act shall have the same rights to contribution as the Purchasers.

### Section 5. Effectiveness of this Agreement and Survival.

(a)  *Effectiveness.*  This Agreement shall become effective upon signing by the parties hereto.

(b)  *Survival.*  The respective representations, warranties and other statements of the Company and its officers and the agreements, covenants and the indemnities set forth in or made pursuant to this Agreement will remain in full force and effect, regardless of any investigation made by or on behalf of the Purchasers or the Company or any of its or their partners, officers or directors or any controlling person, as the case may be, and will survive delivery of and payment for the Notes sold hereunder or any termination of this Agreement (for whatever reason).

### Section 6. Miscellaneous.

(a)  *No Fiduciary Relationship.*  The Company hereby acknowledges that the Purchasers are acting solely as purchasers in connection with the purchase and sale of the Notes. The Company further acknowledges that the Purchasers are acting pursuant to a contractual relationship created solely by this Agreement entered into on an arm's length basis, and in no event do the parties intend that the Purchasers act or be responsible as a fiduciary to the Company or the Guarantors or their management, stockholders or creditors or any other person in connection with any activity that the Purchasers may undertake or have undertaken in furtherance of the purchase and sale of the Notes, either before or after the date hereof. The Purchasers hereby expressly disclaim any fiduciary or similar obligations to the Company or the Guarantors, either in connection with the Transactions or any matters leading up to such Transactions, and the Company hereby confirms its understanding and agreement to that effect. The Company and the Purchasers agree that they are each responsible for making their own independent judgments with respect to any such Transactions and that any opinions or views expressed by the Purchasers to the Company regarding such Transactions, including, but not limited to, any opinions or views with respect to the price or market for the Notes, do not constitute advice or recommendations to the Company. The Company and the Guarantors hereby waive and release, to the fullest extent permitted by law, any claims that the Company and the Guarantors may have against the Purchasers with respect to any breach or alleged breach of any fiduciary or similar duty to the Co-Issuers or the Guarantors in connection with the Transactions or any matters leading up to such Transactions.

    **(b)**    *Notices.* All communications hereunder shall be in writing and shall be mailed, hand delivered or telecopied and confirmed to the parties hereto as follows:

        (A)    if to the Company, shall be delivered or sent by mail, telex or facsimile transmission to it at: Baseline Oil & Gas Corp., Address: 411 Sam Houston Pkwy E., Suite 300, Houston, TX 77060, Attention: Thomas R. Kaetzer (fax: 281-591-610; telephone: 281-598-8017; email: tkaetzer@baselineoil.com);

        (B)    with a copy to Thompson & Knight LLP, Address: 333 Clay Street, Suite 3300, Houston, Texas 77002, Attention: Rhett G. Campbell Esq. (fax: 832-397-8260; telephone: 713-653-8660; email: rhett.campbell@tklaw.com); and

        (C)    (if to a Purchaser, shall be delivered or sent by mail, telex or facsimile transmission to the address set forth immediately below such Purchaser's name on the signature page hereto;

        with a copy to Jones Day, Address: 717 Texas, Suite 3300, Houston, Texas 77002, Attention: Alexander A. Gendzier, Esq. (fax: 212-755-7306; telephone: 212-326-7821; email: agendzier@jonesday.com).

    Any party hereto may change the address for receipt of communications by giving written notice to the others.

    **(c)**    *Successors.* This Agreement will inure to the benefit of and be binding upon the parties hereto, and to the benefit of the employees, officers and directors and controlling persons referred to in Section 5 and in each case their respective successors, and personal representatives, and no other person will have any right or obligation hereunder. The term **"successors"** shall not include any Purchaser.

    **(d)**    *Partial Unenforceability.* The invalidity or unenforceability of any Section, paragraph or provision of this Agreement shall not affect the validity or enforceability of any other Section, paragraph or provision hereof. If any Section, paragraph or provision of this Agreement is for any reason determined to be invalid or unenforceable, there shall be deemed to be made such minor changes (and only such minor changes) as are necessary to make it valid and enforceable.

    **(e)**    *Governing Law Provisions.* This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York. Any legal suit, action or proceeding arising out of or based upon this Agreement or the Transactions ("**Related**

**Proceedings**") may be instituted in the federal courts of the United States of America located in the Borough of Manhattan in the City of New York or the courts of the State of New York in each case located in the Borough of Manhattan in the City of New York (collectively, the "**Specified Courts**"), and each party irrevocably submits to the exclusive jurisdiction (except for proceedings instituted in regard to the enforcement of a judgment of any such court (a "**Related Judgment**"), as to which such jurisdiction is non-exclusive) of such courts in any such suit, action or proceeding.

      **(f)**    *General Provisions.*  This Agreement, the Indenture and the Collateral Agreements constitute the entire agreement of the parties to this Agreement and supersede all prior written or oral and all contemporaneous oral agreements, understandings and negotiations with respect to the subject matter hereof.  This Agreement may be executed in two or more counterparts, each one of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  This Agreement may not be amended or modified unless in writing by all of the parties hereto, and no condition herein (express or implied) may be waived unless waived in writing by each party whom the condition is meant to benefit.  The failure by any party to exercise any right or remedy under this Agreement or otherwise, or delay by a party in exercising such right or remedy, shall not operate as a waiver thereof.  The Section headings herein are for the convenience of the parties only and shall not affect the construction or interpretation of this Agreement.

      Each of the parties hereto acknowledges that it is a sophisticated business person who was adequately represented by counsel during negotiations regarding the provisions hereof, including, without limitation, the indemnification provision of Section *5,* and is fully informed regarding said provisions.  Each of the parties hereto further acknowledges that the provisions of Section *5* fairly allocate the risks in light of the ability of the parties to investigate the Company, its affairs and its business in order to assure that adequate disclosure has been made in the Plan and Disclosure Statement, as required by the Securities Act, the Exchange Act and any other applicable law.

IN WITNESS WHEREOF, the undersigned Purchasers and the Company have caused this Agreement to be duly executed as of the date first above written.

BASELINE OIL & GAS CORP.

By:_____
     Name:
     Title:

[PURCHASER]

By:_____
     Name:
     Title:

Address: _____
          _____
          _____

[PURCHASER]

By:_____
     Name:
     Title:

Address: _____
          _____

*EXHIBIT W*

## **Purchase Information**

| Purchaser (Name for Securities to be Registered in) | Principal Amount of Note | Aggregate Purchase Price |
|---|---|---|
| | | |