**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| IN RE: | § | CASE NO.  09-36291 |
| | § | |
| BASELINE OIL & GAS CORP., | § | |
| | § | |
| Debtor. | § | (Chapter 11) |
| | § | |

**DECLARATION OF THOMAS R. KAETZER IN SUPPORT OF VOLUNTARY
PETITION, FIRST DAY MOTIONS AND DESIGNATION
AS COMPLEX BANKRUPTCY CASE**

Pursuant to 28 U.S.C. § 1746, Thomas R. Kaetzer declares as follows:

1.      My name is Thomas R. Kaetzer.  I am a director and also the Chief Executive Officer of Baseline Oil & Gas Corp. ("Baseline" or the "Debtor"). My business address and telephone numbers are as follows:

> Thomas R. Kaetzer
> Baseline Oil & Gas Corp.
> 411 North Sam Houston Parkway East, Suite 300
> Houston, Texas 77060
> Phone:  (281) 591-6100

2.      I submit this Declaration based on personal knowledge in further support of (a) the voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") filed by Baseline on August 28, 2009 (the "Petition Date"); (b) the Notice of Designation of this case as a complex bankruptcy case; and (c) the following motions:

A.      EMERGENCY MOTION TO APPROVE (A) MAINTENANCE OF CERTAIN PREPETITION BANK ACCOUNTS AND CASH MANAGEMENT SYSTEM; AND (B) CONTINUED USE OF EXISTING CHECKS AND BUSINESS FORMS;

B.      EMERGENCY MOTION FOR APPROVAL OF INTERIM AND FINAL USE OF CASH COLLATERAL AND GRANT OF ADEQUATE PROTECTION;

C.     EMERGENCY MOTION TO APPROVE PAYMENTS TO ROYALTY OWNERS ON ACCOUNT OF PREPETITION AND POSTPETITION SALES OF OIL AND GAS;

D.     EMERGENCY MOTION FOR ORDER AUTHORIZING PAYMENT OF PREPETITION CLAIMS OF CRITICAL VENDORS;

E.     EMERGENCY MOTION FOR ENTRY OF AN INTERIM ORDER (A) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICES, (B) DETERMINING ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES AND (C) ESTABLISHING PROCEDURES FOR DETERMINING REQUESTS FOR ADDITIONAL ADEQUATE ASSURANCE OF PAYMENT FOR POSTPETITION UTILITY SERVICES;

F.     EMERGENCY MOTION FOR ORDER AUTHORIZING THE DEBTOR TO PAY PREPETITION SALES, USE, PROPERTY, SEVERANCE, FRANCHISE, AND OTHER TAXES AND RELATED OBLIGATIONS;

G.     EMERGENCY MOTION TO SCHEDULE HEARING DATE FOR (A) APPROVAL OF PREPETITION SOLICITATION; (B) CONFIRMATION OF PREPACKAGED PLAN OF REORGANIZATION; (C) APPROVAL OF ASSUMPTION OF EXECUTORY CONTRACTS; AND (D) GRANTING RELATED RELIEF;

H.     EMERGENCY MOTION TO ESTABLISH BAR DATE FOR FILING PROOFS OF CLAIM AND INTERESTS; AND

I.     EMERGENCY APPLICATION TO EMPLOY THOMPSON & KNIGHT LLP AS COUNSEL TO DEBTOR AND DEBTOR-IN-POSSESSION.

The foregoing are collectively the "First Day Motions".

3.     I further submit this Declaration to assist the Court and other interested parties-in-interest in understanding the circumstances that compelled the commencement of this Chapter 11 Case.

4.     The relief sought in the First Day Motions should enable the Debtor to effectively administer its estate.  I have reviewed the First Day Motions, and I believe the requested relief is necessary to ensure the success of the Debtor's reorganization.  Except as otherwise indicated, all facts as set forth in this Declaration are based upon my personal knowledge, my review of

relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

5.      On August 28, 2009 (the "Petition Date"), the Debtor commenced this case (the "Case") by filing a voluntary petition under the Bankruptcy Code.  Since the Petition Date, the Debtor has continued to operate and manage its business as debtor-in-possession pursuant to §§ 1107 and 1108(a) of the Bankruptcy Code.

A.      **Background**

6.      Baseline is a Houston, Texas-based independent oil and natural gas company engaged in the exploration, production, development, acquisition and exploitation of natural gas and crude oil properties, with interests in the following three core properties: (i) the Eliasville Field located in Stephens County in North Texas (the "Eliasville Field Properties") (ii) the Blessing Field in Matagorda County located onshore along the Texas Gulf Coast (the "Blessing Field Properties"); and (iii) the New Albany Shale play located in Southern Indiana (the "New Albany Shale Play").

7.      The Debtor was incorporated as a Nevada corporation in February 2004 under the name College Oak Investments, Inc., and changed its name to Baseline Oil & Gas Corp. on January 17, 2006. It is the surviving corporation of a merger transaction with Coastal Energy Services, Inc., a closely-held Delaware corporation ("Coastal"), that was effective on April 6, 2005. As a result of the merger, Coastal was treated as the "acquiring" company, and the historical financial statements of the Debtor were restated to be those of Coastal for financial accounting and reporting purposes. Coastal had been formed to engage in the energy business, and following the merger, the Debtor began pursuing opportunities in the energy industry and

more particularly, the oil and gas industries, which efforts culminated with the acquisitions during 2007 of its above referenced core properties.

**B.**   **Operations Overview**

8.    The Debtor's core properties cover approximately 39,945 net acres across the areas identified above. As of December 31, 2008, based on the reserve report prepared by Cawley, Gillespie & Associates, Inc., independent petroleum engineers ("CG&A" and the "CG&A Reserve Report"), the Debtor's proved reserves were 60.2 Bcfe, of which 46.5% were natural gas and 68.2% were proved developed. The SEC PV-10 of these proved reserves as of that date was $69.5 million. The CG&A Reserve Report assumes the Debtor will perform additional operations that require capital; however, the Debtor's liquidity problems have forced the Debtor to defer many of these operations. The Debtor's lack of liquidity and its resulting financial inability to sustain the level of capital expenditures assumed by the CG&A Report are important factors that should be kept in mind when reviewing that report. During 2008, the Debtor produced 2.8 Bcfe and had a proved reserve reduction of 6.7 Bcfe as a result of reserve revisions. The Debtor produced an additional 62.4 thousand barrels of oil and 257.8 million cubic feet of natural gas during the first quarter of 2009 and received an average price of $38.37 per barrel and $4.58 per thousand cubic feet, respectively, resulting in total oil and gas sales revenue for the quarter of $3.6 million, before the effects of hedging.

9.    The Debtor's proved reserves are primarily long-life crude oil located in the Eliasville Field and natural gas and condensate located in the Blessing Field. These two fields are characterized by over 50 years of development drilling and production history along with active participation by several industry leading companies in and around these fields. The New Albany Shale Play assets, which currently do not have any booked proved reserves, represent upside

potential that the Debtor is currently evaluating and developing with its operating partners, Atlas Energy Resources, LLC and El Paso Corporation, each of which brings significant regional expertise and financial and operational resources. The Debtor participated in the drilling of 17 (gross) wells during 2008 and performed 19 workovers on existing wells. Of the 17 wells drilled, 15 were development wells located in the Debtor's two operated Texas fields and 2 were non-operated exploratory wells drilled in the Southern Indiana acreage. All of the workovers were performed on wells in the two Texas fields.

### C.    Ownership

10.    The Debtor is a publicly-traded company incorporated on February 3, 2004, under the laws of the State of Nevada, whose common stock is presently quoted on the OTC Bulletin Board under the symbol "BOGA."

11.    On June 30, 2009, the Debtor had 300 million shares of common stock authorized under its charter documents, of which 151,497,530 shares of common stock are issued and outstanding and an additional 12,527,500 shares of common stock are issuable, pending vesting schedules in some instances, upon the exercise or conversion, as applicable, of outstanding warrants, options and other derivative securities. Although authorized under the charter documents, no shares of preferred stock are currently designated or outstanding. There were approximately 132 holders of record of the Debtor's common stock as of June 30, 2009. The largest shareholder is Third Point, LLC with beneficial ownership of 58.3% of the issued and outstanding common stock as of June 30, 2009.

12.    On July 1, 2009, the Debtor had outstanding indebtedness of $133.5 million, consisting chiefly of the Debtor's outstanding 15% Senior Secured PIK Notes due 2009 (the "15% Prepetition Notes") and the 12½% Senior Secured Notes due 2012 (the "12½% Prepetition

Notes") in the approximate aggregate principal amounts of $108.7 million and $15 million, respectively, and accrued interest thereon in the approximate aggregate amounts of $6.7 million and $937,500, respectively.

**D.**     **Core Properties**

13.     As stated above, the Debtor's assets consist chiefly of oil and natural gas properties covering approximately 39,945 net acres across the following three core areas: (i) the Eliasville Field Properties; (ii) the Blessing Field Properties; and (iii) the New Albany Shale Play.

*Eliasville Field Properties*

14.     On April 12, 2007, the Debtor acquired, effective February 1, 2007, a 100% working interest in 5,231 net acres in the Eliasville Field located in Stephens County in North Texas, roughly 90 miles west of Fort Worth, Texas for an adjusted purchase price of $27.05 million. The Eliasville Field was discovered in the 1920's and produces primarily from the Caddo Lime oil formation at a depth of 3,300 feet. During December 2008, this field produced at rates of 541 bopd and 71 mcfpd net to the Debtor's interest, for an equivalent net rate of approximately 553 boepd of production. There are 92 oil wells producing in the field, and a portion of it is operated as an active waterflood with 57 injection wells. There are 8 leases, 2 central operating facilities and 3 tank batteries.

15.     Proved net reserves have been estimated in the CG&A Reserve Report to be 4.5 MMBoe with a pre-tax PV-l0 value of $22.3 million, based on year-end SEC pricing. Of the proved reserves, 67.6% are proved developed producing, or PDP, 11.5% are proved developed non- producing, or PDNP and 20.9% are proved undeveloped, or PUD, reserves.

16.    The Debtor successfully drilled 11 proved undeveloped wells to the Caddo formation at 3,350 feet during 2008. All of the wells were on production by the end of December. The average initial daily rate for each new well has been approximately 32 bopd (8/8ths). In addition to drilling new wells, the Debtor also performed workovers on 12 low-rate or idle wells during 2008. These workovers were on oil wells, which were either returned to production, or on which perforations were added and/or stimulation was performed. One of the workovers involved the conversion of previously idle oil wells to waterflood injection service.

17.    The Debtor has identified 20 proved undeveloped locations to drill in the field and 27 additional workovers to be done as capital becomes available and oil prices improve.

*Blessing Field Properties*

18.    On October 1, 2007, the Debtor acquired, effective as of June 1, 2007, a working interest of over 95% in the Blessing Field Properties located onshore along the Texas Gulf Coast for an adjusted purchase price of $96.6 million. The Debtor operates 100% of the wells on these properties. During December 2008, this field produced at rates of 172 bopd and 2,642 mcfd net to the Debtor's interest, for an equivalent net rate of approximately 3,674 mcfepd. Proved net reserves on the Blessing Field Properties have been estimated in the CG&A Reserve Report to be 33.3 Bcfe with a pre-tax PV-10 value of $47.2 million based on year-end SEC pricing. Of the proved reserves, 12.5% are PDP, 47.0% are PDNP, and 40.5% are PUD reserves.

19.    The Blessing Field Properties are situated within the Blessing Field area, located in Matagorda County, Texas, on trend with several prolific Frio fields. Most of these fields were structural traps along down-to-the-coast growth faults containing normally pressured Frio sand reservoirs. A proprietary 3-D seismic survey was acquired over the area in 1996. As a result, a series of buried faults were identified that set up traps in the deeper, geopressured Frio section

basinward of Blessing Field. With the aid of this proprietary 3D seismic survey, 17 wells have been drilled and completed to date. Production in 5 separate fault blocks has been established, with proved and probable reserves identified in 21 different sands.

20.     The Debtor drilled four new wells in this field in 2008 and also performed seven workovers. All four new wells were drilled to an approximate depth of 12,000 feet, and all four were completed and are producing natural gas and condensate. The seven workovers were done to re-complete existing wells in new zones or add perforations to existing zones. Neither the new wells nor the workovers are performing as well as was anticipated.

*New Albany Shale Play Properties*

21.     The Debtor owns a direct working non-operating interest in leasehold interests covering approximately 171,000 gross (32,340 net) surface acres in the Illinois Basin located in Southern Indiana and known to overlay the New Albany Shale formation. The Debtor's total average working interest is approximately 18.5%, and its acreage is grouped into three separate areas of mutual interest, or AMIs, where the Debtor has varying working interests as follows:

      a.     19.7% working interest in approximately 122,000 gross acres (approximately 24,400 net acres) located primarily in Greene County and operated by Atlas Energy Resources, LLC ("Wabash AMI");

      b.     18.2% working interest in approximately 41,000 gross acres (approximately 7,380 net acres) located in Knox and Sullivan Counties and operated by Atlas Energy Resources, LLC ("Knox AMI"); and

      c.     6.9% working interest in approximately 8,000 gross acres (560 net acres) located in Greene County, operated by El Paso Corporation.

22.     The name "New Albany Shale" refers to a brownish-black shale exposed along the Ohio River at New Albany in Floyd County, Indiana, and present in the subsurface throughout much of the Illinois Basin. The Illinois Basin covers approximately 60,000 square

miles in parts of Illinois, Southwestern Indiana and Western Kentucky. The New Albany Shale has produced natural gas since 1858, mostly from wells located in Southwestern Indiana and Western Kentucky.

23.   Although the industry has reported a range of natural gas production rates and reserve potential in the New Albany Shale, there is not extensive production history from horizontal wells completed in the New Albany Shale, and the Debtor has no active production or proved reserves booked to its acreage position. The Debtor presently considers the acreage contained in its Knox AMI to be highly prospective, as it lies between active producing projects owned by Noble Energy to the north (southern Sullivan County) and El Paso Corporation to the southeast (Knox and Davies Counties).

24.   During 2008, the Debtor participated with its partners in the drilling of two vertical wells located in the Wabash AMI of Greene County, Indiana. Both wells had gas shows in the New Albany Shale but insufficient gas in the Devonian formation. The wells will be used in the development of the New Albany Shale formation. The Debtor also participated in the extension of certain oil and gas leases on its acreage. Currently, the Debtor's partner Atlas Energy Resources, LLC is planning to install gas gathering compression and treating facilities in 2009, as well as to drill up to 25 wells. The Debtor is evaluating its participation on a well by well basis, depending on drilling results, natural gas prices and available capital. The steep drop in natural gas prices that has occurred since mid-2008 is expected to slow the evaluation and development of the New Albany Shale Play, as the economics of this area require a relatively robust price environment in order to generate attractive rates of return.

25.   As is customary in the oil and natural gas industry, the Debtor can generally retain its interest in undeveloped acreage by drilling activity that establishes commercial production

sufficient to maintain the leases or by paying delay rentals during the remaining primary term of leases. The oil and natural gas leases in which the Debtor has an interest are for varying primary terms, and if production under a lease continues from the Debtor's developed lease acreage beyond the primary term, the Debtor is entitled to hold the lease for as long as oil or natural gas is produced.

###  E.    Events Preceding the Filing of Chapter 11

26.    Despite a number of identified opportunities for the Debtor to increase production and develop its reserve base through infill and step-out drilling of new wells, workovers on existing wells, stimulation of existing wells and the expansion of enhanced oil recovery projects such as waterflood operations, such efforts are heavily dependent on the availability of sufficient capital. A number of events set forth below have significantly adversely affected the Debtor's liquidity. As a result, the Debtor's production and attendant cash flow declined in the first quarter of 2009.

27.    The Debtor is facing significant repayment obligations with respect to outstanding prepetition notes, the majority of which were restructured during the fourth quarter of 2008. The 15% prepetition notes matured on June 15, 2009, and the 12½% Prepetition Notes that were not converted into 15% Prepetition Notes became due on October 6, 2008.

28.    During July 2008, funds managed by Third Point, LLC (collectively "Third Point") purchased and converted into equity all of the Debtor's $53.5 million in outstanding 14% Senior Subordinated Convertible Notes due 2013. The Debtor ultimately issued to Third Point a total of 117,035,248 shares of common stock, resulting in such investors holding approximately 77.25% of the Debtor's outstanding shares of common stock as of July 30, 2008. The purchase of these 14% Senior Subordinated Convertible Notes resulted in a "change of control," and as a

result, the Debtor was required to offer to purchase all $115 million in aggregate principal amount of its 12½% Prepetition Notes at a price of 101% of par. On August 8, 2008, the Debtor commenced a change of control offer in accordance with the provisions of the indenture governing the 12½% Prepetition Notes, which offer was accepted by all of the then 12½% Noteholders.  However, because of the turmoil and slowdown in transaction activity that occurred in the U.S. and global credit markets during September and October 2008, the Debtor was unable to obtain the loan and equity commitments required to complete the change of control purchase transaction for the 12½%  Prepetition Notes and defaulted on such obligations on October 6, 2008.

29.     After subsequent negotiations, the Debtor arrived at an agreement on October 29, 2008, with the holders of $100 million in principal amount of the 12½% Prepetition Notes to Jefferies & Company, Inc., Jefferies High Yield Trading, LLC, Third Point Offshore Master Fund, LP, and Third Point Ultra Master Fund, LP, to convert those notes to $106.7 million of 15% Prepetition Notes. The 15% Prepetition Notes provide for an interest rate of 15% per annum, paid quarterly, commencing January 1, 2009, with 12.5% required to be paid in cash and the remaining 2.5% required to be paid in kind in the form of additional principal amount of 15% Prepetition Notes. The interest payment due January 1, 2009, was paid by the Debtor.  The 15% Prepetition Notes (and any issued PIK notes) matured on June 15, 2009. The Debtor has no current means of re-paying the holders of the 15% Prepetition Notes

30.     The remaining $15 million in principal amount of the 12½% Prepetition Notes, which amount was not converted to 15% Prepetition Notes in October 2008, became due in full on October 6, 2008, upon the Debtor's failure to finance the purchase offer that was commenced

on August 6, 2008. This remaining principal amount continues to carry a cash interest rate of

12.5% per annum, payable semi-annually on October 1 and April 1st.

31.     In addition to the global credit crisis, since the Debtor issued the 15% Prepetition

Notes in October 2008, oil and natural gas prices declined significantly from mid-2008 levels.

Though oil prices have risen during 2009, natural gas prices have continued to decline, adding to

the Debtor's liquidity problem. As a result, the operating revenues and stock prices of many

publicly traded oil and gas exploration and production companies have fallen sharply. It has

become extremely difficult for below-investment grade companies such as the Debtor to raise

debt or equity capital in the U.S. markets. As a result of these factors, the Debtor defaulted on its

obligation to make the $4.29 million of cash interest payments due April 1, 2009, on the

Prepetition Notes, its obligation to issue any PIK notes with respect to the 15% Prepetition

Notes, and its obligation to pay the entire outstanding principal, together with accrued and

unpaid interest, on the 15% Prepetition Notes at their June 15, 2009 maturity. The principal

amount of the 15% Prepetition Notes, together with any accrued and unpaid interest thereon, has

become due and payable. The remaining principal amount of the 12½% Prepetition Notes,

together with any accrued and unpaid interest thereon, on which the Debtor has defaulted is also

due and payable.

32.     The Debtor acquired the Blessing Field Properties on October 1, 2007, for an

adjusted purchase price of $96.6 million. This acquisition occurred during a period when it was

common for companies acquiring oil and gas properties to assign value to proved, probable and

even possible reserve categories, and at a time when prices paid for oil and natural gas properties

in general were relatively high by historic standards. Such practices reflected the then widely-

held belief of industry observers and participants that oil and natural gas prices were likely to

remain at high levels relative to historic standards and that the use of new technologies had mitigated some of the risks traditionally associated with drilling successful oil and natural gas wells, regardless of the classification of the associated reserves as proved, probable or possible.

33.    Production from the existing producing wells located on the Blessing Field Properties began to decline significantly during the months leading up to the Debtor's October 2007 acquisition closing. Upon assuming ownership and operations of this field in October 2007, the Debtor also experienced a variety of operational problems on existing producing wells, which required costly (and in some cases, unsuccessful) remediation.

34.    The Debtor drilled five new wells on the Blessing Field Properties starting in the fourth quarter of 2007 and lasting throughout 2008. The drilling and completion costs of these five new wells were higher than anticipated, and the overall production rates and reserves were significantly lower than originally anticipated. As a result, the Debtor was not able to significantly increase its overall daily oil and natural gas production and cash flow generation to the degree originally expected during 2008. The Debtor was correspondingly unable to take advantage of the extremely high prices that prevailed during much of the first three quarters of 2008, as newly drilled wells generally failed to result in significant incremental volumes that could be hedged at high oil and natural gas prices. Combined with the steep decline in oil and natural gas prices that occurred during the last months of 2008, the disappointing performance of the Blessing Field Properties led to reductions in the Debtor's ability to service its debt and its ability to meet the terms of its credit agreements and indenture.

F.    **Chapter 11 Bankruptcy Case**

35.    The Debtor requires additional capital in order to survive.   The Debtor has engaged in lengthy and protracted negotiations with a substantial majority of its senior secured

noteholders that has resulted in a commitment to recapitalize the Debtor and obtain additional financing. These negotiations resulted in the prepackaged plan of reorganization that is being filed in this Case and the execution of a Plan Support and Lock Up Agreement by the Debtor and the majority of the senior secured noteholders. Because the Debtor has received a commitment for an exit facility from a majority of senior secured noteholders, subject to the terms and conditions of the Plan Support and Lock Up Agreement, the Debtor does not expect this Case to be protracted. In fact, the Debtor will request confirmation of the Plan at the earliest possible opportunity; indeed, the Debtor's cash budget filed with the cash collateral motion demonstrates that the Debtor needs to exit chapter 11 promptly or the Debtor may run out of cash. Specifically, the Debtor will request that the hearing to consider the adequacy of the written disclosure statement relating to the Plan and confirmation of the Plan occur as early as September 25, 2009.

36.     The Debtor believes that the length of its stay in chapter 11 must be as short as possible because of the Debtor's need for cash and in order to preserve the value of its assets and avoid the costs associated with obtaining debtor-in-possession financing that may otherwise be required.

G.     **Valuation of Assets by Independent Advisor**

37.     In June 2009, the Debtor engaged the corporate advisory and restructuring services of Grant Thornton LLP ("Grant Thornton") to perform various services, including a valuation of the Debtor's assets. The Grant Thornton valuation report dated June 16, 2009 assigns the Debtor a going-concern value of approximately $82 million. Such valuation was based upon Grant Thornton's analysis of (i) oil and gas companies with similar characteristics, (ii) the average market trading multiples of members of the Debtor's peer group, and (iii) the

Debtor's discounted cash flow, based upon a discount rate that incorporated the Debtor's inherent riskiness. In performing this analysis, it is the Debtor's understanding that Grant Thornton utilized the CG&A Report, adjusted to take into account the operations that Debtor could not perform due to lack of liquidity and also adjusted for somewhat higher prices in recent months.

**H.** **Other**

38.   On March 31, 2009, the Debtor had support equipment and other property and equipment valued at $364,339 (net of accumulated depreciation of $121,236). Such equipment and other property consist of land, vehicles, office furniture and equipment and computer software and, in accordance with GAAP, are valued at cost and depreciated over their estimated useful lives, using the straight-line method over estimated useful lives of 3 to 5 years. Additions are capitalized, and maintenance and repairs are charged to expense as incurred. Gains and losses on dispositions of equipment are reflected in income or loss from operations.

39.   The Debtor has negotiated an exit facility, which will provide $5 million in cash to use for operations and to make payments to the holders of claims, as set forth in the Plan. The reorganized Debtor proposes to pay all of the unsecured creditors in full in cash as soon as practicable on the later of (a) the effective date and (b) the date on which such claim becomes an allowed claim payable under applicable law or any agreement relating thereto.

*First Day Motions*

40.   I have reviewed the various First Day Motions filed contemporaneously herewith and discussed herein.[1]   The allegations contained in each of the First Day Motions are true and correct to the best of my knowledge, information, and belief.

---

[1] All capitalized terms not defined herein shall have the meaning ascribed to them in their respective First Day

**DECLARATION OF THOMAS R. KAETZER IN SUPPORT**
**OF VOLUNTARY PETITION, FIRST DAY MOTIONS AND**
**DESIGNATION AS COMPLEX BANKRUPTCY CASE- PAGE 15**
513796 000004 HOUSTON 658582.1

I.      **Emergency Motion to Approve (A) Maintenance of Certain Prepetition Bank
Accounts and Cash Management System; and (B) Continued Use of Existing
Checks and Business Forms**

41.      Before commencing this Case, the Debtor managed its cash receivables and
payables through a cash management system (the "Cash Management System") utilizing three
bank accounts maintained at BBVA Compass ("Compass").  A flowchart of the accounts is
attached as Exhibit A to the motion.

42.      The transition to (and expedited exit from) chapter 11 will be more orderly and
will minimize the disruption to the Debtor's operations if the Debtor is authorized to continue its
prepetition practices by using its Cash Management System and associated bank accounts.  The
Debtor's Cash Management System is an essential business practice and provides significant
benefits to the Debtor and its estate as it enables the Debtor to control corporate funds, ensure the
maximum availability of funds when necessary, and reduce borrowing costs and administrative
expenses by facilitating the movement of funds and by providing more timely and accurate
account balance information.

43.      Also, the Debtor maintains three bank accounts at Compass:  xx-xxx-0343 (the
"Operating Account"); xx-xxx-0351 (the "Royalty Account"); and xx-xxx-0335 (the "Revenue
Account").  Proceeds from the sale of hydrocarbons received by the Debtor related to its oil and
gas operations are wire transferred by the purchasers of production into the Revenue Account.
From there, the proceeds of production are divided into amounts due to royalty owners (and
moved to the Royalty Account) and amounts attributable to Baseline's working interest (and
moved to the Operating Account).  Requiring a change of wiring instructions to the purchasers of

production would likely entail a loss of revenue for a period of time, to the Debtor's great detriment.

44.    Having to replace the current Cash Management System would be costly and disruptive of the orderly collection of revenues by the Debtor, resulting in a significant adverse effect on the Debtor's reorganization efforts.  To ensure that all transfers and transactions will be documented in its books and records, the Debtor will continue to maintain records of all transfers within the Cash Management System.

45.    The Debtor has an inventory of check stock and business forms that would go to waste if new checks were to be ordered and used.  Moreover, requiring the Debtor to obtain new checks, which bear the designation "Debtor-in-Possession," would cause the Debtor to incur undue expense.

**J.**    **Emergency Motion for Approval of Interim and Final Use of Cash Collateral and Grant of Adequate Protection**

46.    The Debtor has an immediate need to use cash collateral (the "Cash Collateral") to continue the operation of its business.  Without such funds, the Debtor will not be able to pay costs and expenses, including but not limited to wages, salaries, rent, professional fees, general and administrative operating expenses, lease operating expenses, drilling costs, oil lease operations, and maintenance costs that arise in administration of this Case and in the ordinary course of the Debtor's business.

47.    Absent the ability to use the Cash Collateral, the Debtor will be forced to shut down its operations abruptly, which will negatively impact the value of its assets and reduce or eliminate any prospect for a successful reorganization and confirmation of the Debtor's prepackaged Plan.  An abrupt shut down will result in a severe and dramatic loss of asset value. Accordingly, the Debtor is requesting interim authority to use the Cash Collateral as set forth in

an interim budget until a final order granting the use of the Cash Collateral can be entered. The Debtor is without sufficient funds, other than the Cash Collateral, to operate for 15 or more days until a final hearing. The Debtor's inability to timely pay the ongoing costs and expenses will result in immediate and irreparable harm to the estate. The request for interim authorization seeks only that amount of Cash Collateral necessary to avoid immediate and irreparable harm to the Debtor's assets pending a final hearing.

K.     **Emergency Motion for Order Authorizing the Debtor to Pay Prepetition Sales, Use, Property, Severance, Franchise, and Other Taxes and Related Obligations**

48.     The Debtor seeks authority to pay prepetition property taxes (the "Property Taxes"), and federal, state and local severance taxes (the "Severance Taxes"), employment withholding taxes (the "Employment Taxes"), franchise and/or income taxes (the "Franchise Taxes") and other taxes (together with the Sales and Use Taxes, Property Taxes, Severance Taxes, Employment Taxes, and Franchise Taxes, the "Taxes") to the respective taxing authorities (collectively, the "Taxing Authorities"). Such relief shall be without prejudice to the Debtor's right to contest the amounts of any Taxes on any ground it deems appropriate. Additionally, the Debtor seeks entry of an order authorizing it to pay prepetition Taxes for which the applicable payment was remitted but had not cleared the Debtor's bank accounts as of the Petition Date.

49.     The failure to pay the Taxes could disrupt the Debtor's operations and reorganization efforts and impair its successful reorganization. As such, the immediate payment of the Taxes is in the best interest of the Debtor, its estate and its creditors.

L.    **Emergency Motion for Entry of an Interim Order (A) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (B) Determining Adequate Assurance of Payment for Future Utility Services, and (C) Establishing Procedures for Determining Requests for Additional Adequate Assurance of Payment for Postpetition Utility Services**

50.    Various utility companies provide the Debtor with traditional utility services (the "Utility Companies"), such as telephone and communication services, electricity, water, gas and other similar services that are necessary for the continued operation of the Debtor's day-to-day operations.  A list of all identified utility companies for each debtor is attached to the motion concerning utility services as Exhibit A (the "Utility Service List").  In some cases, the Debtor has paid a security deposit to the Utility Company.  As of the Petition Date, there are no defaults or arrearages with any Utility Company.  On average, the Debtors' aggregate monthly utility usage is approximately $275,000.

51.    Uninterrupted utility service is critical to the Debtor's ability to operate and maintain the value of its business and to maximize value for the benefit of the creditors.  The Debtor cannot operate its business without utility service.  Should any utility company refuse or discontinue service, the Debtor would be forced to cease or limit operations.  Such an interruption would substantially disrupt operations and result in loss of revenues, which could irreparably harm and jeopardize the reorganization efforts or other objectives of the Debtor.

M.    **Emergency Motion to Approve Payments to Royalty Owners on Account of Prepetition and Postpetition Sales of Oil and Gas Sales**

52.    The Debtor requests the authority to make all payments due to royalty owners in "pay" status in the normal course of business regardless of whether the royalty is due for production before or after the Petition Date.  The Debtor's oil and gas leases are the most important assets the Debtor owns.  The oil and gas leases are the lifeblood of the Debtor's

business.  Nonpayment of royalty could jeopardize the oil and gas leases and thus jeopardize the success of this reorganization.

53.    If the Debtor does not make the royalty payments, it risks litigation and other potentially precipitous action by the royalty owners.  Even though the Debtor believes that it would succeed in defending against such litigation and such actions, the expense of doing so will far exceed the costs of making the royalty payments and would put at risk the success of this reorganization.  I have been advised that royalty owners may be entitled to a lien on the proceeds of production to secure the obligation to pay royalties, as reflected in UCC § 9.343.  It is my understanding that royalty owners will be paid regardless, and it would be far better for the success and continued viability of the Debtor to pay them on a current basis.

54.    Additionally, payment to royalty owners affects the Debtor's image and its reputation in the oil and gas industry.  To conduct its oil and gas operations (both drilling, reworking, and producing), the Debtor is often required to physically go upon the land that is often owned by the royalty owner.  An unpaid royalty owner can make the Debtor's entry onto the premises to conduct operations difficult or impossible.  While the Debtor would have the right, in case of a lock-out, to seek legal assistance including writs from this Court and from local courts, the need for immediate access to conduct operations may render such ability meaningless.   We ask the Court to authorize the Debtor to pay royalty owners in the normal course of business.

**N.**    **Emergency Motion to Schedule Hearing Date for (A) Approval of Prepetition Solicitation; (B) Confirmation of Prepackaged Plan of Reorganization; (C) Approval of Assumption of Executory Contracts; and (D) Granting Related Relief**

55.    The Debtor needs a hearing on the confirmation of the Plan as soon as possible. As the Debtor intends to assume all of the executory contracts listed in the schedules, it also

requests that its motion to assume executory contracts be heard at the same time as the Plan. Accordingly, the Debtors are requesting that this Court schedule this hearing for September 25, 2009, or as soon as practicable.

56.    The Debtor also seeks relief from compliance with certain requirements in the Bankruptcy Rules and Bankruptcy Code.  Specifically, relying upon Bankruptcy Code § 341(e), the Debtor requests that this Court enter an order directing the Office of the United States Trustee not to convene a meeting of creditors or holders.  The Debtor believes that a waiver of the meeting of creditors and equity security holders is justified because the Debtor has filed a plan that proposes paying all unsecured creditors in full (100%), has commitments for exit financing sufficient to make these payments, and has sufficient votes from impaired classes to confirm its Plan. Consequently, the Debtor is requesting a confirmation hearing for September 25, 2009, or as soon as practicable, obviating the need for a meeting of creditors.

## CONCLUSION

57.    Approval of the First Day Motions is in the best interest of the Debtor's Estate.

58.    I have reviewed this Declaration and hereby declare under penalty of perjury that the foregoing is true and correct and within my own personal knowledge.

**Executed this 27th day of August, 2009.**

Thomas R. Kaetzer
Chief Executive Officer